UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| UNITEDHEALTHCARE | § | No. 5-18-CV-347-DAE |
| INSURANCE COMPANY, INC., | § | *Consolidated under* |
| UNITED HEALTHCARE | § | No. 5:17-CV-1016-DAE |
| SERVICES, INC., | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| vs. | § | |
| | § | |
| MICHAEL MURPHY, M.D., JESSE | § | |
| SAUCEDO, JR., SAMANTHA | § | |
| MURPHY, LYNN MURPHY, JULIE | § | |
| PRICER, MISSION TOXICOLOGY | § | |
| LLC, SUN CLINICAL | § | |
| LABORATORY LLC, SUN | § | |
| ANCILLARY MANAGEMENT | § | |
| LLC, INTEGRITY ANCILLARY | § | |
| MANAGEMENT LLC, | § | |
| ALTERNATE HEALTH LAB, INC., | § | |
| and LMK MANAGEMENT LLC, | § | |
| | § | |
| Defendants. | § | |

<u>ORDER DENYING DEFENDANTS' MOTIONS TO DISMISS</u>

Before the Court are two motions to dismiss under Rule 12(b)(6) filed

by two different sets of Defendants in this action.  (Dkts. ## 59, 60.)  Pursuant to

Local Rule CV-7(h), the Court finds these matters suitable for disposition without a

hearing.  After careful consideration of the memoranda filed in support of and in

opposition to the motions, the Court, for the reasons that follow, **DENIES**

Defendants' Rule 12(b)(6) Motions to Dismiss Plaintiffs' Complaint.[1]  (Dkts. ## 59, 60.)  However, the Court also **ORDERS** the Plaintiffs to **SHOW CAUSE** why their claim for fraudulent transfer should not be dismissed.

BACKGROUND

Plaintiffs in this action provide health insurance and administration of health plan benefits to insureds and plan participants.  (Dkt. # 1[2] at 9.)  Defendants in this action are a series of business entities and individuals involved with those entities who purport to provide medical laboratory testing for patients.  (Id. at 4–8.)

Defendant Sun Clinical Laboratory, LLC ("Sun") is licensed to perform laboratory services, but as alleged by Plaintiffs, Sun performed few, if any, of the lab services at issue in this case, instead paying other labs to actually

---

[1] Consolidated with this action is a related case in which two of the Defendants in this action are suing the Plaintiffs in this action and others for recovery of benefits under ERISA.  (See Case No. 5:17-CV-1016-DAE (W.D. Tex.)).  Defendants in that case have filed a motion to dismiss under Rule 12(b)(6).  Filed concurrently with this Order is a related Order adjudicating that motion to dismiss.  Because the facts alleged in each respective complaint are different, and because on a Rule 12(b)(6) motion to dismiss, like the instant motions, the Court is generally limited to considering the facts alleged in the complaint, the Court deems it prudent to issue separate orders, even though the cases are consolidated.

[2] "Dkt. # 1" as referred to in this order refers to Plaintiffs' complaint filed in Case No. 5:18-CV-347-DAE.  On September 20, 2018, this case was consolidated with Case No. 5:17-CV-1016-DAE, which involves many of the same parties and issue. All subsequent filings were ordered filed in the lead case, Case No. 5:17-CV-1016-DAE.  Accordingly, all other docket citations refer to documents filed on the docket in that case.

perform the services.  (Id. at 4.)  Defendant Mission Toxicology, LLC ("Mission")
is also licensed to perform laboratory services, but like Sun is alleged by Plaintiffs
to have performed few, if any of the lab services at issue in this case, instead
paying other labs to actually perform the services.  (Id.)  Defendant Sun Ancillary
Management, LLC ("SAM") "implements and manages 'lab programs' for rural
hospitals and provides marketing services, insurance verification services,
accessioning services, billing and collection services, and other management
services for those rural hospitals.  (Id. at 5.)  Defendant Integrity Ancillary
Management ("IAM") performs the billing and administrative services for the
related entities that are defendants in this action.  (Id.)  Defendants allegedly use
IAM as the rural hospitals' third-party biller to maintain control over the hospitals'
billing operations.  (Id.)  Defendant Alternate Health Labs, Inc. ("AHL")
performed the majority of the lab services that were billed to Plaintiffs.  (Id. at 6.)
Defendant LMK Management, LLC ("LMK") manages and operates AHL.[3]  (Id.)
Plaintiffs allege that these Entity Defendants, though legally distinct, in reality
operate as "a single business enterprise" for the purposes of carrying out the
alleged fraud against them.  (Id. at 5.)

---

[3] These entities will be collectively referred to as the "Entity Defendants."

Defendant Michael Murphy, M.D. ("Murphy") is the alleged architect of the fraudulent scheme that is the subject of this case and owns or controls the Entity Defendants. (Id. at 6.) Defendant Jesse Saucedo, Jr. ("Saucedo") is Murphy's business partner and founded, owns, and/or controls Mission, IAM, and LMK. (Id. at 6–7.) Defendant Samantha Murphy is Murphy's daughter and a manager and compliance officer at IAM. (Id. at 7.) Defendant Lynn Murphy is Murphy's wife and IAM's CEO. (Id.) Defendant Julie Price is IAM's CFO.[4] (Id.)

Plaintiffs' basic allegation is that Defendants are operating a health care fraud scheme, using financially-strained rural hospitals as "fronts" to submit to insurers, like Plaintiffs, bills for lab services that were not ordered or properly performed, and to inflate the prices of those services for their own financial gain. (Id. at 1.) Plaintiffs allege this scheme took various forms, but the basic premise is that Defendants paid kickbacks to physicians and contracted with two rural hospitals, Newman Memorial Hospital ("Newman") and Community Memorial Hospital ("CMH"), in order to receive referrals for laboratory testing services. (Id. at 11–15.) Defendants then either performed the tests themselves, or contracted with a third-party lab at a bulk rate discount to perform the tests. (Id. at 16.) Defendants then utilized Newman and CMH's statuses as network providers of

---

[4] These individuals will be collectively referred to as "Individual Defendants."

Plaintiffs to have the hospitals bill Plaintiffs at their network rate, before transferring the proceeds to themselves after they were received by the hospitals. (Id. at 18–23.)  According to Plaintiffs, these practices were fraudulent because Defendants made various misrepresentation to Plaintiffs in seeking reimbursement: double-billing for some services, misrepresenting where the lab services were referred and performed, misrepresenting who performed the lab services and the type of services that were performed, and misrepresenting why the services were ordered or performed and whether the services were performed at all.  (Id. at 25–28, 33–35.)

On the basis of these allegations, Plaintiffs bring the following six claims: (1) fraud and fraudulent disclosure; (2) tortious interference with contract; (3) liability under the Texas Theft Liability Act; (4) fraudulent transfers; (5) money had and received; and (6) negligent misrepresentation.  (Id. at 39–54.)

Entity Defendants and Individual Defendants now move separately to dismiss Plaintiff's claims under Federal Rule of Civil Procedure 12(b)(6).  (Dkts. ## 59, 60).  Plaintiffs filed responses in opposition to Defendants' motions. (Dkts. ## 70, 71.)  Defendants filed no replies in support of their motion, and the time in which to do so has now elapsed.

LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(6) authorizes dismissal of a complaint for "failure to state a claim upon which relief can be granted."  Review is limited to the contents of the complaint and matters properly subject to judicial notice.  See Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322 (2007).  In analyzing a motion to dismiss for failure to state a claim, "[t]he court accept[s] 'all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff.'"  In re Katrina Canal Beaches Litig., 495 F.3d 191, 205 (5th Cir. 2007) (quoting Martin K. Eby Constr. Co. v. Dallas Area Rapid Transit, 369 F.3d 464, 467 (5th Cir. 2004)).

To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must plead "enough facts to state a claim to relief that is plausible on its face."  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).

DISCUSSION

Entity Defendants' motion to dismiss and Individual Defendants' motion to dismiss raise two arguments in support of dismissal.  First, dismissal is appropriate because Plaintiffs' claims are preempted by ERISA.  (Dkts. ## 59; 60.)

Second, dismissal is appropriate because Plaintiffs' claims are insufficiently pled.

(Id.)  Individual Defendants' motion further asserts that the claims against them

should be dismissed because Plaintiffs cannot pierce the corporate veil.  (Dkt. # 60

at 18–19.)  Because both motions, and Plaintiffs' responses thereto, raise

essentially the same arguments related to preemption and sufficiency, the Court

will address the first two arguments raised by the motions together.  The Court will

then separately address Individual Defendants' piercing the corporate veil

argument.

## I.    ERISA Preemption

ERISA preempts "any and all State laws insofar as they may now or

hereafter relate to any employee benefit plan."  29 U.S.C. § 1144(a).  "A law

'relates to' an employee benefit plan, in the normal sense of the phrase, if it has a

connection with or reference to such a plan."  Shaw v. Delta Air Lines, Inc., 463

U.S. 85, 96–97 (1983).  However, in attempting to define the scope of what

"relates to" an employee benefit plan, the Supreme Court has "declined to apply an

'uncritical literalism' to the phrase, and observed that '[w]e simply must go beyond

the unhelpful text and the frustrating difficulty of defining its key term, and look

instead to the objective of the ERISA statute as a guide to the scope of the state law

that Congress understood would survive.'"  Access Mediquip L.L.C. v.

UnitedHealthcare Ins., Co., 662 F.3d 376, 382 (5th Cir. 2011), aff'd on reh'g, 698

F.3d 229 (5th Cir. 2012) (quoting N.Y. State Conference of Blue Cross & Blue

Shield Plans v, Travelers Ins. Co., 514 U.S. 645, 656 (1995)).  As explained by

Congress, the purpose of ERISA was to,

> protect interstate commerce and the interests of participants in
> employee benefit plans and their beneficiaries, by requiring the
> disclosure and reporting to participants and beneficiaries of financial
> and other information with respect thereto, by establishing standards of
> conduct, responsibility, and obligation for fiduciaries of employee
> benefit plans, and by providing for appropriate remedies, sanctions, and
> ready access to the Federal courts.

29 U.S.C.§ 1001(b).

Based on these objectives, the Fifth Circuit has adopted "a two part

test when a defendant argues that a claim is preempted by ERISA."  E.I. DuPont de

Nemours & Co. v. Sawyer, 517 F.3d 785, 799–800 (5th Cir. 2008).

> A defendant pleading preemption must prove that: (1) the claim
> addresses an area of exclusive federal concern, such as the right to
> receive benefits under the terms of the Plan; and (2) the claim directly
> affects the relationship among traditional ERISA entities—the
> employer, the plan and its fiduciaries, and the participants and
> beneficiaries.

Bank of La. v. Aetna U.S. Healthcare Inc., 468 F.3d 237, 242 (5th Cir. 2006)

(internal quotation marks omitted).  Because ERISA preemption is an affirmative

defense, the party asserting preemption bears the burden of proof on both elements.

Id.  Although ERISA's preemption language is "clearly expansive," the Supreme

Court has stated that "[p]re-emption does not occur if the state law has only a

tenuous, remote, or peripheral connection with covered plans, as is the case with many laws of general applicability." Travelers Ins. Co., 514 U.S. at 661.

The Court begins its analysis by noting that the issue of conflict preemption by ERISA as it relates specifically to allegations of fraud levelled at Sun and Mission Toxicology over their use of in network hospitals as a conduit for submitting insurance claims to insurers has already been passed on by the Southern District of Mississippi.  See Blue Cross & Blue Shield of Miss. v. Sharkey-Issaquena Cmty. Hosp., NO. 3:17-CV-338-DPJ-FKB, 2017 WL 6375954, at *1 (S.D. Miss. Dec. 13, 2017).  Presented by defendants in that case with many of what appear to be the same arguments as are presented here, the court in Blue Cross & Blue Shield of Mississippi declined to find the state law fraud-based claims preempted by ERISA.  Id. at *5.  That court concluded that neither part of the Fifth Circuit's ERISA preemption test was satisfied.  First, the plaintiffs' claims for "fraud, civil conspiracy, negligent misrepresentation, and unjust enrichment" did not "address areas of exclusive federal concern such as the right to receive benefits under the terms of the Plan" because "they [were] based on duties the parties owed each other under . . . state law . . . ." Id. at *4.  Second, neither party was acting as ERISA entities with respect to the billing for laboratory services and the frauds alleged.  Id. at *5.

This Court now reaches the same conclusion for similar reasons. First, finding Plaintiffs' claims not preempted vindicates, as opposed to frustrates, the purposes of ERISA.  See Trs. of AFTRA Health Fund v. Biondi, 303 F.3d 765, 776 (7th Cir. 2002) (finding that plan fiduciary's resort to common law fraud claims "to recoup monies . . . improperly expended as a result of . . . fraudulent conduct" was "far from thwarting ERISA's stated statutory objectives" but instead was "an attempt to protect the financial integrity of the [healthcare fund], which is certainly in the [p]lan participants' and beneficiaries' best interests, as well as being consistent with the Trustees' fiduciary obligations under ERISA").  Further, Plaintiffs' claims do not "subject plan administrators and plan sponsors to conflicting directives among States or between States and the federal government, or create a potential conflict in substantive law requiring the tailoring of plan and employer conduct to the peculiarities of the law of each state."  Id.  Therefore, the claims do not "threaten in any way Congress's goal of national uniformity in the administration of ERISA plans" and "[a]s such, the . . . claim[s are] quite remote from the areas with which ERISA is expressly concerned—reporting, disclosure, fiduciary responsibility, and the like.'"  Id. (quoting Ca. Div. of Labor Standards Enforcement v. Dillingham Const., N.A., Inc., 519 U.S. 316, 330 (1997).

Second, Plaintiff's state law tort claims do not address an area of exclusive federal concern.  Defendant's alleged intentional submission of false,

misleading, or incomplete information is not an area that Congress intended to regulate when it enacted ERISA.  See Blue Cross & Blue Shield of Miss., 2017 WL 6375954, at *4 ("[T]he state-law claims for breach of contract, fraud, civil conspiracy, negligent misrepresentation, and unjust enrichment do not address areas of exclusive federal concern such as the right to receive benefits under the terms of the Plan."); Aetna Life Ins. Co. v. Humble Surgical Hospital, No. H-12-1206, LLC, 2016 WL 7496743, at *3 (S.D. Tex. Dec. 31, 2016) ("The Act does not give comprehensive regulations and procedures for all eventualities that might be tangentially related to a benefit plan. It is silent about overpayment by an insurer to a provider.  Recourse to the common-law right to recover an insurer's overpayments does not interfere with the national scheme."); Fustok v. UnitedHealth Grp., Inc., 2013 WL 2189874, at *6 (S.D. Tex. May 20, 2013) ("Allowing this claim to go forward in no way compromises the purpose of Congress and does not impede federal control over the regulation of employee benefit plans. Therefore, the Court finds no ERISA preemption of United's fraud claim.").  As the Fifth Circuit has stated, in enacting ERISA, "Congress clearly did not intend to broadly immunize non-fiduciary parties" like a medical services provider "from liability under traditional state law contract and tort causes of action."  Lewis v. Bank of Am. NA, 434 F.3d 540, 544 (5th Cir. 2003).

Finally, in the context of this action, medical services providers like Defendants are not traditional ERISA entities.  See Memorial Hosp. Sys. v. Northbrook Life Ins. Co., 904 F.2d 236, 249 (5th Cir. 1990) (finding that "health care providers were not a party to" the "'bargain' that Congress struck in [passing] ERISA"); Blue Cross & Blue Shield of Miss., 2017 WL 6375954, at *5 (finding that, in the context of an insurer seeking to recover losses from paying claims that were fraudulently submitted, the insurer was "was not acting as a plan fiduciary" and that "it [was] beyond dispute" that the defendants, including defendants in this action Sun and Mission Toxicology, "were not ERISA entities" as to the fraud allegations).

Accordingly, the Court concludes that Plaintiffs' state law claims are not preempted by ERISA.[5]

---

[5] Multiple courts in multiple jurisdiction have reached similar conclusions in similar contexts.  See Trs. of the Nw. Laundry and Dry Cleaners Health & Welfare Trust Fund v. Burzynski, 27 F.3d 153, 157 (5th Cir. 1994) (affirming judgment against provider who committed fraud, under Texas law, by submitting claims for reimbursement and failing to disclose material information); Geller v. Cty. Line Auto Sales, Inc., 86 F.3d 18, 23 (2d Cir. 1996) (fraud claims brought by plan not preempted because "[t]he [ERISA] plan was only the context in which this garden variety fraud occurred."); Trs. Of AFTRA Health Fund v. Biondi, 303 F.3d 765, 779 (7th Cir. 2002) (holding ERISA preemption did not apply and that a person's "decision to commit fraud in the context of an employee benefit plan does not immunize him from tort liability under state law"); Conn. Gen. Life Ins. Co. v. Advanced Surgery Ctr. of Bethesda, LLC, No. 14-cv-02376, 2015 WL 4394408, at *17 (D. Md. July 15, 2015) (insurer's fraud and negligent misrepresentation claims not preempted because "the core allegations of misconduct . . . relate to the

II.    Sufficiency of the Pleadings

Defendants further argue that even if not preempted by ERISA, Plaintiffs' claims still fail because they are insufficiently pled.  (Dkts. ## 59 at 12–19; 60 at 10–18.)  The Court will address the arguments related to each of Plaintiffs' claims in turn.

A.    Fraud, Fraudulent Nondisclosure, and Negligent Representation

Defendants argue that Plaintiffs' claims for fraud and fraudulent nondisclosure and negligent misrepresentation must be dismissed because they do not meet the heightened pleading standard of Rule 9(b) and improperly rely on group pleading.  (Dkts. ## 59 at 12; 60 at 10.)  Rule 9(b) requires that "[i]n

—————————————

[provider-defendants'] fraudulent or negligent misrepresentations"); Dist. Council 16 N. Cal. Health & Welfare Trust Fund v. Sutter Health, No. 15-cv-00735, 2015 WL 2398543, at *1-6 (N.D. Cal. May 19, 2015) (ERISA did not preempt plan's unfair competition claim); Arapahoe Surgery Ctr. v. Cigna Healthcare, Inc., No. 13-cv-3422, 2015 WL 1041515, at *6–7 (D. Colo. March 6, 2015) (ERISA did not preempt insurer's state law claims against surgery center); Conn. Gen. Life Ins. Co. v. Advanced Chiropractic Healthcare, 54 F. Supp. 3d 260, 264–68 (E.D. N.Y. 2014) (ERISA did not preempt insurer's claims for fraud, unjust enrichment, and money had and received); Nutrishare, Inc. v. Conn. Gen. Life Ins. Co., No. 13-cv-02378, 2014 WL 1028351, at *5–8 (E.D. Cal. March 14, 2014) (ERISA did not preempt insurer's state statutory and common law claims); Aetna Health Inc. v. Health Goals Chiropractic Ctr., Inc., No. 10-cv-5216, 2011 WL 1343047, at *3–6 (D.N.J. April 7, 2011) (ERISA did not preempt insurer's common law claims); Aetna Health Inc. v. Srinivasan, No. 10-cv-4858, 2010 WL 5392697, at *3 (D.N.J. Dec. 22, 2010); Mass. Mut. Life Ins. Co. v. Marinari, No. 07-cv-2473, 2009 WL 5171862, at *6-9 (D.N.J. Dec. 29, 2009) (ERISA did not preempt insurer's claim under state fraud statute).

alleging fraud or mistake, a party must state with particularity the circumstances

constituting fraud or mistake."  Fed. R. Civ. P.  9(b).  Further, Rule 9(b)'s

heightened pleading standard also applies to claims for negligent misrepresentation

when "fraud and negligent misrepresentation claims are based on the same set of

alleged facts."  Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC, 594 F.3d 383,

387 n.3 (5th Cir. 2010).  In order to comply with the requirements of Rule 9(b), the

Fifth Circuit requires "a plaintiff to plead the time, place and contents of the false

representation, as well as the identity of the person making the misrepresentation

and what the person obtained thereby."[6]  U.S. ex. rel. Grubbs v. Kanneganti, 565

F.3d 180, 186 (5th Cir. 2009).  However, "Rule 9(b) does not 'reflect a subscription

to fact pleading' and requires only simple, concise, and direct allegations of the

circumstances constituting fraud, which after *Twombly* must make relief plausible,

not merely conceivable, when taken as true."  Id. (internal quotations and citations

omitted).

      To be liable for fraud, a defendant may either actively participate in

the fraud or with knowledge of the fraud, remain silent and gain some benefit.  See

---

[6] Where the facts relating to the alleged fraud are uniquely within the perpetrator's knowledge, "the pleading requirements of Rule 9(b) may be to some extent relaxed."  U.S. ex rel. Willard v. Humana Health Plan of Texas Inc., 336 F.3d 375, 385 (5th Cir. 2003).  The same holds true where the fraud occurred over a ling period of time and consists on numerous acts.  See U.S. ex rel. Johnson v. Shell Oil Co., 183 F.R.D. 204, 206 (E.D. Tex. 1998).

In re Arthur Andersen LLP, 121 S.W.3d 471, 481 (Tex. App.—Houston [14th Dist.] 2003, no pet.) (noting that a party "need not have made representations directly to the Plaintiffs" to be liable for fraud).  For that reason, it is not necessary that Plaintiffs allege that each Defendant specifically made a fraudulent misrepresentation directly to Plaintiffs in order for each Defendant to face liability for a fraudulent scheme.  See Indep. Receivables Corp. v. Precision Recovery Analytics, Inc., No. 11-008-LY, 2012 WL 13029375, at *2 (W.D. Tex. June 7, 2012) (explaining that "all who participate are liable for the fraud").  Instead, Plaintiffs need only allege that each Defendant had knowledge of the fraud or fraudulent scheme, and—with that knowledge—remained silent and gained benefit from the fraudulent scheme.  See In re Arthur Andersen LLP, 121 S.W.3d at 481 (noting that "although the [defendants] may not have misrepresented anything to the [p]laintiffs, they may be liable for fraud because they allegedly participated in the fraudulent transactions and reaped the benefits"); Bransom v. Standard Hardware, Inc., 874 S.W.2d 919, 924 (Tex. App.—Fort Worth 1994, writ denied) ("A party in interest may become liable by mere silent acquiescence and partaking of the benefits of the fraud.").

　　　　　Plaintiffs' complaint painstakingly alleges a scheme whereby Defendants: (1) induced requests for lab services by paying kickbacks to referral sources and falsely claiming to referral sources that Sun and Mission were part of

Plaintiffs network; (2) establishing "sham" lab programs with rural, in-network hospitals like Newman and CMH to launder claims for lab services, some of which were never ordered, never performed, were not ordered as performed, were double-billed, and/or for which results were never provided; (3) paid other labs to perform the services that were referred to Sun and Mission; (4) submitted claims to Plaintiffs using the rural hospitals' billing credentials; and then (5) instructed those rural hospital employees to transfer money reimbursed by Plaintiffs to the hospitals to Defendants.  (Dkt. # 1 at 10–23.)

Plaintiffs further allege that the misrepresentations made to them by Defendants include misrepresenting: (1) where the lab services were referred; (2) where the lab services were performed; (3) who performed the lab services; (4) the type of services that were performed; (5) the authorization of the services; (6) why the services were ordered or performed; and (7) whether the services were performed at all.  (Dkt. # 1 at 25–28, 33–35.)  In connection with these alleged misrepresentations, Plaintiffs attach to their complaint representative examples, including dates and amounts, of payment claims submitted by Defendants through both that contained each of these respective misrepresentations.  (Dkts. ## 1-1–15, Exs. A–O.)

Plaintiffs also specifically allege what role each Defendant, both business entities and Individual Defendants, played in executing the scheme.  For

instance, the complaint asserts that IAM "is the administrative hub for the scheme to defraud, acted as the billing agent, maintained the tracking of testing specimens, and submitted the allegedly false claims for lab services. (Dkt. # 1 at 18.) Sun allegedly "directed and participated in the submission of fraudulent claims . . . by gathering lab specimens and the requests for testing that were the basis for the submission of fraudulent claims." (Id. at 44.) The complaint alleges the same conduct against Mission. (Id. at 45.) SAM allegedly managed the lab programs for Newman and CMH and acted "as the conduit between Sun's gathering of lab specimens and requests for testing and using [Newman] and CMH to submit fraudulent claims." (Id.) AHL allegedly "perform[ed] the services that were billed for and suppl[ied] IAM with results reports that were then changed to make it appear that services were provided by the rural hospital whose billing credentials were used to submit the fraudulent claims." (Id.) LMK allegedly "manag[ed] AHL's performance of lab services that were used as the basis to submit fraudulent claims." (Id. at 46.)

Regarding the Individual Defendants, the complaint alleges Murphy, among other things, executed the agreements with Newman and CMH, instructed IAM to submit the claims involving false and fraudulent information, made kickback payments intended to induce physicians to refer lab testing to defendants, and instructed the rural hospitals to transfer the money they received from Plaintiff

to Defendants.  (Id. at 42.)  Similar allegations are made against Saucedo.  (Dkt. # 42–43.)  Samantha Murphy allegedly managed the claim submission process at IAM and covered up complaints of fraudulent billing.  (Id. at 43)  Lynn Murphy allegedly acted as IAM's CEO and oversaw IAM's submission of fraudulent claims and creation of fraudulent records, manage the brokering of lab specimens to various labs, and covered up the fraudulent scheme through communications with Newman and CMH.  (Id. at 44.)  And Pricer, as IAM's CFO, allegedly managed the creation of fraudulent invoices and other records and instructed the rural hospitals to transfer money to IAM, Sun, and Mission.  (Id.)  Finally, Defendants are alleged to have received upwards of $40 million dollars from Plaintiffs as undeserved payments for fraudulent claims.  (Id. at 28, 35.)

Notably, at least one other court in this Circuit has denied motions to dismiss—related to nearly identical allegations against some of the same defendants—on the basis that misleading claim forms can be basis for fraud claims.  See Sharkey-Issaquena, 2017 WL 6375954, at *8 ("The Court concludes that [Plaintiff] has sufficiently pleaded plausible fraud and negligent-misrepresentation claims" [because] "[Plaintiff] has alleged that every bill submitted by the Laboratories using [the hospital's] billing credentials misrepresented that the services rendered were covered and reimbursable under the Contract.").  Moreover, Plaintiffs' Complaint and attached exhibit in this case

18

appears to contain more detailed information than what was determined to be sufficient in Sharkey-Issaquena.

Based on these detailed allegations of the nature and mechanisms of the alleged scheme, each Defendants' alleged role in carrying it out, and how the Defendants allegedly benefitted by perpetrating it, the Court concludes that Plaintiffs have sufficiently plead their fraud and fraudulent nondisclosure, and negligent representation, claims with particularity as required under Rule 9(b).

B.     Fraudulent Transfer

Defendants argue that Plaintiffs' "claims for fraudulent transfers must be dismissed because the are insufficiently pled and lack any factual particularity with respect to intent."  (Dkts. ## 59 at 14; 60 at 13.)  Under Texas law, a cause of action for fraudulent transfer must assert that there was actual or constructive fraudulent intent.  See Walker v. Anderson, 232 S.W.3d 899, 914 (Tex. App.—Dallas 2007).  The Texas Business and Commerce Code sets out a list of facts and circumstances, known as "badges of fraud" to be considered in determining whether there was intent to defraud.  See id. (citing Tex. Bus. & Com. Code § 24.005(b)).

Under Federal Rule of Civil Procedure 9(b), intent may be alleged generally.  At least one district court in this circuit has framed the question of pleading intent at the motion to dismiss stage as "whether the plaintiff has alleged

enough facts, and with sufficient detail, for the court to reasonably infer that the defendants intended to hinder, delay or defraud . . . by consummating the allegedly fraudulent transfers.  U.S. Bank Nat'l Ass'n v. Verizon Comms. Inc., 817 F. Supp 2d 934, 940 n.1 (S.D. Tex. 2011).

On the arguments presented in Defendants' motions and Plaintiffs' responses, Defendants' motions must be denied as to these claims because Plaintiffs have pled facts indicating the presence of several badges of fraud, including that the transfers were made to insiders, that Defendants retained possession or control of the property transferred after the transfer, that the transfers were concealed, and that the value received for the transfer was not reasonably equivalent to the value transferred.  (See Dkt. # 1 at 15, 22–23, 24, 28–29, 35–36, 51–52.)  However, Plaintiffs' fraudulent transfer claim may be subject to dismissal for a separate reason not raised by Defendants' motions.  The Texas fraudulent transfer statute applies to "transfer[s] made or obligation[s] incurred by a debtor" that are "fraudulent as to a creditor."  Tex. Bus. & Com. Code. § 24.005(a). Plaintiffs have not alleged in their complaint that either Defendants, Newman, or CMH are debtors to Plaintiffs.  Accordingly, the Texas Fraudulent Transfer Act appears not to apply to the conduct complained of.  Plaintiffs are therefore **ORDERED TO SHOW CAUSE** as to why their claims for fraudulent transfer should not be dismissed for this reason.  See Davoodi v. Austin Indep. Sch. Dist.,

755 F.3d 307, 310 (5th Cir. 2014) ("[D]istrict courts should not dismiss claims <u>sua sponte</u> without prior notice and opportunity to respond."); <u>Lozano v. Ocwen Federal Bank</u>, FSB, 489 F.3d 636, 643 (5th Cir. 2007) ("Notice . . . allow[s] the [Plaintiffs] an opportunity to seek leave to amend their complaint to allege that cause of action properly."). **Plaintiffs shall file their response to this Order to Show Cause within fourteen days of the entry of this Order.** If Plaintiffs fail to respond in that time, Plaintiffs' fraudulent transfer claims shall be deemed dismissed.

C.    <u>Tortious Interference with Contract</u>

Under Texas law, there are four elements to successfully prove tortious interference with an exiting contract: "(1) an existing contract subject to interference, (2) a willful and intentional act of interference with the contract, (3) that proximately caused the plaintiff's injury, and (4) caused actual damages or loss." <u>Prudential Ins. Co. of Am. v. Fin. Review Servs., Inc.</u>, 29 S.W.3d 74, 77 (Tex. 2000). A plaintiff must present some evidence that a defendant knowingly induced one of the contracting parties to breach its contractual obligations. <u>Rimkus Consulting Grp., Inc. v. Cammarata</u>, 688 F. Supp. 598, 674–75 (S.D. Tex. 2010). "General claims of interference with a business relationship are insufficient to establish a tortious interference with contract claim." <u>Id.</u> at 675.

Plaintiffs identify two existing contracts: their network agreement with Newman and their network agreement with CMH.  (Dkt. # 1 at 23–24, 32, 46.)  Plaintiffs further allege that Defendants willfully and intentionally interfered with these contracts by inducing Newman and CMH to allow Defendants to use the hospitals in-network status and billing credentials to submit false claims for reimbursement by "disguise[ing] out-of-network lab services as though they were performed by CMH and [Newman], so that [Plaintiff] would incorrectly reimburse the insurance claims under the contracts negotiated between these rural hospitals and [Plaintiffs]."  (Id. at 46–48.)  Finally, Plaintiffs allege this interference caused actual damages proximately caused by Defendants by causing Plaintiffs to "make millions of dollars of payments to CMH and [Newman] under their contracts, which [Plaintiffs] otherwise would not have made."  (Id. at 47–48.)  These allegations are sufficient to state a claim for tortious interference with contract. See U.S. Enercorp, Ltd. v. SDC Mont. Bakken Expl., LLC, 966 F. Supp. 2d 690, 705–06 (W.D. Tex. 2013).

D. Texas Theft Liability Act Claim

To state a claim for theft under the Texas Theft Liability Act, a plaintiff must plead that: (1) the plaintiff had a possessory right to property; (2) the defendant unlawfully appropriated property in violation of the Texas Penal Code; and (3) the plaintiff sustained damages as a result of the theft.  Simmonds Equip.,

LLC v. GGR Int'l, Inc., 126 F. Supp. 3d 855, 870 (S.D. Tex. 2015).  Under the Texas Penal Code, a person commits the offense of theft if he "appropriates property with intent to deprive the owner of property . . . without the owner's effective consent."  Tex. Penal Code § 31.03.  "Appropriate" means "to bring about a transfer or purported transfer of title to or other nonpossessory interest in property, whether to the actor or another" or "to acquire or otherwise exercise control over property other than real property."  Id. at § 31.01(4).  Consent is not effective if "induced by deception or coercion."  Id. at § 31.01(3)(a).  And "Deception" means "creating or confirming by words or conduct a false impression of law or fact that is likely to affect the judgment of another in the transaction, and that the actor does not believe to be true."  Id. at § 31.01(1).  Finally, a Texas Theft Liability Act claim is not subject to the heightened pleading standards or Rule 9(b). Mid-Town Surgical Ctr., LLP v. Blue Cross Blue Shield of Texas, No. H–11–2086, 2012 WL 302805, at *5 (S.D. Tex. July 24, 2012).

Plaintiffs allege that Defendants unlawfully appropriate their property, in the form of money, through a variety of intentional deceptions, including misrepresenting: (1) where the lab services were referred; (2) where the lab services were performed; (3) who performed the lab services; (4) the type of services that were performed; (5) the authorization of the services; (6) why the services were ordered or performed; and (7) whether the services were performed

at all.  (Dkt. # 1 at 25–28, 33–35.)  For instance, Plaintiffs allege that Defendants

represented the services were referred to and performed by Newman, when in

Reality they were referred to and performed by Sun or Mission.  (Id. at 25).

Plaintiffs allege that Defendants submitted claims for services that had already

been billed using a different hospitals billing credentials.  (Id. at 26.)  And

Plaintiffs allege that Defendants submitted reimbursement claims under procedure

codes that did not accurately reflect the services already performed.  (Id. at 28.)

Plaintiffs also allege that Defendants forged lab results by altering the letterhead on

lab reports to make it look like Newman or CMH actually performed the testing

instead of Defendants.  (Id. at 20–21.)

　　　　Based on these allegations, the Court concludes that Plaintiffs'

complaint sufficiently pleads a claim under the Texas Theft Liability because it

alleges that Defendants brought about a transfer of or otherwise acquired more

than $40 million dollars that otherwise belonged to Plaintiffs by means of this

variety of intentional deceptions, rendering Plaintiffs consent to the transfer

ineffective.

　　　　E.　　Money Had and Received Claim

　　　　A claim for money had and received arises under Texas Law "when a

party obtains money which in equity and good conscience belongs to another."

Mims v. Stewart Title Guar. Co., 521 F. Supp. 2d 568, 574 (N.D. Tex. 2007).

(internal quotation marks omitted). "The doctrine is not based on wrongdoing on the part of the defendant but looks only to the justice of the case and inquires whether the defendant has received money which rightfully belongs to another." Id. (internal quotation marks omitted).

Defendants' only argument in its motion related to this claim is that they were properly paid for services rendered, meaning they have not received money which rightfully belongs to another. (Dkts. ## 59 at 18–19; 60 at 17–18.) However, this argument ignores the numerous allegations of fraud and misrepresentation, including overbilling and billing for services not actually rendered and billing for services never requested or authorized, that Plaintiffs assert are the reason the money was transferred to Defendants in the first place. (Dkt. # 1 at 6, 26, 27, 34.) Assuming Plaintiffs' myriad allegations are true, as the Court must on a motion to dismiss under Rule 12(b)(6), then equity and justice dictates that Defendants have received money which rightfully belongs to Plaintiffs.

Accordingly, the Court concludes that Plaintiffs have sufficiently pled their claim for money had and received.

III.    Piercing the Corporate Veil

Individual Defendants argue that the causes of action against them should be dismissed "because of [Plaintiffs'] failure to pierce the veil." (Dkt. # 60

at 18–19.)  However, the "longstanding rule" in Texas is that "a corporate agent is

personally liable for his own fraudulent or tortious acts."  Miller v. Keyser, 90

S.W.3d 712, 717 (Tex. 2002).  The Fifth Circuit has confirmed this principle,

stating "A corporation's [agent] is personally liable for tortious acts which he

directs or participates in during his employment."  O'Hare v. Graham, 455 F.

App'x 377, 380 (5th Cir. 2011) (quoting Leyendecker & Assocs., Inc. v. Wechter,

683 S.W.2d 369, 375 (Tex. 1984)).  Further, "[i]nstigating, aiding, or abetting the

wrongdoing constitutes participation."  Cass v. Stephens, 156 S.W.3d 38, 62 (Tex.

App.—El Paso 2014).  Thus, "[i]n and action seeking to hold an agent individually

liable for his tortious or fraudulent acts, the corporate veil is not required to be

pierced."  Sanchez v. Mulvaney, 274 S.W.3d 708, 712 (Tex. App.—San Antonio

2008).

In this case, Plaintiffs have alleged that the individual Defendants

were knowing participants in the alleged frauds perpetrated against them, the

manners in which they participated, and why they are liable.  (Dkt. # 1 at 6–8,

10–12, 37, 38, 41–44.)  Accordingly, the Individual Defendants are potentially

liable as principals for their individual conduct in relation to the allegedly

fraudulent scheme, and there is no need to pierce the corporate veil to hold them

so.

<u>CONCLUSION</u>

For the reasons stated, the Court **DENIES** Entity Defendants' and Individual Defendants' Motions to Dismiss (Dkts. ## 59, 60.)  The Court additionally **ORDER** the Plaintiffs to **SHOW CAUSE** why their claims for fraudulent transfer should not be dismissed.  **Plaintiffs shall file their response to this Order to Show Cause within fourteen days of the entry of this Order.**  If Plaintiff's fail to respond in that time, Plaintiffs' fraudulent transfer claims shall be deemed dismissed.

**IT IS SO ORDERED.**

**DATED**: San Antonio, Texas, August 20, 2019.

_____

David Alan Ezra
Senior United States Distict Judge