# Exhibit 1

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

MISSION TOXICOLOGY, LLC, and        )
SUN CLINICAL LABORATORIES, LLC,     )
                                    )
        Plaintiffs,                 )
                                    )
v.                                  )No. 5:17-CV-01016
                                    )(lead case)
UNITEDHEALTHCARE INSURANCE          )
COMPANY; UNITEDHEALTHCARE OF        )
TEXAS, INC.; and                    )
UNITEDHEALTHCARE SERVICES, INC.,    )
                                    )
        Defendants.                 )
_____)_____
UNITEDHEALTHCARE INSURANCE          )
COMPANY, INC., and                  )
UNITEDHEALTHCARE SERVICES, INC.,    )
                                    )
        Plaintiffs,                 )
                                    )
v.                                  )
                                    )
MICHAEL MURPHY, MD; JESSE           )
SAUCEDO, JR.; SAMANTHA MURPHY;      )C.A. No. 5:18-cv-00347
LYNN MURPHY; JULIE PRICER;          )(consolidated case)
MISSION TOXICOLOGY, LLC;            )
SUN CLINICAL LABORATORY, LLC;       )
SUN ANCILLARY MANAGEMENT, LLC;      )
INTEGRITY ANCILLARY MANAGEMENT,     )
LLC; ALTERNATE HEALTH LAB, INC.;    )
and LMK MANAGEMENT, LLC,            )
                                    )
        Defendants.                 )

DEPOSITION OF CHARLES BEAUFORD
Dallas, Texas
Tuesday, November 26, 2019

Reported by:

REBECCA A. GRAZIANO, CSR, RPR, CRR

JOB NO. 171987

Page 34

A.  I sent one client there.

Q.  And when you say you "sent one client there," are you able to clarify what you mean?

A.  I sent one physician.  It was a while ago.  I don't remember who it was, but I sent one physician there.

Q.  Do you mean that you arranged for that physician to order testing from Sun Clinical Labs?

A.  Correct.

Q.  All right.  And are you familiar with Jesse Saucedo?

A.  Yes.

Q.  And how did you meet Mr. Saucedo?

A.  I was connected -- introduced to him through some representative -- I don't remember who they are, it was years ago -- that had done some work with Mission.

Q.  So are you familiar with Mission Toxicology?

A.  Yes.

Q.  All right.  What did you understand to be the difference between Sun and Mission?

Oh, and sorry.  To clarify, if I

Page 35

refer to "Sun," I'm referring to Sun Clinical Laboratories.

A.  I understood them both to be laboratories.

Q.  Um-hum.

A.  I don't know if I understood a difference.

Q.  So to you, the -- you understood them to be essentially the same?

MS. ZERNER:  Objection; vague.

THE WITNESS:  I understood them to be similar -- similar businesses.

BY MR. GOKEY:

Q.  Similar in that they both provided laboratory testing services?

A.  I understood them to provide laboratory testing services.

Q.  All right.  I am going to hand you another document and this will be marked as Exhibit 228.

(Exhibit 228, Management Services Agreement; Bates CTRL0031670, marked for identification.)

MR. GOKEY:  I don't think I'm going to break 300 today, but we're getting

Page 36

there.

(Discussion off the record.)

BY MR. GOKEY:

Q.  All right.  So you can take a moment to review this and familiarize yourself, if that helps.

So, Mr. Beauford, am I correct that this is a contract between you and Mission?

A.  You are correct.

Q.  All right.  And is this the only contract that you had with Mission?

A.  To my remembrance, yes.

Q.  All right.  So if you turn to Page 8 -- there are teeny, tiny page numbers at the bottom -- am I correct that that is your signature for BeauMed Consultants?

A.  Yes, sir.

Q.  All right.  And am I correct that Jesse Saucedo, Jr., is listed as the signatory for Mission?

A.  Yes, sir.

Q.  All right.  So flipping back to the first page here, looking at the first paragraph under "Management Services Agreement," am I correct that this contract defines

Page 37

BeauMed Consultants, LLC, as manager?

A.  Yes.

Q.  And Mission Toxicology, LLC, is defined as "Mission"?

A.  Yes.

Q.  So in the first paragraph under "Recitals," am I correct that this says that:  "Mission is engaged in the business of owning and operating a clinical laboratory, defined as the 'Lab,' specializing in the provision of toxicology/blood testing services"?

A.  Yes, sir.

Q.  So then do you understand that this is a contract pertaining to a clinical lab owned and operated by Mission?

A.  Yes, sir.

Q.  All right.  Having reviewed this contract a second ago, did you see it discuss any other labs?

MS. ZERNER:  Objection; the document speaks for itself.

THE WITNESS:  No, I didn't.  Not to my knowledge.

BY MR. GOKEY:

Q.  I see.  So this agreement pertains

10 (Pages 34 to 37)

Page 38

only to a lab owned and operated by Mission?
A.    To my understanding.
Q.    All right.  So if you look at the next paragraph, am I correct that this states: "Manager is in the business of, among other businesses, managing and arranging for the availability of ancillary health care services for and on behalf of networks of physicians and physician group practices, defined as the 'Network Physicians'"?
A.    Yes.
Q.    All right.  So were these the same physicians that we were talking about a moment ago?
A.    Can you clarify?
Q.    So BeauMed has relationships with some physicians; is that correct?
A.    Correct.
Q.    And were those the same physicians with whom BeauMed was connecting Mission in this contract?
A.    One of the laboratories I connect them with, yes.
Q.    So if you look at the next paragraph, am I correct that this says:

Page 39

"Manager desires to arrange for the lab to be available for use by the network physicians for the provision of medically necessary toxicology testing services"?
A.    Yes.
Q.    So then did you understand that this would be a contract under which BeauMed's physicians would order testing from a lab owned and operated by Mission?
MR. CARR:  Objection; form; vague; assumes facts not in evidence.
MS. ZERNER:  Same objection.
THE WITNESS:  I understood the physicians, based upon their desire to test their patients and based upon what Mission offered, to elect to send patient submission.  That's what I understand.
BY MR. GOKEY:
Q.    So do you mean by that that they would order tests from Mission?
A.    Yes.
Q.    And order those tests to be performed at a lab owned and operated by Mission?
A.    To my understanding, yes.

Page 40

Q.    So if you'll just take a second to quickly review Paragraph 2 here under "Recitals," it lists a series of services BeauMed contracted to perform.
All right.  So is it fair to say that one duty BeauMed assumed under this contract was to market the services of Mission's laboratory to physicians?
A.    Yes.
Q.    And is it fair to say that another duty that BeauMed assumed under this contract was to facilitate the orders of toxicology testing from Mission?
A.    Yes.
Q.    And, again, these were -- strike that.
So BeauMed didn't assume any duty with respect to marketing other labs other than the laboratory owned and operated by Mission; is that correct?
A.    That's incorrect.
Q.    "That's incorrect," did you say?
A.    Because Mission was one of the laboratories that I offered to physicians that I knew based upon their desires for testing and

Page 41

what they asked for.
Q.    I see.  So under this contract, though, under this contract, BeauMed only assumed duties related to marketing services from Mission; correct?
A.    Yeah, that's correct.
Q.    And those were the services of a clinical laboratory owned and operated by Mission?
A.    Yes, sir.
Q.    Did you perform any services for Mission that weren't governed by this contract?
A.    Not to my understanding, sir.
Q.    Okay.  So if you turn the page here to Page 2, and if you look at Paragraph 4, "Management Fee," am I correct that this states that "throughout the term of this agreement, Mission agrees to pay manager a monthly fee, defined as the 'Management Fee,' with regard to the services provided to each network physician in an amount equal to 60 percent of the net collections"?
A.    Yes.
Q.    All right.  And am I correct that if you look at the following sentence, it

11 (Pages 38 to 41)

Page 42

specifies these are net collections that were received by Mission?

A. Yes.

Q. So did that mean that you would receive 60 percent of the net collections on tests ordered from BeauMed physicians?

A. Yes.

Q. And so the more tests those physicians referred, the more BeauMed would get paid?

A. Would you clarify that?

Q. So if a physician orders one test, that means that BeauMed gets paid 60 percent of what Mission gets for that one test; correct?

A. Correct.

Q. And if that same physician that orders ten tests, that means BeauMed gets 60 percent of what Mission receives for those ten tests; right?

A. Yes.

Q. So then the more tests a physician orders, the more BeauMed is paid under this agreement; is that correct?

A. In theory, yes.

Q. Why only in theory?

Page 43

A. Because I really don't know exactly how and when they got paid, and I just know the reports they gave me.

Q. But assuming that they got paid for every test, is that how it would work?

A. Yes.

Q. All right. And so earlier you said that you did little work for Sun; is that correct?

A. I referred one physician there that ordered some testing.

Q. And was that on similar terms that we were just discussing here under this contract?

A. It was presumed. I never had a contract with Sun.

Q. When you say "presumed," was there any discussion about the terms on which you would be sending this physician to Sun?

A. Yes.

Q. And do you recall those terms?

A. It would be similar to -- to the 60 percent agreement represented here.

Q. I see.

So you would get 60 percent of what

Page 44

Sun received from tests ordered by that physician?

A. Yes.

Q. And how did you decide whether to market Sun or Mission to a particular physician?

A. It was all based upon what the physician wanted in terms of service, what they wanted as it relates to testing, if they had satisfaction with a current vendor or if they were seeking something else.

My job was to make sure that the laboratory was credible, that they offered the testing the physicians wanted, and then to connect them and let the doctor make the decision at that point.

Q. So then did you connect physicians with both Sun and Mission and then they would make the decision?

A. There was only one instance where a physician opted to send some tests to Sun.

Q. But did you market Sun's clinical lab to others?

A. No, I didn't.

Q. Um-hum.

Page 45

A. It was only one physician I spoke to about it.

Q. So for both Sun and Mission, though, your work was essentially marketing the services of their clinical labs?

A. Yes, sir.

Q. To solicit business from physicians?

A. On an as-needed basis.

Q. And that business was the referral of specimen?

A. Yes, sir.

Q. Okay. And as compensation, Sun and Mission would pay you commissions equal to about 60 percent of what it received?

A. On Mission. I never received any payment from Sun.

Q. And do you know why that was?

A. I have no idea, besides the fact I heard it was -- it was some internal issues. I have no details of it. I never really got a good answer about that.

Q. But at least with Mission, it was your understanding that they would essentially split the fees that they received for receiving -- performing the test with you?

12 (Pages 42 to 45)

Page 54

that correct?

A. Yes.

Q. So did you understand that Mission was in-network with all five major payors?

A. To my knowledge.

Q. All right. And this one is going to be a little bit challenging to find because you're going to have to flip through a bunch of pages here.

A. Yes, sir.

Q. But if you flip through these various charts, you will eventually reach the first page after the charts, which says "Tips & Tools" at the bottom.

A. Got it.

Q. All right. So in the upper right-hand corner, am I correct that this says: "Mission Toxicology works hard to keep our testing cost-efficient by negotiating in-network status with most major insurance companies"?

A. Yes, sir.

Q. And so you understood, then, that Mission Toxicology had negotiated in-network status with most major insurance companies?

Page 55

A. To my knowledge, yes, sir.

Q. And that was information you would have conveyed to the doctors you marketed to?

A. To my knowledge, yes, sir.

Q. And so if you look below that, it says: "Mission will perform and bill the patients insurance for the testing services that have been ordered by the physician;" is that correct?

A. Yes, sir. That's what it reads.

Q. So did you understand that Mission Toxicology would, itself, perform the testing ordered from it?

A. I understood them to manage all the testing. You know, I can't say exactly who billed or who didn't bill.

Q. But in terms of the tests that were ordered, they were ordered from Mission Toxicology; correct?

A. Yes, sir.

Q. And you understood Mission Toxicology to be a high complexity reference lab?

A. To my knowledge, yes, sir.

Q. And that would perform the tests

Page 56

that were ordered from Mission?

A. To my knowledge, I understood them to manage all the testing.

Q. Is that different from performing the testing?

A. Performing the testing and managing the testing would be similar.

Q. And how are they different?

A. Because I understood them to have some agreements with people that, at times, you know, they would utilize to help them with tests they couldn't manage.

Q. So a physician would order a test from Mission; is that right?

A. Yes.

Q. And then Mission would reference that sample out to another lab?

A. It was based on the need, and I trusted them to manage that. I really didn't know exactly the process of that. I can just speak to what I know. I trusted them to manage those samples and do what they felt best.

Q. But those were tests that were ordered from Mission; correct?

A. Correct.

Page 57

Q. And am I correct that the information set out in this pertains to a clinical lab owned and operated by Mission?

A. Yes, sir.

Q. So the management services that aren't encompassed in actually testing the samples are not discussed in this?

A. To my knowledge, no, I don't -- I don't think it is.

Q. All right. And if you would turn to the second attachment here, it is a form that says "New Client Registration" at the top; am I correct?

A. Yes, sir.

Q. All right. So was this a registration form you used to onboard physicians for Mission Toxicology?

A. Yes.

Q. And did you ever fill out any of these forms?

A. Yes.

Q. Do you recall if Mission requested any other information to onboard physicians?

A. If this was incomplete, to my knowledge, they would follow up and ask more

Page 58

questions.

Q. Um-hum.

A. But to my knowledge, no.

Q. And would they have asked those questions of you?

A. Of me or the office.

Q. And when you say "the office," do you mean your office?

A. They would -- no. They would contact the particular provider and ask for Mission information at times, to my knowledge.

Q. I see.

All right. So if you look here at the very bottom of this registration form, am I correct that this says that "this form gives Mission Toxicology permission to test each specimen according to the selection made on the individual forms received in laboratory"?

A. That's how it reads, yes, sir.

Q. So you understood that you were signing your physicians up to have tests performed by Mission Toxicology?

A. Yes, I understood that.

Q. And you would have conveyed that understanding to the physicians you were

Page 59

marketing to?

A. Yes, to the best of my ability.

Q. To your knowledge, did Mission ever ask any of your physicians if it could send specimen to a different lab?

A. I don't remember.

Q. Would you have expected your physicians to tell you?

A. I would think they would.

Q. And if they had sent a specimen to a different lab, would you have expected another new client registration to be filled out by the physicians you worked with?

A. I don't know.

Q. Well, if you look at the bottom, it does say that it gives Mission Toxicology permission to test each specimen; is that correct?

A. It does.

Q. So if they were to send specimen to a different lab, would you expect the physicians to then have to authorize that lab to perform the testing?

A. I would assume that to be reasonable, yes, sir.

Page 60

MR. CARR: Charles, we've been going about an hour. Can we take a break?

MR. GOKEY: That would be perfect.

MR. CARR: All right.

THE VIDEOGRAPHER: Off the record at 10:01 a.m.

(Recess from 10:02 a.m. to 10:20 a.m.)

THE VIDEOGRAPHER: Back on the record at 10:20 a.m.

BY MR. GOKEY:

Q. All right. Mr. Beauford, I'm going to hand you another document, and this one will be labeled Exhibit Number 230.

(Exhibit 230, Email with Attachment; Bates BeauMed 000337 through 000341, marked for identification.)

BY MR. GOKEY:

Q. Take a moment to review that.

A. Thank you.

Q. So, Mr. Beauford, am I correct that this is another email to you from Jesse Saucedo?

A. Yes, sir.

Q. All right. And am I correct that in the body of the email, Jesse writes: "Attached

Page 61

are small marketing brochures that we use to detail physicians and patients"?

A. Yes.

Q. So having reviewed these materials, are these materials, like the last ones, to your knowledge, 100 percent accurate?

A. To my knowledge, yes, sir.

Q. And so is this information that you would have faithfully conveyed to physicians that you were marketing Mission's services to?

A. Yes.

Q. All right. So taking a look at this first page of the brochure that's attached here, am I correct that this, again, characterizes Mission Toxicology as a "high complexity reference laboratory located in San Antonio, Texas"?

A. Yes.

Q. So then did you convey to physicians that they would be ordering tests from a high complexity reference laboratory located in San Antonio, Texas?

A. Yes.

Q. All right. And if you turn to the next page, am I correct that this states that

16 (Pages 58 to 61)

Page 62

"What Sets Mission Toxicology Apart From Other Labs" is that "Mission Toxicology is local and committed to quality testing. We will collect specimen and perform the test the very same night"?

A. Yes.

Q. So, again, you would convey to the local Texas area doctors to whom you were marketing that they would be ordering tests from a local lab?

A. Yes.

Q. And that Mission itself would collect the specimen and perform the testing that very night?

A. To my knowledge, yes.

Q. Well, I'm afraid that the document pile will continue to grow here. I'm going to hand you another one.

A. Sure.

Q. This will be marked Exhibit 231.

(Exhibit 231, Email Chain; Bates BeauMed 000122 through 000124, marked for identification.)

BY MR. GOKEY:

Q. Take a moment to familiarize

Page 63

yourself with that.

Am I correct that this is an email exchange between you and a Cheryl Graham?

A. Yes.

Q. And Cheryl Graham, who is she?

A. The administrator for CA Chiropractic.

Q. And is that Dr. Greg Steiner's practice?

A. Yes.

Q. All right. So if you look at the very first email in this chain, which starts on the last page, am I correct that this email with the subject line of "possible meeting & introduction for Wednesday"?

A. Yes.

Q. And in the body of the email, Cheryl Graham writes: "I spoke with Dr. Greg and he has an opening around 10:30 (I previously mentioned 10:00 a.m.) tomorrow. Can you stop by and meet with us?"

A. Yes.

Q. And what was the purpose of that meeting?

A. The meeting was to talk about

Page 64

marketing services for the clinic.

Q. And did you market Mission to Dr. Steiner at that meeting?

A. At that meeting, I talked about marketing their practice in terms of getting them more exposure in the community; and Dr. Steiner asked me about laboratory testing because that's something they did, and at that point, I spoke with them about Mission.

Q. And so would you have conveyed the information that we were just going over in these materials to Dr. Steiner?

A. These materials (indicating)?

Q. Um-hum.

A. Yes.

Q. And so if you look at the email that begins at the very bottom of the first page and continues to the next page, am I correct that you and Dr. Steiner's office scheduled a meeting for Tuesday of the following week?

A. Correct.

Q. All right. And looking at the date of this email, it was July 12th, 2016?

A. Yes.

Q. So the following Tuesday, since this

Page 65

was itself a Tuesday, would have been Tuesday, July 19th; correct?

A. Yes.

Q. All right. I'm going to hand you yet another document, but this one's short, so...

THE REPORTER: Is this 232?

MR. GOKEY: Oh, yes, it is. Sorry about that. I got a little ahead of myself.

THE WITNESS: Thanks.

(Exhibit 232, Email Chain; Bates BeauMed 000121, marked for identification.)

BY MR. GOKEY:

Q. All right. So, Mr. Beauford, looking at the email on the bottom of this page, am I correct that this is an email from you to Cheryl Graham?

A. Yes.

Q. And the subject of that is "Mission information"?

A. Yes.

Q. And am I correct that Ms. Graham responds: "Dr. Steiner was very impressed.

17 (Pages 62 to 65)

Page 66

I've attached the new client registration form"?

A.   Yes.

Q.   And would that have been the registration form that we were looking at a moment ago --

A.   Yes.

Q.   -- for Mission Toxicology?

A.   Yes.

Q.   So based on what you told Dr. Steiner, Dr. Steiner signed up for Mission's services?

A.   Yes.

Q.   So did doctor consult -- did Dr. Steiner provide any consultation services to BeauMed in connection with Mission's services?

A.   Could you clarify your question?

Q.   Um-hum.  So was any of the consulting advice that you got from Dr. Steiner related to lab testing from Mission?

A.   It was related to identifying patient types and how he treated patients.  So in that regard, yes.

Q.   And did he consult about other lab

Page 67

services?

A.   Could you clarify that question?

Q.   Okay.  Actually -- sorry.  Strike that.

Did Dr. Steiner work with any other labs that you marketed?

A.   Yes, he did.

Q.   And what lab was that?

A.   He worked, to my remembrance, with CQuentia laboratory.  There may have been another, but I can't remember.

Q.   And when would Dr. Steiner have started working with CQuentia?

A.   That, I don't remember.  I was just prepared to talk about Mission, mainly.  So sorry.

Q.   Oh, no.

Do you recall if Dr. Steiner would have started working with CQuentia after this?

A.   I don't remember.  I'm sorry.

Q.   And what kind of testing did CQuentia perform?  Do you recall?

A.   Genetic testing to talk about blood markers, and they offered some sophisticated-type testing.  I don't fully

Page 68

remember the details of that.

Q.   But not normal blood testing?

A.   Huh-uh.

Q.   Okay.  So then Mission was the only lab that Dr. Steiner worked with through you that did blood testing?

A.   Yes.

Q.   Okay.  So earlier you mentioned onboarding a physician for Sun Clinical Laboratory; correct?

A.   Um-hum.

Q.   And did -- am I correct that earlier you said you thought that Sun Labs and Mission were similar in the services they offered?

A.   Yes.

Q.   Would you have told the physician you onboarded for Sun Labs similar information to what you told physicians about Mission?

A.   I don't remember exactly what I said about Sun.  Perhaps so.  I don't want to guess.  Perhaps so.

Q.   Would you have told physicians that Sun was a local lab?

A.   Yes, to the state of Texas.

Q.   And that those physicians would be

Page 69

ordering tests from that local lab?

A.   Yes.

Q.   All right.  I'm going to hand you another document.

All right.  And this will be marked as Exhibit 233.

(Exhibit 233, Email Chain; Bates LD0154188 through 0154190, marked for identification.)

BY MR. GOKEY:

Q.   And you can take a moment to familiarize yourself with that.

So, Mr. Beauford, am I correct that this is an email to you from an on -- or it -- sorry.  Strike that.

That this is an email from you to an onboarding@iamgmt.com?

A.   Yes.

Q.   And do you know if that email address is associated with Integrity Ancillary Management?

A.   Based on the IMG, I would say so.

Q.   Did you ever have any dealings with Integrity Ancillary Management?

A.   I never had an agreement with them.

18 (Pages 66 to 69)

Page 74

I can't verify that or deny it.

Q.   So to your recollection, were you ever asked for additional information about these physicians, besides what's attached to this email?

A.   Based on my memory, I can't say that's the case.

Q.   Is that a "no"?

A.   Based on what I remember, I don't think so.

Q.   Okay.  And so if you look at the bottom here, under "Provider Signature Record," am I correct that this form also states that it "gives Sun Clinical Labs permission to test each specimen according to the selection made on the individual forms received in the laboratory"?

A.   Yes.

Q.   And so like with Mission, this form authorized Sun Labs to test the specimen?

A.   Yeah, I would say so.

Q.   And did you ever ask Dr. Hall to authorize another lab to test the specimen?

A.   No, I don't think so.  I don't think so.

Page 75

Q.   So is it your understanding, then, that Dr. Hall would be ordering testing from Sun Labs?

A.   To my knowledge.

Q.   And that Sun Labs would be performing the testing?

A.   To my knowledge.

Q.   And if you look at the last attachment to this email, am I correct that this is a UPS account request form for Dr. Hall's practice?

A.   Yes, you would be correct.

Q.   And what was the function of this form?

A.   The function of this form was to set up pickups for any specimens that Dr. Hall ordered.

Q.   So looking at the upper left-hand corner, am I correct that this box has the pickup information as Dr. Hall's practice?

A.   Yes, it does.

Q.   And so the delivery location in the lower right-hand corner, am I correct that that says it's Sun Clinical Labs?

A.   You would be correct.

Page 76

Q.   So was it, then, your understanding that specimen were picked up from Dr. Hall's office and brought to Sun Labs?

A.   To my knowledge, yes.

Q.   And is that how you would have explained it to Dr. Hall in marketing Sun to him?

A.   Yes, sir.

MS. ZERNER:  Objection to the extent it calls for speculation.  You can ask what did he actually say to Dr. Hall.

BY MR. GOKEY:

Q.   But you recall telling Dr. Hall that specimen would be sent to Sun Labs?

A.   I recall -- I recall telling him that specimens would go to Sun.

Q.   Thank you.

All right.  I'll hand you another document here.  This will be marked as Exhibit 234.

(Exhibit 234, Email Chain (no Bates range), marked for identification.)

BY MR. GOKEY:

Q.   And have you had a chance to look this over?

Page 77

A.   Yes.  Go ahead.

Q.   All right.  So am I correct that this is an email from you to an Angela Niemietz?

A.   Yes, you're correct.

Q.   All right.  And do you know who Angela Niemietz is?

A.   She was a service manager of some sorts.

Q.   And was she a service manager at Mission?

A.   Yes.

Q.   And is she somebody that you interacted with at Mission under -- while performing -- sorry.  Strike that.

Was she somebody that you interacted with at Mission while performing on your contract with Mission?

A.   Yes.  She was someone I interacted with, yes, sir.

Q.   And can you tell me who else at Mission you would have spoken to?

A.   I don't remember every name.

Q.   Um-hum.

A.   Her primarily and perhaps Amanda.

20 (Pages 74 to 77)

Page 78

Q. And what was Amanda's last name?

A. I think Feyrer, I believe. I can't remember the others off the top of my head.

Q. And was Jesse Saucedo also one of those people?

A. Oh, yes. Of course.

Q. All right. So, Mr. Beauford, looking at the first email in this chain, am I correct that this sets out a table that includes clients -- strike that.

Mr. Beauford, am I correct that this sets out a table with a column titled "Clients" with "Beau Medical" under it?

A. Yes.

Q. And were the individuals and entities listed in this column medical professionals with whom BeauMed had a relationship?

A. I -- I knew of them, yes.

Q. Were these people that you had onboarded for Mission's services?

A. Me or a 1099 representative, yes.

Q. So going through this, are you able to identify for me which of these were people that you onboarded versus people onboarded by

Page 79

one of your 1099 representatives?

A. I think, for the most part, yes. Would you like me --

Q. Yes, please.

A. CA Chiropractic would be me. Dallas Pelvic would be someone else. Fit Life would be someone else.

Foot and Ankle would be someone else. All the Foot and Ankles would be someone else.

Gustavus, I really don't even remember that account. That may be an error. I don't remember even having anybody or any relationship with that account.

Houston Medical Wellness, someone else; Interventional Pain, someone else; Nazari, someone else; Optimum, someone else; RX Fit, someone else; Signature Women's, myself; Spinal Decompression, someone else; Integrative Medicine, someone else; West Plano, someone else; Women Caring for Women, myself; Your Med, someone else.

Q. All right. So looking at the medical professionals who you identified here, am I correct that you had a consulting

Page 80

agreement with CA Acupuncture?

A. That would be correct.

Q. Um-hum.

A. Medical advisory board, I would say.

Q. Yes. Thank you.

And how about with Signature Women's Health?

A. That -- that would be correct.

Q. And how about Women Caring for Women?

A. That would be correct.

Q. And so physicians that worked at those facilities were part of BeauMed's advisory board?

A. Yes.

Q. Were any of the physicians who were onboarded by others, members of BeauMed's advisory board?

A. I don't know --

Q. On this list?

A. I -- I don't remember fully. Maybe a couple.

Q. Are you able to identify any of these various entities that were members of BeauMed's medical advisory board, besides the

Page 81

ones that we've already discussed?

A. I would say Your Med was. Your Med was and Optimum was. That's what I remember.

Q. So how would you pay the individuals who onboarded the various clinics here that you didn't onboard?

A. I would pay them through marketing agreements.

Q. And those were the agreements that we discussed earlier?

A. Yes.

Q. And they would be paid a percentage of what BeauMed was paid for testing their doctor samples?

A. Correct.

Q. And do you recall what the percentage split was between BeauMed and some of these reps?

A. I can't say for sure, but normally they took half or more of the revenue. I can't say 100 percent, but normally that would be the standard arrangement, half or more.

Q. So a physician would order a test from Mission; correct?

A. (Moving head up and down.)

21 (Pages 78 to 81)

Page 82

Q. And then Mission would perform that test; right?

A. (Moving head up and down.)

Q. And then Mission would get paid for that test?

A. Um-hum.

Q. You're going to have to actually answer verbally. Sorry.

A. Yes.

Q. And the answer to those last couple of questions was also "yes;" correct?

A. Yes.

Q. So after Mission was paid, Mission would then split what it received with you?

A. Yes.

Q. And then you would split what you received with the representative that onboarded the particular doctor that ordered the test?

A. A split or some sort of that, yes.

Q. Sorry. Could you repeat what you --

A. Yes.

Yes, some -- some type of arrangement where we shared the revenue. Yes, sir.

Page 83

Q. Okay. And do you know if any of the individuals working under you also had consulting agreements or consulting boards?

A. I have no idea.

Q. And how did you meet the individuals who helped you market Mission's services?

A. I met them through relationships that I had just in the industry from knowing doctors and working in the industry for years or through someone that knew them and thought they would be a good fit to market what I did.

Q. And did you provide them with the marketing materials that you got from Mission?

A. I did.

Q. And so -- all right.

And also with respect to the various physicians that you onboarded for Mission, would you have conveyed the information to them from those marketing materials we were discussing earlier?

A. Yes, sir, I would.

Q. And would you have told the representatives who were marketing for Mission under you to also convey the information set out in those marketing materials to physicians?

Page 84

A. I always shared any marketing materials I had with them, yes.

Q. With your intent was they would then share that information with physicians?

A. That would be my intention.

Q. Yeah.

All right. I am going to hand you yet another document. And this one will be marked as Exhibit 235.

(Exhibit 235, Email with Attachment; Bates BeauMed 000545 through 000559, marked for identification.)

BY MR. GOKEY:

Q. You can take a moment to familiarize yourself with that.

All right. So looking at the cover email, am I correct that this is an email to you from a Roni Apolinar?

A. Yes.

Q. And who is Roni Apolinar?

A. Someone that worked with Mission.

Q. And looking at Roni Apolinar's email address, am I correct that it's also an email address at IAMGMT.com?

A. You are correct.

Page 85

Q. And am I correct that we earlier discussed that as being an email address associated with Integrity Ancillary Management?

A. Yes, I would say so.

Q. So in your interactions with Integrity Ancillary Management, is it fair to say that they operated as essentially an arm of Mission?

A. I would assume that.

Q. So looking at the date of this email in the upper right-hand corner, am I correct that that is May 8th, 2017?

A. Yes.

Q. And is that just about a year after you started working with Mission under the contract we discussed earlier?

A. It is -- it is actually under. I didn't actually start to work with Mission until the area of August or October of the year before. So it wouldn't be a full year.

Q. But it would be a number of months?

A. Yes.

Q. So looking at the body of this email, am I correct that this says: "This is Roni on behalf of Jesse Saucedo with

# Exhibit 2

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

MISSION TOXICOLOGY, L.L.C.,
et al.,                              CONFIDENTIAL

              Plaintiffs,

                           Case No. 5:17-CV-01016
   vs.                                   (lead case)


UNITEDHEALTHCARE INSURANCE
COMPANY, INC., et al.,


              Defendants.
UNITEDHEALTHCARE INSURANCE
COMPANY, INC., et al.,


              Plaintiffs,

                           Case No. 5:18-CV-00347
   vs.                              (consolidated case)


MICHAEL MURPHY, M.D., et al.,


              Defendants.


     VIDEOTAPED DEPOSITION OF DANIEL BOONE

           August 28, 2019

  TAKEN ON BEHALF OF UNITEDHEALTHCARE INSURANCE

              COMPANY

REPORTED BY: VESTA L. YORK

JOB NO: 165877

Page 26

Q. Okay. So given that you didn't have any experience in the medical field, what made you decide to start a medical -- an ancillary medical company?

A. I -- initially there was a company called, I think -- I'm having a hard time remembering the name. They were with -- it's not MedReps, but there's another company I'll have to think of in a second.

But, anyway, they were doing kind of in the -- doing some different hospital programs such as toxicology and blood. And so it was based on a multilevel marketing kind of. And they have a lot of people in it across the United States. Med-EX Prime is it. It's called Med-Ex Prime.

Okay. And so I belonged to that and -- but in the process I was recruiting a lot of the people that became VPs and higher up regional directors. And so then I said, wait a minute, I said why do I want to bring all these people to them, you know, because I'm pretty good about networking and I'm good with people.

So I said -- that's when I started kind of -- starting to get into a -- I worked with a company initially called Three Rivers out of

Page 27

Pittsburgh, and spelled out numerical -- or letter "three." And they said they had contracts with some hospital programs. And so they then -- they then was working with us. And then I come to find out that one -- that the reps that we had recruited, that I had recruited and -- to be under One Stop Medical, they then -- they then turned around and the hospital went into audit. And so people couldn't understand the -- why they weren't getting paid because it's kind of a domino effect.

So if the insurance company puts a hospital in audit, which they have the contract, then it flows downhill. Then the people who have the distributor contract isn't able to pay the reps out that. And when they can't pay the reps, people are not providing for their families. It caused a lot of headache.

And -- and so that's when I decided that I was going to change directions and come up with an opportunity where I could bring value added out into the medical arena. And so that's when I then started One Stop Medical Services and started working with people to get opportunities.

I then flew around the country to meet a lot of people, including Jesse and Dr. Murphy,

Page 28

because they were pretty well established in that arena. And so I probably got in probably half or three-quarters of the way when almost everybody in the country knew of them and -- but I was able to do some things.

And then I was also able to get different opportunities. If you look at my website, you would see the different things we have that we can offer. And so I then became just a marriage-maker to put people together that are -- that have reps underneath them that are calling on doctors or it could be hospitals. It could be clinics or whatever.

Q. I tried to look at your website last night and I -- is it down? I wasn't able to access it.

A. Well, I did -- I did get a call from Go Daddy, so I don't -- I haven't turned back with them but the website is the least of my priorities.

Q. Okay. So just to back up a little bit. Given what you've been doing with One Stop for the last five or so years, is it fair to say you have some familiarity now with the urine toxicology testing?

A. Yes. Yes. The first couple years I

Page 29

will tell you I almost starved to death, okay, because it was -- you know, if you're new coming in this arena, it's pretty -- pretty tough, you know. Because a lot of people had made some money on compounding, which I was not into that time frame. And then the next one that came along was probably the outreach programs that many hospitals were doing across the country. And Dr. Murphy and Jesse was probably the biggest one, but there were other people who were doing the outreach program too.

Q. What other people were you aware doing the outreach program?

A. There was a group -- gentleman by the name of Eric Santos was doing something. I forget the name of his company because I don't talk to him hardly at all no more, but he had that. And then -- and that was probably the two biggest ones that I was actually getting some compensation off of back in 2017 is really when I really had a fairly good year. 2016 was pretty starving. And then 2017 I had, like I said, a good year. '18 was pretty tough and then '19 is all right now as far as income wise, yes.

Q. Have you ever heard of, you know, an entity named Peoples Choice Hospital?

8 (Pages 26 to 29)

Page 38

A. No. These are people that have business that, for example, could have been nursing homes. It could have been with treatment centers, et cetera.

Q. So, for example let's just take the first one that you listed, Nocher --

A. Uh-huh.

Q. -- what did they do?

A. I really don't know all the things -- any of those companies I mentioned, they had -- a good book of business. They then got a contract with Mission or -- with Mission. And then Jesse dealt with them on there and we just got a 5 percent override.

Q. And when you said they have a good book of business, do you mean that they had good referral sources?

A. Well, they had been in healthcare for quite some time, so they had business lined up with treatment centers, nursing homes, re -- rehab, et cetera, that they did then -- had a contract with Mission to bring in business. And then out of that -- out of the business that was there, Jesse then turned around and paid a 5 percent override to us. And then out of that 5 percent override, I gave

Page 39

70 percent to Esan Coleman, I took 30, because they were his clients.

Q. Why didn't Esan didn't just contract directly with Sun and Mission --

A. He had not --

MR. MARKHAM: Let her finish.

THE WITNESS: Okay.

MS. KURTZ: Actually it was better if I just finish my question there.

Q. So why would Esan not contract directly with Sun and Mission?

A. I don't think he knew of them quite yet.

Q. So Esan didn't have a personal relationship with Sun and Mission at the time?

A. Correct. Yes.

Q. Is Esan still working in this industry, do you know?

A. I -- I don't. I think he dabbles in it, but I haven't talked to him in probably, you know, a month or two, so I don't know what he's in to.

Q. Did he have a company?

A. I think on my thing I think it was like JLJ Associates or something, but if you looked at

Page 40

these reports I have, I think he's on there where we were sending money out.

Q. Okay. I want to back up. So you said that Nocher and the other companies that you identified they had good books of business, meaning that they had business lined it with toxicology cen- -- or treatment centers, nursing homes, rehab facilities, right?

A. Yes.

Q. And so when you said they had business lined up with those types of facilities, do you mean they had a relationship where those facilities would refer specimens for testing --

A. That's correct, yes.

Q. -- to Esan or whoever?

A. It wouldn't be Esan. It would be that they had -- they got their own direct contract with Mission and Sun. And so Jesse and -- because I don't think he did -- I don't think out of those three I mentioned, none of them actually done any business with Sun. But they -- but they -- but at the time, Jesse had a fairly good reputation, okay, and so they wanted to do business with Mission instead of Sun, so that's what they did.

Q. Okay. So toxicology center or --

Page 41

sorry, treatment center has a whole bunch of specimens that need to be tested. Esan connects them to Sun and Mission through you, and then they start referring their specimens for testing directly to Mission, for example?

A. That is totally correct.

Q. Okay. Good. I understand it I think. We'll see.

So did you as One Stop Medical have any relationships with referring physicians or physician practices?

A. No.

Q. So you were just a middleman; is that fair to say?

A. That's correct. Yes.

Q. Do you know how companies like Nocher, for example, developed relationships with, you know, treatment centers or nursing homes?

A. Do not.

Q. Would Esan know that?

A. Maybe better than me, but I did not.

Q. Where does Esan live?

A. I think he's in Austin, Texas.

Q. Okay. So, basically, your clients or customers were Sun and Mission on one side and then

11 (Pages 38 to 41)

Page 42

Esan on the other?

A. (Nods head.)

Q. Yes?

A. Yes.

Q. Was there anyone on the side of Esan else that you worked with -- I'm sorry, that was a terrible question. I'll rephrase.

Was there anyone else like Esan that you worked with?

A. No. On that -- with -- but Mission, the answer's no. Okay. On the deal with Sun, then there was a group called Foremost Labs, a gentleman by the name of Chris Parris whom I -- their headquarters is in Detroit, Michigan.

I flew up and met them. And then I then introduced them to Dr. Murphy. And then they -- they did business with some samples, not a whole lot, but with Sun and their main things with Allergy Pro. And they got a direct override -- or they had a direct contract and I just got a 5 percent override.

Q. So similar to the relationship you had with Esan then?

A. Yes.

Q. Okay. So is it fair to say that what

Page 43

One Stop did for Sun and Mission and that it got paid for was to connect Sun and Mission with other people who had referral sources for specimens?

A. Yes.

Q. Okay. And is it fair to say that the reimbursement you received for providing that service was your percentage override?

A. 5 percent.

Q. Okay. And it was 5 percent across the board?

A. Yes. Of the net minus -- so, obviously, what the samples were reimbursing at through whether hospital program they had within Alternate Health, like could have been Sharkey. Could have been -- I think they had five or six hospitals I guess. My understanding. So -- so in saying that, yes, we -- I would get an override pertaining to the amount of business they submitted in.

Q. And just to be clear, and we can look at a contract later that might help clarify that. When you say net, that's a net revenue associated with --

A. Meaning you have the -- okay.

Q. Sorry. That's the net revenue

Page 44

associated with the business that you were able to connect Sun and Mission with?

A. Yes. Now let me go a little further if you wouldn't mind, okay, and I have about ten seconds to wrap it up. You have what a sample will be reimbursed by the major insurance companies. Okay. Then you have what you call your COGS, C-O-G-S. That's the amount of what it cost to run the samples. Okay. You minus that, and then you would get a net figure.

Q. So you take the total reimbursement amount. So United reimburses $500 for the sample.

A. Uh-huh.

Q. There's some costs associated with running that sample. Let's say $150.

A. 125, 150, yes.

Q. Okay. So you subtract the 125 from that total --

A. Uh-huh.

Q. -- so we're at, what, 350, 375 if we're using 125?

A. Yeah.

Q. And so then you would say get 5 percent of that net?

A. That's correct.

Page 45

Q. And so it wasn't entirely dependent upon the number of specimens your referral resources were referring to that hospital, correct?

A. Totally correct, yes.

Q. Okay. Thank you.

Did One Stop have any competitors in the laboratory space?

A. Tons.

Q. Can you name some of them?

A. Everybody -- I mean I would have to really look at my phone, but everybody out there would be doing the same thing that I would be doing, meaning that they are looking for people who have the business or reps that had good relationships with -- could be treatment centers, could be doctors' offices, et cetera.

So, yes. I mean I could -- off the top of my head I can't name them, but if I looked at my phone I could probably give you four or five people that would be doing there. But it's very competitive, okay, and if you make money in this business, you thank your lucky stars.

Q. Is this type of -- are these types of arrangements still going on?

A. Yes, it does, but I will tell you, it's

12 (Pages 42 to 45)

Page 46

getting very scary and people are basically getting out of the lab arena due to the new laws, I think they're called EKRA laws.

MR. MARKHAM: Could you spell that, please.

THE WITNESS: I think it's E-R-K-A [sic] I think it is, off the top of my head.

BY MS. KURTZ:

Q. You say it's getting very scary. Do you think it's getting scary because of the laws or something else?

A. No, the laws.

Q. Okay. I have a few more questions about your relationship with Dr. Murphy and Sun and Mission, and then I think it would be a good time for a break, okay?

A. Sure.

Q. So, obviously, we've been speaking about Dr. Murphy. When did you first meet Dr. Murphy?

A. It was around the 2015, I think, sometime. Dr. -- I was --

MR. MARKHAM: She just asked you when.

A. 2015.

MR. MARKHAM: Yeah.

Page 47

Q. And how did you meet him?

A. Initially by the phone.

Q. Were you introduced by someone?

A. No. I think I Googled him. I had heard about that they were -- I heard about they were probably the 500 -- 800-pound gorilla as far as in the lab arena. But I had not met him.

So what I id is I then Googled him and called him and left a message and said I would like to meet him, that I may have some people that I could bring, you know, business.

Then after I met him, I think it might have been a month, and I flew down to see him, him and Jesse both. And they gave me a tour of their offices. They gave me a tour of Alternate Health. And they showed me the processes so I could feel very comfortable with the way they were doing was totally compliant.

Q. What is your understanding of what Dr. Murphy and Sun and Mission were doing at the time?

A. They were working an outreach program.

Q. How do you define an outreach program?

A. An outreach program is a -- a group has a -- contracts with the hospitals to -- to -- to run

Page 48

the samples. And their particular case, and I'm going to get you pretty close, okay, but in their particular case what I seen was they had the different hospitals located within Alternate Health that samples would be accessioned in.

(Reporter clarification.)

THE WITNESS: Yeah. A-S-S-E-S-S-I-O-N I think.

MR. MARKHAM: I think it's -- is it A-C-C or A-S-S?

THE WITNESS: Could be, yeah.

MR. MARKHAM: We'll figure it out.

THE WITNESS: Yeah.

A. And once they're accessioned in, then they would then have the hos- -- have the hospital group within Alternate Health would then run the samples and do the confirmation and confirm and then get the reports back to the doctors. And then my understanding is if it didn't have a hospital group there, and I don't think -- very few of them did not -- within the Alternate Health building, okay, then they had the ability, my understanding. Is to reference it out.

Q. Okay. So I just want to clarify a few things. You understand that the tests were not

Page 49

being ordered from the hospitals, correct?

MR. MARKHAM: Objection. Lack of foundation.

Q. You can answer.

A. That they weren't done by the hospital?

Q. Well, they weren't being ordered from the hospital?

A. No.

Q. Okay. So the tests were being ordered to be performed by Sun or Mission, correct?

A. The people would have contracts with Sun or Mission who had contracts with the hospitals.

Q. Right. But I want to go back to who the physician who was ordering the test was ordering it from, okay?

A. Well, then the physician would be on the reqs of Sun or Mission.

Q. Right. So they were -- the requisitions were to Sun or Mission, correct?

A. That's right, yes.

Q. They weren't to the hospitals to perform the testing, correct?

MR. MARKHAM: Objection. Lack of foundation.

You can answer if you know.

TSG Reporting - Worldwide - 877-702-9580

Page 50

A.  I really don't know that answer.

Q.  Okay.  We'll look at some documents because I think you do.

You understood that the patients whose specimens were being tested didn't have any relationship with the hospitals, correct?

MR. MARKHAM:  Objection, again.  Lack of foundation.

A.  That's my knowledge, yes.

Q.  And you understand that at least for certain hospitals, the hospitals weren't actually performing the testing, correct?

A.  I -- there might have been a one or so that did, but my understanding within the setup that they had in Alternate Health, that they were actually doing the -- running the samples within the building of Alternate Health.  They had it set up doing that, yes.

MR. MARKHAM:  Can you just they who?  The hospitals?

THE WITNESS:  The hospitals had employees, okay, with the right -- with the equipment to run the -- run the toxicology.  And if I remember right, they were doing blood also.  I don't think they were doing anything else besides

Page 51

that.

MR. MARKHAM:  Okay.

BY MS. KURTZ:

Q.  Okay.  So the specimens were not being tested at the hospitals' labs on site, correct?

A.  On site, yes.  But employees of the hospital, the answer is yes, they were being done.

Q.  How do you know that employees of the hospital were --

A.  Because I had seen them.

Oh, sorry.

Q.  And how would you know that an individual was an employee of the hospital?

A.  Because when they gave me a tour of the Alternate Health building, they went around and introduced me to all the specific hospital groups within the building.

Q.  And you think that the employees of the hospitals were working at the alternate health building, correct?

A.  Yes.

Q.  And then in terms of how the claims were billed to the insurers, the hospitals were billing the claims as if the hospitals had performed the tests, correct?

Page 52

A.  I think that is correct, but I'm not 100 percent sure.  I think that is correct.

MR. MARKHAM:  I'm sorry, could you read back that question?

THE REPORTER:  Yes.

(The requested portion of the record was read by the reporter, as follows:  Question: "And then in terms of how the claims were billed to the insurers, the hospitals were billing the claims as if the hospitals had performed the tests, correct?")

MS. KURTZ:  Correct.

MR. MARKHAM:  I just wanted to hear the question back.  And what was your answer?

THE WITNESS:  Yes.

MR. MARKHAM:  Could you read back the last answer?

THE REPORTER:  To that question I read?

MR. MARKHAM:  Yes.

(The requested portion of the record was read by the reporter, as follows:  Answer: "I think that is correct, but I'm not 100 percent sure. I think that is correct.")

BY MS. KURTZ:

Q.  Did you have any direct relationship

Page 53

with a hospital called Community Memorial Hospital in Ohio?

A.  No.

Q.  What about a hospital named Newman Memorial Hospital in Oklahoma?

A.  Knew of them.

Q.  What did you know of them?

A.  I just knew that that's one of the, I think, four or five hospitals that Mission and Sun had contracts or management agreements with.

Q.  And how did you come to learn that information?

A.  On the reports.

Q.  What reports?

A.  That I have that I gave -- I think John -- I think John's got them down there.  It would list the -- called the portals.  And in the portals it would -- there would be several things it would list:  The type of sample it was, whether it was blood or urine, whether it was -- it would tell you the reimbursements.  It would tell you the COGS and it is would tell you what the net figure would be, and it would also tell you the hospital who was doing it.

Q.  Was the portal an actual Internet or

14 (Pages 50 to 53)

Page 54

intranet that you could log into?

A. You had to have a password and user ID, but it was THE portal that belonged to Mission and Sun.

Q. And did the portal have the requisition forms and test results?

A. There would be a -- segments in there where they could download it.

Q. Did you have access to the portal?

A. I didn't need -- yes, I've seen -- no. I had a password to look at it, but I just depended on every week I would get the -- a report from, I think, Jesse's brother on the Mission side. I forget his brother's name, but then on the -- on the Sun side, I would get a report from Julie Pricer and telling me the samples that were run, what they reimbursed back, who did it. And so I would know where it came from. And then on my reimbursements I would get, I would get checks from Jesse and he would send weekly and then -- from Mission, and on Sun I would say get ACH deposit into my account.

Q. So you had access to the portal, but you didn't often --

A. Yeah.

Q. -- go into it?

Page 55

A. I was -- I was doing other things and -- I mean I didn't care to get into the weeds, you know.

Q. But when you had access to the portal, you could also access the requisitions and test results?

A. Yeah, there was. Oh, sorry. The answer's yes.

Q. So we're talking about this, you know, outreach program. You understood that if Sun and Mission had billed the insurers directly, their claims might not have been paid or they might have been paid less than if the hospital billed the claims, right?

MR. MARKHAM: Objection. Lack of foundation.

A. That would probably -- that would probably be a correct statement, yes.

Q. And that's the reason why you needed the hospitals' involvement with this outreach program, right?

MR. MARKHAM: Objection. Lack of foundation. Calls for a legal conclusion.

A. That -- my understanding that's -- yes. Yes, that's correct.

Page 56

Q. Because the hospitals were essential to making as much in reimbursements as possible for these testing services, right?

MR. MARKHAM: Objection. Leading. Lack of foundation.

A. Yes. That's of my knowledge, yes.

Q. Okay.

MS. KURTZ: I think we've been going for about an hour. Now's a good timing for like a ten-minute break. Okay?

VIDEOGRAPHER: Go off the record at 10:01 a.m.

(A recess was taken from 10:01 a.m. to 10:17 a.m.)

VIDEOGRAPHER: This is the beginning of disk number 2 and we are back on the record at 10:17 a.m.

BY MS. KURTZ:

Q. Okay, Mr. Boone. I'm going to hand you two documents.

(Deposition Exhibit Numbers 11 and 12 were marked for identification.)

BY MS. KURTZ:

Q. The first is marked as Exhibit 11 and it bears the Bates number OneStop00000002.

Page 57

A. Uh-huh. You want me to read that?

Q. Yes. Whenever I hand you an exhibit, please take the time you need to read it. Most of these are going to be pretty short, so if it's longer I might ask you not to read every word verbatim for purposes of time. But if you ever need more time to digest an exhibit, please take it.

I'm also handing you an exhibit that is marked as Exhibit 12, and it bears the Bates number LD0104540. And I will represent to you that these are two parts of the same e-mail chain. I marked them separately because the first one you produced and the second one a different party produced. Okay?

A. Uh-huh.

MR. MARKHAM: I'm sorry, so this is -- what exhibit is this?

MS. KURTZ: The One Stop is Exhibit 11 and the other one is Exhibit 12.

MR. MARKHAM: Thanks.

BY MS. KURTZ:

Q. And let me know when you've had a chance to look through the e-mails.

A. Yeah, this one -- these are actually Esan's contacts.

15 (Pages 54 to 57)

Page 62

e-mail --

A. Uh-huh.

Q. -- on September 28th. And you wrote, "Jeff, Thank you for the introduction and, sir, I look forward in talking to you plus working with you on," quote, "'in network,'" quote, "solutions"?

A. Uh-huh.

Q. Why did you put "in network" in scare quotes?

A. Because --

MR. MARKHAM: Excuse me. Could you define "scare quotes."

MS. KURTZ: Yeah, just outside of quotes like that.

A. They're -- in the hospital arena it was always best to have a group or had -- they had a management contract that the contracts were in network because it seemed to pay a little bit better, and they were pretty exclusive, okay, instead of having something that was out of network.

Q. So in-network contracts reimbursed at higher rates than out of network, correct?

A. That's correct.

Q. Okay. So then if you go to the next page of the exhibit, flip it over.

Page 63

A. Okay.

Q. It looks like Dr. -- you sent some follow-up e-mails to Dr. Murphy, and then October 4th Dr. Murphy responded to you and said, "Thanks for reaching out. What type and amount of samples do you have?"

A. Uh-huh.

Q. Do you see that?

A. Yes, I do.

Q. And you responded that same day and wrote, "My network works with many labs from 1,000 samples to over 10,000 per month."

Do you see that?

A. Yes, I do.

Q. So you're talking about there are some entities that are referring anywhere from 1,000 to 10,000 samples a month?

A. Yes. There was -- you know, I mean here -- let's back up a second. There's a difference of talking large numbers, okay. Because, for example, Esan would always take about mega numbers and -- you know, and -- but in reality if you got a fourth of those samples come in, you would be pretty lucky, okay. Because it's -- a thousand samples is a ton of business. It's a lot of

Page 64

business. But you can't call the person a -- you can only take his word at what he says and -- but he did have a lot of good connections.

Q. Okay. So I just want to make sure I understand, though. It says, "My network works with many labs from 1,000 samples to over 10,000 per month."

A. Meaning capacity, what they could do.

Q. Okay. Great. Then you go on, "Five treatment centers in California and three in Utah."

Do you see that?

A. Yes, I do.

Q. So is what you're telling him here is that you have, or someone in your network, has relationships with these treatment centers who are able to refer specimens?

A. Yes.

Q. And you go on and "then signed a large contract with a large sales force and managers over 4,000 plus."

Do you see that?

A. And signed a large contract with a sales force and managers. Yes.

Q. What did you mean by that?

A. Well, that there would be people who

Page 65

had people -- there was some groups here that had a large amount of people underneath them that were reps.

Q. When you say "reps," are these people who are out talking to the doctors --

A. Yes.

Q. -- and --

A. Yes.

Q. And what were the reps doing with the doctors; do you know?

A. I don't know that answer.

Q. Okay. And then you finish, "All looking for good in-network solutions."

Do you see that?

A. Yes, I do.

Q. So all of these labs and referring providers are looking for in-network solutions so they can maximize their reimbursements?

A. Yes.

Q. And then Dr. Murphy responded to you that day as well and he asked, "Tox or blood?"

Do you see that?

A. Yeah, at the top.

Q. Do you understand what he meant by that?

17 (Pages 62 to 65)

Page 74

had the contract, a management contract, with Sutter. So I said the key to this is probably the number of layers.

Q. And why were you talking about Sutter Health here?

A. Because for a while Sutter was kind of a hot -- hot deal out in the rep world, and they were paying out until -- until some people started posting on the Internet and on LinkedIn what they were making and stuff saying -- they came down -- Sutter came down on everybody and said, we're done with the outreach program because people -- instead of being very happy what you're doing and keep it to your vest, people were bragging what they were making. And that's kind of a no-no.

Q. Why is that a no-no?

A. Because you're -- you're getting exposure out there that you don't want to get exposure.

Q. Why were you concerned about exposure if everything was above board?

MR. MARKHAM: Objection. I don't think he was concerned.

A. I'm not concerned of it, but I'm just saying people -- because everybody's guided by rules

Page 75

and regulations, right. And in the case of Sutter, they don't want people posting on the Internet of what they're making, you know. If you did make something down the road, you thank your lucky stars. You would be appreciative of it. And you don't put it out for the whole world to know about it.

Q. Was the concern that when people learned about how much money was running through that outreach program --

A. Oh, yeah.

MR. MARKHAM: Let her finish because --

THE WITNESS: Okay.

MR. MARKHAM: -- I have an objection to put --

THE WITNESS: Okay.

MR. MARKHAM: -- on the record so just slow down.

THE WITNESS: Okay.

BY MS. KURTZ:

Q. Is it your understanding that the concern was that people were concerned about telling the world about how much money they were making in the outreach program that there would be a scrutiny on the program?

MR. MARKHAM: Objection. It calls for

Page 76

speculation as to what other people are thinking.

Q. You can answer.

A. I can?

Q. Yeah.

A. Okay. Yes. But, you know, it's -- anything you do in this world, greed is a bad thing, okay. If you handle yourself professionally, and I try to, okay, but you always have people out there that are -- that are -- they are very greedy and they always want more.

And you would see it happening so many times where, for example, let's say a group had a management contract with a hospital and they're getting this and they're paying them a certain amount, well, then, some other group say I have this person who we're working with that has a management contract. And then they're switching. And they would -- they would be wanting to jump fence to another group that had maybe an in-network contract not realizing what it did to the doctors, you know, because, you know, they would have to change their req forms again, you know, and they would have to do this. And it was just a bad scene. So those kind of people I wanted to stay away from.

Q. Okay. So then you go on to say, "We

Page 77

were getting paid from Trumivir" -- "Triuimvir." How do you pronounce that?

A. Where are you at here?

Q. The bottom of that e-mail.

A. Yes. There was a gentleman that had -- I forget the gentleman's name -- but that was his company, Triumvir.

Q. Triumvir.

A. Uh-huh.

Q. -- "and CGH."

Do you understand that CGH is Campbellton-Graceville Hospital?

A. Yes.

Q. -- "in which we made it through four rounds."

A. Yes.

Q. Do you see that?

A. Yes.

Q. What do you mean by "four rounds"?

A. That means that there were four rounds of payments, meaning monthly payments, but for -- but for there was problems and they did an audit, with the insurance company did an audit.

Q. So then you say, "from the BC-BS situation."

Page 82

couldn't reference out to anybody besides Mission and Sun I'm guessing, but I don't know that answer.

Q. Okay. You can set that document aside.

A. Okay.

(Deposition Exhibit Number 13 was marked for identification.)

Q. The next document I am handing you is being marked as Exhibit 13.

A. Could I say one thing?

Q. Sure.

A. Okay. What I would like to have also, if you could put this (indicating) in there. This is one of the procedures --

Q. This is my deposition.

A. Okay.

Q. I get to use whatever documents I want.

A. Okay. Got it.

MR. MARKHAM: Well -- okay.

BY MS. KURTZ:

Q. If Mr. Markham wants to ask you about that, he's more than welcome to.

A. That's fine.

Q. Okay. This is a document that there's the Bates number One Stop 00000033.

A. Uh-huh.

Page 83

Q. And this is a Management Services Agreement between One Stop Medical Services, LLC, and Sun Clinical Laboratories. Do you see that?

A. Yes, I do.

Q. And it's dated October 20th of 2016. Do you see that?

A. Yes, I do.

Q. If you go to the page that has the number that ends in 38.

A. Okay.

Q. It's signed by Dr. Murphy. Do you see that?

A. Uh-huh.

Q. It's not signed by One Stop. Do you see that?

A. Uh-huh.

Q. Was this a contract that went into effect ever?

A. It did when I -- I imagine I probably had to sign it and send it back.

Q. Okay. Take a look at it really quickly and just confirm for me that this is the agreement that was actually in effect between Sun and One Stop.

A. It may -- in my opinion, it's missing

Page 84

the Exhibit B, which usually tells you the percent you're getting.

Q. Uh-huh.

A. And I don't see this having that.

Q. Did you have the complete contract in your files?

A. If you don't have it in the e-mails, I probably don't have it.

Q. Did you operate under a contract with Sun Labs?

A. Yes, I did, but I don't know -- yeah. Obviously I -- I must have signed it and sent it back. But that was their base agreement, and his wife handled all the contracts, Lynn did, I think, and prepared all the agreements on his behalf and then he would sign them and the other party would execute them.

Q. Okay. So let's just work under the exception that for the exception of Exhibit B, which is not filled out, this is pretty close to the final contact if not the final contract that you signed, okay?

A. Yes.

Q. And if you see anything in here that leads you to believe that this wasn't the final

Page 85

contract, the body of the contract, or Exhibit A, just let me know, okay?

A. Uh-huh.

Q. All right. So I want to start at the front page. And, again, on this contract it says this was effective October 20th of 2016.

A. Uh-huh.

Q. Does that sound like the right date?

A. Yes.

Q. Okay. Just one quick question. So you obviously have separate contracts with Sun and Mission. What was the difference in your relationship with Sun versus Mission?

A. I think reputation.

Q. What do you mean by that?

A. Because they're -- even though I like both of them, okay, they're -- in the arena out in the network, okay, of distributors and reps, Dr. Murphy had been on a couple front ends of some things, my understanding, and don't hold me on it, but had been on the front end of some programs that went south. And he had not the greatest reputation. Even, you know -- there are people that are, obviously, very loyal to him, okay, that -- on that. But for people, the reputation or the scuttlebutt

22 (Pages 82 to 85)

Page 86

out into the field was you want to do business with Jesse and not Dr. Murphy. And so, I mean I'm not going to tell you not -- nothing but the truth?

Q. So Sun was owned, in part, by Dr. Murphy, right?

MR. MARKHAM: Objection. Lack of foundation.

A. My understanding, yes.

Q. And was Mission owned by Jesse?

A. I think Dr. Murphy had some ownership into Mission.

Q. Okay. But Jesse was maybe running Mission?

A. That's correct.

Q. Got it. Okay. Thank you.

A. Uh-huh.

Q. So I want to look at the first -- the paragraph that's marked as number 1, Services. Do you see that?

A. Yes, I do.

MR. MARKHAM: I'm sorry to interrupt but could I have his last answer read back, the long one? I apologize, I just --

(The requested portion of the record was read by the reporter, as follows: Answer:

Page 87

"Because they're -- even though I like both of them, okay, they're -- in the arena out in the network, okay, of distributors and reps, Dr. Murphy had been on a couple front ends of some things, my understanding, and don't hold me on it, but had been on the front end of some programs that went south. And he had not the greatest reputation. Even, you know -- there are people that are, obviously, very loyal to him, okay, that -- on that" -- )

MR. MARKHAM: Okay. I can stop you. You can go back. I don't want to interrupt you any longer than need to. Thank you for your indulgence.

BY MS. KURTZ:

Q. So the paragraph that says Services, paragraph 1. Do you see that?

A. Yes.

Q. And it says "Company" -- and when the contract refers to company that's talking about Sun, right?

A. Yes.

Q. -- "agrees to engage the services of manager."

Do you see that?

A. Yes.

Q. And manager is One Stop, right?

Page 88

A. In this case, yes.

Q. "And manager agrees to provide such services upon the terms and conditions hereinafter set forth."

Do you see that?

A. Uh-huh.

Q. Is that a yes?

A. Yes.

Q. And then it goes on, "In general, manager shall perform services related to the marketing and management of the laboratory operated by company."

Do you see that?

A. Uh-huh. Yes.

Q. Is that a yes?

A. Yes.

Q. And so the laboratory operated by Sun Clinical Laboratory is Sun Clinical Laboratory, right?

A. Yes.

Q. Okay. And then it refers us to Exhibit A as "The minimum services to be provided on a regular monthly basis by manager."

Do you see that?

A. Can you tell me where that is?

Page 89

Q. It's the last -- the second to last sentence in the paragraph we were just reviewing.

A. Under Terms and Agreement -- or Services.

Q. In Services.

A. Yes, I do.

Q. Okay. So can we flip to Exhibit A, please?

A. I'm there.

Q. Okay. Great. So I want to walk through all of these things and ask you what One Stop was doing to provide Sun these types of services specifically, okay?

A. Uh-huh.

Q. So number 1 is "Manage client engagements and lead generation strategy."

Do you see that?

A. Yes.

Q. In the first quote under that is "Market healthcare services, which include laboratory services, to potential clients in accordance with company compliance guidelines and code of conduct."

Do you see that?

A. Yes.

23 (Pages 86 to 89)

Page 90

Q. What did you do to market healthcare services which include laboratory services to potential clients?

A. To work with some people in my network that had some -- had some connections that maybe a rep worked with a doctor, for example, or worked with a doctor's office.

Q. So it's basically you worked with people in your network that had connections to referral sources?

A. Yes.

Q. So can you give me an example of the time where you went out to someone in your network and you advertised or marketed what Sun could do for them?

A. If I had sent an e-mail, for example, and just said I am working with Mission or Sun and I have a very good outreach program. But, in general, most people had already been -- when I came along in 2015 -- '16 -- I think it was, '15, '16, somewhere in that time frame, a lot of people had already contracts with Mission and Sun. So they were out there very strong because they were probably the big player in the outreach program. So I just happened to be fortunate enough when I came in that Esan

Page 91

hadn't got a contract with Mission or Sun yet but knew some players that had not either. And we were just able to connect the dots to put -- but, generally, anybody -- most -- I would say probably 95 percent of people had already knew about Mission and Sun, and many of them had contracts already.

Q. So I just want to make sure, though, that we're clear about what you, as One Stop, the marketer was doing. So is it fair to say that in almost every case when you were performing a service for Sun you would just reach out to Esan to see if he had any -- any facilities that might want to use Sun to perform laboratory services?

A. Yes.

Q. Okay. Did you do anything other than that?

A. I would set up a conf- -- if they did, okay, I would set up a conference call with that particular entity that had -- that was looking to be -- to place some of their samples in network. And then what we would do then -- and after that I would step out of the way and allow them to get direct contracts with Mission and Sun. And they would negotiate -- they would basically take this agreement and be able to do that in behalf of me.

Page 92

Q. Okay. Let's get down a few bullets to the fourth bullet down.

A. Okay.

Q. It says, "Drive awareness and positive brand perception within targeted segments/geographies."

Do you see that?

A. Yes.

Q. What did you do to drive awareness and positive brand awareness within targeted segments and geographies?

A. Just be able to -- to -- if there was something that they wanted me to send out on compliance, the way they do business, they would forward to me, which, in turn, I would then send it to Esan. And then Esan would be sending it out to the respective people that had contracts that he brought in with Mission and Sun.

Q. So, basically, you would just forward an e-mail from Sun and Mission to Esan?

A. Yes, you're right.

Q. Next it says, "Strategically align with internal business units to identify areas to mutually drive growth, efficiencies and effectiveness."

Page 93

What did you do to accomplish this goal?

A. To work with Jesse or any -- or any part of Mission to make sure that that particular contract that they may have had with, for example, with the groups I mentioned earlier, that they were following and being in compliance. Do you mind if I give an example?

Q. Well, what I just understood is that you would just forward an e-mail --

A. Yeah.

Q. -- to Esan?

A. Yes.

Q. So did you do any follow-up with Esan or anything like that, or you just let them know what their expectations were?

A. I would do a follow-up with him to make sure he sent it out because either Jesse or Dr. Murphy asked me to send it out.

Q. Did you ever talk to Esan's facilities or anything about compliance expectations directly?

A. No. No. That was his client. I didn't get in the middle.

Q. All right. Let's go down. It says, "Implement programs and tactics to improve

24 (Pages 90 to 93)

Page 98

Management Fees.  Do you see that?

A.  Yes.

Q.  And in that paragraph it says, "As compensation for its services, company shall pay manager 60 percent of the monthly net revenue associated with accounts listed on the attached Exhibit B."

Do you see that?

A.  Uh-huh.

Q.  And so we had discussed net revenue before.  And so that would be, just to confirm, the total reimbursement received for the specimens that were referred through this contract minus the COGS --

A.  Uh-huh.

Q.  -- is that correct?

A.  Yes.

Q.  So you get 60 percent of that net revenue?

A.  That's correct.

Q.  And here it says, "The management fee shall be paid monthly on or before the 20th day."

Do you see that?

A.  Yes.

Q.  And it says, "The parties agree that

Page 99

the management fee is fair market value."

Do you see that?

A.  Yes.

Q.  What was the -- what did you guys do to assess what fair market value would be?

A.  That was all done by Mission and Sun.  I have no -- no say-so in it.  And also out of that 60 percent, that was the total amount, but then that's not 60 percent coming to me because I would then -- on the contract that they would be signing with Mission or Sun, such as Nocher, Bloc Partners or whatever, they would be getting 55 percent of that.

Q.  Understood.

A.  Okay.

Q.  So for the 60 percent, that was entirely dependent upon the number of specimens that were referred to the labs, correct?

A.  Yes.

Q.  If you have less referrals, there would be a smaller management fee, correct?

A.  Yes.

Q.  All right.  If we go to number 4 it says Compliance Efforts.  Do you see that?

A.  Yes.

Page 100

Q.  It says, "Company and manager enter into this agreement with the intent of conducting their relationship in full compliance with applicable state, local and federal law, including but not limited to, patient privacy and security laws, anti-fraud and abuse laws, anti-self referral laws and/or patient nonsolicitation laws."

Do you see that?

A.  Uh-huh.

Q.  Is that a yes?

A.  Yes.

Q.  What did you do to make sure that you were acting in compliance with what is collectively referred to here as healthcare laws?

A.  Here's an -- here's what I would do is get an e-mail from Jesse or Dr. Murphy.  And in this case, this is the procedures to follow, and then I would forward that on to Esan, who would then send it onto his clients (indicating).

THE WITNESS:  Go ahead, sir.

BY MS. KURTZ:

Q.  When you say "his clients," you mean Esan's clients?

A.  Yes.

MR. MARKHAM:  She was looking the other

Page 101

way when you were referring to the document.

THE WITNESS:  Oh.

MS. KURTZ:  I understood what document he was referring to.

A.  Okay.

BY MS. KURTZ:

Q.  Okay.  So I just want to reiterate.  So you were paid to generate referrals to Sun and Mission, correct?

A.  To my network, yes.

Q.  That was all you were being paid to you, right?

A.  That's correct.

Q.  Have you ever heard of the anti-kickback statute?

A.  Yes.

Q.  I want to read you a portion of the anti-kickback statute, okay.  And the anti-kickback statute says that, "It is illegal to knowingly and willfully solicit or receive any remuneration," that means payments, "directly or indirectly overtly or covertly in cash or in kind in return for referring an individual to a person for the furnishing or arrangement for the furnishing of any item or service for which payment may be made in whole or in

26 (Pages 98 to 101)

Page 102

part under a federal healthcare program."

A.   Okay.

Q.   How is what Sun was doing here in terms of paying you for referrals different than the conduct prohibited by the anti-kickback statute?

A.   That is out of my -- I don't know that answer.

Q.   Okay.

A.   And I would be telling you something that I don't know.

Q.   Okay.  You can set that document aside.

A.   Okay.

Q.   And we're going to look at the contract with Mission next.

(Deposition Exhibit Number 14 was marked for identification.)

BY MS. KURTZ:

Q.   I am handing you a document that has been marked as Exhibit 14.

A.   Okay.

Q.   So if you're looking at the front page of this exhibit, this is the Management Services Agreement between One Stop Medical and Mission Toxicology; is that fair?

A.   Uh-huh.  Yes.

Page 103

Q.   And the effective date of this agreement is January 17th of 2017, correct?

A.   Yes.

Q.   All right.  So if you go to page 8 of this document -- are you with me?

A.   Yes.  Is that the signature page?

Q.   Yes.  You got it.

A.   Okay.

Q.   So I just want to confirm that this is your signature on the second page.

A.   Yes, it is.

Q.   And Jesse Saucedo, Jr., signed on behalf of Mission Toxicology, right?

A.   Yes.

Q.   Okay.  So this is the operative contract between One Stop and Mission; is that fair?

A.   Yes.

Q.   Okay.  So if you go to the front page again, if you go to the second Whereas clause, it says, "Whereas manager is in the business of."

Do you see that?

A.   Second paragraph?

Q.   Yeah.

A.   Yes.

Q.   It says, "Wheres as manager is in the

Page 104

business of, among other businesses, managing and arranging for the availability of ancillary healthcare services for and on behalf of networks of physicians and physician group practices," and then that's defined as "network physicians."

Do you see that?

A.   Yes, I see that now.

Q.   And the network physician it says, "require, among other ancillary healthcare services, the reliable and efficient provision of toxicology laboratory services."

Do you see that?

A.   Yes, I do.

Q.   So here is what they're saying is you have a network of referral sources and -- well, let me -- we haven't gone that far.

Is it what it's saying is you have a network of referral services -- referral sources who need toxicology services?

A.   Yes.

Q.   Okay.  Great.  And then it goes on the next paragraph, "Whereas, manager desires to arrange for the lab to be available for use by the network physicians for the provision of medically necessary toxicology testing services."

Page 105

Do you see that?

A.   Yes.

Q.   So is what what that's saying is you're connecting your network with the lab?

A.   Yes.

Q.   That's the goal of this whole contract?

A.   Yes.

Q.   And, again, why -- I don't want to go through everything that we went through with regard to the Sun contract.

A.   Sure.

Q.   But if we can confirm that what you did under the Sun contract is the same thing that you did under the Mission contract, which was basically connect Esan and his referral sources with Mission in this case?

A.   Yes.

Q.   And so you would make the initial introduction, maybe set up a conference call, and then they would contract directly with Sun and Mission?

A.   Yes.

Q.   And you would get a 5 percent total of the net associated with the referrals made pursuant to those contracts?

27 (Pages 102 to 105)

Page 106

A. Yes. And then out of that 5 percent, I gave Esan 70 percent of that.

Q. And you didn't do anything to manage the lab or anything like that?

A. No.

Q. Okay. You can set that document aside.

A. Okay. Thank you.

MS. KURTZ: I think we've been going for about an hour. Let's take a quick break.

VIDEOGRAPHER: Go off the record at 11:13 a.m.

(A recess was taken from 11:13 a.m. to 11:29 a.m.)

VIDEOGRAPHER: This is the beginning of disc number 3, and we are back on the record at 11:29 a.m.

A. Can I say one thing? You were asking about allergy. Okay. And I took a break here. The company that he -- that Dr. Murphy was with was called Arraylt.

Q. Arraya?

A. Yeah A-A-A-R-R-A-Y-L-T.

Q. Three As?

A. No. One A.

Q. Okay. So A-R-Y?

Page 107

A. Okay. A-R-R-A-Y-L-T. Arraylt.

Q. Okay. So, Mr. Boone, before the break we were talking about what were the services that you were providing to Sun and Mission. And you testified that what you were paid for was to refer -- was to refer entities that had referral sources to Sun and Mission --

A. Yes.

Q. -- is that fair to say?

Okay. We're going to just look at some documents that I think discuss what you were doing for Sun and Mission in a little more detail. Okay?

A. Sure.

(Deposition Exhibit Number 15 was marked for identification.)

Q. I'm handing you an exhibit that is being marked as Exhibit 15.

A. Okay.

Q. And before I ask you any questions about this exhibit, I just want to confirm, you didn't have any direct relationships with physicians that were referring specimens to Sun and Mission, correct?

A. No.

Q. It was Esan who had those

Page 108

relationships?

A. Yes.

Q. Let me know when you've had a second to review this e-mail chain.

A. Okay.

Q. Okay. So this is an e-mail chain. It looks like it's between you, Dr. Murphy and Esan Coleman, right?

A. Yes.

Q. And the subject is a forward and it says, "Contract - Sun - Integrated Laboratory Solutions - (50 percent)."

Do you see that?

A. Yes.

Q. Okay. So is Integrated Laboratory Solutions one of the entities -- one of Esan's entities that you connected with Sun or Mission?

A. Yes.

Q. In this case Sun obviously?

A. Yes.

Q. Okay. So if we go to the first e-mail in the chain, it looks like it's an e-mail from you -- no, strike that.

A. On the last page or first page?

Q. On the last page. It looks like it's

Page 109

and e-mail from Esan to you in where he's saying that he has someone who needs a contract for 50 percent with Sun. Do you see that?

A. Yes, I do.

Q. And it says, "Rush please big pain group for multiple states."

Do you see that?

A. On what page, ma'am?

Q. It's on the page you're looking at. It's on the bottom of the page where it says "Subject."

A. Yes. I'm not -- it's not the last page, right?

Q. Not the very last page. The second to the last page.

A. Okay. Does it start off on one that says, "Esan, please advise"?

Q. No. Go all the way to the bottom e-mail on that page. It's dated December 1 of 2016.

A. Okay. I'm with you.

Q. All right. So the subject of Esan's e-mail to you is "Need contract 50 percent - Sun - Rush please big pain group in multiple states."

Do you see that?

A. Uh-huh. Yes.

28 (Pages 106 to 109)

Page 114

Q. What did you mean by that?

A. That means that -- well, that means they wanted to start with toxicology, and on -- and then do blood, but they wouldn't do PGx because they didn't do PGX out of that lab.

Q. So Sun didn't do PGX?

A. No, it did not.

Q. Dr. Murphy responded to you, "Dan, this company is owned by a physician. Please let me know he is sending his own referrals, is a management company, et cetera."

Do you see that?

A. Can you -- is it on the top here?

Q. Right above the e-mail we were just looking at.

A. "Please advise" from Dr. Murphy. Yes.

Q. Do you know why Dr. Murphy was asking you that question?

A. My idea would be because he got -- wanted to make sure that it's not coming from a doctor, you know -- I really don't know that answer, honestly, but I can assume --

Q. Okay.

A. -- I can -- I think what he would be saying is that he wants to be compliant so the

Page 115

doctor would not be getting any kind of kickback or incentive.

Q. So it was important in his view -- or let me rephrase.

You believe it was important in his view that the doctor wasn't getting direct payments based on the number of specimens that doctor himself was --

A. That's correct.

Q. But that if the doctor was referring specimens from other referral sources, it would be okay for him to get a percentage?

MR. MARKHAM: Objection. Calls for speculation.

A. I don't even think that's real to do -- should be doing, as a matter of fact. I wouldn't.

Q. But you got a percentage based upon the number of specimens that your -- the number referred, right?

A. Yeah, if it did come to fruition, the answer would be yes. But as I stated just a few seconds -- a few minutes ago, out of all the contracts, out of about some 20 some contracts that have been issued by Esan or Dr. Murphy or Lynn in the case was issuing the contracts, probably only a

Page 116

handful moved forward.

Q. And if they moved forward you would get paid based upon the number of referrals, right?

A. Yes. Yes.

Q. Okay. You can set that document aside.

(Deposition Exhibit Number 16 was marked for identification.)

BY MS. KURTZ:

Q. I am handing you the document that has been marked as Exhibit 16.

A. Okay.

MR. MARKHAM: 16?

MS. KURTZ: Yes.

BY MS. KURTZ:

Q. Let me know when you're ready.

A. Sure. Okay.

Whenever you are, I'm fine.

Q. Okay. Great. So looking at the earliest e-mail in the chain, which is going to be on the second page of the document, so I think it's probably on the back page of what you're looking at right now.

A. Okay.

Q. Yeah, there you are. So here's an e-mail from Esan Coleman to you dated December 26 of

Page 117

2016. Do you see that?

A. Yes. Can I tell you one thing here? You had wanted earlier a name of Esan's company, and that's his company, B & M Healthcare Consultants.

Q. B & M Healthcare Consultants?

A. Yes.

Q. Great. Thank you.

A. Yes. You're welcome.

Q. All right. So, again, the subject here is "Contract - Sun - 50 percent." The 50 percent is the 50 percent that the contracting entity would receive of that revenue, right?

A. Of my 60 percent, they would get 10 percent -- I mean they would get 50 percent, so we would get 10 percent, and out of that 10 percent Esan would get 70 percent of that 10 percent.

Q. Okay. But 50 percent relates to the number of referrals and the net revenue associated with the number of referrals, right?

A. The net minus your COGS, yes.

Q. So the net is minus the COGS, right?

A. Everything that -- anything we would get paid on would be -- would be the total amount of the bill for minus your COGS to get your net.

Q. All right. And it says, "2,000 tox but

30 (Pages 114 to 117)

Page 122

Q. So EM1 was an actual lab that would perform testing; is that fair?

A. EM1 was looking for an in-network contract because they were out of network.

Q. Uh-huh.

A. So they were looking to send the samples to -- in this case, I think was it to Jesse or was it to --

Q. It looks like this was Sun.

A. Sun and Dr. Murphy, yes.

Q. Okay. So EM1 was basically going to be a referral source --

A. Yes.

Q. -- to Sun in this case?

A. They were going to send samples to them to have them run from their lab over -- to send to Sun to run, yes, because of their in-network contract.

Q. So Sun would be performing the testing?

A. That's correct.

Q. Not EM1?

A. That's correct.

Q. Understood. Okay. I don't really care about what his e-mail to you says, but if you go up, it says -- you're responding to him and you say,

Page 123

"Rob: I have over 20 contracts in to Sun and I get a report of the contracts that have been issued and have not been 'onboarded' or have been 'onboarded.'"

Do you see that?

A. Yes.

Q. What did you mean by that?

A. What I was telling him that of all the contracts I have in, there are very few of them that actually I would see if they were onboarded, mean that they have signed -- they've had the initial conversations. They agreed upon the amount. They got a contract from Sun. They got the supplies sent out. And then now they are ready to start submitting samples into Sun.

Q. Understood. So is what you're telling him is basically it's your job to keep track of who has signed contracts, who has been onboarded, who is ready to start submitting samples?

A. Yes. And then once they did do that, then -- then a person at Sun would then be working with them to get them a portal so they could start seeing which insurers were submitted in, did it pay or not pay, or was it needing additional information.

Q. Got it. Okay. You can set that

Page 124

document aside.

A. Okay.

(Deposition Exhibit Number 18 was marked for identification.)

Q. I'm handing you a document that's being marked as Exhibit 18.

A. Okay. Thank you.

Q. Let me know when you've had a chance to review.

A. Yes.

Q. Okay. So the bottom e-mail is an e-mail from Dr. Murphy to you dated January 13th, 2017. Do you see that?

A. Yes, I do.

Q. And Dr. Murphy is asking you to please take a few minutes and relate to him your experience with onboarding for Sun. Do you see that?

A. Yes.

Q. What did he mean by onboarding for Sun?

A. Customer service was -- was the people on -- that worked for Sun that were giving myself and Esan or any of the people that had got contract the proper -- proper customer service of getting supplies, getting anything they needed to get started and along with portals.

Page 125

Q. What do you mean supplies?

A. Req forms.

Q. So Sun would send the requisition forms directly to the referring providers?

A. Correct.

Q. Anything else, like specimen tubes or anything like that?

A. Yes. It included all that. Yes. Not obviously req form, but you're totally correct, yes.

Q. All right. So you respond on January 13th at 12:44 p.m. that the onboarding -- that "the onboarding team has been a pleasure to work with and very professional."

Do you see that?

A. Yes, I do.

Q. And then you ask for a report for all of the contracts that have been issued, the ones where the labs still need to execute the contract back, the ones that are -- have been onboarded, and where these -- each of these contracts are in the process of sending samples in.

Do you see that?

A. Yes, I do.

Q. So you, basically, were asking for a weekly report of all your contracts and where those

32 (Pages 122 to 125)

Page 138

Name. I'm assuming that's the name of whoever is insuring the patient whose specimen is to be tested; is that correct?

A. Yes. And you can see the maj- -- a lot of them were Blue Cross Blue Shield, UnitedHealthcare and then there's obviously a Baptist Health. Obviously that's not -- you know, not the major five.

Q. Right. There's a Collection Date, which is the date the collection -- or the specimen was collected, right?

A. Yes.

Q. Type of Service, that's the type of specimen being tested, right?

A. Yes.

Q. Then it says Bill Type. Do you see that?

A. Yes.

Q. What does that mean?

A. That's telling you the hospital that it's being billed under, whether it's Sharkey or, in this case, Community Memorial or Newman. I think there's probably three different hospitals on here.

Q. Do you understand why certain specimens were billed through one hospital versus another

Page 139

hospital?

A. That's above my pay code, but I assume --

MR. MARKHAM: Objection. Speculation.

THE WITNESS: Okay. Yes, it is.

A. I assume because maybe that particular hospital had -- maybe had a better contract. I don't know. I'm assuming.

Q. Okay. Then we go to -- and I just want to be clear. It says Bill Type. That doesn't necessarily mean the hospital performed the testing, correct?

A. Can -- well, no. That's not -- that's not my assumption of it. My assumption would be is that once it got accessioned in with the number all the way to the left within the areas of Alternate Health, they had Sharkey, they had Newman. Each one of them had their own employees of the -- of that particular hospital within their Alternate Health billing that they ran the samples.

Q. But the test was not performed at Sharkey Hospital, correct?

A. That's correct. But it was performed by an employee of --

Q. And how do you know that?

Page 140

A. Because I seen them and I seen the different locations when I got a tour and I was introduced to them.

Q. Did you see those individuals who were performing the testing, their employment contract?

A. No. When -- when they gave me a tour of the building, they took me around, first off -- when I first got there, they -- I met Dr. Murphy, okay. And then we went out to lunch. And then -- then after that he went and showed me the different -- where the place in San Antonio where the lab was for Sun and Mission. He then took me to Alternate Health building, which is a very big building. I think employed 2 or 300 people. And then -- then he showed me the different segments of what the machines. Then he also took me into all the different places within the Alternate Health building that had employees of that particular hospital there and the equipment to run the sample.

Q. My question was much simpler than that --

A. I gave you a long --

Q. -- which was, you didn't see the employment contracts between the purported --

A. No. Oh, no.

Page 141

Q. -- between the purported hospital employees --

A. No.

Q. -- and the hospitals?

A. No, I did not.

Q. Okay. So if we go to Rep Manager ID, what is that?

A. I don't know. I don't know what it means.

Q. Okay. Then we go to the right and it says Charge. Do you see that?

A. I can barely see it, yes.

Q. Well, let's look at the first row. It says Charge and it's $11,000. Do you see that?

A. Yes. I can't read it very good without my glasses, but yes.

Q. That's for allergy testing?

A. Uh-huh. Okay.

Q. And then if you go two rows over, it says Payment. Do you see that?

A. Where like the top one says like 1193 and then 2631; is that correct?

Q. Yes.

A. Is that the amount?

Q. Yes.

TSG Reporting - Worldwide - 877-702-9580

APP 29

Page 158

A.  Yes.

MR. MARKHAM:  Objection to all of these.  Lack of foundation.

MS. KURTZ:  Well, we looked at the original spreadsheet, so...

BY MS. KURTZ:

Q.  You recall it was billed through Community, correct?

A.  Yes.

Q.  But what you've seen here, the physician didn't order the test from Community, correct?

MR. MARKHAM:  Objection.  Lack of foundation.

Q.  We looked at the requisition form.

A.  You want me to answer that?

Q.  Yes.

A.  No.

Q.  The physician not order the test from Community?

A.  No.  They probably -- they probably didn't know it was going to go to Community.

Q.  Okay.  And then Community didn't perform the testing, access did -- Axis did, correct?

Page 159

MR. MARKHAM:  Objection.

A.  Like I said, it could be something that they referenced out, but I do not know that answer.

Q.  Okay.  Well, from the documents, Axis was the one who performed the testing, correct?

A.  That's what it said.

Q.  But it was Community who billed the testing as if they had performed the test?

A.  Yes.

Q.  Okay.  And that was important in order to maximize the reimbursement received for this particular test, correct?

A.  Yes.

MR. MARKHAM:  Objection.  Again, lack of foundation.

Q.  You can answer.

A.  Yes.

MR. MARKHAM:  This is what number?

THE WITNESS:  It would be 033220 [sic].

MR. MARKHAM:  No, sorry.  Exhibit number.

THE WITNESS:  Oh, 24.

MS. KURTZ:  We've been going for an hour.  I probably have 20 minutes left so we can take a break.  I don't know how long you're going to

Page 160

have.  It might make sense to grab lunch.

VIDEOGRAPHER:  You want to go off the record?

MR. MARKHAM:  Yes.

VIDEOGRAPHER:  Go off the record at 12:30 p.m.

(A recess was taken from 12:30 p.m. to 1:18 p.m.)

VIDEOGRAPHER:  Okay.  Beginning of disk number 4, we're back on the record at 1:18 p.m.

(Deposition Exhibit Number 25 was marked for identification.)

BY MS. KURTZ:

Q.  Okay.  Mr. Boone, I'm handing you an exhibit, or a document that's been marked as Exhibit 25.

A.  Uh-huh.

Q.  Have you had a chance to look through Exhibit 25?

A.  Yes.

Q.  So this is another one of the e-mails where you're receiving a distribution report from Julie Pricer?

A.  Uh-huh.

Q.  Do you see that?

Page 161

A.  Yes.

Q.  And the second document is actually the distribution report?

A.  Yes.

Q.  Okay.  Can you take a look at the distribution report?

A.  Yes.

Q.  And I'm specifically looking at -- I want to look -- compare the Insurer Name column with the Bill Type column.  Do you see that?

A.  Well, I can't hardly see without my glasses, my readers.

Q.  The Insurance Name column is the third column over.

A.  Okay.

Q.  And the Bill Type column is the sixth column over.

A.  Okay.  So you want the insurer and the biller?

Q.  Bill Type, yes.

A.  Okay.  Got you.

Q.  So it looks to me like the hospital that billed the test was dependent upon, or at least, in part, upon who the insurer was.  Do you see that?  For example, it looks like they were

41 (Pages 158 to 161)

Page 162

billing Aetnas test through South Central Kansas and Newman Memorial.

A. Okay.

Q. And they were billing UnitedHealthcare tests and Blue Cross Blue Shield of Texas through Community Memorial Hospital. Do you see that?

A. Yes, I do. Uh-huh.

Q. Do you know whether it was common that the hospital that was being billed through was dependent upon the insurer?

MR. MARKHAM: Objection. Speculation. Lack of foundation.

A. Do not know that answer.

Q. Who would know that answer?

A. That would probably have to be Jesse.

Q. Were you aware that certain insurers would stop reimbursing claims coming through certain hospitals?

A. No.

Q. You can set that document aside.

So I want to switch gears a little bit. And we talked earlier about having -- how in-network contracts were essential for the outreach programs to work, right?

A. Yes.

Page 163

Q. Because the in-network contract meant that it was more likely that claims would be reimbursed and more likely that claims would be reimbursed at a higher reimbursement rate, correct?

A. Yes.

MR. MARKHAM: Objection. Calls for speculation and foundation, but you can answer.

Q. And, again, you understood that if the labs were to bill these claims directly, they might not get reimbursed at all or might have been reimbursed at lower rates, correct?

A. Yes.

Q. Because they were out of network with the payors?

MR. MARKHAM: Objection. Calls for speculation again.

A. Could you repeat that, please?

Q. Because the labs were out of network labs with the payors?

A. Yes.

Q. So the bills had to go through the hospitals in order to maximize reimbursement, correct?

A. Yes.

Q. And so it was important to track the

Page 164

reimbursement rates that various hospitals would receive from different payors, right?

A. Yes.

Q. And so you, along with Sun and Mission, knew the reimbursement rates that various payors would pay to different hospitals, right?

A. I did not know that, no.

Q. Who would know that?

A. It would have to be probably Jesse or somebody that had the contract.

Q. All right. I want -- I don't want you to do anything.

(Deposition Exhibit Number 26 was marked for identification.)

Q. I'm going to hand you a document that is being marked as Exhibit 26.

A. Okay.

Thank you.

Q. Okay. So this is an e-mail chain that you first received an e-mail from someone named Michael Willoughby who is the chief commercial official of Genotox Labs. Do you see that?

A. No, I don't. Can you -- is it -- on what page?

Q. I think you need to go on to the next

Page 165

page.

A. The back page?

Q. Yeah.

A. Okay.

Q. It goes across two pages, of course.

A. Okay. Yes, I see it.

Q. Who is Michael Willoughby?

A. I don't know him personally, but I think this is probably -- I'm guessing, this is probably coming from -- yeah, it's Esan's deal. So Esan knew him. I don't.

Q. But what he's asking you is to please provide the average reimbursements for, and then there's five different G codes. Do you see that?

A. Yes, so you're talking about CPT codes right there, the G0479 --

Q. Correct.

A. -- to 483?

Q. Yeah.

A. Got it.

Q. Just so we're all on the same page, G0749 [sic] is for presumptive testing.

A. Okay.

Q. And then the rest of the CPT codes here are for different types of definitive testing, okay?

42 (Pages 162 to 165)

Page 166

A. Yep.

Q. And you understand presumptive is a screening test and definitive is the confirmation test, right?

A. Didn't know that, but now I do.

MR. MARKHAM: Well, actually -- could you read back that question. You read that very fast.

(Off-the-record discussion.)

MR. MARKHAM: Thank you.

BY MS. KURTZ:

Q. It doesn't really matter. I just wanted to make sure we're on the same page, that this is for the laboratory testing. These are CPT codes for laboratory testing, okay?

A. Yes.

Q. And so you sent Dr. Murphy an e-mail and said, "Dr. Murphy, if not too much of a problem, please provide the reimbursements of the CPT codes below."

Do you see that?

A. Yes.

Q. And then you can see that Dr. Murphy -- you weren't on this chain -- but he e-mails Tamara Derouen and Samantha Murphy asking for an estimate

Page 167

on the average reimbursements. Do you see that?

A. Uh-huh.

Q. Do you know who Tamara is?

A. I presume it's probably somebody with --

MR. MARKHAM: Objection. She asked if you knew.

MS. KURTZ: Don't coach the witness. He can answer.

MR. MARKHAM: I'm not coaching.

THE WITNESS: Do you want me to answer yes or no?

A. No, I don't know who they are. I assume it's probably somebody within the building area.

BY MS. KURTZ:

Q. Okay. Do you know why Michael Willoughby was asking for the average reimbursement rates for these types of tests?

A. No.

Q. You can set that document aside.

(Deposition Exhibit Number 27 was marked for identification.)

BY MS. KURTZ:

Q. Okay. I'm handing you a document which

Page 168

is an e-mail and attachment that's been marked as Exhibit 27.

A. Okay. Thanks.

Q. Okay. Let me know when you've had a chance to review.

A. Yes. I'm fine.

Q. Okay. So looking at the first e-mail, it's an e-mail from you to Dr. Murphy. Do you see that?

A. Are you talking about this is the information I requested from Ashton?

Q. Yes.

A. Yes.

Q. Who is Ashton?

A. Ashton -- Ashton had a -- he had a -- a lab -- had an office and a lab program he ran down in Dallas.

Q. Do you remember what -- the name of the company?

A. Oh, boy, I don't. But I also know that he is -- he got served by the federal -- they had a raid on his lab. And I think he's in a pretty big lawsuit right now.

Q. Okay. Going back to the subject of the e-mail, so Dr. Murphy requested some information and

Page 169

you're passing it along from Ashton, right --

A. Yes.

Q. -- is that what's happening?

A. Yes.

Q. Okay. Let's look at the attachment.

A. Okay.

Q. Okay. So this attachment looks like it's a table again. And at the top of the table we have Hospital 1, Hospital 2, Hospital 3. Do you see that?

A. Yes, I do.

Q. And so under each of these hospitals we have the five major payors, right: United -- sorry. Aetna, Blue Cross Blue Shield, CIGNA, United and Humana, right?

A. Yes.

Q. And then we have the rates that each of these five major payors will reimburse the hospital for different types of testing, right?

A. Yes. I think it's called billable rates, I assume.

Q. Okay. So -- but the type of testing that's being addressed here is toxicology, blood --

A. Yes.

Q. -- and DNA testing?

43 (Pages 166 to 169)

Page 170

A.   Yes.

Q.   And so here you're telling Dr. Murphy which -- what each of these insurers will reimburse for each of these types of testing, correct?

A.   Yes.

Q.   So he understood that United's contracted rate at Hospital 1 was 60.8 percent, correct?

MR. MARKHAM:  Objection as to what he understood.  You may answer it.

A.   Could you run that question by me again, please?

Q.   Well, in this attachment you're telling Dr. Murphy what United would get reimbursed -- would reimburse Hospital 1 for toxicology testing, correct?

A.   Yes.

Q.   And it was 60.8 percent?

A.   For Hospital 1?

Q.   Yes.

A.   Under United?

Q.   Yes.

A.   Correct.

Q.   Okay.  Do you know what hospital is Hospital 1?

Page 171

A.   Do not.

Q.   And do you know what hospital is Hospital 2 or 3?

A.   Do not.

Q.   Do you know how Ashton got this information?

A.   I don't have a clue.  Maybe it could have been from maybe his lab, what -- that he was doing, I don't know, and his contract.  I'm just guessing now, though.

Q.   Okay.  But, regardless, you provided this information to Dr. Murphy after he requested it, correct?

A.   Yes.

Q.   You can set that document aside.

A.   When I say anything, I just remembered who Ashton worked for.  It's called Southwest Labs.

Q.   Okay.  Thank you.

A.   You're welcome.

(Deposition Exhibit Number 28 was marked for identification.)

Q.   Okay.  I'm handing you a really big document, but we're only going to look at the cover e-mail and one of the attachments, okay?

A.   That's fine.

Page 172

Q.   And I'm marking this document Exhibit 28.

A.   Thank you.

Q.   Okay.  So it looks like this top e-mail is an e-mail from Chris Parris who we had talked about previously, right?

A.   Yes.

Q.   And he's sending it to Dr. Murphy, Jesse Saucedo and yourself.  Do you see that?

A.   We're cc'd on it you mean?

Q.   You're in the "To" line.

A.   Yes, I see it now.

Q.   Okay.  And the subject is "Forward: Hardin Memorial requested data."

Do you see that?

A.   Yes.

Q.   All right.  And what he's writing is, "To All, See information on Hospital Number 1 below."

Do you see that?

A.   Yes, I do.

Q.   All right.  Since it's an e-mail, I'm going to figure out which attachment I want you to look at.

A.   Now Christopher Parris, I mentioned

Page 173

Foremost Labs.  Okay.  That was their lab and then their company was called Nexus Laboratory Management Systems.

Q.   I actually don't see the attachments I want.  Give me one second.

I'm sorry, I handed you the wrong document.  You can set that aside.

A.   Sure.

Q.   But now I'm going to hand you the right one.

A.   Okay.

(Deposition Exhibit Number 29 was marked for identification.)

BY MS. KURTZ:

Q.   Okay.  I'm handing you what's being marked as Exhibit 29.  I'll just confirm it's the right one this time.

Okay.  So we're just going to look at the first e-mail and the last attachment.

A.   Okay.  Sounds good.

MR. MARKHAM:  This is 29?

MS. KURTZ:  Correct.

MR. MARKHAM:  Thank you.

BY MS. KURTZ:

Q.   Have you had a chance to look at the

TSG Reporting - Worldwide - 877-702-9580

Page 174

top e-mail?

A. Where it just said, "To All, Second hospital attached"?

Q. You got it. So, again, this is an e-mail from Chris Parris, right?

A. Yes.

Q. And he's sending it to you, Jesse Saucedo, Dr. Murphy, and someone named Dominic Siwik?

A. He's the CEO of Nexus Laboratory.

Q. Okay. Great. And there's no subject here, but the attachments are named Aetna.pdf, Cigna.pdf, healthlink.pdf and UnitedHealthcare.pdf. Do you see that?

A. Yes.

Q. And he's writing, "To All, second hospital information attached," right?

A. Uh-huh.

Q. Okay. So then if we go to the last attachment in your bundle. You might want to separate because there's a whole bunch of stapled documents.

A. The last attachment?

Q. Yep.

A. Would it be 9029?

Page 175

Q. Yes.

A. Okay.

Q. All right. So if you go to the first page, do you see that it says Facility Participation Agreement?

A. Yes.

Q. And in this case it's an agreement between UnitedHealthcare Insurance Company and Heartland Health System, d/b/a Fayette County Hospital. Do you see that?

A. Yes.

Q. Do you understand this is UnitedHealthcare's network agreement with Fayette County Hospital?

A. I've been reading that. Yes, I do see that.

Q. Okay. And so Chris Parris sent you and Dr. Murphy and Jesse Saucedo an actual copy of this contract. Do you see that?

A. On -- where would I see that at?

Q. On the cover e-mail.

A. Oh, in the beginning part of it?

Q. Yes.

A. Yes, I do.

Q. Okay. So at least for Fayette County

Page 176

Hospital Dr. Murphy had the entire agreement in his possession --

A. Okay.

Q. -- is that correct?

MR. MARKHAM: Objection. Speculation as to what Dr. Murphy had.

Q. Well, Dr. Murphy's on this e-mail that you're on, correct?

A. It is, yes.

Q. And attached to this e-mail is the Facility Participation Agreement between UnitedHealthcare and Fayette County Hospital, correct?

MR. MARKHAM: Objection. Same objection. You can answer.

Q. So Dr. Murphy --

A. Yes.

Q. -- had this agreement?

A. Yes.

MR. MARKHAM: Objection. Same objection.

A. Yes.

Q. Okay. You can set that document aside.

A. You want me to staple it back together?

Q. That would be great.

Page 177

A. Sure.

Q. And it was important for the outreach program to understand what various insurers would reimburse various hospitals, correct?

A. Yes.

MR. MARKHAM: Objection. Speculation.

Q. You may answer.

A. I assume that would be a correct statement, yes.

Q. Well, you talked about it with others when you were discussing the outreach program, correct?

A. With what it was reimbursing at?

Q. Yes.

A. I -- help me out here because I don't -- help me --

Q. Let's go back --

MR. MARKHAM: Wait. Wait. He hadn't finished his answer. Go ahead, answer it.

A. I -- please refresh it because I -- are you talking about the one chart that had all the information on it?

Q. Yeah.

A. Okay. Okay. Then yes, I seen it -- seen what you showed me.

45 (Pages 174 to 177)

Page 198

know because he would -- he would cancel the contract immediately.

Q. Did you ever have any discussions with Dr. Murphy on that subject?

A. Yes.

Q. And what did Dr. Murphy say to you on the subject of the payment of doctors for lab referrals?

A. Same thing. The answer is yes, I did. And also that if he like heard of anybody did it, to let him know and he would take it from there and he'd cancel their contract.

Q. Okay. And did you have that discussion with him more than once?

A. I didn't need to. No, I didn't.

Q. All right. Did you -- you -- during your testimony in answer to questions to Ms. Kurtz you used the term "referral" many, many times --

A. Uh-huh.

Q. -- fair enough?

A. Yes.

Q. And you used -- you talked about payment for referrals, correct?

A. Yes.

Q. Were you at any time talking about

Page 199

payment to doctors for referrals?

A. No.

Q. You were talking payment -- you were talking about payment to brokers who were bringing doctors' business to a lab, correct?

A. That's -- yes.

Q. And what is your understanding about whether or not that is covered by the anti-kickback statute?

MS. KURTZ: Objection. Calls for a legal conclusion.

Q. You can answer.

A. Run this by me again because I lost my train of thought.

Q. You know what, Ms. Kurtz is right. It is a legal conclusion.

A. Okay.

Q. But you were not ever talking about paying doctors, were you?

A. No.

Q. Ever paid a doctor?

A. No.

Q. Ever known Jesse or -- Jesse Saucedo or Mike Murphy to pay a doctor?

A. Two words. Absolutely not.

Page 200

Q. Okay. Does that go for their companies as well?

A. That's correct.

Q. Does that go for the people working for them?

A. That's correct.

Q. Who is Chris Parris?

A. Chris, he's a senior vice president of -- of -- of -- let me think. Nexus Laboratory Systems.

Q. Do you happen to know how he gained access to any of United's contracts?

A. Oh, no. No, I do not. Well, the only thing I could guess would be that they had a lab called Foremost up in Michigan, and maybe that came from there. I don't know that answer. That's speculative.

MR. MARKHAM: Okay. I have nothing further.

MS. KURTZ: I don't have anything further either. I would like to mark the -- designate the transcript as confidential, attorney's eyes only just because for now there's going to be some PHI in the exhibits. I believe under the protective order we have time to designate portions

Page 201

of it, but it --

MR. MARKHAM: Well, I mean these all came through my clients. They've all seen this information.

MS. KURTZ: Okay. Fine. Good point. Let's mark it as confidential and then as containing PHI, just to make sure it doesn't get distributed anywhere else.

MR. MARKHAM: Anywhere else. Agreed.

MS. KURTZ: And You have an opportunity to review the transcript and to sign it and identify whether there are any errors in the transcript. The court reporter will send you the transcript directly if that's something you wish to do.

THE WITNESS: By mail or how would they send it?

MS. KURTZ: By mail.

THE WITNESS: By mail? And what do I need to do with it? Just review it.

MS. KURTZ: And sign it.

THE WITNESS: Yes, be glad to. Now --

MR. MARKHAM: Since we're on the record, if you see an answer that there's something that does not look like what you said --

THE WITNESS: Uh-huh.

51 (Pages 198 to 201)

# Exhibit 3

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF TEXAS

SAN ANTONIO DIVISION

MISSION TOXICOLOGY,              *
L.L.C., ET AL.,                  *
     Plaintiffs                  *
                                 *
V.                               * Case No. 5:17-cv-01016
                                 *       (lead case)
UNITEDHEALTHCARE INSURANCE       *
COMPANY, INC., ET AL.,           *
     Defendants                  *
                                 *
--------------------------       *
                                 *
UNITEDHEALTHCARE INSURANCE       *
COMPANY, INC., ET AL.,           *
     Plaintiffs                  *
                                 *
V.                               * Case No. 5:18-cv-00347
                                 *       (consolidated
MICHAEL MURPHY, M.D.,            *         case)
ET AL.,                          *
     Defendants                  *


     ***************************************

   ORAL AND VIDEOTAPED DEPOSITION OF GREGORY MILO CASKEY
               NOVEMBER 19, 2019
     ***************************************


Job No. 172099

Page 38

be that they would use services that, you know, we installed.

Q. But just to be clear, does this contract contemplate NuMedica physicians ordering tests from Mission?

A. Yes, they had the option of doing that.

Q. Uh-huh. All right.

And so if you look in the next paragraph here, it says, In connection with the use of the lab by the network physicians, Mission desires to engage manager to provide certain management training and other services to the network physicians to facilitate the efficient and appropriate utilization of the lab by the network physicians.

Is that correct?

A. Yes.

Q. All right. So if you look at paragraph 2 here, which starts about two-thirds of the way down the page, am I correct that that defines the services that NuMedica will perform under this contract?

A. Yes.

Q. All right. You can take a moment to just look those over.

A. Yeah. (Witness complies.)

Okay. Yep, looks like it was.

Page 39

Q. So is it fair to say that one of the duties that NuMedica assumed under this contract was marketing Mission's lab to NuMedica's physicians?

A. Yes.

Q. And it didn't assume any duties related to marketing other labs?

A. No.

Q. Just the lab owned and operated by Mission?

A. Yes.

Q. All right. And is it fair to say that another duty that NuMedica assumed under this contract was to facilitate the order of testing from Mission?

A. Yes.

Q. Is there any other service that you performed for Mission that you don't think is fairly encompassed in those two categories?

MR. MERRITT: Objection, best evidence.

THE WITNESS: Sorry? I didn't hear what he said.

MR. MERRITT: You can answer the question, but listen carefully what he asked you.

A. Oh. Can you repeat the question?

Q. Sure.

Did you perform any other services for Mission under this contract that were not marketing

Page 40

Mission's lab to NuMedica physicians or facilitating the order of lab testing by NuMedica physicians from Mission?

MS. ZERNER: The same objection.

A. That was -- that was part of it. But, you know, there's a lot that goes into, you know, running specimens, resulting them, and handling all the day-to-day operations with that.

Q. All right. And so what other services did you provide?

A. Like three pages of management services that, you know, we can go through if you would like. But there is a lot of stuff on there. Just day to day, making sure the courier picked them up, making they're resulted, make sure they were processed correctly, make sure the results go into portals correctly, making sure if any patients had questions, we would facilitate that; if physicians had questions, we would facilitate that, you know, setting up the lab, all the equipment, making sure the equipment ran correctly --

Q. Uh-huh.

A. -- you know, works with the staff, the collectors.

Q. So just to back up, what equipment exactly are you talking about?

Page 41

A. Just like a centrifuge, a draw chair. Not a lot of equipment, just, you know...

Q. So this is equipment that NuMedica would provide to physicians' offices?

A. Normally. Normally we would do that, yeah. A lot of times the clinic already had it. But if they didn't, you know, we would find it for them.

Q. And NuMedica would bear the cost of that?

A. Usually.

Q. Did Mission ever reimburse NuMedica for any of those sorts of expenses?

A. Not that I'm aware of. Not that I'm aware of.

Q. All right. Is it fair to say that primarily the services you performed were first -- well, strike that.

So under this contract, you marketed Mission's laboratory to NuMedica's physicians; is that fair to say?

A. Yes.

Q. And under those contracts, you facilitated their orders of testing from the lab owned and operated by Mission; is that correct?

A. Yes.

Q. All right. And if you would turn to the next page, please.

11

Page 58

office?

A. Yes.

Q. And then there are some options for how physicians would receive results below that; is that correct?

A. Yes.

Q. So below that you will see a box that says Federal Tox Lab.

A. Uh-huh.

Q. Did you understand that to be the laboratory that the specimen would be sent to if the patient was covered by federal insurance?

A. I believe so, or -- yeah, I'm not sure.

Q. All right. So if you look below that in the sales information, what information would go in the sales rep space?

A. It would usually be the actual person that's going to be working the account, managing the account. So it could be Scott or Alex, Robert, or myself.

Q. Uh-huh. And then with the distributor here, if it was one of your accounts, it would be NuMedica?

A. I believe so.

Q. And so below that, there's a spot for the estimated number of samples that the physician being onboarded would send per month; is that correct?

Page 59

A. Yes.

Q. And then below that is a space for the specific physicians who would be sending samples; is that correct?

A. Yes.

Q. All right. So at the very bottom, am I correct that this form says that it gives Mission Toxicology permission to test each specimen according to the selection made on the individual forms received in the laboratory?

A. Yes.

Q. And below that, there's a signature block where the physician would authorize Mission to perform those tests; is that correct?

A. Yes.

Q. So did the physicians authorize other labs to perform the tests when you were working with Mission?

A. I don't -- I don't know. What -- what do you mean by that?

Q. So when you work with Mission, all of the tests that you sent were performed by Mission, is that correct, to your knowledge?

A. To my knowledge, you know, it's saying that it's Mission Toxicology.

Q. Uh-huh.

Page 60

And you've never asked any of your physicians if it was okay to send the specimen elsewhere?

A. You know, I don't recall ever having that conversation.

Q. Uh-huh.

But you would have expected to be the one to be contacted to have that conversation by Mission, and it would not be Mission going directly to your physicians; is that correct?

A. Correct.

Q. Uh-huh.

All right. So just to be clear, the physicians that you onboarded for Mission ordered tests from Mission?

A. It was -- yes, it was on a registration form such as this that said Mission on it.

Q. Uh-huh. And it was your understanding that those tests would be performed by Mission?

A. Yeah. I mean, I didn't really have an understanding. I mean, I assume that they were picked up by Mission, processed by Mission. Whether or not the whole test was done by Mission or not, that was never communicated to me.

Q. Uh-huh.

Page 61

But you communicated to the doctors who you were onboarding that they would be ordering tests from Mission?

A. Yes.

Q. Uh-huh.

If you will just turn back to the first page of this, again, the cover e-mail.

A. (Witness complies.)

Q. So am I correct that in the body of this e-mail you're saying, Good info, good selling?

A. Yeah, it's just an old Pfizer habit, you know, just open attachment and just write that and send it. I doubt I even read the attachment, you know.

Q. So would you have expected Scott Norman, Robert Castaneda, and Alex Epstein to explain the arrangement to doctors they marketed to the way you've explained it to me?

A. Not really. This e-mail looks more just like a process e-mail more than any kind of, you know, marketing material or anything like that.

Q. But mostly, I mean, did Scott Norman -- I'll just say, did these three individuals get their understanding of how the arrangement with Mission would work from you?

A. I don't think so.

16

Case 5:17-cv-01016-JKP   Document 174-2   Filed 01/31/20   Page 42 of 456

Page 70

been my dream to be an entrepreneur and run my own company, and so I learned from Nick and some other people in town, you know, just talking to doctors and realized I could probably do it myself, get a good attorney, a good CPA, and do things the right way. So that's what I did. I had a couple of accounts with Nick, maybe just that one, and then once I kind of understood the business a little better, I just started NuMedica.

MR. MERRITT: Point of clarification, for when he says "you," was NuMedica with Sun, or did you form NuMedica -- you're testifying as NuMedica.

THE WITNESS: Yes. NuMedica was not with Sun. It was always its own entity with -- started with Mission directly. I left Uptown and started my own company. And when I did that, I signed on with Mission and moved my accounts.

Q. So was there any reason that you didn't just continue working with Sun but under the NuMedica corporate entity?

A. Not really. I don't know if -- probably -- I don't know. I mean, things like this, it's, you know, you have circumvent issues, and if Uptown already has the arrangement with Sun, usually you can't jump over them and get a direct deal. So I probably just said,

Page 71

you know, I'll just keep working with Mission.

Q. And if you look down here in the third paragraph in the body of this e-mail --

A. Uh-huh.

Q. -- am I correct, it says, Roka will send all blood, so we would like PD -- oh, sorry -- PHDA to handle any federal samples?

A. Right.

Q. And did Dr. Roka send, exclusively, blood to Mission throughout its relationship?

A. No, no. He used lots of labs, CPL, LabCorp, Mission.

Q. Oh, I'm sorry. I'm asking a slightly different question.

A. Okay.

Q. Did Dr. Roka send only blood to Mission throughout his relationship with Mission?

A. Yes.

Q. So no other type of specimen?

A. Not that I know of. When I started NuMedica, all we did was blood. That was it. Just management.

Q. All right. So looking at the attachment to this e-mail, am I correct that this is the filled-out new client registration form for Dr. Roka to start sending samples to Mission?

Page 72

A. Yes.

Q. And do you recall if you ever provided any other information not contained in this form to Mission about Dr. Roka and the onboarding process?

A. I don't believe so.

Q. And Dr. Roka never told you that Mission reached out to him directly about any other information?

A. No.

Q. And, again, you would have expected Mission to go through you to communicate with Dr. Roka; is that correct?

A. Typically. I mean, Mission is a local San Antonio company, so --

Q. Uh-huh.

A. -- you never know. They've been there a long time, so they know a lot of doctors in town, I'm sure.

Q. Uh-huh.

All right. So are you able to describe sort of in general terms how one of NuMedica's physicians would have ordered a test from Mission?

A. Typically, they would, you know, order labs based on medical necessity of what they needed, and they would fill out a requisition form of the tests that they needed.

I'm not sure the process for each

Page 73

individual doctor. But that's -- you know, filling out the req is the most important part, signing the req and then, you know, sending the patient down to the lab for draws.

Q. Uh-huh.

And can you just tell me briefly what a req is?

A. A requisition form. So it's, you know, a form you sent on a couple of attachments ago, just what -- the menu of serve- -- menu of labs that they can order.

Q. Uh-huh.

And did you understand a requisition form to basically be the means by which the doctor would order a test?

A. Yes.

Q. And so if the doctor ordered a test on a Mission requisition form, that test was ordered from Mission?

A. Yes. But I believe sometimes the reqs would have other names on them besides Mission.

Q. Uh-huh.

But under the onboarding documents, as we discussed earlier, the physicians had only authorized Mission to test the samples; is that correct?

A. Yeah, I -- I suppose so. I mean, it looks like

19

APP 39

Page 74

tests were sent for analysis to Mission Toxicology, yeah.

Q. Uh-huh.

So where would the physicians that ordered tests for Mission send the specimen?

A. They get picked up by courier.

Q. And do you know if those would be taken to Mission's facilities?

A. They were taken someplace, a sorting station, something like that. I'm not sure where it was.

Q. And how would physicians typically receive results for those tests?

A. Usually a portal. They have a user name and ID, and they were able to get them dropped down into the portal, and could print them or put them into the HR.

Q. And Mission would provide that portal?

A. Yes.

Q. And do you recall if it worked roughly the same way when you were working for six months with Dr. Roka under Sun?

A. I'm sure it was similar. I don't recall what their reporting was. It was pretty standard to have a portal. Pretty much every laboratory has a portal.

Q. But Dr. Roka would order a test from Sun on a Sun requisition?

Page 75

A. Yes.

Q. And then send that sample out, presumably, to whoever would test it?

A. Yes.

Q. And would Mission then provide the courier that would take the sample to its destination?

A. Yes. Part of our management was managing the courier's schedule, the pickup, delivery, any problems, traffic, accident, whatever it was. We were always dealing with couriers making sure they picked up on time.

Q. But Mission would pay for the courier?

A. Yes, it was a Mission expense, uh-huh.

Q. So from our conversation, I take it you did not consider working with Sun again after forming NuMedica?

A. No.

Q. And was there any particular reason for that?

A. No. There wasn't any reason at all. I mean, Nick and I had a falling out, so I probably just avoided him and working with Mission -- or Sun.

Q. Uh-huh. So when you marketed Mission's services to physicians, what did you tell them were some of the benefits of Mission?

A. Well, Mission is a known lab in San Antonio. They've been in town for a long time, so physicians know

Page 76

Mission already. Probably just, you know, a quality lab, quick turnaround time, probably something about being in network. I'm not positive. But those kind of things that doctors would ask about.

Q. Uh-huh. So was it your understanding that Mission was in network with insurers?

A. Yes.

Q. And that was something that you would communicate to physicians in the course of marketing Mission?

A. I don't know if we communicated -- I can't recall if we would communicate it all the time. But, I mean, that was something that was asked of us, you know.

Q. Uh-huh. And who told you that Mission was in network?

A. I don't recall.

Q. So who was your primary point of contact at Mission?

A. Mostly Amanda. I talked to Amanda quite a bit. Rarely talked to Jesse. And then everyone else was just through e-mails and stuff. But Amanda and I would chat about, you know, the management and operations.

Q. Uh-huh.

So is she the person who would have provided you with information about Mission typically?

Page 77

A. Yes.

Q. Uh-huh.

Mr. Caskey, I recall earlier you mentioned phlebotomy. Could you tell me what a phlebotomist is?

A. They're, you know, typically MAs with a degree in phlebotomy. It's a -- I don't know what the course is to get certified as a phlebotomist, eight weeks or a six-week course or something like that, to draw blood, or just any kind of laboratory services. But phlebotomy is, you know, about blood.

Q. All right. I'm going to hand you another document, which is --

MR. GOKEY: Could I have 39, please?

Q. And I'm going to mark this as Exhibit 186.

(Exhibit Number 186 marked.)

Q. This is an e-mail with attachments. Beginning Bates number of NM_0008138.

A. Okay.

Q. All right. Mr. Caskey, am I correct that this is an e-mail from Valeria Norris of Mission Toxicology?

A. Yes.

Q. And you received this e-mail notwithstanding the fact that it was sent to missionservices@missiontoxicology.com?

A. Yes.

20

# Exhibit 4

CONFIDENTIAL

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF TEXAS

SAN ANTONIO DIVISION

MISSION TOXICOLOGY, L.L.C., et al.,

    Plaintiffs,

        v.

                    Case No. 5:17-cv-01016

UNITEDHEALTHCARE INSURANCE            (lead case)

COMPANY, INC., et al.,

    Defendants.

_____

UNITEDHEALTHCARE INSURANCE

COMPANY, INC., et al.,

    Plaintiffs,

        v.                Case No. 5:18-cv-00347

                      (consolidated case)

MICHAEL MURPHY, M.D., et al.,

    Defendants.

_____

THE CONFIDENTIAL VIDEOTAPED/ORAL DEPOSITION OF

RANDY DITTMAR

Friday, December 13, 2019

Austin, Texas

JOB NO. 172276

    Confidential Videotaped/Oral deposition of RANDY DITTMAR, held at MLM Holdings, LLC, located at 7373 Broadway Street, Suite 507, San Antonio, Texas, before Lydia L. Edwards, Texas CSR 2567, by machine shorthand and taken pursuant to the Federal Rules of Civil Procedure, unless otherwise agreed to by counsel, and after which time was set forth as follows:

CONFIDENTIAL

Page 26

would receive monthly dividends of up to $16,000 a month?

A. That is possible, but I can't recall exact monthly amounts.

Q. But that sounds like the right ballpark?

A. Not all the time.

Q. But for certain months?

A. It might have occurred one or two months. I really don't recall exactly each distribution payment.

Q. All right. Mr. Dittmar, I'm going to hand you another document.

(Dittmar Exhibit No. 266 marked.)

THE WITNESS: Is this two documents?

MR. GOKEY: This is an email and attachment.

THE WITNESS: So this is the attachment?

MR. GOKEY: Yes, probably. I'm not sure which --

THE WITNESS: -4563?

MR. GOKEY: Yes.

THE WITNESS: Okay.

MR. GOKEY: So typically today if I hand you a document and there are multiple parts to it, it will be an email and then the attachments to that email. I'll let you know if that's not the case.

Page 27

THE WITNESS: Of course, no. I was just making sure that you didn't accidentally hand me two documents that you needed a sticker.

MR. GOKEY: No. I appreciate it.

THE WITNESS: Okay.

Q. (BY MR. GOKEY) So am I correct that this is an employment application form from you to Mission Toxicology, the attachment here? Sorry.

A. That would be correct.

Q. All right. So if you look at the "Date Available" here in the first page of the employment application form, am I correct that that states the 16th of May, 2015?

A. That is correct.

Q. All right. And is this around the time that you started working for Mission Toxicology?

A. I believe so.

Q. But at this point, were you already an investor in Mission Toxicology Management Company?

A. Yes.

Q. So I'll represent to you that Mission has produced documents that indicate you received distributions during the two months before this application of about $10,000 per month. Does that sound right to you?

Page 28

A. You're saying that we produced documents that I received distributions of $10,000 a month every month.

Q. No, for the preceding two months before May 16th, 2015.

A. I can't recall.

Q. But it's not outside of the realm of possibility?

A. It's possible. I -- I just can't recall.

Q. And if you look at the "Position Applied for" above the "Date Available," am I correct that says "Administrative"?

A. That's correct.

Q. So what were your duties after you were -- sorry. Strike that.

Were you ultimately hired by Mission Toxicology?

A. In the sense that I needed -- needed employment and I believe Jesse had thought that it was fair that being there full-time that I should receive a salary.

Q. So was it Jesse Saucedo's position to hire you at Mission?

A. I believe he would have spoken with the other partners about it.

Q. And what other partners would those be?

A. It would be the other ones listed on the

Page 29

agreement.

Q. And --

A. But I was not part of that conversation. So I can't say who he spoke to. Sorry to interrupt.

Q. Not at all. So then you were already working at Mission full-time at this point; is that correct?

A. Yes.

Q. And so the only reason that you applied to work at Mission Toxicology directly is because Jesse thought it fair that you receive a salary for that work?

A. Correct.

Q. And did your work for Mission Toxicology change after you were hired?

A. No -- oh, well, yes, yes, because I wasn't just an investor. I was actually performing other duties.

Q. And are you able to tell me what those duties were?

A. Mainly just assisting the general supervisor, helping in connection with Jesse just to create a streamlined accessioning and workflow, reporting to the physicians, communications with the LIS and the instrument, things of that nature, you know, work with the consultants on who oversaw the laboratory who we also outsourced in the beginning to help assist and just preparation for the lab as far as CLIA/CMS regulations.

CONFIDENTIAL

## Page 30

Q.   And who would you have reported to at Mission?

A.   Say that again.

Q.   Who would have been your supervisor at Mission?

A.   Jesse.

Q.   And did you report to anybody else at Mission?

A.   As far as like HR or --

Q.   In terms of your direct supervisors.

A.   Yeah.  It would be Jesse.  You know, in the terms that we had a laboratory director, you know, I just ensured that he got any assistance that he needed for the lab.

Q.   And are you familiar with a Dr. Michael Murphy?

A.   Yes.

Q.   And how did you meet Dr. Murphy?

A.   Jesse -- let's see.  Jesse had mentioned that he was doing a -- he was working with Dr. Murphy in trying to help him, you know, learn about the lab space and -- well, I can't -- I can't explain the reasons why him and Jesse are connected.  But I just -- Jesse introduced me to Dr. Murphy.

Q.   And do you recall what -- around what time that would have been?

A.   To guess, I would have to say late 2015, potentially first half of 2016.

Q.   All right.  Mr. Dittmar, I'm going to hand you

## Page 31

another document.

(Dittmar Exhibit No. 267 marked.)

THE WITNESS:  Okay.

Q.   (BY MR. GOKEY)  All right.  So am I correct that this is an employment form for you at Integrity Ancillary Management?

A.   That would be correct.

Q.   All right.  And if I refer to Integrity or IAM during the deposition, can we agree that I'm referring to Integrity Ancillary Management?

A.   Yes, sir.

Q.   All right.  So am I correct that you were hired according to this form at Integrity Ancillary Management on February 1st of 2016?

A.   That is correct.  Where's the date?

Q.   It's about halfway down the page.

A.   I believe so, yes.  I mean, that's not my handwriting in the middle.  So I can't entirely attest at this time to that date, but, yeah, it makes sense if I signed it on January 29th.

Q.   All right.  And do you recall who hired you at Integrity?

A.   I do not recall actually.

Q.   And who did you report to at Integrity in terms of your direct supervisors?

## Page 32

A.   Dr. Murphy.  It depends.  Are you talking about throughout the entire time or at the beginning?

Q.   Let's start with the beginning, and then after that we can move chronologically.

A.   I would say Dr. Murphy, I believe.

Q.   And did that change over time?

A.   I'm sorry?

Q.   Did that change over time?

A.   No.  I mean, it was -- it was more like I just worked with various departments because my role was IT and LIS connection, interfacing.  And then I probably overstepped some of my bounds by, you know, trying to see where I could help, you know, as far as if I saw, you know, IT-related bar code printers were moving too slowly, looking at finding, you know, better solutions to that.

Q.   So would this have been at the same time that you were employed by Mission?

A.   Yes.  It looks like that.  That's correct.

Q.   And at this time, you were still a member of the Mission Toxicology Management Company, L.L.C.?

A.   That is correct.

Q.   So looking at the "Job Title" next to the "Employee Hire Date," am I correct that that is "Project Manager"?

## Page 33

A.   That is correct.

Q.   And was there a specific project that you were helping to manage?

A.   No.  I mean, it was just essentially overall processes, you know.  I was good at communicating with the technical staff who were busy.  And, you know, if there was any concerns, anything that the staff thought that they could -- you know, that they were too slow, too busy, that I could speak with them a little bit easier, and I would do that.  But that wasn't necessarily my job.  My job was primarily IT.

Q.   All right.  So what were your specific duties at Integrity?

A.   Primarily IT work and more specific to that would be working with just the managers to help them be more efficient.

Q.   And did you do work related to sort of overseeing the accessioning of specimen into Integrity's LIS?

A.   Integrity did not have an LIS.

Q.   So when you were working on IT, you were not working on Integrity's LIS?

A.   I mean, I don't know the involvement between Integrity and Sun, but I didn't oversee the accessioners.  That would have been done by somebody

# Exhibit 5

CONTAINS CONFIDENTIAL INFORMATION

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

------------------------------

MISSION TOXICOLOGY, L.L.C.,
et al.,

                    Plaintiffs,

vs.                                Case No.
                                   5:17-CV-01016
UNITEDHEALTHCARE INSURANCE          (lead case)
COMPANY, INC., et al.,

                    Defendants.
------------------------------
UNITEDHEALTHCARE INSURANCE
COMPANY, INC., et al.,
                    Plaintiffs,     Case No.
vs.                                 5:18-CV-00347
                                   (Consolidated case)
MICHAEL MURPHY, M.D., et al.,

                    Defendants.
------------------------------

VIDEOTAPED DEPOSITION OF LYNN MURPHY
SAN ANTONIO, TEXAS
October 16, 2019

***Contains Confidential PHI-PII information***

Reported by:  Susan S. Klinger, RMR-CRR, CSR
Job No. 168611

CONTAINS CONFIDENTIAL INFORMATION

Page 6

PROCEEDINGS

VIDEOGRAPHER:  Today is Wednesday, October 16th, 2019.  The time is 9:02.  We are on the record.

LYNN MURPHY, having been first duly sworn testified as follows:

EXAMINATION

BY MR. BORNSTEIN:

Q.  Good morning, Mrs. Murphy.

A.  Good morning.

Q.  Have you ever been deposed before?

A.  I have not.

Q.  So you have been sitting in some of these depositions so you know the drill; right?

A.  Yes.

Q.  It works best if I ask a question and then we pause, then you answer; right?

A.  Yes.

Q.  Okay.  Why don't you just give me a brief overview of your background and involvement with some of the laboratory billing and testing companies we've been discussing in this case?

A.  My background is I went to Southern

Page 7

Methodist University, received my business degree there, a BBA, as well as a JD.  So I'm an attorney graduated from SMU.

I worked for a law firm here in San Antonio when I first got out of school, Oppenheimer Rosenberg Kelleher & Wheatley and I was corporate and securities focused.  We moved to Seguin.  I did some work there privately, my own office for a few months and then went in-house with an SBA lending company, Southwestern Commercial Capital.  After that I chose to stay home and raise my two children.

I didn't go back to work until August of 2016, when I became CEO of Integrity Ancillary Management.

Q.  Were you involved at all in the business of Integrity?  And when I say "Integrity," I'm referring to Integrity Ancillary Management; okay?

A.  That is fine.

Q.  Were you involved at all in the business of Integrity before August of 2016?

A.  No, not in any of the operations.

Q.  Did you know anything about how it worked?

Page 8

A.  I mean, I had a general knowledge just from the fact that my husband owned part of it, but no, I was not in any way involved in the day-to-day prior to August.

Q.  Did you -- do you know what Sun Clinical Labs is?

A.  Yes.

Q.  What is it?

A.  It is a laboratory here in San Antonio.

Q.  Do you know when Sun was founded or started?

A.  No, I don't, because it was an existing laboratory that was purchased by Dr. Murphy through a company called Clover Trail Capital.  We purchased the lab or Clover Trail purchased the lab in the end of 2015, I think, late 2015.

Q.  All right.  So did you know what Sun was in the business of doing in late 2015?

A.  It was a clinical laboratory performing blood chemistry tests and some urine tests, I believe, urine toxicology.

Q.  How did you know that?

A.  Because he continued to do that and

Page 9

I knew that once I was involved with Integrity.

Q.  Okay.  It sort of sounds like, you know, maybe you didn't have an official role with Sun in 2015, early 2016, but you kind of knew what it was doing; right?

A.  I knew it existed and I knew it was a clinical lab.

Q.  Okay.  Did Sun have a relationship with Integrity in late 2015 when it was started?

A.  I wasn't involved at that time.

Q.  Do you know one way or the other?

A.  No.

Q.  Did -- at any point did Integrity perform services for Sun?

A.  Yes.

Q.  When was that?

A.  I know later when I was working in August of 2016 and after that we assisted in performing some of the management duties that Sun was contracted with the hospitals to perform.

Q.  Well, who performed Sun's billing when Sun was a clinical -- you know, throughout the duration of the time when Sun was a

CONTAINS CONFIDENTIAL INFORMATION

Page 10

clinical lab?

A.  Well, prior to our purchase I don't know.  And I think you would have to ask Dr. Murphy.  I believe that Integrity performed those services once Integrity was formed, but I don't have detailed knowledge of that.

Q.  So why don't you tell me about what you know about how Integrity functions as a business.  What was Integrity in the business of providing?

A.  Its main purpose was to provide billing services to various healthcare providers.

Q.  And when you say "billing services," just if you wouldn't mind just educating me about what you are referring to that would be great?

A.  Submitting claims to insurance companies on behalf of our clients as well as performing collection activities from the insurance companies and from patients.

Q.  And is that sort of the full scope in your universe of the services and conduct that Integrity would engage in for its clients?

A.  Integrity also helped manage the

Page 11

accessioning portion of the lab outreach program.  They had some oversight over the verification and accessioning.

Q.  That was done on behalf of which entities?

A.  I'm not sure I understand your question.

Q.  Well, okay.  So I will -- thanks, I will clarify.  You mentioned that Integrity served its clients; right?

A.  Yes.

Q.  That was kind of the word, you used the word "clients"?

A.  Yes.

Q.  What do you mean by client?

A.  The people that we worked for.

Q.  Were they -- were the clients companies?

A.  Well, if we were speaking as an example of our billing services, we would bill on behalf of Newman Memorial Hospital which is I know a factor in this case.  Other hospital providers that were our clients that hired us to perform these billing services as well as some billing services we performed later

Page 12

out-of-network for Sun Clinical Laboratory and Mission Toxicology.

Q.  So the universe of clients -- why don't we just -- can you just make a list of the universe of clients Integrity worked for during 2016 and 2017?  You mentioned Newman and Community Hospitals?

A.  Yes.

Q.  Right?

A.  Yes.

Q.  And you mentioned Sun Clinical Labs; right?

A.  Yes, and Mission Toxicology.

Q.  Were there any other clients that you can think of?

A.  Yes, there were other hospitals that we billed claims, Baker Hospital, Sharkey and I can't say the second half of their name, Issaquena hospital.

Q.  Sure.

A.  And I believe we did some at that time for south central Kansas.

Q.  Are you aware that Sun had a compliance program that it put into place at some point?

Page 13

A.  Yes.

Q.  And that started in 2016; right?

A.  Yes.

Q.  Were you involved at all in putting together that compliance program?

A.  I was.

Q.  And at that time, you weren't the CEO of Integrity; right?

A.  No, not when I wrote the compliance program.

Q.  So when you wrote the compliance program, who were you working for and in what capacity were you acting?

A.  I was working for Dr. Murphy and helping with his business at Sun Clinical Laboratory.

Q.  And about when did you start, you know, preparing those compliance materials?

A.  I believe in about June of 2016.  I would have to go back to see when that compliance manual was dated.

Q.  All right.  Were you an employee, you know, a formal or technical employee of any company at that time or --

A.  No.

4

APP 46

CONTAINS CONFIDENTIAL INFORMATION

Page 14

Q. -- were you just sort of helping out with the business?

A. Just helping out with the business.

Q. All right. And so that was just, like, one example of some work that you did for Sun, not in an official employment capacity but other -- you know, there are other things you did to assist Sun or Mission between, you know, 2016 and 2017 that, you know, weren't part of a formal titled role or something like that?

A. Not to my knowledge, other than helping to write some compliance programs and I did draft some contracts during that time, but that was all.

Q. Which contracts did you draft?

A. I worked on some of the management agreement contracts with independent representatives.

Q. And those would be contracts between Sun and certain reps; right?

A. Yes.

Q. And also Mission and certain reps?

A. I did not do Mission's.

Q. Did you ever review their contracts?

A. I think I shared our forms for them,

Page 15

but they had independent counsel and they did not ask me to draft or do anything other than that.

Q. You are aware that at the end of 2015 Sun started offering and entering into Series investment arrangements with certain physicians and others; right?

A. I am aware of that.

Q. Did you -- how are you aware of that?

A. I sat in on some meetings with attorneys that were doing the drafting of those documents.

Q. Do you remember reviewing those documents in any capacity?

A. Not in any capacity other than the wife of the person that was going to be implementing them.

Q. Okay. That is fine. I just -- but you remember looking at them at the time; right?

A. I did.

Q. Did you have any involvement in deciding whether to use them or not use them or offer them or not offer them?

Page 16

A. No, that was between Sun Clinical Lab represented by my husband and he was working with very competent attorneys that I was comfortable with.

Q. Yeah. I'm just trying to get a sort of -- draw a circle around the scope of --

A. I understand.

Q. -- what you were -- that is why I'm asking.

A. I'm happy to tell you.

Q. So you mentioned that Sun Clinical Labs is one of Integrity's clients; right?

A. Yes.

Q. Did Sun pay Integrity for its work?

A. Yes, I believe it did.

Q. Do you know how it paid it?

A. I don't know what you are asking.

Q. What was the nature of the -- of the payment arrangement between Integrity and Sun?

A. Are you asking if they paid in cash?

Q. No, I could ask a better question.

A. Please.

Q. Were they, like, paid, like, a flat rate, were they pay a percentage of collections? Do you know what the nature of

Page 17

the payment arrangement was between Integrity and Sun?

A. I don't recall at this time.

Q. Mission was also a client of Integrity?

A. Yes.

Q. Presumably Mission paid Integrity for the services it provided as well?

A. They did.

Q. Right. Sun and Mission were independent labs during 2015 and '16 and '17; right?

A. Yes.

Q. So they would occasionally receive orders for lab tests; right?

A. Yes.

Q. And they would receive specimens sent to them; right?

A. I assume so.

Q. And you know, they would have to process those orders and specimens; right?

A. I was not involved in that.

Q. Well, you mentioned that Integrity performed some -- did Integrity perform any processing or verification or accessioning, any

CONTAINS CONFIDENTIAL INFORMATION

Page 18

kind of services like that for any of its clients?

A.   We did for the hospitals through the hospital outreach program, but we did not perform that type of service for Sun Clinical Laboratory.

Q.   So if someone sent a test order to Sun and a specimen to Sun, would Sun do its own processing?

A.   I assume so.

Q.   And that was true throughout 2016 and 2017?

A.   I can't answer that question.  I don't know what Sun was doing outside of the hospital laboratory outreach program.

Q.   If someone wanted to -- well, you mentioned that Integrity did some billing for Sun with workers' comp claims; right?

A.   I didn't say workers' comp claims. I said that we did do some billing late in 2017 for Sun after the hospital outreach program had stopped when Sun went back to doing some out-of-network billing.

Q.   When did Integrity form its client relationship with Sun?

Page 19

A.   I don't know the answer to that.  I wasn't involved.

Q.   So if a physician sent an order and a specimen to Sun at any time during 2016, 2017, which company's employees would process the order, the sample, do the intake?

A.   To my knowledge, the way Sun was operating at that time was through the hospital outreach laboratory program, so they were not receiving samples for themselves.  The outreach program was operating as a management company for the hospitals.  The hospitals were receiving the samples.  I don't think Sun was independently accepting samples at that time. I know we weren't billing for them at that time out-of-network.

Q.   You mentioned a hospital outreach program; right?

A.   Yes.

Q.   What -- why don't you just give me a brief overview of what you understand that to mean?

A.   Can you be more specific?  It would help me to know where you want me to go with this.

Page 20

Q.   Yes, sure.  I will get to that in a second.  I will just finish up a couple of questions about the other subject.

A.   That is fine, of course.

Q.   What about Mission, do you know anything about Mission Toxicology?

A.   No.

Q.   Nothing?

A.   I know they exist.  I know they were one of our clients.  We did some billing for them.

Q.   How do you know they were one of your clients?

A.   Because we did some billing for them.

Q.   Did you have an agreement with them where it would layout the services to be provided?

A.   From a billing standpoint, I don't know if we actually formalized that in writing, but I know that we did their billing and I know that they paid for their billing.

Q.   Do you know what Mission Toxicology was in the business of doing?

A.   I know that they were a clinical

Page 21

laboratory.

Q.   And that means what exactly?

A.   That they process samples that were sent to them for testing.

Q.   And do you know where Mission was located?

A.   I believe they were located on Northwest Military Highway.  You are asking me to go back to where we sent bills.

MR. MARKHAM:  Just if you know, you know; if you don't know, you don't know. Not a problem.

A.   I believe that's correct.

Q.   So if someone sent a sample to Mission, where would they send it?

A.   To their laboratory if they were sending to Mission.

Q.   Did Mission have a UPS account?

A.   I don't know.

Q.   Did Sun?

A.   I don't know.  I take that back.  I do know that they had a UPS account, Sun did.

Q.   What about Mission?

A.   I don't know.

Q.   And how do you know Sun had a UPS

CONTAINS CONFIDENTIAL INFORMATION

Page 42

Q.   So how many people were working for the onboarding team at Sun and Mission?

A.   I don't know.

Q.   So we would need to talk to those people to figure out how they knew how to interpret the various order forms that were coming in?

A.   That and then Dr. Murphy and Jesse Saucedo also had input on that.

Q.   When you say they had input, what do you -- what do you mean?

A.   They had knowledge of where the independent marketers were telling physicians that they had the options to send their samples, to which hospitals they had an option to send their samples to.

Q.   How do you know they knew that?

A.   How do I know Dr. Murphy and Jesse Saucedo knew that?

Q.   Yes.  Did they tell you they knew that?

A.   I heard their testimony earlier when I was listening.

Q.   Any other basis for you testifying that they had that knowledge?

Page 43

A.   No.

Q.   So some of your knowledge in this deposition is based on the testimony that you observed other deponents give; is that right?

A.   In that circumstance, yes.

Q.   You mentioned that Dr. Murphy and Mr. Saucedo knew about different options marketers had presented to physicians about where they might order from; is that right?

A.   Yes.

Q.   But how would they know what specific lab a specific order was to?  It seems different than knowing about different options that were available?

A.   You would need to go back and ask Dr. Murphy and Mr. Saucedo that question.

Q.   I'm just trying to figure out because, okay, a lot of orders came in to -- to Sun and Mission for testing that was ultimately billed through the hospital outreach program; right?

A.   The samples didn't come into Sun and Mission.  They came into the laboratory outreach's sorting station, but yes, a lot of samples processed through that program.

Page 44

Q.   What was -- did Sun have any offices at 1051 Nakoma?

A.   No.

Q.   But other entities did?

A.   Alternate Health Labs --

MR. MARKHAM:  Your question was other entities did?

MR. BORNSTEIN:  No, I said what other entities did.

MR. MARKHAM:  Oh, sorry, I thought you said other entities did.

A.   Alternate Health Labs had a location at Nakoma.

Q.   A lot of orders for lab tests came in to that location; right?

A.   Yes.

Q.   Like thousands; right?

A.   Over a period of time, yes.

Q.   How many do you think came in between 2016 and 2017 just approximately?

A.   I would have to go back to our records to know that, I don't know.

Q.   Like maybe do you think it would be more than 10,000?

A.   Yes.

Page 45

Q.   More than 50,000?

A.   I don't think so, but I would have to go back to records to know that.

Q.   Do you know one way or the other whether every requisition clearly indicated which lab was to perform testing?

A.   I know that we had clear indication of where to send that testing.  I don't know that it was done by logos, no.

Q.   That is what I'm trying to figure out.  So when you say "we had clear indication" --

A.   Integrity.  As I said when I say "we" I'm referring to Integrity.

Q.   And who provided that indication to Integrity?

A.   Dr. Murphy, Mr. Saucedo gave general direction on that.

Q.   And you mentioned we had clear indication as to where to send that testing; right?

A.   Well, the physician sent the testing -- the physician sent the order requesting that testing from these hospitals.  We had indication of where to accession that

CONTAINS CONFIDENTIAL INFORMATION

Page 58

A.   Just a working knowledge from being involved.

Q.   So there was a place on a 1500 form that -- where the identity of the referring physician would be placed; right?

A.   I believe that's correct.

Q.   And the same was for a UB-04 form; right?

A.   For the referring provider, yes, I believe that's correct.

Q.   You understand that there is an electronic equivalent of the 1500 and UB-04 forms?

A.   I do.

Q.   And those are called 837 claims; right?

A.   Yes.

Q.   It is basically the same information that you could put on a 1500 or UB-04, but submitted in electronic format; is that right?

A.   It is similar, but it is not exact.

Q.   Right.  Was the referring physician also a piece of information that would be put on electronic claims?

A.   Yes.

Page 59

Q.   On both different types of claims; right?

A.   Yes.

Q.   So when a -- when Integrity would list the identity of a referring provider on an electronic 837 claim, whether it be a UB-04 or a 1500, it would list the name of the provider; right?

A.   Yes.

Q.   And it would also list their NPI number?

A.   Correct.

Q.   And by listing the provider, they would be conveying to the insurer that that provider ordered the tests listed on the claim from the provider who was listed as the billing provider on the claim; right?

A.   Yes.

Q.   It is important that that representation be true and accurate; right?

A.   Yes.

Q.   If the referring provider didn't order the test from the laboratory listed on the billing -- as the billing provider on a claim, it wouldn't be appropriate to bill the

Page 60

claim using the identity of the billing provider; right?

MR. MARKHAM:  Objection, calls for a legal conclusion.  You can answer.

A.   Integrity utilized the information that was placed in the laboratory information system that was transmitted over to the billing software.  So we were not in the habit of going back and requesting information of whether the doctor actually referred the test, but we assumed that that information was correct.

Q.   So there was information that was in a software program that Integrity relied on to -- when it decided which physician's name it was going to put on a claim form; right?

A.   Correct.

Q.   Integrity independently verified whether that physician had actually ordered that test from the lab that was going to be listed as the billing provider on the claim; right?

A.   Not the billing portion of Integrity, no.

Q.   It didn't know one way or another whether the physician had actually ordered that

Page 61

test from the lab that was listed as the billing provider?

MR. MARKHAM:  Objection.

A.   The assumption --

MR. MARKHAM:  Objection, hold on. It calls for speculation about what other people know.

MR. BORNSTEIN:  Stop, just --

MR. MARKHAM:  It calls for speculation about what other people knew.

MR. BORNSTEIN:  You don't need to coach about what was ambiguous or what should be speculated about.

MR. MARKHAM:  I disagree, go ahead.

A.   Can you repeat the question?

(Record read.)

A.   I don't know what the billing -- what the physician intended or --

Q.   Okay.  Integrity didn't have that knowledge?

MR. MARKHAM:  Objection, speculation.

Q.   Is that right?

A.   I stand by my previous answer.

Q.   Well, I'm just trying to distinguish

CONTAINS CONFIDENTIAL INFORMATION

Page 62

because you said you personally didn't know and that is one thing; right? But the company as a whole they were not aware either; right?

A.   I think I testified to that, I stand by my previous answer.

Q.   Which was what?

A.   I think we can go back to the record for that.

Q.   Okay. So you're declining to answer the question?

A.   I have previously answered it and I stand by that answer.

Q.   That is fine. That is okay.

Do you have any understanding one way or other about whether Integrity could bill, whether -- sorry, strike that.

Do you have any understanding one way or the other as to whether it was appropriate to list the lab as the billing provider on a claim if the physician listed on the claim had not ordered that lab to perform the testing?

A.   No.

Q.   Do you know of any circumstances under which it is appropriate to list the

Page 63

identity of a lab in the billing provider section of a claim where a physician had not actually ordered that test to perform service?

A.   I'm not a billing expert.

Q.   I know, but you were the CEO of a billing company, weren't you?

A.   I was.

Q.   And that seems like -- I'm trying not to ask technical billing questions. I'm trying to ask just, like, basic ones.

Are you aware of any circumstance where a physician could order a test from one lab, but then it would be appropriate to bill the claim to an insurance company listing the provider as a completely different lab?

MR. MARKHAM: Objection, calls for a legal conclusion.

A.   Yeah, I don't know.

Q.   Well, are there any limitations on -- so an 837 claim form, whether it is a 1500 or UB-04, the first box on the claim form is a provider; right?

A.   It is -- I'm familiar with that. It is the billing provider.

Q.   And what do you understand the

Page 64

billing provider to be?

A.   The billing provider is the entity submitting the claim.

Q.   Does it mean anything other than that to you or --

A.   No.

Q.   So in order for a provider to be a billing provider that can submit a claim, are there any prerequisites that need to be satisfied?

A.   No. If they are the billing provider for that claim, they can submit the claim.

Q.   What do you need to do to be a billing provider?

A.   I don't understand your question.

Q.   If an order was submitted to LabCorp for testing, could Sun bill the claim to an insurance company?

A.   No.

Q.   Why not?

A.   Not their claim.

Q.   When you say "not their claim," what do you mean?

A.   That it was never intended for that

Page 65

sample to be associated with Sun.

Q.   All right. What degree of association needs to be present for a provider to be able to bill a claim to an insurance company?

A.   That would be set forth in the Medicare Claims Processing Manual, so it would be in accordance with CMS guidelines.

Q.   How do you know that?

A.   I have read the Medicare Claims Processing Manual.

Q.   Why do you think that applies to commercial insurance?

A.   Because commercial insurance refers to it all the time in their documentation that their protocols are developed through CMS Medicare processing guidelines. And it is general knowledge of billers and billing companies --

Q.   Okay.

A.   -- that those guidelines apply to commercial claims.

Q.   Okay. So let me just ask you, in order to be listed as a billing provider on a claim, does a provider need to have been

17

CONTAINS CONFIDENTIAL INFORMATION

Page 66

ordered to perform testing listed on the claim?

A. Yes, the sample needs to have been ordered.

Q. Does the provider need to have rendered the services on the claim?

A. Not necessarily.

Q. Does the provider need to have received the specimen that it is billing for?

A. Not necessarily.

Q. Does it need to have an assignment of benefits from the patient?

A. No.

Q. Does it need to have done anything in connection with the testing one way or the other?

A. Not in certain circumstances.

Q. Does the patient need to have consented to that provider billing claims for the patient specimen?

A. No.

Q. If a physician ordered a test from Sun, just Sun, could Integrity submit a claim to an insurance company listing Newman Memorial Hospital or Community Memorial Hospital as the provider?

Page 67

A. Repeat that again, I need to follow that correctly.

Q. Sure. Just assume that a physician didn't order a test from a hospital, they just ordered it from Sun?

A. Okay.

Q. Right. Sun is a different entity than the hospital; right?

A. It is.

Q. Mission is a different entity as well?

A. It is.

Q. So I'm just wondering about say a physician just ordered a test be run by Sun or Mission; right?

A. Right.

Q. In that scenario, is there any -- would it ever be appropriate for Integrity to bill a claim to an insurer and list a hospital as the billing provider on the claim?

A. Not if it was a specific referral to Sun.

Q. Why not?

A. Because that would be Sun's claim to bill.

Page 68

Q. If Integrity or any other company did submit a claim to an insurance company in that scenario and listed a hospital as the billing provider, that claim would be false in some way; right?

A. Integrity did not do that.

Q. I didn't ask you if they didn't do or did do it. We can talk about that, but if they did --

MR. MARKHAM: Objection, calls for a hypothetical.

Q. -- that claim would be -- that claim would be false in some way; right?

A. I don't know.

Q. Well, you stated -- you just said it would be inappropriate to bill that type of claim; right?

A. I don't know all of the ins and outs of that. There could be circumstances where it is not.

Q. Are you aware of any circumstances where a hospital can bill a claim for a service that it wasn't ordered to perform or didn't perform, had no connection to?

A. I don't have a circumstance on the

Page 69

top of my head.

Q. If a claim comes into an insurance company and it lists a billing provider on the claim and the test on the claim was actually ordered exclusively from a completely different lab, the claim would misrepresent who the provider was, wouldn't it?

A. I don't have knowledge of that, because we did not deal with that circumstance.

Q. You said that -- I asked you if -- if a provider needed to have actually rendered a service listed on a claim in order to be the billing provider on that claim. And you said, I think, in some circumstances --

A. No.

Q. -- it did?

A. I said no.

Q. Okay. What is the basis of your understanding on that?

A. Based on the Medicare Claims Processing Manual, the CMS guidelines that everyone refers to, if a hospital is a rural hospital, it is allowed to reference out 100 percent of its samples. There is no requirement set forth that it perform any of

CONTAINS CONFIDENTIAL INFORMATION

Page 74

continue to do so.

MR. BORNSTEIN: I don't need it. I really -- I appreciate it, but I don't need it.

MR. MARKHAM: You don't appreciate it. I'm sure you don't need it, but I need it. I need to ask you not to keep repeating it.

MR. BORNSTEIN: It will just go a lot -- everything will go smoother if you just state an objection and we move on.

MR. MARKHAM: I understand your position on that.

MR. BORNSTEIN: Thanks.

MR. MARKHAM: Why don't you ask questions.

Q. All right. Did you -- you had -- you said you had some understanding of the medical claims, sorry, or Medicare Claims Processing Manual and how that might apply to to Integrity's billing.

Did you -- did you ever review any contracts United had with the different rural hospitals Integrity was listing as the billing provider on claims that were submitted to

Page 75

United?

A. I know I did not see Newman Memorial Hospital's contract. I may have seen some of the later ones for Baker and Sharkey.

Q. What about Community?

A. I don't recall.

Q. So were you ever aware one way or the other what the contracts between United and Community required with respect to billing for laboratory services claims?

A. No.

Q. And same answer for Newman; right?

A. Correct.

Q. But you were aware that United was contracted with Community; right?

A. Yes.

Q. And you were aware that United was contracted with Newman; right?

A. Yes.

Q. Anybody else at Integrity aware of those contracts?

A. Not to my knowledge.

Q. What about Sun or Mission, was anybody who worked at Sun or Mission aware that those contracts existed?

Page 76

A. Not to my knowledge.

Q. Was Mr. Saucedo aware that United was contracted with Newman or Community?

MR. MARKHAM: Objection, speculation.

A. You will have to ask Mr. Saucedo that question.

Q. Well, the whole point of the outreach program was to bill through contracted relationships; right?

A. Not to bill through. We billed for of the hospitals.

Q. But did you bill for any hospitals that weren't contracted with any payers that you billed?

A. So presumably the people operating the program would have had some understanding as to whether --

MR. MARKHAM: Objection.

MR. BORNSTEIN: Just let me answer my question -- ask my question, instead of injecting in the middle of it and then we have got a messy transcript.

MR. MARKHAM: Okay. Go ahead.

Q. The purpose of the program was to

Page 77

submit claims on behalf of hospitals to insurers where the hospital and the insurer had a contract; right?

A. Say that again, I lost you mid --

Q. The whole point of the -- you have been referring to something called the hospital outreach program; is that right?

A. Correct.

Q. By the way, do you know what an HOPD is?

A. I think it is a hospital outpatient type program. I think it is different.

Q. The idea of the program was to submit claims that were in-network; right?

A. You will have to ask the people that created the program. I don't know.

Q. You don't have any idea one way or the other whether you were -- Integrity was submitting in-network or out-of-network claim?

A. I know we submitted in-network claims --

Q. Okay.

A. -- on behalf of the hospitals.

Q. So if you were submitting in-network claims that meant that the hospitals were

CONTAINS CONFIDENTIAL INFORMATION

Page 82

hospitals; right?

A.   No.

Q.   Why not?

A.   What caps are you specifically replying to?

Q.   There are certain circumstances under which the reimbursement rate is limited?

A.   Can you give an example?

Q.   No.  Are you aware of them?

A.   No.

Q.   I'm just trying -- I mean, what I'm trying to understand is whether Integrity is trying to sort of pick and choose which -- because the claims processing manuals are extensive and detailed.  And they have an extraordinary number of rules and regulations that are too complicated for most of us to understand.  So I'm just trying to get an understanding as to whether you think all of those provisions apply or whether just some of them do.

A.   Did you have a question in all of that?

Q.   No, I'm just informing you.

MR. MARKHAM:  Thank you.

Page 83

Q.   The claims processing manual talked about how claims should be coded; right?

A.   Yes.

Q.   Is it your understanding, is it Integrity's position in this case that every claim that was billed to United by Integrity on behalf of Newman or Community was for a claim that had been referenced to a reference lab?

A.   No.

Q.   Were there substantial claims -- were there a substantial number of claims that were -- that Integrity contends were referenced to a reference lab?

A.   There were claims referenced to reference labs.

Q.   Let me ask --

A.   Integrity did not reference them. I'm not understanding your question.

Q.   Okay.  Let me ask it a different way.  Is it your understanding that Integrity submitted thousands of claims to United for tests that weren't actually run by the providers listed as the billing provider on the claim?

A.   Yes, I am aware of that.

Page 84

Q.   And is it -- is it your position that in every single one of those instances, the test was referred to a reference lab?

A.   It may have been a partial reference.  It could have been that the hospital performed part or all of the testing.  And if they performed part of the testing, then the remainder could have been referenced to a reference lab.

Q.   Okay.  Were there any circumstances where the hospital performed none of the testing?

A.   Yes.

Q.   And is it your position that all of the tests that were not performed by the hospital were referred to a different lab?

A.   Yes.

Q.   So were the provisions in the CMS guidelines regarding how referenced tests should be coded and billed apply to this case?

A.   You would have to talk to our billing manager.  I don't have the specific information on that.

Q.   Well, it is in the same part as what you are --

Page 85

A.   But it is a more technical --

MR. MARKHAM:  Well, hold on.  He hasn't asked you a question.

A.   Okay.

MR. MARKHAM:  He's just explaining why he thinks what he thinks.  That is not a question.

Q.   Okay.

A.   Okay.

Q.   So there is -- the part of the -- part of the Medicare Claims Processing Manual talks about rural hospital billing; right?

A.   There is a specific section, Section 40.1 of that processing manual that does refer to rural hospitals being allowed to bill for reference testing.

Q.   And is it your view that Section 40.1 applies to this case?

A.   Yes.

Q.   Including the provisions in that section about how claims should be coded?

A.   I don't know the answer to that, because I'm not familiar with all of the coding.

Q.   Was Mr. Saucedo involved at all in

22

CONTAINS CONFIDENTIAL INFORMATION

Page 86

the operations of Integrity during 2016 to 2017?

A.    I assume he was.  He was an owner of the company.

Q.    Okay.  What about Dr. Murphy?

A.    Yes.

Q.    Would Mr. Saucedo or Dr. Murphy ever give you direction about how to run part of Integrity's business?

A.    Yes.

Q.    Would anybody else ever direct your efforts one way or the other?

A.    Yes.  The hospitals would direct accessioning on how they wanted it performed based on their standard operating procedures, and they would direct how they wanted certain billing aspects to be performed.

Q.    Do you remember who at the hospital would give that direction?

A.    For Newman Memorial Hospital and CMH it normally came through Seth Guterman.

Q.    Did you report to anybody during 2016 or 2017?

A.    I worked with Dr. Murphy and Mr. Saucedo.

Page 87

Q.    Anybody else?

A.    No.

Q.    But did you report to them, like, in a hierarchy or were you more of on a peer level?

A.    I would have been a hierarchy in that circumstance.

Q.    You said that you received direction on certain issues.  What type of issues would you get direction from them on?

A.    Who was "them"?

Q.    I guess Mr. Saucedo and Dr. Murphy?

A.    An example would be on direction of -- I'm blanking on specific examples, but yes, they gave direction to me.

Q.    Any direction about how claims should be coded?

A.    No.

Q.    Any direction about how the verification process should work?

A.    No, not specifically.  That was all setup previous to me coming on, so it was to be operated in a similar manner.

Q.    Was it setup -- do you know when it was set up actually, the Integrity's

Page 88

verification accessioning processes?

A.    Prior to when I came on.

Q.    Did those processing change at all while you were there?

A.    There was some tweaking to it, yes.

Q.    Do you remember what the tweaks were?

A.    In the accessioning aspect, we added certain edits into the LIS to ensure that medical necessity was met to prevent overutilization.  We had different things we were implementing to ensure compliance.

Q.    Other than that, the verification and accessioning process basically ran in one continuous way during 2016 and 2017; right?

A.    As I said, yes, it was set up before me.  We continued the operations.

Q.    So you said you didn't really get a lot of direction from anyone other than Seth Guterman on accessioning.  What about -- or sorry, on verification.  What about -- what about any other party intake process?

A.    Yes.  I mean, we had standard protocols that I know that Newman hospital put in place for the fact that requisitions to be

Page 89

accessioned in for Newman had to have the Newman logo, that was after, I believe, November of 2016.  There were other policies like that.  I don't recall specifics, but we implemented what the hospitals requested.

Q.    Okay.  And then what type of areas or issues did you get direction from Dr. Murphy or Mr. Saucedo?

A.    Overall operation, because they were the owners of Integrity.

Q.    What does captured in an overall operation, what does that refer to?

A.    If you can ask specific questions, I'm not sure what you are looking for.

Q.    Yeah, I don't really know exactly.  I'm just trying to figure out when did you go to Dr. Murphy or Mr. Saucedo for guidance and when did you act on your own?  What type of issues would you need to go for -- to Dr. Murphy or Mr. Saucedo for guidance or maybe what issues would they give you guidance on even if you didn't ask for it?

A.    They gave me guidance on most everything.

Q.    Were there any -- you said you were

23

CONTAINS CONFIDENTIAL INFORMATION

Page 90

CEO of Integrity for a couple of months; right? Is that right?

A.   Yes.

Q.   When was that?

A.   I think I became officially CEO of Integrity in the end of August of 2016.

Q.   And then how long did you serve in that role?

A.   Until Integrity closed.

Q.   Which was when?

A.   End of 2017.

Q.   Were there any other officers of Integrity at that time?

A.   Integrity was an LLC, so there were managers.  And I believe that the managers were Dr. Murphy and Mr. Saucedo.

Q.   Are you aware of any other managers?

A.   I don't recall.  I don't believe so.

Q.   Do managers and officers sort of have equal authority to direct the conduct of an entity?

A.   It depends on what is set forth in the LLC.

Q.   In practice, though, was it your experience that you and Dr. Murphy and

Page 91

Mr. Saucedo had equal authority to make decisions about the strategy and conduct and interaction of Integrity as a company?

A.   I would not say it was equal authority, no.

Q.   How was it divided up?

A.   Mr. Saucedo and Dr. Murphy gave guidance to me.

Q.   And did you give guidance to anybody or did you have any people reporting to you?

A.   I did.

Q.   What about the billing directors, did they report to you?

A.   They did.

Q.   Are you familiar with the company called Alternate Health Labs that was in operation during 2016 and 2017?

A.   I'm familiar, yes.

Q.   What about a company called LMK?

A.   Yes.

Q.   What about Sun Ancillary Management?

A.   Yes.

Q.   Those are all three distinct companies; right?

A.   Yes.

Page 92

Q.   With three distinct purposes?

A.   Yes.

Q.   And the conduct of one in your view is separate and distinct from the conduct of another?

A.   Yes.

Q.   Where were LMK's offices, did they have any?

A.   I believe that the listed office was here at this location.

Q.   What about Sun Ancillary Management?

A.   Sun Ancillary Management, I believe, was listed in the -- I'm trying to remember.  I believe it was this location as well.

Q.   So did you have any understanding -- well, you were overseeing the billing of a lot of claims.  Did you have any understanding of what testing capabilities Sun Clinical Labs had during 2016, 2017?

A.   No.

Q.   You didn't know one way or the other whether Sun could run a lab test?

A.   I knew they could run a lab test, but I don't know the extent of their capabilities.

Page 93

Q.   Do you have any idea about what type of test they could run?

A.   I know that we -- when we were billing for them out-of-network we were billing blood claims.

Q.   When you said blood claims, do you have any understanding as to what type of blood testing Sun could run on its own?

A.   I think they had the ability to run C-peptides I remember seeing, various other analytes.  They had capabilities to run testing on blood.

Q.   Was Sun not capable of running any types of blood tests to your -- to your knowledge?

A.   I don't have that information.

Q.   What about with respect to urine? Could Sun run urine tests during 2016, 2017?

A.   I don't remember.

Q.   So you didn't know one way or the other whether Sun could do urine tests?

A.   I don't remember.  I may have known at one time.

Q.   What about Mission, did you have any understanding about Mission's capacity to

CONTAINS CONFIDENTIAL INFORMATION

Page 94

perform lab testing?

A.    Based on the claims that we billed for Mission out-of-network, I know that they did urine toxicology.

Q.    And when you say "urine toxicology," you're referring to screening tests and confirmations or one or the other?

A.    I believe they had the capability to do both.

Q.    Do you remember billing claims for screens and confirmations that Mission ran?

A.    I would have to go back and look at my records.

Q.    What were the circumstances in which you billed out-of-network for Mission and Sun?

A.    Mission had some claims that it had been billing through another billing company. Mission was not happy with the services and they moved those out-of-network claims over to Integrity for billing.  And it was less about billing at that point and more about collecting.

Q.    Okay.

A.    But we did handle those claims.

Q.    Do you remember what type of claims

Page 95

they were?  Were they commercial claims, were they government claims, were they other kinds of claims?

A.    They were commercial claims.

Q.    And so they were billed to commercial insurance companies; is that right?

A.    Yes.

Q.    And was that true for Sun as well, the out-of-network claims?

A.    Yes.

Q.    Do you remember which insurance companies Integrity billed out-of-network on behalf of Sun or Mission during 2016 and 2017?

A.    I would have to go back and look at my records.

Q.    So were they workers' comp claims?

A.    We did handle some workers' comp claims.

Q.    So what is a workers' comp claim? Is it treated differently than a commercial claim by Integrity?

A.    My billing managers would have handled that.

Q.    Who do you understand the payer to be in a workers' comp situation?

Page 96

A.    My billers would have handled -- my billing manager would have handled that.

Q.    So how would you know, not you, but how would Integrity know whether a claim was a workers' comp claim?

A.    My billing managers would have handled all of that.  I mean, I think that it would have been listed on the processing that was sent over to Integrity.

Q.    I mean, do you know one way or the other when a test comes -- an order comes in for a test, that ultimately ends up getting billed as a workers' comp bill type, does the order reflect that it is a workers' comp claim at all?

A.    I would -- I don't know.

Q.    Does the order convey which lab is to be -- to perform the testing?

A.    I don't know.

Q.    How would you -- do you have any understanding one way or the other how Sun would know -- sorry, how Integrity would know that Sun or Mission is to be listed as the billing provider on any type of out-of-network claim?

Page 97

A.    Can you say that again, please?

Q.    Yeah, I will try to do it more clearly.

So Integrity -- so you testified that Integrity would submit some out-of-network claims on behalf of Sun or Mission during 2016 and 2017; right?

A.    At the end of 2017, yes, we did.

Q.    And it would submit those to commercial insurers; right?

A.    Yes.

Q.    And on those claims, it would list Sun as the billing provider; right?

A.    Yes.

Q.    And for Mission it would list Mission as the billing provider; right?

A.    Correct.

Q.    And the claims were billed out-of-network because Sun and Mission didn't have a network agreement with the insurance companies; right?

A.    Correct.

Q.    So what I'm trying to understand is how would Integrity know whether a claim was a Sun claim or a Mission claim?

25

CONTAINS CONFIDENTIAL INFORMATION

Page 98

A.    We were told that it was a Sun/Mission or a Mission claim.

Q.    By whom?

A.    By Sun or Mission.

Q.    But where did the data for the -- you needed to populate the claim form; right?

A.    We did.

Q.    Where did that come from?

A.    It would have come through our connection to the LIS.

Q.    Okay.  So for the out-of-network claims, the information was being sourced from either the Sun LIS or the Mission LIS; right?

A.    Yes.

Q.    Was it the same databases that the information was being sourced for the claims that were billed on behalf of the hospitals to insurers; right?

A.    Yes.  That information was stored in the same laboratory information system.

Q.    Okay.  Presumably in order to bill a claim out-of-network on behalf of Sun or Mission, a physician would have had to order Sun or Mission to perform testing; right?

A.    Yes.

Page 99

Q.    It would have had to send a specimen to Sun or Mission?

A.    I don't know.

Q.    Well, how -- how would Integrity know that Sun had been ordered to perform a test that was ultimately billed out-of-network to a commercial insurer?

A.    The information was passed to us through the LIS.

Q.    And okay.  So that is -- that is where Integrity would get the information about whether Sun had been ordered to do a test or not?

A.    Correct.

Q.    And what -- was there, like, a data field in the LIS that would reflect which -- that Sun had been ordered to do the test?

A.    I don't know that there was a data field.  The requisitions and results would have been attached in the LIS.

Q.    I apologize if these questions are a little technical.  When you say "attached," what do you mean, that information would be like inputted in?

A.    Yes, excuse me.

Page 100

MR. MARKHAM:  Would you like some water?

MR. BORNSTEIN:  Of course.

A.    Yes, the information the requisitions and any verification information would have been scanned into and attached to the individual sample in the LIS.

Q.    You want to wait until we get a drink?

A.    Please, I sound like a frog.

Q.    No problem.  We can wait if you want.  If you want to take a break, we can take a break too.

A.    I am fine.  I just need a sip of water.

Q.    Okay?

A.    Okay.

Q.    Good to go?

A.    Good to go.

Q.    So in the out-of-network situation, why don't you walk me through just real quick and then we can move on.  The intake process that would apply to a specimen that was -- ended up being billed out-of-network on behalf of Sun or Mission, okay.  So a physician would

Page 101

order a test; right?

A.    I didn't manage Sun or Mission.

Q.    Well, who would do the processing of the orders and specimens that would be billed out-of-network to commercial insurance companies?

A.    I didn't manage Sun or Mission.  You would have to ask the people that did.

Q.    Would it have been Integrity employees though?

A.    I did not handle those Sun or Mission claims.

Q.    Okay.  I'm trying to -- Sun was a client of Integrity at the time; right?  You testified to that earlier.

A.    It was a billing client of Integrity, yes.

Q.    And so was Mission; right?

A.    Correct.

Q.    And I mean, I looked at a lot of the documents and we don't need to go through them all, but it looked like Integrity had sort of a large roster of employees who could do things like verification and accessioning; right?

A.    Yes.

CONTAINS CONFIDENTIAL INFORMATION

Page 106

that had been referenced to other labs; right?

A.    Repeat, please.

Q.    Yeah.  You testified earlier that the claims Integrity had submitted to United on behalf of Newman or Community were in many cases for tests that had been referred to other laboratories; right?

A.    That is my understanding, yes.

Q.    What is that understanding based on?

A.    Based on the accessioning that was done.

Q.    What about the accessioning gives you the impression that a test had been referred to other labs?

A.    Based on where the sample was sent after the accessioning was done.

Q.    How do you know where the specimen was sent after the accessioning was done?

A.    Dr. Murphy and Mr. Saucedo would give direction and we would follow that direction.

Q.    So when you say "give direction," can you be a little bit more specific about what you are referring to?

A.    Give direction of whether or not a

Page 107

sample would be tested at Alternate Health Lab, for example.

Q.    So they were sort of the ones that would direct where samples would go for testing?

A.    Correct.

Q.    What -- it wasn't like someone from the hospital calling up and saying direct it here or direct it there; right?

A.    No.  My understanding is through the management agreements that Sun and Mission were giving that authority.

Q.    So I understand that you believe that a specimen was sent to another lab for testing; right?

A.    I don't understand your question.

Q.    Well, do you see a distinction between a specimen being -- a test being referred to another lab and sent to another lab?

A.    No, I don't understand what you are asking.

Q.    Okay.  Do you know what a reference lab is?  Do you have a general understanding of what a reference lab is?

Page 108

A.    I do.

Q.    And what is your general understanding?

A.    It is a lab that receives a sample from another lab for specific testing.

Q.    Do you have an understanding as to what a referring lab is?

A.    A referring lab is the lab that sends the sample to another lab for testing.

Q.    Does a referring lab need to receive a sample before it can refer to it to someone else?

A.    I don't know what you mean by "receive."

Q.    Well, if a referring lab is the lab that sends a sample to another lab, doesn't that inherently mean that that lab needs to have something in its possession first that it can send somewhere else?

A.    It sounds like something that requires a legal conclusion that I'm not willing to give.

Q.    Are you aware of whether there is any guidelines in the Medicare Claims Processing Manual provision that you relied on

Page 109

that defines what a referring lab is?

A.    I don't remember it having definitive statements on whether or not a lab had to, quote, receive the sample.

Q.    But if it did state that, that would be an important provision; right?

MR. MARKHAM:  Objection, calls for a hypothetical conclusion.

A.    I'm not willing to state that, because it sounds like it requires a legal conclusion.

Q.    Well, I will represent to you that there is a definition of referring lab in the Medicare Claims Processing Manual that includes in the definition of referring lab that the lab must receive a specimen in order to refer it. So you can go back and look and challenge it if you want, that is fine.

If that were the case, don't you think that that would also be a relevant concept that should apply to this case?

A.    I stand by my previous answer.  It requires a legal conclusion I'm not willing to give.

Q.    You're an attorney; right?

CONTAINS CONFIDENTIAL INFORMATION

Page 114

understanding as to which lab referred one test to another lab?

MR. MARKHAM: Objection, speculation.

A.   I don't know.

Q.   Okay.  Well, it sounds like -- so the people who would have that knowledge would be Dr. Murphy and Mr. Saucedo; right?

A.   You would have to ask them if they had that knowledge.

Q.   Were you aware of your -- the accessioners that worked for Integrity having an understanding of which lab referred testing to another lab?

A.   That would not have been in their job description.  They were basically data entry people.

Q.   What about the verifiers?

A.   The verifiers also were just data entry type personnel.

Q.   They didn't have, like, a sophisticated understanding of lab services or anything like that; right?

A.   No.

Q.   They weren't healthcare

Page 115

professionals?

A.   No.

Q.   They were paid, like, 10, 11, 12, 13 dollars an hour; right?

A.   They were paid more than 10, but yes.

Q.   Okay.

A.   They were hourly employees.

Q.   So they weren't -- they weren't the ones making referrals or anything; right?

A.   No.

Q.   They weren't the ones deciding where -- whether an order for a test that came in to Integrity should be referred to a different lab; right?

A.   No, they would not make that decision.

Q.   They were acting -- but they had -- they came to some understanding about what to do about everything; right?

A.   They knew where to send the samples yes.

Q.   And that came from their managers; right?

A.   Yes.

Page 116

Q.   And the managers' understanding came from Dr. Murphy and Mr. Saucedo; right?

A.   Yes.

Q.   Do you have any understanding about -- so the intake process involves unpacking a box, verifying the insurance, assessing the specimen, putting data into a list; right?

A.   Yes.

Q.   At that point a specimen and an order is put into a box and sent off somewhere else for testing; right?

A.   I don't know if it was put in a box, but yes, it was sent to someplace else for testing.

Q.   It was shipped somewhere else; right?

A.   Or delivered somewhere else.

Q.   Okay.  So like if it was sent to Alternate Health it would have just been kind of carted down the hallway?

A.   Yes.  It would have been hand delivered to Alternate Health.  I wouldn't reference it as carted down the hallway.

Q.   Just a -- I think I actually saw some documents about stuff being put in a cart

Page 117

so I thought maybe that was, but maybe it wasn't put in the cart.

A.   No.

Q.   It doesn't really matter.  Anyway, so that is sort of a sequence that starts with an order and a specimen being received and ends with -- it ends with a specimen being sent somewhere else for testing; right?

A.   Correct.

Q.   Where in the sequence is the referral decision made?

A.   I don't know.

Q.   Who would know that answer?

A.   Dr. Murphy or Mr. Saucedo.

Q.   So you mentioned earlier that -- we were talking about the fact that Integrity submitted a lot of claims to United where Newman or Community were listed as the provider on the claim?

A.   They were listed as the billing provider.

Q.   Where there wasn't any other information about any other laboratories doing testing; right?

A.   Can you be more specific?

CONTAINS CONFIDENTIAL INFORMATION

Page 122

A.   I would have relied on my billing manager to determine what needed to be appropriately placed.

Q.   What about a -- what about a UB-04. There is a -- there is a place on that for a modifier too; right?

A.   For certain modifiers.

Q.   Is there a place for 90?

A.   Not to my knowledge.

Q.   If I told you that there was, would that change your point of view?

A.   I would have to ask a billing manager to know.

Q.   Have you ever seen anybody put a modifier 90 on a UB-04 claim?

A.   No.

Q.   Can you consider any -- do you think there is any circumstances in which it would be appropriate?

A.   I have no knowledge of that.

Q.   If someone could put a modifier 90 on a UB-04 that would represent that that service to which the modifier was appended had also been referenced; right?

MR. MARKHAM:  Objection,

Page 123

speculation.

A.   I don't know.

Q.   So you don't know one way or the other what information could be put on a UB-04?

A.   I know certain things.  It was my understanding that that was not a requirement to be placed on the UB-04 based on more than one billing manager that had looked at those claims.

Q.   Do you think it was relevant at all to payers whether they were billing -- being billed on one form or the other to understand whether a test had actually been performed by the provider listed on the claim?

MR. MARKHAM:  Objection, speculation.

A.   I don't know what was relevant to providers.

Q.   Is it possible that a payer would like to know whether the entity that is billing it actually did the testing that was listed on the claim?

A.   I don't know what providers, I mean, insurance companies thought.

Q.   What if Integrity had put modifier

Page 124

90 on claims submitted to United on UB-04 forms?

A.   I have no idea.

Q.   What would that convey to United?

A.   I don't think that it was appropriate to put on there, so most likely it would have had edits and never gone to United.

Q.   But you understand that modifier 90 means the same thing in the -- on a UB-04 as it does on a 1500; right?

A.   I don't know that that is true.

Q.   Do you think it was -- so just thinking about the claims that were submitted to United in this case on behalf of Newman and Community, if United wanted to look at the claim and figure out who rendered the service, how would -- would it be able to do that?

A.   Based on the claims that Integrity submitted on behalf of the hospitals, not on the claims that Integrity submitted, no.

Q.   And why is that?

A.   Because it was not required on the UB-04 and it was not placed on the UB-04.

Q.   So United couldn't look at the claim and figure out what lab did the testing because

Page 125

that information wasn't disclosed; fair?

MR. MARKHAM:  Excuse me, objection. She just answered that question.

MR. BORNSTEIN:  Well, I'm trying to clarify because she said it wasn't required and wasn't disclosed.  I'm trying to --

MR. MARKHAM:  She said it wasn't disclosed.  Now, you asked her if it wasn't disclosed again.  Objection, asked and answered.  I will keep it to that.  You don't have to argue.

Q.   It is not disputed that Integrity didn't disclose to United that Newman or Community didn't perform some of the services that were listed on the claim form?

MR. MARKHAM:  Objection, asked and answered.

A.   I did not say that it was never disclosed to United.

Q.   On the claim form?

A.   And I stand by my previous answer.

Q.   Okay.  Well, so what if United wanted to look at a claim and try to figure out which entity had been ordered to do the testing for which it was being billed.  Would it be

32

CONTAINS CONFIDENTIAL INFORMATION

Page 126

able to find that information anywhere?

MR. MARKHAM: Objection, asked and answered.

A. I'm thinking through. The billing provider would have indicated who was the person from whom testing was ordered.

Q. So when the billing provider is listed on a claim, it represents to United that the physician has ordered the testing from that specific provider; is that right?

A. That is my understanding.

Q. And it also represents that -- anyway we can skip that.

So what if United wanted to look at the form and try to figure out whether a test had been referred by the billing provider to someone else, would -- would that information be anywhere on the form?

MR. MARKHAM: Objection, form. Speaks for itself, and asked and answered.

MR. BORNSTEIN: No, I asked who did the testing it is different whether there was a referral. It is actually technically different.

MR. MARKHAM: Objection, the form

Page 127

speaks for itself.

A. Can you repeat the question?

Q. Yeah. I mean, if United wanted to look at a claim that it received from Integrity on behalf of Newman and Community and discern is this a test that has been referred or is it a test that was performed by the hospital, would it be able to find that information in the claim form?

A. Integrity submitted the UB-04s in accordance with the guidelines provided. If United wanted more information than that they would have added that as a requirement but we did not see that request.

Q. So that would be a "no" then; right?

A. Not to my knowledge.

Q. Integrity was aware that testing was being sent to other labs at the time; right?

A. Integrity was aware.

Q. And the source of that information was Dr. Murphy, Dr. Saucedo; right?

A. Source of what information?

Q. That testing had been performed by the lab?

A. No.

Page 128

Q. Did the list have a -- have a data entry column that identified the actual lab that performed the test?

A. I don't know the answer to that, but the results would show what lab performed the test and the results were transmitted over to billing, so billing could accurately bill for the claims.

Q. United didn't have access to the test results in the ordinary course of business, did it?

A. Of course it did.

Q. How would it have access to them?

A. In the ordinary course of business, United denied a significant number of claims. Integrity would provide requisition results, medical records to appeal those claims, so that would have been provided throughout our time.

Q. United would need to ask for the records; is that right?

A. Yes. Well, they would deny the claims, we would provide the records to show that the claims were appropriate.

Q. And you mentioned that Integrity would appeal the claim as well; right?

Page 129

A. Yes.

Q. United didn't have access to Sun or Mission's lists; right?

A. No, they did not.

Q. And they didn't have any access to any database that contained the test orders; right?

A. No.

Q. They couldn't just log into the database to see the test results; right?

A. No.

Q. All they had, really -- I mean, when United's system is deciding whether to pay a claim all it has is the data on the 837 form; right?

MR. MARKHAM: Objection, calls for speculation.

A. And when a claim is submitted the data on the 837 form is submitted to United as -- as appropriately required based on guidelines.

MR. BORNSTEIN: Why don't we take a break.

VIDEOGRAPHER: The time is 11:25. We are off the record.

CONTAINS CONFIDENTIAL INFORMATION

Page 130

(Recess, 11:25 to 11:49 a.m.)

VIDEOGRAPHER:  The time is 11:48. We're on the record.

Q.    During 2015, '16 and '17, were you aware of whether or not Sun was contracted with certain marketers?

A.    I don't know that they were in 2015, but yes, I was aware that they were in 2016 and '17 because I helped prepare the contracts.

Q.    When you say help prepared, you mean drafted them?  Did you do a first draft of them or did you edit them?  What was your role in preparing those contracts?

A.    I did an initial draft of them --

Q.    So you are aware --

A.    -- to be used.

Q.    -- of the terms and provisions of those contracts; right?

A.    I am.

Q.    And I don't think we need to go through them, but they speak for themselves; right?

A.    I'm aware.

MR. MARKHAM:  We agree.

A.    We agree.

Page 131

MR. MARKHAM:  Sorry, I didn't mean to cut you off, just stipulating for the record.

A.    Yes, they speak for themselves.

Q.    We want to look at the intent and purpose of those contracts we just look to the language; right?

A.    If I didn't make any mistakes in drafting.

Q.    All right.

A.    I don't say that it was perfect.

Q.    Okay.  Generally those marketers were independent contractors of Sun; right?

A.    Yes.

Q.    Do you know whether Mission had agreements with marketers as well?

A.    You would have to ask Jesse Saucedo.

Q.    Did you have any role in preparing agreements for Mission with respect to marketers?

A.    I did not.

Q.    Did you ever provide Mr. Saucedo with, like, templates of Sun's agreements that he could use?

A.    It is possible.  I don't recall, but

Page 132

it is possible.

Q.    At any rate, during 2016 and '17, business was generated and specimens were sourced pursuant to the arrangements between Sun and marketers; right?

A.    Correct.

Q.    And the same would be true with respect to Mission and its marketers; right?

A.    You would have to ask Mr. Saucedo.

Q.    And claims for tests run on the specimens that came in through those arrangements were billed to United through Newman and Community Memorial Hospital; right?

A.    Those would have been two of the hospitals, but it wasn't billed through.  It was based on what the physician ordered.

Q.    Okay.  But just billed by listing the name of those hospitals as the billing provider on the claims; correct?

A.    Appropriately listing it as billing provider on the claims.

Q.    I just wanted to confirm, not about billing anymore, I just wanted to confirm that the testing that was billed for on those claims, was done on specimens that were brought

Page 133

in by the marketers Sun was contracted with; is that right?

A.    Some were.

Q.    Did the specimens that came in and which were tested and then billed using the names of those two hospitals, come in from any other sources other than marketers?

A.    Yes.

Q.    What were those sources?

A.    Other physicians that were not independent contractors sent samples.

Q.    And were -- were some of those physicians investors in Sun?

A.    Yes.

Q.    Those physicians had Series agreements with certain -- with Sun; right?

A.    Yes.

Q.    And did you have any role in preparing those Series agreements?

A.    We hired outside counsel to draft and structure the Series.

Q.    So does that mean no?

A.    I think toward the end of the last few Series I would send out the forms that had been prepared previously.  I filled in doctors

CONTAINS CONFIDENTIAL INFORMATION

Page 134

names and things that were interested in the offering, but that is all.

Q.    Okay.

A.    The initial documentation was provided by outside counsel.

Q.    So unlike the marketing agreements with -- that Sun had with marketers you didn't draft the Series agreements?

A.    I did not.

Q.    When did you become aware that Series agreements were in place between physicians and Sun?

A.    I think the Series went in place the beginning of 2016 and possibly the end of 2015.

Q.    And were you aware of that at that time?

A.    Aware of what?

Q.    That the Series -- well, the Series agreements were actually -- they were investment opportunities that were being offered to certain physicians and other licensed professionals; right?

A.    Yes, I was aware of that.

Q.    And those offers were made starting at the end of 2015 and then kind of continuing

Page 135

through 2016; right?

A.    I believe that's correct.

Q.    Who made those offers?

A.    They would have been made by Sun Clinical Laboratory.

Q.    And a fair number of physicians accepted them; right?

A.    Yes.

Q.    And pursuant to those arrangements, other specimens and testing came in as well during '16 and '17; is that right?

A.    Yes, physicians that were invested did send samples.

Q.    And the testing that was run on those samples was billed to United using the names of Newman and Community; right?

A.    We didn't use the names.  They were their samples and we were billing for the hospital.

Q.    I'm actually trying to just come up with an inoffensive way of asking the question.

A.    You haven't found it yet.

Q.    Well, their names were placed in the claims; right?

A.    Yes, we were billing for Newman or

Page 136

Community.

Q.    I'm just trying to establish that a portion of the claims that were billed for on behalf of Newman and Community to United during 2016 and 2017 by Integrity were sourced pursuant to the Series agreements?

A.    I don't know if sourced is the correct answer.  The physicians that were invested in the Series did send samples.

Q.    Okay.  Was there any other -- are you aware of any other -- other than physicians who were associated with marketers or physicians who were investors in Sun, are you aware of any other physicians who just independently sent in specimens that were tested and then billed on behalf of Newman and Community?

A.    Yes.  I believe there were providers that sent in that were not necessarily investors.

Q.    Do you have any idea who they were?

A.    I would have to pull my records on that.

Q.    How would -- I mean, if we wanted to try to discern whether there were any specimens

Page 137

or testing that was sent in or ordered by, you know, someone other than a physician who was invested or associated with the marketer, I mean where would we look to figure that out?

A.    You would have to look at -- the easiest place would be our master report.  It would say -- and then you would have to cross check that to what investors were serious investors versus what -- I mean, what physicians were serious investors versus what physicians were attached to a marketer.

Q.    So sort of like a process of elimination?

A.    Basically.

Q.    There is no, like, separate record?

A.    There is no separate record.

Q.    The marketing arrangements were in place for the most part for the duration of 2016 and 2017 until the hospital -- the hospital billing program wound down?

A.    Yes.

Q.    And the Series agreement was in place for the bulk of that time as well; right?

A.    Not the bulk of that time.

Q.    When did -- well, when were the

35

APP 64

CONTAINS CONFIDENTIAL INFORMATION

Page 138

Series terminated?

A.   As I recall, the Series was terminated early 2017.

Q.   Do you know whose responsibility it was at Sun to authorize entering into Series arrangements with investors?

A.   It would have been Dr. Murphy.

Q.   Anybody else?

A.   No.

Q.   What about authorizing entering into arrangements with marketers. Anybody at Integrity or Sun or Mission who, to your knowledge, was responsible for doing that?

A.   Nobody from Integrity. You would have to ask Dr. Murphy about Sun and Mr. Saucedo about Mission.

Q.   Did you have any role in drafting reference lab agreements for Sun with other labs?

A.   I'm going to have to look at the forms. It is possible that I drafted some.

Q.   Do you remember drafting a reference lab agreement between Sun and Alternate Health Labs?

A.   It is quite possible I did that,

Page 139

yes. I would have to look at the agreement to know for sure.

Q.   Can you think of any other reference labs that you might have -- for which you had might have drafted an agreement?

A.   I would need to see the actual agreements. I really don't recall.

Q.   That is fine. On the Alternate Health Lab piece just for clarity, do you remember one way or the other whether you helped put together a reference lab agreement or not?

A.   I would have to see the documentation to see if it was my work.

Q.   That is fine. I've already skipped like 30 documents.

A.   Thank you.

Q.   No documents for the first two and a half hours?

MR. MARKHAM:  Are we warranting that we're not going to go back that way?

MR. BORNSTEIN:  No, actually they're not chronological, John, but I just know them.

MR. MARKHAM:  That is very

Page 140

impressive.

(Exhibit 135 marked.)

Q.   Mrs. Murphy, I'm showing you what has been marked as Exhibit 135. Can you take a second to scan over it real quick?

Do you recognize this document? I will represent that it is an email with an attachment to an email?

A.   Yes, I recognize this document.

Q.   What do you recognize it to be?

A.   A reference laboratory service agreement form to be executed between Alternate Health Lab for reference laboratory services and Sun lab, Sun Clinical Lab.

Q.   Is this a -- so this an email that you sent -- the cover document, sorry, if you flip back to the front?

A.   Uh-huh.

Q.   It is an email that you sent, I think, to yourself on October 21st, 2016; right?

A.   I did. Sometimes I drafted these when I was at home and would send them to my office email address.

Q.   All right. So you attached a

Page 141

document called the Alternate Reference Health Lab Agreement?

A.   Yes, this would have been a draft.

Q.   Is this a document you drafted?

A.   Yes.

Q.   Did you kind of draft these on your own or did someone help you draft them? Do you remember where you -- how you figured out how to come up with the language?

A.   I drafted these.

Q.   Do you remember why you drafted this document?

A.   Because Dr. Murphy asked me to because Sun lab would be referring to Alternate Health Lab.

Q.   So this lab, or sorry, this agreement was for situations where the referring lab was Sun and the reference lab was Alternate Health; right?

A.   Correct.

Q.   If you -- do you know whether this agreement was ever signed?

A.   I don't know. I would have to go back to the files.

Q.   Do you know whether this type of

36

CONTAINS CONFIDENTIAL INFORMATION

Page 142

reference lab arrangement was ever entered into between Sun and Alternate Health?

A.   I don't know.

Q.   Do you know whether -- okay, well, let's -- why don't you just flip to the first page.

Under the recital section it states that Sun is in the business of providing clinical toxicology laboratory testing, specifically urine toxicology screens and confirmations which are called lab tests; right?

A.   Yes.

Q.   And then the second clause it states that Sun may receive requisitions for lab tests in excess of its capacity to perform these tests in the facility; right?

A.   Yes.

Q.   And how would Sun receive requisitions?

A.   How would Sun receive a requisition?

Q.   Yes.  It says, some labs may receive requisitions.  So what type of requisitions would Sun receive?

A.   You would have to ask Dr. Murphy

Page 143

that question.

Q.   Okay.  Did you sort of just consult him and try to draft this consistent with maybe his direction about what type of agreement he wanted executed?

A.   Yes, I did.

Q.   All right.

A.   And I want to clarify that this does look like a draft, not the final agreement.

Q.   Okay.  Yeah, I didn't see a final one either, maybe there is one.

And then if you go down to the third recital provision it says, where Sun Lab requisitions for lab tests currently exceed its capacity by 5,000 each month, and with anticipated growth Sun Lab expects requisitions for lab tests to exceed its capacity by 50,000 per month within the next 12 months.

Do you see that?

A.   I see that.

Q.   So this is -- this is conveying that Sun's expecting to receive a lot of orders for lab tests; right?

A.   It is.

Q.   Do you have any idea what Sun's

Page 144

capacity for testing was at this time?

A.   I do not know.

Q.   At any rate, at least this draft agreement contemplates that when Sun would receive an order for test results it would defer a fair amount of that testing to Alternate Health Lab; right?

A.   Yes.  And I think based on the numbers here, what it was contemplating is that -- well, yes, I will stand by that answer.

Q.   If you flip over to -- if you flip over to Section 2.01 under services?

A.   Yes.

Q.   This draft says that, pursuant to the terms and conditions of this agreement, Alternate Health shall provide for and on behalf of Sun Lab those lab tests, collectively the services, referred to Alternate Health pursuant to this agreement.

Do you see that?

A.   Yes.

Q.   So the testing that this agreement was contemplating was testing that Alternate would perform for or on behalf of Sun; right?

A.   Correct.

Page 145

Q.   You can put that one away.

Having looked at this, do you recall drafting any other reference lab agreements between Sun and any other labs?

A.   I really don't remember.

Q.   Do you know whether Sun had a reference lab agreement with any lab that can perform genetic testing?

A.   I don't know.

Q.   What about allergy testing?

A.   I don't know.  It is quite possible that they did.

Q.   I want to just switch a little bit and just talk briefly about Newman and Community Memorial Hospitals --

A.   Okay.

Q.   -- for the 2016/'17 time period?

A.   Okay.

Q.   So have you ever been to Newman Memorial Hospital?

A.   I have not.

Q.   Do you know where it is?

A.   Yes, it is in Shaddick, Oklahoma.

Q.   How do you know that is where it is?

A.   Because we billed for them and I

37

CONTAINS CONFIDENTIAL INFORMATION

Page 154

Q.   So is that -- my question to you was do you know one way or the other why a physician would want to order a test from a hospital that couldn't perform the test?

A.   You would have to ask the physician. You are asking me if I know what they were thinking. I do not have that knowledge.

Q.   So are you aware of any reason why any of the physicians who submitted orders that are at issue in this case ordered any testing from Newman or Community?

A.   I think it is the same answer. I don't have the knowledge of what the physicians were thinking.

Q.   All right. If we wanted to know why a physician would order a test from a hospital that couldn't perform the test, we would need to speak to whom?

A.   The physician.

Q.   Anybody else?

MR. MARKHAM:  Objection, calls for speculation as to who else would know.

A.   No, not to my knowledge.

Q.   Do you know whether Mr. Saucedo would understand why any physician would order

Page 155

large scale testing from Newman or Community Memorial Hospitals?

A.   You would need to ask Mr. Saucedo.

Q.   Same with Dr. Murphy; right?

A.   Yes.

Q.   Do you know what a bill type is?

A.   Yes.

Q.   What is it?

A.   It is the -- it is the moniker, I guess you would say, the initials that we would apply in the LIS to designate which hospital the sample was associated with.

Q.   The bill type would determine the name of the provider that would be listed on a claim; right?

A.   The bill type purpose when originally structured as I understand it was as a mechanism to push claims through the interface over to the Centricity billing system.

Q.   Is the bill type like the data point that would be used to load in the billing provider --

A.   Yes.

Q.   -- on the claim?

Page 156

A.   Yes.

Q.   Which employees made the decision about which bill type to apply to specimens that they received?

A.   The accessioners would have done it based on instructions from the sorting station manager who got those instructions from Dr. Murphy and Mr. Saucedo.

Q.   What were the various bill type choices that were available to the accessioners?

A.   There were different abbreviations for the hospitals. NMH, I believe, was Newman's, CMH was Community's.

Q.   Were there any other bill types available or were just -- were the only ones available hospital bill types?

A.   No, if it was an out-of-network Sun claim, that would have had its own bill type.

Q.   Which would be called what, do you remember?

A.   I don't remember.

Q.   Let's do this one.

(Exhibit 136 marked.)

Q.   Mrs. Murphy, I'm showing you what

Page 157

has been marked Exhibit 136. Do you see that?

A.   Yes.

Q.   If you flip to the front page of that document, this is an email from Samantha Murphy to you; right --

A.   Yes.

Q.   -- dated October 20th, 2016; right?

A.   Yes.

Q.   And it has got an attachment named processes; correct?

A.   Yes.

Q.   We can go to that in a second. Who was Samantha Murphy by the way?

A.   Samantha Murphy is my daughter-in-law who worked at Integrity.

Q.   What was her position?

A.   She was bounced around a lot through the company. Her primary roles were related to processing EOBs and compliance officer as well as reporting.

Q.   When did she become a compliance officer, do you remember?

A.   I don't remember the date. I think it was in 2016.

Q.   And how long did she remain in that

CONTAINS CONFIDENTIAL INFORMATION

Page 182

and Mission.

Q. And the referral would be made by whom?

A. The referral would be made by the hospital to either Sun or Mission.

Q. Who at the hospital would make the referral?

A. Yes.

Q. Who at the hospital?

A. Oh, I don't know.

Q. Are you aware of anyone at the hospital ever actually making a referral to Sun or Mission?

A. I don't know the answer to that.

Q. Did you think it was significant that there be a reference lab agreement between a hospital and Sun or Mission?

A. If samples were being referred, it is typical practice to put a reference lab agreement in place. I don't know that it is legally required.

Q. Why is it typical practice?

A. Just to document standard business practices of how much would be paid for samples.

Page 183

Q. Typically you -- typically, I mean people have talked a lot about, you know, stuff is referred everywhere in the lab industry. That is kind of part of the testimony we've heard. Typically you -- you do see reference lab agreements between different referring and reference lab entities; right?

A. I don't have the knowledge base to know if it is typical or not.

Q. Okay. So you did think number 7 was significant to some degree; right?

A. It was just bullet points. They aren't ranked as significant or non-significant.

Q. But did you think 7 was -- I mean 4, 5 and 6 you sort of said I don't know one way or the other whether those were legally significant. Did you think 7 was legally significant?

A. That a reference lab agreement is in place?

Q. Yeah.

A. No. Like I said, I don't know if it is even a requirement.

Q. Okay.

Page 184

A. I think it just documents the agreement between the parties.

Q. You see up in -- you see up in billing process?

MR. MARKHAM: Same page?

Q. Yes.

A. Yes.

Q. On number 1 you write bill through hospital contracts and CLIA?

A. Yes.

Q. What do you mean by that?

A. That we would be billing for the hospital and the hospital would have their contracts in place.

Q. With insurers; right?

A. With insurers.

Q. And the idea was that by submitting a bill on behalf of the hospital, it would cause the insurer to pay pursuant to the contract it had with the hospital; right?

A. Yes.

Q. The -- if you look at the marketing process section?

A. Where are you?

Q. Sorry, it is on the first page, I

Page 185

should have told you that. Go back to the first page. Marketing process step number 1 states integration of specimens collected outside the hospital; right?

A. Yes.

Q. So that is referring to the fact that specimens that would be collected outside the hospital; right?

A. Yes. Specimens would have been collected usually in physician offices.

Q. By physicians or phlebotomists or who?

A. I think it was a mix of both.

Q. Did Sun have any relationship with phlebotomists who collected specimens?

A. They may have at an early time, but it was before I was involved.

Q. Okay. If you don't mind, in marketing process number 4?

A. Yes.

Q. You state providers who utilize our services provided basic supplies, cups, blood test kits, allergy blood cards, requisitions, US -- UPS shipping labels, and processing instructions to send samples to us. Do you see

47

CONTAINS CONFIDENTIAL INFORMATION

Page 214

an out-of-network Sun claim.  An out-of-network Sun claim would be a claim for a test a physician ordered from Sun; right?
A.  Yes.
Q.  And it would be for a test that Sun either performed or referred to another lab; right?
A.  Correct.
Q.  And the same would be true for an out-of-network Mission claim; right?
A.  Yes.
Q.  And when Mr. Mission has been ordered to perform a test and performed the test or referred the test out, the appropriate way to bill that claim would be on a 1500 form; right?
A.  Correct.
Q.  Or the electronic equivalent; right?
A.  Correct.
Q.  That would be the 837 professional form; right?
A.  That is correct.
Q.  And the same would be true for Sun; right?
A.  Yes.

Page 215

Q.  So every test that was ordered from Mission or ordered from Sun, whether it was tested by them or referred to another lab should be billed on a 1500 or its electronic equivalent; right?
A.  Yes, if the physician was intending that Sun perform the testing.
Q.  You're talking about whether modifier 90 has been appropriately applied to these types of claims; right?
A.  Yes.
Q.  So you say, Lisa has been applying modifier 90 incorrectly on these claims; right?
A.  I did.
Q.  And Lisa was who?
A.  Our billing director at the time.
Q.  Modifier -- you state, modifier 90 designates which tests are referenced to third-party labs; right?
A.  Yes.
Q.  So that is what modifier 90 conveys, it affirmatively conveys that test has been referenced to a different lab; right?
A.  Yes.
Q.  You state, instead of designating

Page 216

the specific tests that were referenced, she applied modifier 90 to all tests; right?
A.  Yes.
Q.  What is wrong with applying modifier 90 to all tests?
A.  In this circumstance, in October we were no longer doing the hospital outreach program.  We were now working with claims that were federal samples that were being sent to Sun for testing.  So we were following CMS guidelines for form 1500 for federal samples.  And I felt like based on what I was reading at this time that the individual test needed to be marked with modifier 90 and not a blanket modifier 90 in accordance with CMS guidelines.
Q.  Okay.  And that's because when there are multiple tests that are listed on a claim, the only way to convey whether some have been referred out and some have been performed by in-house, is to apply 90 to the test that had been referred out; right?
A.  Correct.  For these federal samples on a HCFA 1500, that is my understanding.
Q.  Who is the payer of these types of claims, do you remember?

Page 217

A.  These were Medicare/Medicaid claims.
Q.  Who was billing Medicare and Medicaid at this time?
A.  Sun.
Q.  Was Integrity performing the billing?
A.  Yes.
Q.  So you say, on blood Mission referenced everything else by putting modifier 90 on all tests was correct although unintentional; right?
A.  Yes.
Q.  So for a claim where Mission was ordered to do the testing it referred every single test to a different lab.  Modifier 90 should be on or next to every single test that was being billed for; right?
A.  On federal samples on a HCFA 1500, that is correct.
Q.  What if they were non-federal samples that were still being billed out-of-network on a 1500?
A.  I believe that modifier 90 was required on those as well.
Q.  And the way to affirmatively convey

55

APP 69

CONTAINS CONFIDENTIAL INFORMATION

Page 230

A.    You keep going back to this idea and it confuses me why you are asking it. Maybe you can clarify, because there is no requirement that anybody's name be put on a requisition form. We knew these requisitions were coming in for Sun or Mission and they would be used appropriately.

Q.    Do you know whether Sun or Mission was listed on the form?

A.    I don't know. I would have to go back and look.

Q.    The form is one way the doctor -- the form is something a doctor uses to convey which lab they would like to perform a test; right?

A.    It is one method.

Q.    Do you know whether any of these claims that you're talking about here had hospital logos on them?

A.    From looking at the timing on this, the date and what she is discussing, I would say no.

Q.    So who would have instructed -- when you determined that the correct bill type was either Sun or Mission, how did you know that?

Page 231

A.    Well, it is possible that a Sun or Mission logo would have been on the requisition form.

Q.    So that would have been one indicator to you that Sun --

A.    It is one indicator.

Q.    Thank you.

A.    At this time in the program or it is not in the program. At this time in the life of Sun and Mission.

(Exhibit 145 marked.)

Q.    Okay. I'm showing you what has been marked Exhibit 145.

A.    Yes.

Q.    If you look at the first page, this is an email that you sent to Lisa Lewis on January 30th, 2017; right?

A.    Correct.

Q.    And the subject is updated hospital spreadsheet; right?

A.    It is.

Q.    And the email attaches a document called hospital with insurance and volume; right?

A.    Yes.

Page 232

Q.    So you write to Tamara and someone named Arnold Cantu. Who is that by the way?

A.    Arnold Cantu was our IT director at that time.

Q.    And you write, attached is the list of the hospitals Mike has signed or anticipates signing in the near future with anticipated volumes. Do you see that?

A.    Yes.

Q.    Do you mind flipping to the attachment, please?

A.    Okay.

Q.    This is the spreadsheet you attached to the email; is that right?

A.    It appears to be, yes.

Q.    It has one column for hospital, one column for insurance contracts and one column for amount of samples; right?

A.    Correct.

Q.    One of the hospitals listed is Newman Memorial Hospital in Oklahoma; right?

A.    Where do you see that?

Q.    It is actually if you look under -- I will direct you to it. If you look under the hospital column there is an entry called

Page 233

Oklahoma?

A.    Oh, I see, I'm sorry.

Q.    Do you see that?

A.    I do see that.

Q.    In parentheses is the letters NMH; right?

A.    Yes.

Q.    And that reflects a reference to Newman Memorial Hospital?

A.    Correct.

Q.    And in the insurance contracts column to the right it lists three payers; Aetna, Cigna and United, right?

A.    Correct.

Q.    That reflects that those are the payers that are contracted with Newman; right?

A.    I don't know who contracted with Newman. Those would certainly have been some of them.

Q.    Okay. But is that what that -- is what the insurance contract column conveying -- is the insurance contract column conveying which payers were contracted with Newman Memorial Hospital?

A.    It is conveying at least some of

CONTAINS CONFIDENTIAL INFORMATION

Page 234

them that were contracted.  It may not be a complete list.

Q.   And the same would be true for the line below, for the insurance contracts listed that relate to the hospital entry for Community Memorial Hospital; right?

A.   Correct.

Q.   So basically what this spreadsheet is doing is reflecting that United was contracted with Newman and United was contracted with Community; right?

A.   That is one thing it is reflecting, yes.

Q.   And you were aware of that at this time?

A.   Yes, I was aware of it at this time.

Q.   Other people in Integrity were aware that United was contracted with those two hospitals as well; right?

A.   Yes.  We had been working for Newman for many months by January 30th.

Q.   There is an amount of samples column, do you see that?

A.   I do.

Q.   Next to the Newman Memorial Hospital

Page 235

entry the number listed is 6,000.  Do you see that?

A.   I do.

Q.   This is the approximate number of samples Integrity expected to bill for Newman during a certain period of time?

A.   It looks like it was an estimate, yes.

Q.   And how was that estimate generated?

A.   I don't know.  I did not prepare this spreadsheet.  I don't know where I received this spreadsheet or who estimated those numbers.  I was passing that information on to Lisa.

Q.   There is a higher amount listed for Community, it is 8,000; right?

A.   Yes.

Q.   What was the point of circulating these numbers?

A.   We were getting busier.  One point that comes to mind is she would need to know whether or not to hire additional billing staff to prepare for this so we did not fall behind in our services.

Q.   Is this a spreadsheet that Chelsea

Page 236

Ewing prepared?

A.   I don't know who prepared this spreadsheet.

Q.   And you said you didn't have any idea how the volume numbers were calculated; right?

A.   No, it looks like I was passing information on.

Q.   If you look down to the middle of the spreadsheet there is a header called UnitedHealthcare, do you see that?  It is right in the center?

A.   Here, yes, I see that.

Q.   There is five states listed.  Do you see that?

A.   I do.

Q.   What are the significance of those states, do you know?

A.   I do not know.  I have no knowledge of that.

Q.   You can put that document away.

As the CEO of Integrity and the other capacities in which you worked, did you have any understanding as to whether it was appropriate to modify physician orders after

Page 237

they were received?

A.   To my knowledge, we did not modify physician orders without the physician's permission.

Q.   All right.  The question was slightly different, which is if a physician -- I guess I can ask it differently.

If a physician hasn't consented, it is not appropriate to modify a physician's order; right?

A.   Generally that is true, but Integrity did not modify physician orders.

Q.   And why is it true that modification of a physician order without consent would be problematic?

A.   You might change a test to a different test that the doctor did not want run.

Q.   You could modify the order in a way that wouldn't reflect the physician's intent; is that fair?

A.   That is fair.

Q.   And an implication of that -- I'm not saying it happened, but if there were more modifications made to physician orders without

60

CONTAINS CONFIDENTIAL INFORMATION

Page 274

increasing cost of healthcare; right?

A. I have seen some.

Q. Large healthcare bills can devastate people; right?

A. I don't know if that is true or not.

Q. It is one of the leading causes of personal bankruptcy in this country right now is that -- do you have any knowledge of that one way or the other?

A. I do not.

Q. Was it important to Integrity to understand how billing claims through hospitals to insurers would impact patients financially?

A. No. We were simply a billing company servicing the submission of claims on behalf of our clients.

Q. What about to the other entities and people running this outreach program generally? Do you think it was important to anybody else how much patients were going to be -- what type of financial obligations patients were going to be saddled with because of the way claims were being billed?

A. I think you need to speak to them. I won't speak for them.

Page 275

Q. Are you aware of anybody else expressing concern about that point?

A. Within our -- within Sun, Mission or Integrity?

Q. Yeah.

A. No, I had not heard anything.

Q. So during 2016 and 2017, nobody running the program ever came to you and said, we're concerned that this is going to hit patients really hard financially?

A. There would be no reason for them to tell me that.

Q. So when a claim is submitted to an insurance company on behalf of a hospital, there is a charge list on the claim; right?

A. Yes.

Q. Did you have any understanding as to what percentage of the charge commercial payers like United would pay?

A. No, I did not have access to those contracts.

Q. The EOBs would reflect the allowed amounts in the claims; right?

A. They would.

Q. And allowed amounts would be a

Page 276

percentage of the charge; right?

A. I didn't sit down and calculate it, but presumably that is how they were being paid.

Q. Anyway there is a record somewhere in Integrity -- in Integrity's files that would reflect how the amount an insurer would pay on claims related to the charge; right?

A. If you went back through every EOB and took a calculator and calculated it, we only had the EOBs.

Q. Did you have a general understanding of what percentage of the charge United would pay?

A. On the individual contracts, no, I never saw the contracts.

Q. Just based on --

A. But I never calculated the charge based on EOBs.

Q. Did you understand that the higher the charge -- a higher charge could cause a higher payment?

A. Payment to whom?

Q. The hospitals?

A. That a higher charge from a hospital

Page 277

to United could result in a larger payment to the hospital?

Q. Yes.

A. Yes.

Q. And a larger charge to United could also result in a larger cost sharing obligation to the patient; right?

A. It depends on their contract.

Q. It was possible though; right?

A. I don't know. I've not seen any of those policies.

(Exhibit 149 marked.)

Q. Handing you what has been marked Exhibit 149. Do you see that?

A. When I put my glasses on I do.

Q. Great. This is an email that you sent to Samantha Murphy on December 6th, 2016; right?

A. Yes.

Q. And it is basically you making a record regarding earlier emails some of which you were copied on?

A. Yes.

Q. That relate -- that relate to patient bills; right?

CONTAINS CONFIDENTIAL INFORMATION

Page 326

deductible so that when they submit their bill they do not hit deductible. And we have a period of time to bill these claims, so it was a question of when did he want them submitted.

Q. When you said "doctors," are you referring to treating physicians or Dr. Murphy?

A. Treating physicians.

Q. So why are you asking Dr. Murphy how he wants to -- whether he wants to delay billing claims to avoid deductibles?

A. Dr. Murphy was my contact to the hospitals. He would have talked to the hospitals to see that. I would just ask him to transfer that information to see what they wanted to do. In actuality we did not delay billing. That decision was made not to, but I was offering that option as a billing company.

Q. What did -- I mean, what benefit would that -- who would that benefit to bill in a way, to hold claims in a way that avoided deductibles?

A. It would benefit the hospital.

Q. Why?

A. Because their claims would not hit deductible, because it is difficult to collect

Page 327

from patients.

Q. So the hospital would be able to collect more money in connection with the claims it billed because it would be -- if it avoided deductibles, it would just be getting paid by the insurance carriers rather than having to deal with chasing patients around for money; right?

A. Correct.

Q. So this was another tactic at least being considered to increase revenue to the hospital?

A. It wasn't a tactic. I understood it to be somewhat of a normal billing practice and in fact the hospitals declined the offer and it did not happen.

Q. Do you know what a kickback is in a general sense?

A. In the course of healthcare?

Q. Yeah.

A. In a general sense, a kickback is giving something of value in exchange for a referral.

Q. And is it your understanding that that is generally prohibited?

Page 328

A. It depends on the situation, but yes in general it is prohibited.

Q. So sometimes in healthcare the kickbacks are paid to generate referrals or claims; right?

A. I don't know the answer to that if someone else did it. We did not.

Q. If kickbacks are paid though, it is not appropriate to bill for claims that are tainted by those kickbacks; right?

A. I can only speak to our situation and I don't believe any kickbacks were paid, at least not to my knowledge.

Q. Yeah, I'm asking a slightly different question though about, just because you have talked about some of the laws and regulations that apply in the healthcare context. Is it your understanding that if a claim is tainted by a kickback or associated with a kickback the claim shouldn't be billed to the insurer?

A. It would depend if that is a material fact to the insurer. Normally each insurer gives notice of what they consider material to their claims.

Page 329

Q. So is it your testimony that you think some insurers pay claims that are tainted by kickbacks?

A. I don't know.

Q. Do you know of any insurer that would pay a claim that was tainted by a kickback?

A. I don't know. I would have to see what their administrative guides say, so whether or not that was an important factor for the insurance company to be considered.

Q. Do you know whether there is any federal or state laws that say that if kickbacks are paid claims aren't payable?

A. They would be specific to certain claims. There are federal laws, but they only apply to Medicare and Medicaid and other federally funded claims.

Q. What about state laws? Are you aware of any state laws that prohibit the practice of providing or receiving something of value in exchange for referrals?

A. I'm aware of certain state laws in various states.

Q. Which ones?

TSG Reporting - Worldwide    877-702-9580>

Page 338

A.   I don't know who he is. But yes, Jesse says here are questions from the attorney but I don't think Taylor was the attorney. I think this Brett Greenberg was possibly, anyway.

Q.   Well, I Googled James R. Taylor and he's an attorney.

A.   Okay.

Q.   I don't know --

MR. MARKHAM:  James Taylor, he's also a great singer. It could be more than one.

MR. BORNSTEIN:  James R. Taylor?

MR. MARKHAM:  I'm just saying.

Q.   Yeah. Anyway, I would like to just -- so Mr. Taylor writes an email to someone named Radi, right, on August 24th, 2016?

A.   That is what I'm confused on, because it looks like Dr. B wrote the letter to Radi.

Q.   Well, it kind of looks like Dr. B copied and pasted in some --

A.   That is unclear.

Q.   Okay. Anyway, someone wrote a review of the Series materials and made some

Page 339

legal observations. And then you in red made some responses to those observations; right?

A.   Yes, it looks correct.

Q.   And Dr. Greenberg on August 24th wrote to Jesse and said, here are the questions from the attorney. I was told we can simply get the questions answered and bypass the attorneys speaking. Do you see that?

A.   I see that.

Q.   And then above that you wrote, basic answers are typed below each question. If you need more information, please let me know; right?

A.   Yes.

Q.   So at least what you probably understood you were doing here was responding to some questions raised by an attorney by the Series arrangements; right?

A.   Yes.

Q.   If you look to -- there is five issues identified by this lawyer that concern the Series agreements; right? They are enumerated in paragraphs 1 through 5.

A.   Yes.

Q.   If you look to comment number 3 one

Page 340

of the questions is is the Series entity simply selling fractional interests in the company whereby the companies ownership is split between the Series 1 owners, Series 2 owners, etcetera. Do you see that?

A.   I do.

Q.   And you answer that question by saying, the easiest way to understand the Series arrangement is to imagine a master LLC that has separate divisions; right?

A.   Yes.

Q.   Each Series operates as a separate division with a unique name, bank account and separate books and records; right?

A.   Correct.

Q.   And then you write, income generated by physicians in the Series stays within the division and is distributed as earned; right?

A.   Yes.

Q.   So the way the Series would work was that income would be generated by certain physicians and then would be -- a portion of that income would be distributed back to those physicians; right?

A.   It is a little more complex than

Page 341

that. In that if it was revenue generated would be assigned to the Series based on the physicians that generated that revenue, but expenses would be deducted from that. And the net revenue would go into the Series and then the doctors would receive dividends based on their ownership percentages.

Q.   Okay. So once costs were deducted from the revenues that were generated by the physicians in the Series, a percentage of essentially the profits would be distributed back to those physicians; right?

MR. MARKHAM:  That was so fast, could you read that back, please. I didn't understand it.

(Record read.)

A.   That seems like a mischaracterization of what I just testified to.

Q.   Okay. That is fine. I think your testimony was accurate so we can --

A.   Thank you.

Q.   -- move on, or I tried to characterize it appropriately.

Anyway, the individual Series didn't

Page 358

think that that was one factor that played into our discontinuing the Series, but I know that there were others.

Q.   Which hospitals were questioning the Series structure?

A.   I don't remember.

Q.   You said there were other factors that played in as well, what were those?

A.   You would need to ask Dr. Murphy.

Q.   Showing you what has been marked Exhibit 160.

(Exhibit 160 marked.)

Q.   Do you recognize this document?

A.   It is an email from me to Julie Pricer in April of '17 regarding the termination letter that was sent out to Series members.

Q.   And did you draft the termination letter?

A.   I did.

Q.   If you don't mind flipping to that actual letter, the letter is attached to your email; right?

A.   It is.

MR. MARKHAM:  The draft letter,

Page 359

yeah.

Q.   Yeah, the draft letter.  Does this draft letter reflect -- is it consistent with your understanding of the letter that was actually sent out to the Series investors?

A.   Yes, I believe it was what was sent out to investors.

Q.   In the middle paragraph this draft letter writes, the decision to terminate is a result of recent concerns regarding physician investment in our Series.  Do you see that?

A.   Yes.

Q.   And are those the concerns from at least one hospital that you just were discussing?

A.   Yes.

Q.   Were they concerned that the arrangement wasn't fully compliant with the law?

A.   No, they just didn't know what to think about it.  It was just something that they didn't want to have involvement with. Whether or not it was legal or non-legal, they didn't say they had an opinion on that, but it was a hindrance.

Page 360

Q.   Was some aspect of the way the Series was structured particularly bothersome to hospitals?  I mean, what part of it bothered them?

A.   I don't think they ever saw the actual Series.  I think it was just the idea of a Series.

Q.   And then you write, our physician relationships make it difficult to contract with hospitals and current hospitals have questioned the Series structure.  Do you see that?

A.   I do, but we never sent any Series documents to a hospital.

Q.   And then you say, in an effort to protect everyone's best interest we believe terminating the Series is the most prudent action.  Do you see that?

A.   I do.

Q.   Was it in Sun's best interest to terminate the Series as well?

A.   Sun had changed over to being more of an aggregator of samples through the independent reps.  The Series was really not a big part of its business plan.  It had changed

Page 361

its business plan, so it was something that was not hurtful to Sun to terminate.

MR. BORNSTEIN:  Well, we need to get to the airport and this is the logical stopping point from a subject matter standpoint.

MR. MARKHAM:  Our deal remains, you have got more time left.

MR. BORNSTEIN:  We are off the record for now.  We will hold it open with the amount of time that remains on the record.

THE WITNESS:  That is fine.

MR. BORNSTEIN:  Thank you for your time today.

VIDEOGRAPHER:  The time is 5:40. We're off the record.

(Deposition adjourned at 5:40 p.m.)

_____

LYNN MURPHY

Subscribed and sworn to before me this    day of        2019.
-------------------------------

# Exhibit 6

CONTAINS CONFIDENTIAL PORTION - BOUND SEPARATELY

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

MISSION TOXICOLOGY,           §
L.L.C., ET AL.,               §
                              §   CASE NO. 5:17-CV-01016
      PLAINTIFFS,             §   (LEAD CASE)
                              §
V.                            §
                              §
UNITEDHEALTHCARE              §
INSURANCE COMPANY, INC.,      §
ET AL.,                       §
                              §
      DEFENDANTS.             §
                              §
------------------------      §
UNITEDHEALTHCARE              §   CASE NO. 5:18-CV-00347
INSURANCE COMPANY, INC.,      §   (CONSOLIDATED CASE)
ET AL.,                       §
                              §
      PLAINTIFFS,             §
                              §
V.                            §
                              §
MICHAEL MURPHY, M.D., ET      §
AL.,                          §
                              §
      DEFENDANTS.             §

**CONTAINS CONFIDENTIAL PORTION - BOUND SEPARATELY**
PAGES 323-328
ORAL AND VIDEOTAPED DEPOSITION OF
MICHAEL MURPHY, M.D.
OCTOBER 8, 2019

ORAL AND VIDEOTAPED DEPOSITION OF MICHAEL MURPHY, M.D., produced as a witness at the instance of the Plaintiffs and duly sworn, was taken in the above styled and numbered cause on Tuesday, October 8, 2019, from 9:05 a.m. to 5:54 p.m., before TAMARA CHAPMAN, CSR, CRR, RPR in and for the State of Texas, reported by computerized stenotype machine, at the offices of Stonecrest Holdings, LLC, 7373 Broadway, San Antonio, Texas, pursuant to the Federal Rules of Civil Procedure and any provisions stated on the record herein.
Job No: 168607

CONTAINS CONFIDENTIAL PORTION - BOUND SEPARATELY

Page 30

they have to notify the patient of that?

A. Reference labs are used because the lab typically doesn't have the equipment necessary to perform the test, or that the equipment that they have is full and they have no more capacity to get that lab turned around in a timely fashion. So that is the primary use of using a reference lab.

Reference lab use does not require the permission from the patient. It is normal course throughout the United States for decades to do it this way. And sometimes the cost of doing unusual tests that normal labs don't have the equipment for is more expensive.

Q. Okay. What about a test that -- well, Sun Labs performed urine toxicology screens. Right?

A. It did.

Q. And it would charge a certain amount for that. Right?

A. No, the hospitals did.

Q. No. Sun Labs charged a certain amount.

A. We did do some specimens. We did screens. And we charged those independently, which was out of network.

Q. And what was the charge for those?

A. I don't recall.

Page 31

Q. About a hundred bucks?

A. No, not the charge.

Q. Okay. Well, I've got -- I understand that you don't have documents in front of you. We'll look at those.

What's your memory as to what -- when Sun Labs charged a self-pay person for a urine toxicology screen, what Sun Labs would charge?

A. I don't know.

Q. Do you know whether it's a hundred bucks or a thousand bucks, or somewhere in between?

A. I do not know.

Q. What about Alternate Health? Is there a lab called Alternate Health?

A. It is.

Q. Is that a lab in which you had any kind of ownership?

MR. MARKHAM: Objection. I'd like you to clarify that. There is an Alternate Health Corp. and there is an Alternate Health Labs. Which are you referring to?

Q. Is there a facility or has there been in a facility in the United States that did laboratory services called Alternate Health?

A. There was a facility called Alternate

Page 32

Health Labs, yes.

Q. And did you have an ownership interest in Alternate Health Labs?

A. No.

Q. Did you have any management or employment responsibilities at Alternate --

A. I did.

Q. What were your responsibilities there?

A. I ran the lab for them.

Q. So when you ran the lab, did you know that Alternate Health had a price sheet for toxicology testing?

A. Alternate Health simply served as a reference lab. It was not an independent lab that took samples directly from patients. It contracted with various entities to do their reference lab work. And so, yes, they had a contracted price list for doing reference lab work.

Q. And how much did it charge for a urine toxicology test, if you remember?

A. I remember $120 on that.

Q. All right. Is that consisted with what -- the market rate?

A. That was the national average at that time.

Page 33

Q. So "national average" meaning that if somebody walked in without insurance and wanted to get a urine toxicology test, they could expect to pay about 120 bucks for that test. Right?

A. Absolutely not.

Q. Why is that not that case?

A. Because they didn't take routine patients. I just said they were a reference lab only.

Q. You said national average?

A. For reference labs.

Q. And what's your basis for understanding what a -- what a -- what the national average was?

A. I was in the industry.

Q. And so you paid attention to your competitors' pricing?

A. You have to.

Q. Is that a "yes"?

A. That was a yes.

Q. You talked about Sun Clinical Laboratory. You had an ownership interest in that entity. Is that right?

A. I did.

Q. You started the company in about 2015. Is that right?

A. That is my recollection.

9 (Pages 30 to 33)

CONTAINS CONFIDENTIAL PORTION - BOUND SEPARATELY

Page 34

Q. And were you the founder of that lab?

A. I was.

Q. What did it do?

A. It did two things. It was a laboratory. It did urine toxicology. It did blood. It did allergy testing. And it also had -- it eventually evolved into more of a marketing company for hospital outpatient departments.

Q. Would doctors refer tests to Sun?

A. Yes.

Q. Does that mean that it wasn't, strictly speaking, a reference laboratory?

A. It never was a reference lab. It was a laboratory.

I take that back. It initially started as not a reference lab. It did do some reference lab samples for hospital outpatient departments towards the end.

Q. Towards the end of what?

A. Before I closed it.

Q. When did you close it?

THE WITNESS: When was that? Now '17.

A. Yeah, 2017.

Q. Why did you close it?

Page 35

A. Because y'all quit paying us.

Q. Who is "y'all"? I never paid you anything.

A. Your client, UnitedHealthcare, and the others.

Q. What others?

A. Aetna.

Q. So Aetna and UnitedHealthcare stopped paying Sun?

A. Stopped paying Sun. They stopped paying the hospitals. They stopped paying for lab work that was legitimately done for their clients.

Q. All right. So you closed Sun Labs because insurance companies stopped paying Sun for testing that Sun did. Is that what you're telling me?

A. I told you a lot more than that.

MR. MARKHAM: Objection; misstates --

A. I said they also quit paying the hospitals that we were working for.

Q. So Sun worked for hospitals?

A. It did.

Q. Sun Clinical Lab worked for hospitals?

A. It was -- I just told you, we had a marketing arm that recruited patients for hospital

Page 36

outpatient departments upon their request.

Q. And were you compensated for recruiting patients to hospitals?

A. Yes.

Q. How were you paid?

A. By contract.

Q. And what did those contracts entitle you for recruiting a patient to a hospital?

A. We negotiated contracts anywhere from 40 to 50 percent.

Q. 40 to 50 percent of what?

A. Of net revenue.

Q. Net revenue generated from what?

A. Collections.

Q. Collections from what?

A. Insurance companies.

Q. For what services?

A. The ones I just told you, recruiting patients for the hospital to perform lab services on.

Q. So the revenue was a product of payments for what?

A. Lab services.

Q. That who performed?

A. The hospital and their reference labs.

Q. And did you get paid only what the

Page 37

hospital got -- a percentage of what the hospital kept or what the reference lab kept? What --

A. The hospital got all the money. The hospital got 100 percent of the money, and then by contract, they paid their expenses like any other business.

Q. And your recollection is that the hospital would keep between 60 and -- between 50 and 60 percent of whatever they built?

A. I never said that. I said that's what the marketing services were worth.

Q. So the hospital paid you guys 50 percent?

A. I didn't say that, either.

Q. Well, I'm not trying to put words in your mouth. I'm just trying to understand the facts so --

A. I'm just trying to answer the questions and they're all over the place.

You asked me a while ago what marketing services were worth and I said their reps were paid about 40 to 50 percent on average, but that's not all the expenses that the hospital had to pay.

Q. What were the other expenses?

A. Billing and collection fees, reference lab fees.

Q. So the 120 bucks of screen fees?

10 (Pages 34 to 37)

CONTAINS CONFIDENTIAL PORTION - BOUND SEPARATELY

Page 54

A. We never did.

Q. Why not?

A. I don't believe in it.

Q. What do you mean you don't believe it in?

A. I don't believe in turning people over to          09:51
collections for healthcare dollars.

Q. Why not?

A. Personal belief.

Q. Did Sun have reference lab agreements at
that time, the early days?          09:51

A. Uh-huh, yes, it did.

Q. With what labs?

A. We used CPL, we used Axis, we used -- I
think that was all at that time.

Q. Where was CPL located?          09:51

A. In San Antonio, in Austin.

Q. Did you an ownership interest in CPL?

A. I did not.

Q. What about CPL made you want to work with
that lab?          09:51

A. They were a complete lab.  They could do
things that we couldn't, like you would look for in
any reference lab.

Q. What about Axis?  Where was that located?

A. San Antonio.          09:51

Page 55

Q. Same reason, why you used Axis?

A. Uh-huh, yes.

Q. What were the -- and there were reference
lab agreements between Sun and those two labs?

A. Yes.          09:52

Q. What, generally speaking, they -- that
would include the pricing that the reference lab
agreed to charge --

A. That is correct.

Q. -- to Sun?          09:52

Was -- are you familiar -- I think you
used the term "in network" before?

A. I have.

Q. What's an in-network provider as you
understand it?          09:52

A. It is a provider that has an insurance
contract for payment of services with a health
insurance provider.

Q. A direct contract between that provider
and a certain insurer.  Is that right?          09:52

A. That is correct.

Q. So you can refer to a provider -- if you
refer to a provider as in network, your understanding
is that provider has a contract with the insurance
company?          09:52

Page 56

A. Correct.

Q. What about an out-of-network provider?  Do
you know that term?

A. I do.

Q. What's an out-of-network provider?          09:52

A. It's the opposite.  You don't have a
contract with an insurance provider and you choose to
try to collect on their out-of-network benefits.

Q. That means that patients -- well, so
insurance companies will cover -- in some instances          09:53
will cover services provided by an out-of-network
provider.  Right?

A. I would rephrase that.  An insurance
company will cover very few of the services provided
by an out-of-network facility.          09:53

Q. Or -- and likely a smaller percentage of
the cost of that care.  Is that right?

A. No, it's usually larger.

Q. Larger percentage of the cost?

A. Uh-huh.  Out-of-network payments are          09:53
larger than in-network costs and that's why insurance
companies normally don't pay anyone.

Q. Have you ever worked for an insurance
company?

A. In medicine nowadays you think you do.          09:53

Page 57

Q. I'm just asking you whether you ever
worked for an insurance company.

A. I have not.

Q. Do you consider yourself an expert in
insurance?          09:53

MR. MARKHAM:  Objection.  Lengthy
definition of what an expert is.  He's talking
about a Daubert qualified expert or somebody who
has general familiarity.

A. I've billed to insurance companies for          09:54
30-something years.  And once you do business with
someone who is responsible for payments to you, you
become very familiar with their tactics and their
reimbursement protocols.

Am I an expert in the insurance          09:54
industry as --

MR. MARKHAM:  Objection to you
answering that question --

THE WITNESS:  Fair enough.

MR. MARKHAM:  -- from the          09:54
standpoint of a legal -- you can give an answer.
I'm just objecting that it calls for a legal
conclusion.

THE WITNESS:  I'll just choose --

MR. MARKHAM:  We'll decide at          09:54

15 (Pages 54 to 57)

CONTAINS CONFIDENTIAL PORTION - BOUND SEPARATELY

Page 62

Q. Are you familiar with an entity called Mission Toxicology?

A. I am.

Q. What is Mission Toxicology or what --

A. It was --                                09:58

Q. -- what was it?

A. -- it was another lab.

Q. Another lab? Was it similar to Sun?

A. It was similar, but started many years earlier.                                09:58

Q. In 2013?

A. I have no idea.

Q. You didn't start it?

A. I did not.

Q. Who started it?                         09:58

A. Jesse Saucedo.

Q. Is that the individual who is sitting at the table here today?

A. It is.

Q. When did you first meet Mr. Saucedo?     09:59

A. Probably in 2005, 2006.

Q. How did you two meet?

A. He was a marketing rep for an imaging company.

Q. And he was marketing to you or --        09:59

Page 63

A. He was marketing to me as a physician.

Q. And did you stay in touch over the years?

A. Yes.

Q. Have you ever gone into business together?

A. Yes.                                    09:59

Q. In what capacity?

A. He marketed for my pain practice after he left the imaging industry.

Q. You had a pain practice?

A. I did.                                  09:59

Q. And when -- do you still have that today?

A. I do not. Well, I have restarted a different one.

Q. What was the name of that pain practice?

A. Consultants in Pain Medicine.          10:00

Q. Located in San Antonio?

A. Yes, sir.

Q. And what did Mr. Saucedo do to market your pain practice?

A. Talked to physicians.                  10:00

Q. About what?

A. Sending referrals to my pain practice.

Q. How was he compensated?

A. Salary.

Q. So he was an employee?                 10:00

Page 64

A. He was.

Q. For how long?

A. Eight years, nine years.

Q. From, roughly speaking, what dates?

A. I think I said 2006 through when he started Mission.                         10:00

Q. Did you have any other business ventures with Mr. Saucedo?

A. At that time or later?

Q. Ever.                                  10:00

A. Well, yes. He was part of Sun Labs. He owned a minority stake in Sun Labs. And then we started Integrity Ancillary Management together.

Q. Anything else?

A. I later, much later, bought into a stake of Mission, but that was in, I think, late 2017.    10:01

Q. What were the terms of that agreement?

A. I owned 50 percent of a management company off of Mission. I actually didn't own Mission Toxicology. We had a management company owning that.    10:01

Q. Is that LMK?

A. No.

Q. What's the name of the management company?

A. I think it was Mission Toxicology Management. I don't know exactly.          10:01

Page 65

Q. What did you pay for the -- for that interest?

A. I don't recall.

Q. Is Mission Toxicology still operating?

A. It is not.                             10:01

Q. When did it close?

A. You'll have to -- you know, I'm not an authority on Mission Toxicology. You're taking his deposition next week, so I'm going to let you quiz him on that. I don't know the answer to those    10:02 questions.

Q. Does 2018 sound about right?

A. I'm not going to answer that.

MR. MARKHAM: Because you don't know?                                    10:02

THE WITNESS: Because I don't know. I just said that.

Q. Were you an employee of Mission?

A. I was not.

Q. Did you have any say whatsoever on the    10:02 operation of Mission?

A. No.

Q. So your sole interaction with Mission would have been in the capacity in 2017 -- late 2017 as an owner of some management company whose name you    10:02

17 (Pages 62 to 65)

CONTAINS CONFIDENTIAL PORTION - BOUND SEPARATELY

Page 66

don't remember?

A. Well, I told you what I thought the name was. And, yes, I had a capacity, but it wasn't in day-to-day operation. It was on more direction and future opportunities. 10:02

Q. Explain that to me. What did you do for Mission?

A. I just did.

Q. Well, explain it again then.

A. I helped determine future direction and 10:03 look at future opportunities.

Q. Future direction for what?

A. Of what -- where the business was going to go, if there were other opportunities we could do or if we needed -- just needed to close it down. 10:03

Q. Did you -- were you involved in the decision to close it down?

A. No.

Q. Did you give advice on the future direction of the lab? 10:03

A. I did.

Q. Starting in what time period?

A. No, I didn't say of the lab. I said future direction of the company. If we wanted to get into other ventures besides lab work. 10:03

Page 67

Q. What company were you referring to?

A. The one you're asking about, Mission Toxicology. You asked if I was involved in the day-to-day operations of the company. I was not. I was involved in a more general direction of where the 10:03 company was going in the future. And that's my answer.

Q. So you communicated with Mr. Saucedo about the future direction of Mission Toxicology?

A. Yes. 10:03

Q. And did you -- when did you start having those communications?

A. After we -- I bought into the company.

Q. So in late 2017?

A. Correct. 10:04

Q. Prior to 2017, did you have any communications with Mr. Saucedo about the operation or direction of Mission Toxicology?

A. No. Mission Toxicology had its own board of directors and owners. I was not one of them so I 10:04 was not privy to their internal decisions.

Q. Mission Toxicology was a wholly-separate entity from Sun Clinical Labs?

A. Absolutely it was.

Q. And what did Mission Toxicology do? 10:04

Page 68

What -- what was it -- what services did it perform?

A. I don't know all of the services. You're welcome to ask Mr. Saucedo that.

Q. Did it perform lab testing?

A. It did at one time, yes. 10:04

Q. In 2016?

A. Yes.

Q. 2017?

A. I don't recall.

You're asking me about company that I had 10:04 nothing to do with.

Q. That company that you had nothing to do with is Mission?

A. In 2016 and '17, correct. I had no oversight, ownership, or authority to direct them in 10:05 any way, fashion, or form.

Q. Do you know one way or another whether Mission could perform allergy tests in 2016?

A. I do not.

Q. What about in 2017? 10:05

A. I do not.

Q. Do you know whether Mission could perform urine testing in 2016 --

A. I do recall they did urine toxicology screens. 10:05

Page 69

Q. How you know that?

A. Because I remember that.

Q. From where would you have learned it?

A. From Jesse who was part of the company so he had an inherent knowledge of the company and that 10:05 is something we discussed, I remember.

The other things you asked me, I don't recall and I don't know.

Q. Do you know whether Mission could perform blood testing in 2016 or 2017? 10:05

A. I don't know.

Q. Do you know whether Mission served as a reference lab in 2016 or 2017?

A. I do not.

Q. Did Mission or Sun -- and Sun share any 10:06 employees?

A. I think we may have shared an IT person at some point. There could have been other employees that we shared simply for economic reasons like some companies do, but I don't recall exactly. I do think 10:06 we shared an IT person that -- that actually worked for Mission and then I would have hired them independently to come help me.

Q. Did Mission and Sun share -- did they share any IT platform like the LIS or computer 10:06

18 (Pages 66 to 69)

TSG Reporting - Worldwide - 877-702-9580

APP 81

CONTAINS CONFIDENTIAL PORTION - BOUND SEPARATELY

Page 70

systems or anything?

A. Not that I recall.

Q. Did you consider --

A. Sun had its own LIS as did Mission.

Q. So they had separate LIS?   10:07

A. Yes.

Q. And if -- did Sun and Mission treat one another's -- or perform testing on behalf of one another?

A. Not that I recall.   10:07

Q. So if -- if Sun was ordered to do a test, Sun would do that test, not Mission. Is that right?

A. Correct.

Q. And vice versa?

A. Correct. That is my recollection, but,   10:07 again, we're talking almost four years ago.

Q. Did Sun make any payments to Mission?

A. We made payments to Jesse Saucedo. I don't recall any patient -- payments to Mission and I don't know what those would be for, unless it was for   10:07 payment of shared employees, which is an expense that we would cover the cost of one of their employees if they worked for us and vice versa.

Q. Did Mission ever pay Sun?

A. I don't recall that.   10:08

Page 71

Q. Can you think of anything that Mission would have paid Sun for?

A. Same thing I just mentioned.

Q. Did Sun have marketing agreements with reps or distributors?   10:08

A. I hired a few reps back then. I hired a female -- I'm blanking on her name -- that helped market Sun. One of our owners, Joel Nelson out of Dallas, did marketing for us, but he wasn't compensated separately for that. I did most of the   10:08 marketing myself. That's what I recall.

Q. Do you know whether Mission had contracts with --

A. I don't --

Q. -- marketers?   10:09

A. -- remember that at all.

Q. Did Sun and Mission share a physical space?

A. We did not.

Q. So if -- did they have the same mailing   10:09 address?

A. They did not.

Q. So if a doctor wanted to send a specimen to Mission, he would use a different address than if he wanted to send it to Sun. Is that right?   10:09

Page 72

A. Absolutely. One was located on the deep south side and the other was on the north side of San Antonio. They were probably 35 miles apart.

Q. You mentioned Newman Memorial Hospital earlier. Is that right? You're familiar --   10:09

A. Yes.

Q. You're familiar with that facility?

A. I am.

Q. Do you know where it's located?

A. In Oklahoma.   10:09

Q. Do you know what town?

A. Shattuck, I believe.

Q. Have you ever visited Newman?

A. I did.

Q. How many times?   10:09

A. Once.

Q. When was that?

A. Early '16, mid-'16.

Q. What was the circumstances of your visit?

A. They were recruiting us to do services for   10:10 their lab outreach program and I went up to meet with an individual that was recruiting us to work for them.

Q. Who is "us" in that sentence?

A. Jesse and I both went up.   10:10

Page 73

Q. You said -- you said that Newman was recruiting us?

A. Uh-huh.

Q. Who is "us"?

A. Sun and Mission.   10:10

Q. So Newman recruited Sun and Mission?

MR. MARKHAM: He just answered that question.

A. Do you want me to answer it again?

Q. Yes.   10:10

A. Yes.

MR. MARKHAM: Within limits, you can do that, but it's going to be a long day, anyway.

Q. And what -- who made the outreach to you?   10:10

A. People's Choice Hospitals.

Q. Is that Seth Guterman?

A. It is.

Q. Did you know Mr. Guterman before he made that outreach?   10:10

A. Never met him before.

Q. But did you know of him?

A. I knew the name, but I didn't know him.

Q. How did he find you, if you know?

A. He was familiar with our work and wanted a   10:11

19 (Pages 70 to 73)

TSG Reporting - Worldwide - 877-702-9580

CONTAINS CONFIDENTIAL PORTION - BOUND SEPARATELY

Page 98

A. Correct.

Q. Is that right?

Now, you mentioned that at some point in time you decided that Integrity would take over billing for Sun's samples. Is that right?

A. That is correct.

Q. How did that work in practice?

A. They sent the claims to us and we billed them.

Q. Who sent the claims to you?

A. Campbellton-Graceville.

Q. What did they send you?

A. They sent us -- I forget if we connected directly to their LIS, but they would send us all necessary information to generate a claim.

Q. So they would send information to Integrity Ancillary Management?

A. Correct.

Q. Using a computer system of some sort?

A. That's my recollection.

Q. Was that for every that Campbellton-Graceville billed or only the ones that were associated with Sun?

A. Only the ones associated with Sun and Mission.

Page 99

Q. So Integrity Ancillary Management did the billing for both Sun and Mission?

A. That is correct.

Q. Was that pursuant to --

A. Actually, let me correct that. They did the billing for Campbellton-Graceville on the samples that were generated for Campbellton-Graceville.

Q. And were those claims submitted to insurance -- did Integrity submit claims to insurance companies on behalf of Campbellton-Graceville?

A. It did.

Q. Was that for urine toxicology screening?

A. It was.

Q. And what steps would Integrity make to -- take to make sure that those claims were true and accurate?

A. We had a full compliance department within our billing company that we hired the best billing managers we could find. We had -- we bought software that would scrub claims to make sure they were compliant. We had periodic audits of our billing. We ran it as -- as professionally and compliant as we could.

Q. Who did the testing that Integrity Ancillary Management billed on behalf of

Page 100

Campbellton-Graceville?

A. Some was done at Graceville. Some was done at their reference labs. I don't recall exactly who did all the testing.

Q. Was Sun one of those reference labs?

A. We could have done some of the screens. I don't recall that.

Q. Was Mission one of the reference labs?

A. It could have been.

Q. You would have known at the time that the bill was being submitted. Right?

A. At the time, but you're asking me to recall this four years later. At the time, I would have, yes, but do I recall who all the reference labs they used were, I do not.

Q. I am just asking before a bill was submitted to an insurance company on behalf of Campbellton-Graceville, would somebody at IAM be responsible for ensuring where the testing that was being billed, where it was performed?

A. No.

Q. No?

A. No.

Q. Although that information was available to those folks. Is that right?

Page 101

A. Not necessarily.

Q. Well, they could have asked you. Right?

A. I wouldn't have known. It's Campbellton-Graceville's sample. They could have done it in a reference lab somewhere else.

Q. I'm saying whether it was done -- fair point.

Would they have known whether the testing had been performed at either Sun or Mission?

A. Sun or Mission would have known that because they would have submitted a bill for their reference lab fee.

Q. All right. So you took this trip to Shattuck in early 2016. Is that right?

A. Early or mid. I don't remember exactly.

Q. At the time, had you entered into any sort of contractual relationship with Newman Memorial Hospital?

A. No.

Q. All right. So it pre- -- your trip to Shattuck predates any contractual relationship between any entity you were affiliated with and Newman?

A. That's my current recollection.

Q. And what did Mr. Guterman tell you about

26 (Pages 98 to 101)

CONTAINS CONFIDENTIAL PORTION - BOUND SEPARATELY

Page 138

would market them and say "This is, you know, the hospitals we have. Are you okay with sending your samples there?" And the doctors historically would not even know they were sending it to a hospital. They just wanted an in-network facility. And they didn't want LabCorp or Quest. That was the primary driving factor.

Q. Was Sun in network?

A. No, Sun was never in network.

Q. Sun was never in network?

A. No. Although we tried for years to get contracts, we were -- as most independent labs, we were shut out by the insurance companies.

Q. Integrity entered into a contract with Newman. Is that right?

A. That is correct.

Q. And that was in 2016?

A. Correct.

Q. Do you recall about when in 2016 that was?

A. I do not.

Q. By the time Integrity was contracting with Newman, Jorge Perez's company had been terminated as the biller. Is that right?

A. No.

Q. So there was overlap?

Page 139

A. There is always overlap in billing. You try to collect for months and months and months after a contract is terminated. We still have cases to collect on.

(Exhibit 33 was marked.)

Q. Sir, you now have before you what's been marked Exhibit 33. The first page of the document has a control number on it. That's just a housekeeping item for our purposes. It's labeled LD0103624.

The document as produced by your counsel begins on the second page. And it has the title "Newman Memorial Hospital Billing Services Agreement." Do you see that?

A. I do.

Q. All right. Now, if you look at the last page of the document, there is a signature there under "Integrity Ancillary Management"?

A. I do.

Q. Is that your electronic signature?

A. It is.

Q. You caused that signature to be applied to this document. Is that right?

A. I did.

Q. And if you look at the first page, the

Page 140

date of the agreement is the 27th of May, 2016. Is that right?

A. Correct.

Q. That's the date that you caused your signature to be applied to this document. Is that right?

A. I don't know that. The date of this document is the 27th. What date I signed it, I don't know.

Q. Well, would you have signed it after that date?

A. I could have. The effective date of the document is that. I could have signed it before the effective date, after reading it.

Q. You sign documents after the effective date?

A. I said I could have. I didn't say I did.

Q. Well, what's your practice with respect to when you sign --

A. I sign it on the date. But, again, we're talking four years ago and you're asking me for an exact date that I signed a document.

Q. No. I'm asking you for your practice. Is it your practice to sign documents after the -- after the effective date?

Page 141

A. That's actually not what you asked me initially. It is my practice to sign documents on the day they're due to be signed.

I just cannot say, in good faith, under oath, that I signed this particular document on that day.

Q. Do you know whether anyone at Newman Memorial ever signed this billing services agreement?

A. It's my understanding that they did.

Q. And that would have been Mr. Guterman?

A. Correct.

Q. Now, this is the agreement that you referenced earlier between Integrity and Newman to provide certain services. Is that right?

A. That is correct.

Q. Now, the services that are -- that Integrity was agreeing to provide are defined in Paragraph 1 of this document, is that right, on the first page?

A. Yes.

Q. And it says that "Integrity shall prepare, process and submit on behalf of Hospital all claims for third-party payment to commercial payors for outpatient laboratory services provided by Hospital."

Do you see that?

36 (Pages 138 to 141)

CONTAINS CONFIDENTIAL PORTION - BOUND SEPARATELY

Page 178

were sent to different reference lab that performed that line of testing.

Q. All right. So if Newman could do the testing then the specimen went from this suite that you identified in San Antonio, it will be shipped to Shattuck. Is that right?

A. That is correct.

Q. Who paid for the shipping?

A. I think Newman paid for their shipping going to them.

Q. And if Newman couldn't do the testing, it would go -- the specimen would go somewhere else. Right?

A. To a reference lab.

Q. And that reference lab had a contract, a reference lab agreement. Right?

A. Right.

Q. With Newman?

A. No, we've already covered that. The reference lab agreements were done through Sun, who managed the lab outreach program for laboratory services for Newman and so we were sending them to that.

Q. When you say "Sun" are you referring to Sun Ancillary Management?

Page 179

A. I don't recall if the contracts were with Sun Ancillary or Sun.

Q. Well, you do recall that the contract between Newman -- the contract with Newman was Sun Ancillary Management. Right?

A. I do. I do.

Q. And are you aware of any contract that Sun Ancillary Management had with a reference lab?

A. I'll again tell you I don't recall if the reference lab agreements were from Sun Ancillary or Sun.

Q. Was it important to you to make sure which entity was contracting with the reference lab?

A. I'm sure it was at the time. That doesn't mean I remember it four years later.

Q. Did you initiate this lawsuit?

A. Against United I did.

Q. So it would go to the -- the specimen would then be shipped to a reference lab. Is that right?

A. That is correct.

Q. And that lab would perform the testing as ordered by the doctor. Right?

A. Correct.

Q. The -- would -- that lab would then

Page 180

generate results. Correct?

A. Correct.

Q. And those results would be put into some sort of lab report. Right?

A. Correct.

Q. Where would those results -- and those lab reports were made available to the doctor. Correct?

A. That is correct.

Q. Who made them -- whose report -- what lab was identified on the report?

A. The lab that did the report.

Q. The lab that actually performed the testing?

A. In most cases.

Q. Well what cases would it be some other lab?

A. Arrayit did their own reports. And so Arrayit would have their lab name on the test. If -- you try to consolidate reports for doctors for ease of reading. You don't want a doctor to get five different reports on the same. So for example, if Alternate Health did a majority of it but there were a few tests that we didn't do, we would send to CPL, they would send us back the results and we would do a

Page 181

consolidated report and Alternate Health would be on that report.

CPL did not want their name on the report. They -- that was their decision and told us "we don't want our name sent out on the report."

Q. So you didn't put it on the report?

A. That's correct.

Q. So a doctor would have no idea that CPL actually tested specimen?

A. That would be correct.

Q. Now, Integrity would then bill for the services that this reference lab performed. Correct?

A. The hospital would bill for it. Integrity provided that service to the hospital.

Q. And the hospital would then receive payment from the insurance company. Correct?

A. Correct.

Q. Where did the money -- where did the money go from there?

A. To the hospital. That's where it went.

Q. And then did it go anywhere else?

A. Well, it went to pay their bills.

Q. Which included?

A. Which included the part of their bills to the lab service, probably their own rent,

46 (Pages 178 to 181)

TSG Reporting - Worldwide - 877-702-9580

CONTAINS CONFIDENTIAL PORTION - BOUND SEPARATELY

Page 186

Toxicology." Right?

A. It is.

Q. Did you have authority to sign on behalf of Mission Toxicology?

A. Jesse gave me that authority to negotiate the agreement for both of us.

Q. Did Mr. Saucedo give you permission to sign on behalf of Mission Toxicology?

A. He did.

Q. And were you a managing partner of Mission Toxicology --

A. No --

Q. -- in September of 2016?

A. -- I was not.

Q. Is this the only contract that Sun Ancillary Management entered into with Community Hospital?

A. I don't know. We may have had a similar billing contract. I don't know that.

Q. Was this contract amended, to your knowledge?

A. I don't think so.

Q. Was it assigned to anyone?

A. Not that I remember.

Q. And does this contract accurately reflect

Page 187

the terms that you caused Sun Ancillary Lab Management and Mission to agree to in September of 2016?

A. It is.

Q. So when it defines the services that are going to be offered, that's an accurate depiction of what Sun Ancillary Management was agreeing to provide to Community. Correct?

A. I can take time to reread them again if you would like for me to do that. If they're similar to the services in the original agreement with Newman, then I would say yes. If they're different, we can take time to go through them one by one.

Q. That's fine. I just -- if you're not aware of any written amendment to this agreement. Is that --

A. I'm not.

Q. Did Community Hospital employ accessioners?

A. No.

Q. So who did accessioning for Community Hospital specimen?

A. One of our team members.

Q. One of whose team members?

A. Integrity, I believe, did this.

Page 188

Q. That distinguishes Community -- the process with Community from the process with Newman. Correct?

A. Right.

Q. Now, you wanted to have Community accessioners accession?

A. I did. I felt that the most appropriate way to do it.

Q. Why did you feel that?

A. Because that's what our protocol was. We felt we were doing the best protocol.

Q. Who is "we"?

A. Sun Ancillary Management, Integrity, Mission Toxicology. We felt that kept it as compliant as possible.

Q. Were you concerned that Community didn't have its own accessioners?

A. CMH made their own decisions. This was their program. CMH made several decisions that was their decisions and they should hold the responsibility for that. Remember, we were a vendor for these hospitals. We had nothing to do with running these programs.

CMH did not want their name on the requisition forms as opposed to Newman. That was a

Page 189

direct order from them. CMH also did not want to sign by their attorney the -- the accessioning center.

Q. You're --

A. They were very comfortable with us doing it for them.

Q. You wanted CMH's name to be on the requisition forms. Right?

A. We did.

Q. And CMS told you they weren't willing to do that. Is that right?

A. CMH did. Not CMS but CMH did.

Q. Let me withdraw.

You wanted Community Memorial Hospital's name to be on requisitions for C- -- for Community Memorial Hospital samples. Right?

A. That was our recommendation.

Q. And Community Memorial Hospital told you "we don't want your -- our name showing up on a requisition." Is that right?

A. That is correct.

Q. And so because CMH told you that, you did not include CMH's name on requisitions?

A. Correct.

Q. So how would you determine, then, that a

48 (Pages 186 to 189)

CONTAINS CONFIDENTIAL PORTION - BOUND SEPARATELY

Page 210

right?

A. Correct.

Q. Now, were those invoices sent on those dates?

A. Yes.                                    02:06

Q. And were they paid?

A. Yes.

Q. How do you know that?

A. Because I ran the company.

Q. You ran which company?          02:06

A. I owned Integrity with Jesse.

Q. Did you ever forgive any of those lease payments?

A. Not that I -- not that I'm aware of.

Q. Now, what were the terms -- did Community    02:07 lease office space from anyone that -- any company that you owned?

A. No. I think Community refused to do the accessioning. I told you that earlier.

Q. We talked about accessioning, but I don't    02:07 think we talked about property. Did they lease property?

A. Why would they lease a space if they didn't have employees in it?

Q. So your testimony then is Community didn't    02:07

Page 211

lease property from you?

A. That is correct.

Q. Where --

A. That -- that is my recollection.

Q. Where physically were Community specimens    02:07 accessioned within the accessioning --

A. In an area that didn't belong to a particular hospital. In other areas within the space.

Q. Well, you can see there's a plot of the --    02:07 that's probably the wrong term, but --

(Simultaneous speaking.)

A. If it wasn't assigned to a hospital it was assigned to Integrity and that's where they did it.

Q. They did or Integrity did it?    02:07

A. The employees at Integrity.

Q. Now, you entered into series LLCs with doctors. Is that right?

A. We did.

Q. Whose idea was it to enter into series    02:08 LLCs?

A. Our attorney.

Q. Which attorney?

A. Several.

Q. What are their names?    02:08

Page 212

A. Jackson Walker out of Dallas.

Q. Did you enter into written agreements pursuant to the series LLCs?

A. Of course.

Q. What were you offering -- well, who were    02:08 the parties to those agreements? Meaning, who on your side was the party to the series LLC?

A. Sun Labs.

Q. Sun Clinical Lab?

A. Yes.    02:08

Q. Anyone else?

A. No.

Q. Was Mission?

A. No.

Q. Was Newman?    02:08

A. No.

Q. Was Community?

A. I said no one else was involved but Sun Clinical Labs. We can go through the whole dictionary if you want.    02:08

Q. And the -- those series LLC agreements entitled doctors to invest in Sun Clinical Labs. Right?

MR. MARKHAM: Objection.

A. Not just doctors.    02:09

Page 213

Q. Folks other than doctors?

A. Correct.

Q. Who could invest?

A. People that ran their practices, businesspeople. They were not limited to doctors.    02:09

Q. Were some doctors investors in series LLCs?

A. They were.

Q. About how many different series LLCs did you cause to be formed?    02:09

A. I don't recall how many were actually functioning. If I had to guess at this stage, 10 or 12.

Q. Now, did each of those series LLCs have at least one doctor as an investor?    02:09

A. Yes.

Q. How was it determined which doctors would be provided the opportunity to invest in a series LLC?

A. We would approach groups of doctors and    02:10 they would put together groups. We required it to be more than one doctor. They would usually put together their own group of investors and present us with that investor group. We didn't choose them.

Q. Were these doctors who were potentially    02:10

54 (Pages 210 to 213)

CONTAINS CONFIDENTIAL PORTION - BOUND SEPARATELY

Page 354

whole amount.

Q. You were going to hold back something that was contractually obligated to be distributed?

A. Sometimes you do to cover cost of goods.

Q. But the idea was to keep the physicians happy. Right?          05:19

A. The idea was to keep the investors happy, as every business in the world does.

Q. Well, they're not your investors. Right?

A. That's why I asked Tommy. They were his investors.          05:19

Q. So you wanted to know how much to pay Tommy's investors, his doctors. Right?

A. And Tommy, it says.

Q. Why did you want to keep them happy?          05:19

A. Because they had trusted me in an investment model that I wanted to make sure investors were happy in and it was a good investment for them. Just like every other investment model in the country.          05:20

These doctors invested in an extremely legal way to own part of a lab. There are MSOs that own imaging centers. There is MSOs that own hospitals. There is MSOs that own ambulatory surgery centers, and have for 40 years, and they get          05:20

Page 355

distributions.

The people running those, at the end of every month, decide what they can distribute to keep their investors happy. And that's what we were doing as well, is doing our best to keep investors happy in          05:20
their investment.

MR. GLEASON: Let's go off the record.

THE VIDEOGRAPHER: Off the record, 5:20.          05:21

(Break.)

THE VIDEOGRAPHER: This is Segment No. 6. We're back on the record, 5:38.

Q. Dr. Murphy, are you a licensed physician in the State of Texas?          05:38

A. I am.

Q. Have you been so consecutively since 2015?

A. Yes.

Q. You were aware that Newman Memorial Hospital, in 2016 and 2017, was in network at United. Correct?          05:38

A. I was.

Q. You knew that it had a contract with United. Right?

A. I did.          05:38

Page 356

Q. And you knew that in 2016 and 2017 Community Memorial Hospital was also contracted with United. Correct?

A. I don't remember if we -- yeah, I guess we send United samples to CMH. That's why you're here. So yes.          05:39

Q. And you testified earlier about some of the problems about being a lab that was out of network and billing specimen -- billing testing to insurance companies.          05:39

A. Correct.

Q. Was that true for United in your experience? It was hard to get an out-of- -- out-of-network lab claim paid by United?

A. Yeah. I'd have to go back and look at our billing claims on how many y'all paid on this particular run. But historically in hospitals that I managed and ran ambulatory surgery centers, and other entities that I started getting paid out of network was very difficult. So, yes.          05:39

Q. So if -- do you know whether Axis, for example, was a contracted lab with United?

A. I have no idea anything about Axis.

Q. You knew that if Sun, in 2016, had billed Newman for lab testing, it would likely be paid less          05:40

Page 357

than Newman would be paid for the same work. Is that fair?

A. Repeat that question.

Q. You knew that if Sun were to bill -- in 2016, were to bill United for lab testing, it was likely to get paid less by United than if Newman billed for that equivalent service?          05:40

A. Well, based on the amount of claims that we got paid at Newman as a percentage, I'm not sure in totality that is correct. But if you took a case-by-case on insurance rates, that's probably the case.          05:40

Q. And the same would be true for CMH. Correct? Your expectation would be that CMH would likely be paid more by United for a claim for lab services than Sun if --          05:40

A. That's correct. And I think that is the reason that hospitals chose and made the decision to start lab outreach programs, so they could make money.          05:41

Q. And they would -- you understood that the amount that Newman would receive for lab testing was a matter of contract, the rates they agreed to with United. Is that right?

A. Correct.          05:41

90 (Pages 354 to 357)

CONTAINS CONFIDENTIAL PORTION - BOUND SEPARATELY

Page 358

Q. And those rates are substantially higher than what Sun charged as a reference lab. Correct?

A. Correct.

Q. The same is true for CMH. Right? CMH charged --

A. Sun would not have billed the insurance company as a reference lab.

Q. What about Sun as the --

A. Primary lab?

Q. Yeah.

A. Yes, they would have been higher.

Q. The Newman claims were -- the Newman contracted rates are higher than what Sun billed to United?

A. Correct.

Q. And that was your interest in getting involved in relationships with Newman and Community, was to take advantage of the contracted rates in in-network status that those hospitals had with insurers like United. Correct?

A. Yeah.

Q. What was the benefit for you of working with those hospitals?

A. I couldn't make a living as a lab so I changed my business model to a billing company, a

Page 359

reference lab company, and a marketing company because I saw more and more hospitals creating their own lab outreach program and they needed those services.

Q. The money that -- well, when Integrity identified Newman as the provider on a bill that was a submitted to United, you knew that would trigger the contractual rate that Newman was owed under the contract. Is that right?

A. As does every hospital billing company. They bill for the hospital and the hospital gets their contracted rate.

Q. But by writing "Newman" on the claim form or inputting that information using the NPI for Newman and submitting a claim for a test, you understood that the intent was to tell -- to use the -- for United to pay the claim based on the contracted rates between United and Newman. Is that right?

A. That was Newman's intent of starting the lab outreach program. And by starting the lab outreach program, their contracted billing company had to put their name on it. It wasn't our intent, it was how you billed those claims.

Q. How you know that?

Page 360

A. How do I know what?

Q. That the contracted billing company had to put Newman's name on those claims?

A. Because you're billing under their NPI number. They instruct you to do that.

Q. Did they instruct you to identify any reference lab involved in that process?

A. No, that wasn't done there. That came under a different agreement. You're asking about an Integrity billing agreement. They asked us under the billing to bill their claims for them, which is extremely common in the healthcare space.

Very few hospitals have their own billing department. They outsource their billing. Most of it goes to India these days as outpatient billing and the backend work is done by foreign countries.

Q. I asked a different question and I apologize if it wasn't clear.

So you said Newman instructed Integrity to put Newman's NPI on the claim. Is that right?

A. Newman instructed us to bill their claims. By billing their claims, you use their NPI number.

Q. And do you also identify on those claims the existence of any reference labs that were involved in the performance of the services that

Page 361

Newman was billing?

A. No. No lab does that.

Q. Are you familiar with something called the Medicare Claims Processing Manual?

A. No, but my billing people will. I'm going to go back to what I told you earlier. That's not my area of expertise.

Q. So the statements that are made in the Medicare Claims Processing Manual didn't affect one way or another your decision as to whether it was proper to run a hospital outreach lab program?

MR. MARKHAM: Objection; mischaracterizes test- --

A. I don't know the answer to that question.

Q. You knew that when United paid money to Newman for claims that were Sun claims, Sun would get a portion of the money that --

A. They were never Sun's claims. They were always the hospital's claims.

Q. Did the hospital pay money to Sun at some point?

A. As they did their electric bill. They used money that they received for providing services at that hospital. I'm sure they billed for surgical procedures, they billed for patients with congestive

91 (Pages 358 to 361)

APP 89

CONTAINS CONFIDENTIAL PORTION - BOUND SEPARATELY

Page 362

heart failure, all of that came into their account from various insurance companies and they paid their bills.

Q. Did the electricity company get a percentage of the net revenues?    05:45

A. You didn't ask me that. They used -- if they used money to pay us.

Q. Well, you told me that the billing arrangement was the same between the electric company and Sun. Is that right?    05:45

A. No, I did not.

Q. Oh, okay. I misunderstood.

A. I said they used their money to pay all of their bills. Our bill was one of them the hospital paid.    05:45

Q. And the bill was a product of how much money they received?

A. The bill was a product of the contracted rate that we negotiated, which had to do with a percentage of collections, as is all billing    05:46 arrangements.

Q. So if Newman received zero dollars for a claim, how much did Newman owe to Sun under that agreement?

A. Zero.    05:46

Page 363

Q. And if Newman received a thousand dollars on a claim, how much would Newman owe to -- to Sun if it were an 80 percent agreement?

A. You said a thousand? It would be $800.

Q. So how much Newman owed to Sun depended on    05:46 how much Newman received from an insurance company. Right?

A. Yeah, I think we handled it very clearly when we discussed the contracts earlier.

Q. The more money -- is that true also for    05:46 Community Memorial Hospital?

A. Yes.

Q. So the more money that Community Memorial Hospital received on referrals generated by Sun from insurance companies, the more money it would owe to    05:46 Sun. Is that fair?

A. Correct.

Q. And you knew that when Sun received money, you, Dr. Michael Murphy, would receive a portion of that. Is that right?    05:47

A. Correct.

Q. So the more money that Newman made from United, from billing claims to United, the more money you made under this arrangement. Is that right?

A. Short-term, yes. Long-term, no.    05:47

Page 364

Q. And the more money that Community Memorial Hospital made from claims submitted to United, the more money you, Dr. Michael Murphy, would make. Is that right?

A. In theory that is correct.    05:47

Q. That was the intended arrangement, at least?

A. That was the intended arrangement.

Q. I'm going to show you a document that was previously marked as an exhibit to somebody named    05:48 Daniel Boone. Do you know who is that?

A. I do.

Q. And you contracted with Mr. Boone. Correct? Or at least his company, One Stop Medical?

A. I did.    05:48

MR. MARKHAM: Do you mean in person?

MR. GLEASON: I don't know who contracted with him.

(Discussion off the written record.)    05:48

Q. Now, you asked -- do you know who Ashton Kouzbari is?

A. Some guy that's in Dallas.

Q. Have you ever heard of something called Southwest Labs?    05:48

Page 365

A. Yes.

Q. Did you ever do any business with Southwest Labs?

A. I don't recall. I don't think so. If it was, it was short-lived.    05:49

Q. If you look at the last page of Exhibit 27 there is a list of hospitals and contracted rates. Do you see that?

A. Yes.

Q. Is that consistent with the kind of    05:49 information you were aware of with respect to the various hospital contracts that hospitals you worked with had?

A. This is information that Ashton sent Dan. I have no idea what hospitals they were.    05:49

Q. Did you learn --

A. Some hospitals provided us their contracted rates, some did not.

Q. Did Newman?

A. We never saw their contracts.    05:49

Q. Did you know how much -- did you know the terms of the contracts?

A. We might have at some point. I knew the insurance companies that they wanted us to send. We may have been given their percentages at some point    05:50

92 (Pages 362 to 365)

# Exhibit 7

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

MISSION TOXICOLOGY,                §
L.L.C., ET AL.,                    §
                                   §  CASE NO. 5:17-CV-01016
     PLAINTIFFS,                   §  (LEAD CASE)
                                   §
V.                                 §
                                   §
                                   §
UNITEDHEALTHCARE                   §
INSURANCE COMPANY, INC.,           §
ET AL.,                            §
                                   §
     DEFENDANTS.                   §
                                   §
-------------------------          §
UNITEDHEALTHCARE                   §  CASE NO. 5:18-CV-00347
INSURANCE COMPANY, INC.,           §  (CONSOLIDATED CASE)
ET AL.,                            §
                                   §
     PLAINTIFFS,                   §
                                   §
V.                                 §
                                   §
MICHAEL MURPHY, M.D., ET           §
AL.,                               §
                                   §
     DEFENDANTS.                   §

ORAL AND VIDEOTAPED DEPOSITION OF
SAMANTHA MURPHY
OCTOBER 10, 2019

     ORAL AND VIDEOTAPED DEPOSITION OF SAMANTHA
MURPHY, produced as a witness at the instance of the
Plaintiffs and duly sworn, was taken in the above
styled and numbered cause on Thursday, October 10,
2019, from 9:10 a.m. to 3:55 p.m., before TAMARA
CHAPMAN, CSR, CRR, RPR in and for the State of
Texas, reported by computerized stenotype machine,
at the offices of Stonecrest Holdings, LLC,
7373 Broadway, San Antonio, Texas, pursuant to the
Federal Rules of Civil Procedure and any provisions
stated on the record herein.

  Job No. 168609

Page 10

in preparation for your deposition?

A. No.

Q. Did you speak with Dr. Murphy or Lynn Murphy?

A. Lynn Murphy, briefly.

Q. Is there any reason why you're unable to testify truthfully today?

A. No.

Q. And then the last thing I'll remind you is your counsel can object, but it's expected that regardless of his objection, unless he instructs you not to answer, that you'll answer the question. Okay?

A. Understood.

Q. And I will certainly ask questions that don't make sense during the course of the day. If you don't understand what I'm asking you, or you need clarification, please just ask me and I will do my best to rephrase. Okay?

A. Gotcha.

Q. If you answer one of my questions, I'm going to assume that you understood it. Okay?

A. Of course.

Q. All right. Let's just start with your background a little bit. What is your educational

Page 11

background, college and beyond?

A. I received a BA in sociology from Southern Methodist University.

Q. When did you receive that degree?

A. I graduated in 2015.

Q. What did you do after graduating from SMU?

A. I was an intern at a nonprofit for three months, and then I was unemployed for a few months, and then went to work for Integrity Ancillary Management.

Q. What did you do at the nonprofit?

A. I was a development intern.

Q. What does that mean?

A. Fundraising. I also wrote grants for the nonprofit, assisted in that process.

Q. Okay. So you just testified that after you interned, you were unemployed, and then you went to work at IAM. Correct?

A. Yes, ma'am.

Q. And if I say "IAM," you'll understand That refers to Integrity Ancillary Management?

A. Yes.

Q. I may also refer to it as "Integrity." If you need any clarification to understand what I'm referring to, please just ask me.

Page 12

So do you recall when precisely you started at IAM?

A. In March of 2016.

Q. How did you get that job?

A. My father-in-law expressed that he needed assistance in the onboarding department, and I accepted the job.

Q. What was the onboarding department?

A. The onboarding department was where we essentially signed clinics up for Sun Labs or its programs.

Q. I'm sorry. There is going to be some awkward pauses. I'm just taking notes or thinking about my next question. Okay?

A. Of course.

Q. Okay. So you said the onboarding department signed clinics up for Sun Labs and the variety of services that they offered. Is that fair?

A. Yes.

Q. Can you describe the services that you understood Sun offered to clinics at the time?

A. Sun Labs -- and at the time -- I would like to clarify it was around March of 2016 -- we provided a manage -- it was -- we provided lab services, as well as helping manage hospital outreach

Page 13

programs.

Q. Okay. Let's break that up. When you say Sun provided lab services, what do you mean by that?

A. We were a laboratory that provided urine and blood testing services.

Q. So in 2016 Sun had capabilities for both urine and blood testing services?

A. I believe so.

Q. Who would know for sure?

A. Mike Murphy or Jesse Saucedo.

Q. Do you know about what the capacity was for Sun at the time, meaning --

A. No.

Q. Okay. And just to finish my question, meaning how many specimens they could test a day or something like that.

A. (Nods.)

Q. Could Sun run allergy tests?

A. I do not know.

Q. Okay. And then the second thing you said that the -- the second service that you said Sun provided to various clinics or -- or -- let me rephrase.

The second thing that you mentioned Sun

4 (Pages 10 to 13)

Page 14

did was helping to manage hospital outreach programs. Right?

A. Yes.

Q. What do you mean by "hospital outreach program"?

A. A hospital had a laboratory. They had a laboratory and they were able to accept -- accept samples.

Q. So what service was Sun providing to hospitals that had labs that could accept samples?

A. We were providing the marketing, the -- a lot of the basic business management.

Q. What does that mean?

A. Shipping, providing supplies. Other functions.

Q. And so were you shipping -- so let's break that up. What do you mean by "shipping"? I mean, I understand what shipping means, obviously, but what was Sun offering in terms of shipping to the hospital outreach programs?

A. We were helping them get the samples to their facility.

Q. And when you say "them," who do you mean?

A. The hospitals.

Q. So your testimony is that you were helping

Page 15

the hospitals actually receive the specimens at the hospital's location?

A. No.

Q. What do you mean then?

A. Newman -- they came to our sorting station.

Q. Where was the sorting station?

A. I believe it was located on Northwest Military.

Q. And that's in Texas?

A. Yes.

Q. Where is Newman located?

A. Newman is -- Newman Hospital is located, and their lab, is located in Oklahoma.

Q. Have you heard of Community Hospital?

A. Yes.

Q. Where is Community?

A. Hicksville, Ohio.

Q. Have you ever been to Newman or Community?

A. No, I have not.

Q. Okay. Sorry. So to back up, so the specimens came in to the sorting station in Texas. And then what would happen with the specimens?

A. They were accessioned into our LIS. I did not work at the sorting station, so I do not know

Page 16

their exact process.

Q. Who would know?

A. Mike Murphy or Jesse Saucedo.

Q. Would the accessioners presumably know as well?

A. They would know their specific job functions, yes.

Q. Did Jesse Saucedo have any involvement in Sun?

A. Yes. He was in -- I mean, he owned part of Clover Trail, that owned Sun Labs.

Q. After the accessioning, do you know what happened with the specimens?

A. Not the exact process, no. I assume they went to be tested.

Q. Okay. We will get into that more, but we were talking about your background and we've gone pretty far afield. So let's try and get back there. That was my fault, not yours.

Okay. So you said you started working at Sun while at IAM in 2016, March. Were you ever employed with any of the other -- by any of the other defendants in this case, Sun or Mission?

A. Not Sun or Mission, but I was employed by Alternate Health Labs later.

Page 17

Q. You testified that you started working at IAM in the onboarding department and that you signed clinics up for some services. What were your interactions with specific clinics?

A. We sent them --

MR. MARKHAM: "Your" meaning hers or --

MS. KURTZ: I mean hers.

MR. MARKHAM: Yours.

A. My specific interactions involved speaking to clinics about our services, sending them supplies and requisitions, as well as educational material and answering any questions they had about the program.

Q. Just to clarify, you spoke with clinics directly not through marketers?

A. We did both.

Q. You personally did?

A. But we were sure --

MR. MARKHAM: She's asking about you, not "we."

A. Me, specifically, I did speak to both marketers and clinics, but if we were signing up a clinic, we spoke to a representative at the clinic.

Q. Okay. So you provided them with supplies. What kind of supplies?

5 (Pages 14 to 17)

Page 18

A. Testing supplies, blood testing supplies, as well as urine testing supplies.

Q. The clinics weren't actually doing the testing. Correct?

A. No, but they were selecting the specimen.

Q. Okay. So the supplies you're talking about are --

A. Specimen collection supplies. Sorry. Clarification.

Q. That's okay.

And then you would supply them with a requisition, so blank requisition forms. Is that fair to say?

A. Yes.

Q. And then you mentioned I think marketing materials or informational materials.

A. Educational materials.

Q. And what do you mean by that?

A. How to collect a specimen as well as how to store and ship a specimen.

Q. So it wasn't materials about, you know, the services that Sun could offer. It was more the nitty-gritty of how to collect the specimens, how to appropriately store them?

A. I do not remember material about a general

Page 19

overview. The material I remember giving out at that time was specific specimen collection instructions.

Q. Did the hospitals ever collect the specimens that were billed through the hospital outreach program themselves?

A. Not to my knowledge.

Q. Did the employees at the hospitals collect the specimens?

A. Not to my knowledge.

Q. Okay. How long did you work in the onboarding department?

A. Approximately, three months.

Q. What did you do after that?

A. I assisted Julie Pricer.

Q. Doing what?

A. Most of the time, putting accession numbers on invoices from reference labs and various menial tasks she assigned to me.

Q. Julie Pricer is an accountant. Right?

A. Yes.

Q. So were you like her assistant, personal assistant? I'm just trying to get an understanding.

A. I would call it an assistant, yes.

Q. Okay. So you stated that you put accession numbers on invoices that went to reference

Page 20

labs.

A. That came from reference labs.

Q. That came from reference labs.

What types of invoices would you be receiving from reference labs?

A. Invoices for reference lab testing.

Q. So the reference lab would perform the tests and then they would charge IAM or someone for the actual costs of running those tests. Is that fair?

A. Correct.

Q. What were the reference -- and you don't need to list every single one that you worked with, but can you list some of the reference labs that you would receive invoices from?

A. CPL, Clinical -- I think it's Clinical Pathology Labs. That's honestly the only one I remember.

Also, another task I did I forgot to mention, we would get UPS invoices and we would have to -- I would have to pull out the fees that were to be charged to the series.

Q. So at that time -- well, you just mentioned the series. It was Sun that had the series investors. Right?

Page 21

A. Correct.

Q. Mission didn't have series investors?

A. I'm not aware of what Mission did. I was not involved.

Q. Okay. So when you were working for IAM, the services that you were providing were services for Sun and Sun-related business. Right?

A. Well, Integrity had a management agreement with Sun, so, therefore, I was providing services for Sun under that agreement.

Q. Okay. And I just want to clarify you weren't providing services to Mission?

A. Not at that time, no.

Q. Okay. Why did you move from the onboarding department to being an accounting department assistant?

A. I desired to learn more departments of the business.

Q. Okay. About how long did you do that?

A. Approximately, two months.

Q. What did you do after that role?

A. After that, I became project-based. Any sort of project that needed done, but my biggest project was reconciling EOBs and remittances from the hospitals.

6 (Pages 18 to 21)

Page 50

noted that you had all employees sign a document that said that they understood the compliance program. Correct?

A. Yes.

Q. And that they had conducted whatever training they were asked to conduct?

A. Yes.

Q. Or participated in any training that they were asked to participate in?

A. Yes.

Q. And I just want to make sure that this is consistent with your understanding because we had a little bit of confusion about ethics before. But under the standard of conduct, it says, "Sun Lab expects all employees and independent contractors with which it works to conduct business in an ethical, legal, and competent manner."

Do you see that?

A. Yes.

Q. So that was important for Sun and IAM. Right?

A. Yes.

Q. And I think you already confirmed this, but it wasn't only important that they were acting appropriately with regard to their dealings

Page 51

internally, but also in any dealings Sun or IAM were having with third parties. Correct?

A. Yes.

Q. And that would include the insurers that IAM was billing. Correct?

A. Yes.

Q. I want to go through some of these relevant laws that you have listed here.

A. Okay.

Q. The first is the federal and state False Claims Act. Do you see that?

A. Yes.

Q. What's your understanding of what is prohibited by federal and state False Claims Acts?

A. I do not remember the law. If I was given time to study it, I would have a better answer for you.

Q. Did you understand that in general -- in general anything that taints a claim -- well, let's start with the federal False Claims Act. Okay? The federal False Claims Act applies to any federal dollars. Correct?

MR. MARKHAM: Objection; calls for a legal conclusion.

Q. As a compliance officer, it was your job

Page 52

to make sure you understood these laws. Correct?

A. Yes. And that I had references available.

Q. Okay. You can take a look at what's written out here if you want.

A. Will you ask the question again, the one that you asked before he objected.

Q. You understand that the federal False Claims Act applies to any situation where federal dollars are at issue. Correct?

MR. MARKHAM: Objection; calls for a legal conclusion.

A. That is a legal question, but under my training, I did assume that.

Q. And you testified earlier that you weren't dealing with federal dollars with Sun and Mission -- or Sun. I'm sorry. Correct?

A. None of our providers we dealt with federal dollars.

Q. Why is that?

A. I do not know. That's is a legal question.

Q. Do you know who made the decision?

A. No. The decision was made before I was an employee.

Q. As a compliance officer, you never asked

Page 53

why that might be the case?

A. I might have. I do not remember.

Q. Okay. And what is your general understanding of what the federal False Claims Act prohibits?

MR. MARKHAM: Same objection.

A. I studied it when I studied. I don't remember all of it now.

Q. Okay. Do you understand that, in general, it prohibits submitting a claim for reimbursement where there is any material misinformation associated with a claim?

A. Yes.

Q. And you understand that would also include submitting a claim for reimbursement where the specimen or the service is tainted by a kickback?

MR. MARKHAM: Objection; calls for a legal conclusion.

A. That's a legal question, but yes, in general.

Q. Okay. What is your understanding of what a kickback is?

A. Something of value given.

Q. For what purpose?

A. To get referrals.

14 (Pages 50 to 53)

Page 98

A. Part of it, yes.

Q. What do you mean by "part of it"?

A. Part of the place in Texas was subleased by Newman.

Q. Once it arrived at that location, the specimen was accessioned. Right?

A. I don't know the full accessioning process.

Q. But in general it had to be accessioned in order to figure out where it was going to go next. Right?

MR. MARKHAM: Objection; lack of foundation.

A. I don't know. I don't know the accessioning process. I'm not willing to speak about it in detail.

Q. Okay. And who would know about it?

A. Mike Murphy or Jesse Saucedo.

Q. Okay. And then after a specimen was accessioned, it would be tested by some lab. Correct?

A. It would be tested, yes.

Q. If the requisition form had a Sun logo on it, would it always be tested by Sun?

MR. MARKHAM: Objection; lack of

Page 99

foundation.

A. I don't know. That's part of the accessioning and receiving process. So I -- and the policy changed at different times. I don't know.

Q. Okay. You know, though, that there were third-party reference labs that weren't Sun or Newman that performed some of the testing. Correct?

A. Yes.

Q. And it was the accessioner that decided where that would go?

A. No.

MR. MARKHAM: Objection; lack of foundation.

A. I don't know that.

Q. And then regardless of whether it was Newman or Sun or some other reference lab that performed the testing, Newman would submit -- well, IAM would submit the bill to an insurer on behalf of Newman. Correct?

A. Well, it was a Newman sample.

Q. We are talking about an example where you're calling it a Newman sample.

A. Okay. Newman, yes, would use reference labs.

Q. Okay. And it was -- regardless of whether

Page 100

it was Newman or Sun or some other lab, for a Newman sample, Newman would bill the test. Correct?

A. Yes.

Q. How was something determined to be a Newman sample or not?

MR. MARKHAM: Objection; lack of foundation.

A. I don't know the exact circumstances at the sorting station. I just know it was a Newman sample.

Q. Something would happen at the sorting station to identify it as a Newman sample?

A. I don't know.

Q. Who would know?

A. The owners, Mike Murphy, Jesse Saucedo.

Q. You understand that it's expected that when a lab is referenced -- or laboratory service is referenced, the referencing lab is supposed to be identified in the claim form. Correct?

A. I don't know that to be true for hospital claims.

Q. Who would know that?

A. Our billing director.

Q. Don't you think --

A. Possibly.

Page 101

Q. Don't you think that's an important piece of information to know?

A. I know that they thought that -- I know that they were -- I know they thought they were submitting claims correctly, and I trusted their expertise.

Q. But wasn't it your responsibility to make sure billing was performed in a compliant manner?

A. It's my responsibility as a compliance officer to get with experts to make sure that the claim is billed correctly. I am not a billing expert.

Q. What was the background of your billing directors?

A. A lot of them had more than -- well, a lot of them -- I know one of them had over 20 years of experience in billing. The others had multiple, multiple years' experience in billing.

Q. Did you hire a third-party expert to make sure bills were being submitted appropriately?

A. I -- I don't remember. I don't remember. We might have.

Q. Do you know whether the billing managers would ever reach out to a payer to make sure that the bills were being submitted appropriately for that

26 (Pages 98 to 101)

Page 102

payer's guidelines?

A. I can't testify directly to what the billing directors did.

Q. You'd agree with me, though, that if a claim form had a misrepresentation on it, and as a result of that misrepresentation the claim was paid, it wouldn't be appropriate for the hospital or anyone else to retain that money. Correct?

MR. MARKHAM: Objection; calls for a legal conclusion.

A. If a claim was knowingly submitted with a misrepresentation, then yes -- or, no, I don't know exactly what you asked.

Q. Let me just rephrase.

A. Okay.

Q. If it was knowingly submitted with a misrepresentation, it would be inappropriate for the hospital or anyone else who received money related to that claim to keep that money?

MR. MARKHAM: Objection. It calls for a legal conclusion. You left out the word "material," for one thing. I object.

A. I don't know.

Q. Do you know what -- sorry.

So we walked through that process for

Page 103

Newman, but I want to talk about a difference that Community had from Newman. Okay?

A. Okay.

Q. You understood that Community did not sublease space in Texas. Correct?

A. I don't know if I was aware of that at that time.

Q. Are you aware of it now, though?

A. Now, yes.

Q. So taking a Community claim, it would come from a nonpatient of the hospital. Correct?

A. Uh-huh.

Q. Collected from a nonhospital employee. Correct?

A. Uh-huh.

Q. And it would come into a sorting station. Correct?

A. Yes.

Q. And that sorting station was not, in any way, related to Community. Correct?

A. I don't know if that's true.

Q. Okay. But you understand that unlike Newman, Community did not sublease any of the facility in Texas?

A. I know that now, yes.

Page 104

Q. Okay. All right. I want to -- I want to, you know, talk about in a little bit more detail the various parts of that chain that we just went through. So we've talked about marketers. Correct?

A. Yes.

Q. And Sun had arrangements with marketers. Correct?

A. Yes.

Q. Sun also had the series LLCs. Correct?

A. Yes.

Q. And at least for some of those series, the investors were physicians. Correct?

A. The A shares, yes.

Q. Yeah, okay. And for the A shares it was only physicians that were investors. Correct?

A. I think they were all providers, yes.

Q. So it could be like a physician assistant or a nurse practitioner. Correct?

A. Yes.

Q. So when you mean "provider," it's someone who is capable of ordering a test?

A. Yes. To clarify, when I say "billing provider," I am talking about a billing provider -- a provider is a physician MP or -- or...

Q. That's a fair distinction.

Page 105

A. Okay. Good.

Q. And we can also try and offer even more clarity. We can try and talk about where the billing provider is a hospital versus a lab or something like that.

A. Perfect. Thank you.

Q. And if I am not clear on that, just point it out to me and I will try and fix it.

Okay. So in some cases Sun worked with marketers in order to try and generate more specimen referrals. Correct?

A. Yes.

Q. And those marketers had relationships with various physicians or clinics. Correct?

A. I assume so.

Q. Do you know anything specific about the relationships that the marketers had with -- with physicians or nurse practitioners or clinics or anything like that?

A. I know what we set as a standard for those relationships, and what we expected them to follow.

Q. Okay. But you don't have any visibility necessarily specifically into the relationships that the marketers had with those people?

A. I do not listen to their conversations,

27 (Pages 102 to 105)

Page 110

It was sent to your email address. Correct?

A. Yes.

Q. And you would have read it?

A. Probably, yes.

Q. Who is Chad Walker?

A. He is a marketer with Tomahawk Medical Group.

Q. What's Tomahawk Medical Group?

A. They were a company that had a marketing agreement with Sun.

Q. Did you interact with Chad regularly?

A. I interacted with Chad at least monthly, probably.

Q. Okay. And what was the nature of your interactions with him?

A. Well, he was a rep so he would have been asking program questions. Mostly to me it would have been reimbursement questions.

Q. And when you say "reimbursement," do you mean the amounts that he would be reimbursed?

A. His company, yes.

Q. Okay. So amounts he was getting paid for providing marketing services?

A. Yes.

Q. And so in the first line here, it says,

Page 111

"Are you able to forward the reports that have been adjusted and itemized per our discussions."

Do you see that?

A. Uh-huh.

Q. Is that a "yes"?

A. Yes. Sorry. My fault.

Q. You sat in the deposition of Julie Pricer yesterday. Correct?

A. Yes.

Q. And there were a whole bunch of distribution reports that were reviewed. Do you remember that?

A. Yes.

Q. Is that, in general, what he would be referring to?

A. Yes. Or reports on claims that would have come in that might not have been distributed yet.

Q. Okay. So a claim had been submitted and maybe it's been paid or not paid yet and there hadn't been a distribution yet made to Tomahawk?

A. Presumably.

Q. Okay. He then says, "Separately have collections and 'on holds' been completed so we can address."

Do you see that?

Page 112

A. Yes.

Q. And so by "collections," that would be -- that would be actually payments collected from payers. Right? Insurers?

A. Or payments received from the hospitals.

Q. Okay. Right. Because the insurer will pay the hospital, then the hospital would distribute to IAM or Sun?

A. For the rep commissions --

Q. Yes.

A. -- the hospital would be paid. A percentage of that would go to Sun, then Sun would pay out their marketing agreements.

Q. Got it. Okay.

And then what does he mean or do you know what he means when he refers to "on holds"?

A. Not specifically. But, generally, whenever we said something was on hold, it was a claim that was missing information, whether it be a signature or a diagnosis code or we were -- maybe we didn't get enough blood for the order, we needed a new order, any sort of lab issue.

Q. Okay. So the requisition might not be complete or the specimen for some reason was incapable of being tested?

Page 113

A. At that time, yes.

Q. Okay. And then he goes on to say, I think he means, "We need to send commissions today as they are 8 days late for the field."

Do you see that?

A. Yeah. Yes.

Q. Do you know what he would have meant by that?

A. No, not -- not in that specific instance, no. And I was not involved in paying out commissions.

Q. But when he refers to commissions, you understand that would mean payments to marketers?

A. Yes.

Q. And Tomahawk had a whole bunch of marketers associated with it. Correct?

A. They had a number, yes.

Q. All right. Then if we go to the bottom line, he says, "Lastly, what is the status with billing all health claims due to insurance type."

Do you see that?

A. Yes.

Q. Do you know what he meant by that?

A. No, I don't.

Q. Did you understand that some insurers

TSG Reporting - Worldwide - 877-702-9580

Page 158

Right?

A. A toxicology sample that was in the Mission-owned LIS.

Q. It went to the Mission-owned LIS because Mission was the lab on the top of the rec form. Right?

A. Not necessarily. Really, that it was a clinic that was signed up under a Mission marketer.

Q. Understood. Okay.

A. More the distinction.

Q. Then we go to the last page and this is the laboratory report. Do you see that?

A. Yes.

Q. Community Memorial is at the top. Do you see that?

A. Yes.

Q. Just to confirm, it's for the same patient, SB?

A. Yes.

Q. And the date it was collected was April 17th and the date the specimen was received was April 18th and it was reported on April 21st. Do you see that?

A. Yes.

Q. And we have a confirmation result summary.

Page 159

Do you see that?

A. Yes.

Q. And at the bottom it says confirmations were performed by Alternate Health Labs. Do you see that?

A. Yes.

Q. Do you know why it would have been Alternate Health that was selected to perform the testing?

A. I wasn't involved in decisions on who per- -- what reference labs were chosen.

Q. Who was involved in those decisions?

A. Presumably, Mike Murphy and Jesse Saucedo. For Mission, Jesse Saucedo.

Q. Do you know if there was any follow-up communication with the patients or the doctor about the cost of the bills?

A. Well, the email on the front says that Lynn reached out to the doctor about the cost of bills.

Q. And if we go to the front email, it looks like Lynn suggested that she just start sending to different labs if the cost is a problem. Right?

A. Well, yes. If a doctor wasn't satisfied with our service, they always had the option to

Page 160

select another lab.

Q. Just going back to the requisition, there is nothing on the requisition form that indicates that this was supposed to be sent through or billed through Community. Right?

A. I don't know that for -- I don't know.

Q. Well, there is nothing on the form that says it. Right?

A. I don't know how -- okay. No.

Q. If the specimen was sent to the hospital, there would be some tracking information, right, for that?

A. In our LIS.

Q. Right. In this case, at least, we know from the lab report that it was Alternate Health that performed the testing. Right?

A. The confirmations, yes.

Q. Okay. All right. You can set that document aside.

(Discussion off the written record.)

(Exhibit 91 was marked.)

Q. I'm handing you a document that's been marked as Exhibit 91. It bears the Bates No. LD0139235.

Okay. This is another email chain.

Page 161

A. Yes.

Q. It starts with an email from Patient ED to someone at a pain center.

A. Uh-huh.

Q. And then someone from Community Hospital. Do you see that?

A. Yes.

Q. And that was ultimately sent from Steve Caryer at Community Memorial Hospital to you. Do you see that?

A. Yes.

Q. Who was Steve Caryer?

A. He was the -- he was I believe, the CFO of Community. He was my contact at Community.

Q. What was the nature of your interactions with him?

A. Mostly about EOBs and remittances.

Q. Did you have about the same level of contact between Newman or Community -- or Newman and Community?

A. I definitely spoke to Newman, to Elizabeth more. Steve wasn't as talkative.

Q. All right. So let's go back to that original email from Patient ED. This is another patient that has some last name confusion.

41 (Pages 158 to 161)

Page 206

A. I would assume, yes.

Q. You also understand that billing out of network sometimes means that an insurer will reimburse at lower rates. Right?

A. Sometimes, depending on the plan, yes.

Q. Okay.

A. And depending on the contract of the in-network contract.

Q. Right. So if Sun or Mission had billed United directly as an out-of-network provider, that there was at least a chance or an increased likelihood that the claim either wouldn't be reimbursed or it would be reimbursed at a lower rate. Correct?

A. Yes.

Q. You understood that United was in network with Newman and Community Memorial Hospitals. Right?

A. That was my understanding, yes.

Q. You've never seen those contracts?

A. No.

Q. But you understand that to be in network, it meant that United had a contract with the hospitals?

A. Yes.

Q. And as we just said, the converse is a

Page 207

contract made it more likely that the claims would get paid. Right?

A. Most -- yes.

Q. Potentially at higher rates?

A. You added that.

Q. So I'm asking, potentially at higher rates?

A. On -- on some claims, yes.

Q. All right. Do you have any understanding of the rates that Newman and Community reimbursed at?

A. I'm sure I knew at some time because of -- I looked at so many EOBs, but I don't remember now.

Q. Do you remember that was a percent of billed charges?

A. Yes.

Q. In general, it was a pretty high percent of billed charges. Right?

A. I don't remember the percentage.

Q. Do you understand that in general, insurers have particularly rich contracts with rural hospitals?

A. No. I knew those were good -- I mean, probably better contracts than we could get.

Q. Let's say Jane Doe needed toxicology, a comprehensive panel. Okay. If that comprehensive

Page 208

panel was billed directly to United, United would either potentially not pay it or reimburse it as a lower rate. Right?

MR. MARKHAM: Directly from whom?

A. From whom?

Q. Sorry. If Sun had billed United directly for performing that comprehensive panel on Jane Doe's specimen?

A. Yeah. Probably, yes.

Q. But if Sun -- but if the same test was billed through Newman or Community, it was going to get reimbursed at a percentage of billed charges. Right?

A. It wouldn't be reimbursed at all because it would be in network.

Q. And that meant that Sun got more money. Right?

A. For the services it provided, yes.

Q. Even though the service is provided on the same specimen for the same person, just billed differently. Right?

A. Sun functioning as an out-of-network lab is completely different than its function with the hospital program.

Q. I understand, but Sun got a cut of net

Page 209

revenues --

A. Yes.

Q. -- of claims billed. Right?

A. Yes.

Q. So if a claim was billed through Newman or Community, it was likely that Sun was going to get paid more than if Sun had billed directly as an out-of-network lab. Right?

A. Probably.

Q. If Sun or Mission had performed the testing at issue -- and I know that in certain cases other labs performed the testing -- but take the example where Sun and Mission actually were doing the tests. Could they have billed those tests directly as out of network to United?

A. If we got permission from the provider that they were sending the test to us.

Q. There was nothing that prohibited the lab who was actually performing the testing from billing the insured directly?

A. No, but then we would only bill for the portion that we performed and then the other reference labs, say there were more, would have to bill for their portion.

(Exhibit 100 was marked.)

53 (Pages 206 to 209)

Page 218

Q. Presumably from Sun?

A. It's on a Sun requisition form.

Q. Let's go over to the right. It's a little bit hard to read, but you're young so you have young eyes. Right?

A. I don't have the best.

Q. It says "Screening Tests Performed by Mission Toxicology." Do you see that?

A. Yes.

Q. And then "Confirmation Testing Performed by Axis Diagnostics." Do you see that?

A. Uh-huh.

Q. Is that a "yes"?

A. Yes.

Q. So here it's conveying that based on this requisition, any screening testing will be done by Mission and any confirmation testing by Axis.

A. These requisitions, especially the ones that the series had, this one looks, honestly, a little bit outdated. We do not have the results attached here, but the results might have indicated that a different -- it was tested differently. Honestly, these were probably just outdated requisitions.

Q. But at least what's being communicated to

Page 219

the doctor, or the doctors communicated by signing this form, is that screening tests is going to be -- sorry -- screening tests are going be performed by Mission and confirmation tests by Axis.

A. It just might -- just because -- okay. This might be an outdated form, and it might not reflect the communication that we had had with our series providers at that time. They were informed about the hospital outreach programs.

Just because the requisition was outdated, I don't think means that we didn't communicate that.

Q. Have you seen any written documentation about what -- that confirms that the doctors were informed about this?

A. I don't remember any, no. But when all this started, I wasn't at a position where I would have seen that.

Q. Axis Diagnostics, is that a lab that you heard of before?

A. I have heard of Axis, yes.

Q. Is Axis one of the labs that was doing a lot of the referenced testing?

A. I can't say a lot. I know that they were doing some, yes.

Q. Okay. And they would bill for the COGS

Page 220

associated with the labs that they were performing. Right?

A. Yes. They would charge us a reference fee.

Q. Okay. And that was a set amount, depending upon the type of test?

A. Yeah. I'm pretty sure it was negotiated. I wasn't involved in those negotiations.

Q. Okay. And then going all the way over to the right, again there is a Newman logo here. Right?

A. Yes.

Q. And it looks like it's covering up something that was written below?

A. Yes.

Q. And it's really hard to see, but to the right of the Newman logo, peering out from under it, it says "LLE Hospital." Do you see that?

A. Yes.

Q. So it looks like it's covering up something about a hospital that ends -- whose name ends in L-L-E. Right?

A. Yes.

Q. Do you understand that was probably Campbellton-Graceville?

A. I don't know who that was based on "LLE."

Page 221

This was also, again, during a time where I was not involved in any of these processes.

Q. And you don't know who would have put that Newman sticker on top of whatever is written below there?

A. I don't know if that's a sticker. And, no, I do not know who would have done that.

Q. All right. You just talked a little bit about the series LLC physicians. Those were Sun-associated only. Right?

A. The ones that I -- yes.

Q. All right. Did you have -- did you know, in general, who the physician or clinic investors were?

A. Yes.

Q. Did you communicate with them?

A. No.

Q. How did you know who they were?

A. As an assistant to Julie Pricer, I helped put together monthly series reports.

I also looked at data that showed the series they were in.

(Exhibit 102 was marked.)

Q. Okay. I'm going to hand you a document which is an email and an attachment that is

TSG Reporting - Worldwide - 877-702-9580

APP 101

Page 230

logos on it, I know at one time we were calling physicians to get permission if we could run it for them so that the sample didn't go to waste.

Q. And how would those calls be documented?

A. I have no idea. I wasn't doing them. I know that they were documented on top of the requisition. Sometimes you would see something that says "okay to send to blank per doctor whoever."

Q. Okay. And that notation would be something that was written by someone, like, from Sun or Mission, not the doctor?

A. It would be someone who was from Integrity. Might have been a Newman, like, subcontracted employee after speaking to the physician.

Q. Okay. And then he says, "Gary, please create a policy and procedure for the NMH Accessioning Team."

A. Yes.

Q. Do you know if Gary Ayres ever did that?

A. I do not know if Gary ever did that.

Q. And you don't have an understanding of why Seth Guterman thought this was important?

A. Seth Guterman also thought it was a HIPAA violation for us to send medical records so --

Page 231

Q. I'm just trying to make sure I understand --

A. Yes. I don't --

Q. -- what you understand.

A. I do not understand where he came to these conclusions.

Q. Okay. All right. I just have one last line of questioning that I want to go through. And this may feel somewhat redundant to some of the other things I discussed, but I just really want to make sure I understand what your testimony is going to be if we go to trial. Okay?

A. (Nods.)

Q. All right. And if you don't know a fact, you are more than welcome to say that, but I'm going to ask you the follow-up question every time, who would know. If you think I have a fact wrong, I'm going to ask you for the basis of that or why you think I'm wrong.

A. (Nods.)

Q. All right. So between approximately April of 2016 and December of 2017, Community Memorial didn't have laboratory facilities sufficient to conduct large-scale urine toxicology testing. Right?

A. I don't know that.

Page 232

Q. You don't know. Who would know?

A. Mike Murphy and Jesse Saucedo.

Q. At a minimum, you understood that Community Memorial Hospital didn't have the capacity to run all of the tests that were ultimately billed through Community Memorial's NPI. Correct?

A. Yes, I did understand that, that they referenced out tests.

Q. Between approximately April '16 -- April of 2016 and December of 2017, Newman Memorial did not have laboratory facilities sufficient to conduct large-scale urine toxicology testing. Right?

A. I don't know that to be true.

Q. At a minimum, you know that Newman Memorial didn't have the capacity during that entire time frame to conduct all of the testing that was billed through Newman. Correct?

A. They did reference out tests, yes.

Q. If Newman were to reference out a test, how would that be communicated?

A. I don't know. I wasn't involved in that communication.

Q. Who would know?

A. Mike Murphy or Jesse Saucedo.

Q. Would that be recorded somewhere?

Page 233

A. I have no idea because I wasn't involved in the communication.

Q. Between approximately April of 2016 and December of 2017, Community Memorial Hospital did not have the laboratory facilities sufficient to conduct large-scale blood testing. Right?

A. I do not know that.

Q. You know that they didn't have the facility sufficient to conduct all of the blood testing that was billed through their NPI number. Correct?

A. Yes, I am aware that they reference test that.

Q. And the same is true for Newman. Correct?

A. Yes.

Q. You understand that Dr. Murphy, in his capacity with Integrity, made an arrangement or entered into an arrangement under which Integrity would provide claims processing services for Community in return for a fee. Correct?

A. Billing, yes.

Q. And that fee was calculated -- it was five percent of any amounts that were collected from insurers. Correct?

A. Yes.

TSG Reporting - Worldwide - 877-702-9580

APP 102

Page 234

Q. That were billed by Integrity?

A. Yes.

Q. The same arrangement was true for Newman Memorial Hospital. Right?

A. Yes.

Q. Between April '16 and December of 2017, Dr. Murphy and Jesse Saucedo caused Sun, Mission, and other out-of-network clinical testing laboratories outside of Oklahoma and Ohio to perform urine or blood testing for individuals who were not inpatients or outpatients of Community Hospital. Correct?

A. What? Can you -- okay. Walk me -- let's go --

Q. All right. Rather than saying between 2016 and December 2017 --

A. Just --

Q. -- I'm going to say that's the relevant time frame. Okay?

A. That's fine.

Q. And if there is a distinction somewhere in there that something changed over time, point that out, but, otherwise, my questions are all going to be centered around 2000- -- April of 2016 through December of 2017. Okay?

A. Understood.

Page 235

Q. Great.

So under the out- -- or the hospital laboratory arrangements, Dr. Murphy and Jesse Saucedo caused Sun, Mission, and other out-of-network labs that were not located in Oklahoma or Ohio to perform blood testing for individuals who were not patients of Community Memorial Hospital. Correct?

A. They were nonpatients, yes.

Q. Okay. And those --

A. Those labs -- sorry. Those labs performed reference tests.

Q. At the direction of Dr. Murphy or Jesse Saucedo. Right?

A. I don't know who directed them.

Q. The same is true for Newman Memorial Hospital?

A. Yes. My answer stands.

Q. Dr. Murphy and Jesse Saucedo entered into arrangements with marketers to obtain specimens from physicians throughout the United States that were tested and billed through Newman Memorial or Community Memorial Hospitals. Right?

A. Yes. We managed a marketing program to help the lab programs advertise to get samples.

Q. And the purpose of those programs were to

Page 236

obtain more specimens to be tested. Correct?

A. Yes, to boost their programs.

Q. And those specimens were then tested by Sun, Mission, and other nonhospital laboratories. Correct?

A. If the hospital needed to reference out testing because of capacity or issues, then, yes, those labs would perform tests.

Q. And then Integrity submitted claims for reimbursement through Community's NPI number to United for those tests. Correct?

A. For Newman claims, yes, Integrity billed for Newman for the hospital outreach program.

Q. Including for tests that weren't actually performed by Newman. Correct?

A. Including reference lab testing, yes.

Q. And the same is for Community. Correct?

A. Yes.

Q. And many of those claims that Integrity submitted for reimbursement either through Community or Newman's contract with United were for tests performed by labs outside of Oklahoma or Ohio. Right?

A. Yes, the reference work was sent all over.

Q. The claims were submitted to United by

Page 237

Integrity on forms that represented that Community and Newman were the providers. Correct?

A. They were the providers, yes.

Q. Even in instances where Community and Newman didn't actually perform the testing?

A. When they referenced out testing, yes.

Q. But the claims still identified Community and Newman as a provider of the service. Correct?

A. Yes.

Q. United -- as a result of this billing, United paid millions of dollars to Community and Newman based on claims Integrity had submitted for blood and urine testing. Correct?

A. I don't know the exact dollar figure, but yes, they did pay the hospitals for those tests.

Q. It was significant in amount of dollars. Right?

A. Yes.

Q. After the hospitals received payments from United, a portion of those proceeds was transferred to Sun or Mission in accordance with the agreements that the hospitals had with Sun or Mission. Correct?

A. Yes.

Q. And then based upon contracts signed by either Dr. Murphy or Jesse Saucedo, the funds that

60 (Pages 234 to 237)

Page 238

Sun or Mission received from the hospital were further distributed to marketers who had caused referrals to be made into the program. Correct?

A. Yes.

Q. And -- and the laboratories that actually performed the testing in instances where it was referenced, they received some payment as well. Correct?

A. They charged, yes, a fee for service.

Q. It wasn't a percentage of net revenue?

A. No, it was a standard fee for service.

Again, I don't know that 100 percent on everything. That is the invoices that I saw were all fee for service.

Q. Understood.

So in the case of Sun where there were profits that came into the Sun series LLCs, those profits were distributed to investors. Correct?

A. Yes, based on their investments.

Q. And in Series A the investors were physicians. Correct?

A. Yes.

Q. And Integrity also received a percentage of the net reimbursements paid by United as a result of claims submitted by Integrity. Correct?

Page 239

A. Yes. Just like every other billing company.

Q. And it was 5 percent. Correct?

A. Yes.

Well, it could vary based on our client. It was a negotiable fee. For Newman, I believe yes, it was 5 percent.

Q. That would be just reflected in a contract?

A. Yes, they're all documented.

Q. We already discussed this, but just to confirm. When Integrity submitted claims to United on behalf of Community and Newman, Integrity identified Newman or Community as the provider of the services on those claim forms. Correct?

A. Some of them. The ones that they were the provider, yes.

Q. Well, in any instance where Newman or Community were the billing entity, they were identified as the provider of the services. Correct?

A. I don't know if like -- I mean, you'd have to show me a claim form. And I wasn't a biller.

Q. Well, maybe I will show you a claim form. I don't know yet.

MR. MARKHAM: Claim forms show who

Page 240

the provider was. I think she already answered that she believed that they were the provider.

A. I believe that we were billing correctly based on what we had been told by experts.

Q. That wasn't my question.

My question is simpler and you've already answered it so we can move on.

So the next question I have is Integrity's representation on those claim forms that Newman and Community were the providers were important to United's decision to reimburse those claims. Right?

A. I don't know what --

MR. MARKHAM: Objection.

A. I don't know what is important to United when reimbursing a claim.

Q. Well, in order for United to reimburse the claim under a contract with Newman or Community, Newman or Community had to be the provider. Correct?

A. I don't know. I don't...

Q. Had Integrity not identified Newman or Community as the provider of the services, United would not have made the payments on the claims to Newman or Community. Right?

A. I'm unclear by what you're saying by provider because there is -- from a billing aspect

Page 241

that can mean multiple things. But yes, they are the provider.

Q. It would be important -- in order for Newman and Community to get paid, they had to be identified as the provider on the claim form. Correct?

A. Yes.

Q. When Integrity identified Newman and Community as the provider -- and when I say "Newman and Community," obviously in each claim it was either Newman or Community.

MR. MARKHAM: She's answered with that in mind.

Q. I understand. I just want to make sure for the record that that's your understanding.

A. That is also my understanding.

Q. When Integrity identified Newman or Community as the provider on a claim it submitted to United, it also knew that at least in some cases different labs had performed many of the tests that were being billed. Correct?

A. That they were reference labs, yes, as on the results.

Q. But those labs were not identified on those claim -- on the claim forms. Correct?

TSG Reporting - Worldwide - 877-702-9580

APP 104

Page 242

A. I don't know.

Q. When Integrity identified Community or Newman on the claim forms as the provider, Integrity didn't actually know whether the hospital had performed the service or a reference lab had performed the service. Correct?

A. No, that's not true at all. It's on the results.

Q. So Integrity knew the instances in which a lab was referenced, before billing?

A. They looked at the results every single time they billed, and the results were very clear on who performed the test.

Q. Integrity knew that unless it was on the claim form, United would have no way of knowing whether it was Community or Newman or a different lab that had performed the test. Right?

A. Well, I mean, I know we sent you at least 2,500 different results throughout -- I think from December 2016 to April 2017, which completely said what it did. And at any time you asked for medical records or results, we were glad to give them.

Q. That wasn't my question.

A. Well -- I mean --

MS. KURTZ: Could you read my

Page 243

question back, please.

(The requested material was read.)

A. Only if -- if you were only looking at the claim.

Q. Okay. So if the only information United had available to it was the claim form, United wouldn't know whether it was a test performed by Newman or Community or by a reference lab. Correct?

A. I'm not sure what was on the claim form.

Q. Who would know?

A. I would -- our billing director or someone who was looking at either the claim form or the electronic submission that you received.

Q. When Integrity submitted claims using Community or Newman's NPI numbers, the reason it was submitting those claims was to cause United to pay reimbursements for those claims. Correct?

A. Any time anyone submits a claim, they are asking for -- well, reimbursement -- unless it's a corrected claim.

Q. Fair enough.

MS. KURTZ: I don't have anything else.

MR. MARKHAM: I don't have anything.

Page 244

THE VIDEOGRAPHER: This concludes the deposition. It's 3:55.

(Deposition concluded at 3:55 p.m.)

Page 245

CORRECTION PAGE

WITNESS NAME: SAMANTHA MURPHY    DATE: 10/10/2019

PAGE  LINE  CHANGE        REASON

_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

62 (Pages 242 to 245)

# Exhibit 8

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

MISSION TOXICOLOGY,           §
L.L.C., ET AL.,               §
                              §  CASE NO. 5:17-CV-01016
     PLAINTIFFS,              §  (LEAD CASE)
                              §
V.                            §
                              §
UNITEDHEALTHCARE              §
INSURANCE COMPANY, INC.,      §
ET AL.,                       §
                              §
     DEFENDANTS.              §
                              §
--------------------------    §
UNITEDHEALTHCARE              §  CASE NO. 5:18-CV-00347
INSURANCE COMPANY, INC.,      §  (CONSOLIDATED CASE)
ET AL.,                       §
                              §
     PLAINTIFFS,              §
                              §
V.                            §
                              §
MICHAEL MURPHY, M.D., ET      §
AL.,                          §
                              §
     DEFENDANTS.              §

ORAL AND VIDEOTAPED DEPOSITION OF
JULIE PRICER
OCTOBER 9, 2019

     ORAL AND VIDEOTAPED DEPOSITION OF JULIE PRICER,
produced as a witness at the instance of the
Plaintiffs and duly sworn, was taken in the above
styled and numbered cause on Wednesday,
October 9, 2019, from 10:11 a.m. to 5:00 p.m.,
before TAMARA CHAPMAN, CSR, CRR, RPR in and for the
State of Texas, reported by computerized stenotype
machine, at the offices of Stonecrest Holdings, LLC,
7373 Broadway, San Antonio, Texas, pursuant to the
Federal Rules of Civil Procedure and any provisions
stated on the record herein.

  Job No. 168608

Page 10

Q. What was the position called?

A. It was for chief financial officer, accountant.

Q. And you ultimately got that job. Right?

A. Yes, sir.

Q. And that was your title at Integrity. Right?

A. When I started it was, and then about three or four months later we had a meeting with Dr. Murphy. "We" as in all of the managers. And at that point he stated nobody at the company had titles except for him and Jesse Saucedo.

Q. I'm not sure I understand exactly. So you were hired as the chief financial officer of Integrity. Right?

A. Yes.

Q. And how long did you perform in that role?

A. I would say up to the point he said we didn't have any titles. At that point I was just doing accounting work.

Q. And how long did you work at Integrity doing accounting and any other work?

A. I believe up until the company shut down, which was -- I can't remember the exact date. It might have been -- I don't know if it was in 2016 or

Page 11

2017. I'm sorry. I don't remember the exact date that I transferred.

Q. Was Integrity always located at the same address during your time there?

A. Yes. Well, it was at 45 Northeast Loop 410, and then I believe it transferred to the Nakoma location.

Q. So maybe walk me through each one of those. The first address was -- what did you say?

A. I believe it was 45 Northeast Loop 410.

Q. And when was Integrity located at that address?

A. Since I started in July of 2015 -- and I'm not sure the exact date that they moved.

Q. Do you remember what year it was in?

A. No, I can't be 100 percent sure.

Q. Do you know if it was in 2016?

A. I honestly don't remember if it was 2016 or 2017.

Q. All right. So either in 2016 or 2017 Integrity relocated to a different address. Right?

A. I believe so. Like I said, I can't remember the exact dates.

Q. Okay. But it was probably during '16 or '17. Right?

Page 12

A. I'm not 100 percent sure.

Q. Okay. Did you go to the office when you would work or would you work from home?

A. I would go to the office.

Q. Was it an Integrity office?

A. Yes.

Q. Where would you go? What address would you go to?

A. The 45 Northeast Loop 410.

Q. Okay. I'm just getting some background information.

A. Sure.

Q. Did you ever start reporting to a different address?

A. No. Not until I changed to Alternate Health.

Q. Okay. Well -- so you mentioned that Integrity changed its location to a different address at some point. Right?

A. Yes.

Q. When that happened, did you start going to that address to do your job?

A. No.

Q. Okay.

A. Maybe I should clarify.

Page 13

Q. Okay.

A. I'm sorry.

MR. MARKHAM: Don't apologize. You're doing fine.

A. Okay. At one point the billing office did move to the Nakoma location, but we still had offices until the lease was up at the 45 Northeast Loop 410.

Q. So --

A. So it was kind of split.

Q. Okay. So at some point the billing office of Integrity moved to what you're calling the Nakoma location. Right?

A. Yes, sir.

Q. Do you remember when that happened?

A. No.

Q. Was there -- when you say "the billing office," what do you mean by that?

A. The -- the staff that did the billing, so the billing director and all of the billing staff.

Q. So all of those people moved to this Nakoma location. Right?

A. Yes, sir.

Q. And why don't you tell me about -- were there any other businesses located at the Nakoma location at that time?

4 (Pages 10 to 13)

Page 14

A. Alternate Health Laboratory.

Q. Do you remember the Nakoma address?

A. 1051 East Nakoma, I believe.

Q. Was it a warehouse? And can you just describe the -- can you just describe the facility?

A. It was a two-story building. The lab was on the first floor and the offices were on the second floor.

Q. When you say "the lab," which lab were you referring to?

A. Alternate Health Lab.

Q. That's a separate company. Right?

A. Yes, sir.

Q. And it's a laboratory. Right?

A. Yes, sir.

Q. What type of lab test does it conduct?

A. Urinary and blood samples.

Q. And then you mentioned that there was a billing office on an upper floor. Right?

A. Yes, sir.

Q. And that was the billing office for what company?

A. Integrity Ancillary Management.

Q. Did Integrity do billing for Alternate Health?

Page 15

A. Yes, sir.

Q. Did it do billing for any other labs?

A. Yes, sir.

Q. Which ones?

A. Sun Clinical Lab, Mission Toxicology, and then the different hospitals.

Q. So when the billing office moved, you stayed where? I know you explained it to me, but if you wouldn't mind just explaining it again, that would be great.

A. I stayed at the 45 Northeast Loop 410 location.

Q. And was your job still with Integrity at that point?

A. Yes.

Q. At some point, you said you started working for Alternate Health. Right?

A. Alternate Health Corp, yes.

Q. When was that?

A. I don't remember the exact date.

Q. Do you remember whether it was in 2017?

A. No, I don't. I don't know 100 percent. I can't remember that date --

Q. How do you know you started working for a different company?

Page 16

A. They told me that Integrity was shutting down and I was going to start working for Alternate Health Corp and that's where my paychecks started coming from.

Q. Do you remember who told you that?

A. I had a conversation with Dr. Murphy.

Q. Do you remember when that was?

A. No.

Q. So let's talk about Integrity as a business. Do you mind just explaining -- what type of business was Integrity Ancillary Management?

A. It was a medical billing and management company.

Q. And what does it mean to be a medical billing and management company? What type of services does Integrity provide?

A. They did the medical billing for the lab samples and then they were the management company for the series LLCs that were set up.

Q. So did they do anything else?

A. Not that I'm aware of.

Q. And when you say "billing," what do you refer to?

A. Medical billing.

Q. Yeah. So when you say "billing," what did

Page 17

Integrity do with respect to billing?

A. They would send claims or medical claims for the lab services for patients.

Q. And when you say "lab services," what are you referring to?

A. The -- like if a patient has any blood work done or they submit a urine sample to a physician, then the lab would process those samples and the billing company would send -- would make -- bill the claims for those samples.

Q. So --

A. To insurance companies.

Q. Okay. So Integrity would fill out and submit claims for laboratory services to insurance companies. Right?

A. Yes.

Q. Would it do any collections?

A. I'm not 100 percent sure if they did collections.

Q. All right. Well, you worked for them. Right?

A. Yes.

Q. And you looked at all their books and records. Right?

A. Yes.

5 (Pages 14 to 17)

APP 108

Page 22

A. Yeah. I mean, I'm not aware of any other statements.

Q. Okay. And you weren't aware of Integrity having retained a collections agency or anything like that. Right?

A. No.

Q. Did Integrity ever invoice hospitals for the amounts those hospitals owed to laboratories?

A. Yes.

Q. Was that one of the services Integrity provided?

A. Yes.

Q. Which hospitals did it invoice?

A. Newman Memorial Hospital, Community Memorial Hospital, Kansas, which I'm not for sure the full name of the hospital. We refer to them as Kansas. There was one called Sharkey. I'm not for sure -- I don't remember the full name of that one, either.

That's all I can remember right now. If there were any more, I just can't recall it.

Q. And who at Integrity would send those invoices to those hospitals?

A. I would.

Q. Would anybody else?

Page 23

A. Not that I am aware of.

Q. Who would prepare the invoices?

A. I would.

Q. Would you work with anybody else to prepare them?

A. Yes.

Q. Who is that?

A. I'd work with Samantha Murphy on making sure that the amounts were correct to our knowledge based upon the contracts.

Q. All right. So you were aware that there were some contracts that justified invoicing hospitals for some amounts. Right?

A. Yes, sir.

Q. Which contracts were you aware of?

A. I don't know the exact name of the contracts. They were laboratory services contracts or billing services contracts.

Q. And on whose behalf did you invoice the hospitals?

A. What do you mean by that?

Q. So an invoice that comes from one company or person to another right?

A. Yes.

Q. The invoice was sent to Newman Memorial

Page 24

Hospital, for example, right? On behalf of what company?

A. Oh, I'm sorry. On behalf of Sun Clinical Laboratory, Mission Toxicology, and Integrity Ancillary Management.

Q. And you invoiced Community on behalf of those same companies. Right?

A. Yes, sir.

Q. All right. Did you ever ask a hospital to transfer funds to Integrity?

A. No.

Q. Well, when you'd invoice them, you'd ask them to send money to Integrity. Right?

A. When I invoiced them, I submitted them an invoice.

Q. Uh-huh.

And an invoice is a request to be paid. Right?

A. If that's the definition of it, I guess.

Q. Well, I just -- I'm just -- I'm not trying to be like a legal definition or anything like that.

But when you would invoice Newman, for example, on behalf of Integrity, your expectation was that Newman would pay the invoice. Right?

A. Yes.

Page 25

Q. Same for when you'd invoice Newman on behalf of Sun Clinical Labs. Right?

A. Yes.

Q. And then same for on behalf of Mission Toxicology. Right?

A. Yes.

Q. Basically, you would be the one who would just ask Newman to make a payment to Integrity, Sun, and Mission. Right?

A. I submitted invoices to them, like I said, based upon what we believed would be the correct amount based upon the contracts that they owed us.

Q. Did Integrity ever invoice -- actually, withdraw that.

Were you involved at all in making payments from Sun Clinical Labs to any other entities?

A. Can you clarify what you mean by that.

Q. I'll get to that one in a second. Why don't I just finish one topic up.

A. Okay.

Q. So can you tell me who -- who directed and controlled the conduct of Integrity as a company?

MR. MARKHAM: Objection; calls for a legal conclusion.

7 (Pages 22 to 25)

Page 26

You can answer.

A. Dr. Murphy and Jesse Saucedo.

Q. So did anybody else decide how Integrity was going to conduct itself and its business?

A. Not that I am aware of.

Q. I just kind of like want to walk through the titles and positions of the different people who were in charge of making decisions about how Integrity would conduct itself as a business. Okay?

A. Okay.

Q. You mentioned Dr. Murphy. Right?

A. Yes.

Q. Did he have a position with Integrity?

A. He was one of the owners.

Q. Did he have a -- can you remember if he had a title?

A. I don't remember when he stated to us that only him and Jesse had titles. I don't remember the exact titles that they gave each other.

Q. All right. But at some point during '16 or '17 he conveyed to you that he and Jesse were the only people with titles with respect to Integrity. Right?

A. Correct.

Q. Do you remember what he said Jesse's title

Page 27

was?

A. No.

Q. Were either of them executives of Integrity?

A. They were owners.

Q. Do you know what percentage share each of them owned?

A. I --

MR. MARKHAM: Lack of foundation.

You can answer.

A. I believe it was 50-50. I can't be 100 percent sure, but I think that's what it was.

Q. Did you ever make distributions out of Integrity's account to Dr. Murphy or Jesse for their ownership shares?

A. Maybe once or twice. I -- I can't remember 100 percent.

Q. Would anybody else have paid out Dr. Murphy or Mr. Saucedo from Integrity for their ownership share in the company?

A. What do you mean by that?

Q. Well, I guess owners typically have a right to some -- the profits or distributions of a company. I don't know if that happened with respect to Integrity or not. I'm just asking you whether you

Page 28

are aware of Integrity paying out distributions to its owners, Dr. Murphy and Mr. Saucedo?

A. Like I said, it may have happened once or twice. I don't remember the exact number of times. It wasn't very many that I'm aware of.

Q. Did Integrity have a chief executive officer?

A. I'm not 100 percent sure who would have had that title.

Q. Do you know one way or the other whether Ms. Lynn Murphy was involved at all in running Integrity or anything regarding Integrity?

A. Yes, she -- she started working for Integrity but not receiving a paycheck for it to kind of help out, I believe, in the management to make sure processes were in place.

Q. And when was that?

A. I don't remember exactly.

Q. Do you remember why Ms. Murphy started working for Integrity to help out, as you described?

A. My understanding, to help out to make sure processes were in place and -- and things were running accordingly.

Q. Do you remember what kind of processes she was working on?

Page 29

A. I'm not 100 percent sure I know everything she worked on. I know she helped out with the billing processes and then if we had -- "we" as in Samantha and I had questions in regards to contracts that were executed, making sure we understood those.

Q. And you mentioned Samantha. Is that Samantha Murphy?

A. Yes.

Q. The Samantha Murphy sitting right here?

A. Yes.

Q. So Samantha Murphy worked for Integrity, too. Right?

A. Yes.

Q. What was her position?

A. I don't recall her having a title.

Q. Do you remember what she was responsible for during 2016, 2017?

A. I don't know what she was responsible on those exact dates. I -- I know she helped out whenever we would get the payment remittances from the hospitals, she would help reconcile those.

Q. What does that mean, "reconcile"? It's just a term I'm not totally familiar with.

A. So we would receive the remittances from the hospitals, copies of checks or payments from the

8 (Pages 26 to 29)

Page 34

foundation. You haven't established she knows any of this.

Q. Is it your understanding that a Mission specimen was a specimen that went to Mission?

MR. MARKHAM: Same objection.

A. I'm assuming so.

Q. All right. That's fine.

Did you take a salary -- were you paid a salary from Integrity when you worked there?

A. Yes, sir.

Q. Do you mind just telling us what -- how much it was per year?

A. 90,000.

Q. Did you -- were you eligible for bonuses or incentive compensation based on performance or anything?

A. That was never really -- I don't remember that ever being in our handbook or we -- if we ever really did that.

Q. Yeah, companies do things different ways.

A. Yeah.

Q. Some people have official policies and others just kind of do it informally.

But were eligible for bonuses or incentive compensation or did you just strictly receive a

Page 35

salary?

A. I strictly received my salary.

Q. So whether you did a great job or an average job, you couldn't earn more money?

A. Not that I am aware of.

Q. Let's just talk a little bit about some of the different laboratories you discussed. Okay?

A. Okay.

Q. One of the laboratories is Sun Clinical Labs. Right?

A. Correct.

Q. What do you know about Sun Clinical Labs' business during 2016 and 2017?

A. What do you mean by that?

Q. And by the way, generally if it's helpful, most of my questions are about the 2016 and 2017 time frame.

A. Okay.

Q. Because that's just what this case is about.

A. Okay.

Q. So you can just assume I'm asking about those years and not all years. Okay?

A. Okay.

Q. I'm just wondering what did Sun do for a

Page 36

business? Do you know?

A. Process laboratory specimens.

Q. Did it do anything else that you're aware of?

A. No.

Q. Did it ever refer specimens to other labs for testing?

MR. MARKHAM: Objection; lack of foundation.

A. I'm not 100 percent sure.

Q. Do you know what it means to -- for a lab to refer a specimen to another lab for testing?

A. I've heard the terminology before.

Q. Do you have an understanding of what it means?

A. Very vague.

Q. All right. So Sun would do lab testing. Right?

A. Yes.

Q. Do you know what type of lab testing Sun would do?

A. I'm trying to remember. I believe they did toxicology and blood.

Q. Well, when you say "toxicology," what does that refer to?

Page 37

A. Urine samples.

Q. Do you know what type of tests Sun could run on urine samples?

A. I don't know specific tests.

Q. That's fine.

Do you know -- you mentioned blood. Right?

A. Yes.

Q. Do you know what type of tests Sun would or could run on blood samples?

A. I don't know specific tests, no.

Q. Do you know if Sun could run allergy tests on blood samples?

A. I'm not 100 percent if they did that or not.

Q. Did you ever -- were you ever aware of Sun testing -- running allergy tests on blood samples?

A. I'm not 100 percent sure what exact tests they did --

Q. That's fine.

A. -- for that.

Q. Now, what about genetic testing? Could Sun run genetic testing, to your knowledge, on Sun -- on spe- -- on samples?

A. Not -- I don't know.

10 (Pages 34 to 37)

Page 38

Q. All right.

A. Not that I'm aware of.

Q. Well, what about Mission? Were you aware at all -- Mission was a laboratory as well. Right?

A. Correct.

Q. And Mission would run tests on -- Mission would run lab tests on patient specimens. Right?

A. Yes.

Q. Are you aware of what types of tests Mission could run on specimens?

A. Not 100 percent. I don't know exactly everything they did.

Q. I'm just trying to -- I'm still kind of just doing background stuff.

Are you aware of any type of testing Mission was able to perform on specimens?

A. I think they did -- I know they did urine toxicology testing I'm not 100 percent sure if they did blood testing or not.

Q. All right. Who were the officers or executives or managers of Sun during 2016 and '17, to your knowledge?

A. To be honest, I really don't remember.

Q. Was Sun a client of Integrity?

A. Yes.

Page 39

Q. Did Integrity do the billing for Sun?

A. Yes.

Q. Did Integrity do the billing for Mission?

A. I think so.

Q. Okay. I'm just trying to establish the degree to which Integrity had a relationship with Sun and Mission.

A. Uh-huh.

Q. So when Sun would perform a lab test, Integrity would sometimes bill that test to an insurance company. Right?

A. Correct. To my knowledge.

Q. Same with respect to Mission. Right?

A. I believe so.

Q. So in your line of work, when you were working for Integrity, did you ever become aware of who was running Sun, for example?

A. What do you mean by "running Sun"?

Q. Really anything. I'm just trying to -- if there is a laboratory, someone is in charge of running that business. Right? Sun was a freestanding independent lab. Right?

A. Uh-huh.

Q. And it ran a business. Right?

A. Yes.

Page 40

Q. It made money by getting paid on tests it performed. Right?

A. Yes.

Q. So I'm just trying to figure out whether you know who was running Sun's business when you were working for Integrity.

MR. MARKHAM: Objection; asked and answered.

A. I guess I'm not 100 percent sure by running what?

Q. Okay. If you don't know, that's okay.

A. Okay.

Q. What about -- was -- do you know one way or the other whether Dr. Murphy was involved in running Sun's business?

A. I believe so.

Q. All right.

A. I believe he was maybe -- he was an owner. Well -- can I take that back?

Q. Of course.

A. Clover Trail owns Sun and he was an owner of Clover Trail, so...

Q. Okay. What about Mission? Were you aware of who was in charge of running Mission's business?

A. All that I'm aware of is Jesse Saucedo.

Page 41

Other than that, I don't know their structure.

Q. And what are you aware of with respect to Mr. Saucedo?

A. That he was an owner of Mission.

Q. Okay. Did you ever talk to anybody about money that was owed Sun or money that was owed Mission?

A. Can you clarify?

Q. Yeah. Well, Sun and Mission got paid in connection with laboratory testing. Right?

A. Uh-huh.

Q. So Integrity did some of the financial work for Sun and Mission. Right?

A. For Sun, yes. For Mission, the only thing that Integrity was involved in was submitting the invoices to the hospitals.

Q. All right.

A. Everything else was done by their -- their people.

Q. Their people. All right.

But Integrity did do more for Sun. Right?

A. Yes.

Q. And do you mind just kind of listing what services Integrity would provide for Sun?

A. They would do the billing services and the

11 (Pages 38 to 41)

Page 42

bookkeeping.

Q. All right. When you say "they," you would also do some of those services --

A. Yes.

Q. -- too. Right?

A. Yes.

Q. All right. I just want to make sure, when you say "they," you're referring to Integrity --

A. Integrity.

Q. -- but you're also referring to some work you did. Right?

A. Yes.

Q. And when you would do that work for Sun did you communicate with anybody at Sun about it?

A. Dr. Murphy.

Q. Anybody else?

A. Maybe Lynn Murphy or Jesse. I'm not 100 percent sure. I know for sure Dr. Murphy.

Q. All right. So if you needed financial information with respect to Sun, to allow you to bill for Sun or collect for Sun from someone, who would you get it from?

A. Well, I never billed anything. But if I had any questions regarding financial --

MR. MARKHAM: Well, if you didn't

Page 43

bill anything, the answer is you didn't go to anybody because you didn't bill. Right?

Q. I can rephrase the question.

MR. MARKHAM: Well, hold on. Just -- do you understand what I'm saying?

THE WITNESS: Yes.

MR. MARKHAM: If you didn't bill, you didn't bill. If you didn't, tell him you didn't bill for them.

MR. BORNSTEIN: No, that's okay. You can just state like a form objection on the record. It's not a big deal, but I just want to keep it moving.

And I'm happy to rephrase the question if she says -- she doesn't answer.

Q. When I mean -- said "bill," I was referring, in that context, to either billing an insurance company and getting paid on a claim, which you said was a service Integrity performed for Sun.

A. Uh-huh.

Q. Or invoicing -- billing a hospital.

A. Okay.

Q. So I guess a bill could take a couple different forms.

A. Okay.

Page 44

Q. So I apologize for the confusion.

But when you would do claims billing or hospital invoicing on behalf of Sun, presumably you needed some information about how much to bill. Right?

A. Correct.

Q. And who would you get that from?

A. I would always go to Dr. Murphy.

Q. All right. So he was aware of most of the financial conduct and -- most of the financial conduct of Sun. Right?

A. Yes, as far as I know.

Q. And as far as you know, he kind of directed that conduct as well. Right?

A. Yes, as far as I know.

Q. You mentioned that Mr. Murphy and Mr. Saucedo had ownership interest in Sun. Right?

A. Yes.

Q. Do you know of anybody else who had ownership interest in Sun?

A. Prasanna. I don't know how to say his last name. It starts with an A. And Joel Nelson.

Q. So --

A. I think that's his name.

Q. Thanks.

Page 45

So who is Prasanna?

A. Prasanna -- my understanding, Prasanna had owned Sun prior to Dr. Murphy purchasing it. But Dr. Murphy made him part owner of it after he purchased it.

Q. All right. And then you mentioned Joel someone?

A. Yes.

Q. Right?

(Reporter admonishment.)

Q. Was Prasanna a doctor?

A. No, not that I'm aware of.

Q. What about Joel?

A. Yes.

Q. All right. What about the ownership of Mission? Do you know anything about who owned Mission?

A. I don't.

Q. All right. You mentioned a company called Alternate Health Labs. Right?

A. Correct.

Q. Why don't you just tell me a little bit about what that company did.

A. They processed laboratory specimens.

Q. So they were a separate independent lab,

12 (Pages 42 to 45)

Page 58

Q. And you're not aware whether Community Memorial was able to run any laboratory tests one way or the other. Right?

A. I don't know.

Q. You're not even aware whether they had a laboratory. Right?

A. Yeah, I -- I don't know.

Q. So at no point in time while you were working at Integrity did you ever learn that, for example, Newman Memorial had run a lab test. Right?

A. I have no idea.

Q. Okay. But no one ever told you, "hey, Newman -- Newman is running lab tests." Right?

A. I don't remember.

Q. This may seem obvious, but I just want to cover a couple of questions anyway. You're not aware one way or the other whether Newman could test any blood. Right?

A. I do not know.

Q. And the same would be true with respect to urine and any other patient specimens. Right?

A. Correct. I don't know.

Q. Same answer with respect to Community. Right?

A. Correct.

Page 59

Q. All right. Do you know whether at any time Integrity ever filled out and submitted claims to insurance companies on behalf of Newman Memorial Hospital?

A. I believe so.

Q. And what is that belief based on?

A. Newman paid Integrity for billing services so...

Q. So it's just your assumption that Integrity would have submitted claims on behalf of Newman. Right?

A. Correct.

Q. Are you aware of whether Integrity ever submitted claims to insurance companies on behalf of Community Memorial hospital. Right?

A. I believe so.

Q. From a simple standpoint, what was your understanding of what it means for Integrity to submit a claim to an insurance company on behalf of Newman Memorial Hospital, for example?

A. Would -- what do you mean by that?

Q. Well, what would Integrity do? Would it fill the claim out?

A. I guess so. I never billed before. I don't know exactly what they did.

Page 60

Q. All right. So who was the person --

MR. MARKHAM: Let her finish. You don't know exactly what? You were saying you don't know exactly what -- I think he voiced over it.

A. What they did, because I never did billing before.

Q. So who would be the person who would know about the billing services that Integrity provided to Newman or Community?

A. Anybody in billing, I assume.

Q. Yeah, but someone was running the company. Right?

A. Yes.

Q. And it was a billing company?

A. Correct.

Q. And it had -- Integrity had pretty significant contracts with Newman and Community. Right?

A. Yes.

Q. It was paid substantial sums for its billing services. Right?

A. Correct.

Q. And it also collected large amounts from those hospitals on behalf of Sun Clinical Labs and

Page 61

Mission. Right?

A. Yes.

Q. You invoiced --

A. Correct.

Q. -- Newman for pretty big amounts for those labs. Right?

A. Correct.

Q. So all of that work -- sorry. Stepping back.

The work that Integrity would bill to Newman for its billing services, I'm wondering who at Integrity we could ask questions about how the billing services work? Who would that be directed to?

A. Dr. Murphy, Jesse Saucedo. Maybe Lynn Murphy.

Q. All right. As far as you're aware, they were the ones responsible for running that part of that business?

A. Correct.

Q. Do you have any knowledge about when Integrity started submitting claims to insurance companies on behalf of Newman Memorial Hospital?

A. No, I don't remember the dates.

Q. Did it start in 2016?

16 (Pages 58 to 61)

Page 66

A. Yes.

Q. Who is that person?

A. I can't remember what his first name is. Maybe Bruce.

Q. All right. Do you remember what that person's role was?

A. No.

Q. What about the next email address, scaryer@cmhosp.com. Do you know who that person is?

A. I don't remember what their first name was.

Q. All right. Do you have any idea why you'd be sending an invoice for services to these two individuals?

A. That's where Dr. Murphy told me to send them to.

Q. All right. So Dr. Murphy directed basically your invoicing activity?

A. Yes.

Q. Why don't we flip to the first attachment.

MR. MARKHAM: That's 78513?

MR. BORNSTEIN: Yeah.

Q. Ms. Pricer, we're looking at the document that has the identifying code LD0078513 on the bottom right corner. Right?

Page 67

A. Yes.

Q. This is a wire worksheet/invoice that you sent to Community Memorial Hospital. Right?

A. Yes.

Q. And let's just walk through what the different lines mean. Okay?

A. Sure.

Q. So the top line says gross amount, and it lists an amount of $1,108,863.27. Right?

A. Correct.

Q. What does "gross amount" refer to?

A. That would be the gross amount of payments that the hospital received from the insurance companies for payments.

Q. All right. And that would be the gross amount that the hospital received from insurance companies on payments on claims that Integrity submitted. Right?

A. Yes, you're correct.

Q. All right. If you go down to expenses, it says 5 percent billing. Right?

A. Correct.

Q. What does it mean, 5 percent billing? What does that refer to?

A. The billing fee that they would pay to

Page 68

Integrity for the billing services.

Q. All right. How did you come to understand that there was a 5 percent billing fee owed to Integrity?

A. Based upon the executed contract that we received.

Q. All right. So there was a contract that set forth the 5 percent rate. Right?

A. I believe so.

Q. Do you know who executed that contract on behalf of Integrity?

A. I don't remember.

Q. Would it have been Dr. Murphy who would have had the authority to enter into that contract?

MR. MARKHAM: Objection; calls for speculation.

A. I don't remember who signed that contract.

Q. All right. But either way, you were aware that Integrity had entered into a contract with Community, wherein Integrity would be paid 5 percent of the proceeds that Community received in connection with the claims Integrity billed to insurers. Right?

A. Correct.

Q. All right. And that 5 percent amount reflected here is $55,443 -- strike that.

Page 69

The amount is $55,443.16. Right?

A. Correct.

Q. Approximately how much -- how many weeks' worth of billing does that reflect a fee for?

A. I have no idea.

Q. Does it make sense that it'd be about a week?

A. To be honest, I don't know. My understanding is the 5 percent billing was based upon the gross amount --

Q. All right.

A. -- that was collected.

Q. Okay. So the more -- the more claims Integrity could submit to insurance companies that got paid to the hospital, the more money Integrity was owed. Right?

A. Not necessarily.

Q. All right. All right. Well, the 5 percent amount was tied to the gross amount that was paid by insurance companies to the hospital. Right?

A. Correct.

Q. And Integrity did all the billing to the insurance companies on behalf of the hospital. Right?

TSG Reporting - Worldwide 877-702-9580

APP 115

Page 70

A. As far as I'm aware.

Q. All right. Integrity wouldn't get paid -- if the insurance companies didn't pay the claims, Integrity wouldn't get paid any money. Right?

A. Correct.

Q. All right. So the more money that an insurance company paid on claims Integrity submitted to the hospitals, the more money Integrity was due. Right?

A. Sure.

Q. Well, that's how percentages work. Right?

A. Yeah.

Q. Okay. So there is incentive for Integrity to successfully bill claims that insurance companies paid. Right?

A. I guess.

Q. There is a line called "gross minus expenses." Do you see that?

A. Yes.

Q. What does that refer to?

A. It looks like reagents or any other expenses.

Q. Well, there is a $1,053,000 line item --

A. Uh-huh.

Q. -- for gross minus expenses. Do you have

Page 71

an understanding of what that amount means?

A. I don't have a calculator, but I'm assuming it's the gross amount of 1.1 million less the 5 percent billing fee.

Q. That makes sense. Then you mentioned there was a reagents expenses line for $20,777.08. Right?

A. Correct.

Q. What does that amount reflect?

A. I'm trying to remember. I believe Community would submit vendor invoices where they bought reagents, and we would reimburse them for those.

Q. What are reagents?

A. What the labs need to process specimens.

Q. All right. And then there is a 60 percent number below those two lines. Do you see that?

A. Uh-huh.

Q. And aside -- across from the 60 percent number is the number $619,585.82. Right?

A. Yes.

Q. What does the 60 percent reflect?

A. 60 percent of the 1,032,643.03.

Q. Okay. So why would you put the 60 -- why would you calculate a 60 percent number in this

Page 72

invoice?

A. I believe, based upon executed contracts, that's what was agreed upon.

Q. All right. So you're generally aware that there was some executed contracts between somebody and the hospital. Right?

A. Correct.

Q. Do you know who?

A. No, I don't remember who signed them.

Q. Okay. What -- just what -- and what was the 60 percent -- 60 percent of what?

A. It was my understanding the 60 percent is the amount that the labs would get after expenses. That gross collections minus all the expenses. The labs would receive 60 percent and then the hospital would have 40 percent.

Q. All right. So insurance companies would make payments on claims to hospitals. Right?

A. Correct.

Q. And those hospitals included Community and Newman. Right?

A. Correct. Uh-huh.

Q. And then on the backend, Community and Newman would split those fees with Sun and Mission Labs. Right?

Page 73

A. Yes.

Q. Down below there is a line that says "Amount to Sun." Right?

A. Yes.

Q. And there is an "Amount to Mission." Right?

A. Yes.

Q. Those numbers are different. Right?

A. Yes.

Q. Why?

A. Without seeing the actual report that goes with this, the EOB reports that we would create based upon the remittances and payments that they would send to us that they received, the hospitals received --

Q. Uh-huh.

A. -- we would -- after putting it in the spreadsheet, we would then see which payments were on Sun patients and which payments were on Mission payments, and it would be split accordingly.

Q. All right. So the $87,000 is a payment that would be for Sun patients. Right?

A. Correct.

Q. And when you say "patients," does that mean -- are you referring to patient specimens that

Page 74

were sent to Sun?

A. Yes, I believe so.

Q. All right. And when you say "Mission payments," are you referring to -- these would be payments for tests run on specimens of patients who were sent to Mission labs?

MR. MARKHAM: I objected to this before. Lack of foundation completely.

A. I believe so.

Q. All right. So what's your understanding as to -- so if you look back to the 60 percent number, $619,585.82.

A. Uh-huh.

Q. And then also referring to the two specific amounts to the two different labs.

A. Uh-huh.

Q. What's your understanding of what service Sun and Mission were providing that the hospital was paying them for?

A. I'm guess- --

MR. MARKHAM: Objection; lack of foundation.

A. -- I'm guessing laboratory services.

Q. All right. Well, you're the one that did these invoices. Right?

Page 75

A. Correct.

Q. So you probably had some understanding of what you were billing the hospitals for. Right?

A. Uh-huh.

Q. And I'm just trying to get kind of a sense of what your understanding was.

MR. MARKHAM: Well, she just answered the question.

MR. BORNSTEIN: Okay. I can ask it a couple different ways and then we can move on.

Q. So if you wouldn't mind just explaining to me again, and then we'll move on, what's your understanding of what Sun and Mission were doing that entitled them to 60 percent of the total claim amounts paid to the hospitals?

MR. MARKHAM: Objection; lack of foundation.

A. Laboratory services, I'm guessing. It's been quite a while. I don't remember.

Q. At the bottom, there is a line called, "Total amount wired." Right?

A. Yes.

Q. And it states that the total amount is to be the sum of the amounts owed to the labs plus the

Page 76

amount owed to Integrity. Right?

A. Correct.

Q. Where was that amount to be wired to?

A. To the different entities.

Q. Okay. So the 675,000 wouldn't be wired to one entity. Right?

A. No.

Q. It was your expectation that the hospital would wire the Sun amount to Sun. Right?

A. Correct.

Q. And it would wire the Mission amount to Mission. Right?

A. Correct.

Q. Those would be bank accounts that those labs owned. Right?

A. Correct.

Q. And then the 55,000 would be an amount wired to Integrity's bank account. Right?

A. Correct.

Q. And when you would submit these invoices, did the hospitals generally wire the amounts invoiced in response?

A. From what I remember, yes, I believe so.

Q. So it's fair to say that you played a role in causing the hospitals to transfer these amounts to

Page 77

Sun, Mission, and Integrity. Right?

A. I just submitted the invoices to them.

Q. I understand.

Why don't you flip real quick past the second attachment to the third attachment with the -- with the label LD0078515.

A. Okay.

Q. This is another attachment to the email you sent. Right?

A. Yes.

Q. And on the -- this is an invoice to Community Memorial Hospital from Mission Toxicology, LLC. Right?

A. Correct.

Q. This is an invoice you created. Right?

A. Correct.

Q. That's your email listed there under "Mission." Right?

A. Correct.

Q. Were you working for Mission at this time?

A. No.

Q. Okay. So I'm just trying to figure out. Earlier, you said Mission had their own finance people.

A. Correct.

20 (Pages 74 to 77)

Page 78

Q. So why were you invoicing Community on behalf of Mission?

A. That's what I was directed to do.

Q. By whom?

A. Dr. Murphy and Jesse Saucedo.

Q. All right. Did you ever wonder why you were -- I mean, I'm just trying to figure out did you ever wonder why you were billing on behalf of Mission if you didn't work for them?

A. I -- I don't remember --

Q. Okay. Did it --

A. -- ever wondering that.

Q. Did it seem kind of strange to you at all or not?

A. I don't remember.

Q. All right. Well, I mean, these were separate companies. Right?

A. Correct.

Q. Mission was on the other side of town from Sun. Right?

A. I'm assuming so.

Q. Did you ever go to Mission Labs or Sun Labs?

A. No.

Q. All right. Were you aware of any

Page 79

agreement between Integrity to do billing on behalf of Mission to hospitals?

A. There might have been one. I don't remember 100 percent.

Q. All right. So you kind of just did what you were told to do --

A. Yes.

Q. -- basically?

All right. Did Dr. Murphy or Mr. Saucedo ever instruct -- explain to you why they were asking you to invoice hospitals on behalf of Mission?

A. It was based upon the contracts that they had.

Q. So they wanted you to help them invoice the hospitals for the amounts the hospitals owed to their companies, Sun and Mission. Right?

A. Correct.

Q. And you agreed to do that. Right?

A. Yes.

Q. In the description part of this invoice, it says, "EOB Batch 2.15.17."

Do you see that?

A. Yes.

Q. And then there is an amount for $532,000 and some change. Right?

Page 80

A. Yes.

Q. What is an "EOB Batch"?

A. That is a batch that we created based upon the payments that Community sent us copies of payments that Community would send to Integrity so we would compile them into batches to make it easier and we would just put a date that we received the batch.

THE WITNESS: Excuse me.

MR. BORNSTEIN: No problem.

Q. Do you know what an EOB is?

A. An explanation of benefits.

Q. All right. And what is that -- what information is contained in an EOB that would allow you to generate that amount number?

A. I believe it was the amount that the insurance paid the hospital.

Q. And how would you -- I mean, how would you just calculate that off an EOB?

A. I -- I didn't -- I believe there is a part on an EOB that says "this amount was paid by the insurance."

Q. All right. This invoice contains the logo of Mission Toxicology. Right?

A. Yes.

Q. Did you put that logo on the invoice?

Page 81

A. Yes.

Q. All right. Was it just like a -- like a -- like a little image that you would stick on the invoice or was there like a preset form that you would use for Mission invoices?

A. It was a form.

Q. Okay. Do you mind flipping real quick to the next document. That would be 0078516.

A. Okay.

Q. This is the last attachment to the email you sent to Community Memorial Hospital. Right?

A. Okay.

Q. And this is a -- a corresponding invoice on behalf of Sun Clinical. Right?

A. Correct.

Q. And the testimony that you just gave about why you submitted invoices and how you calculated the amounts, that would apply to this type of invoice as well. Right?

A. Correct.

Q. And these are the type of invoices you would send to Community on a regular basis. Right?

A. Correct.

Q. All right. So it's fair to say that if -- if we've got records of these -- I don't want to

21 (Pages 78 to 81)

Page 82

belabor it anymore, but if we have records of these types of invoices the testimony you gave about these two would apply to the other ones as well. Right?

A. Correct.

MR. BORNSTEIN: All right. I think we can take a break.

MR. MARKHAM: Okay.

THE VIDEOGRAPHER: Off the record, 11:29.

(Break.)

THE VIDEOGRAPHER: This is Segment No. 2, back on the record.

Q. Do you mind just reminding me what was your education and training with respect to finance/accounting?

A. I received my bachelor's degree from Tarleton State University in accounting. Bachelors in accounting. Sorry.

Q. Anything else?

A. Work experience.

Q. All right. Any other certifications or anything like that?

A. Huh-uh.

Q. So, basically, everything you learned about financing and invoicing and bookkeeping and

Page 83

otherwise tracking the money of the different entities you worked with came through work experience?

A. Or school, yes.

Q. All right. In your work for Integrity or Sun or any other company, were you aware of whether Sun had any physician investors?

A. Yes.

Q. What -- what did you understand with respect to Sun's physician investors?

A. They were part of the series LLCs that were set up.

Q. What's a "series LLC"?

A. I don't know the correct definition of that. My understanding, it's a LLC that's set up with a series of investors that would purchase shares.

Q. Do you know what they would purchase shares in?

A. Yeah. You clarify.

Q. Yeah. What -- what did the physicians invest in? Did they invest in Sun Clinical Labs?

A. I don't know.

Q. Okay. Are you aware of whether physicians were offered the opportunity to invest in Sun?

Page 84

A. I don't know what they were offered.

Q. Okay. Are you aware of whether physicians did invest in Sun?

A. Yes.

Q. How do you know that?

A. The legal documents that I received.

Q. What documents are those?

A. The -- I don't know the exact terminology of all of the documents, but each series had -- they had agreements and then they had the -- the signature pages where they signed agreeing to it. I -- like I said, there was -- it was a packet, but I don't remember the terminology for all of the different documents that they signed.

Q. So there were physicians who were investors in different series. Right?

A. Correct.

Q. Do you remember how many series there were?

A. No.

Q. Was it more than ten?

A. I don't remember the exact number.

Q. Okay. And each series was comprised of physicians. Right?

A. Part of it, yes.

Page 85

Q. All right. What part?

A. The A shares.

Q. Okay. So each series had A shares. Right?

A. Correct.

Q. And each -- and the owners of the A shares were physicians. Right?

A. Some of them, yes.

Q. Okay. Were some of them owners of physician practices?

A. I'm not 100 -- I -- I don't know for sure.

Q. All right. What did you understand -- how did you understand which physicians were allowed to become part of a specific A share?

A. I don't know that.

Q. Did the physician investors get payments?

A. Yes.

Q. Who did they get payments from?

A. The series LLC that they invested in.

Q. All right. How frequently were they paid?

A. Once a month.

Q. Did you have any role in making those payments?

A. Yes.

Q. What was your role?

22 (Pages 82 to 85)

Page 86

A. To cut the checks.

Q. Okay. Did you calculate the amounts?

A. Yes.

Q. Did you do anything else?

A. Created reports.

Q. Okay. Why were payments due to physicians who were invested in series entities?

A. They received a percentage of whatever revenue was received for that particular series.

Q. All right. So why don't we break that down a little bit. When you say "revenue received for that particular series," are you referring to revenue than Sun received in connection with testing that was billed for services that were ordered by the physicians in the group?

A. Can you say that again?

Q. Sure.

A. That was a lot.

Q. Well, you said the revenue was for --

MR. MARKHAM: She didn't say what the revenue was for. She said the payments were for the revenue.

MR. BORNSTEIN: Okay. Thank you.

Q. You said the payments to the physician investors were for revenue associated with that

Page 87

series. Right?

A. Percentage. Correct.

Q. All right. So what do you mean by the revenue associated with that series?

A. So it was my understanding the way the series was set up, it had various different physicians that would submit samples to the lab. And they were associated with the series and so any revenue received from any of those physicians went into that series. And then based upon their -- the number of shares that they purchased in that series, we turned that into a percentage and that's the amount that they would receive in a distribution.

Q. All right. So the funds that were -- the distributions that were made to the physician investors in the series were funds that Sun acquired in connection with specimens that the physicians sent to Sun. Right?

MR. MARKHAM: Objection; lack of foundation.

A. Can you say that one more time?

Q. Yeah. So the physician --

A. Your question is really long.

Q. Would they order testing from Sun?

A. Yes.

Page 88

Q. Would they have sent a specimen to Sun to be tested?

A. Yes.

Q. And then the specimen they sent to Sun would be tested. Right?

A. Yes.

Q. And would be billed to an insurance company. Right?

A. Yes.

Q. Insurance company would make a payment that would end up at Sun. Right?

A. Yes.

Q. And then that amount would be distributed to the physician investors who had sent in the specimens in the orders. Right?

A. Yes.

MR. MARKHAM: Objection. That conflicts with her -- objection; asked and answered.

Q. Is that consistent with your understanding?

A. Yes.

Q. So if the physicians sent more specimens and ordered more tests that were paid, they could make more money from the series. Right?

Page 89

A. I don't know the answer to that.

Q. Well, you said that they were -- they were paid a percentage of the funds that came into the series that related to the business they ordered from Sun. Right?

MR. MARKHAM: Objection; that's not what she said. Objection; mischaracterizes her testimony.

Q. If you want to clarify, you can. But that's how I understood what you were testifying to.

A. Can you say that again?

Q. Physician investor would send a specimen to Sun. Right?

A. Correct.

Q. That physician would order Sun to perform the testing on the specimen. Right?

A. Correct.

Q. A claim for the testing would be paid. Right?

A. Sometimes, yes.

Q. If it were paid, the amount that was paid would accrue to the benefit of Sun. Right?

A. Correct.

Q. Then Sun would make a percentage of that amount available to the physician who sent in the

23 (Pages 86 to 89)

Page 90

specimen and the order.  Right?

A.  To any of the investors in that particular series.

Q.  Got it.  So maybe we can just talk about the more that the group of physicians sent in and ordered that was paid, the greater amount that could be distributed back to them.  Right?

MR. MARKHAM:  Objection.

Her answer to that was "I don't know."

A.  I don't know.

Q.  You just said that they were paid a percentage.  Right?

A.  They were paid a percentage of the revenue that was received for that particular series LLC.

Q.  Okay.  So all I'm asking you is if the revenue that was received for that particular series went up, the group would be paid more money.  Right?

A.  Correct.

Q.  So if the group referred more specimens and more testing to Sun on which payments were made, they could receive more money.  Right?

MR. MARKHAM:  Objection; asked and answered.

A.  I don't know.

Page 91

Q.  Well, is there any -- okay.

What led to the amount of revenue that was attributed to a series?  What factors caused that amount to go up or go down?

A.  I'm not 100 percent sure what the -- the billing criteria is on that --

Q.  I'm not talking about billing.

A.  But --

Q.  Is one of the factors that could affect the amount that would accrue to the series whether claims were paid?

A.  Yes.

Q.  So if more claims were paid, more money would accrue to the series.  Right?

A.  Yes.

Q.  If -- is one of the factors that could affect how much money was attributed to the series the number of samples that were sent in for testing?

MR. MARKHAM:  Objection; fourth time it's been asked and answered.

MR. BORNSTEIN:  It hasn't been.  Just state --

MR. MARKHAM:  I just said asked and answered.  That's all I said.

MR. BORNSTEIN:  Okay.  But I

Page 92

haven't asked the question this way.  I'm trying to get through this so I can go on a different subject.

A.  Would you mind repeating that?

Q.  Okay.  Say the group sends in one specimen to Sun.  Right?

A.  Yes.

Q.  Sun tests the specimen.  Right?

A.  Uh-huh.

Q.  That claim for the testing is billed to an insurer.  Right?

A.  Correct.

Q.  The amount that the insurer pays is the amount that's attributable to that group.  Right?

A.  Yes.

Q.  Okay.  Now, say that same group sends in 100 specimens.  Right?

A.  Okay.

Q.  Sun tests those specimens.  Right?

A.  Okay.

Q.  Claims for all of the specimens are submitted to insurance companies.  Right?

A.  Okay.

Q.  And all of them are paid.  Right?

A.  Okay.

Page 93

Q.  Those physician investors get more money in that scenario.  Right?

MR. MARKHAM:  Objection; asked and answered.

A.  It depends on how much the specimen is paid.  I'm not --

Q.  Well, I'm asking you --

A.  -- sure --

MR. MARKHAM:  She's not finished her answer.  I know what you want to try to get.  It's very clear to everybody at the table.  Let her finish her answers.

Q.  I'm sorry for cutting you off.

A.  That's okay.

Q.  I thought you were finished.

Is there --

MR. MARKHAM:  Could you read back her answer so she could pick up where she left off?

(The requested material was read.)

Q.  So let's try again and then we can move on.

A.  Okay.

Q.  I gave you one example where the group would send in one specimen.  Right?

24 (Pages 90 to 93)

Page 94

A. Yes.

Q. And we assumed that that specimen was paid. Right?

A. Yes.

Q. And that would result in a certain amount of revenue being available to the physicians who sent in that specimen. Right?

A. Yes.

Q. And I asked you about a different scenario where instead of sending in one specimen, the physicians would send in 100 specimens. Right?

A. Uh-huh.

Q. Assume that payment was made on all those specimens.

A. Okay.

Q. In that scenario, would more money be due to the physicians who sent in those specimens?

MR. MARKHAM: Objection; asked and answered.

A. I guess.

Q. Is there any circumstances in which the answer would be no?

A. I mean, I guess you can assume that. I don't want to assume, though.

Q. You were the one who was calculating all

Page 95

these payments. Right?

A. Correct.

Q. And you would see payments flush way up and down. Right?

A. Uh-huh.

Q. What would determine whether the payments were higher or lower at any given time?

A. However much the insurance paid on the claim that was billed.

Q. So maybe instead of talking about the number of specimens, we should talk about the value of testing that was ordered.

A. Okay.

Q. Is it your testimony that if the value of testing that was ordered and paid was higher, the payments to the physicians would be higher?

MR. MARKHAM: Objection; asked and answered.

A. I don't know. Possibly.

Q. Okay. Well, you just talked about the amount that the insurer might pay on the claims. Right?

A. Right.

Q. That's about what the claims were worth. Right?

Page 96

A. What the insurance agreed to pay.

Q. Okay. So if the claims get paid at a higher rate, more money is available to the investors who sent the claim in. Right?

A. I guess so. Sure.

Q. Do you know why Sun set up the series investment structure?

A. I have no idea.

Q. Did the physicians who were Series A investors send specimens and orders for testing to Sun?

A. Yes.

Q. Why?

MR. MARKHAM: Objection; lack of foundation.

A. I don't know.

Q. Do you have any knowledge of whether the investment structure contributed to their decision to send specimens or testing to Sun?

MR. MARKHAM: Same objection.

A. I don't know.

Q. There were Series A investors in Sun during 2016-2017. Right?

A. Correct.

Q. At some point that structure was

Page 97

terminated. Right?

A. Yes.

Q. When was that?

A. I don't know.

Q. Did you terminate it?

A. I did not.

Q. Who did?

A. I do not remember who signed the letter, but a letter was sent out to all investors, saying that the series were going to be terminated.

Q. Do you know who made the decision to terminate the series?

A. Dr. Murphy and Jesse.

Q. Do you know why they decided to do that?

A. No.

Q. When payments would be made to the physician investors, would you make those payments?

A. I would cut the checks for them, yes.

Q. And what checks -- what accounts would you cut the checks from?

A. The series LLC accounts.

Q. So the series LLCs had separate bank accounts. Right?

A. Yes.

Q. How would money get into the series LLC

TSG Reporting - Worldwide  877-702-9580

APP 122

Page 98

bank accounts?

A. They would be transferred from the Sun Clinical account.

Q. All right. So insurance companies would make payments on claims. Right?

A. Yes.

Q. And those claims would be affiliated with orders of the Series A investor physicians. Right?

A. Uh-huh.

Q. Those payments would find their way into Sun's bank account. Right?

A. Correct.

Q. And then you would go in and distribute the money from Sun's bank account to the different series accounts. Right?

A. Yes.

Q. How would you figure out how much money to distribute from Sun's bank account to the different series accounts?

A. Based upon the reports I received when the payments came in that broke it down by patient, and they had identifiers for what series those specimens belonged to.

Q. Who would generate those reports?

A. I don't remember who generated those

Page 99

reports.

Q. Someone would send them to you?

A. I believe so, yes.

Q. And would those reports just direct you about how much money you should transfer from Sun to the series bank accounts?

A. They would just pretty much be a list of the specimens, like I said, that had an identifier for each of the series. I believe we then created a pivot table to make it easy to break them down by series and then the amounts.

And then that would be submitted to Dr. Murphy and Jesse to review, and then at that point they would approve the transfers.

Q. Why did transfers need to be approved?

A. Because Dr. Murphy and Jesse always approved the transfers.

Q. So what was the -- so are you saying that every transfer that was made from a series bank account to a licensed physician investor was approved by either Michael Murphy or Jesse Saucedo?

A. Yes.

Q. Would it have to be approved by both?

A. I don't remember it being -- having to be approved by both.

Page 100

Q. So one of them had the authority to approve?

A. Yes.

Q. Do you remember Mr. Saucedo approving any on his own?

A. I don't remember.

Q. Okay. Do you remember Mr. Murphy approving them on his own?

A. Yes.

Q. Did Mission have a similar series investor structure?

A. I don't know.

Q. Why was Mr. Saucedo involved in determining amounts to be paid from Sun series accounts to physician investors?

A. Because Jesse was a part owner of Sun and Clover Trail, and Clover Trail owned Sun.

Q. All right. So maybe I can just summarize and then we can move on to something else.

Sun offered physicians the opportunity to be investors in Sun. Right?

A. Yes.

MR. MARKHAM: Asked and answered.

Q. Dr. Murphy was involved in making those offers to physicians. Right?

Page 101

A. Yes, I believe so.

Q. And those offerings -- Sun and Dr. Murphy offered to make payment to those physicians that was a portion of the revenue those physicians' practices generated for Sun. Right?

MR. MARKHAM: Objection.

A. I don't know the conversations that they had.

Q. All right? Payments would be made directly to those physicians from series LLC accounts. Right?

A. If that is how they invested in their shares individually, then yes.

Q. Would it be via check?

A. Yes.

Q. Would it be via wire?

A. Not normally. From what I remember, I believe the series payments were checks.

Q. And the funds that were distributed to the physicians originated from Sun's bank account. Right?

A. From the LLC accounts.

Q. Right. And the money that went into the LLC accounts came from Sun Clinical Labs' bank account. Right?

26 (Pages 98 to 101)

Page 102

A. Yes.

Q. The payments to the physicians by the LLCs would be made -- would they be made overtly or covertly?

A. I don't know what you mean by that.

Q. Would they be made openly or in private?

A. I still don't know what you mean by that.

Q. That's fine.

They were made directly, though. Right?

A. They were sent to them directly, yes.

Q. And any physician who was an investor in a Series A had obviously accepted the offer to invest. Right?

A. Yes.

(Exhibit 61 was marked.)

MR. MARKHAM: 61?

THE WITNESS: Uh-huh. Yes.

Q. Ms. Pricer, I'm showing you what's been marked Exhibit 61.

A. Okay.

Q. Why don't you flip past the cover page to look at this document.

A. Okay.

Q. This is an email that someone named Chelsea Ramirez sent to a number of people, including

Page 103

Michael Murphy, Julie Pricer, that's you, Jesse Saucedo, and others on September 16th, 2015. Right?

A. Yes.

Q. And it attaches a file called "Sun Labs 9/11/15." Right?

A. Yes.

Q. Why don't we flip to that document. So late -- or September of 2015, was that around the time Sun was setting up the series investment structure?

A. I don't know when they started setting up the series structure.

Q. If you look at the attachment, there is a header called "Sun Labs" at the top. Right?

A. Yes.

Q. And it lists people who are present and absent. Right?

A. Yes.

Q. Do you recognize what this document is?

A. It looks like something that our -- a discussion during a meeting that we had.

Q. All right. And would this be like a record of -- what company would be having a meeting here?

A. I'm -- I don't know if it was under a

Page 104

particular company.

Q. Okay. Well, did -- there is a bunch of different people listed at the top. Right?

A. Yes.

Q. Why would these people meet?

A. Because Dr. Murphy asked everyone to meet.

Q. Okay. But why would -- what kind of meetings were these? Let me rephrase. Do you remember going to meetings with the type of -- with the people listed at the top in the "present" line?

A. Yes.

Q. Okay. What type of meetings would you go to? Why would -- why would everybody be meeting?

A. Because Dr. Murphy asked us to.

Q. For what reason?

A. To discuss what's going on in the companies.

Q. Okay. And would the meetings be sort of generally about all -- a bunch of different companies?

A. I don't remember them being about any companies in particular. They would be about just -- I guess just going over what's going on.

Q. Okay. Would the business of Sun and Mission and Integrity kind of treat it as one

Page 105

collective whole?

A. I wouldn't say they were treated as one whole.

Q. Well, why would --

A. They were all different entities.

Q. Right. What I'm trying to figure out is whether everybody distinguished between entities when they'd meet or whether the people who worked for the different entities would just meet together and talk about the lab business.

A. I don't remember.

Q. Well, you were at the meetings. Right?

A. Well -- yes.

Q. Okay. So --

MR. MARKHAM: The fact that she's --

Q. Let me just ask it this way.

The subjects of what you talked about weren't specific to one company or another. Right?

A. Not that I can remember.

Q. Okay. This talks about a discussion that was had at this meeting. Right?

A. Yes.

Q. And it lists a number of different -- if you look at the -- one line under the header

27 (Pages 102 to 105)

Page 106

"Discussion," it says, "Follow up on current and newly signed groups to Sun." Right?

A. Yes.

Q. Those group are physician practices that signed up as investors. Right?

A. Correct.

Q. So as we go down this list, these are all different groups of physicians who are Series A investors in Sun. Right?

A. Correct.

Q. And this is just an update on what was going on with those different groups. Right?

A. It looks like that, yes.

Q. All right. So, for example, one line starts with "Consultants in Pain 1 and 2."

Do you see that?

A. Correct.

MR. MARKHAM: Can you kind of tell us where that is on the page so we can follow.

MR. BORNSTEIN: Sure. It's like the fourth paragraph down.

MR. MARKHAM: Okay. Got it.

Q. This states, "Referrals have picked up from CPM." Right?

A. Yes.

Page 107

Q. That's referring to the fact that physicians in that group had been sending more referrals to Sun. Right?

A. That's what it looks like.

Q. And if you go down to the next one, there is a group called "Medcare." Right?

A. Yes.

Q. Do you remember what Medcare was?

A. Medcare was what we called one of the series that -- because I don't remember which series number they were.

Q. Okay.

A. But we called them the Medcare group.

Q. It's another group of physicians. Right?

A. Right.

Q. And this reflects that referrals were improving for Medcare as well. Right?

A. Yes.

Q. The physician investors in the Sun series were sending more referrals to Sun. Right?

A. I'm -- I guess that's what they mean by saying that.

Q. Okay. If you go down a little bit further past the "Headache + Pain-Referrals" section to the next paragraph that starts with "Nash."

Page 108

A. Okay.

Q. Do you know what Nash is?

A. Nash was a name that we called a series group.

Q. Another group of physicians. Right?

A. Sure.

Q. This states "Jesse has finalized the deal with Nash which consists of four doctors. We are expecting 600 to 700 urine drug screens from them as well as genetics." Right?

A. Yes.

Q. So at the time these deals were signed, there was some understanding of the volume of referrals that the doctors would be in a position to send to Sun. Right?

MR. MARKHAM: Objection. Her understanding or somebody else's?

MR. BORNSTEIN: Just state the objection.

MR. MARKHAM: Well vague.

MR. BORNSTEIN: Okay.

A. I'm sorry. Can you ask that again.

Q. Is it your understanding that what's being discussed with respect to Nash is that they had 600 to 700 screens available to refer to Sun at this

Page 109

time?

A. It looks like that's what they're saying they were expecting.

Q. All right. Will you flip over to the back page. Go all the way down to -- there is a section entitled, "Billing management office."

A. Okay.

Q. And if you go down to the fourth bullet.

A. Okay.

Q. It states, "Julie."

Is Julie you?

A. Yes.

Q. It says, "Julie will look into splitting sorting station expenses between Sun Lab and Mission Toxicology." Right?

A. Yes.

Q. What's a "sorting station"?

A. It was my understanding that is where some of the specimens were sent to.

Q. Where was that? Where was the sorting station?

A. On Northwest Military Highway. I don't remember the exact address.

Q. Was there another company located at that the address as well?

28 (Pages 106 to 109)

Page 110

A. I believe half of the -- or maybe not even half. Part of the facility was used by Sun and part was used by Mission. I don't remember.

Q. Did you ever visit it?

A. Yes.

Q. What's -- what does a sorting station look like?

A. It just looks like a regular office space that you would walk into and there were different offices --

Q. Okay. Is it --

A. -- or rooms.

Q. Were there specimens sent to the sorting station?

MR. MARKHAM: Objection; lack of foundation.

A. Yes.

Q. Is it --

A. When I was there, I did see specimens at that location.

Q. So do you have any understanding of what would happen to a specimen when it arrived at the sorting station?

A. No, I don't.

Q. In addition to having investor-type

Page 111

relationships with physicians, some had arrangements and agreements with marketers during 2016 and 2017. Right?

A. Correct.

Q. And Mission also had arrangements with marketers. Right?

A. I don't know what Mission did.

Q. Okay. You're aware that Sun had arrangements with marketers. Right?

A. Yes.

Q. How do you know that?

A. Because they executed agreements that we would receive.

Q. And did you have possession or access to those agreements?

A. Yes, I seen them.

Q. All right. So you've read them or reviewed them?

A. I've reviewed them.

Q. Do you have a general understanding of what the nature of the arrangements were?

A. Yes.

Q. So there were contracts -- they were essentially contracts, right, between Sun and a marketer?

Page 112

A. Yes.

Q. And one party to the contract would be a marketer. Right?

A. Uh-huh.

Q. And the other party would be who, Sun Clinical Labs?

A. Yes.

Q. What did you understand a marketer to be?

A. Somebody who would go out there and sell something.

Q. Okay. But the type of people who Sun was contracted with, what did you understand they were supposed to be doing?

A. Contracting with offices possibly.

Q. Offices of?

A. Physician offices.

Q. Okay. So the marketers were supposed to be entering into separate contracts with physician offices. Right?

A. I don't know what they did.

Q. That's fine. I'm just covering your understanding.

A. Okay.

Q. So you said you expected them to at least have arrangements with physician offices. Right?

Page 113

A. I guess they did.

Q. Okay. And what's that based on?

A. The agreement that they signed.

Q. Can you be more specific? Just -- what I'm trying to figure out is, you know, what you know about it and how you know it.

A. Can you ask the question again. I'm sorry.

Q. Yeah. I mean, just -- why don't you just tell me what you knew about the types of relationships marketers would have with physicians.

A. I don't know the relationships they would have with them. The marketing agreements -- my understanding was that they would get a percentage of whatever offices they signed up to send their specimens to our lab, our lab, Sun Lab.

Q. Okay. So Sun retained marketers because it wanted physicians to send specimens to Sun. Right?

A. Yes.

Q. And the marketers had relationships with physicians. Right?

A. I guess so.

Q. Well, the specimens had to come from somewhere. Right?

29 (Pages 110 to 113)

Page 114

A. Yes.

Q. Did -- who had the specimens? Did the -- the marketers have the specimens in their possession or did the physicians have the specimens in their possession?

A. I believe the physicians did.

Q. Okay. But the marketers had a way of accessing different specimens at different physicians?

A. I don't think they ever touched the specimens. I'm not 100 percent -- I don't know.

Q. I'm just trying to figure out why wouldn't Sun just deal with the physicians directly. I mean, what value did the marketers provide to Sun?

A. A bigger network.

Q. Okay. So, basically, the marketers had relationships with physicians. Right?

A. Sure.

Q. Well, is that your understanding?

A. Yes.

Q. And Sun would retain the marketers to -- so that the marketers would help convince physicians to send specimens to Sun. Right?

A. I don't know if they convinced them or not. I don't know that part of it.

Page 115

Q. Were the physicians that the marketers had relationships with capable of sending specimens to Sun?

A. I guess. I -- I don't know.

Q. Well, that's where the specimens came from. Right?

A. Yes.

Q. A lot of specimens came in to Sun through these marketer arrangements. Right?

A. Yes.

Q. Do you have an understanding of how many?

A. No.

Q. Was it a pretty big part of Sun's business to use marketers to generate referrals?

A. I guess. I don't remember the exact numbers on those.

Q. I know, but you paid out payments to these marketers for their work. Right?

A. Yes.

Q. You dealt with a lot of them, didn't you?

A. What do you mean by "dealt with"?

Q. A large number of marketers?

(Simultaneous speaking.)

MR. MARKHAM: "Dealt with."
Objection; vague.

Page 116

Q. Did you sent distribution report to marketers?

A. I did.

Q. Did you calculate the amounts that would be due to marketers?

A. I did.

Q. Do you have a general sense of the number of marketers that you were working with at any given time?

A. No.

Q. Was it more than five?

A. Yes.

Q. Was it more than ten?

A. I don't remember.

Q. Do you think it might be less than ten?

A. I honestly don't remember the number of them.

Q. Okay. You sent a lot of emails to marketers attaching distribution reports. Right?

A. Yes, I did.

Q. I don't want to put words in your mouth, but we looked at the documents. It looked like it was a big part of your job, wasn't it?

A. Any time any distribution was made, we did send reports. I can't remember the exact number of

Page 117

how many of those went out.

Q. Was it your job to calculate the amount of money that was due to a marketer?

A. Yes.

Q. Was it anybody else's job?

A. I had -- after I would create it, I would have Samantha review it and then after that I would send it to Dr. Murphy for him to review to make sure that we did everything correctly.

Q. So there was an approval process in place for generating a distribution?

A. Yes.

Q. And who ultimately signed off on the distribution?

A. Dr. Murphy.

Q. Did he sign off on every distribution?

A. Yes.

Q. So he was aware of the amount of money that Sun was paying to marketers. Right?

A. Yes.

Q. And he understood why Sun was paying the payments to marketers. Right?

A. Yes.

MR. MARKHAM: Objection; calls for speculation.

30 (Pages 114 to 117)

Page 118

Q. What was your understanding of what Sun was paying marketers for?

A. A percentage of the revenue received on the clinic -- so they would get a percentage of the revenue brought in under any of the -- the clinics they signed up.

Q. When you say "revenue," can you break that down a little bit for me? Revenue associated with what?

A. The billing of the lab samples.

Q. So the marketer would sign up a clinic to send in lab specimens or samples to Sun. Right?

A. Yes.

Q. And those specimens would come in accompanied with orders for testing. Right?

A. Uh-huh.

Q. And specimens that came in through the marketer arrangements, they came in to Sun. Right?

A. Yes.

Q. And each of them was accompanied by an order ordering Sun to do some testing on the specimen. Right?

A. Yes.

Q. So if we look at data, and there is a lot of it, about distributions being made to marketers by

Page 119

Sun, those distributions would be for specimens that were sent to Sun. Right?

A. Correct.

Q. And they would be for specimens that -- for which testing was ordered from Sun. Right?

A. The testing was ordered by the physicians, processed by Sun.

Q. What's the difference?

A. The physician has to order the testing and then the lab processes whatever they order.

Q. Okay. So versus like -- so the physicians would order a test. Right?

A. Uh-huh.

Q. And Sun would process that test?

A. Yes.

Q. And then you said that there were payments that were made out to the marketers in connection with the specimens and orders that came in to Sun. Right?

A. Yes.

Q. And we were going to talk about how those amounts were calculated and I think we got off topic. So those payments that were made were percentages of what?

A. The revenue received.

Page 120

Q. The revenue that Sun received?

A. Correct.

Q. For tests run on the specimens that the physicians sent to Sun. Right?

A. Correct.

Q. That was true with respect to every payment made to a marketer. Right?

A. I believe so.

Q. So the arrangements were sort of designed to incentivize marketers to generate more physician referrals for Sun. Is that fair?

A. I don't know.

Q. How would you figure out whether a marketer got credit for a specimen or a test run on a particular specimen? How would you attach the specimen -- connect the specimen to the marketer?

A. When they -- when the specimens came in, they had -- they obviously had what clinic they came from and that clinic was then tied to a marketer.

Q. All right. And how did you know which clinics were affiliated with which marketers?

A. We had a list.

Q. So each of the specimens that came in was obviously a specimen of a -- a patient of a physician. Right?

Page 121

A. Yes.

Q. Suffice it to say the more business that marketers generated for Sun from the physicians that they were affiliated with, the more money they could make. Right?

A. I don't know.

Q. Well, if they were paid a percentage of Sun's collections, if Sun collected more on the specimens that the marketers brought in, the marketers could make more money. Right?

A. Sure.

Q. If the claim was paid out at higher amounts on the specimens that the marketers brought in, the marketers could make more money. Right?

A. The marketers made a percentage off of whatever revenue came in so --

Q. Do you know whether the marketers would ever pass any of that along to the physician?

A. I have no idea.

Q. Do you know whether it would be appropriate for them to?

A. I have no idea.

Q. You don't know one way or the other?

A. I don't.

Q. Did anyone ever tell you that there was

31 (Pages 118 to 121)

Page 126

that came into and out of Integrity and Sun. Right?

A. Correct.

Q. That's a big responsibility. Right?

A. Yes.

Q. It was probably important to you to make sure that those companies were compliant with various laws and regulations. Right?

A. Correct.

Q. If you had questions about what laws might apply to the inflow and outflow of funds to those entities, who would you ask?

A. Dr. Murphy, and Lynn, and Jesse.

Q. So those three would sort of be authorities on that subject. Right?

A. Yes.

Q. And did you sort of rely on them to understand what was permissible and impermissible?

A. Yes.

Q. Did they ever direct you to take certain actions or refrain from taking others?

A. Yes. They told me how to do my job, what to do for my job.

Q. Did they ever state that certain actions were prohibited by certain laws and regulations that might apply to your job?

Page 127

MR. MARKHAM: Objection; partially asked and answered.

A. I don't know. I mean...

Q. I'm just -- because healthcare is so regulated, I'm wondering if anyone ever came to you and said, "We can make these types of payments, but we can't make these other types," that sort of thing. Did that conversation ever happen?

MR. MARKHAM: Objection; asked and answered.

A. That we could make payments based upon the amount of revenue that was received.

Q. Okay. That you could or that you couldn't?

A. That we could.

Q. Okay. And did anyone ever talk to you at all about patient cost-sharing obligations?

A. I don't know what that is.

Q. Do you know what a deductible is?

A. I know what a deductible is.

Q. What's a deductible?

A. It's the amount that a patient would pay for medical benefits received.

Q. Okay. You have an insurance policy probably. Right?

Page 128

A. Yes.

Q. Do you have, like, a home -- I don't know if you have a home policy, or a car policy, or a medical policy. Do you have any of those types of policies?

A. Yes.

Q. Is it consistent with your understanding that the deductible -- the deductible is pretty common in insurance companies. Right?

A. Yes.

Q. The deductible is an amount that the insured, the person who has the policy, has to pay out of pocket before their insurance benefits kick in. Right?

A. Correct. Yes.

Q. All right. So if someone has a deductible and has to pay their deductible, the insurance obligation to start paying hasn't been triggered. Right?

MR. MARKHAM: Objection.

A. Say that again.

MR. MARKHAM: It calls for legal conclusion and it varies from contract to contract.

Q. Okay. Generally -- generally your

Page 129

understanding is that -- let's just talk about within -- you understand that there were deductibles associated with healthcare claims. Right?

A. Yes.

Q. And there were deductibles associated with claims that Integrity would bill to insurance companies. Right?

A. I guess there were, yes.

Q. Well, you guys would get all the EOBs from the insurance company. Right?

A. Yes.

Q. And it would -- it would list all the deductible amounts associated with the claims. Right?

A. I did not review all of the EOBs.

Q. Okay. Did you understand that there was something called the deductible, though, that was sometimes associated with the healthcare claim?

A. Yes. I've seen that.

Q. All right. And was it your understanding that that amount was an amount that the patient was responsible for paying?

A. Yes.

Q. Okay. And it was an amount the patient was responsible for paying before their insurer

33 (Pages 126 to 129)

Page 130

started paying. Right?

MR. MARKHAM: Objection; calls for speculation.

A. Correct.

Q. That's your understanding, though. Right?

A. That -- yes.

Q. All right. What about coinsurance? Do you have any understanding of what coinsurance is?

A. Very vague. I don't really know.

Q. Did anyone at Integrity or Sun or Mission ever talk to you about whether patient deductibles and coinsurance amounts needed to be collected from the patients?

A. No.

Q. You were never apprised one way or another about whether it was important to collect or not collect those amounts?

A. What do you mean by that?

Q. Okay. Did Dr. Murphy ever talk to you about deductibles?

A. No.

Q. Did he ever talk to you about coinsurance?

A. No.

Q. Did Lynn Murphy or Jesse Saucedo ever talk to you about deductibles or coinsurance?

Page 131

A. No.

Q. Did Samantha Murphy ever talk to you about deductibles or coinsurance?

A. No.

Q. Okay. One thing that Integrity was responsible for doing that you told me earlier was doing collections of funds from patients sometimes. Right?

A. For the self-pay patients that did not have insurance.

Q. All right. That makes sense. I understand that.

Did anyone ever talk to you about collecting deductibles for coinsurance obligations from commercially insured patients?

A. No.

Q. It just wasn't a subject of conversation at the company?

A. No.

MR. MARKHAM: Objection. That calls for speculation. What was the company conversations.

MR. BORNSTEIN: You're right, John. "Occasionally" is a vague term that's used.

Page 132

MR. MARKHAM: Well, that's why I'm jumping in.

MR. BORNSTEIN: Fair enough.

Q. To your knowledge, you weren't privy to those conversations?

A. No.

Q. When kickback laws were discussed with you, were they ever discussed as they applied to patient deductibles and coinsurance amounts?

A. No.

Q. Sun would make payments to marketers, as we were talking about before. Right?

A. Correct.

Q. Those payments were the product of arrangements that the marketers had offered -- entered into with Sun. Right?

A. Yes.

Q. Well, Sun would make an offer to a marketer to enter into a certain arrangement. Right?

A. I don't know what their --

Q. Okay. Well, one -- either -- either Sun or the marketer would offer each other. Right?

A. I don't know what you mean by that.

Q. That's fine.

The -- basically Sun told marketers "if

Page 133

you can generate sufficient revenue for us from certain physician practices, we will pay you a certain percentage of that revenue." Right?

A. I don't know what their conversations were.

Q. I'm just -- is that your understanding of the terms of the relation -- the general nature of the terms of the relationship?

A. I understand that that's how the contracts were. I don't know their conversations.

Q. Okay. Sun would, pursuant to those arrangements, make payments to the marketers. Right?

A. I don't know.

Q. Well, you were the one that would come up with the distribution reports. Right?

A. Yes.

Q. And you said that Dr. Murphy would approve the distributions. Right?

A. He would review them and approve them.

Q. All right. And then at some point payments were made to the marketers. Right?

A. Correct.

Q. Which entity paid the marketers?

A. Sun Clinical Lab.

Q. Okay. So money in Sun's bank account

34 (Pages 130 to 133)

Page 134

would be sent to the marketers. Right?

A. Correct.

Q. In exchange for them generating revenue for Sun. Right?

A. Correct.

Q. Were you involved in making those payments from Sun's bank account to the marketers?

A. Yes.

Q. Okay. What would you do to cause those payments to be made?

A. I would either -- after they were approved for payment, they -- we would either send a wire or write a check.

Q. All right. So one way or another funds were transferred out of Sun's account to marketers. Right?

A. Yes.

Q. And those funds were actually originally supplied by insurance companies. Right?

A. Correct.

Q. Those payments would be made directly to the marketers. Right?

A. Correct.

Q. To bank accounts that they owned or checks written out in their name. Right?

Page 135

A. Correct.

Q. Were the marketers paid on generating blood and urine business or just one or the other?

A. I believe it was both.

Q. And both those types of specimens and orders for testing on those specimens were sent in to Sun. Right?

A. Correct.

MR. BORNSTEIN: Why don't we take a break, if that's okay.

THE VIDEOGRAPHER: We're going off the record, 12:42.

(Break.)

THE VIDEOGRAPHER: This is segment No. 3. We're back on the record, 1:42.

(Exhibit 62 was marked.)

Q. All right. Ms. Pricer, I've shown you a document that's marked LD0149781. Can you flip to the first page of the document, please.

A. Sure.

Q. If you look to kind of the bottom of this document, this is an email thread that starts between you and someone named Chuck Dugas. Right?

A. Yes.

Q. Who is Chuck?

Page 136

A. Chuck was one of the marketing people, marketer.

MR. MARKHAM: Did you say this was from Chuck to Julie?

MR. BORNSTEIN: It involves a thread from Chuck to Julie.

MR. MARKHAM: Okay.

Q. In Chuck's -- Chuck's signature block, it indicates that he's associated with something called "Network Toxicology."

Do you see that?

A. Yes. Uh-huh.

Q. Do you know what "Network Toxicology" is?

A. I believe that's his company.

Q. Okay. Was he a marketer?

A. Yes.

Q. And was Network Toxicology a marketing company?

A. I believe so.

Q. Is it your understanding that Chuck and Network Toxicology were doing marketing for Sun?

A. Yes.

Q. Okay. If you go to the very first email which is actually the last email on the thread.

A. Okay.

Page 137

Q. Chuck writes to you in February of 2017 and says, "Since the Sales portal is having issues, can you get me a collections report?" Right?

A. Yes.

Q. He's referring to the Sun sales portal?

A. I don't know which exact portal he's referring to.

Q. Okay. Were you aware of it? Was there a Sun sales portal? Do you know what he's talking about when he references a sales portal?

A. There was a sales portal, yes.

Q. Was it a Sun sales portal?

A. I don't remember.

Q. All right. At any rate, if you flip over to the first page again. What Mr. Dugas is asking for is a collections report. Right?

A. Yes.

Q. And then you write to him and you say, "Please see the attached report for collections." Right?

A. Yes. Uh-huh.

Q. At any rate, he writes back to someone named Aimee Huizar. That's the top thread in the chain. Right?

A. Yes.

35 (Pages 134 to 137)

Page 138

Q. Do you know who Aimee is?

A. Yes.

Q. Who is Aimee?

A. Aimee worked for Integrity Ancillary Management as well.

Q. What was her job?

A. I do remember she was one of the main contacts for onboarding the clinics.

Q. Okay. And when you refer to onboarding -- sorry -- onboarding the clinics, what are you referring to?

A. They had -- I don't know their exact process, but after the contracts were executed, the clinics would need to be signed up, for lack of better words, with the lab and so they went through an onboarding process where they had to fill out paperwork and I think she managed most of that.

Q. All right. So there is a difference between, like, clinics and, like, a marketing group. Right?

A. Yes, I believe so.

Q. When you're talking about clinics, you're talking about like a physician's practice?

A. Yes.

Q. And they would sign up with Sun. Right?

Page 139

A. Correct.

Q. Anyway, Chuck writes to Aimee, if you look at the first line of his email, "With the number of specimens that have been going through Sun, the attached report is extremely concerning."

Do you see that?

A. Yes.

Q. When he refers to the number of specimens that have been going through Sun, what's he talking about?

MR. MARKHAM: Objection; speculation.

A. I don't know for sure.

Q. Do you think he's referring to specimens that he's sending to Sun?

MR. MARKHAM: Objection. Same.

A. By reading that, you could probably assume that.

Q. All right. Now we can move to a different document.

MR. MARKHAM: Was there an attachment to this document?

MR. BORNSTEIN: I didn't have it attached to that document. I don't think there was, actually. I know one was referenced, but I

Page 140

don't -- I think that's how it was produced.

MR. MARKHAM: Okay.

MR. BORNSTEIN: Yeah.

(Exhibit 63 was marked.)

Q. I've handed you what's been marked Exhibit 3. I'm sorry, 63. This is an email from someone named Matt Walker to you. Right?

A. Correct.

Q. And it's written in October of 2016. Right?

A. Correct.

Q. Subject is "wiring instructions." Right?

A. Correct.

Q. And do you know who Matt Walker is?

A. I don't remember exactly who he was.

Q. He copies someone named Paul Stewart at sdrconsult.com. Do you know who Paul Stewart was?

A. I can't remember exactly. He was obviously associated with SDR Consulting, but I can't remember if he was the primary person for that account.

Q. What was SDR Consulting?

A. I believe that was one of the marketing companies, marketing groups.

Q. All right. So Matt says, "Julie, Morning.

Page 141

Attached is wiring information for" -- something redacted. I know we are weeks away -- sorry.

"I know we are a few weeks away from Sun remunerating for items sent this month."

Do you see that that?

A. Yes.

Q. What do you understand him to be referring to there?

MR. BORNSTEIN: Objection; speculation.

A. I honestly do not know.

Q. All right. Well, remunerating means paying. Right?

A. To be honest, I don't know.

Q. Remunerating -- do you know what remuneration -- have you ever heard the term "remuneration"?

A. No, not that I can --

Q. I'll represent that it means providing money.

A. Okay.

Q. When you received an email like this, that doesn't appear that he's referring to Sun sending money to SDR for items sent this month?

MR. MARKHAM: Objection;

36 (Pages 138 to 141)

Page 146

A. Yes.

Q. So an AllergyPro claim would be a claim for some sort of allergy test. Right?

A. Correct.

Q. And it would be a test that AllergyPro performed. Right?

A. Correct.

Q. Do you have any idea why -- and in this email Christian Calhoun is referring to Dr. Murphy authorizing funds to be released to SDR for AllergyPro claims. Right?

A. Yes.

Q. Do you have any idea why funds would be paid by Sun to a marketer regarding claims that Allergy -- I'm sorry -- testing that AllergyPro performed?

A. Can you say that one more time?

Q. Yeah. Why would Sun be paying a marketer for -- in connection with tests that a company named AllergyPro performed?

A. I don't know if Sun made that payment.

Q. All right. Well, when Christian Calhoun says "per Dr. Murphy's blessing, please release the funds," who would be releasing the funds?

A. Who as in which company?

Page 147

Q. Yeah.

A. Or who as in which person?

Q. Either one.

A. If I'm reading this correctly, "please release the funds to SDR for AllergyPro."

MR. MARKHAM: Objection; speculation.

A. AllergyPro would have paid that.

Q. All right. And when you look up to the top thread, this is your response to the message. It says "Yes I just received a text from Dr. Murphy about this." Right?

A. Correct.

Q. So at the time at least he had some understanding of what he was talking about?

A. Yes.

Q. And reading this today, your understanding is that Dr. Murphy was asking you to have AllergyPro make a payment to a marketer. Right?

A. Correct.

Q. Did you have access to AllergyPro's bank account?

A. Yes.

Q. How did you have that access? Why did you have that access?

Page 148

A. Because I did the bookkeeping for AllergyPro.

Q. Who owned AllergyPro?

A. To be honest, I don't remember who owned AllergyPro.

Q. Okay. Do you know who was generally responsible for running the business at AllergyPro?

A. Dr. Murphy.

Q. Was there anyone else?

A. There may have been. I don't remember.

Q. Do you know whether Jesse Saucedo was involved in AllergyPro or not?

A. I don't remember.

Q. So this sounds like what you're talking about is payments related to a specimen someone sent in for allergy testing. Right?

MR. MARKHAM: Objection; speculation.

A. Can you say that one more time?

Q. It sounds like you're talk -- I'll rephrase. It sounds like you're talking about making a payment to a marketer in connection with a payment that was made on a claim for allergy testing. Right?

A. Yes.

Q. And the testing would have been performed

Page 149

by AllergyPro. Right?

A. Yes.

Q. And it would have been ordered from AllergyPro. Right?

A. No.

Q. Who would it have been ordered from?

A. The physician does the orders for the testing.

Q. Okay. So a physician would have ordered the allergy testing. Right?

A. Correct.

Q. Which lab would the physician have ordered to run the allergy test?

MR. MARKHAM: Objection.

A. I do not know.

Q. Do you have any idea whether it would have been an order directed to Sun?

A. I don't know.

Q. Do you know whether it would have been an order directed to AllergyPro?

A. I don't know.

Q. The specimen would have been sent to AllergyPro for testing. Right?

MR. MARKHAM: Objection.

A. I don't know where those specimens were

38 (Pages 146 to 149)

Page 154

A. He is one of the marketers for Tomahawk Medical.

Q. Okay. Will you flip to -- and it attaches a distribution report. Right? You can look at it if you want.

A. Okay.

Q. You can even open it up and fold it out.

(Discussion off the written record.)

A. Okay.

Q. You don't need to look at the spreadsheet yet. That looks like a distribution report that you would send to marketers. Right?

A. Yeah.

Q. This is the type of document you would regularly create and send out. Right?

A. Yes.

Q. And would it show payments they were going to receive in connection with business they generated. Right?

A. Correct.

Q. If you flip back to the email, actually will you go to the back page of it, which was the message that started the thread?

A. Okay.

Q. On Friday, December 9th, 2016, Mr. Walker

Page 155

writes "Good morning, Julie. I'm reaching out concerning the most recent collections from mid-November for all Sun and AllergyPro business." Right?

A. Correct.

Q. What's he referring to there?

A. I guess the collections from that time period for any lab specimens that went through Sun or AllergyPro.

Q. When you say "went through," what do you mean?

A. That were submitted and processed by Sun and AllergyPro.

Q. If you go down to the second -- skip a paragraph and then go down one more to the paragraph starting with the word "based."

A. Okay.

Q. If you look at the last sentence in that paragraph, he states "we have received commissions on only three AP YTD on over 600-plus specimens received by AllergyPro." Do you see that?

A. Yes.

Q. So what he's upset about is that the commissions haven't been paid out on very many specimens that were sent to AllergyPro. Right?

Page 156

A. Correct.

Q. If you go down two more paragraphs, there's a -- the second sentence starts with "if." Do you see that?

A. Uh-huh.

Q. "If we can demonstrate a major collection uptick, we are confident folks will continue with Sun and AP." Does AP refer to AllergyPro?

MR. MARKHAM: Objection; speculation.

A. I'm assuming so, yes.

Q. What do you think he's referring to when he talks about folks continuing with Sun and AP?

A. I don't know.

Q. Is it possible he's referring to marketers continuing to generate business for Sun and AllergyPro?

MR. MARKHAM: Objection; speculation.

A. I don't know exactly what he meant there.

Q. Anyway, you attach a report to him. Right?

A. Uh-huh.

Q. And the report reflects distributions that he's entitled to in connection with specimens sent to

Page 157

either Sun or AllergyPro. Right?

A. Yes.

MR. MARKHAM: Objection.

Q. If you just look at the very first column on the left-hand side?

A. Okay.

Q. That column says "accession" at the top.

A. Correct.

Q. And if you look down, there's a bunch of different numbers. Right?

A. Uh-huh.

Q. They all start with S. Right?

A. Yes.

Q. "S" refers to Sun. Right?

A. Correct.

Q. Some of them start "SNB." Right?

A. Yes.

Q. Does that refer to Sun blood?

A. Yes.

Q. And then some of them are "SNT." Right?

A. Correct.

Q. And that refers to Sun toxicology?

A. Correct.

Q. So if a specimen has one of these accession numbers, it means it was sent to Sun.

Page 174

on, for example, the first claim to a lab?

A. Yes. What's in the payment column is what Newman or whoever got paid, paid the lab.

Q. I don't think that's exactly right and this is why. You tell me if you disagree. And correct me if I misunderstand -- if I misunderstand this. Okay?

A. Okay.

Q. The charge is the amount that's listed on the claim. Right?

A. That was billed to the insurance.

Q. Right?

A. Okay. Yes.

Q. Charge is the amount that's charged to the insurer for the service render. Right?

A. Yes.

Q. The payment is the amount that the insurer pays on the claim. Right?

A. No. So for our records, the payment is the amount that the -- the lab received from the hospital.

Q. Okay. So if you're looking at Line 1, this is a situation where United was billed for a claim and United paid the hospital. Right?

A. Uh-huh.

Page 175

Q. And then your testimony is that the hospital paid a certain amount to Sun?

A. Yes.

Q. And the amount that the hospital paid to Sun was part of the money that United had paid to Newman. Right?

A. Correct.

Q. They took a percentage of the money that United had paid Newman and -- and referred it back to Sun. Right?

A. Correct.

Q. All right. So United's money ended up in Sun's possession. Right?

MR. MARKHAM: Well --

A. It went to Newman and Newman paid the labs.

Q. Okay. When you say "labs," who are you referring to?

A. Sun Clinical Lab, Mission Toxicology Lab.

Q. Can you think of any others?

A. They paid the billing fee to Integrity.

Q. All right. And then what does the net amount reflect? If the 2,903 amount in the first column was the amount that Newman paid to Sun, what does the net amount reflect?

Page 176

A. The net --

MR. MARKHAM: Where do you see net amount?

MR. BORNSTEIN: It's the third column from the right.

MR. MARKHAM: It says "net." Not net amount.

MR. BORNSTEIN: There's an amount listed underneath.

MR. MARKHAM: I just want to make sure I wasn't looking at the wrong thing.

MR. BORNSTEIN: Yeah.

A. So the net is the payment that the lab received less the billing fee less the COGS. I don't have a calculator. We did all this in spreadsheet so...

MR. MARKHAM: He didn't ask you whether it was right, he just asked what it was.

THE WITNESS: Okay.

Q. Who bears the billing fee in the COGS? It was borne by the lab?

A. The billing fee is the billing fee to Integrity and the COGS is the cost that is -- for running the specimen. So the lab.

Q. Let's talk about the COGS column. You

Page 177

said it's the cost of running the specimen. Right?

A. Correct.

Q. The cost that what lab incurred in running the specimen?

A. Whichever lab processed the specimen.

Q. Which lab would process the specimens?

A. I'm not 100 percent sure. If I had to assume looking at this report, Sun.

Q. So it's your understanding that the cost on the first claim to Sun of running the lab was $160. Right?

A. Yes, that's what it says.

Q. And who paid Sun for that cost? Who was the cost charged to?

A. The -- the group Tomahawk.

Q. Any idea why the charge for a test would be thousands and thousands of dollars higher than the cost -- the cost to run it?

A. I don't know.

Q. Looking at the spreadsheet, can you tell which lab actually tested the specimens?

A. No.

Q. Do you have any understanding why tests would be billed to United through a hospital?

MR. MARKHAM: Objection; asked and

45 (Pages 174 to 177)

Page 186

Q. Was Sun in network with insurance companies?

A. I have no idea.

Q. You don't know one way or the other?

A. No. I honestly don't remember.

Q. Are you aware of any lab that you worked with or did billing for or did financials for that was in network with United?

MR. MARKHAM: Objection; calls for speculation.

A. I don't know what the contracts were on -- on that.

Q. Do you know what "in network" means?

A. That it's covered by the insurance company? To be honest, I don't know the correct terminology for that.

Q. Well, when she gave you this direction, "All insurances are to go to Integrity to be billed as in network," what do you understand her to be telling you to do?

A. She's not telling me to do anything.

Q. Okay. I mean, I'm just trying to figure out did the direction she gave you answer your question that you originally posed?

A. I guess so. I can't remember that far

Page 187

back.

Q. All right. These were the general practices of Integrity at the very end of 2015. Right?

A. It looks that way.

Q. All right. There are some exceptions, as you noted. Right?

A. Yes.

Q. It talks about UHC PPO, Humana PPO, self-pay, and work comp "go to Pacific Lab and are billed as out of network." Do you see that?

A. Yes.

Q. What does that mean?

A. It looks like those -- if a specimen came in with those insurances, they would be -- they would go to a different lab and be billed as out of network.

Q. All right. So who would look at the insurance that covered a specimen to determine how the specimen would be billed?

A. I don't know.

Q. Does it -- but it appears that the identity of the insurer played some role in how the claim was billed. Right?

A. It looks like that, yes.

Page 188

Q. It looks like the -- someone would look at which insurance company insured the specimen. Right?

A. Correct.

Q. And then based on the identity of the insurer, would decide whether to bill the claim in network or out of network. Right?

MR. MARKHAM: Objection.

MR. BORNSTEIN: Don't interrupt. Just wait until I'm done with my question.

Can you read my question back?

THE REPORTER: Yes.

(Requested material was read.)

MR. MARKHAM: Are you through with your question?

MR. BORNSTEIN: Yeah.

MR. MARKHAM: I thought you had. Objection; calls for speculation. Nothing on this email suggests that one way or the other. Calls for speculation.

Q. You can answer my question if you understood it.

A. Would you mind asking it again. Sorry.

Q. So does it appear to you that the identity of the -- every patient is insured by an insurance company. Right?

Page 189

A. Most patients.

Q. All right. Well, these -- we're talking about -- let me just start over.

Other than you, who else at Integrity would know how the identity of the insurance company who covered a patient would impact how a claim for that patient was billed?

A. I did not know that. I wasn't in billing.

Q. Right. Other than you. I'm asking who else would be able to testify on that topic.

A. On -- on -- can you ask, sorry, again. Who...

Q. Well, every time a patient came in to Sun to be tested there was an associated insurance company with that patient. Right?

A. Uh-huh.

Q. And that -- the identity of that insurance company may have impacted how the claim was billed. Right?

A. Correct.

Q. So who would I talk to at Integrity to understand how the identity of the insurance company impacted how the claim was billed?

A. Somebody in billing.

(Discussion off the written record.)

48 (Pages 186 to 189)

Page 190

(Exhibit 67 was marked.)

Q. Ms. Pricer, I'm showing you a document that's been marked Exhibit 67. Do you see that?

A. Yes.

Q. This is an email thread between -- on the bottom you and someone named Erin Gallagher. Right?

A. Yes.

Q. And then it continues to become a thread between you and someone named Jaylene Candelaria.

A. Yes.

Q. Who is Erin Gallagher?

A. Erin Gallagher is the vice president of Trifecta.

Q. What's Trifecta?

A. I believe it was a marketing group or marketing company.

Q. All right. The subject is "Andrew Clark, Dr. Alflatoon." Right?

A. Yes.

Q. Do you know who Dr. Alflatoon was?

A. No.

Q. Dr. Alflatoon was at least a doctor. Right?

A. Yes.

Q. Okay. The message from Erin says, "Julie,

Page 191

can you check where in the billing cycle Dr. Alflatoon's samples are." Do you see that?

A. Yes.

Q. What's she referring to there?

A. I guess what -- where -- where the billing cycle -- if they've been billed and/or paid.

Q. Okay. So these would be referring to samples Dr. Alflatoon sent to Sun. Right?

MR. MARKHAM: Objection; calls for speculation as to where they're sent.

A. Yeah, I don't know where they were sent to.

Q. Okay. Let's look at the next sentence. The next sentence says, "He did 150 tox tests through Sun." Do you see that?

A. Yes.

Q. So does that mean that these are samples that Dr. Alflatoon sent to Sun?

A. Yes, it looks that way.

Q. All right. For testing. Right?

A. Yes.

Q. And it says he's "anxious to see if there are payments through Integrity or if they are being billed through your new hospital." Do you see that?

A. Yes.

Page 192

Q. So this discusses the prospect that a sample sent to Sun, tested at Sun, would be billed through a different hospital. Right?

MR. MARKHAM: Objection; speculation.

A. I guess she's asking if payments came through. What was your question again?

Q. When she says "He did 150 tox tests through Sun and is anxious to see if there are payments through Integrity or if they are being billed through your new hospital" --

A. Uh-huh.

Q. -- what does she mean when she says "being billed through your new hospital"?

MR. MARKHAM: Speculation.

A. I don't know.

Q. Well, did you understand what she was saying when she wrote you this email?

MR. MARKHAM: Speculation.

A. Obviously not because I said -- I asked Jaylene if she could help me with it.

Q. All right. Do you have any idea why someone would ask -- write an email to you and ask you whether -- whether tests that had been sent to Sun were being billed through different hospitals?

Page 193

MR. MARKHAM: Speculation.

A. Why they would ask me?

Q. Yeah. Why would this email come to you, as opposed to someone else?

A. Maybe she didn't have somebody else's email to ask. I don't know.

Q. All right. Did Sun have a relationship with a hospital named Integrity at the end of 2015 -- or during 2015 or '16?

A. I'm not sure on the dates of that, but, yes.

Q. What was Integrity Hospital? What do you know about it?

A. It was a hospital.

Q. Do you know where it was?

A. No.

Q. Did Sun have relationships with any other hospitals other than Integrity, Newman, and Community during 2016 and '17?

A. I don't know on the dates.

Q. Okay. But when you were working with Sun, did Sun have relationships with any other hospitals, other than the ones we've discussed?

A. Not that I can remember.

Q. Okay. So you're only aware of Sun having

49 (Pages 190 to 193)

Page 202

A. It was a lot of money.

Q. How do you know that?

A. In my opinion -- I mean, I understand some of the invoices were 100,000 or 300,000 or 500,000. The total amount, I don't know that number. Is that a lot of money? Yes, it is.

Q. Okay. Sitting here today, do you have any idea the extent to which Sun and Mission actually ran tests on the specimens that were billed to United by Newman or --

MR. MARKHAM: Objection; lack of foundation.

A. I don't know what you mean by that, to be honest.

Q. Well, claims were billed to United by Community. Right?

A. Correct.

Q. By Integrity. Right?

A. Correct.

Q. And claims were billed to United on behalf of Newman. Right?

A. Correct.

Q. Do you have any idea how many of those claims were for tests that Sun or Mission performed?

A. No.

Page 203

Q. Do you have any idea how many of those claims were for tests that Newman or Community performed?

A. No.

Q. Do you have any idea how many of those tests were for -- sorry -- how many of those claims were for tests that different laboratories in different parts of the United States performed?

A. No.

Q. So when claims were being submitted, you didn't know one way or the other why United was being billed or what tests it was being billed for?

A. No.

Q. Are you aware that other labs did do the testing -- sorry.

Are you aware that other labs other than Newman and Community did do testing for which Integrity billed United?

A. Other labs as in Sun Lab or Mission Lab.

Q. Okay. Are you aware of any other labs -- I can rephrase it.

Are you aware of any other labs that did a test for which United was billed on behalf of Newman or Community?

THE WITNESS: I'm sorry. Can you

Page 204

read that back.

Q. I can maybe ask it better. Sometimes that's the problem. I just don't ask a very good question.

So we've talked about Community -- Integrity billed United on behalf of Community during '16 and '17. Right?

A. Yes.

Q. And Integrity billed United on behalf of Newman during '16 and '17. Right?

A. Yes.

Q. And it - it billed United for lab tests. Right?

A. Yes.

Q. Other than Sun and Mission, are you aware of any other labs that actually performed the tests that were being billed to United?

MR. MARKHAM: Objection; calls for speculation.

A. I don't know.

Q. Okay. Are you aware of whether -- well, you testified that you weren't sure one way or the other which one of the tests that were billed the hospitals performed. Right?

A. Say that one more time.

Page 205

Q. I'm just wondering -- we've talked about different labs. Right? We've talked about Sun. Right?

A. Correct.

Q. We've talked about Mission. Right?

A. Correct.

Q. We've discussed Community and Newman Memorial Hospital. Right?

A. Correct.

Q. And we're talking about the population of claims that Integrity billed to United on behalf of Community and Newman during 2016 and 2017. Right?

A. Okay.

Q. Okay. Are you aware of the identity of any other laboratories that performed the tests for which United was billed?

A. Billed by?

Q. Integrity.

MR. MARKHAM: Objection; calls for speculation.

A. I don't know. Alternate Health Lab, maybe.

Q. Okay.

A. I don't know.

MR. MARKHAM: Objection;

52 (Pages 202 to 205)

Page 206

speculation.

Q. Are you aware of whether Alternate Health Lab ran tests on specimens that were billed to United on behalf of Community or Newman?

A. I don't know -- I know Alternate Health Labs perform laboratory services. I don't know if they performed them on behalf of Newman or CMH or whomever.

Q. What about Axis? Have you ever heard of Axis?

A. I've heard of Axis.

Q. What's Axis?

A. I believe it's another laboratory.

Q. Did Axis test specimens that were billed to United through either Newman or Community?

A. I do not know that.

Q. Have you heard of a company called Arrayit?

A. Arrayit sounds familiar.

Q. Do you know what Arrayit is?

A. I think it was a laboratory. I can't remember.

Q. Okay. And I'm guessing you're not aware one way or the other whether Arrayit tested specimens that were billed to United through Newman or

Page 207

Community?

A. No, I don't know.

Q. What about a company called Advanced Genomics? Have you ever heard of them?

A. Yes.

Q. What do they do?

A. I believe they did genetic testing.

Q. Did they do genetic testing that was billed to United through Newman or Community?

A. That, I don't know.

Q. Did they have a relationship with Sun or Mission?

A. Yes with Sun. I don't know about Mission.

Q. And what was the nature of the relationship?

A. I believe they did lab testing for genetics that may have come through Sun. Sun could not process genetics, genetic testing, so they went there, I think.

Q. So if there's a scenario where a physician ordered a genetic test from Sun. Right?

A. Okay.

Q. And sent a specimen to Sun to be genetic -- to have genetic testing run. Right?

A. Okay.

Page 208

Q. And Sun wasn't capable of performing that testing, your testimony is that Sun might send that test to Advanced Genomics and they would do the test. Right?

A. Yes, I guess so. I don't know 100 percent sure. I don't know if they did for sure, but...

Q. Is that your understanding of how the process would work?

A. Yes.

Q. Are you aware of any other labs that had a similar type of relationship with Sun where if a specimen or an order came to Sun and Sun wasn't able to do the testing that was ordered, it would refer the test to a different lab?

A. I don't remember.

Q. You're not aware of any other labs that Sun had that type of relationship with?

A. I honestly can't remember.

Q. What about Alternate Health? Did Sun have that type of relationship with Alternate Health Labs?

A. I don't remember exactly what Alternate Health Lab -- what test they processed that Sun Lab wouldn't. I don't remember that.

Q. Were you aware that they did process some specimens that Sun didn't?

Page 209

A. I know they processed specimens, but...

Q. Did you ever bill Sun or Mission on behalf of Alternate Health?

A. I don't remember. Let me think. I might have, come to think of it. I can't remember.

Q. Ms. Pricer, you can take a look at -- did I mark it?

MR. MARKHAM: No.

THE WITNESS: I think you put it on your copy.

(Exhibit 69 was marked.)

Q. I'm showing you what's been marked Exhibit 69. Do you see that?

A. Yes.

Q. You only need to turn to the email.

A. Okay.

Q. There is an attachment as well, but I won't ask you about that right now.

A. Okay.

Q. This email is from you to Dr. Murphy on April 4th, 2017. Right?

A. Yes.

Q. And the subject is AHL blood. Right?

A. Yes.

Q. You said "I forgot to ask you when you

TSG Reporting - Worldwide 877-702-9580

APP 139

Page 210

were here, but we need to talk about AHL blood and how you want that charged to Sun/Mission." Right?

A. Yes.

Q. So what are you referring to here?

A. It looks like Alternate Health Labs did process blood specimens for Sun and Mission and I wanted to ask what the cost of goods of that would be.

Q. And so Sun would get an order to do a test and it would refer the test to Alternate Health to do testing. Right?

A. Yes.

Q. And that's what you're talking about, that situation here. Right?

A. Uh-huh.

Q. Is that --

A. Yeah.

Q. Okay. We can move on.

If Sun was ordered to do a test and referred the test to Alternate Health and Alternate Health ran the test, do you have any understanding of any circumstance why the test would be billed to an insurance company through Newman Memorial Hospital?

A. No.

Q. Can you think of any reason why that would

Page 211

be the case?

A. No --

MR. MARKHAM: Objection calls for speculation.

A. -- I don't know.

(Exhibit 70 was marked.)

Q. Ms. Pricer, I'm showing you what's been marked Exhibit 70. Do you see that?

A. Yes.

Q. If you look at this email, it's a series of thread emails between Randy Dittmar, you, and a number of other people. Right?

A. Yes.

Q. The first email is the lowest thread from Randy Dittmar to Gilbert Saucedo, copying you. Right?

A. Yes.

Q. Anyway, you respond to that email by writing an email of your own in the middle. Right?

A. Yes.

Q. And you write an email to Randy and you say "Randy, I think it would be a good idea if everyone got together on this, as many people use the reporting for different purposes." And then you state "wouldn't the bill type only determine how it

Page 212

is billed, not where the specimen is going." Do you see that?

A. I do.

Q. So when you are talking about the bill type determining how it's billed, not where the specimen is going, what distinction are you drawing there?

A. I wasn't quite sure what they were using the bill type for so I -- I did not know what that meant.

Q. When you say -- when you refer to the bill type determining how something's billed, what are you talking about?

A. I don't even remember.

Q. When you contrast that to where a specimen is going, what are you referring to there?

A. Where -- I'm assuming what I meant is where the specimen was going to be processed.

Q. Okay. So you're -- you're talking about a situation where a specimen is tested at one lab and billed through a different lab. Right?

MR. MARKHAM: Objection; speculation.

A. I don't think that's what I was saying.

Q. What do you think you were talking about?

Page 213

A. I honestly don't remember.

Q. Okay. Well, you're the right person to be asking about this email. Right?

A. Well, yes, I wrote it four years ago.

Q. All right. The rest of the sentence says "soon we will be utilizing Axis as well, so then we have Axis and Pacific processing tox." Do you see that?

A. I do.

Q. When you say "we" who are you talking about?

A. "We," I'm assuming I was talking about Sun.

Q. And you referred to Sun utilizing Axis. Right?

A. If I'm assuming "we" is Sun. I don't remember what I meant by "we."

Q. Can you think of anything else you might mean?

A. Integrity.

Q. Integrity, the billing company?

A. The billing company.

Q. How would Integrity be utilizing Axis?

A. If they were billing for them, which I don't remember if they did or not, but...

Page 214

Q. Then you say "so then we will have Axis and Pacific processing tox." Right?

A. Yes, that's what it says.

Q. Right there you were referring to the prospect of two different laboratories, Axis and Pacific, processing tox tests. Right?

A. Yes.

Q. When you read this, your understanding is it's probably referring to them doing that on behalf of Sun. Right?

MR. MARKHAM: Objection.

A. Yes, I guess so.

Q. Where is Axis located?

A. I have no idea.

Q. Any idea who owns it?

A. No.

Q. Any idea who operates it?

A. No.

Q. Do you know whether Dr. Murphy or Jesse Saucedo or anybody else you worked with had any involvement with Axis?

A. No.

Q. Do you know whether Axis had a relationship with Sun or Mission?

A. No, I don't remember.

Page 215

(Exhibit 71 was marked.)

Q. Ms. Pricer, I'm handing you what's been marked Exhibit 71. Do you see that?

A. Yes.

Q. Why don't you flip to the first page?

A. Okay.

Q. This is an email thread between someone named Dave Kuhn and you. Right?

A. Yes.

Q. Do you know who Dave is?

A. I believe he was a marketing rep.

Q. And this is an email in March of 2016. Right?

A. Yes.

Q. This was the -- during the time when Integrity was billing United and other insurance companies on behalf of Newman and Community. Right?

A. Okay.

Q. Why don't you go to the bottom thread on the first page?

A. Okay.

Q. So David writes to you and says "is the $165 per test based on the cost of referencing to another lab." Do you see that?

A. Yes.

Page 216

Q. What's he asking you there?

A. Is that the cost of running the sample at the lab.

Q. So it sounds like he received a report where he was charged a cost of $165 per test. Right?

A. Yes.

Q. And he's wondering what that charge was for. Right?

A. Yes.

Q. And he asked you if that's based on the cost of referencing to another lab. Do you see that?

A. Yes.

Q. When he says "the cost of referencing to another lab," what's he referring to?

MR. MARKHAM: Objection; speculation.

A. The cost to run that specimen.

Q. The cost to who?

A. The cost that the lab would charge to run the specimen.

Q. Okay. The cost that one lab would charge to another lab?

A. I'm not sure if -- it looks like that's the cost that they were charged to run that specimen.

Q. And when you say "they," do you know who

Page 217

you're referring to?

A. "They" of -- Dave Kuhn got charged, that they -- Dave Kuhn's group got charged for running lab that specimen.

Q. Okay. So that was a reference lab that tested this specimen. Right?

A. It looks that way, yes.

Q. And there was a cost associated with that reference lab running that test. Right?

A. Yes.

Q. Do you know the identity of that reference lab?

A. I do not, looking at this, no.

Q. Is this contemplating a situation where Sun would refer a test to a different lab for it to be tested?

A. It --

MR. MARKHAM: Objection; speculation.

A. -- it looks that way.

Q. All right. So then in the thread above you say, "Hi, Dave. Yes, that is the cost that the reference lab charges us, so we pass that cost through." Right?

A. Yes.

Page 218

Q. You're referring to a situation where Sun gets an order to run a test. Right?

A. Correct.

Q. Refers that to a different lab. Right?

A. Correct.

Q. That lab performs the test. Right?

A. Correct.

Q. And then charges the cost back to Sun. Right?

A. Correct.

Q. And this was generally how a fair amount of the testing would work during the time you were working with Sun. Right?

MR. MARKHAM: Objection; speculation.

A. If the specimen was referenced out to another lab, yes.

Q. Yeah. But Sun would do that sometimes. Right?

A. Yes.

Q. In that instance, Sun would be the referring lab. Right?

A. Yes.

Q. All right. Then he responds to you and says, "So what is Sun Lab's specialty for in-house

Page 219

testing? Blood?"

Do you see that?

A. I do.

Q. Do you know what he's asking you there?

A. I do not.

Q. Is he asking you whether Sun's capable of testing blood in house?

A. I don't know if that's what he meant.

Q. Do you know whether Sun was capable of testing blood in house during 2016?

A. I do not know that.

Q. Did Sun reference out all orders for blood testing that it received in 2016?

A. I don't know.

Q. Did Sun refer out any orders for blood testing it received in 2016?

A. I don't know during that time period if they did or not.

Q. All right. If you go to the thread above, you write a response. Right?

A. Yes.

Q. On March 29, 2016 you write back to him, and this is in answer to his question. Right?

A. It looks that way.

Q. You say, "In order for us to utilize the

Page 220

hospital contracts, then we have to use the reference labs that they have contracted." Do you see that?

A. Yes.

Q. When you talk about "us," who are you referring to?

A. I'm assuming "us" would be Sun Lab.

Q. Okay. And when you talk about utilizing the hospital contracts, which contracts are you referring to?

A. I'm assuming the insurance contracts.

Q. All right. And when you say utilize the insurance contracts, does that mean -- what does that mean?

A. I believe -- it looks like I meant it for the -- for billing, billing the claims.

Q. Okay. So you understood that Integrity was billing claims to insurance companies using hospitals' contracts with those insurance companies. Right?

A. Yes.

Q. One of those insurance companies was United. Right?

A. I'm assuming so. I don't know what contracts they had with the insurance companies.

Q. Okay. And you say, "Then we have to use

Page 221

the reference labs that they have contracted." Right?

A. Yes.

Q. So you're contemplating a lab that Sun might refer a test to. Right?

A. Yes.

Q. All right. And when you say "we have to use the reference labs that they have contracted," what are you referring to there?

A. I don't remember at the -- at that time what I meant, but reading it now, it looks like we have to use the reference labs that the hospitals have contracted to use.

Q. Were you aware of any reference labs that Newman had a contract with at this time?

A. Sun or Mission.

Q. Other than those two?

A. No.

Q. So the only place a specimen could be tested and appropriately billed through the hospital's contract would be -- with an insurer would be at Sun or Mission?

MR. MARKHAM: Objection; speculation.

A. I don't know all of the contracts that the

TSG Reporting - Worldwide 877-702-9580

APP 142

Page 226

Q. Okay. I'm just trying to figure out, you know, you were doing bookkeeping for large amounts of money. Right?

A. Correct.

Q. And you were facilitating transfers of that money between different entities. Right?

A. Correct.

Q. And other people were directing you to do that. Right?

A. Correct.

Q. What standards were you aware of, if any, that applied to that bookkeeping conduct? And that might influence whether it was done properly or improperly.

A. I don't know the exact accounting principles. To be honest, I don't have those memorized. It's been quite a while since I've looked at those, since school.

Q. Are you aware of anything that Integrity or Sun or Mission or Sun did to make sure all of its accounting and financial transactions were being done properly?

A. We had an outside accounting firm that would always review all of the books and bookkeeping. They would review everything. They prepared all the

Page 227

tax returns, all of that stuff.

Q. Would the firm audit the financials of different companies?

A. I don't know what they did internally. I know I would send them the books and they would do whatever they did.

Q. Did you ever get like an audit report where an accountant audited the books for any given year of Integrity or Sun or Mission or any other lab?

A. I don't remember any audit reports.

Q. What companies did they do the tax returns for?

A. Integrity Ancillary Management, Sun Clinical Lab, Clover Trail, LMK, and the -- the series LLCs.

Q. And did you supply them with the information they needed to do those tax returns?

A. Yes. I sent them the QuickBooks files.

Q. And when you say "QuickBooks files," what are you referring to? QuickBooks files of which company?

A. Of all of the ones I listed.

Q. Okay. Did each company keep a separate set of QuickBooks files?

A. Yes.

Page 228

Q. Did Sun Ancillary Management have any financial records?

A. Not that I can remember.

Q. Did Sun Ancillary Management do anything or not?

A. Not that I can remember.

Q. Did they have a bank account?

A. No, I don't think so.

Q. Ever ask for any tax returns to be prepared for Sun Ancillary Management?

A. Not that I am aware of.

Q. What about the series LLCs, did they do anything other than distribute funds to investors?

A. Who?

Q. The series LLCs, the Sun series.

A. What about them?

Q. Did they have any other business conduct, other than making distributions to investors?

A. No.

Q. Okay. So, basically, the series LLCs were essentially bank accounts. Right?

A. Well, they had bank accounts.

Q. Yeah. But did they do anything else, other than make distributions to investors?

A. Not that I am aware of.

Page 229

Q. Are you aware of the series LLCs having, like, a manager or an executive?

A. They had shareholders.

Q. Other than that?

A. No.

Q. All right. Did you -- now, who did you actually report to when you were working at Integrity? Did you have a direct report, someone above you?

A. Dr. Murphy and Jesse Saucedo.

Q. Anybody else?

A. I would report to Lynn Murphy as well sometimes.

Q. All right. Would the issues you would report to be different based on who you were reporting to?

A. No.

Q. Okay. Did you have any subordinates?

A. No.

Q. So you basically just worked for Jesse, Ms. Murphy, and Mr. Murphy?

A. Yes.

Q. Let's talk a little bit about the overall flow of funds again. Okay?

A. Okay.

TSG Reporting - Worldwide 877-702-9580

APP 143

Page 230

Q. Some of the questions I didn't ask you earlier. So we were talking about earlier you were aware that insurance companies would make payment to Newman Memorial Hospital. Right?

A. Correct.

Q. That was on claims Integrity submitted. Right?

A. Correct.

Q. And insurers would make payments to Community. Right?

A. Correct.

Q. And one of those insurers was United. Right?

A. Correct.

Q. There were other -- other insurers as well. Correct?

A. I'm sure.

Q. So money would flow from the insurers to the hospitals and then a portion of that would be distributed back to Sun and Mission. Right?

A. Correct.

Q. So what I'd like to talk about is what happened to the funds that came into Sun and Mission's possession after they received them from the hospital. Okay?

Page 231

A. Okay.

Q. So what type of -- earlier, we talked about some of the funds went from Sun to physician investors. Right?

A. To the series LLCs.

Q. Right. Sorry. I'll -- earlier, we talked about some of the funds went from Sun to series LLCs, then from there to physician investors. Right?

A. Correct.

Q. Other funds went directly from Sun to marketers. Right?

A. Correct.

Q. Mission made payments to marketers. Right?

A. I'm assuming they did. I don't -- I didn't do Mission's bookkeeping.

Q. Okay. What about other -- so there's other entities -- corporate entities that are defendants in this lawsuit. They include Alternate Health Labs. They include LMK. Did Sun ever make payments to Alternate Health Labs?

A. Yes. They may have for the reference lab fees.

Q. For any other reason?

A. Not that I can remember.

Page 232

Q. Okay. And if funds were transferred from Sun to Alternate Health Labs, did you make those transfers?

A. Yes.

Q. Did you do that on your own or were you asked to do it by someone else?

A. I was directed by Dr. Murphy or Jesse.

Q. And did you have access to Alternate -- oh. Sorry. You had access to Sun's bank account. Right?

A. Correct.

Q. Did you have access to Alternate Health Lab's bank account?

A. No.

Q. Did you make transfers from Alternate Health Labs to anybody else?

A. No, not that I can remember.

Q. Okay. What about the LMK, did you have access to LMK's bank account?

A. Did I? Yes, maybe I did. I can't remember.

Q. All right. Would Sun ever send funds that it received from hospitals or on other insurance payments to LMK?

A. I can't remember if Sun sent payments to

Page 233

LMK. If they did, for what reasons, I don't remember that.

Q. What about would Sun ever send payments to something called Clover Trail?

A. Yes.

Q. What were those payments for?

A. Clover Trail was the -- or the entity that owned Sun Labs so they were distribution payments, I guess.

Q. What about a company called New Leaf, have you ever heard of a company called New Leaf?

A. Yes.

Q. What is that?

A. That is Jesse Saucedo's company.

Q. Okay. And would you ever make payments from any entity to New Leaf?

A. From the series LLCs, yes.

Q. Okay. From any other bank account?

A. Not that I can remember.

Q. All right. Would you ever make payments from Sun's bank account to Dr. Murphy, personally?

A. I can't remember if the payments were ever to him, personally.

Q. Do you remember making any -- writing out any check or wiring any information or any money to a

59 (Pages 230 to 233)

Page 234

bank -- one of Dr. Murphy's bank accounts?

A. Yes, we did.

Q. Okay. And under what circumstances?

A. For distributions out of Clover Trail.

Q. Okay. So Clover Trail was another entity. Right?

A. Yes.

Q. And did you have access to Clover Trail's bank accounts?

A. Yes.

Q. Why was that?

A. To make the distributions because Clover Trail owned Sun and Clover Trail was the B shareholders for the series LLCs.

Q. Uh-huh.

But why if you -- as -- you as, you know, CFO or some other status with Integrity, why would you -- why would you have access to the company Clover Trail's bank account? I don't get the -- I'm not making the connection.

A. Because Dr. Murphy wanted me to have access so that I could submit the payments when they requested them.

Q. Okay. And when you were doing that, were you acting in the capacity of your employment or were

Page 235

you acting just like as a personal favor?

A. I was doing what I was directed to do.

Q. What about to AllergyPro, did you ever send payments from Sun to AllergyPro?

A. Yes.

Q. Okay. What about other laboratories, do you remember ever making payments from Sun to other laboratories?

A. I'm sure I did.

Q. Why is that?

A. For the reference lab fees that we went over in the exhibits.

Q. Do you remember ever causing any transfers to be made from any of the companies we've been discussing to an account held by something called MLM Heritage Trust?

A. Yes, I remember that.

Q. What do you remember?

A. That I think -- I don't know for sure. But I -- MLM Heritage Trust was what Dr. Murphy used as the entity for the ownership distributions out of Clover Trail, I believe, I don't think it was him personally, I think it was MLM Heritage Trust. Maybe.

Q. Do you know anything about what MLM

Page 236

Heritage Trust is?

A. No.

Q. Do you know who is the beneficiary of the trust?

A. No.

Q. And you were asked to make those distributions as well. Right?

A. Yes.

Q. Okay. Did you ever make a transfer of funds from Sun or AHL or LMK or Clover Trail or any of the other entities we've been talking about without being asked to do so first?

A. No.

Q. And without being directed to do so. Right?

A. No.

(Exhibit 73 was marked.)

Q. Ms. Pricer, I'm showing you what's been marked Exhibit 73.

Q. What number is it?

A. 73.

(Discussion off the written record.)

Q. I'm showing you what's been marked Exhibit 73. Do you see that?

A. Yes.

Page 237

Q. This is an email from Dr. Murphy to you on August 2nd of 2016. Right?

A. Yes.

Q. It's entitled "Newman wire." Right?

A. Yes.

Q. And he writes to you after you tell him that "We received a Newman wire today, $11,182.58." Right?

A. Correct.

Q. That's not that much money. Right? Kind of a small wire from the hospital. Right?

A. I guess.

Q. Anyway, he says to you "get all over Newman this morning and have them wire the larger amount." Right?

A. I see that, yes.

Q. What was he asking you to do there?

A. I can't remember exactly what he's asking. My assumption would be that he would want me to reach out to them and ask them why they didn't submit any more. I'm not 100 percent sure on that one.

Q. Were there ever circumstances where Dr. Murphy, or you, or somebody else wanted Newman or Community to wire more money to Sun or Mission than they had?

60 (Pages 234 to 237)

Page 242

A. Uh-huh. I do.

Q. So this is sort of typical of how you would be instructed to make payments to different entities?

A. Sometimes, yes.

Q. And do you know what this type of request to wire $100,000 from Sun to AHL would be for?

A. I don't know exactly what this one would be for.

Q. I'm just trying to use it as an example more than anything else. When you were asked to send money from here to there for different entities and wire funds and cut checks, did you -- did you know why you were being asked to send the funds and why you were asked to send them in certain amounts?

A. Normally I would. There would have probably been a prior conversation as to what it would be for, but looking further down on this email, it looks like this is for reference lab fees that Sun owed Alternate.

Q. Okay. Reference lab fees would be for tests that Sun was ordered to perform that it referred to Alternate. Right?

A. Yes.

(Exhibit 75 was marked.)

Page 243

Q. Ms. Pricer, I'm showing you what's been marked Exhibit 75. Now, this is another email from Chelsea Ewing to you in June of 2000 -- on June 14th, 2017. Right?

A. Yes.

Q. It's titled "Distributions from AHL to MLM/Jesse and wire to AHC." Right?

A. Yes.

MR. MARKHAM: It doesn't say AHC. It does. Sorry.

MR. BORNSTEIN: Okay.

Q. And Chelsea writes to you, "Dr. Murphy would like to transfer $500,000 from AH -- from the AHL account to LMK." Do you see that?

A. Yes.

Q. So here you're being directed to transfer a large round dollar amount sum from AHL to LMK. Right?

A. Yes.

Q. Do you have any idea why you'd be asked to make this type of transfer?

A. It looks like it's a distribution from AHL to Dr. Murphy and Jesse to the LMK account.

Q. Did -- do you know if LMK had an ownership interest in AHL?

Page 244

A. I don't remember.

Q. Did LMK perform services for AHL?

A. I don't know.

Q. Okay. So you're not aware, one way or the other, what the basis is for cutting this type of a check to LMK?

A. I honestly can't remember.

Q. That's fine. And then the email continues. It says, "If you could then cut a check for MLM (written to the trust) and to Jesse in the amount of $250,000 each." Do you see that?

A. I do.

Q. Any idea what checks in those amounts would be for?

A. It looks like distributions.

Q. Okay. Distributions for what?

A. I don't know.

Q. All right. So sometimes Chelsea Ewing would direct you to make transfers. Right?

A. On behalf of Dr. Murphy, yes.

Q. Okay.

MR. MARKHAM: I have on the back of the one you handed me a 4756.

MR. BORNSTEIN: It's just an attachment to -- I think it was just a wire form

Page 245

attachment.

(Exhibit 76 was marked.)

Q. Ms. Pricer, I'm showing you what's been marked Exhibit 76. Do you see that?

A. Yes.

Q. This is an email that you sent to Chelsea Ewing on March 3rd of 2017. Right?

A. Yes.

Q. And it's titled "Transfer to LMK from AHL."

A. Yes.

Q. And this is in response to an email that Chelsea Ewing wrote to you that said, "Please transfer $200,000 to the LMK account for Alternate Health Labs, Inc. This is for back pay on the management fee (49 percent) owed to Dr. Murphy."

Do you see that?

A. I do.

Q. So what was Dr. Murphy managing for which he was being paid?

A. The lab, Alternate Health Lab. He was managing the lab.

Q. That was your understanding at the time?

A. Yes.

Q. All right. So if Alternate Health Lab was

TSG Reporting - Worldwide 877-702-9580

APP 146

Page 250

Right?

A. Correct.

Q. That was an aggregate sum reflecting an amount that was due to physician series investors. Right?

A. It was due to the series LLCs.

Q. All right. And that would be a portion of money Sun received by providing services to the patients of the series investors. Right?

A. Uh-huh.

Q. If you look down to the equity section, there is -- and by the way, there would been an -- there would be an amount due to the series from Sun every month. Right?

A. Yes.

Q. Were payments made on a monthly basis or more frequently?

A. It was a monthly basis, I believe.

Q. And was it based on the amount of business Sun generated from the investors during the previous month?

MR. MARKHAM: We've been over this now. You spent a half an hour on this.

MR. BORNSTEIN: Okay.

MR. MARKHAM: I object; asked and

Page 251

answered.

Q. Okay. You can answer real quick. I'm not going to spend that much time on it.

MR. MARKHAM: Yeah. Real quick.

A. The revenue that was received for those series LLCs.

Q. Was it -- I'm just saying were the -- were the liabilities due for the series reflected on a balance sheet of a given month? Were those liabilities based on the revenues that came in during the previous month?

A. I don't know the exact time frame of that entry.

Q. All right. In the equity section, there is an entry "Clover Trail Distributions."

Do you see that?

A. I do.

Q. And that is negative $1.5 million flat. Right?

A. Yes.

Q. What was that payment for?

A. To be honest, I don't know exactly what that payment is for.

Q. That reflects a payment made to Clover Trail in the amount of $1.5 million even. Right?

Page 252

A. Correct.

Q. Is that the type of payment you would have been instructed to make?

A. Correct.

Q. Any idea why it's a round dollar amount?

A. I don't remember.

Q. Flip to the next attachment. The next attachment is I think a profit and loss statement, isn't it?

A. Um --

Q. Or are you on a different one?

A. I'm looking.

Q. Why don't you flip to --

A. Is it the Sun Lab profit and loss?

Q. Yeah. Do you have that one?

A. I do have that one.

Q. Thank you. In the profit and loss section under the expense section there is an entry for reference laboratory fees. Do you see that?

A. I do.

Q. And that amount is $261,359.38. Do you see that?

A. I do.

Q. This is an amount that Sun owed to other laboratories for tests those laboratories performed

Page 253

on specimens Sun referred to those labs. Right?

A. Correct.

Q. And this is a typical type of expense you'd see on a monthly profit and loss statement for Sun. Right?

A. Yes.

MR. MARKHAM: You mean typical in amount or just an entry?

MR. BORNSTEIN: I mean a typical type of entry.

A. Yes.

Q. So every month Sun would have reference lab fees. Right?

A. If they paid them in that month then, yes, they would be reflected on that month's statement.

Q. Suffice it to say Sun referred a fair amount of testing out to other laboratories that it was ordered to perform. Right?

A. Yes.

Q. Thanks.

At the bottom there is an Entry 75000 called "commissions." Right?

A. Correct.

Q. That's in the amount of $683,271.85. Right?

64 (Pages 250 to 253)

Page 254

A. Correct.

Q. That's an aggregate sum that Sun paid to its marketers in exchange for the business they generated for Sun. Right?

A. Correct. That was their commission payments.

Q. And payments -- commission payments of that type were common month to month on Sun's books. Right?

A. Correct.

MR. MARKHAM: You forgot the most important question on this.

MR. BORNSTEIN: Okay.

MR. MARKHAM: Why are the professional fees only one-tenth of the postage.

MR. BORNSTEIN: Wait a second.

MR. MARKHAM: I was just kidding.

Q. If you flip to the next page, can you find the attachment, No. LD0205130?

A. Yes.

Q. It's entitled "Integrity Ancillary Management balance sheet"?

A. Uh-huh. Yes.

Q. These are books you put together on behalf of Integrity. Right?

Page 255

A. These are the statements for the bookkeeping that I did, yes.

Q. At the bottom there is an entry called "equity." Right?

A. Yes.

Q. And one of the entries under that section is "JS equity." Do you see that?

A. I do.

Q. Does that stand for Jesse Saucedo equity?

A. It does.

Q. Below that there is an entry for "Draws." Right?

A. Correct.

Q. And it's listed as negative $200,000 even. Right?

A. Correct.

Q. What does that reflect?

A. A distribution payment.

Q. To whom?

A. Jesse Saucedo.

Q. For what?

A. A distribution.

Q. So he owned equity in Integrity. Right?

A. Correct.

Q. And he took a percentage of the funds that

Page 256

Integrity was paid by hospitals for them conducting its billing. Right?

A. They did distributions as -- I mean, I submitted those as I was instructed how they...

Q. My point is just that Integrity got paid by the hospitals and providers it billed for. Right?

A. Correct.

Q. And so that's where Integrity would get its money. Right?

A. Correct.

Q. That money was originally paid to those providers by insurance companies. Right?

A. Say that again. I'm sorry.

Q. Insure -- insurers would pay hospitals and providers. Right?

A. Yes.

Q. Integrity would bill claims for those providers. Right?

A. Yes.

Q. In exchange, Integrity would get funds that were originally paid to the providers by insurers. Right?

A. I don't know how their bookkeeping was for --

Q. Okay.

Page 257

A. -- when they paid Integrity.

Q. Well, Integrity would get 5 percent, for example, of the revenues --

A. Yes.

Q. -- it collected for the hospitals?

A. Yes. Yes.

Q. Right? And then some subset of that money that came into Integrity would get distributed to Jesse Saucedo. Right?

A. Yes.

Q. And if you look down to the entry below that, it's called MLM equity?

A. Correct.

Q. That's Michael Murphy equity. Right?

A. Correct.

Q. It lists another flat round dollar amount, $200,000 payment. Right?

A. Correct.

Q. That would for the same thing as Jesse Saucedo. Right?

A. Yes.

Q. And your previous testimony would apply to this payment as well?

A. Yes.

Q. Were these common types of distributions

TSG Reporting - Worldwide 877-702-9580

APP 148

Page 258

out of Integrity on a monthly basis?

A. No. Integrity didn't make regular distributions. It was whenever Dr. Murphy and Jesse agreed upon it, I'm assuming. Then they would tell me to do those.

Q. Got it.

If you look at LD0205131?

A. Okay.

Q. This is a profit and loss statement for Integrity Ancillary Management. Right?

A. Yes.

Q. There is an entry towards the bottom, a No. 68400 for travel expense. Do you see that?

A. Yes.

Q. Apparently for MLM travel expense. Right?

A. Yes.

Q. Is that Dr. Murphy, travel expense?

A. It was what we -- what that account was set up as. It may not have been just him. It was whichever Integrity traveled, they traveled for Integrity.

Q. So anybody who traveled for Integrity would have their travel expenses reimbursed?

A. If it was regular employees, they would. For this particular case, I don't think it was

Page 259

reimbursed. I...

Q. Well, this says this is one of the expenses on the profit and loss sheet?

A. Correct. Uh-huh.

Q. So that would be an expense to Integrity for this month. Right?

A. Yes.

Q. Do you know if anybody ever like flew on private jets on behalf of Integrity?

A. Yes. Dr. Murphy and Jesse would.

Q. Is that sort of their typical means of travel?

A. I don't know what their typical means were.

Q. Is that why this travel expense would be somewhat high?

A. Yes.

MR. BORNSTEIN: Two more and I think I'm done.

(Exhibit 78 was marked.)

Q. Ms. Pricer, I'm showing you what's been marked Exhibit 78. Do you see that?

A. I do.

Q. That is a series of emails between you, Randy Dittmar, someone named Jennifer Gaskill during

Page 260

all of 2017. Right?

A. Yes.

Q. Do you know who Jennifer Gaskill is?

A. She was a contact for GE Healthcare.

Q. Do you know what GE Healthcare is?

A. That was the company we -- Integrity purchased the billing software from, Centricity, I believe.

Q. All right. If you look -- can you flip to the second-to-the-last page in this document?

A. Okay.

Q. There is an email dated July 12th.

A. Okay.

Q. So it looks to me like you've been discussing an issue and I can't really discern what, with Jennifer Gaskill. But on July 12, 2017, she writes to you and says "Yes, I did have someone review this and I just heard back yesterday. Have you recently increased your provider count, as we see that the provider number fluctuates quite a bit on your EDIs." Do you know what she's talking about?

A. I'm sorry. Exactly where are you at on there?

MR. MARKHAM: Let me coach here. Right there.

Page 261

THE WITNESS: Okay.

MR. BORNSTEIN: Thanks.

A. So I was not really familiar with all of this. I was kind of -- to be honest, I think I was more like a middleman between GE and IT on doing this.

Q. Anyway, she's referring to something called "your provider account fluctuating." Right?

A. Uh-huh.

Q. And she's talking about in 2016 there were 63 providers -- sorry.

In October 2016 they had 63 providers.

And then she lists different numbers for different months of 2016 and '17?

A. Uh-huh.

Q. Do you see that?

A. I do.

Q. Do you have any idea what she's referring to there?

A. To be honest, not exactly what she's referring to and I think that's why I sent it to Randy because, like I said, I wasn't very familiar with all of that terminology and what each of those things meant.

Q. So you sent -- if you flip over to the

66 (Pages 258 to 261)

Page 262

next page, I think you already did that?

A. Yeah.

Q. You forwarded that email to Randy Dittmar. Right?

A. I did.

Q. And his role was what with Mission Toxicology?

A. I don't remember -- I don't know exactly what his role was with Mission. I know he did assist Integrity with IT.

Q. If you look down to sort of the second main paragraph in your email to -- or sorry.

Then Randy Dittmar responds to you on July 12th, 2017. Do you see that?

A. Where he responds to Jen, to Jennifer?

Q. He responds to you and he copies her. But yes. Yeah. Yeah, you're right.

A. Oh, okay. Okay, yeah. I'm sorry. Yes, you're right.

Q. Thank you. So he responds to Jen?

A. Yes.

Q. And in the second paragraph of his email he says, "These invoices appear to be generating based on Referring Provider." Do you see that?

A. I do.

Page 263

Q. Do you have any understanding what he's talking about when he says "referring provider"?

A. To be honest, no.

Q. Okay. And if you look to the next sentence, he says, "Which does not apply the same way, since we have 1,000 referring providers but only the original four performing providers."

Do you see that?

A. I do.

Q. And then he goes on to say, "I don't understand why we would be charged based on referring and not the provider who is on the claim who is rendering the care." Do you see that?

A. I do.

Q. Was it your understanding that the provider who was identified on a claim was supposed to be the provider who was rendering the care?

A. To be honest, I don't know.

Q. All right. That seems to be his understanding. Right?

A. Yes, it looks that way. I can't answer for him, though.

Q. Can you go down to the paragraph that he writes, where it's called -- it's titled "Background of our structure."

Page 264

A. Okay.

Q. And he gives a little bit of an overview of what Integrity Ancillary Management does. Right?

A. Okay.

Q. He says, "Integrity Ancillary Management is the billing entity for 2 laboratories and 2 hospitals." You see that. Right?

A. I do.

Q. The two labs are Mission and Sun. Right?

A. Correct.

Q. And the two hospitals are Newman and Community at that time. Right?

A. To be honest, I don't know during that time if that's who he's referring to.

Q. And then he says, "It is those laboratories or hospitals that are providing the care and Integrity is submitting the claim based on the NPI of these four facilities." Do you see that?

A. I do.

Q. Then he says, "The referring provider is attached to the claim only as the indicator to the payer as to who ordered the reference tests to be performed by Sun, Mission, or hospitals." Right?

A. I see that.

Q. When he's talking about the referring

Page 265

provider being attached to the claim --

A. Uh-huh.

Q. -- what provider do you understand he's referring to?

A. I have no idea.

Q. Would that be the physician that ordered the tests?

MR. MARKHAM: Objection; asked and answered.

A. I honestly don't know.

Q. Okay. I'm just wondering whether you understand what he's talking about here.

A. No, to be honest.

Q. Any idea why it would be important to convey to the payer on a claim who ordered the test to be performed?

MR. MARKHAM: Objection; speculation.

A. I don't know.

Q. So you kind of just disregarded this email from him? Didn't think much of it one way or the other?

A. Like I said, I sent it to him because he knew and understood all of that. I was just kind of a middleman between Jennifer and him.

67 (Pages 262 to 265)

Page 270

A. No.

Q. Do you know how they were sent to be processed by any lab?

A. No.

Q. Do you know the address to which they were sent?

A. No.

Q. Do you know who accessioned them when they arrived at the addresses to which they were sent?

A. No.

Q. Did you ever see any accessioning?

A. I did not see it physically done. I was told about how it was done, but I've never seen it.

Q. Okay. And did anybody ever tell you who did the accessioning?

A. No.

Q. Do you know who did the accessioning?

A. No.

Q. All right. And do you know whether or not there was any direction in the labels that sent these lab specimens to be tested, as to who was supposed to do the testing? Do you know that?

A. No.

MR. BORNSTEIN: Objection; form.

Q. Okay. Now, did you ever process any

Page 271

claims?

A. No.

Q. Do you know how they were processed?

A. No.

Q. Okay. Was any of what I've asked you part of your job?

A. No.

Q. Do you believe that you could testify competently about any of these subject matters?

A. No.

Q. Why not?

A. Because it wasn't my job duties.

Q. Let me just go over one thing with you real quick.

You were asked earlier today about the functions described at the top of the spreadsheet, which was part of Document LD0079904. And I think that was Exhibit 65. But that's the number.

Do you remember being asked about this?

A. Yes.

Q. Okay. And you were asked questions about accessioning. Correct?

A. Correct.

Q. Do you know who actually did any accessioning on any of the specimens itemized on this

Page 272

spreadsheet?

A. No.

Q. Okay. Do you know who was supposed to do it?

A. Not anybody in particular. The accessioners is what I knew them as.

Q. Okay. And you were asked several times today if specimens were sent to Sun and to Mission. Do you recall that?

A. Yes.

Q. Did you ever see any labels which would have instructed you as to where they were sent by the doctors?

A. No.

Q. As to who the addressees were?

A. No.

Q. Okay. So you don't really know that, do you?

A. No.

MR. MARKHAM: All right. That's all I have.

MR. BORNSTEIN: We're good.

MR. MARKHAM: We're good. Get out of here.

THE VIDEOGRAPHER: We're off the record, 5:00 p.m.

(Deposition concluded at 5:00 p.m.)

Page 273

ERRATA SHEET

Case Name:

Deposition Date:

Deponent:

Pg. No. Now Reads    Should Read  Reason

___ ___ _____  _____  _____

___ ___ _____  _____  _____

___ ___ _____  _____  _____

___ ___ _____  _____  _____

___ ___ _____  _____  _____

___ ___ _____  _____  _____

___ ___ _____  _____  _____

___ ___ _____  _____  _____

___ ___ _____  _____  _____

___ ___ _____  _____  _____

___ ___ _____  _____  _____

___ ___ _____  _____  _____

___ ___ _____  _____  _____

___ ___ _____  _____  _____

_____

Signature of Deponent

SUBSCRIBED AND SWORN BEFORE ME

THIS ____ DAY OF _____, 2019.

_____

(Notary Public)  MY COMMISSION EXPIRES:_____

69 (Pages 270 to 273)

# Exhibit 9

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

MISSION TOXICOLOGY,     §
L.L.C., ET AL.,     §
    § CASE NO. 5:17-CV-01016
    PLAINTIFFS,     § (LEAD CASE)
    §
V.     §
    §
UNITEDHEALTHCARE     §
INSURANCE COMPANY, INC.,     §
ET AL.,     §
    §
    DEFENDANTS.     §
    §
--------------------------     §
UNITEDHEALTHCARE     § CASE NO. 5:18-CV-00347
INSURANCE COMPANY, INC.,     § (CONSOLIDATED CASE)
ET AL.,     §
    §
    PLAINTIFFS,     §
    §
V.     §
    §
MICHAEL MURPHY, M.D., ET     §
AL.,     §
    §
    DEFENDANTS.     §

ORAL AND VIDEOTAPED DEPOSITION OF
JESSE SAUCEDO
OCTOBER 15, 2019

ORAL AND VIDEOTAPED DEPOSITION OF JESSE
SAUCEDO, produced as a witness at the instance of
the Plaintiffs and duly sworn, was taken in the
above styled and numbered cause on Tuesday,
October 15, 2019, from 9:10 a.m. to 4:56 p.m.,
before TAMARA CHAPMAN, CSR, CRR, RPR in and for the
State of Texas, reported by computerized stenotype
machine, at the offices of Stonecrest Holdings, LLC,
7373 Broadway, San Antonio, Texas, pursuant to the
Federal Rules of Civil Procedure and any provisions
stated on the record herein.

Job No. 168610

Page 30

Q. Were you ever employed by IAM?

A. No.

Q. Did you have any ownership interest in IAM?

A. I did.

Q. What was the nature of that ownership interest?

A. Me and Dr. Murphy were 50-50 partners there.

Q. When was IAM started?

A. I don't remember exactly when.

Q. Were you a partner immediately or as soon as it started?

A. Dr. Murphy had started it in the -- in the beginning and then he'd asked me to be a partner.

Q. And do you -- I'm sorry, I already asked. You don't remember when it was started?

A. I can -- I can research it and then let you know after the break.

Q. It's okay. I think we probably have some documents that show it so I won't make you use your break that way.

A. Okay.

Q. Did you have any oversight responsibilities for IAM?

Page 31

A. No, ma'am.

Q. I asked before if you had ever been deposed. Have you been interviewed by any law enforcement or -- or anything of that nature?

A. No, ma'am.

Q. You mentioned that Mission closed. Do you remember when that happened?

A. Mission has been closed for, I'd say probably over a year already.

Q. So sometime in 2018?

A. Uh-huh.

Q. Why was it closed?

A. Ran out of money.

Q. Why did it run out of money?

A. We weren't getting paid by the payers anymore for the services that we were offering. We were, you know, spending hundreds of thousands of dollars a month to run samples and getting paid zero.

Q. Before Mission became involved in the hospital outreach programs, Mission was performing testing for physicians. Correct?

A. Yes, ma'am.

Q. And Mission had a billing company that was billing -- billing for those tests. Right?

A. Yes, ma'am.

Page 32

Q. Was -- did Mission have contracts with health insurers?

A. No, ma'am.

Q. So when Mission was performing the testing and billing on behalf of Mission, Mission was billing out of network. Correct?

A. It was out of network and then we had a third party. It wasn't really in network, but it was a third-party provider that we went through that had relationships with payers. So we utilized that third-party payer.

Q. Can you explain that a little bit more?

A. So it was a company that had reached out to us and said that they have relationships with the insurance carriers they would be able to bring us on to their platform and then we could bill -- so basically they would -- it was -- it was complicated. So it was still kind of out of network, but they would limit the amount of money that the patients had to pay out of pocket.

I forgot the name of the company, but it's a pretty large company. I don't know how all that works with the insurance companies, but they approached me. And I can give you the name of that company after the break. I can research that.

Page 33

Q. That would be great. When --

A. Oh, it's called MultiPlan.

Q. MultiPlan?

A. MultiPlan. So there's a lady, Claudia, that reached out to me and said that they -- they help out. Out-of-network providers tend to get in network, but you're not really in network in a sense.

Q. When Mission was billing directly for its own claims in association with this third-party provider, MultiPlan, was Mission using its NPI number to bill the claims?

A. It was.

Q. In general, was it your experience that the claims of the amount of reimbursements were less when Mission was using its NPI number versus when a hospital would be billing for the same tests?

A. Actually, not. Actually reimbursements out of network through UnitedHealthcare at that time were pretty high.

Q. What about the number of claims that would be reimbursed?

A. Obviously if you're -- if you're out of network, you're going to get less claims reimbursed than in network.

Q. Was Mission doing pretty well before it

9 (Pages 30 to 33)

Page 34

started its involvement in the outreach program?

A. Yes, ma'am.

Q. Okay. So we talked about Mission's ability to perform screening tests at the outset. At some point did Mission gain the capability for performing the confirmation tests?

A. No.

Q. And when we're talking about toxicology testing, for the most part that's testing on urine specimens. Correct?

A. Correct.

Q. Did Mission ever perform blood testing?

A. It never performed blood testing, but we did offer blood testing and referenced it out to Clinical Pathology Laboratories, to CPL.

Q. So any blood testing would be referenced to CPL?

A. Yes, ma'am.

Q. Did have you a reference laboratory agreement with CPL?

A. Yes, ma'am.

Q. What about allergy testing? Was Mission ever able to do allergy testing?

A. I don't believe we did allergy testing at that time. No, ma'am.

Page 35

Q. At any time did Mission offer allergy testing?

A. To the management -- when we starting helping manage these small rural hospitals, we did, yes, ma'am.

Q. Was Mission itself capable of running allergy tests?

A. No, it was not.

Q. So were all of the allergy tests that were ordered from Mission referenced out?

A. Yes.

Q. Who were they referenced to?

A. I believe at that time it was CPO as well.

Q. Did Mission ever reference to AllergyPro?

A. Yes. For the finger stick, yes, ma'am.

Q. Did Mission ever offer or have capabilities for doing pharmacogenomics, or PGx testing?

A. I believe we never offered PGx testing at Mission. That was one I didn't want to get involved in.

Q. Why not?

A. A lot of the doctors just didn't believe in the PGx testing so I just chose for myself not to get involved in it.

Page 36

Q. I understand that you weren't involved from a management perspective with Sun, but I'm going to ask the same questions that I just asked about Mission of Sun.

A. Okay.

Q. Was Sun able to perform any confirmation testing at any time?

A. No, ma'am.

Q. Only screening testing?

A. Yes, ma'am.

Q. What about blood testing?

A. They were able to provide blood testing.

Q. I moved on too quickly. So if a doctor ordered a confirmation test from Sun, would that be referred out?

A. That would be referred out.

Q. To whom?

A. I don't know who they were sending that to.

Q. What about allergy testing?

A. Allergy testing, they were able to do it in-house. They had a machine that was -- it was a manual machine so it took a lot time to run those samples. They were able to do some of it in-house. I don't know how much volume they are doing, if they

Page 37

ever referenced any of that out. I don't know.

Q. What about PGx testing?

A. They were not able to do that in house.

Q. Do you know if it's something they offered?

A. I don't know.

Q. Just a few more questions about Sun.

A. Okay.

Q. Sun, you mentioned, also became involved in the outreach programs in mid-2016. Correct?

A. Yes, ma'am.

Q. Before Sun became involved in the outreach programs was Sun operating services as a stand-alone lab?

A. It was.

Q. In those instances, Sun would market to doctors and doctors would order tests from Sun?

A. Yes, ma'am.

Q. And Sun would either perform the tests or reference the tests?

A. Correct.

Q. Do you know how Sun was billing for the tests it was performing?

A. Can you clarify that question?

Q. Yeah. Did -- did Sun have a billing firm

10 (Pages 34 to 37)

Page 42

Q. And do you remember about when Mission and Newman entered into that contract?

A. I don't exactly know the date.

Q. That's okay. I bet the contract says it.

A. Okay.

Q. Okay. So you mentioned that you were providing -- you were helping them get their lab up and running. You had expertise in the laboratory services space that you were offering to them. You were providing support in terms of validation and things like that.

A. Uh-huh.

Q. Also marketing services. Correct?

A. Correct.

Q. Can you describe the nature of those marketing services?

A. So obviously I come from a sales background. So I know a lot of other people that have relationships with physicians. So, you know, due to those relationships, I was able to get them to start, you know, pitching Newman's outreach program for their hospitals, if it was an option for those physicians.

So part of our job at Newman was to generate samples into the hospital.

Page 43

Q. Separately, aside from the laboratory services agreement, Newman signed a billing services agreement with IAM. Correct?

A. Yes, ma'am.

Q. So IAM performed all billing?

A. Yes, ma'am.

Q. For lab -- I'm sorry. Let me rephrase that.

A. For laboratories. Yes, ma'am.

Q. Okay. So IAM performs laboratory billing services for the hospitals, but not other types of billing services?

A. No. I think they already currently had a billing company that did all their other stuff that they did. They hadn't ever done laboratory before, so they wanted IAM to take over the billing for laboratory only.

Q. Okay. So then the next step that I see in the program would be actually going out and marketing to physicians in order to acquire specimens. Is that fair?

A. Yes, ma'am.

Q. Can you provide a high-level overview of how that worked?

A. So, you know, I had relationships -- so I

Page 44

would reach out to some -- some of the reps that I knew, and I would explain the program to them. And then they would say they wanted a contract with Mission Toxicology because they were the ones that were contracted with Newman to push the services that Newman can offer in their laboratory outreach program to their physicians.

Q. The contracts that the reps wanted with Mission was a marketing services agreement or something like that. Right?

A. Correct.

Q. And a lot of times those contracts were not entered into between Mission and an individual rep, but Mission and a company, a marketing company. Correct?

A. Yes, ma'am.

Q. Did Mission have any contracts with individual reps?

A. Yes, ma'am.

Q. Do you remember who?

A. I don't remember. We had a lot of reps. But I know that we had some that worked -- some of them are like what I had with TMMC. We were marketing companies. And some of them are just -- just reps that were out there. I paid them directly.

Page 45

Q. And the marketing companies, do you remember some of the marketing -- the larger marketing companies that you worked with?

A. Uh-huh.

Q. Can you list some of them, please?

A. Some of them -- one of them's name was Icon.

Q. Sorry. Is that Icon or ICOM?

A. Icon, I-C-O-N.

Q. Okay.

A. Mustang Management. Newmedica. Who are some of the other ones? I don't believe -- I don't know his name -- I don't know the name of his company. It was a gentleman by the name of Ben Holland that was -- was one of the big companies that used to send a lot to us.

I'm trying to think of others.

Q. Fortis? Does Fortis sound familiar?

A. Fortis never sent to Mission. It sent to Sun.

Q. Okay. What about Tomahawk Medical?

A. That sent to Sun as well.

Q. Okay. So is it fair to say -- were there any marketers that sent to both Sun and Mission?

A. Some of them had sent to Sun and they came

12 (Pages 42 to 45)

Page 46

over to Mission. So we were -- we were definitely competitors. And it was just the way we ran it different. You know, we -- I didn't run the Sun side. I ran the Mission side. And some things were just run different.

Q. Do you remember how -- you know, examples of how things were run differently between Sun and Mission?

A. Well, a lot of it, number one, is we had been doing it a lot longer. So my staff had been dong it for, you know, three, four years already. Some of these people had been doing it far longer than that.

The one thing that -- the difference is I was always available for our reps. I was highly involved, highly involved with making sure the doctors got quality results, quick results. And so they liked that they can call me at 11 o'clock at night and wake me up and I'd answer the phone.

Q. Okay. So going back to the, you know, marketing in order to acquire specimens. So the marketers had relationships with physicians. They would go out and market Sun or Mission's services. And then if all went according to plan, the physician would submit orders to Sun or Mission. Is that fair?

Page 47

A. Correct.

Q. Okay. And under the marketing agreements, the marketers reimbursed depending upon reimbursements associated with the specimens that they had referred to Sun or Mission. Right?

A. Correct.

Q. Okay. So next is the physician orders the test?

A. Uh-huh.

Q. Is that fair?

A. Yes, ma'am.

Q. So a doctor would order a test using a requisition form. Is that fair to say?

A. Yes, ma'am.

Q. And those were either Sun or Mission req forms?

A. Yes, ma'am.

Q. And on the requisition form, the doctor would identify the types of testing it was ordering --

A. Yes, ma'am.

Q. -- he or she was ordering.

And once a test was ordered, the requisition form, along with a specimen, would be sent to a processing facility. Correct?

Page 48

A. Yes, ma'am.

Q. And Sun and Mission provided the materials required to collect specimens to doctors' offices. Correct?

A. Yes, ma'am.

Q. So like a urine cup, if that's what you're collecting?

A. Yes.

Q. And would Sun or Mission also provide the shipping labels to the doctors' offices?

A. Yes.

Q. So they were just preprinted shipping labels that the doctor would put on the box and send it in to Sun or Mission?

A. Yes, ma'am.

Q. And it was the doctors or their offices that were actually collecting the specimens. Correct?

A. Correct.

Q. Okay. So now we're at the point where a doctor has ordered the test and it's shipped it to Sun or Mission. Correct?

A. Uh-huh. Yes, ma'am.

Q. So then the next step, I think, is processing of the specimen. Is that fair?

Page 49

A. Yes.

Q. And you'll tell me if I've gotten it wrong. Right?

A. No. You're good.

(Discussion off the written record.)

Q. So the specimens are shipped to Sun or Mission's processing facility. Correct?

A. Yes, ma'am.

Q. Where was that located?

A. I believe it's 1051 East Nakoma, I believe, is the address.

Q. I will say I'm impressed by all of your ability to remember that specific address. I mean, I can -- I would have no idea the address of the place that I last worked, but...

Okay. And so it was sent to 1051 East Nakoma regardless of whether it was a Sun or Mission sample. Right?

A. If they were sent -- if it was a Mission sample, it would go into Mission laboratory. If it was part of the outreach, it would go into the Nakoma address.

Q. And the Nakoma facility was owned by or rented by Mission. Correct?

A. It was -- it was -- it was rented by IAM,

13 (Pages 46 to 49)

Page 54

quantitative that you -- they actually had medication in their body.

Q. Okay. You mentioned that in some cases that the aliquot of a specimen would be sent to Newman to run a screening test?

A. Yes, ma'am.

Q. What about -- what would happen before Newman had gained the capacity to run screening tests?

A. Those would actually be done at Integrity.

Q. By Sun or Mission -- or by Mission?

A. I mean, I'm sorry, not Integrity. At Alternate Health Labs. Alternate Health Labs had screening machines in there and they had confirmation machines. So before Newman was able to do the qualitative, AHL was doing it while we were helping the hospital set up their laboratory program.

Q. Okay. And was AHL also located at that -- was it the East Nakoma location?

A. Yes. It had -- I don't know if you've ever been to that space, but it had two different -- there were two different suites at one time. There was the 10- -- 1051 East Nakoma. Downstairs was the lab. Upstairs was Integrity and then there was another space next door that was separate where the

Page 55

hospitals would do their processing.

Q. Before, you said that CPL was doing the screen -- or the confir- -- the confirmation tests for Mission.

A. Uh-huh.

Q. At some point, was it AHL that began to do that?

A. In the outreach side, yes, ma'am.

Q. Okay. So CPL would do it when Mission was billing directly. AHL would do it when it was being billed through an outreach program?

A. Unless AHL couldn't provide all of the services, then we would reference some of it out to CPL. We had already had that relationship so we kept that relationship with CPL. There was just -- there is so many different blood panels that you can run that it's just -- you can't have all of the equipment. So we ran a lot of them there at Alternate Health. Some of them that we couldn't run, we would outsource it to CPL.

Q. You mentioned that hospital staff would do the processing. In the case of Newman, what happened was Newman signed employee lease agreements. Correct?

A. Correct.

Page 56

Q. So Newman would lease, I think they were Integrity employees to do the processing. Is that fair?

A. Correct.

Q. Community never had an employee or lease agreement, did it?

A. No, ma'am.

Q. So in the case of Community, it was an Integrity employee that was doing the processing?

A. Correct.

Q. Okay. So the testing is being done by Newman or AHL. Did Mission ever do any of the actual testing for the outreach programs?

A. I don't believe we -- I don't believe we did.

Q. Okay. Do you know if Sun did?

A. I don't believe they did, either. I think at that point everything went into AHL because it had all the equipment there.

It's -- we turned it from a laboratory more to a management company. It -- it just -- it seems --

MR. MARKHAM: Could you clarify "it"? You turned "it" into a management --

A. We -- Mission -- Mission was a laboratory

Page 57

that turned into -- to a management company. So at that point, when it became a management company, there was other agreements already set on outreach where things needed to -- to funnel. AHL was now the laboratory for the outreach program so the samples went there.

Q. We talked a little bit before about when Newman gained the ability to do screening tests. Just to confirm, Newman was never able to do the confirmation testing. Correct?

A. Correct.

Q. And at any point, was Newman able to perform blood testing?

A. I believe the only blood test -- they were able to do a complete metabolic panel. That was all they were able to do. Like, the CBCs, we had to do those at AHL because those are sensitive within 24 hours. They did the complete metabolic panel so same thing, we would send one of the blood vials to the hospital to run. The rest of them would stay behind at AHL so AHL can run the rest of it.

Q. Okay. And just before we move on, Community, do you recall what capabilities Community had from a laboratory testing standpoint?

A. I believe Community was able to do the

TSG Reporting - Worldwide - 877-702-9580

Page 58

qualitative testing, the screening only, and they were able to do the -- the metabolic comprehensive -- complete metabolic panel as well.

Q. Do you remember when Community gained the ability to do screening testing?

A. I don't.

Q. What about the blood testing?

A. I don't.

Q. They weren't able to do those tests right away. Correct?

A. No, ma'am.

Q. And you helped them get the equipment necessary?

A. Correct.

Q. Okay. So now a test has been performed and results are generated. Correct?

A. Yes, ma'am.

Q. And the results were made available to physicians via some sort of portal. Is -- is that right?

A. Yes, ma'am.

Q. What was the portal called?

A. It's called Lab Health.

Q. And they could just log on and see those results?

Page 59

A. Yes, ma'am.

Q. Next I think in the process is the billing of the claims. Is that fair?

A. Yes.

Q. So you testified earlier that for all outreach program specimens, IAM would perform the billing. Correct?

A. Correct.

Q. And that's true for both Newman and Community. Correct?

A. Correct.

Q. And for both Sun and Mission's involvement with Newman and Community. Correct?

A. Correct.

Q. So IAM would submit a bill to whatever insurance carrier insured the patient at issue using Newman or Community's NPI number. Correct?

A. Correct.

Q. And Newman and Community both had contracts with UnitedHealthcare. Correct?

A. I believe so.

Q. Okay. So then United, in the case of United, would decide whether to pay the claim. Correct?

A. Yes, ma'am.

Page 60

Q. And if the claim was paid, that reimbursement would go to the hospital. Correct?

A. Yes, ma'am.

Q. And the hospital would keep a certain percentage of the reimbursement it received for that claim. Correct?

A. Yes, ma'am.

Q. And it was like 20 percent or something like that?

A. Yeah, in the beginning it was a little bit more and then Newman kind of started -- I guess Newman was reaching out to other laboratories that could help them with their outreach program as well. They were using them against us to drive down our -- our percentages. So eventually it got down a little bit lower, but I believe in the beginning it was -- it was a higher percentage.

Q. Okay. So let's just, for the sake of making sure we're both talking about the same thing, assume that Newman kept 20 percent.

A. Yes.

Q. So the remaining 80 percent in the case of a Newman-Mission claim would go to Mission. Correct?

A. Yes, ma'am.

Q. And then Mission would pay any reference

Page 61

fee -- fees to whichever lab did the testing. Right?

A. Yes, ma'am.

Q. And then -- and would take that out of the total reimbursements it had received. Right?

A. Yes, ma'am.

Q. And any other kind of billing services, payments that were owed. Correct?

A. Yes, ma'am.

Q. And then so what -- whatever was left, the marketers would get a certain percentage of the remainder. Right?

A. Yes, ma'am.

Q. And that was -- and they -- and the marketers would only receive a percentage of the amounts related to the reimbursements received for specimens that they had referred. Correct?

A. Yes, ma'am.

Q. So the more their doctors referred, the more the marketers would receive. Correct?

A. Yes, ma'am.

Q. Did I miss any step in the process?

A. No. You're good.

MS. KURTZ: Okay. We're going to start looking at some documents so I think now would be a good time to take a short break.

16 (Pages 58 to 61)

Page 78

A. I see where that is, yes, ma'am.

Q. I'm a little confused because if you just go down to that first paragraph, it says, it's a laboratory services agreement "by and between Community Memorial Hospital and Sun Ancillary Lab Management, LLC and Mission Toxicology, LLC." Do you see that?

A. I do see that.

Q. What is the reference to Essence Laboratory, if you know?

A. I don't know who Essence is.

Q. Okay. But do you agree with me that this is the agreement that Mission and Sun had with Community Memorial Hospital?

A. Yes, ma'am.

Q. Okay. And then if we go to the signature page, which is Page A-7, it was Dr. Murphy who signed on behalf of Sun and Mission. Correct?

A. I believe so.

Q. Although, you were identified as a consultant for -- under the Mission Toxicology notice Section 15. Right?

A. Yes, ma'am.

Q. Okay. Do you know why Murphy would have signed, rather than you?

Page 79

A. I do not.

Q. Okay. He had authority to sign this agreement on behalf of both Sun and Mission, though. Correct?

A. Yes, ma'am.

Q. All right. Okay. So let's go back to the first page and here, again, services -- well, let me back up.

This is basically the same type of agreement whereby Sun and Mission were going to be providing certain services to Community Memorial. Correct?

A. Correct.

Q. And Paragraph No. 1 defines "services." Correct?

A. Yes, ma'am.

Q. And it says the minimum services to be provided are described in Exhibit A again. Correct?

A. Yes, ma'am.

Q. All right. So let's go to Exhibit A, which is Page A-9. Are you there?

A. Yes, ma'am.

Q. Great. So just take a quick look. From what I can tell, this is not identical, but, in general, the same types of services were being

Page 80

provided. Is that fair?

A. Yes, ma'am.

MR. MARKHAM: Same as what?

MS. KURTZ: As in the Mission-Newman contract.

Q. So, again, accessioning services, outpatient laboratory services, marketing services?

A. Yes, ma'am.

Q. Insurance verification.

And in this case, it was Sun or Mission employees that provided the accessioning services, not Community employees. Correct?

A. It was actually an AHL employee that was -- that was doing that, yes, ma'am.

Q. Did Sun or Mission contract with AHL to provide that service?

A. Yes. I would -- I would pay for that service through AHL every month.

Q. Okay. All right. And here, again, the compensation is set forth right below the listing of services. Do you see that?

A. Yes, ma'am.

Q. And here it says, "As compensation for all services rendered under this agreement, Community shall pay to Sun and Mission an amount equal to

Page 81

60 percent of the net collected revenues derived from the expanded laboratory facility." Correct?

A. Yes, ma'am.

Q. And then it goes on to define "net collected revenues." Correct?

A. Yes, ma'am.

Q. And, again, what that would be is the amounts that the hospital received from insurers for specimens that came in through Sun or Mission. Correct?

A. Yes, ma'am.

Q. Less certain expenses?

A. Correct.

Q. Do you know why this was 60 percent compensation, rather than 80 percent as we saw before?

A. I do not.

Q. Do you know if there was any fair market value analysis performed?

A. I do not.

Q. Okay. You can set that document aside.

So that was Step No. 1, which was the relationships between Mission and Newman and Community Memorial Hospital. Correct?

A. Yes, ma'am.

Page 82

Q. All right. So then the next step, as we discussed before, is the acquisition of specimens, marketing to physicians, and things like that.

A. Yes, ma'am.

Q. All right. So just to confirm, during 2016 and 2017, both Sun and Mission had arrangements with marketers. Correct?

A. Yes, ma'am.

Q. And those arrangements were set forth in various contracts?

A. Yes, ma'am.

Q. And one party to the contract was a marketer and the other party to the contract was either Sun or Mission. Correct?

A. Yes, ma'am.

Q. And the purpose of the contract was to set forth the terms under which the marketer would promote the services of Sun or Mission. Correct?

A. Correct.

Q. And then the marketers that Sun or Mission had arrangements with had relationships with various physicians. Correct?

A. Yes, ma'am.

Q. And the physicians had access to patient specimens. Correct?

Page 83

A. Yes.

Q. And they were positioned to refer patients and send specimens to Sun and Mission for testing. Correct?

A. Yes.

Q. How do you know that?

A. Well, I mean, as these -- as these reps would come in contract with us, they would go and visit physicians and send us that onboarding document and they would put their rep number on there, knowing that that -- they have already explained the services to the physician. The physician was interested in utilizing the Mission management platform for the outreach program.

Then is when we would tell the doctors all the -- the hospitals that we were contracted with, services it provides, insurances they -- they accept, yada, yada, yada. And they would say, "yes, we want to use those services."

Q. So just to be clear, since I haven't seen the onboarding document --

A. Yes.

Q. Was it the rep that was signing the onboarding document or was it the physician that was signing the onboarding document?

Page 84

A. The rep. The physician would take the onboarding document because you had to get the physician's, like, address, NPI numbers. They would get all that information and then the doctors would -- would fill it out.

Q. Okay. And was it the rep that signed the onboarding document or was it the doctor that signed the onboarding document?

A. To be honest, I don't know if it had a signature for the physician on the onboarding document.

Q. Okay.

A. I'm not sure.

Q. Okay. All right. Thank you. That's helpful.

All right. So then just in terms of the arrangements that Sun or Mission had with marketers -- the arrangement -- the purpose of the contracts were to incentivize the marketers to try and get physicians to refer tests to Sun or Mission. Correct?

A. Yeah. It was -- it was to utilize their relationships and figure out -- I mean, me, as a marketer, you'd go and you'd talk to a doctor and they would tell you that they're utilizing certain

Page 85

labs and they're not getting good service or good turnaround time.

Q. Uh-huh.

A. So we knew with our -- with our platform with us managing these outreach programs that we can give more testing and we would try to get better turnaround time.

Q. Okay.

A. So if we can help them help their patients quicker, it was a better opportunity for that physician. That's what the lab space -- that's what every lab company tries to do.

Q. And, presumably, that would be the pitch that the reps would give to the physicians. Correct?

A. Sure. I mean, every single laboratory, I'm sure Quest and LabCorp do the same pitch.

Q. For the marketers, the more specimen referrals that they got into Sun or Mission, the more they would get paid. Correct?

A. Well, the more samples they'd bring in, absolutely, the more money they would make. But to bring in that kind of sample, you have to get multiple doctors so they're working harder and harder to get paid that money, yes, ma'am.

Q. Okay. And as we mentioned before, the --

22 (Pages 82 to 85)

Page 86

the marketers all have contracts with either Sun or Mission, depending who they were sending specimens to. Correct?

A. Correct.

Q. All right. I just want to look at one exemplary contract.

A. Sure.

Q. I know that there were a lot of them, but I'm not going to endeavor to walk through even a substantial portion of them for the sake of everyone's time here.

A. Okay.

Q. So this is an exhibit that was previously marked as Exhibit 14 which was used in the deposition of Daniel Boone.

Do you know Daniel Boone?

A. I do.

Q. It's a great name, isn't it?

A. Yes. He's --

Q. Okay.

A. He's a good guy.

Q. Can you just describe the nature of your relationship with him.

A. So Daniel had reached out to us. Daniel or Dan Boone is what I call a distributor. All

Page 87

right. So he knows a lot of reps. So the reps, what they want to do is call on their doctors and they want somebody else to deal with issues, concerns, making sure that everything is given to their doctors, supplies, all that kind of good stuff. It's kind of like the --

Q. The middle man?

A. -- the liaison. The middle man. So that's what Dan would do and that's what he still does today.

Q. Okay. So I've seen that term "distributor" in a few documents and that's a helpful description because I've been trying to reconcile what's the difference between a distributor versus a marketer versus a rep.

A. Yes.

Q. And I may have more questions about that.

A. Okay.

Q. But that is helpful.

A. Sure.

Q. Okay. So Daniel Boone's company was called or maybe still is called One Stop Medical Services. Correct?

A. Yes, ma'am.

Q. All right. So this is a management

Page 88

services agreement between One Stop and Mission Toxicology. Do you see that?

A. Yes, ma'am.

Q. And if we go to the signature page. That's Page 8 of the document.

A. Yes, ma'am.

Q. The signature -- or you signed on behalf of Mission Toxicology. Correct?

A. I did, yes, ma'am.

Q. And Dan Boone signed on behalf of One Stop?

A. Correct.

Q. All right. Great. Let's go to the first page again.

A. Okay.

Q. So here it says -- and the -- the date of this is January 17th of 2017. Correct?

A. Yes.

Q. Here it says "Mission is engaged in the business of owning and operating a clinical laboratory specializing in the provision of toxicology/blood testing services." Do you see that?

A. Yes, ma'am.

Q. And then it says "manager is in the business of, among other businesses, managing and

Page 89

arranging for the availability of ancillary healthcare services for and on behalf of networks of physicians and physician group practices." Do you see that?

A. Yes, ma'am.

Q. So here, what the contract says is Mission owns a lab and One Stop manages and arranges for healthcare service for doctors basically. Correct?

A. Yes, ma'am.

Q. All right. So then if we go to Paragraph 2 of the document, it again defines services?

A. Yes, ma'am.

Q. So this is describing the services that One Stop is going to be performing on behalf of Mission in this case. Correct?

A. Yes, ma'am.

Q. All right. So the first is "Advise and assist Mission in overseeing and implementing marketing services for the promotion of the Lab and the toxicology and other clinical laboratory services offered by the Lab." Correct?

A. Yes, ma'am.

Q. So here, he's going to help market services for the lab that Mission runs. Correct?

23 (Pages 86 to 89)

Page 94

advance, is consistent with the fair market value and an arm's-length transaction." Do you see that?

A. Yes, ma'am.

Q. Do you know if there was a fair market value analysis performed in this case?

A. I do not.

Q. And it says that the aggregate compensation over the term of the agreement is set in advance, but that's not actually the case. Correct?

A. Ask the question again.

Q. Yes. Sorry.

It says "The aggregate compensation paid to the Manager over the term of the agreement is set in advance." Do you see that?

A. Yes, ma'am.

Q. Which would imply that the total compensation that Dan Boone would receive under this agreement was determined in advance of the contract being signed. Do you see that?

A. Yes, ma'am.

Q. But that's not what really happened. It was a percentage of net revenues?

A. Yes, ma'am.

Q. Do you know who prepared this contract?

A. Jerry Cohen with Pulman, Cappuccio, Benson

Page 95

and somebody else. Pullen or something like that. It's a big group. They're right down the street from our office on NorthWest Military.

Q. Is that a law firm?

A. It's a law firm, yes, ma'am.

Q. Were for the most part the contracts that you signed with marketers pretty much along these lines?

A. Yes, ma'am. I mean, he -- Jerry was very active while we were running the -- the laboratory from day one all the way to the end. So he was always involved in pretty much everything.

Q. You can set that document aside.

A. Okay.

Q. So Sun and Mission both entered into agreements with marketers. Correct?

A. Yes, ma'am.

Q. Sun also received specimens from physicians who had invested in Sun Laboratories. Correct?

A. Yes, ma'am.

Q. All right. And the -- the Sun Laboratories investment structure was a series of series LLCs. Correct?

A. Yes, I believe so. Yes.

Page 96

Q. And so in each series it was defined who could invest in that type of series. Correct?

A. Yes, ma'am.

Q. And the distributions were based upon the series that that investor had invested in. Correct?

MR. MARKHAM: Objection. The documents speak for themselves.

Q. You can answer.

A. I believe so, yes.

Q. All right. I want to talk a little bit about Sun's marketing program. And I know you weren't as involved, but there are some documents that I think you're on the emails --

A. Okay.

Q. -- so I'm going to ask you about them.

A. Sure.

Q. Okay. I'm handing you a document that is being marked as 106. The Bates number is LD175459. And this is an email and an attachment to an email so it's two separate documents, but I'm marking it as a single exhibit. Okay?

A. Yes, ma'am.

(Exhibit 106 was marked.)

Q. So let's start by looking at the email.

(Discussion off the written record.)

Page 97

Q. So this is an email from Chelsea Ramirez dated September 6th of 2015 to several different people, including you and Mike Murphy. Do you see that?

A. Yes, ma'am.

Q. Is Chelsea Ramirez also Chelsea Ewing?

A. Yes, ma'am.

Q. And she was Mike Murphy's assistant?

A. Yes, ma'am.

Q. Or maybe still is Mike Murphy's assistant?

A. Correct.

Q. And the subject is "Sun Labs 9/11/15." Do you see that?

A. Yes, ma'am.

Q. And then there is a document attached and I want to go to that attachment.

Just for clarity's sake, this is before the outreach programs would have started. Right?

A. I believe so.

Q. So I'm looking at the attachment now and it looks like it is like meeting notes or something like that?

A. I believe this is probably -- this looks like a -- like a meeting note when we used to meet together on Fridays.

25 (Pages 94 to 97)

Page 102

Q. Okay. So at least for some of these groups that you guys are discussing in this meeting, they are series investors and you guys are discussing the number of referrals, right, from those groups?

A. Yeah. They were -- they were discussing the projections that some of these offices would throw out, which were never even remotely closely right.

Q. Were they optimistic?

A. They were very optimistic.

Q. All right. I want to look at the Florida Rehab Center. Do you see that?

A. Yes, ma'am.

Q. And this is one of the ones you thought might not have been a series, correct, investor?

A. I believe they were not. I'm not -- I didn't get to see all the legal paperwork. That was really -- Dr. Murphy and Lynn would do that. I was -- I was an owner of Sun, but I really wasn't in the whole management side of it.

Q. Okay. Here the discussion is "The medical director of this group orders toxicology testing three times a week and wants full confirmations on each test." Do you see that?

A. Where are you at?

Page 103

Q. At the very bottom.

A. Oh, yes, yes, yes. I do see that.

Q. Okay. Is it appropriate to order full confirmations for each toxicology test three times a week?

A. These drug rehab centers, because of the kind of patient that they're dealing with, they normally tend to violate their sobriety. So a lot of them wanted to test, just because there are so many different drugs that can come into a treatment center. It may not be the drug specific of why they're there. So they would ask for full confirmations on those.

And they -- and this particular one wanted three times a week. I know on the Mission side we would tell them that they couldn't order a certain amount per year. And some of them would come on board and most of them would tell us that's not good enough for their program. And that was specific to the medical directors.

Q. Okay. Then moving to the next page, it says "We will not run the test for a patient with Blue Cross Blue Shield of Florida." Do you see that?

A. Yes, ma'am.

Q. Do you remember why not?

Page 104

A. I don't remember why not.

Q. Okay. So was it pretty standard in these meetings to talk about different investors or different referring physicians, and try and project the number of referrals that they would be bringing in?

A. As some of them were coming on board, they would -- we'd get information on what they were going to order. And like if they ordered tox, or if they're going to do more blood, and then roughly how many patients they see, and they would tell us, we normally -- some of them would pull utilization reports from -- from the laboratories, and they would tell us how much they normally send.

Q. Okay.

A. Just so we knew what volume. Because obviously we're growing the lab at the same time. So we need to make sure that we're going to have enough man power, equipment, all that, to run these samples.

Q. Was there ever discussion that -- about whether to invite a physician to invest in a series based upon the number of referrals they were likely to generate?

A. No, ma'am, not that I remember.

Q. Okay. You can set that document aside.

Page 105

A. Okay.

Q. I'm handing you a document that's being marked as Exhibit 107. It bears the Bates No. FORT_2434.

(Exhibit 107 was marked.)

Q. Okay. So this is an email that was sent from -- well, it's an email chain with a top email being sent from you to someone named Bill Flowers and Thomas Palmer on August 17th of 2016.

Do you see that?

A. Yes, ma'am.

Q. All right. And the original email was sent to you on that date from Bill Flowers. Correct?

A. Yes, ma'am.

Q. Who is Bill Flowers?

A. I believe he was one of the representatives that dealt with Fortis Labs.

Q. And who is Thomas Palmer?

A. I believe he's the owner of Fortis Labs.

Q. And Fortis only referred to Sun?

A. Yes, ma'am.

Q. Okay. So here we have an example of a rep emailing you directly, even though he was associated with a marketer group. Correct?

A. Yes, ma'am.

Page 106

Q. All right. So in his -- in Bill Flowers' email to you, he notes in the second sentence that there are several physician groups that wanted to start with Sun, but he wanted to speak with you first. Correct?

A. Yes, ma'am.

Q. Do you know why he would have been reaching out to you related to Sun, rather than someone else?

A. Like I said, I had been a marketer for a long time. So a lot of people in Texas know who I am and I know who they are. They knew that I was affiliated with Sun through Mission on the outreach program. So they reached out to me directly. They would always reach out to me directly just because, like I said, I was always available on the phone. Dr. Murphy wasn't always available. So these guys needed questions, they would always just start calling me.

Q. Okay. He goes on to say, "We have had issues with two of the hospital deals we have been using for blood, and I would like to discuss in further detail how it is going at Sun and hopefully see some recent collection reports." Do you see that?

Page 107

A. Yes, ma'am.

Q. So here it sounds like they have some sort of arrangement with regard to an outreach program separate from yours. Correct?

A. Yes, ma'am.

Q. And they were having issues with that?

A. Yes, ma'am.

Q. I mean, he's asking to make sure that things are going well with Sun's outreach program. Correct?

A. Yes, ma'am.

Q. Namely, he wants to make sure Sun is getting paid through its outreach program. Correct?

A. He could be saying payments or could be the actual service that was provided. There was a lot of -- at this time there was a lot of management companies that were doing outreach and a lot of them didn't know how to manage a laboratory. So it was -- I mean, a lot of these deals were train wrecks. So doctors were not happy. If you're going to give them terrible service, they're not going to use the -- they're not going to use the platform, period.

Q. Okay.

A. So I don't know if that's what he was talking about.

Page 108

Q. But he's -- sorry.

A. You're -- you're good.

Q. I don't want to cut you off.

A. No, you're good.

Q. He says, "hopefully see some recent collection reports."

Do you see that?

A. That, he's looking for financial information when he states that, yes, ma'am.

Q. So collection reports would be collections on specimens that were being referred to Sun by its marketers. Correct?

A. Correct.

Q. Then he says, "We just want to make sure that if we move our doctors that we are moving them to a lab that has had success with in-network billing." Correct?

A. Yes, ma'am.

Q. So what he is saying is he is thinking about trying to convince his doctor to start referring to Sun, but he wants to make sure that Sun's out- -- outreach program is functioning well. Correct?

A. Yes, ma'am.

Q. He wants to make sure people are getting

Page 109

paid. Correct?

A. Yes, ma'am.

Q. And you responded to him, "I will be traveling to Houston tomorrow but I am available today."

Do you see that?

A. Yes, ma'am.

Q. Do you remember the conversation that you had with Bill Flowers?

A. I don't.

Q. Ultimately, Fortis did refer a lot of specimens to Sun. Correct?

A. They did. And we -- we did meet with Dr. Flowers and Tommy Palmer here in San Antonio. I don't know the time frame, but we did meet them face-to-face with me and Dr. Murphy and I think there were a couple other people in the room with both of these gentlemen.

Q. Was Fortis a group that you would call a distributor?

A. So Fortis had a management company that Bill Flowers ran and then I don't know what his relationship was to Tommy Palmer, but they were doing business together as well.

Q. Okay. So --

28 (Pages 106 to 109)

Page 110

A. So I think Bill was the distributor on the -- on the marketing side.

Q. So Bill would then have had relationships with reps who then had relationships with doctors?

A. Correct.

Q. Okay. And he said, "We just want to make sure that if we move our doctors."

Do you see that?

A. Yes, ma'am.

Q. So the reps are making that decision?

A. I guess the reps are going to go and talk to their -- their doctors and pitch, obviously, the outpatient -- our outpatient model to see if they would want to send in to our facility.

Q. Okay. All right. You can set that document aside.

Okay. I'm handing you a document that is being marked as Exhibit 108. This document bears the Bates No. FORT_498.

(Exhibit 108 was marked.)

A. Okay. Thank you.

Q. Okay. So this is, again, an email chain where you are copied.

A. Yes, ma'am.

Q. The top email is from Thomas Palmer and

Page 111

it's dated November 14th of 2016. And he's sending it to both you and Mike Murphy. Do you see that?

A. Yes, ma'am.

Q. And it's titled, "Fortis Labs - Partnership Thoughts." Correct?

A. Yes, ma'am.

Q. All right. And he says, "Per our previous conversations I wanted to follow up in writing on two topics that can help us deepen our partnership and increase revenues together."

Do you see that?

A. Yes, ma'am.

Q. Can you describe the nature of Sun's partnership with Fortis.

A. Fortis would -- would be a management company. I believe they had a management company so they were looking at bringing in samples to our outreach program through Sun, is what I'm assuming this is what he's saying here.

Q. Okay. So he has several bullets, I guess, that outline his different thoughts.

A. Yes, ma'am.

Q. The first one is "Blood Lab/Core Lab." Do you see that?

A. Yes, ma'am.

Page 112

Q. He identifies the problem, proposed solution, and rationale. Do you see that?

A. Yes, ma'am.

Q. And he says the problem is "We are losing business with our doctors due to limited CPL options and high CPL send-out costs."

Do you see that?

A. Yes, ma'am.

Q. All right. So my question here is, my understanding was that CPL wasn't being used by Sun for the outreach program. Am I incorrect in that understanding?

A. I believe they -- they were still doing certain stuff for -- for Sun. If -- if we couldn't do a particular test, we would outsource it to CPL.

Q. Okay. So what he's saying is, "We're losing business with our doctors due to limited CPL options and high CPL send-out costs."

Did you have an understanding of what he meant by that?

A. No.

Q. All right. Here, he wants -- the proposed solution is for Fortis' lab to run their own samples for their own doctors. Correct?

A. I believe so, yes.

Page 113

Q. So even for specimens that were part of the outreach program that were referred by Fortis doctors, Fortis would run the tests under his proposal. Correct?

A. That's what he wanted, yes, ma'am.

Q. All right. And his reasoning is below, I want to focus on, he says, "In addition we had higher customer satisfaction with our physicians when we ran OON Fortis samples than since we transitioned to In-Network Sun/CPL samples."

Do you see that?

A. Yes, ma'am.

Q. "We are simply asking to take care of our own doctors." Correct?

A. Yeah, that's what he's asking.

Q. So what he's proposing here is for Fortis to run the labs but still bill through the hospitals. Correct?

A. That's what he's asking, yes, ma'am.

Q. Was that something that he was ever allowed to do?

A. I don't believe so.

Q. Would you think that would be appropriate under an outreach program?

A. I don't know the answer to that. I don't

29 (Pages 110 to 113)

Page 114

know the legal part of -- of that question.

Q. All Right. Then if we go down to "bid models." Do you see that?

A. Yes, ma'am.

Q. And the problem he identifies here is "Some of our reps and distributors are pitting our MSO and series LLC model(s) against the Sun MSO model."

Do you see that?

A. Yes, ma'am.

Q. Do you understand what he meant by that?

A. I -- I don't. I'm guessing that the Sun series models were competing against his MSO is what I'm assuming that means and...

Q. So I understand that Sun had the series LLC investment model.

A. Yes.

Q. Did Sun also have MSOs that it was involved in?

A. Just had the series model.

Q. Okay. So he says his proposed solution is for Sun to discontinue the running MSOs and other business models. Do you see that?

A. Yeah. He wanted Sun to stop their series LLCs.

Page 115

Q. Do you know why?

MR. MARKHAM: Objection; calls for speculation.

A. Yeah. I don't -- I don't know what his intent was, but I can imagine he probably wanted to pick up some of those doctors to put into his MSO.

Q. That's not something that -- you didn't take his advice on those. Correct?

A. No.

Q. Do you remember if you ever had a follow-up conversation?

A. I -- I don't.

Q. Okay.

A. He asked for a lot when he came on board. He wanted everything. He wanted the kitchen sink and everything else. I don't believe Dr. Murphy did any of it.

Q. So Fortis wasn't an investor in the Sun series LLCs. Correct?

A. No, ma'am.

Q. All right. You can set that document aside.

Okay. I'm handing you a document that's being marked as Exhibit 109.

(Exhibit 109 was marked.)

Page 116

Q. It bears the Bates No. LD189253.

A. Okay.

Q. And, again, this is an email with some attachments.

A. Okay.

Q. All right. So this is an email that you sent on June 18th of 2016 to yourself and Gilbert Saucedo. Do you see that?

A. Yes, ma'am.

Q. Is Gilbert Saucedo your brother?

A. Yes, ma'am.

Q. And what was his involvement in Mission?

A. He was my financial analyst.

Q. Was he involved in Sun at all?

A. I do not believe so.

Q. Okay. So you're saying to him, "Attached are the payment reports for all 3 hospitals. Let's talk to get the distributions ready for the reps and the physicians. When can you work on this?"

Do you see that that?

A. Yes, ma'am.

Q. So this is about Mission Toxicology, correct, not Sun?

A. This is Mission Toxicology, yes, ma'am.

Q. All right. And the hospitals that are

Page 117

being addressed here are Campbellton-Graceville, Regional General, and Newman. Correct?

A. Correct.

Q. And so if we just look quickly at the attachments. These are spreadsheets that show the amounts that were actually paid by insurance for various specimens that had been referred to Mission. Correct?

A. Correct.

Q. And billed through the various hospitals. Correct?

A. Correct.

Q. All right. And so the first spreadsheet is "RGH Payment Detail By Account."

Do you see that? It's at the bottom.

A. Yes, ma'am.

Q. The second spreadsheets I don't think are labeled that way.

A. No.

Q. Yeah. The second one just says "Payment Detail By Account" and the third one says "Payment Detail By Account." I'm assuming it's in the order that they were attached, so RGH and CGH, then NMH. Do you see that?

A. Yes, ma'am.

TSG Reporting - Worldwide - 877-702-9580

Page 118

Q. So you were providing this information to your brother in order for him to calculate the amounts that would need to be distributed under your marketing agreements. Correct?

A. Yes.

Q. All right. And you say that the distributions need to be ready for the reps and the physicians. Correct?

A. Yes.

Q. Did distributions go directly to physicians?

A. Mission Toxicology, when it was first opened, was a physician-owned laboratory. So our physicians were investors in -- in the laboratory.

Q. Was that the case in 2016?

A. Yes.

Q. When did they stop being physician-owned?

A. I believe it was late '17.

Q. Did you have a series model the same way Sun did?

A. I did not. It was a POL model so they -- they invested in the laboratory and then got a percentage of net profits.

Q. And they were referring to the lab?

A. Yes, ma'am. And I believe I sent all

Page 119

the -- I sent all those contracts to you guys. Those were drafted by Jerry Cohen and he's the one that put that -- all that together for us as well.

Q. Okay. So this is consistent with what we've discussed before, that insurance companies would make payments and then a certain percentage of those net revenues would then be distributed to, in this case, either marketers or physician owners and then the marketers would then distribute further as their agreement said?

A. Yes, ma'am.

Q. Is that fair?

A. Yes, ma'am.

Q. All right. And the distributions were based upon the number of referrals made by those marketers or physicians?

A. To the -- to the reps, yes. To the physicians, they were not. So basically all the referrals came in together. It didn't matter if you sent one or 400, the revenues were appropriate to your percentage. So if you only owned 1 percent, you get 1 percent of the net profits. So it really didn't calculate your -- your volume.

Q. But if a physician only referred one specimen, the reimbursements would be lower than if a

Page 120

physician referred 100 specimens. Correct?

A. No.

MR. MARKHAM: Objection.

A. No.

Q. Well, if a physician owner referred a single specimen, they would get reimbursed, let's say, $1,000 for that specimen?

MR. MARKHAM: Objection.

MS. KURTZ: I'm not saying "they," the physician.

A. Let me give you an example of it. If, okay, let's say at the end -- at the end of the month we have $100,000 in that and then we have, you know, 100 doctors, right, then that's -- that's how we would do it. So each doctor would get $1,000 if you own 1 percent.

So you can have -- you can send five samples and own one share and get $1,000, or you can have 200 samples and own one share and get the same amount of money. So it wasn't on volume.

Q. But if a doctor referred more specimens to the lab, it was likely that the net profits would be higher. Correct?

A. Sure. If they did, yes.

Q. So if a doctor referred 100 specimens

Page 121

rather than one specimen, it was likely that the net profits would be higher in the case where they were referring 100 specimens than one specimen. Correct?

MR. MARKHAM: Objection; incomplete hypothetical.

A. No. We had a lot of doctors that didn't send 100. We had a lot of doctors that just -- they sent what they were able to send. This is -- this is no different from an imaging center with physicians that are -- own -- I know -- I mean, there is -- your facility's own surgery centers that are physician-owned. It's no different on your side than it is on ours.

Q. That wasn't my question. I just want to confirm that if a doctor sends 100 specimens rather than one specimen, the company's profits that month are likely to be higher than in the case where one specimen was sent?

A. Of course.

MR. MARKHAM: Objection; it depends on what everybody else does. Incomplete hypothetical.

Q. "Of course" is your --

A. Of course if you -- if you're sending more volume, the reimbursement is going to be higher.

31 (Pages 118 to 121)

Page 122

That's in any business. You sell more plates of food, you make more money.

Q. Okay. You can set that document aside.

(Brief interruption.)

(Discussion off the written record.)

THE VIDEOGRAPHER: The time is 11:34. We are off the record.

(Break.)

THE VIDEOGRAPHER: The time is 11:48. We are on the record.

Q. Okay. I'm handing you a document that is being marked as Exhibit 110.

(Exhibit 110 was marked.)

Q. It bears the Bates No. LD188145. This, again, is an email and an attachment. So looking at the email, it's an email from you dated April 24th of 2016 to Jason Laubenstein. Do you see that?

A. Yes, ma'am.

Q. Who is Jason Laubenstein?

A. He is one of the other owners of Mission.

Q. Was he a physician?

A. He is not.

Q. Okay. And there is an attachment, it's a Mission Toxicology PowerPoint presentation. Do you

Page 123

see that?

A. Yes.

Q. And you say "Jason, I have been working on this PowerPoint presentation for our new reps. I am not done with it yet. Check it out and tell me what you think." Do you see that?

A. Yes, ma'am.

Q. Okay. So then if we go to the attachment, we see the PowerPoint presentation?

A. Yes, ma'am.

Q. Is this a PowerPoint presentation that looks familiar to you?

A. Yes. It's one that I put together.

Q. And this would have been distributed to reps to use in their marketing to physicians?

A. I don't believe we ever distributed it. I believe we put it together, but I don't think it ever actually was delivered to any physicians.

Q. Do you know if any similar marketing presentation was delivered to physicians?

A. I don't believe so.

Q. Okay. So you didn't create any formal marketing presentations?

A. Most of the stuff that we'd give to the doctors was -- all they wanted really to see was

Page 124

requisition forms. And they knew kind of everything else in the laboratory space. They wanted to know what testing we were doing, is really what they cared about. And then turnaround time and all that kind of good stuff.

He wanted to put a presentation together and we did, but it was -- no doctor is going to let you present all this information because they're just too busy to listen to it all.

Q. Okay. So at a minimum, though, this is the information that you thought was important for a doctor to know about the Mission program. Correct?

A. Uh-huh.

Q. All right. So let's look at the "About Us" page. I'm sorry these aren't numbered so I'll do the best that I can to direct you to where I am. It says "Mission Toxicology opened on April 29, 2013." Do you see that?

A. Yes, ma'am.

Q. And then you identified it as a "Highly -- High Complexity Reference Lab, Providing Toxicology, Blood, OB/GYN, and Allergy Services." Correct?

A. Uh-huh.

Q. Is that a "yes"?

A. Yes, ma'am.

Page 125

Q. Sorry.

A. Sorry.

Q. I don't mean to be rude. So Mission couldn't perform blood testing, though, could it?

A. It could with referencing out to our reference partners, yes.

Q. Okay. But Mission itself didn't perform the blood testing. Correct?

A. Correct. It didn't itself, yes. It could if it wanted to on our -- on our qualitative screens you can run urine or blood through there for some of your panels. So it could if it wanted to. It couldn't do all of it.

Q. And for the most part it referenced out blood testing. Right?

A. Yes, ma'am.

Q. And then OB/GYN and allergy services. Do you see that?

A. Yes, ma'am.

Q. We've talked about the allergy testing. What OB/GYN testing would they perform? Like Pap smear testing or something like that?

A. Yes, ma'am.

Q. And would that be something that would

TSG Reporting - Worldwide - 877-702-9580

APP 168

Page 126

have been referenced out as well?

A. That would have went to CPL because they're a pathology lab.

Q. Okay. So then if we move along to the first slide that says "Benefits." Do you see that?

A. Where is that at?

Q. It --

A. Is it in the back?

Q. It comes right after the "Lab Test Services" slide. The first bullet is "In Network."

A. Benefits and advantages?

Q. Let me see. Here, let me find it for you. Here we go.

A. Thank you.

Q. Okay. So the first benefit listed is that Mission is in network with all five major payers through a partnership with a hospital system. Do you see that?

A. Yes, ma'am.

Q. Mission didn't have a contract directly with any of the payers. Correct?

A. It did not.

Q. So when it says it was in network, it was based upon the laboratory services arrangements it had with hospitals?

Page 127

A. It was the outreach model.

Q. It says here that it has a partnership with "a hospital system." Was that because this was created at a time where there was only one hospital that Mission was contracted with?

A. It may have been when we just started with one of the hospitals and then we brought in others after.

Q. And then it says "Quick turnaround time with reports." Do you see that?

A. Yes, ma'am.

Q. And "One provider to trust with all your lab needs." Do you see that?

A. Yes, ma'am.

Q. All right. So then we go to two slides from there.

A. Yes, ma'am.

Q. And it's talking about the advantages of being in network. Do you see that?

A. Yes.

Q. The first advantage is the no competition because most labs are out of network. Right?

A. Yes, ma'am.

Q. It was important to doctors to refer in network. Correct?

Page 128

MR. MARKHAM: Objection; speculation.

A. Most doctors wanted to send in network, yes, ma'am.

Q. Why?

A. Number one, it's -- obviously it's less amount of patient -- out of pocket for the patient if you're in network to out of network. The deductibles in network are a little bit less than out of network. Insurances pay more in network than out of network.

Q. Okay.

A. So there is a lot of expense to the patient out of network.

Q. So if we go to the bottom bullet, it says "In-network deductibles are much lower, which means less upset customers and less irate customer calls to the doctor." Do you see that?

A. Yes, ma'am.

Q. So the doctor wanted to make sure that the patient wasn't going to be charged too much. Right?

MR. MARKHAM: Objection; speculation.

A. Well, I mean, I don't know what Quest and LabCorp charged for their testing, but I can imagine. I've heard doctors say that they charge a lot of

Page 129

money for their patients, and they send them to collections. So I don't know what that would mean.

Q. But you put -- you made this bullet. So you're saying in-network deductibles are much lower --

A. They are lower, yes.

Q. -- which means less upset customers and less irate customer calls to the doctor.

A. Yeah, but it's not just deductibles. There's coinsurance that's involved in a lot of these plans. So it's not just deductible-driven. If you have an 80/20 plan, it's deductible plus your coinsurance.

Q. But my only point is that you're conveying this as a benefit of your program. Correct?

MR. MARKHAM: Objection. He said he never conveyed this.

MS. KURTZ: He created the document.

MR. MARKHAM: But that's -- you asked him if he conveyed it.

Q. I'll rephrase it.

A. Yeah.

Q. When you created this document the intent was that this may be conveyed to doctors, what one of

33 (Pages 126 to 129)

Page 130

the benefit of the programs would be?

A. That it was in network, yes, ma'am.

Q. And that one of the benefits of being in network was that the patients would pay less. Correct?

A. The patients' deductibles will be less is what I was trying to refer. But then again, that's not always the case. It depends on the employers. If the employers pick a $10,000 deductible in network, then that would be a higher deductible. It will be higher out of pocket for the patient.

Q. Why did you include this bullet on this line?

A. Because physicians would rather be in network, use an in-network laboratory.

Q. And one of the reasons was that at least here you're saying the deductibles would be lower?

A. In some plans, yes.

Q. If you go to the second-to-last page, it's the one right before the Q and A. It shows a DNA test requisition form. Do you see that?

A. Uh-huh.

Q. And it's a Sun requisition form. Do you see that?

A. Yes, ma'am.

Page 131

Q. Why would you include a Sun requisition form in a Mission marketing?

A. Because if we were going to do PGX testing, we were going to send it to Sun.

Q. And the doctors would be ordering it from Sun?

A. The doctors would be ordering through Mission, and we would reference it out to Sun.

Q. Would that have been communicated on the requisition form?

A. Yes.

Q. And you said this document never actually was used for marketing purposes. Correct?

A. Not that I'm aware of. No, ma'am.

Q. And that there weren't other similar materials that were used?

A. No.

Q. I just wanted to make sure, though. I didn't see any hospital -- specific hospital names in this document. Did I miss something?

A. Well, the specific hospitals were explained to the physician as we were showing them the requisition forms. We didn't put the hospitals in any of our materials.

Q. Why not?

Page 132

A. Because we didn't want other reps to know what hospitals we were using so they can go and try to take hospitals from us.

Q. But it was the reps that were telling the physicians about the outreach program. Right?

A. Well, there was other management companies out there that had outreach. So at this point everybody was trying to locate which hospitals were doing outreach programs. So the more information you gave out there, the less -- more likely that somebody is going to come in and try to take that hospital from you, from your management.

Q. So you didn't tell the reps which hospitals you were associated with?

A. Yeah, we told the reps. We just didn't put it in a -- if you circulate this, this can get into anybody's hands. We told the reps they were under contract. Once they were under contract with us, they couldn't give our information to other people. So I wanted to make sure to get them on contract first, and then we would give them all the information.

MS. KURTZ: One thing I'd like to note for the record is we are unable to find any of those onboarding documents in our production,

Page 133

and that's something we would like to request production of.

MR. MARKHAM: Okay.

MS. KURTZ: Lynn, this is marked AEO.

I don't have any problem with it. This was an email that was produced by a different entity, but Jesse is the one who wrote the email. So I don't see how they can --

MS. MURPHY: I am happy to step out if it makes you more comfortable.

MS. KURTZ: It doesn't. I honestly don't care. And it might be a nonissue because I'm not sure that we even have it.

(Discussion off the written record.)

MS. KURTZ: Never mind. We'll just ask a different one. It's a nonissue then.

Q. Okay. I'm handing you a document that's being marked as Exhibit 111. It bears the Bates No. LD195810.

(Exhibit 111 was marked.)

Q. Okay. This is an email chain, with a top email from you dated February 19th of 2017, to Shel Main. Do you see that?

A. Yes, ma'am.

34 (Pages 130 to 133)

Page 134

Q. Who is Shel Main?

A. It's -- it says Shel Mainzer. I don't -- I guess he's one of our representatives. I don't remember him.

Q. Do you remember a company called Innovative Medical?

A. Not from the top of my head. No ma'am.

Q. All right. Let's go to the earlier email in the -- earliest email in the chain --

A. All right.

Q. -- which is on the second page. Here, whoever this person is wrote to you, "I have doctors wanting to see the contracted rates in writing. How can we get this set up?" Do you see that?

A. Yes, ma'am.

Q. And you responded, "Hospital negotiated contracted rates? If so we do not share hospital contracts with distributors or reps."

Do you see that?

A. Yes, ma'am.

Q. Why didn't you share the hospital contracts with distributors or reps?

A. The hospitals -- I never had a hospital contract.

Q. You never saw the hospital's contracts

Page 135

with the insurers?

A. No.

Q. If you did have a hospital contract, would you share it with the distributors or the reps?

A. No.

MR. MARKHAM: Objection.

A. It wouldn't be for me to share with them.

Q. Then this person writes, "Can you share with physicians? This was a direct question from a physician." Do you see that?

A. Yes, ma'am.

Q. Okay. And you responded, "We don't share this with physicians either." Do you see that?

A. Yes.

Q. Why wouldn't you share this information with physicians?

A. The same reason. I didn't have the contract, nor would it matter to share it with a physician.

Q. Why do you say it wouldn't matter?

A. Well, they're looking for -- I would assume here they're looking for how much it pays to the hospital from the insurance company. And to me it didn't matter how much it paid.

What we were looking for is to send

Page 136

services to our outreach model, regardless of whether it paid high or low. It didn't matter.

Q. Why is that? Why were you -- why did you want to send services to the outreach model if the amount of payment didn't matter?

A. Obviously because it's in network.

Q. And why does in network matter?

A. Because that's what the physicians wanted.

Q. And why would the physicians want that?

A. I don't know. They just preferred in-network laboratories.

Q. Did you have an understanding of whether Quest or LabCorp were in network with a lot of these insurers?

A. I know that they are in network with some of the insurers, as some of them, they're preferred providers, just because I've been in medicine for a long time. So, yes, I do know that.

Q. So the physicians could have sent in network to Quest or LabCorp in a lot of cases. Correct?

A. Well, physicians have every -- physicians can use whoever they want, as long as a patient -- as long as it's in network. The physicians can dictate where -- where that patient goes.

Page 137

Q. Have you ever seen the physician's network agreements with the payers?

A. No, ma'am.

Q. And you haven't seen the hospital's network agreements with the payers?

A. No, ma'am.

Q. And you understand that reimbursements under either of those agreements must be compliant with the terms of those contracts, though. Correct?

MR. MARKHAM: Objection; calls for a legal conclusion. Contracts he's never seen.

A. Yeah.

Q. All right. So you ask, "why is he interested in our contracts?"

A. Uh-huh.

Q. It wasn't your contract, though, was it?

A. Well, he knew -- he knew that we were contracted with hospitals for our outreach program. So that's why he was asking me for them.

Q. And you say, "If he is looking to see if we are in-network or adjudicate the percentage we communicate to our distributors then we can show him EOBs." Do you see that?

A. Uh-huh.

Q. So you're basically saying we'll show an

35 (Pages 134 to 137)

Page 142

Q. Did you have any concern that the contracts might prohibit this behavior?

A. No.

Q. Why not?

A. Because, obviously, the -- the hospital executed the contract. So if they had any provisions, I would assume that their attorneys would have advised them not to.

Q. But you never asked the hospital or you never confirmed that with anyone?

A. I didn't really talk to the hospitals a whole lot. Dr. Murphy had a lot of communication with the hospitals. I didn't have lot of communication with them.

Q. You signed the contract between Mission and Newman, though. Right?

A. Yes, ma'am.

Q. Was it Dr. Murphy who had the communications leading up to the signing of the contract with Newman?

A. Yes, ma'am.

Q. All right. I want to change subjects and I want to talk now about receipt of specimens and accessioning. Okay?

A. Yes, ma'am.

Page 143

Q. So we've spoken before that doctors were ordering tests from Sun and Mission. Correct?

A. At one time, yes, ma'am.

Q. I'm handing you a document that's being marked as Exhibit 112. It bears the Bates No. LD185168.

(Exhibit 112 was marked.)

Q. So this is an email dated August 21st of 2015 from you to someone named Richard Vera. Do you see that?

A. Yes, ma'am.

Q. Who is Richard Vera?

A. I believe at this time Richard was one of the marketing representatives for Axis Diagnostics.

Q. Axis Diagnostics is one of the labs that were referred tests under the outreach program. Correct?

A. I don't believe we referred anything to Axis through the -- through the outreach program.

Q. A lot of the claim -- or test results that I've seen identify Axis as having performed confirmation testing.

A. Well, they may have, then.

Q. Okay.

A. I'm not 100 percent sure.

Page 144

Q. Who made the decision who a lab would be referred to?

A. Who made the decision --

Q. That a given lab would receive a referral.

A. For the reference?

Q. (Nods.)

A. At Mission, it would be me. But me and Dr. Murphy made some decisions together for Mission and Sun. It just depends on which lab it was.

Q. Okay. So this is before the outreach program started. Correct?

A. Correct.

Q. All right. So I'm looking at the bottom email and he's saying, "Can you help me understand the dynamics of how Sun Labs is going to be sending their confirmation samples to Axis."

Do you see that?

A. Yes, ma'am.

Q. So at this time, Sun is using Axis for confirmation testing. Is that fair?

A. At this time, I believe Mission was using Axis and then Sun, I think, was getting created at this time and needed a reference lab to do the quantitative. So I was telling Dr. Murphy that we use Axis if he wanted to use it, basically, I think,

Page 145

is how we got here.

Q. Okay. So if we look at the email above, it says, "Starting September 1, Sun Clinical Labs will start running some of their accounts and Mission will be running some of their accounts."

Do you see that?

A. Yes, ma'am.

Q. Does that mean Mission was going to be running some of Sun's accounts?

A. I believe at this time, Sun wasn't -- they had purchased Sun Labs, but we were doing some of the qualitative for them until they got some of the machines with the methods that -- that we had at Mission. So we were doing some of the referencing for them until they got all that squared away with the equipment.

Q. Okay. Then it says, "Mission will be billed for all specimens sent on their requisition form and the same will apply to Sun."

Do you see that?

A. Yes, ma'am.

Q. So is he saying that Mission will be billed by Axis -- Axis for all of the labs referenced from Mission req forms?

MR. MARKHAM: Objection;

37 (Pages 142 to 145)

Page 150

Q. Feyrer?

A. Yes, ma'am.

Q. Okay.

MS. KURTZ: It's F-E-Y-R-E-R.

Q. Responded, "We will not co-brand our reqs with any outside entity's logo." Do you see that?

A. Yes, ma'am.

Q. "The specimen must be ordered on a Mission requisition." Do you see that?

A. Yes, ma'am.

Q. "We also do not share the names of our hospitals with reps." Do you see that?

A. Yes, ma'am.

Q. Why do you not share the names of your hospitals with reps?

A. We did. I mean, we have several emails to Bryce Fellows that we have sent over to you guys that states the actual hospitals that we were using at that time. So I don't know why Amanda would -- would say that.

I think she was -- some of these guys were -- had other labs that they were -- that they had obviously used and they were trying to bring those labs in to put their -- their logo on the req form so their lab can get part of our outreach

Page 151

program.

And so most of those, we just didn't want to deal with those, with that kind of sample. We wanted it to come directly from the doctor's office straight into our outreach program directly.

Q. And you did that by making sure it was just Mission on the requisition form?

A. That's the requisition form that the hospitals granted us to use.

Q. Okay. You can set that document aside.

A. Yeah, it specifies on here that Zion is a laboratory.

Q. Okay. You can set that document aside.

A. Okay.

Q. I'm handing you a document that's being marked as Exhibit 114.

(Exhibit 114 was marked.)

Q. It bears the Bates No. LD107218. Okay. So this is an email from Christian Calhoun dated January 23rd of 2017 to you and Mike Murphy. Do you see that?

A. Yes, ma'am.

Q. Christian Calhoun, we discussed earlier. Right?

A. Yes, ma'am.

Page 152

Q. He was one of the people working with People's Choice Hospital to set up the outreach program?

A. Yes, ma'am.

Q. Did Paradigm -- was Paradigm a marketing company as well, or no?

A. Yes, ma'am.

Q. So they had marketers associated with them, too?

A. Marketers would reach out to Paradigm and they would -- they were kind of like a -- like a distributor in a sense.

Q. Okay. So he's saying "I'm working with a large lab out of Georgia that has big volume but I'm trying to overcome the hesitation from their big distributors regarding utilizing Sun and Mission."

A. Yes, ma'am.

Q. I'm a little confused. He's saying he's working with a lab but he wants the lab's distributors to use Sun or Mission?

A. I guess the -- the marketers are sending to this lab. He wants them to send to our outreach model. Because obviously he knew that we already were managing the -- the different hospitals.

So they're trying to get those referrals

Page 153

instead of going to this hospital in -- or to this lab in Georgia to come to our outreach hospitals, is what I'm assuming he's saying here.

Q. Okay. So you don't think he's actually working for that lab?

A. I don't believe so.

Q. He's trying to divert referrals from that lab to the outreach program?

MR. MARKHAM: Calls for speculation.

A. I don't know if he's trying to divert them. I just think that maybe some distributors did not want to use that lab anymore and they were looking -- at this time people were trying to find different labs to send samples in. So if this lab wasn't doing good service, they're going to want to send somewhere else. So I'm assuming they contacted Christian and he was trying to put them through our outreach hospital model.

Q. So he goes on to say basically he's encountering some problems with reps and he wants to make sure the work flow was a certain way in order to try and get them to start working with Sun and Mission. Is that fair?

MR. MARKHAM: Objection;

39 (Pages 150 to 153)

Page 154

speculation.

A. Let me read through it. Where exactly are you reading that from? What paragraph?

Q. The next -- the first paragraph, the last few sentences.

A. (Pause.)

I'm guessing that obviously these reps weren't happy with the laboratory they were using and wanting to use another -- another laboratory.

Q. Okay.

A. Is what I get from it.

Q. So then he says he basically wants to create this work flow and make sure it was consistent with what Sun or Mission were doing?

MR. MARKHAM: Objection; speculation.

A. Yeah, don't -- I don't know exactly what he's trying to accomplish there.

Q. Okay. You don't remember any follow-up with him on this email?

A. No. Christian would always attach me on all the emails. I didn't do a lot of business with Christian Calhoun in the beginning so he would just attach me to it because he knew I was highly involved with Doc, with Dr. Murphy.

Page 155

Q. You can set that document aside then.

I'm handing you a document that's being marked as Exhibit 115.

(Exhibit 115 was marked.)

Q. Bears the Bates No. LD190362.

Okay. So this is an email where the top email is an email from you to M. Huizar at IAM dated July 25th of 2016. Do you see that?

A. Yes, ma'am.

Q. Who is M. Huizar?

A. Matt Huizar was one of the employees that ran the laboratory, the Integrity part of the accessioning station and sorting station.

Q. What exactly did he do?

A. He managed a lot of the employees there. So he would manage all the -- like when the samples came in and all that good stuff, some of those were Integrity employees. He would manage those Integrity employees.

Q. He would also manage the lease -- the employees at the hospital's lease, too. Right?

A. Yes, ma'am.

Q. I want to look on the bottom email on this page. And this is from someone named Mary Ann Solis. Who is that?

Page 156

A. Mary Ann Solis was, I believe, one of the -- she used to -- she used to supervise with Matt as well. She was kind of a lead in a sense. She was like Matt's assistant.

Q. And you're copied on this email. Correct?

A. Yes, ma'am.

Q. And she's saying "We noticed there's a new Bill Type in the options for the accessioners." Do you see that?

A. Yes, ma'am.

Q. What did that bill type field convey?

A. We would put the bill types so that would convey any of the hospitals that we bring in, we would associate it with a bill type.

Q. So it was basically conveying which hospital to bill through?

A. It would have an acronym of where the sample was going to get billed through, yes, with that hospital.

Q. So she says "We notice there's a new Bill Type in the options for the accessioners. That says Newman - in house billing." Do you see that?

A. Yes, ma'am.

Q. And then she goes on, "Are they supposed to be choosing this for all except Blue Cross?" Do

Page 157

you see that?

A. Yes, ma'am.

Q. Do you understand what she was asking?

A. I do not.

Q. All right. Well, let's go to the next email. Jaylene. Who was Jaylene?

A. Jaylene was our manager at Integrity at the billing department.

Q. Responds to Mary Ann, copying you, and says "Yes, this Bill Type was put in by Matt a few weeks ago after discussing with Jesse. You should be utilizing the Newman - In House for all in-network specimens, excluding BCBS, which should be RGH - In House." Do you see that?

A. Yes, ma'am.

Q. So basically she's saying for any specimen coming in to Mission with a payer other than Blue Cross Blue Shield, it should be billed through Newman?

MR. MARKHAM: Objection; speculation.

A. Yeah, I don't think it says Mission on there. But like I said, our physicians knew by the insurance where their samples were going to be going.

We sent those emails over to you guys so

40 (Pages 154 to 157)

Page 158

you're going to know that that was already mentioned to the doctors. So they knew that it was going there and they knew when they received a report it's going to say Newman Hospital on it as well. So they were aware that it was going to the hospital.

Q. Okay. But at least what's being said here -- and I haven't seen any of those emails from physicians. You keep referencing them, but that's not something we've seen.

But this isn't saying for a specific physician. It's saying for all in-network specimens other than Blue Cross Blue Shield, it should be Newman who's getting billed through. Correct?

MR. MARKHAM: Objection -- same objection.

A. That's what it says on there, but that's not what was communicated to the reps and the physicians.

Q. But it's being what's -- it's what's communicated to the accessioner. Correct?

A. Mary Ann is not an accessioner. She was a supervisor. But she's not an accessioner.

Q. Okay. But she's supervising accessioners. Correct?

A. Matt was supervision the accessioners.

Page 159

Q. All right. You have someone asking what the accessioners should do in the original email. Correct? Utilize Bill Type Newman for anything other than Blue Cross Blue Shield. Correct?

A. That was Mary Ann asking Jaylene. Is that where you're at?

Q. Yes.

A. Uh-huh.

Q. And she's saying "We noticed there is a new Bill Type in the options for the accessioners." Do you see that?

A. Uh-huh.

Q. Is that a "yes"?

A. Yes.

Q. So she's asking what the accessioner should be doing. Correct?

MR. MARKHAM: Same objection.

A. I don't know -- I don't know if that's what she's asking.

Q. You don't interpret it that way?

MR. MARKHAM: Objection.

A. I don't know what she's asking.

Q. Okay. Well, let's go to --

A. I don't know if she's asking specifically for the accessioners. She could have been going to

Page 160

the system herself and saw that I was asking a question.

Q. Okay. Regardless, Jaylene responds "You should be utilizing the Newman - In House for all in-network specimens, excluding BCBS." Do you see that?

A. Yes, ma'am.

Q. And then if you look at the email above, which is an email from you to Matt Huizar. Do you see that?

A. Uh-huh.

Q. You're saying, "Did you not make Mary Ann aware of this change?" Do you see that?

A. Uh-huh.

Q. Is that a "yes"?

A. Yes, that's a "yes."

Q. So basically what you're confirming or asking Matt is did he not confirm with Mary Ann that they're supposed to start using Newman for all non-BCBS samples. Do you see that?

A. I do see that. I think I was telling Matt that he should be telling Mary Ann that we have Newman as an option now on our bill type, which was explained to our doctors, and that they can utilize that bill type if that doctor wants the sample to go

Page 161

there.

Q. But Mary Ann isn't talking about for some specimens. She's talking for all specimens other than BCBS. Correct?

MR. MARKHAM: Objection; again, speculation about what somebody else means.

A. That's what she put on there, but I don't know if that's what she actually meant.

Q. You were copied on this email. Correct?

A. Yeah, I was copied on the email.

Q. You didn't respond to this email saying, "No, that's not right," did you? I don't see that anywhere.

A. No, I didn't on the email, but that doesn't mean that we didn't have a face-to-face discussion, because I was in that laboratory a bunch.

Q. At least from the email communication, it doesn't seem like you corrected them. Correct?

A. Well, I'm sure it was corrected, but it wasn't on this email.

Q. It's not in writing?

A. It was not in writing. Not that I know of. There could be another email that is in writing.

Q. You'd agree with me that at least in part the type of insurance related to a given specimen

41 (Pages 158 to 161)

Page 162

determined what hospital would be billed through. Correct?

A. The hospitals told us what insurances they are contracted with. So those -- that's how some of these samples got sent to that hospital. Not every hospital was on every insurance.

Q. Do you think it's a problem to determine the bill type based upon the type of insurance at issue?

MR. MARKHAM: Objection; vague, as to what "problem" means.

Q. Do you think it would be legally problematic to select bill type, depending upon the type of insurance at issue?

MR. MARKHAM: Objection; legal conclusion.

A. Do I answer it?

Q. Yes.

MR. MARKHAM: Oh, sorry. Unless I tell you not to, you can answer the question.

THE WITNESS: Oh, okay.

A. Can you ask that question again? I'm sorry.

Q. Do you think it would legally be problematic if the bill type that accessioners were

Page 163

selecting was based upon the type of insurance associated with a given specimen?

MR. MARKHAM: Objection; calls for a legal conclusion.

A. No.

Q. What is the basis for that opinion?

A. Well obviously at that point the doctors were well aware that that bill type was going to be going to that hospital. So that's where it went.

Q. And you think that the awareness, or the doctors became aware of this based upon conversations they were having with the reps?

A. Based upon that, and then like I said, the production that we've given. I know the production that we've sent over to you guys, it specifically has some doctors referring back to us and saying, "Yes, you can send it here." So you'll see that in production.

Q. Any other kind of formal writing on that?

A. It would just be either a rep saying they spoke with a doctor's office or somebody from the doctor's office saying, "Yes, you can do this."

Q. And you think as long as a doctor says, "Yes, you can do this," you can bill through any in-network provider?

Page 164

A. Well, that would be his decision.

Q. But you think that's legally appropriate?

MR. MARKHAM: Objection; calls for a legal conclusion.

You can answer.

A. Yeah, why wouldn't it be?

Q. So you think a doctor who has no relationship with a facility, the patient is never seen at that facility, the patient's specimen is never tested by that facility, as long as the doctor says that you can bill through that facility's NPI number, that's okay?

MR. MARKHAM: Objection.

A. The doctor didn't say that we can bill through the NPI number. The doctor is telling us that they want that insurance to go to the hospital that we have a contract with that is in network with you guys.

Q. Regardless of whether the hospital was performing the testing?

A. Absolutely.

Q. Okay.

A. Labs do that all the time.

MS. KURTZ: I think now is a good time for a break.

Page 165

MR. MARKHAM: Okay. Lunch break?

MS. KURTZ: Yeah.

THE VIDEOGRAPHER: The time is 12:35. We are off the record.

(Break.)

THE VIDEOGRAPHER: The time is 1:35. We are on the record.

Q. Mr. Saucedo, I'm handing you a document that's being marked as Exhibit 116. It bears the Bates No. LD190459.

(Exhibit 116 was marked.)

A. Thank you.

Q. Okay. This is an email chain between you and Matthew Huizar that spans over Thursday, July 28th and Friday, July 29th. Do you see that?

A. Yes, ma'am.

Q. Looking at the bottom email, this is an email from you to Mr. Huizar on July 28th of 2016, with the subject "Aspen Hills." Do you see that?

A. Yes.

Q. Here you start by saying, "We will start receiving samples again for Aspen Hills tomorrow." Do you see that?

A. Yes.

Q. What's Aspen Hills?

42 (Pages 162 to 165)

Page 170

to go to Newman. So we're trying to figure out how do we separate this from our samples.

Q. And then he asks, "It's all Newman. Correct?"

Do you see that?

A. Yes, ma'am.

Q. So is what he's asking there, is this all to be billed through Newman?

MR. MARKHAM: Same objection.

A. I would assume so, yes, ma'am.

Q. And you responded, "Yes."

Do you see that?

A. Yeah, because they were already sending to Newman prior to sending in these samples so I figured that's where they needed to go.

Q. Okay. You can set that document aside.

A. Okay.

Q. Okay. I'm handing you a document that's being marked as Exhibit 117.

(Exhibit 117 was marked.)

Q. It bears the Bates No. LD205474.

Okay. Again, this is an email chain back and forth between you and Matthew Huizar. Right?

A. Uh-huh.

Q. And the original email is from you to him

Page 171

on July 20, 2016. Do you see that?

A. Yes, ma'am.

Q. And you titled it, "Mission/Sun."

Do you see that?

A. Yes, ma'am.

Q. It's being sent to Matthew Huizar and Mary Ann Solis. Do you see that?

A. Yes.

Q. Why are you addressing it to Mission/Sun?

A. Because those were the two entities under the outreach program.

Q. Okay. So you're emailing Mr. Huizar and Ms. Solis, but for the purposes of communicating what's supposed to happen for Mission and Sun --

A. Uh-huh.

Q. -- in this case?

All right. You note, "Please do not enter any more BCBS or CIGNA specimens with bill type RGH until further notice."

Do you see that?

A. Yes.

Q. "Bill type RGH," what does that mean?

A. I believe it's Regional General Hospital.

Q. So, here, you're telling them don't accession Blue Cross Blue Shield or CIGNA specimens

Page 172

to Regional General Hospital?

A. Yes, ma'am.

Q. Do you remember why you were providing them that direction?

A. I don't know specifically.

Q. Regional General Hospital was another hospital you had an outreach program with?

A. Yes, ma'am. In Florida.

Q. And by "you," I mean Sun and Mission.

A. Yes.

Q. At some point, Blue Cross Blue Shield and CIGNA stopped reimbursing claims through Regional General Hospital. Correct?

A. I believe so, yes.

Q. So could it be the case that you're telling them not to enter any more specimens from Blue Cross Blue Shield or CIGNA through Regional General Hospital because they weren't paying anymore?

A. It could have been because they didn't want us to send any more samples through their hospital, which is what I would assume. It's the only reason why we would stop.

Q. So that would be a communication from RGH to you?

A. Yes, ma'am.

Page 173

Q. Regardless of what the doctor had ordered?

A. We would still run the sample at that point. We had to get -- we had to get the sample out the door. So we still had to do the reporting, but we just were not going to use that particular hospital anymore. Those were the cases where we would call the doctor and tell them that we're no longer using this hospital and if they would want us to use another one. So -- but that took a lot of time because there was a lot of samples that would come daily for us to do that.

Q. So you say, "Just accession the sample and hold off on putting a hospital sticker on our requisition form, too."

Do you see that?

A. Yes, ma'am.

Q. So when you say, "Just accession the sample," that means just enter it into the system, but don't test it yet?

A. No. It's -- you accession it and you test it.

Q. Who would test it?

A. Alternate Health.

Q. "Hold off on putting a hospital sticker on our requisition form."

Page 174

Were accessioners putting hospital stickers on accession forms -- or on requisition forms?

A. I do not remember putting hospital stickers on RGH, but I'm not 100 percent sure.

Q. Did you do it with other hospitals?

A. In the beginning with Newman, I believe we did, but only because they changed -- Newman allowed us to use our requisition form and then they said they wanted it cobranded, but we had some of our requisition forms already out there with doctors who were intending to send to Newman so we would just label it so our accessioners knew that that was a Newman sample.

Q. But it was labeled after the doctor had signed the order. Correct?

A. The doctor knew that it was supposed to go to Newman.

Q. But the sticker was applied after the requisition form had been signed by the doctor. Correct?

A. But they knew before.

Q. That's not my question.

My question is the sticker was applied --

A. Well, yes. Of course, it was.

Page 175

Q. By an IAM employee?

A. By a Newman employee.

Q. When you say "a Newman employee," you mean a subleased --

A. Accessioner.

Q. -- a subleased employee?

A. Yes.

Q. How did it work for Community?

A. Community let us use our own requisition forms so they would let it use a Sun or a Mission requisition form.

Q. Do you know why the -- Newman wanted the requisition forms cobranded?

A. I do not.

Q. Did you ever ask?

A. I did not.

Q. Okay. You can set that document aside. I'm handing you a document that is being marked as Exhibit 118. It bears the Bates No. LD190656.

(Exhibit 118 was marked.)

Q. Again, this is an email chain where you're on the emails. Do you see that?

A. Yes, ma'am.

Q. The top email is an email from you dated

Page 176

August 5th of 2016 to someone named Tammy Phillips and copying Mike Murphy and Jaylene Candelaria. Do you see that?

A. Yes, ma'am.

Q. Who is Tammy Phillips?

A. Tammy was in charge of our billing at one point at Integrity.

Q. When you say in charge of billing, does that mean she was a billing manager?

A. Yes.

Q. Do you know why she left the company?

A. I do not.

Q. Okay. Let's look at the first email in the chain. It's an email from Mike Murphy to Tammy copying you dated August 4th. Do you see that?

A. Yes.

Q. Actually, I'm wrong. The first email -- never mind. I don't want to go to those emails. I want to go to the email where you're emailing Tammy Phillips on August 4th. Do you see that?

A. Yes.

Q. And that is an email responding to an email that Tammy wrote to you originally on that same day. Correct?

A. I believe so.

Page 177

Q. Here, she writes, "We are holding off on entering any more RGH until GE has a resolution on the payer rejections from BCBS Florida to avoid any additional rework."

Do you see that?

A. Yes, ma'am.

Q. Do you know what she's talking about here?

MR. MARKHAM: Objection; speculation.

A. I don't -- I don't know what she's talking about.

Q. When she says "to avoid any additional rework," do you know what that means?

MR. MARKHAM: Objection --

A. No, ma'am.

MR. MARKHAM: Same objection. Are you hearing me?

THE REPORTER: Uh-huh.

Q. In response to her email, regardless, you wrote "Tammy, as of today all of our samples are going through Newman Hospital. This includes BCBS." Do you see that?

A. Yes, ma'am.

Q. So you're directing her that all specimens coming in to Mission will be billed through Newman.

45 (Pages 174 to 177)

Page 178

Correct?

A. Yeah, I would assume so, yes, ma'am.

Q. And that's true across the board?

MR. MARKHAM: What do you mean by "across the board"? Objection.

A. I don't know what that means.

Q. For all specimens, there's no nuance, where the specimen depends upon the doctor who ordered it. Correct?

A. Sure.

Q. Do you know why you made the decision that all specimens would be billed through Newman as of this date?

A. Because it looks from here we're not going to use RGH anymore. So as -- as I testified before, we would tell the doctors we're using -- we had RGH and Newman. They had let us either use Newman or RGH. If we're not using RGH, then we would be allowed to use Newman.

Q. And you can't recall whether those communications were in writing or just over the phone. Correct?

A. I believe they're both in emails and over the phone.

Q. Would Mission communicate directly with

Page 179

physicians?

A. We would -- we would call the physician staff, the physician staff would communicate with their physicians and then tell us what they needed to do with the samples, what we needed to do with the samples.

Q. I just want to make sure I'm clear when I say Mission -- is it a Mission employee who would call the doctors' offices?

A. It depends on the sample.

Q. Why would it depend on the sample?

A. If it's a Newman sample, then it would probably be one of their employees calling.

Q. So one of the subleased employees would call the doctor's office?

A. Yes.

Q. So you would try and get permission from the doctor, but it was ultimately your decision to do that. Correct?

A. It would be the doctor's decision to do that.

Q. But you made the decision that you wanted to bill everything through Newman rather than RGH at this point. Correct?

A. No, because the doctors had already given

Page 180

us permission to use either one of those hospitals, so it's the doctor's decision. I'm just saying to do it.

Q. So the doctors didn't care what hospital it was being billed through so long as that hospital was in network?

A. That's correct.

Q. And you would just give them a list of in-network facilities for a given payer and the doctor said you can bill through any of these?

A. Yes.

Q. And you don't recall whether you have consistent written communications on that?

A. I believe we do.

Q. In the form of email?

A. Email, and I believe we have a spreadsheet. I'm not 100 percent sure, but I believe we kept records of all those as well.

Q. If I asked you to try and find the spreadsheet on the system, would you be able to do that for me?

A. Yeah.

Q. Okay. I'm handing you a document that's being marked as Exhibit 119. It bears the Bates No. LD190761.

Page 181

(Exhibit 119 was marked.)

Q. Okay. This is an email chain between you and Mr. Huizar and others and the top email is from you and dated August 10th of 2016. Do you see that?

A. Yes, ma'am.

Q. I want to start with the original email in the chain, which is an email from you to Mr. Huizar, Mary Ann Solis, Amanda Feyrer, and -- is it Randy Dittmar?

A. Yes.

Q. Dated August 9th of 2016. Do you see that?

A. Yes, ma'am.

Q. Here, the subject is "Mission Toxicology" and you stated "starting immediately, don't accession any more Mission Toxicology BCBS samples under Newman Memorial Hospital." Do you see that?

A. Yes, ma'am.

Q. So you're saying that all Blue Cross Blue Shield samples should be accessioned somewhere else. Correct?

A. Yes, ma'am.

Q. And you suggest "If possible go back and pick RGH as the bill type and change the paperwork with the correct sticker." Correct?

46 (Pages 178 to 181)

Page 182

A. Yes, ma'am.

Q. So even if a sample was originally going to be accessioned to Newman, you're saying don't do that, choose a different bill type and sticker accordingly. Correct?

A. Yes, ma'am.

Q. Do you remember why you had made the decision not to accession anymore through Mission Toxicology -- sorry -- let me ask that question again.

A. Yes.

Q. Do you remember why you made the decision not to accession any more Mission Blue Cross Blue Shield samples under Newman?

A. I don't remember directly, but I know that there was issues with Seth Guterman. He would go back and forth with percentages and other people coming in and taking over the laboratory program if we don't do X, Y, and Z.

So there was a lot of conflict with him. I don't know if that was some of it and then we were just no longer going to use Newman anymore. But we had specimens that we had to run and this was the complete opposite of what we just went through, so we still had RGH as one of our doctors.

Page 183

Our doctors knew that that was one of our -- our hospitals so we changed it back over to RGH. But we had to -- the issue with some of these -- some of these problems is the doctors wanted it to go in network so it had to go to one of those hospitals. If we're not going to use Newman anymore then they had blessed RGH so we just sent it right back into RGH.

Q. And rather than putting a Newman sticker on those requisition forms, you would put an RGH sticker. Correct?

A. Yes, ma'am.

Q. Or if a Newman sticker had already been applied, you would apply an RGH sticker on top of it?

A. The doctor was notified that it was going to go to RGH so we would get clarification from them and then we would put a sticker and send it through. The doctor already knew that it was going to RGH and the report that they'd get say RGH on it as well.

Q. Why didn't you just have cobranded requisition forms that had the name of the hospital and the name of the lab on them?

A. It's just when we first started with all these hospitals, they saw our requisition form and they said it's just an order, it doesn't -- you don't

Page 184

even have to have your logo on a requisition form. They just wanted the order itself. Because we already had all the analytes and everything set up for testing, it's just easier to use that and they were going to try to mimic our analytes within their in-hospital laboratory once they were getting there.

Q. Why did you even apply a sticker at all to the requisition forms?

A. Because it had a Newman sticker on it. We didn't want it to go through with Newman and send it over to Newman because we're not using Newman anymore.

Q. I mean in the case where you just would receive a requisition on a Mission-only form, why would you put a Newman sticker on there in the first place?

A. Because when we first started with Newman they didn't care for it to be cobranded. And then as we started, all of a sudden Seth came out with "I need stickers" or "I need cobranding on all the reqs." We told him that there was tens of thousands of req forms out there that we were already getting from Newman, so they didn't have it.

So he said "put stickers on it until we can get all those req forms taken back and then we

Page 185

can do the cobranding going forward."

Q. Do you know why he wanted stickers applied after the fact?

A. I don't know. Something changed, I guess, with the hospital wanting it cobranded. I don't know why. He didn't tell us why, he just sent -- he sent Dr. Murphy an email and it was forwarded over to me and it just had that direction on there with a bunch of other stuff on there as well.

Q. Okay. At the top email you're directing these people to follow the same protocol for Sun Clinical Lab as well. Correct?

A. Yes, ma'am.

Q. So the same thing, no longer billing Sun Toxicology Blue Cross Blue Shield samples through Newman. Instead, use RGH. Correct?

A. It would be the same, yes, ma'am.

Q. I'm handing you a document that's being marked as Exhibit 120. It bears the Bates No. FORT_000464.

(Exhibit 120 was marked.)

Q. Okay. So this is an email chain between you and Larry McKenna and some others. Correct?

A. Yes, ma'am.

Q. And it's dated December 7th of 2016. Do

47 (Pages 182 to 185)

Page 190

you see that?

A. Yes, ma'am.

Q. And copied on this email is you. Do you see that?

A. Yes, ma'am.

Q. So if we go to the beginning of the email chain, Seth's -- Seth's original email is dated February 2nd of 2017, and he's asking for some additional information related to certain claims that were being billed through hospitals. Do you see that?

A. What -- what page are you on?

Q. It's at the -- it's on the last page, although --

A. Okay.

Q. -- the email starts technically on the page before, the very, very bottom.

A. Gotcha. Okay. I see it, yes.

(Pause.)

Yes, I -- I see it.

Q. So he's just asking for some information related to certain claims. Correct?

A. Yes.

Q. All right. And in response, Mr. -- or Dr. Murphy says "We will continue to assimilate the

Page 191

requested paperwork." Do you see that?

A. Yes, ma'am.

Q. And he says, "You need to release our wires for the cases that we have been paid on. I have to have the cash flow just like you do to function." Do you see that?

A. Yes, ma'am.

Q. Do you remember an issue where Seth Guterman was refusing to make distributions to Sun or Mission?

A. I believe there was a couple of instances where they held on to the money and we had to go back and forth to get it released.

Q. Is it fair to say that he wasn't always easy to work with?

A. Correct.

Q. Was he working with both Newman and Community?

A. Yes, ma'am.

Q. Did he do that for both Newman and Community or just Newman?

A. I believe it would happen with both at different times.

Q. Okay. So Mr. Guterman responds to him, "If everything is in place by tomorrow, NMH will

Page 192

release all the money." Do you see that?

A. Yes, ma'am.

Q. All right. Dr. Murphy -- and granted you're not on this email, but ultimately you received this chain.

A. Yes.

Q. It says, "If you continue to withhold monies due us, we will continue to divert all cases to other hospitals." Do you see that?

A. Yes, ma'am.

Q. We discussed this a little bit earlier, where there were some issues with Newman and Community. And so the decision was made to bill through other hospitals. Correct?

A. If we had other hospitals on board, yes, ma'am.

Q. And it was you or Dr. Murphy who made that decision?

A. What decision was that?

Q. To start billing -- diverting cases to other hospitals.

A. It would just depend on the circumstance. In this particular circumstance, obviously he's not paying us for our services. We're providing services. We're taking all the responsibility,

Page 193

liability, the cost.

You can't run a business without getting paid to do the services that they promised to do for us or to pay us for. So if we had another hospital, then if the doctors allowed us to move those samples from another hospital, we would if we needed to.

Q. But it was -- in this case, Dr. Murphy, in the first instance who made that decision, and then you may have gone back and asked the doctors for permission. Correct?

A. Yeah. Me and Dr. Murphy had talked all day, every day.

MR. MARKHAM: Did you answer her question about whether you went back to the doctors afterwards?

MS. KURTZ: That wasn't my question. He answered my question.

Q. So sometimes you and Dr. Murphy would discuss, "Hey, we're not getting paid by this hospital. Let's figure out where else we can bill it through."

A. Sometimes he would get an email like this from Seth directly to Mike. Because I didn't really communicate that much with Seth, and then he would make demands on Dr. Murphy and add Mission on the

Page 206

Q. And he's asking Randy or saying, "Randy, the rep is asking if there is any way we can send their samples to a different hospital other than NM."

Do you see that?

A. Yes, ma'am.

Q. And NM would be Newman Memorial?

A. Newman Memorial.

Q. "They have noticed more claims being paid faster from other hospitals."

Do you see that?

A. Yes, ma'am.

Q. So, here, the rep is asking Mission to start sending samples that they had brought in as referrals to different hospitals. Correct?

A. Yes.

MR. MARKHAM: Objection.

Q. You respond and say, "Terry, we can't move these samples around due to these issues. Next will be Hospital A pays better than Hospital B. We put them where their capacity by payer" -- sorry -- "We put them where there is capacity by payer and can't make special privileges for any group to be fair across the board."

Do you see that?

A. Yes, ma'am.

Page 207

Q. So what you're saying is, basically, it's important for us to refer to a variety of different hospitals. Correct?

A. What I'm saying on there is we're not going to send samples -- we're not picking the best contracts for certain reps. We're not -- that's not why we're doing it. He wants -- he's saying that, obviously, there is another hospital that's getting paid faster so he wants it to go to that hospital so he can get paid quicker, but that's not how we ran the program.

Q. It was based upon what the hospital's capacity is and the payer?

A. And the payer, yes.

And certain hospitals had the same payers so one may pay faster than the other. But we're not going to just use one over the other for that reason.

MS. KURTZ: Okay. So I think that's all I want to talk about regarding accessioning. So let's take a break since it's a logical breaking point.

THE VIDEOGRAPHER: The time is 2:25. We are off the record.

(Break.)

THE VIDEOGRAPHER: The time is

Page 208

2:49. We are on the record.

Q. Before we move on to the testing of -- the actual testing, I have a few more questions on the accessioning.

A. Yes, ma'am.

Q. So I want to start by trying to kind of identify all of the labs who performed reference services as part of the outreach program. Okay?

A. Uh-huh.

Q. So can you list the ones that you can recall? And I might have some others I want to add.

A. So Alternate Health, Axis did at one time, diagnostics. Clinical Pathology Laboratory. There was the one in California. There was one that we did for their finger prick testing and I forgot the name of that lab.

Q. AllergyPro, maybe?

A. It was -- AllergyPro was the company that did the finger prick, but it went to a laboratory, I believe in California.

Q. Arrayit?

A. Arrayit. I believe Arrayit was one of them.

Q. Do you remember a lab called Ion?

A. I do not.

Page 209

Q. What about Sonic?

A. Sonic is part of CPL. It's owned by CPL.

Q. Okay. All right. So at a minimum there were a handful of labs that would perform reference services as part of the outreach program. Correct?

A. Yes.

Q. All right. Who made the decision that specimens would either be sent to the hospital for testing or go to a reference lab for testing?

A. Who made the decision?

Q. (Nods.)

A. Well when the samples -- the samples would come in, obviously whatever the hospitals can do, they would -- they would do those -- that testing. And they knew what they can do. They assumed everything else that we could do, we would do in our -- in our laboratory, and then anything that we couldn't do at our laboratory would get accessioned out.

So if it was blood, more than -- most of that went to CPL that we -- we did most of the blood in house. Certain stuff we just couldn't do.

Q. Okay. So it was the accessioners who were deciding where the specimens would be sent?

A. We would tell the accessioners at that

53 (Pages 206 to 209)

Page 210

point. So they knew if it was the qualitative, like if it was Newman, they would -- they would be able to run the -- the qualitative specimen. We would do the quantitative at AHL, so we would do all of it because we can do all of it there.

If it was blood, the complete metabolic panel will go to Newman, the rest of it was done at -- at AHL, what we can do, and then from there it would go to CPL.

Q. Okay. And I just want to back up. You said "we would tell the accessioners" what the various labs could do. When you say "we," is that Mission or Sun?

A. That's Mission or Sun. Because we -- we already had these conversations with Seth and with the hospital on how all this is going to be dictated, so we already knew what that - what that was.

Q. How was that communicated to the accessioners?

A. Vocally.

Q. So you would just say accessioners, if it's a Newman specimen, Newman can do qualitative testing, so send qualitative specimens to Newman. If it's quantitative testing, we can do that at AHL?

A. Yeah, because they had to aliquot as well.

Page 211

Q. Was that written down anywhere?

A. I'm not sure if we -- I'm sure it was. I don't know if it was -- if it was written down or not.

Q. So for Newman, you had accessioners that were subleased employees, but for Community, the accessioners were not subleased employees. Correct?

A. Correct.

Q. So for Community, it would be Sun or Mission that would decide where the specimens would go for testing. Correct?

A. No, that would go -- so those were already -- kind of what we discussed this morning -- those doctors already knew what hospitals we were dealing with so that's where -- that's where those would be accessioned under that hospital.

Q. Right. I understand. But Community didn't have subleased employees that were accessioners. Correct?

A. It would be an Integrity employee that would do that.

Q. Okay. So the specimen would come in to an Integrity employee for accessioning and that employee would decide whether to send the specimen to the hospital for testing or for a reference -- or to a

Page 212

reference lab?

A. The employee didn't make the decision. That's what I'm saying. The doctor made that decision, right, so then they would put it, depending on if the -- if the volume was -- like at Newman we're past volume and it was Blue Cross Blue Shield. We knew that we had Community, we would send it over to Community because we're past volume.

Q. Right. But I -- I understand.

A. The employee didn't make the decision.

Q. I understand that's your testimony. But what I'm trying to understand is someone would have to receive a specimen from a doctor?

A. Uh-huh.

Q. And then they would have to aliquot that specimen?

A. Uh-huh.

Q. And they would have to decide whether the specimen would go to Community for testing or to some reference lab for testing. Correct?

MR. MARKHAM: Objection. The word "decide" is what's throwing me.

THE WITNESS: Yeah, that's what's throwing me off.

MS. KURTZ: Okay. That's not an

Page 213

objection. If you think it's vague, you can say --

MR. MARKHAM: You've asked it twice.

MS. KURTZ: I'm trying to get -- please let me ask my questions. You can object to vague.

MR. MARKHAM: I did.

Q. Someone had -- a human being had to decide do I put a shipping label to Community or do I put a shipping label -- or do I just send it next door to AHL. Correct?

MR. MARKHAM: Objection; vague, go ahead.

A. No. At that point, like I told you, the doctors knew that we were going to use either one of those. So they can pick either Community or they can pick Newman, depending on if they met -- so they can pick whichever one they wanted at that point because those two were active hospitals for that -- for that particular insurance.

Q. When you say "they could pick whoever they wanted" --

A. We told them that they -- that -- that came from the -- from the hospital to us to the

54 (Pages 210 to 213)

Page 218

again.

MR. MARKHAM: No, no, no. If you haven't finished your answer, I'd like you to finish it.

MS. KURTZ: I'd appreciate -- your lawyer is going to get to ask you questions at the end. If you try and answer the question I ask you, it will make this deposition go faster and a lot more smoothly.

THE WITNESS: Sure.

MR. MARKHAM: He's been doing that virtually all day, for the record.

Q. In the case, in the specific instance -- so I'm not talking about what doctors generally did or did not know.

A. Okay.

Q. I'm saying in the case of the specimen for Jane Doe, let's say that, was it ever communicated to the billing hospital that in this case Jane Doe's specimen is going to be referenced to AHL rather than some other reference lab?

A. No.

MR. MARKHAM: Can I have that question read back?

(The requested material was read.)

Page 219

Q. I want to talk about the testing of specimens. And we don't need to go too far into this. We have already talked, I think, at length about the capabilities that Sun and Mission and Newman and Community had, so I'm not going to belabor that point. There is just one document I want to ask you about.

A. Okay.

Q. I'm handing you a document that's being marked as Exhibit 126.

(Exhibit 126 was marked.)

Q. It is Bates-numbered LD107897.

So you are not on this email. I'm just going to ask you a few questions about it.

A. Sure.

Q. I'm looking at the second email in the chain. It's dated February 27th, 2017, and it's from Darren Cohen [sic]. Do you see that? Or Darien Cohen?

A. Yes.

Q. Who is Darien Cohen?

A. I believe he was Seth Guterman's partner at People's Choice Hospital.

Q. Okay. And he writes, "As noted below, we need to ensure blood and urine specimens are being

Page 220

performed at NMH." Do you see that?

A. Yes.

Q. "I've been informed that 7 tox samples are expected to arrive tomorrow." Do you see that?

A. Yes.

Q. And then he also goes on to say, "As noted in this email from Gary on February 21, we have been capable of receiving blood as well." Do you see that?

A. Yes, ma'am.

Q. Do you know when precisely Mission became capable of receiving blood?

A. Mission?

Q. Sorry. Newman.

A. Newman? I don't. I don't remember -- it took them a while to get the equipment and stuff in there. So I don't know exactly the time frame.

Q. I think Dr. Murphy said it was early 2017, February or March.

A. Yes.

Q. Does that seem about right?

A. Probably, yeah.

Q. Do you know why Darren -- or Darien Cohen thought it was important that blood and urine specimens were being performed by NMH?

Page 221

A. I do not. I mean, I know that Seth Guterman wanted as much -- if the hospital can run the test, they wanted to run as much as they can run, and then reference out the rest.

Q. Was that to ensure the legitimacy of the program?

A. I don't know. Seth had his own kind of regulations of what he thought was right and wrong. It wasn't always right.

Q. Did you think that was important for the program to be legitimate, for the hospitals to be performing some of the testing?

A. I do not.

Q. So you think the program would have been fine if the hospitals hadn't performed any of the testing?

A. That's what --

MR. MARKHAM: Objection; vague as to what you mean by "fine." Do you mean legally?

MS. KURTZ: Yes.

A. The 141 bill type says whether you're inpatient or outpatient, whether the sample hits the hospital or not, with a relationship you can bill under that hospital's contract. It's pretty black and white.

TSG Reporting - Worldwide - 877-702-9580

Page 222

Q. And who told you that?

A. I read the law.

Q. Did you consult any lawyers about that?

A. We did consult lawyers before we started this program, yes.

Q. Okay. You can set that document aside.

A. Thank you.

Q. Are you a billing expert?

A. I am not.

Q. Do you have any experience in billing?

A. I've been in healthcare long enough. I've been around billers long enough to know a little bit about billing, yes.

Q. Do you know what's required to completely and accurately submit a claim form?

A. That I don't know.

Q. Do you know the type of claim forms that are supposed to be used for billing different types of claims?

A. I know there is HCFAs and UB-04s.

Q. Do you know when it's appropriate to use a HCFA versus a UB-04?

A. No.

Q. Do you know the rules about how those claim forms are supposed to be filled out to make

Page 223

sure your claim is valid?

A. I do not.

Q. Who would I talk to about that?

A. It would have been whoever was running our billing department. It was several different people. It was Frances Gomez, Jaylene Candelaria, and Tammy Phillips were the ones that were running our billing company.

Q. Okay. Sun and Mission weren't in network with United. Correct?

A. That's correct.

Q. They didn't have contracts with United?

A. Not directly. We were able to send through MultiPlan, with United through MultiPlan.

Q. Other than that, there were no contracts?

A. Other than that, no contracts.

Q. Okay. So if Sun or Mission had billed United, they would have been billing out of network. Correct?

A. That's correct.

Q. You testified earlier that when billing out of network, it was more likely that a claim might be denied than if billing in network. Correct?

A. It seemed to us as -- when we were out of network, we would get a lot of denials. United, as

Page 224

well as the other insurance companies, wouldn't pay because the member went to an out-of-network provider. And multiple times our providers used to get letters from United, and I sent one in production, that stated they were going to terminate his contract or they were going to lower his contracts because he was using an out-of-network provider.

Q. I asked you earlier about United's contracts with in-network physicians, and you testified that you didn't know anything about them, but you just referred to one. Correct?

A. I referred to what doctors would tell me that UnitedHealthcare and other insurance companies would do to them if they sent out of network.

Q. So doctors told you that their contracts with United required that they refer in network if at all possible?

A. They didn't say that. They said that they would -- if they sent to an out-of-network laboratory, their in-clinic contracts would either get taken away from them or they would lose money off of it, for whatever reason. I don't know how that correlates, but I guess if they don't follow the rules, they get punished.

Page 225

Q. Okay. Just so we have a clean question and answer, if Sun or Mission were billing out of network, it was your experience that those claims were more likely to be denied than if the same claims had billed in network. Correct?

A. We had a lot of -- we had a lot of claims get denied in network as well. So I don't know what the percentage of -- of that is, because we had a lot of them denied out of network as well.

Q. I'm not asking for a percent. But I believe you testified earlier that more claims were denied --

A. I would assume they would. I would assume if you go in network, more of them would pay than out of network, but it's an assumption.

Q. You understood that United was in network with Newman and Community. Correct?

A. Yes. We were told by them that they were, yes.

Q. Newman and Community had contracts with United. Correct?

A. Yes.

Q. And that meant it was more likely that the claims would be reimbursed if they were submitted through Newman or Community. Correct?

57 (Pages 222 to 225)

Page 226

MR. MARKHAM: Objection; asked and answered.

Q. You can answer.

A. That's not why we made the decision for -- to go to the outreach program.

Q. That wasn't my question. My question was it was more -- because Newman and Community were in network with United, it was more likely that laboratory claims would be reimbursed if billed through Newman or Community?

A. I just said a little while ago I assumed that it would. I'm not sure.

Q. You testified that the reason why you guys engaged in this outreach program was because you thought that you could provide better service to physicians and patients. Correct?

A. Uh-huh.

MR. MARKHAM: Is that -- you need to answer yes or no.

A. Yes.

Q. Ultimately, Alternate Health lost its CLIA license. Right?

A. It gave up its CLIA license.

Q. Because there were a series of problems that they felt couldn't be remedied. Correct?

Page 227

A. We disputed that. We didn't -- we didn't believe that those were problems with CLIA, because we had -- COLA had walked in four months before that and gave us great accolades. But they went after AHL, Sun, and Mission within a three-day span. So there was a reason why they did it.

Q. Ultimately they felt, at least CLIA felt, that there were issues with the labs. Correct?

A. They said that there was new regulations we were unaware of, and we got violations because of that. We challenged them heavily and we thought they were wrong.

Q. But the CLIA licenses were ultimately given up. Correct?

A. Of course. Because they thought they were right. We thought they were wrong. But there was 50 other labs in Texas that to had give up their CLIA license for the same lady.

Q. You understand that Newman and Community are rural hospitals. Right? You testified to that earlier?

A. Yes.

Q. You understood that rural hospitals' services were reimbursed at a percentage of billed charges. Correct?

Page 228

A. We were told by the hospital that their contracts were a percentage of billed charges, yes.

Q. Most contracts aren't a percentage of billed charges. Right? There is usually a charge master?

MR. MARKHAM: Objection; foundation.

A. I honestly don't know that.

Q. You've been in the healthcare industry for a really long time.

A. I don't know what to practice and bill. I'm a marketer.

Q. I'm just struggling with you're telling me that you think this is all permissible because of Bill Type 141, but you then say you don't have any real background in billing and you're not a biller, you're just a marketer.

A. I read information that tells you black and white how this outreach -- what the federal government says you can do, and that's what I read. Our attorneys gave us advice. So we did it. I mean, I don't think our attorneys would give us advice and put us into something that can get us in trouble. I should hope not.

Q. You understand that there are a series of

Page 229

rules and regulations for what the federal government required for billing to be appropriate under an outreach program like this. Correct?

A. I would hope our attorneys did.

Q. Do you understand that?

A. I'm not an attorney.

Q. You just told me you read the regulation.

A. I read it.

Q. Okay.

A. I read it. Yes, I did read it.

Q. All right. And so those regulations outlined things like how the claims are supposed to be billed. Correct?

A. I didn't read that -- the claim part of it. I read the general 141 bill type. If you read it, it's seven -- six sentences. It doesn't say anything about billing. It says whether inpatient or outpatient, whether the patient is at the hospital or not, that you can run that sample -- you can run a sample through a hospital, that's what the 141 bill type says.

Q. That's the extent of your knowledge about that. Is that fair?

A. That's what it says.

Q. You don't -- you haven't read any other

58 (Pages 226 to 229)

Page 234

good relationship towards the end, and they were bitter with each other. So this was Seth's way to attack Jorge, and then Jorge turned around and attacked him with other allegations. They were throwing allegations at each other.

So my question -- my -- I just said "holy smokes," like I don't believe that they're going to throw mud at each other like that because they work for the same company.

Q. So you weren't concerned that at least Seth Guterman thought that it was fraudulent to bill using a hospital's NPI number for specimens that never went to the hospital?

A. No.

Q. Can you remind me when Integrity started doing the billing for Mission?

MR. MARKHAM: Just for clarity, you said you're going to refer to that as IAM. Are you --

MS. KURTZ: I said I may sometimes.

MR. MARKHAM: I thought you said you were going to.

A. I don't exactly know the date.

Q. Did any --

Page 235

A. Because it was like a hard stop with Kim Sivaraman because, I mean, literally her husband committed suicide at her daughter's birthday party at their house, and then she shut her business down immediately. So we scrambled.

Integrity was already up and billing at that point, and I was using Kim. I had to move quickly. I don't remember what date that was. But I can get that information.

Q. Okay. And it was a stupid question because it's not actually what I meant to ask, which you can't possibly know.

What I meant to ask was, was Integrity always the entity that did the laboratory billing for NMH?

A. To my knowledge, yes.

Q. Okay.

A. But then again, Newman told us that we were the only people doing their referencing, and then we found out there was a lot of other people sending stuff over there. So I don't know if Seth and them were very honest with us upfront.

Q. Let me ask a more specific question.

A. Gotcha.

Q. For any referencing through Mission, was

Page 236

Integrity always the entity that was billing for Newman?

A. Yes.

Q. I'm handing you a document that's being marked as Exhibit 128.

(Exhibit 128 was marked.)

Q. It bears the Bates No. LD190445. And, again, it is an email and attachments.

A. Okay.

Q. And I'll tell you, the attachments are all requisitions --

A. Yes.

Q. -- and some associated information. So there might be a few I might want to look at, but you -- you can take my word for it or not, but --

A. Yeah, I trust you.

Q. -- I'll represent to you that's what that is.

A. I trust you.

Q. All right. So this is an email chain between you and Dr. Guterman. Correct?

A. I think it was -- I think it was Dr. Guterman to somebody else, and then it was, I guess, forwarded to me.

Q. Well, looking at --

Page 237

A. Is it --

Q. Looking at the top email, the first email in the chain, the latest in time.

A. Uh-huh.

Q. It's an email from you, Jesse Saucedo, dated July 28th, to Seth Guterman. Do you see that?

A. Yes.

Q. Okay. And the original email is -- it looks like it's Seth Guterman emailing Dr. Murphy, asking for requisition forms for certain patients. Correct?

A. Yes.

Q. All right. And then how you got involved is Dr. Murphy asked you to handle. Do you see that? It's right above Seth's original email. It's dated July 28th, 2016.

(Pause.)

A. There it is. Sorry.

Q. Just to confirm --

A. Yes.

Q. Mike probably forwarded you Seth's email and asked you to handle it ASAP. Correct?

A. Yes.

Q. And then you asked someone else to handle?

A. Yes.

60 (Pages 234 to 237)

Page 262

outreach program than they might have otherwise been. Correct?

A. Yes.

Q. Did that cause you concern?

A. I mean, I knew that there was some. I don't know that we had tons of them. There was a lot of patients that we did, there was a lot of samples that we did. I don't know what the percentage of complaints were. But I think there was a huge percentage of noncomplaints.

But I've heard from doctors where Quest sends out 6, 7, $800 bills. I mean, that's excessive as well.

Q. It depends upon the type of testing. Right?

A. It depends on a lot of things, yes.

Q. Toxicology testing in general is usually pretty affordable through Quest or LabCorp. Correct?

A. I don't know, because they don't do it. They outsource it. But I don't know how they bill that.

Q. All right. So I want to talk a little bit about Newman and Community's contracts with UnitedHealthcare. Okay? And I know you say you haven't seen the contracts. I'm not going to ask you

Page 263

specifics about the terms of those agreements. Okay.

A. Sounds good.

Q. Just more conceptually?

(Discussion off the written record.)

Q. Okay. So you understood or you were told that Newman and Community had contracts with UnitedHealthcare. Correct?

A. Correct.

Q. And that was important for this outpatient -- hospital outreach program. Right?

A. Yes.

Q. The whole point was to be able to bill claims in-network. Correct?

MR. MARKHAM: Objection; mischaracterizes a vast amount of prior testimony.

Q. You can answer.

A. They told us that they were in network, so we told our physicians that they were in network. So that's what the physicians expected, was the patients to go in network.

Q. And that was a key component of the outreach program?

A. That was one of them.

Q. What were the other components?

Page 264

A. Well, the outreach program, when we -- number one, that particular -- these small rural hospitals needed our help, wanted our help. We obviously knew a lot about the laboratory program. We thought it would help them and their community to be put a laboratory in there and be able to help that hospital stay alive. But unfortunately it didn't work out for any of those hospitals that way.

Q. Okay. So going back to the fact that Newman and Community had contracts with United.

So you understood that because -- and rather than say Newman and Community every time, I'm just going to say "the hospitals" and when I'm saying "the hospitals" in this line of questioning --

MR. MARKHAM: It's those two?

Q. -- I'm referring to those two. Okay?

A. Okay.

Q. So you knew that the hospitals had contracts with United. Correct?

A. Correct.

Q. And that meant that if the hospitals rendered a service, they could submit a claim under their name to United for reimbursement. Correct?

A. Correct.

Q. And United would pay the claim to the

Page 265

hospitals, whichever one was submitting the bill. Correct?

A. Correct.

Q. You understood that in order for a claim to be reimbursable, the claim had to be a claim for a payable service. Correct?

A. Correct.

Q. Under the contract that the hospitals had with the -- with the insurer?

A. I don't know what the contract -- I don't know what that what that contract said.

Q. You understood that the contracts with the hospitals set forth the amount that the hospitals would receive for various types of claims. Right?

A. I didn't -- I didn't see any of the financial -- I didn't see the contract at all, so I don't know anything that's inside of those contracts.

Q. You saw the amounts that the hospitals were reimbursed by United, though. Correct?

A. I saw the EOBs. Yes, ma'am.

Q. So you knew that at least United was reimbursing that amount for the claims that were being submitted, whatever appeared on an EOB. Correct?

A. Yes.

67 (Pages 262 to 265)

Page 266

Q. Sun and Mission, as you've already testified, had an arrangement with the hospitals for lab claims paid by commercial insurers. Correct?

A. Yes, ma'am.

Q. Including United?

A. Yes.

Q. Sun and Mission and Integrity knew that if the hospital -- that if a hospital's bill type was assigned to a claim for lab services submitted to United, United would pay under the contract, correct --

A. Correct.

Q. -- that it had with the hospital?

A. Correct.

Q. Sun and Mission and Integrity also knew that they had an agreement with the hospitals on the back end, meaning that the hospitals would distribute some of the reimbursements that they had been paid by United to Sun and Mission. Correct?

A. Correct.

Q. And the more money that United reimbursed the hospitals, the more money the hospitals would pay to Sun and Mission. Correct?

A. On the percentage, yes.

Q. And Integrity would also get a percentage

Page 267

of the reimbursements from the hospitals. Correct?

A. That is correct.

Q. 5 percent?

A. I believe so, yes.

Q. And then Sun and Mission would use some of the money that they received to pay marketers. Correct?

A. A large majority of that money went to costs and marketers.

Q. And the marketers were paid based upon the number of referrals that they made to Sun or Mission. Correct?

A. They were paid on a percentage that was on their contract, not necessarily on -- they were -- it was a percentage of the services that they provided. We would pay a percentage to that particular marketer to do those services for us.

Q. It was a percentage of the revenues --

A. Yes.

Q. -- received for specimens that those marketers had referred to Sun or Mission. Correct?

A. It was a percentage of the revenues that the hospital would collect on offices that referred in that they knew, yes.

Q. You understood that United paid a

Page 268

substantial portion of claims that were billed through Sun and Mission's arrangement with the hospitals?

A. I don't know how many, but I know that most of them are Blue Cross. But there was a lot of United as well.

MS. KURTZ: Okay. Now is a great time for a break.

THE WITNESS: Okay.

THE VIDEOGRAPHER: The time is 3:57. We are off the record.

(Break.)

THE VIDEOGRAPHER: I have the time as 4:16. We're back on the record.

Q. We're close to wrapping up. That's the good news.

We've spent a lot of time talking today about the outreach program and how it all worked and I just want to go through a series of questions to make sure that I fully understand your testimony as to the various aspects of the program. Okay?

A. Okay.

Q. These questions are all going to be based in the time frame of April 2016 through December of 2017 unless I say otherwise. Okay?

Page 269

A. Okay.

Q. So that's the relevant time frame.

And I will, also, again, comingle the hospitals unless there is a reason to separate out the two. Okay?

A. Okay.

Q. So I'm talking about to Community and to Newman. Okay?

A. Perfect.

Q. So during the relevant time frame, the hospitals didn't have laboratory facilities sufficient to conduct confirmation urine toxicology testing. Correct?

A. That is correct.

Q. Early on in the program, Newman didn't have the facilities to perform urine toxicology quantitative testing. Correct?

A. Correct.

Q. It took a few months to get those capabilities. Correct?

A. Correct.

Q. Early on in the program, Community didn't have the facilities to perform quantitative urine toxicology testing. Correct?

A. Correct.

TSG Reporting - Worldwide - 877-702-9580

APP 189

Page 270

Q. Did it also take Community a few months to get -- to ramp up to that?

A. Yes.

Q. And when I say a few months, it would be a few months from the time that the contract was signed between Sun and Mission and the hospitals. Correct?

A. Yes, ma'am.

Q. So the Newman contract was signed before the Community contract. Correct?

A. Yes.

Q. So it would have been different time periods for when Newman and Community gained the capability of performing quantitative testing. Correct?

A. Yes.

Q. All right. During the relevant time frame, the hospitals did not have the laboratory facilities to be able to conduct large-scale blood testing other than complete metabolic panel testing. Correct?

A. Correct.

Q. And at the beginning of the program, Newman didn't have the capacity to perform any blood -- blood testing. Correct?

A. I believe so. Correct. Yes.

Page 271

Q. And I believe you testified earlier that Newman didn't get those capabilities until February or March of 2017. Correct?

A. I believe so, yes.

Q. What about Community? When did Community get those capabilities?

A. I don't know.

Q. Okay. So Dr. Murphy, acting on behalf of Integrity and Community Hospital -- or -- and the hospitals entered into an agreement in which -- under which Integrity would provide claims processing services to the hospitals in return for a fee. Correct?

A. Correct.

Q. And that fee was 5 percent of the -- of the amounts of reimbursements collected by the hospitals from health insurers. Correct?

A. Correct.

Q. During the relevant time frame, you and Dr. Murphy caused Sun, Mission, and other clinical testing laboratories to perform tests for patients that were neither patient -- inpatients, nor outpatients of the hospitals. Correct?

MR. MARKHAM: Objection; calls for a legal conclusion as to what is meant by

Page 272

"outpatient."

A. I don't know what -- I don't know what you mean by we "caused."

Q. You -- you helped facilitate the out- -- the outpatient billing program or the nonpatient billing program through the hospitals. Correct?

A. Yeah. We ran --

MR. MARKHAM: Objection; characterization. That's all. Conclusion.

A. We ran samples from physicians sent in to our outreach program, which, in turn, billed United for those samples. Yes.

Q. And many of those samples were tested by facilities other than Newman or Community. Correct?

A. Correct.

Q. You and Dr. Murphy entered into contracts with marketers to acquire referrals of specimens into the out- -- or the outreach program. Correct?

A. We contracted with reps to provide services for our outreach program. Correct.

Q. And the reps -- one of their responsibilities were to help to generate referrals from physicians. Correct?

A. It was to push our services, which, obviously, if the service is good, the doctor will be

Page 273

sending samples our way, yes.

Q. And marketers were successful in their responsibilities, at least in some cases. Correct?

A. Some of them, yes.

Q. So physicians referred specimens into the hospital outreach program. Correct?

A. Correct.

Q. And those specimens were then tested by a variety of labs. Correct?

A. Some.

Q. Including labs other than Newman and Community's labs. Correct?

A. Correct.

Q. During the relevant time frame, Integrity submitted claims for reimbursement using the hospital's NPI numbers to United. Correct?

A. Correct.

Q. And those claims for reimbursement were for urine and blood and other types of tests?

A. Yes.

Q. And many of those tests were performed by labs other than Newman or Community. Is that correct?

A. Yes.

Q. During the relevant time frame, United

69 (Pages 270 to 273)

Page 274

paid millions of dollars to Community and Newman based upon the claims that Integrity submitted for those tests?

A. Yes.

Q. And after United reimbursed the hospitals based on those claims, a portion of those proceeds were transferred to Sun and Mission in accordance with Sun and Mission's contracts with the hospitals. Correct?

A. Correct.

Q. The -- the proceeds received by Sun and Mission in accordance with the contracts that were signed by you and Dr. Murphy were then further distributed to, in some cases, the labs that had actually performed the testing. Correct?

A. I -- I never -- Mission never did any testing for laboratories. It was all just reps or distributors.

Q. Yeah. That --

A. I don't believe it was a laboratory directly.

Q. All right. That was a bad question.

A. Okay.

Q. Some of the proceeds that Sun and Mission received from the hospitals were used to pay the

Page 275

reference laboratory costs?

A. Yes. Gotcha. Yes.

Q. Okay. And then other proceeds were distributed to marketers based upon the marketers' contracts with Sun and Mission. Correct?

A. Yes.

Q. And in the case of both Sun and Mission, profits were also distributed to physician investors. Correct?

A. Yes.

Q. And you testified before you really don't know anything about the specifics of billing. Correct?

A. I know some of billing, but I don't know it all. I'm not a -- I'm not biller.

Q. Let me ask you this question, then. When Integrity would submit claims to United on behalf of Newman or Community, Integrity identified on the claim form Newman and Community as the providers who rendered the services. Correct?

A. I don't -- that, I don't know.

Q. Okay. I just want to make sure I have a clear understanding of what you think is and is not required for this outreach program to be legal and legitimate. Okay?

Page 276

A. Okay.

Q. In order to use -- in order to bill using a hospital's name and NPI number, did the specimen ever need to be sent to the hospital?

MR. MARKHAM: Objection. Can I just have a standing that it calls for a legal conclusion --

MS. KURTZ: Absolutely. I'd love for you to have a standing objection on that.

MR. MARKHAM: With respect to these questions about what is and isn't right, proper, or legal, I assert a standing objection that this calls for a legal conclusion.

MS. KURTZ: And I'll just let you know when this line of questioning is over so you can know when you can start objecting again.

MR. MARKHAM: Well, I may have other objections, but --

MS. KURTZ: Understood.

Q. Okay. So in your opinion, that's what I'm asking for.

A. Gotcha.

Q. I want to know what you think is or is not required in order for this outreach program to be legal and legitimate. Okay?

Page 277

A. Okay. What I would assume is --

Q. I'm going ask you a series of questions.

A. Oh, okay. I thought you were --

(Discussion off the written record.)

Q. So in order to bill using a hospital's name and NPI number, did the specimen need to be sent to the hospital?

A. My opinion is no, because hospitals -- some of these hospitals, the samples didn't go to the hospital, and, obviously, they have attorneys that looked at it and gave them clearance to provide this program for their own hospitals. So I would say no.

Q. Okay. Did the specimen need to be received by the hospital?

A. I would assume -- I would say no.

Q. Did the specimen need to be processed by employees of the hospital?

A. I would say no.

Q. Did testing need to be performed by the hospital?

A. I would say no.

Q. If the hospital wasn't performing the testing, was it the hospital who had to refer to another lab?

A. If the hospital was -- read that again.

TSG Reporting - Worldwide - 877-702-9580

APP 191

Page 278

Q. If it was not the hospital that was going to perform the testing, was it the hospital or hospital employees that needed to refer the testing to another lab?

A. No.

Q. Did the patient need to authorize the hospital to bill for the tests run on their specimen?

A. No.

Q. Okay. Just a few more documents to go through and then I will be done, unless John has questions for you.

A. Okay.

Q. You've mentioned several times during the deposition that there were legal opinions that you had seen related to this arrangement. Correct?

A. Correct.

Q. I want to walk through some of the ones that I've seen. Okay?

A. Okay.

Q. I'm handing you a document that's being marked as Exhibit 132.

(Exhibit 132 was marked.)

Q. It bears the Bates No. LD184739.

A. Okay.

MR. MARKHAM: 132?

Page 279

MS. KURTZ: Correct.

Q. This is an email from you to Anna Gonzaba, dated July 11th, 2015. Do you see that?

A. Yes.

Q. Who is Ann Gonzaba?

A. Dr. Gonzaba's wife.

Q. Who is Dr. Gonzaba?

A. He is a physician here in San Antonio.

Q. Is he an investor -- or was he an investor in the Sun series?

A. I don't believe so.

Q. Okay. Is she an attorney?

A. I don't think so. I think she's a physician herself.

Q. Okay. The email that you're forwarding to her is an email from Jeff Drummond. Do you see that?

A. Yes.

Q. And Jeff Drummond is an attorney at Jackson Walker. Correct?

A. Yes.

Q. And Jackson Walker is one of the firms that you identified as having provided legal opinions related to the arrangement?

A. I believe they did.

Q. Did you ever interact with Jackson Walker

Page 280

or Mr. Drummond directly?

A. No, I didn't -- I didn't communicate with any of the attorneys.

Q. Okay. So the email that Mr. Drummond is sending on Friday, July 10th, of 2015 is sent to Dr. Murphy, and it looks like probably another lawyer at Jackson Walker. Do you see that?

A. Yes.

Q. And it says, "Dr. Gonzaba." I'm assuming what he is doing here is drafting an email that someone could then forward along to Dr. Gonzaba. I have no idea, though.

A. I would assume so. I'm not sure.

Q. Either way, this is an email that you received. Correct?

A. Yes.

Q. And it was sent to the email address that you used in the ordinary course of your business?

A. Yes.

Q. And for these types of legal opinions and other opinions, it was common for you to receive them via email. Correct?

A. Yes.

Q. All right. So here Mr. Drummond is asking -- or is offering an opinion related to the

Page 281

Texas Patient Solicitation Act. Do you see that?

A. Yes.

Q. And you've read this email before. Correct?

A. I don't remember reading this email. It's been four years ago.

Q. The Texas Patient Solicitation Act is also known as the Texas Anti-Kickback Statute. Correct?

A. That's what it says here, yes.

Q. Are you familiar with the Texas Patient Solicitation Act?

A. No.

Q. Have you had conversations with anyone about the Texas Patient Solicitation Act?

A. No.

Q. Okay. Here he is talking about how the Texas Patient Solicitation Act could apply to the series LLC laboratory arrangements being considered by Sun Clinical Labs. Do you see that? That's the third paragraph down.

A. Yes.

Q. Do you remember having any conversations about whether the Sun series arrangements would comply with the Texas Patient Solicitation Act or the Federal Anti-Kickback Statute?

71 (Pages 278 to 281)

# Exhibit 10

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | |
|---|---|
| MISSION TOXICOLOGY, LLC., and SUN CLINICAL LABORATORY, LLC, <br><br> *Plaintiffs*, <br><br> v. <br><br> UNITEDHEALTHCARE INSURANCE COMPANY, UNITEDHEALTHCARE OF TEXAS, INC., UNITEDHEALTHCARE OF FLORIDA, INC., and UNITEDHEALTHCARE SERVICES, INC., <br><br> *Defendants.* | No. 5:17-CV-01016- DAE (lead case) |
| UNITEDHEALTHCARE INSURANCE COMPANY, INC. and UNITEDHEALTHCARE SERVICES, INC. <br><br> *Plaintiffs*, <br><br> v. <br><br> MICHAEL MURPHY, M.D., JESSE SAUCEDO, JR., SAMANTHA MURPHY, LYNN MURPHY, JULIE PRICER, MISSION TOXICOLOGY, LLC, SUN CLINICAL LABORATORY, LLC, SUN ANCILLARY MANAGEMENT, LLC, INTEGRITY ANCILLARY MANAGEMENT, LLC, ALTERNATE HEALTH LAB, INC., AND LMK MANAGEMENT, LLC, <br><br> *Defendants*. | No. 5:18-CV-00347-DAE (consolidated case) |

---

**DEFENDANT SUN CLINICAL LABORATORY, LLC's SUPPLEMENTAL RESPONSES TO PLAINTIFF'S FIRST SET OF INTERROGATORIES**

---

1

COMES NOW, Defendant SUN CLINICAL LABORATORY, LLC ("Sun Labs" or "Defendant"), and serves its Supplemental responses and objections to Plaintiff's First Set of Interrogatories as follows:

## PRELIMINARY STATEMENT

a.  The following responses and objections are based upon information presently available to Defendant, which Defendant believes to be correct.  These responses are made without prejudice to Defendant's right to utilize subsequently discovered facts and documents.

b.  While Interrogatories herein answered were served in Civil Action No. 18-CV-347, these Responses are offered both for use in that case and in Civil Action 17-CV-1016.

c.  These responses may be supplemented upon Defendant's further investigation and acquisition of information that Defendant either does not possess or cannot locate at this time.  Any further supplementation will be made in accordance with the Federal Rules of Civil Procedure and applicable local rules.

d.   Despite any "definitions" or instructions contained within Plaintiffs' discovery requests, Defendant will provide only responses that are required under the applicable rules of civil procedure.

e.  Defendant objects to any "definition" or instructions preceding Plaintiffs' discovery requests that seek information or documents constituting work product, material protected by the attorney-client privilege, opinion work product, or any other privilege or protection.

f.  Defendant's response to each Request does not waive its right to challenge the relevance, materiality, or admissibility of information or documents produced, or to object to the use of information or documents in any subsequent proceeding, including the trial, of this

2

matter.

g.  Defendant incorporates this Preliminary Statement into each response below.

## DEFINITIONS

When used in the below responses and objections, the following terms shall have the following meanings:

h.  Unless indicated otherwise, the term "Plaintiff," "United," "You" and/or "Your" includes UnitedHealthcare Insurance Company, and any agents, representatives, employees, contractors, or any other person or persons acting for or purportedly acting on Aetna's behalf.

i.  Unless indicated otherwise, the term "Defendant" or "SCL" means or refers to Sun Clinical Laboratory, LLC.

## GENERAL OBJECTIONS

### GENERAL OBJECTION 1

Defendant objects to providing work product information prepared in anticipation of litigation in accordance with F.R.C.P. § 26 (b).

### GENERAL OBJECTION 2

Defendant objects to providing any information that constitutes attorney-client communications, including items to which the attorney acquired his/her knowledge by his/her own observation where observation was as a result of his/her professional employment.

### GENERAL OBJECTION 3

Defendant also objects to providing any information that constitutes opinion work product. *See Hisaw v. Unisys Corp.,* 134 F.R.D. 151 (W.D.La. 1991) (ordinary work product is discoverable only upon a showing of substantial need and opinion work product is never

3

discoverable; *Upjohn Co. v. United States,* 449 US 383, 401-402 (1981) (showing substantial need and inability to obtain other information without undue hardship is insufficient to compel disclosure); *In re Murphy*, 560 F.2d 326, 336 (8th Cir. 1977) ("nearly absolute immunity"); *Duplan Corp. v. Moulinage et Retorderie de Chavanoz*, 509 F.2d 730, 732 (4th Cir. 1974) (opinion work product is absolutely protected).

## GENERAL OBJECTION 4

Insofar as any discovery requests seek confidential proprietary information, Defendant objects to providing such information without an appropriate protective order.

## GENERAL OBJECTION 5

Defendant objects to the discovery requests insofar as they exceed the scope of lawful discovery by seeking information not "relevant to any party's claim or defense and proportional to the needs of the case," in violation of F.R.C.P. §26(b). This Objection is adopted by reference without being restated in any Response to which it applies, namely any of these Interrogatories which seek information outside the time frame during which this Answering Defendant or anyone working with this answering Defendant submitted billings or received payments from United.

## GENERAL OBJECTION 6

Defendant objects to the extent the relevance of the information Plaintiffs seek is outweighed by Defendant's privacy rights and no compelling need for such information has been shown.

4

## GENERAL OBJECTION 7

Defendant objects to United's Definitions and Instructions to the extent they are not consistent with the Federal Rules of Civil Procedure or otherwise attempt to unlawfully expand Defendant's obligations to respond.

## GENERAL OBJECTION 8

Defendant objects to the extent the Requests seek information not in Defendant's control.

## GENERAL OBJECTION 9

Defendant objects to the extent the Requests are overly broad and would cause unreasonable expense to Defendant.

## GENERAL OBJECTION 10

Defendant objects to the extent the Requests seek information protected under the Health Insurance Portability and Accountability Act of 1996 (HIPAA).

## SPECIFIC RESPONSES

**1.      Provide the name, address, phone number, and employer of each person who contributed to the preparation or formulation of Your responses to all Interrogatories, Requests for Production, and Requests for Admission served in this matter.**

**RESPONSE:**

Attorneys and staff of Joseph, Aleem & Slowik, LLC, 1355 Peachtree Street NE, Suite 700, Atlanta, GA 30309, (404) 220-9178: Mohamad Ahmad, Yussuf Aleem, Edward Molinary, John Wisiackas, Jaymie Parkkinen

Attorney John Markham, Markham & Read, One Commercial Wharf West, Boston MA 02110, Tel: (617) 523-6329

Lynn Murphy, 7373 Broadway Avenue, Suite 307, San Antonio, TX 78209

5

Samantha Murphy, 7373 Broadway Avenue, Suite 307, San Antonio, TX 78209

Michael L. Murphy, 7373 Broadway Avenue, Suite 507, San Antonio, TX 78209

**2.      Identify and describe all individuals and/or entities that possess, or formerly possessed, an ownership interest in You. Your description should include the percentage of the ownership interest, the date the ownership interest was acquired, and the date the ownership interest was lost.**

RESPONSE:

Sun Clinical Lab's Ownership Structure has been as follows:

| Name | Class Shares | Investor Name |
|---|---|---|
| **Series 1** | A | Hill Country Pain |
| | A | C.William Murphy |
| | A | Mihnea Dumitrescu, MD |
| | A | Justin Vigil, MD |
| | B | Clover Trail |
| | C | Justin Jones |
| | | |
| **Series 3** | A | Ellen Duncan, MD |
| | A | Scott Worrich, MD |
| | A | Martinez-RCK, LLC |
| | B | Clover Trail |
| | C | MLM Heritage Trust |
| | C | New Leaf Investments - Saucedo |
| | | |
| **Series 4** | A | Mark Moran, MD |
| | A | Stephanie Jones, MD |
| | A | Shaun Jackson, MD |
| | B | Clover Trail |
| | C | MLM Heritage Trust |
| | C | New Leaf Investments - Saucedo |
| | | |
| **Series 5** | A | MedCare Associates, PA |
| | A | Saleh Jaafar, MD |
| | A | Divya Muthappa, MD |
| | A | Aria Dayani, MD |

6

|  | A | Auston Myers, MD |
|---|---|---|
|  | A | Kristi Beauchamp, MD |
|  | A | Rodrigo Crespo, MD |
|  | B | Clover Trail |
|  | C | Auburn Doege |
|  | C | MLM Heritage Trust |
|  | C | New Leaf Investments - Saucedo |
|  |  |  |
| **Series 6** | A | Kevin P & Anne B Spencer Ventures, LLLP |
|  | A | Brimberry Complete Cycle Medicine, LLLP |
|  | A | David J Gabriel, MD |
|  | A | Mark Dawson, MD |
|  | A | Schultz-Lone Star Hills Family Health, PA |
|  | A | Geyer Family Medicine LTD, LLP |
|  | A | John K Frederick, MD |
|  | A | South Austin Family Practice Clinic, LLP |
|  | B | Clover Trail |
|  | C | D.S.A.S Integrated Ventures, LP |
|  | C | Steinle Business Ventures, LP |
|  | C | Meneer LLC |
|  | C | Bravmo, LLC - Bryan Cox, MD |
|  | C | MLM Heritage Trust |
|  | C | New Leaf Investments - Saucedo |
|  |  |  |
| **Series 7** | A | Victor Pallares, MDPA |
|  | A | D. Michael Forman, MDPA |
|  | A | Aldon Williams, MDPA |
|  | B | Clover Trail |
|  | C | Sabrina Begum |
|  | C | MLM Heritage Trust |
|  | C | New Leaf Investments - Saucedo |
|  |  |  |
| **Series 8** | A | Nash Health Enterprises, LLC |
|  | A | Edward Nash, MD |
|  | A | Kokomo Pain Management, LLC - Klim |
|  | A | Michael McKee, MD |
|  | A | EBM & Associates, PA - McClendon |
|  | A | Vivek Kushwaha, MD |
|  | A | Ronald A Buczek, DO |
|  | A | Paul Kobza, MD |
|  | B | Clover Trail |

7

|  |  |  |
|---|---|---|
|  | C | Signature Physician Consulting, LLC - Laubenstein |
|  | C | Michael Berkowitz |
|  | C | San Pedro Holdings, LLC - Ramirez |
|  | C | Anves, LLC - Norman Williams |
|  | C | MLM Heritage Trust |
|  | C | New Leaf Investments - Saucedo |
|  |  |  |
| **Series 9** | A | Toth Enterprises, II-William Franklin, MD |
|  | A | William Franklin, MD |
|  | A | John Kim, MD |
|  | A | Nomita Kim, MD |
|  | A | Nathan Pekar, MD |
|  | A | Sarita Prajapati, MD |
|  | A | Gary Albertson, DO |
|  | A | Ralph Hadley, PA-C |
|  | A | Sharon Shepherd, NP |
|  | A | Salang LLC-Keith Rose |
|  | B | Clover Trail |
|  | C | Max Total Health Inc-Clay Ellis |
|  | C | Eric Holle |
|  | C | Michelle Holle |
|  | C | MR & KJ Investments |
|  | C | Medical Practice Development Partners, LLC |
|  |  |  |
|  |  |  |
| **Series 10** | A | Rohan Coutinho, MD |
|  | A | Wendy Nguyen, MD |
|  | A | John Nguyen, MD |
|  | A | John Phillips, MD |
|  | A | Stephanie Hoefle |
|  | A | Stone Oak Family Doctors |
|  | B | Clover Trail |
|  | C | Bravmo, LLC - Bryan Cox, MD |
|  | C | MLM Heritage Trust |
|  | C | New Leaf Investments, LLC - Saucedo |
|  |  |  |
| **Series 14** | A | Gonzalo Venegas, MD |
|  | A | Women's Specialty Center |
|  | A | Alfredo G. Antonetti, MD |
|  | A | Jesus Baeza, MD |

8

|  |  |  |
|---|---|---|
|  | A | Javier Garcia Ruiz De Somocurcio, MD |
|  | B | Clover Trail |
|  |  |  |
| **Series 15** | A | UPSA ACO, LLC |
|  | A | Lloyd Van Winkle, MD |
|  | A | Emily Briggs, MD |
|  | A | Carlos Porter, MD |
|  | A | Mary S. Nguyen, MD |
|  | A | Gordon Hill, MD |
|  | B | Clover Trail |
|  | C | Kevin P & Anne B Spencer Ventures, LLLP |
|  | C | Richard Turner |
|  |  |  |
| **Series 25** | B | Clover Trail |
|  | C | Christopher Furno |
|  | C | Biotechnologies MD, Inc - Marshall Forrester |
|  | C | David Kuhn |
|  | C | OC Marketing Group, LLC - Marshall Forrester |
|  | C | Biolab Laboratory Solutions, LLC-Dave Kuhn |
|  | C | Brandon Reisdorf |
|  | C | TNC Health Solutions, LLC - Naveen Bohra/Cuney Luke |
|  | C | Gentech, LLC - Steven Anthony |
|  |  |  |
| **Series 26** | B | Clover Trail |
|  | C | Shad Sherwood |
|  | C | Robert Hunter, Jr |
|  | C | Sonia Ulloa |
|  | C | Avagen Biosciences, LLC-Justin Jones |
|  |  |  |
| **Series 27** | A | Derrick D. Cox, MD PLLC |
|  | A | JLVMD Holdings, LLC |
|  | A | Muneer Assi, DO |
|  | A | Edward R. Assi, DO PA |
|  | A | HPS Enterprises, LLC-Helson Pacheco, MD |
|  | A | Keith R. Johnson, MDPA |
|  | A | Chikezie Amadi |
|  | B | Clover Trail |
|  | C | Womack Consulting, LLC-Billy Womack |
|  | C | Med-Services Group, LLC-Billy Womack |
|  | C | TNC Health Solutions, LLC - Naveen Bohra/Cuney Luke |

9

| | | |
|---|---|---|
| **Series 29** | A | William A. Blume, MD |
| | A | Midwest Interventional Spine Specialist, LLC-Shaun Kondamuri |
| | A | Steven A. Rupert, MD |
| | A | Gavin D. Chartier, LLC-Gavin Chartier, MD |
| | A | WM.C. Thompson II, D.O. |
| | A | Pinkerton Pain Therapy, LLC-Mark Pinkerton, MD |
| | B | Clover Trail |
| | C | Deborah Turpen |
| | C | Wellpoint Medical, LLC-Emily Markwell |
| | C | Laboratory Solutions, LLC-Timothy Watson |

These Series were terminated on June 1, 2017. Clover Trail is the sole remaining member and owns one hundred percent of the outstanding shares.  Series numbers not listed in the numerical order represent series transactions that were offered but not closed or funded.

Pursuant to Rule 33(d), Fed. R. Civ. P., see "2019.01.18 DOCUMENT PRODUCTION TO UNITED" file produced on January 18, 2019 through Dropbox. In that file see, file "Sun Clinical Laboratory," then subfile "Corporate Documents," then subfile "Series Docs," and see files of "Signature Pages."  Further information identifying individuals/entities is included there.

**3.      Identify and describe all entities in which You possess, or formerly possessed, an ownership interest. Your description should include the percentage of the ownership interest, the date the ownership interest was acquired, and the date the ownership interest was lost.**

**RESPONSE:**

Sun Labs owns 100 % of Sun Ancillary Management, LLC.

Date ownership interest acquired: September 9, 2015.

**4.      Identify all individuals You employ, or have been employed by You at any time since January 1, 2015, whose job functions relates or related to the performance,**

10

**administration, billing, accounting, marketing, or referring of laboratory services.**

**RESPONSE:**

Sun Labs only employee from April 2016 to September 5, 2017 was:

| Employee | Term Date |
|---|---|
| MARTINEZ JESUS | 5/23/2017 |

Jesus Martinez, 8202 Recio Oak, San Antonio, TX  78223   Phone: 210-887-8105.

Prasanna Athyala, a member of Clover Trail, also assisted in sample testing at Sun Labs.

5.      **Identify all individuals or entities with whom You have, or have had at any time since January 1, 2015, an independent contractor relationship, who performed any functions relating to the performance, administration, billing, accounting, marketing, or referring of laboratory services. For each individual or entity, provide the amount paid to that contractor, the "clients" or referral sources associated with the contractor, or for whom the contractor receives credit or commissions as a result of, and identify any employees or contractors utilized by that contractor in furtherance of the services performed for You.**

**RESPONSE:**

Sun Labs Independent Contractors from February 22, 2016 to September 5, 2017 have included the following:

| Independent Contractor | Date of Agreement | Signer |
|---|---|---|
| Aeventure, LLC | 8/15/2016 | Kristoff Goson |
| Amanda Feyer | 3/3/2017-10/30/2017 | Amanda Feyrer |
| American Healthcare Systems, Inc | 5/11/2016 | Ed Defrank |
| Belle Healthcare Solutions, LLC | 8/25/2016 | Rhett Bruce |

11

| Blue Wave Trades, LLC | 9/12/2016 | Joe Figuerroa |
|---|---|---|
| Bridgelock Consulting, LLC | 12/8/2017 | Brandon Woodward |
| Coast Diagnostics, LLC | 10/23/2016 | Brian Ward |
| Cool Springs Health Management, LLC | 1/27/2017 | Aron Tipton |
| Dood Consulting, LLC | 4/4/2017 | Dan Dood |
| Eventus Medical, LLC | 8/5/2016 | John F. Devlin |
| First Aid Consulting, LLC | 1/8/2017 | Alex Zarzuela |
| Foremost Lab Management, LLC | 12/31/2016 | Dominic Siwik |
| Fortis Labs, LLC | 8/16/2016 | Thomas J. Palmer |
| Genesis Medical Solutions | 5/3/2017 | Jason Padgett |
| Giant Medical | 8/2/2016 | Todd Mundt |
| GVA & Associates, LLC dba Go Partners Health Care Solutions | 4/4/2017 | Amber Thompson |
| Integrity Ancillary Management | 6/23/2015 | Michael L. Murphy |
| J&B Management Group, LLC | 10/21/2016 | Jack E. Norsworthy |
| Laboratory Start-Up Consultants, LLC | 3/28/2017 | Chris Harol |
| Labpharm, LLC | 7/7/2016 | Dave Francolini |
| Legacy Lab Solutions, LLC (Replaced Utox, LLC) | 5/1/2017 | Peder Johnson |
| MC Miami Holdings Corp. | 7/6/2016 | Monti Wilkens |
| MDP Worldwide, LLC | 12/13/2016 | Jeff Gibson |
| Medical Consultants MD, LLC | 2/22/2016 | Craig Arman |
| Medical Consultants MD, LLC | 5/1/2017 | Craig Arman |
| Medical Supply Plus, Inc | 2/21/2017 | Michelle Larkin |
| Mustang Medical Management, LLC | 5/1/2016 | Kevin Barton |
| Network Toxicology | 12/8/2016 | Chuck Dugas |
| NextGen Marketing Group, Inc | 2/20/2017 | Joseph M. Clouse |
| Northern Tier Medical | 1/18/2017 | Robert Talbot |
| Northlake Labs | 7/15/2016 | Tony Scott |
| Omniwest, LLC | 9/2/2016 | Marc Jablonski |
| One Stop Medical Services, LLC | 10/20/2016 | Dan Boone |
| Paradigm Healthcare Solutions, LLC | 7/8/2016 | Christian Calhoun |
| Paramount Health Solutions, Inc | 11/3/2016 | Joei Skeffington |
| Perpetuity MD | 11/8/2017 | Derek Peterson |
| Pluvia, LLC | 8/31/2016 | Matt Walker |
| Principle HS, LLC | 10/17/2016 | James Dieter |
| Providica Medical, LLC (Central Tox, LLC) | 3/8/2017 | Michael Schmitt |
| Qualitox Laboratories, LLC | 7/22/2016 | Alex Strahan |
| Reliable Laboratory Solutions, LLC | 11/15/2016 | Chris Furno |
| SDR Consulting, LLC | 9/7/2016 | Paul Stewart |

12

| SDR Consulting, LLC-Amendment | 2/24/2017 | Paul Stewart |
| The Solutions Company, LLC | 11/20/2016 | Lou Priester |
| Universal Clinical Laboratories | 12/1/2016 | Warren J. Melick |
| Uptown Medical Management, Consulting & Brokerage, LLC | 6/30/2016 | Nick Barnes |
| Utox,LLC | 8/24/2016 | Brandon Koepfer |
| Zenith Laboratory Services, LLC | 8/4/2016 | Cyrus Kashef |

Pursuant to Rule 33(d), further information called for by this Interrogatory is found in Defendant's business records that will be produced at a mutually convenient time. Specifically, see Excel file entitled "MSA Sun Contact Info" produced with this supplemental response. See also, Dropbox link to "2019.02.05 DOCUMENT PRODUCTION TO UNITED" which includes the following file "Sun Clinical Laboratory" with subfile "Interrogatories – First Set – Response 5."

6.      **Identify and describe all "series" entities created by You, on Your behalf, or for Your benefit under Tex. Bus. Org. Code Sec. 101.601, et seq. Your description should include, for each "series," the date of formation, the owners or beneficiaries, the purpose of the series, and the nature of the business in which the "series" has been primarily engaged since January 1, 2015.**

**RESPONSE:**

See Response to Interrogatory No. 2.

Pursuant to Rule 33(d), see also, "2019.01.18 DOCUMENT PRODUCTION TO UNITED" file produced on January 18, 2019 through Dropbox. In that file see, file "Sun Clinical Laboratory," then subfile "Corporate Documents," then subfile "Series Docs."  The files there include series investor information, investor identification and signatures, summary of private offering, and subscription agreement.

13

**7.     Identify and describe all licenses relating to the performance of laboratory services that You possess or have possessed at any time since January 1, 2015. Your description should include the purpose of the license, when You received it, the services that You are authorized to perform as a result of the license, and the license's current status.**

**RESPONSE:**

Sun Clinical Laboratory Lab Licenses Are:

- **CLIA Certificate of Accreditation**

  Purpose of License: Authorized to perform clinical laboratory testing
  Issued: 09/23/2013
  Services Authorized: Urinalysis, Hematology, Toxicology, Routine Chemistry, Endocrinology
  Current Status: Inactive

- **COLA Accreditation Certificate**

  Purpose of License: Laboratory Accreditation
  Full Accreditation: 7/31/14
  Services Authorized: Hematology, Toxicology, Routine Chemistry, Endocrinology
  Current Status: Withdrawal 08/02/18

**8.     Identify and describe all bank accounts You utilize, have utilized, or have had utilized on Your behalf at any time since January 1, 2015. Your description should include identifying information for each account, the purpose of the accounts, when the accounts were opened (or closed), and the signatories for the accounts.**

Sun Clinical Laboratory Bank Accounts
**Bank of San Antonio**
Sun Clinical Laboratory, LLC.
Account Number: 29405
Purpose of Account: Conduct Business
Opened: 5/20/15
Status: Active
Signatories: Lynn Murphy, Michael Murphy, Jesse Saucedo, Julie Pricer, Prasanna Athyala

14

**9.    Identify all lawsuits to which You are a party, or have been a party at any time since January 1, 2015, concerning the performance, administration, or billing of laboratory services.**

RESPONSE:

1.    United States District Court for the Western District of Texas

Aetna, Inc. and Aetna Life Insurance Company v. The Peoples Choice Hospital, LLC; PCH Management Newman, LLC; PCH Lab Services, LLC; Mission Toxicology, LLC; Mission Toxicology, II, LLC; Mission Toxicology Management Company, LLC; Sun Clinical Laboratory, LLC; Sun Ancillary Management, LLC; Integrity Ancillary Management, LLC; Alternate Health Labs, Inc.; Alternate Health Corp.; LMK Management, LLC; Fortis Diagnostics, LLC; Escalon Health Associates, LLC; Seth Guterman, MD; David Wanger; Michael L. Murphy, MD; Lynn Murphy; Samantha Murphy; Julie Pricer; Thomas Palmer; Jesse Saucedo, J.; and John and Jane Does. Case No. 5:18-CV-0323-OLG.

2.    United States District Court for the Western District of Texas.

Mission Toxicology, LLC; Sun Clinical Laboratory, LLC v. UnitedHealthcare Insurance Company; UnitedHealthcare of Texas, Inc.; UnitedHealthcare of Florida, Inc. and UnitedHealthcare Services, Inc. Case No. 5:17-CV-01016.

3.    United States District Court for the Southern District of Mississippi, Northern Division.

Blue Cross & Blue Shield of Mississippi, a Mutual Insurance Company v. Sharkey-Issaquena Community Hospital, Sun Clinical Laboratory, LLC; Mission Toxicology Management Company, LLC; Mission Toxicology, LLC; Mission Toxicology II; and John Does 1-10. Case No. 3:17-cv-00338-DPJ-FKB

15

4.  United States District Court for the Western District of Texas, San Antonio Division.

Sun Ancillary Management, LLC; Mission Toxicology, LLC; Integrity Ancillary Management, LLC v. Shattuck Hospital Authority and Newman Memorial Hospital, Inc. Case No. 5:18-cv-00036-RCL.

**10.     Identify and describe all information management software systems or databases You utilize, have utilized, or have had utilized on Your behalf at any time since January 1, 2015, which relate to the performance, accounting, or billing of laboratory services and related reimbursements (e.g., Xifin RCM database, laboratory information systems, accounting software, email software, etc.). Your description should include the information stored in the database, including metadata fields, the way that the software or database was used, and the employees or third-parties who assist or manage the use of the software or database.**

**RESPONSE:**

Defendant answers as follows:

| Software | Vendor | Description |
|---|---|---|
| Labhealth | QSS | Laboratory Information System (LIS) managed and owned by Quality Software Systems (QSS). Database is only accessible by QSS. Information stored in the LIS includes patient demographics, results, scanned copies of orders, instrument interfaces, and Quality Control system for instrumentation. |
| QuickBooks | QuickBooks | Accounting Software |
| iPowerdoc | QSS | Results portal for physician offices. Third party results portal hosted by Quality Software Systems (Labhealth). Labhealth managed the result transmission from the LIS to the result portal they host on their servers. |

16

Pursuant to Rule 33(d), further information called for by this Interrogatory is found in Defendant's business records that will be produced at a mutually convenient time. Specifically, see, Dropbox link to "2019.02.05 DOCUMENT PRODUCTION TO UNITED" which includes the following file "Sun Clinical Laboratory" with subfile "Interrogatories – First Set – Response 10."

**11.     Identify and describe all locations where You have performed laboratory testing services that have been billed to United since January 1, 2015. Your description should include the date range during which You performed laboratory services at each location, the type of machines on which services were performed, and the number of claims that were submitted to United as a result of the services performed by each machine.**

**RESPONSE:**

Since January 1, 2015, Sun Labs has been located at, and performed laboratory services at, 102 Palo Alto Road, Suite 245, San Antonio, Texas 78211.  Sun uses the following machinery in its provision of laboratory services:

| Equipment |
| --- |
| Medonic M Series |
| Architect i1000 |
| Vitros 250 |
| Hitachi CLA |
| ABBOTT-ARCHITECT PLUS 5820 |
| IDS-iSYS |

Sun Labs performed tests on 759 claims submitted to United Healthcare from Newman Memorial Hospital and Community Memorial Hospital. (This does not include Mission

17

Toxicology, LLC)  Pursuant to Rule 33(d), further information called for by this Interrogatory is found in Defendant's business records that will be produced at a mutually convenient time.

OBJECTION: To the extent United is requesting identification of specific machines that tested each claim, the raw data for the instrument results that are integrated with the Laboratory Information System (LIS) are stored on the server for Labhealth. However, because the results are batched by run time, it would be an undue and overly burdensome process to pull out the patients in question in order to identify specifically what instrument was used for every test. The LIS does not have a report available to identify the testing equipment and thus the information is not reasonably accessible.

**12. Identify and describe all agreements You have or had with any hospital or any other entity or person acting on behalf of a hospital, at any time since January 1, 2015. Your description should include the name of the agreement, the names of the parties to the agreement (and the names of the individuals who signed any written agreements on behalf of the parties), the date the agreement was executed, the date the agreement was terminated (if any), and a description of the general purpose of the agreement.**

**RESPONSE:**

None.

**13. Identify and describe any laboratory to which You have referred specimens to be tested. Your description should include the number of specimens that You have referred to the laboratory and the amount You have paid the laboratory to perform those services.**

**RESPONSE:**

From April 20, 2016 to September 5, 2017, Sun Labs used the following reference laboratories: Aeon, Health Track Rx, Your Health Lab, Iverson Genetic Diagnostics, Alternate Health Labs, Mission Toxicology, Clinical Pathology Labs, Arrayit Corporation.

18

Pursuant to Rule 33(d), further information called for by this Interrogatory is found in Defendant's business records that will be produced at a mutually convenient time. Specifically, see Dropbox link to "2019.02.05 DOCUMENT PRODUCTION TO UNITED" which includes the following file "Sun Clinical Laboratory" with subfile "Interrogatories – First Set – Response 13."

**14. For each specimen referred by You to Alternate Health Labs, Inc. ("AHL") for testing, identify the price for testing charged by AHL, describe the basis for that price, identify the price for that testing charged to a hospital, and identify the price for that testing billed under the hospital's provider identification number.**

**RESPONSE:**

Sun Lab answers as follows:

[see next page]

19

| CHEMISTRY | | | |
|---|---|---|---|
| CBC with DIFF | $ 1.75 | Magnesium | $ 1.50 |
| FERRITIN | $ 2.00 | Uric Acid | $ 1.50 |
| Vitamin B12 | $ 4.00 | HDL | $ 2.00 |
| Vitamin D | $ 10.00 | LDL | $ 15.00 |
| Gluclose | $ 1.50 | Cholesterol | $ 2.00 |
| HGBA1C | $ 4.00 | Triglycerides | $ 2.00 |
| Insulin | $ 4.00 | Lp(A) | $ 12.00 |
| C-Peptide | $ 7.00 | Apo A | $ 13.00 |
| Sodium | $ 1.70 | Apo B | $ 13.00 |
| Potassium | $ 1.70 | AST | $ 2.00 |
| Chloride | $ 1.70 | ALT | $ 2.00 |
| Bicarbonate | $ 1.70 | ALP | $ 1.70 |
| Creatinine | $ 1.70 | Albumin | $ 1.70 |
| Bun | $ 1.70 | Total Bilirubin | $ 1.70 |
| Calcium | $ 1.70 | Direct Bilirubin | $ 1.50 |
| Phosphorous | $ 1.50 | Total Protein | $ 4.00 |
| Amylase | $ 2.00 | DHEA-S | $ 8.00 |
| TSH | $ 2.00 | SHBG | $ 10.00 |
| T3U | $ 2.50 | Cortisol | $ 5.00 |
| T4 | $ 2.00 | LH | $ 4.00 |
| Free T3 | $ 4.00 | FSH | $ 4.00 |
| Free T4 | $ 2.50 | Growth Hormone | $ 8.00 |
| Testosterone | $ 6.00 | Estradiol | $ 4.00 |
| Free Testosterone | $ 10.00 | PROGESTERONE | $ 4.00 |
| PROLACTIN | $ 4.00 | PSA | $ 4.00 |

| Allergen | |
|---|---|
| Western Inhalant | $ 209.00 |
| NW Inhalant | $ 192.50 |
| SW Inhalant | $ 198.00 |
| NE Inhalant | $ 203.50 |
| SE Inhalant | $ 198.00 |
| Western Inhalant | $ 170.10 |
| Complete Inhalant- | $ 297.00 |
| Food Panel | $ 170.10 |

| Toxicology | |
|---|---|
| Screen | $ 25.00 |
| Confirmation | $ 100.00 |

20

The foregoing fee schedules are based on the fair market value for independent reference laboratory services at the time such services were performed.

Pursuant to Rule 33(d), further information called for by this Interrogatory is found in Defendant's business records that will be produced at a mutually convenient time.

**15.    Identify and describe all individuals and/or entities that have referred specimens to You for laboratory testing services. Your description should include the number of specimens that have been referred to You and the process by which You receive those referrals.**

**RESPONSE:**

Pursuant to Rule 33(d), information called for by this Interrogatory is found in Defendant's business records that will be produced at a mutually convenient time except to the extent the Request seeks information protected under the Health Insurance Portability and Accountability Act of 1996 (HIPAA).

**16. For each Medical Provider identified in response to Interrogatory No. 15, identify and describe the incentive(s) provided to the Medical Provider in exchange for the referral. Your description should state whether the incentive(s) varied based on the volume of referrals You received from that Medical Provider.**

**RESPONSE:**

Sun provided no financial incentives to medical providers.

**17. For each Medical Provider identified in response to Interrogatory No. 15, identify and describe what information was given to the Medical Provider concerning the in-network or out-of-network status of the referred testing.**

**RESPONSE:**

Defendant disclosed to medical providers that Defendant was out-of-network when it marketed for itself.  When Defendant marketed for hospitals pursuant to its management

21

agreements, Defendant disclosed to medical providers the in-network or out-of-network status for each hospital, as applicable, based on the hospital's contracts with insurance carriers.

**18. Describe what, if anything, You do to confirm that the laboratory testing services performed by You or referred by You to another laboratory for testing conform with any or all of the following principles: were ordered by a Medical Provider; are medically appropriate for the Patient; are performed as ordered by the ordering Medical Provider; that results from the testing are provided to the appropriate Patients and/or Medical Providers; are not billed under more than one provider identification number, and to confirm that United Members receive the appropriate affiliation information as required by Section 102.006 of the Texas Occupations Code.**

**RESPONSE:**

The samples in question are reference samples from other laboratories; therefore it is the responsibility of the billing entity to determine the medical necessity of the sample before it is sent to Plaintiff for testing. Plaintiff received an electronic order from the referring laboratories LIS. Testing was performed based on the electronic order received.

**19. Describe all of the reasons Your requisition forms reference Section 102.006 of the Texas Occupations Code.**

**RESPONSE:**

It was believed to have been the correct statutory reference for disclosure of certain medical providers' investment interests in Sun Lab's series LLC.

Dated:  February 6, 2019                    Respectfully submitted,

*/s/ John J.E. Markham, II*
John J.E. Markham, II
Attorney *Pro Hac Vice* (MA BBO 638579)
MARKHAM & READ
One Commercial Wharf West
Boston, Massachusetts 02110
Tel: (617) 523-6329

22

Fax: (617)742-8604
jmarkham@markhamread.com
*Counsel for Defendant*

JOSEPH ALEEM & SLOWIK LLC
Yussuf Abdel-Aleem
Mohamad Ahmad
1355 Peachtree St. NE, Suite 700
Atlanta, GA 30309
Tel: (470) 819-7534
Tel: (310) 948-7226
*Counsel for Defendant*

HORNBERGER FULLER & GARZA
INCORPORATED
David William Navarro
7373 Broadway, Suite 300
San Antonio, Texas 78209
(210) 271-1700
*Local Counsel for Defendant*

23

## VERIFICATION

I certify under penalty of perjury under the laws of the United States of America that the foregoing Supplemental Interrogatory Responses are true and correct.

Executed this 6th day of February, 2019 in San Antonio, Texas

On behalf of Defendant Sun Clinical Laboratory, LLC:

*Michael L. Murphy*
Name

*Manager*
Title

Signature

24

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on February 6, 2019, that the foregoing document is being served on counsel of record by electronic mail at the email addresses specified on the CM/ECF system docket as indicated below:

*/s/ John J.E. Markham, II*
John J.E. Markham, II

Andrew G. Jubinsky
Raymond E. Walker
Figari & Davenport, L.L.P.
901 Main Street, Suite 3400
Dallas, TX 75202-3796
Email: andy.jubinsky@figdav.com
ray.walker@figdav.com
*Attorneys for United Entities*

Scott P. Kerew
Stephen W. Mooney
Claire C. Murray
Adam Sinton
Weinberg Wheeler Hudgins Gunn & Dial, OOC
3344 Peachtree Road NE, Suite 2400
Atlanta, GA 30326
Email: skerew@wwhgd.com
smooney@wwhgd.com
cmurray@wwhgd.com
asinton@wwhgd.com
*Attorneys for United Entities*

# Exhibit 11

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | |
|---|---|
| MISSION TOXICOLOGY, LLC., and SUN CLINICAL LABORATORY, LLC, <br><br> *Plaintiffs*, <br><br> v. <br><br> UNITEDHEALTHCARE INSURANCE COMPANY, UNITEDHEALTHCARE OF TEXAS, INC., UNITEDHEALTHCARE OF FLORIDA, INC., and UNITEDHEALTHCARE SERVICES, INC., <br><br> *Defendants.* | No. 5:17-CV-01016- DAE (lead case) |
| UNITEDHEALTHCARE INSURANCE COMPANY, INC. and UNITEDHEALTHCARE SERVICES, INC. <br><br> *Plaintiffs*, <br><br> v. <br><br> MICHAEL MURPHY, M.D., JESSE SAUCEDO, JR., SAMANTHA MURPHY, LYNN MURPHY, JULIE PRICER, MISSION TOXICOLOGY, LLC, SUN CLINICAL LABORATORY, LLC, SUN ANCILLARY MANAGEMENT, LLC, INTEGRITY ANCILLARY MANAGEMENT, LLC, ALTERNATE HEALTH LAB, INC., AND LMK MANAGEMENT, LLC, <br><br> *Defendants*. | No. 5:18-CV-00347-DAE (consolidated case) |

**DEFENDANT MISSION TOXICOLOGY, LLC's RESPONSES TO PLAINTIFF'S FIRST SET OF INTERROGATORIES**

1

COMES NOW Defendant Mission Toxicology, LLC ("Mission" or "Defendant") and files its responses and objections to Plaintiff's First Set of Interrogatories as follows:

## PRELIMINARY STATEMENT

a. The following responses and objections are based upon information presently available to Defendant, which Defendant believes to be correct. These responses are made without prejudice to Defendant's right to utilize subsequently discovered facts and documents.

b. While Interrogatories herein answered were served in Civil Action No. 18-CV-347, these Responses are offered both for use in that case and in Civil Action 17-CV-1016.

c. These responses may be supplemented upon Defendant's further investigation and acquisition of information that Defendant either does not possess or cannot locate at this time. Any further supplementation will be made in accordance with the Federal Rules of Civil Procedure and applicable local rules.

d. Despite any "definitions" or instructions contained within Plaintiffs' discovery requests, Defendant will provide only responses that are required under the applicable rules of civil procedure.

e. Defendant objects to any "definition" or instructions preceding Plaintiffs' discovery requests that seek information or documents constituting work product, material protected by the attorney-client privilege, opinion work product, or any other privilege or protection.

f. Defendant's response to each Request does not waive its right to challenge the relevance, materiality, or admissibility of information or documents produced, or to object to the use of information or documents in any subsequent proceeding, including the trial, of this matter.

2

g.  Defendant incorporates this Preliminary Statement into each response below.

## DEFINITIONS

When used in the below responses and objections, the following terms shall have the following meanings:

h.  Unless indicated otherwise, the term "Plaintiff," "United," "You" and/or "Your" includes UnitedHealthcare Insurance Company, and any agents, representatives, employees, contractors, or any other person or persons acting for or purportedly acting on Aetna's behalf.

i.  Unless indicated otherwise, the term "Complaint" refers to the pleading filed by United on April 18, 2018 (Docket No. 1).

j.  Unless indicated otherwise, the term "Defendant" or "Mission" means or refers to Mission Toxicology, LLC.

k.  The term "Request" refers to any of the Specific Requests listed below.

## GENERAL OBJECTIONS

### GENERAL OBJECTION 1

Defendant objects to providing work product information prepared in anticipation of litigation in accordance with F.R.C.P. § 26 (b).

### GENERAL OBJECTION 2

Defendant objects to providing any information that constitutes attorney-client communications, including items to which the attorney acquired his/her knowledge by his/her own observation where observation was as a result of his/her professional employment.

### GENERAL OBJECTION 3

3

Defendant also objects to providing any information that constitutes opinion work product. *See Hisaw v. Unisys Corp.,* 134 F.R.D. 151 (W.D.La. 1991) (ordinary work product is discoverable only upon a showing of substantial need and opinion work product is never discoverable; *Upjohn Co. v. United States,* 449 US 383, 401-402 (1981) (showing substantial need and inability to obtain other information without undue hardship is insufficient to compel disclosure); *In re Murphy*, 560 F.2d 326, 336 (8th Cir. 1977) ("nearly absolute immunity"); *Duplan Corp. v. Moulinage et Retorderie de Chavanoz*, 509 F.2d 730, 732 (4th Cir. 1974) (opinion work product is absolutely protected).

## GENERAL OBJECTION 4

Insofar as any discovery requests seek confidential proprietary information, Defendant objects to providing such information without an appropriate protective order.

## GENERAL OBJECTION 5

Defendant objects to the discovery requests insofar as they exceed the scope of lawful discovery by seeking information not "relevant to any party's claim or defense and proportional to the needs of the case," in violation of F.R.C.P. §26(b). This Objection is adopted by reference without being restated in any Response to which it applies, namely any of these Interrogatories which seek information outside the time frame during which this Answering Defendant or anyone working with this answering Defendant submitted billings to or received payments from United.

## GENERAL OBJECTION 6

Defendant objects to the extent the relevance of the information Plaintiffs seek is outweighed by Defendant's privacy rights and no compelling need for such information has been shown.

4

**GENERAL OBJECTION 7**

Defendant objects to United's Definitions and Instructions to the extent they are not consistent with the Federal Rules of Civil Procedure or otherwise attempt to unlawfully expand Defendant's obligations to respond.

**GENERAL OBJECTION 8**

Defendant objects to the extent the Requests seek information not in Defendant's control.

**GENERAL OBJECTION 9**

Defendant objects to the extent the Requests are overly broad and would cause unreasonable expense.

**GENERAL OBJECTION 10**

Defendant to the extent the Requests seek information protected under the Health Insurance Portability and Accountability Act of 1996 (HIPAA).

**SPECIFIC RESPONSES**

**1.      Provide the name, address, phone number, and employer of each person who contributed to the preparation or formulation of Your responses to all Interrogatories, Requests for Production, and Requests for Admission served in this matter.**

**RESPONSE:**

Attorneys and staff of Joseph, Aleem & Slowik, LLC, 1355 Peachtree Street NE, Suite 700, Atlanta, GA 30309, (404) 220-9178: Mohamad Ahmad, Yussuf Aleem, Edward Molinary, John Wisiackas, Jaymie Parkkinen, Attorney John Markham, Markham & Read, One Commercial Wharf West, Boston MA 02110, Tel: (617) 523-6329, and Jesse Saucedo Jr., 1018 Solitude Cove, San Antonio, TX 78260.

**2.      Identify and describe all individuals and/or entities that possess, or formerly**

5

possessed, an ownership interest in You. Your description should include the percentage of the ownership interest, the date the ownership interest was acquired, and the date the ownership interest was lost.

RESPONSE:

3.    Identify and describe all entities in which You possess, or formerly possessed, an ownership interest. Your description should include the percentage of the ownership interest, the date the ownership interest was acquired, and the date the ownership interest was lost.

RESPONSE:

Mission does not possess and has never possessed ownership interest in another entity.

4.    Identify all individuals You employ, or have been employed by You at any time since January 1, 2015, whose job functions relates or related to the performance, administration, billing, accounting, marketing, or referring of laboratory services.

RESPONSE:

| Employee | Descriptive Job Title |
| --- | --- |
| Angela A. Niemietz | Customer Service |
| Anne W. Dimas | Shipping Service |
| Annette Pendaz | Customer Service |
| Chasiti N. Arocha | Shipping Service |
| Ciel M. Gomez | Accessioning |
| Elizabeth Rincon-Ubertaccio | Laboratory Technician |
| Ernest Flores, V | Accessioning |
| Jorge A. Aguilar | Accessioning |

6

| | |
|---|---|
| Lauren A. Solis | Laboratory Technician |
| Martina C. Tullos | Accessioning |
| Mary Ann Solis | Accessioning |
| Melissa S. Alfaro | Accessioning |
| Randy L. Dittmar | Manager |
| Rebecca A. Dominguez | Shipping Service |
| Richard Trevino | Laboratory Technician |
| Stacey L. Revell | Customer Service |
| Tommi L. Rincon | Shipping Service |
| Valeria M. Norris | Customer Service |
| Victor L. Perez, Jr. | Accessioning |

**5.      Identify all individuals or entities with whom You have, or have had at any time since January 1, 2015, an independent contractor relationship, who performed any functions relating to the performance, administration, billing, accounting, marketing, or referring of laboratory services. For each individual or entity, provide the amount paid to that contractor, the "clients" or referral sources associated with the contractor, or for whom the contractor receives credit or commissions as a result of, and identify any employees or contractors utilized by that contractor in furtherance of the services performed for You.**

**RESPONSE:**

Pursuant to Rule 33(d), information called for by this Interrogatory is found in Defendant's business records that will be produced at a mutually convenient time.

7

6.    Identify and describe all "series" entities created by You, on Your behalf, or for Your benefit under Tex. Bus. Org. Code Sec. 101.601, et seq. Your description should include, for each "series," the date of formation, the owners or beneficiaries, the purpose of the series, and the nature of the business in which the "series" has been primarily engaged since January 1, 2015.

RESPONSE:

None.

7.    Identify and describe all licenses relating to the performance of laboratory services that You possess or have possessed at any time since January 1, 2015. Your description should include the purpose of the license, when You received it, the services that You are authorized to perform as a result of the license, and the license's current status.

RESPONSE:

Mission holds the following licenses: CLIA Certificate of Accreditation and COLA Accreditation Certificate.

8.    Identify and describe all bank accounts You utilize, have utilized, or have had utilized on Your behalf at any time since January 1, 2015. Your description should include identifying information for each account, the purpose of the accounts, when the accounts were opened (or closed), and the signatories for the accounts.

RESPONSE:

9.    Identify all lawsuits to which You are a party, or have been a party at any time since January 1, 2015, concerning the performance, administration, or billing of laboratory services.

8

**RESPONSE:**

1. United States District Court for the Western District of Texas, Case No. 5:18-CV-0323-OLG

   Aetna, Inc. and Aetna Life Insurance Company v. The Peoples Choice Hospital, LLC; PCH Management Newman, LLC; PCH Lab Services, LLC; Mission Toxicology, LLC; Mission Toxicology, II, LLC; Mission Toxicology Management Company, LLC; Sun Clinical Laboratory, LLC; Sun Ancillary Management, LLC; Integrity Ancillary Management, LLC; Alternate Health Labs, Inc.; Alternate Health Corp.; LMK Management, LLC; Fortis Diagnostics, LLC; Escalon Health Associates, LLC; Seth Guterman, MD; David Wanger; Michael L. Murphy, MD; Lynn Murphy; Samantha Murphy; Julie Pricer; Thomas Palmer; Jesse Saucedo, J.; and John and Jane Does.

2. United States District Court for the Western District of Texas, Case No. 5:17-CV-01016

   Mission Toxicology, LLC; Sun Clinical Laboratory, LLC v. UnitedHealthcare Insurance Company; UnitedHealthcare of Texas, Inc.; UnitedHealthcare of Florida, Inc. and UnitedHealthcare Services, Inc.

3. United States District Court for the Southern District of Mississippi, Northern Division, Case No. 3:17-cv-00338-DPJ-FKB

   Blue Cross & Blue Shield of Mississippi, a Mutual Insurance Company v. Sharkey-Issaquena Community Hospital, Sun Clinical Laboratory, LLC; Mission Toxicology Management Company, LLC; Mission Toxicology, LLC; Mission Toxicology II; and John Does 1-10

4. United States District Court for the Western District of Texas, San Antonio Division, Case No. 5:18-cv-00036-RCL

9

Sun Ancillary Management, LLC; Mission Toxicology, LLC; Integrity Ancillary Management, LLC v. Shattuck Hospital Authority and Newman Memorial Hospital, Inc.

**10.    Identify and describe all information management software systems or databases You utilize, have utilized, or have had utilized on Your behalf at any time since January 1, 2015, which relate to the performance, accounting, or billing of laboratory services and related reimbursements (e.g., Xifin RCM database, laboratory information systems, accounting software, email software, etc.). Your description should include the information stored in the database, including metadata fields, the way that the software or database was used, and the employees or third-parties who assist or manage the use of the software or database.**

**RESPONSE:**

Mission Toxicology used Paracelsus as the Laboratory Information System from April,2013 to September, 2015. It switched to Labhealth from October, 2015 to lab closure in May, 2018. Mission Toxicology outsources its finance department.

**11.    Identify and describe all locations where You have performed laboratory testing services that have been billed to United since January 1, 2015. Your description should include the date range during which You performed laboratory services at each location, the type of machines on which services were performed, and the number of claims that were submitted to United as a result of the services performed by each machine.**

**RESPONSE:**

Accessioning took place at 2145 NW Military Highway Suite 102, San Antonio, TX 78213 from April, 2013 to March, 2016. From April, 2016 to July, 2016 at 2241 NW Military Avenue, San

10

Antonio, TX 78213. From August, 2016 through September, 2017 at 1051 E. Nakoma Avenue, Suite 201, San Antonio, TX 78216.

12.    **Identify and describe all agreements You have or had with any hospital or any other entity or person acting on behalf of a hospital, at any time since January 1, 2015. Your description should include the name of the agreement, the names of the parties to the agreement (and the names of the individuals who signed any written agreements on behalf of the parties), the date the agreement was executed, the date the agreement was terminated (if any), and a description of the general purpose of the agreement.**

**RESPONSE:**

Pursuant to Rule 33(d), information called for by this Interrogatory is found in Defendant's business records that will be produced at a mutually convenient time.

13.    **Identify and describe any laboratory to which You have referred specimens to be tested. Your description should include the number of specimens that You have referred to the laboratory and the amount You have paid the laboratory to perform those services.**

**RESPONSE:**

The labs involved are:

Clinical Pathology Laboratories

Axis Diagnostics

Alternate Health Labs

Your Health Labs

Pursuant to Rule 33(d), further information called for by this Interrogatory is found in Defendant's business records that will be produced at a mutually convenient time.

11

**14.** For each specimen referred by You to Alternate Health Labs, Inc. ("AHL") for testing, identify the price for testing charged by AHL, describe the basis for that price, identify the price for that testing charged to a hospital, and identify the price for that testing billed under the hospital's provider identification number.

RESPONSE:

| | |
|---|---|
| CBC with DIFF | 1.75 |
| FERRITIN | 2 |
| Vitamin B12 | 4 |
| Vitamin D | 10 |
| AST | 2 |
| ALT | 2 |
| ALP | 1.7 |
| Albumin | 1.7 |
| Total Bilirubin | 1.7 |
| Direct Bilirubin | 1.5 |
| Total Protein | 4 |
| Amylase | 2 |
| Gluclose | 1.5 |
| HGBA1C | 4 |
| Insulin | 4 |
| C-Peptide | 7 |
| Sodium | 1.7 |
| Potassium | 1.7 |
| Chloride | 1.7 |
| Bicarbonate | 1.7 |
| Creatinine | 1.7 |
| Bun | 1.7 |
| Calcium | 1.7 |
| Phosphorous | 1.5 |
| Magnesium | 1.5 |
| Uric Acid | 1.5 |
| HDL | 2 |
| LDL | 15 |
| Cholesterol | 2 |
| Triglycerides | 2 |
| Lp(A) | 12 |

12

| | |
|---|---|
| Apo A | 13 |
| Apo B | 13 |
| TSH | 2 |
| T3U | 2.5 |
| T4 | 2 |
| Free T3 | 4 |
| Free T4 | 2.5 |
| TSH | 2 |
| T3U | 2.5 |
| T4 | 2 |
| Free T3 | 4 |
| Free T4 | 2.5 |
| Screen | 25 |
| Confirmation | 100 |

The price was set by market value. Pursuant to Rule 33(d), further information called for by this Interrogatory is found in Defendant's business records that will be produced at a mutually convenient time.

**15.     Identify and describe all individuals and/or entities that have referred specimens to You for laboratory testing services. Your description should include the number of specimens that have been referred to You and the process by which You receive those referrals.**

**RESPONSE:**

Pursuant to Rule 33(d), information called for by this Interrogatory is found in Defendant's business records that will be produced at a mutually convenient time.

**16.     For each Medical Provider identified in response to Interrogatory No. 15, identify and describe the incentive(s) provided to the Medical Provider in exchange for the referral. Your description should state whether the incentive(s) varied based on the volume of referrals You received from that Medical Provider.**

**RESPONSE:**

13

Mission provided no financial incentives to medical providers based on the volume of referrals.

**17.    For each Medical Provider identified in response to Interrogatory No. 15, identify and describe what information was given to the Medical Provider concerning the in-network or out-of-network status of the referred testing.**

**RESPONSE:**

Pursuant to Rule 33(d), further information called for by this Interrogatory is found in Defendant's business records that will be produced at a mutually convenient time.

**18.    Describe what, if anything, You do to confirm that the laboratory testing services performed by You or referred by You to another laboratory for testing conform with any or all of the following principles: were ordered by a Medical Provider; are medically appropriate for the Patient; are performed as ordered by the ordering Medical Provider; that results from the testing are provided to the appropriate Patients and/or Medical Providers; are not billed under more than one provider identification number, and to confirm that United Members receive the appropriate affiliation information as required by Section 102.006 of the Texas Occupations Code.**

**RESPONSE:**

The samples in question are reference samples from other laboratories; therefore, it is the responsibility of the billing entity to determine the medical necessity of the sample before it is sent to Defendant for testing.   Defendant received an electronic order from the referring laboratories LIS.   Testing was performed based on the electronic order received.

**19.    Describe all of the reasons Your requisition forms reference Section 102.006 of the Texas Occupations Code.**

14

**RESPONSE:**

It was believed this this statutory reference was correct.

Dated: February 4, 2019

Respectfully submitted,

*/s/ John J.E. Markham, II*
John J.E. Markham, II
Attorney *Pro Hac Vice* (MA BBO 638579)
MARKHAM & READ
One Commercial Wharf West
Boston, Massachusetts 02110
Tel: (617) 523-6329
Fax:(617)742-8604
jmarkham@markhamread.com
*Counsel for Defendant*

JOSEPH ALEEM & SLOWIK LLC
Yussuf Abdel-Aleem
Mohamad Ahmad
1355 Peachtree St. NE, Suite 700
Atlanta, GA 30309
Tel: (470) 819-7534
Tel: (310) 948-7226
*Counsel for Defendant*

HORNBERGER FULLER & GARZA
INCORPORATED
David William Navarro
7373 Broadway, Suite 300
San Antonio, Texas 78209
(210) 271-1700
*Local Counsel for Defendant*

15

## VERIFICATION

I certify under penalty of perjury under the laws of the United States of America that the foregoing Interrogatory Responses are true and correct.

Executed this 4th day of February, 2019 in San Antonio, Texas

On behalf of Defendant Mission
Toxicology, LLC:

_Jesse Saucedo_____
Name and Title

_Principal / CEO_____
Signature

_____

16

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on February 5, 2019, that the foregoing document is being served on counsel of record by electronic mail at the email addresses specified on the Pacer record as indicated below:

*/s/John J.E. Markham, II*
John J.E. Markham, II

Andrew G. Jubinsky
Raymond E. Walker
Figari & Davenport, L.L.P.
901 Main Street, Suite 3400
Dallas, TX 75202-3796
Email: andy.jubinsky@figdav.com
ray.walker@figdav.com
*Attorneys for United Entities*

Scott P. Kerew
Stephen W. Mooney
Claire C. Murray
Adam Sinton
Weinberg Wheeler Hudgins Gunn & Dial, OOC
3344 Peachtree Road NE, Suite 2400
Atlanta, GA 30326
Email: skerew@wwhgd.com
smooney@wwhgd.com
cmurray@wwhgd.com
asinton@wwhgd.com
*Attorneys for United Entities*

17

# Exhibit 12

## ONE STOP MEDICAL SERVICES, LLC
## MANAGEMENT SERVICES AGREEMENT

This Management Services Agreement ("Agreement") is made and entered into effective as of this __20th__ day of __October__, 2016 by and between **ONE STOP MEDICAL SERVICES, LLC** ("Manager") and **SUN CLINICAL LABORATORY, LLC**, a Texas limited liability company ("Company").

WITNESSETH:

WHEREAS, Company is engaged in the business of operating a multi-specialty healthcare laboratory in San Antonio; and

WHEREAS, Company desires to market and operate its laboratory services in full compliance with all ethical, statutory, and regulatory requirements; and

WHEREAS, it is recognized by the parties that Manager has the experience to assist Company with its management and marketing services as herein contemplated; and

WHEREAS, Company desires to have the benefit of Manager's services, and Manager desires to provide those services to Company;

NOW, THEREFORE, for and in consideration of the mutual covenants and conditions contained herein, and other good and valuable consideration, the receipt and adequacy of which is now and forever acknowledged, Company and Manager hereby agree as follows:

1. Services. Company agrees to engage the services of Manager, and Manager agrees to provide such services upon the terms and conditions hereinafter set forth. In general, Manager shall perform services related to the marketing and management of the laboratory operated by Company. The minimum services to be provided on a regular monthly basis by Manager are more specifically described in Exhibit A ("Services). All Services rendered by Manager shall be conducted in its capacity as an independent contractor.

2. Term and Termination.

   (a) Term. This Agreement shall commence as of the Effective Date and will continue for a period of one (1) year, and shall automatically renew for additional one (1) year periods thereafter, unless otherwise terminated in accordance with this Agreement.

   (b) Termination with Cause. Either party shall have the right to terminate this Agreement prior to the expiration of the initial term or any renewal term upon the occurrence of any of the following events:

**EXHIBIT 13**
**BOONE**
**August 28, 2019**
Vesta L. York, CSR, RMR, CRR

ONESTOP00000033

(i)  Breach or default by the other party of any terms or obligations under this Agreement which is not waived in writing by the non-defaulting party. In such case, the non-defaulting party shall notify the other of such alleged breach or default and the other party shall have thirty (30) days to cure the default. If uncured upon the expiration of thirty (30) days, the non-defaulting party may immediately terminate the Agreement;

(ii)  The other party is declared insolvent or bankrupt, or makes an assignment for the benefit of creditors, or a receiver is appointed which is not removed within thirty (30) days after notice from the other party of election to terminate; or

(iii)  Written agreement of both parties.

The termination rights described in this Section are in addition to any remedies either party may have at law or in equity for any breach of this Agreement.

3.  Management Fees.  As compensation for its Services, Company shall pay Manager sixty percent (60%) of the monthly net revenue associated with accounts listed on the attached Exhibit B ("Management Fee"). Company will determine net revenue in its reasonable discretion in accordance with generally accepted accounting practices. The Management fee shall be paid monthly on or before the twentieth (20th) day after the end of each month, based on the prior month's net revenue.  The parties agree that the Management Fee is fair market value and commercially reasonable.

4.  Compliance Efforts. Company and Manager enter into this Agreement with the intent of conducting their relationship in full compliance with applicable state, local and Federal law, including, but not limited to patient privacy and security laws, anti-fraud and abuse laws, anti-self referral laws, and/or patient non-solicitation laws (collectively "Healthcare Laws").

(a) Manager shall use its best efforts to ensure all services performed by Manager, its officers, managers, employees, agents, representatives, and/or independent contractors are in compliance with the Healthcare Laws and any and all requirements imposed by rules, regulations, ordinances, or certification or accreditation standards, including but not limited to those pertaining to federal, state or local agencies, departments, commissions, associations or other governing or advisory bodies having authority to set standards governing the operation of Company or its client's facilities.

(b) Manager shall comply with all laws and regulations respecting the confidentiality of the records of Company and shall comply with all applicable federal, state, and local laws and regulations relating to the records of Company. Specifically, Manager agrees to comply with the Health Insurance Portability and

ONESTOP00000034

Accountability Act of 1996, as codified at 42 U.S.C. Section 1320d ("HIPAA"), and any current and future regulations promulgated thereunder including, without limitation, federal privacy and security standards. In addition, during the term of this Agreement, the parties shall cause their employees, officers and other related parties to refrain from discussing with or disclosing to anyone any information or data regarding the other party, especially as it relates to the rights of patients to maintain privacy.

(c) In the event that (i) either a state or federal government enacts legislation or adopts rules and regulations (or any interpretation of same) which results in this Agreement being in violation of any law or which otherwise may adversely affect this Agreement, (ii) a court of competent jurisdiction shall interpret such laws, rules, or regulations in a manner which results in this Agreement being in violation of any law or which otherwise may adversely affect this Agreement, or (iii) legal counsel retained by either party provides a written opinion which concludes that any word, phrase, sentence or section of this Agreement is likely to result in either party being viewed by the relevant enforcement agencies as in violation of any law; then the parties shall negotiate in good faith to accommodate the terms and intent of this Agreement to the greatest extent possible consistent with the requirement of applicable law. If the parties cannot agree upon mutually acceptable terms within ninety (90) days, this Agreement shall terminate as the end of said 90-day period.

5. Confidential Information. The term "Confidential Information" means information of a confidential or proprietary nature relating to the subject matter described in this Agreement which is taken from or disclosed by one party (the "Disclosing Party") by or to the other party (the "Receiving Party"). Confidential Information includes, but is not limited to, matters of a technical nature such as trade secrets, methods, compositions, data and know-how, designs, systems, processes, computer programs, files and documentation, similar items or research projects, and any information derived therefrom; matters of a business nature, such as the terms of this Agreement (including, without limitation, any pricing terms and pharmaceutical manufacturer contract terms), marketing, sales, strategies, proposals, and lists of actual or potential clients, customers, or other sources of potential business, as well as any other information that is designated by either party as confidential.

(a) The Receiving Party agrees to hold the Disclosing Party's Confidential Information in strict confidence and to take commercially reasonable precautions to protect such Confidential Information (including, without limitation, using all precautions Receiving Party employs with respect to its own Confidential Information). The Receiving Party further agrees not to disclose any Confidential Information to any third party, not to use, analyze, transcribe, transmit, decompile, disassemble or reverse engineer any Confidential Information unless required in the performance of the Receiving Party's duties under this Agreement, not to use any Confidential Information for its own or any third party's benefit unless authorized by this Agreement or by the Disclosing Party in writing, and not to alter or remove

ONESTOP00000035

any legend, marking or notice provided by the Disclosing Party on its Confidential Information regarding the confidential and proprietary nature of such information.

(b) The confidentiality obligations of this Section shall not apply to information which, as evidenced in writing or other documentary form:

(i) is or becomes publicly known through no breach of this Agreement by the Receiving Party;

(ii) is learned by the Receiving Party from a third party entitled to disclose it; or

(iii) is rightfully obtained by the Receiving Party prior to the effective date of this Agreement; or

(iv) is disclosed to affiliates of Company involved in billing or management services for Company.

(c) The confidentiality obligations contained in this Section shall expire two (2) years after the termination of this Agreement for any reason. Receiving Party may make disclosures required by Law or court order provided Receiving Party has given the Disclosing Party prompt written notice of the request so that the Disclosing Party can object or otherwise seek to intervene and provided that the Receiving Party uses diligent, reasonable efforts to limit disclosure and to obtain confidential treatment or a protective order.

6.  Promotional Materials.  Company shall provide Manager with sales, literature, brochures, and advertising materials regarding Services to be performed under this Agreement in such quantities as the parties may mutually agree. Manager shall not use its own or any other promotional materials without the prior written consent of Company.

7. Indemnification.  Manager shall defend and hold harmless Company and its officers, employees, agents and assigns from and against any liability, loss, expense, fees or claim for injury or damages arising from any gross negligence or willful misconduct of Manager, its offers officers, employees, agents, or assigns in connections with this Agreement.  Company shall defend and hold harmless Manager and its officers, employees, agents and assigns from and against any liability, loss, expense, fees, or claim for injury or damages arising from any gross negligence or willful misconduct of Company, its officer, employees, agents, or assigns in connection with this Agreement.

NOTWITHSTANDING ANY OTHER PROVISIONS OF THIS AGREEMENT, IN NO EVENT SHALL EITHER PARTY TO THIS AGREEMENT, OR ANY AFFILIATE OF EITHER PARTY TO THIS AGREEMENT, BE LIABLE TO THE OTHER PARTY OR ANY OF ITS' AFFILIATES, FOR ANY INDIRECT DAMAGES, SPECIAL DAMAGES, CONSEQUENTIAL DAMAGES, PUNITIVE DAMAGES, OR LOST PROFITS FOR ANY REASON, ARISING OUT OF OR RELATED TO SUCH PARTY'S PERFORMANCE OR NON PERFORMANCE OR ANY OTHER MATTER UNDER THIS AGREEMENT OR RELATED

ONESTOP00000036

TO THIS AGREEMENT IN ANY WAY, OR BREACH HEREOF, EVEN IF SUCH PARTY HAS BEEN ADVISED OF THE POSSIBILITY THEREOF.

8. Legal Fees. In the event either party elects to institute a legal proceeding to enforce or interpret any provision of this Agreement, the prevailing party will be entitled to recover such legal expenses, including, without limitation, attorneys' fees, costs and necessary disbursements, in addition to any other relief to which such party shall be entitled.

9. Choice of Law and Venue. The parties agree that this Agreement shall be governed by and construed in accordance with the laws of the State of Texas, and, with the exception of arbitration, that the state or federal courts located in Bexar County, Texas shall be the exclusive courts of jurisdiction and venue for any litigation, special proceeding or other proceeding as between the parties that may be brought, or arise out of, in connection with or by reason of this Agreement.

10. Benefit/Assignment. Subject to provisions herein to the contrary, this Agreement shall inure to the benefit of and be binding upon the parties hereto and their respective legal representatives, successors, and assigns; provided, however, except to the extent otherwise provided herein, no party may assign this Agreement without the prior written consent of the other party, which consent shall not be unreasonably withheld.

11. Notices. Any notice or other communication by either party to the other shall be in writing and shall be either delivered personally or mailed, postage prepaid, registered or certified mail, return receipt requested to the following addresses unless a party shall otherwise designate a change of address by proper notice.

Manager:                                Company:
One Stop Medical Services, LLC          Sun Clinical Laboratory, LLC
1125 N. Briarwood Road                  45 NE Loop 410, Suite 215
Derby, Kansas 67037                     San Antonio, Texas 78216

12. Counterparts. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but which together shall constitute one and the same instrument.

13. Waiver of Breach. The waiver by either party of any breach or violation of any provision of this Agreement shall not operate as, or be construed to be, a waiver of any subsequent breach or violation of the same or any other provision hereof.

14. Severability. In the event any provision of this Agreement is held to be invalid, illegal, or unenforceable for any reason and in any respect, and the basis of the bargain of this Agreement is not thereby defeated, such invalidity, illegality, or

ONESTOP00000037

unenforceability shall in no event affect, prejudice, or disturb the validity of the remainder of this Agreement, which shall be in full force and effect, enforceable in accordance with its terms.

15. Independent Relationship. None of the provisions of this Agreement are intended to create, nor shall be deemed or construed to create, any relationship between Manager and Company other than that of independent entities contracting with each other hereunder solely for the purpose of effecting the provisions of this Agreement. Neither of the parties hereto, nor any of their respective employees, shall be construed to be the agent, partner, employer, or representative of the other.

16. Non-Exclusive. Manager hereby acknowledges and agrees that this Agreement is non-exclusive, and nothing contained in this Agreement shall preclude or in any way limit Company's ability to enter into other non-exclusive management services agreements to provide similar services.

17. Entire Agreement. This Agreement supersedes all previous contracts between the parties relating to the subject matter hereof and constitutes the entire agreement between the parties. Oral statements or prior written materials not specifically incorporated in this Agreement shall not be of any force and effect.

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed in multiple originals by their duly authorized officers, all as of the day and year first above written.

**ONE STOP MEDICAL SERVICES, LLC**

By: _____
     Name: _____
     Manager

**SUN CLINICAL LABORATORY, LLC**

DocuSigned by:

*Michael L. Murphy*

By: ⎣—DE2C9FA9C12D455...⎦_____
     Michael L. Murphy, MD
     Manager

ONESTOP00000038

**EXHIBIT A**
**SERVICES**

The term "Services", as set forth in the Agreement, shall mean and include the items listed below:

1. Manage Client Engagements and Lead Generation Strategy

- Market healthcare services, which include laboratory services, to potential clients in accordance with Company compliance guidelines and code of conduct
- Develop and manage client engagement and lead generation strategy focused on creating a sense of community and improving market share.
- Identify, build and leverage communication channels to improve brand awareness, preference and overall engagement with clients
- Drive awareness and positive brand perception within targeted segments / geographies
- Strategically align with internal business units to identify areas to mutually drive growth, efficiencies and effectiveness.
- Partner with internal teams to improve alignment of brand, communication and engagement across markets
- Implement programs and tactics to improve engagement by clients
- Provide feedback to Company concerning provider and patient satisfaction and ongoing operational issues
- Assist in building sustainable relationships with clients


2. Lead Acquisition

Provide front-end data acquisition including, without limitation:
- Manage third party relationships with lead providers
- Manage third party relationships with media buyers
- Manage internal lead generation and spending
- Manage internal media spending

3. Advertisement & Brand Recognition

Provide advertisement and brand recognition services including, without limitation:
- Creation, design, implementation, and management of creative resources
- Website design and development
- Online health surveys
- Display advertisement
- Online content and information
- Email templates and design
- Brand development and strategic messaging

ONESTOP00000039

- Campaign management and platform optimization

4.    Technology & Systems Management

Provide technology and systems needed to manage the services provided including, without limitation:

- Technology platform and all analytic software
- Analytics on implementing technology to improve business and stream line services, information, and processes
- Develop and manage technology across entire patient engagement platform
- Integrate all data into centralized data warehouse

5.    Lead Analytics

Provide analytics on all key performance indicators related to obtaining a lead in order to optimize performance and quality including, without limitation:

- Reporting on performance and quality
- Strategic analysis of continued performance and quality
- Implementation of intelligence tool for continued optimum performance and quality
- Analysis and continued implementation of data warehouse performance, quality and security

5.    Laboratory Management

Provide services to assist in Laboratory relationships including, without limitation:

- Manage day-to-day interaction with Lab(s)
- Handle initial integration with Lab, call center, and doctor network
- Assist in managing the Lab – doctor network relationship to ensure the patient experience is optimized and professional from lead acquisition through prescription fulfillment

ONESTOP00000040

APP 242

**EXHIBIT B**
**ACCOUNTS**

ONESTOP00000041

# Exhibit 13

From:       Matt Walker
Sent:       Wed 10/26/2016 4:46 PM (GMT-00:00)
To:         <jpricer@iamgmt.com>
Cc:         "Paul Stewart" <pstewart@sdrconsult.com>
Bcc:
Subject:    Fwd: Wiring Instructions
Attachments: Incoming Wiring Instructions for ████████.docx

Julie:

Morning. Attached is wiring information for ████ I know we are a few weeks away from Sun remunerating for items sent this month, but wanted to go ahead and get this set up if possible. One less thing to worry with next month.

Please let me know if you need anything additional, and thanks in advance.

Matt

Sent from my iPhone

Begin forwarded message:

**From:** Traci Jarvis <traci.jarvis@citizensbankal.com>
**Date:** October 24, 2016 at 4:47:17 PM CDT
**To:** Todd Edmiston <todd.edmiston@gmail.com>, "mattwalker@bellsouth.net" <mattwalker@bellsouth.net>
**Subject: Wiring Instructions**

As requested, attached you will find the wiring instructions for incoming wires to ████████

If you need anything further, please let me know.

Regards,

Traci M. Jarvis
Assistant Vice President/
Branch Manager
NMLS #1036556

*Citizens' Bank, Inc.*
*P O Box 2067*
*Foley, AL 36536*

251-424-1575 Office
251-970-2299 Fax

www.citizensbankal.com


EXHIBIT
63

SDR 001127

Confidentiality Notice: The information in this e-mail message, including any attachments thereto, is intended to be confidential and is for the use of the individual or entity named above. If the reader of this message is not the intended recipient, you are hereby notified that retention, dissemination, distribution, or copying of this message is strictly prohibited. If you receive this message in error, please notify the sender and delete the material immediately. Thank you.

SDR 001128

# Exhibit 14

| From: | Thomas Palmer <tpalmer@fortisdiagnostics.com> |
|---|---|
| Sent: | 11/14/2016 9:24:39 PM -0600 |
| To: | Mike Murphy <mlmurphy25@gmail.com>; Jesse Saucedo <jesse@txmmc.com> |
| Subject: | Fortis Labs - Partnership Thoughts |

Hola Dr Murphy, Jesse,

Per our previous conversations I wanted to follow up in writing on two topics that can help us deepen our partnership and increase revenues together.

- Blood Lab/Core Lab
  - Problem: We are losing business with our doctors due to limited CPL options and high CPL send out costs.
  - Proposed solution: Fortis Blood Lab/Core Lab to run our own samples for our own doctors (approx 200 – 300 doctors).
  - Rationale: Simply stated, our Blood Lab/Core Lab is better than CPL, Quest or Lab Corp. We have 16,000 sq. ft. We have 71 employees most of whom are dedicated to blood lab/core lab. We have a payroll of $300k per month. We have a more robust Blood menu than Lab Corp, Quest or CPL. We have quicker turn around times. We have fewer send outs (we can run 100% of our wellness panel in house i.e.: zero send outs). Our PhD, Lab Director and clinicians used to run Baylor University Medical Center blood lab/core lab in Dallas for 10 years. Also ran Lab Corp for approx 3 years. In addition we had higher customer satisfaction with our physicians when we ran OON Fortis Samples than since we transitioned to In Network Sun/CPL samples. We are simply asking to take care of OUR OWN doctors. Down the road if we both find that this partnership works o our mutual satisfaction, we could expand it. We could then potentially become your sole Reference Blood Lab. We could also extend you better terms than CPL, Quest or Lab Corp and perhaps 60 day terms, for example, before payment is due. Please consider this option.

- Business Models
  - Problem: Some of our reps and distributors are pitting our MSO and Series LLC Model(s) against the Sun MSO model. We do not want to compete with you for MSO business. We are trying to bring you more business. Better business. We do not want to get penalized for bringing you business. I'm sure this is not your intention. Let's work through this together.
  - Side note: At our first meeting I asked you both if Sun was going to continue running the business model(s). To which the answer was no. Let's stop competing for business via business models.
  - Proposed solution: For Sun to discontinue the running MSO's and other business models. We are happy to take this off of your plate and run business models so you can focus on the big picture of hospital recruitment and reference lab operations.
  - Rationale: You guys are much bigger now. You could benefit from a strong reliable partner. Fortis is that partner. I don't think you want to run all of these elements simultaneously for too long: i) hospital relationships    ii) Reference Lab    iii) Billing/Collections    iv) master distributor recruitment & distributor/rep relations    v) Non patient, Under Arrangement Outreach Programs logistics,    vi) Business models



EXHIBIT
108

FORT_000498

(whether Series LLC's or MSO's) with all the legal and liability that goes with that. You may be spending more time with less revenue to show for it. As we all know this is time consuming, comes with lots of legal expenses and considerations and has perhaps a lower ROI than if you were to stay with your core competency of hospital recruitment and reference lab operations.

o Fortis has run multiple business model structures for 5 years now. We offer 7 modalities. We're happy to send you all of the business you can handle if you will stop competing with our MSO's & Series LLC offerings

It's my belief that we are better together. Fortis can step up and become a part of your overall solution for blood lab/core lab. We can also take the whole MSO thing off of your plate so that you can focus on the the bigger picture.

Thank you for your consideration,
Tommy

Thomas Palmer
President/CEO

Fortis Labs
1651 N. Collins Blvd.
Suite 135
Richardson, TX  75080
m 818-424-4270
tpalmer@fortisdiagnostics.com

Fortis Diagnostics
1717 McKinney Ave
Suite 712
Dallas, TX  75202

16501 Ventura Blvd.
4th Floor
Encino, CA  91436
m 818-424-4270
tpalmer@fortisdiagnostics.com
www.fortisdiagnostics.com

FORT_000499

# Exhibit 15

| | |
|---|---|
| **From:** | Milo Caskey <milocaskey@yahoo.com> |
| **Sent:** | 12/15/2016 1:32:47 PM +0000 |
| **To:** | Amanda Feyrer <afeyrer@missiontoxicology.com> |
| **Subject:** | Roka Mission Set Up 12.16 |
| **Attachments:** | Roka Mission Set Up 12.16.pdf; Untitled attachment 109911.txt |

Hey Amanda:

Hope all is well!  Here are the Roka set up documents to start with mission.  We are currently with Sun under Uptown but wish to move to Mission under NuMedica.  I spoke to Jessie about this.

Roka has three locations but stone oak is the main one and requires daily courier w/ some Saturdays.  The other two will call when they have any specimens.

They currently have sun supplies in all locations and only need new reqs unless there is something else hey need.  Roka will send all blood so we would like PHDX to handle any federal samples.

Please advise on any thing else u need or questions.  Thanks!

Milo Caskey



EXHIBIT

185

NM_0002560

**✦ MISSION** TOXICOLOGY

| Account Start Date: | ASAP | | Toxicology: ☐  Blood: ☒ |
|---|---|---|---|

### New Client Registration

## ACCOUNT INFORMATION

| Facility Name: Alexander Roka, MD | | | Date: 12-15-16 | |
|---|---|---|---|---|
| Street: 20658 Stone Oak Pkwy | City: SA  # 108 | State: TX | | Zip: 78258 |
| Contact: Annette Roka | Phone: 210-403-3220 | | Fax: 210 290-9574 (Labs) | |

## SHIPPING AND REPORTING INFORMAITON

| Shipping pickup days and time: | M: 4:30 | T: 4:30 | W: 4:30 | Th: 4:30 | F: 4:30 |
|---|---|---|---|---|---|

| Report Delivery Options: | Online Portal: X | Fax: X | Both: X | EMR Interface: X | Secured Email: _____ |
|---|---|---|---|---|---|

Additional Instructions: Needs unidirectional interface - working w/ Randy on this

Federal Lab: PHDX - Please send fed specimens there!

## SALES INFORMATION

| Sales Representative: | Sales Manager: Milo Caskey / NuMedica |
|---|---|
| Sales Rep Phone: | Sales Manager Phone: 210-241-5692 |
| Sales Rep Email: | Sales Manager Email: milocaskey@yahoo.com |

## PROVIDER INFORMATION

| Provider Name: Alex Roka, MD | NPI #: 1882602264 |
|---|---|
| Provider Name: Matt Jones, PA-C | NPI #: 1962802975 |
| Provider Name: Terri Finiki, CRP | NPI #: 1376974899 |
| Provider Name: | NPI #: |
| Provider Name: | NPI #: |

## PROVIDER SIGNATURE RECORD

This form gives Mission Toxicology permission to test each specimen according to the selection made on the individual forms received in the laboratory. Please have each provider ordering tests sign and date.

I, the below signed, authorize tests ordered and sent for analysis at Mission Toxicology.

| Provider Signature: [signature] | Date: 12/14/16 |
|---|---|
| Provider Signature: [signature] PA-C | Date: 12/14/16 |
| Provider Signature: Alexander J. Roka | Date: 12/14/16 |
| Provider Signature: | Date: |
| Provider Signature: | Date: |

Email completed forms to afeyrer@missiontoxicology.com

2145 NW Military HWY, Ste. 102        San Antonio, Texas 78213        Phone: 210 314-8607 Fax: 210 314-8666

NM_0002561

## MISSION TOXICOLOGY

**New Client Registration**

Account Start Date: ASAP     Toxicology: [ ]  Blood: [✓]

### ACCOUNT INFORMATION

| | | |
|---|---|---|
| Facility Name: Alexander Roka | | Date: 12-15-16 |
| Street: 4006 Nogalitos St | City: SA. | State: TX  Zip: 78211 |
| Contact: Mary | Phone: 210-921-0049 | Fax: 210-921-7208 |

### SHIPPING AND REPORTING INFORMAITON

| Shipping pickup days and time: | M: ON-Call | T: | W: | Th: | F: |
|---|---|---|---|---|---|

Report Delivery Options: Online Portal: X  Fax: X  Both: X  EMR Interface: X  Secured Email: ___

Additional Instructions: Will call courier when needed - thank you.

Federal Lab: PHDX - Please send all fed specimens there.

### SALES INFORMATION

| | |
|---|---|
| Sales Representative: X | Sales Manager: Milo Caskey / NuMedica |
| Sales Rep Phone: | Sales Manager Phone: 210.241.5692 |
| Sales Rep Email: | Sales Manager Email: milocaskey@yahoo.com |

### PROVIDER INFORMATION

| Provider Name: | NPI #: |
|---|---|
| Alex Roka MD | 1982602264 |
| Matt Jones, PA-C | 1962802975 |
| Terri Finiki, CNP | 1376974899 |
| | |
| | |

### PROVIDER SIGNATURE RECORD

This form gives Mission Toxicology permission to test each specimen according to the selection made on the individual forms received in the laboratory. Please have each provider ordering tests sign and date.

I, the below signed, authorize tests ordered and sent for analysis at Mission Toxicology.

| Provider Signature: | Date: |
|---|---|
| [signature] AC R-PA | 12/14/16 |
| [signature] Jones PAC | 12/14/16 |
| [signature] Alexander J. Roka | 12/14/16 |
| | |
| | |

Email completed forms to afeyrer@missiontoxicology.com

2145 NW Military HWY., Ste. 102        San Antonio, Texas 78213        Phone: 210 314-8607 Fax: 210 314-8666

NM_0002562

## MISSION TOXICOLOGY

| Account Start Date: | ASAP | | | | Toxicology: ☐ | Blood: ☒ |
|---|---|---|---|---|---|---|

### New Client Registration

### ACCOUNT INFORMATION

| Facility Name: Alexander Roka, MD | | Date: 12-15-16 |
|---|---|---|

| Street: 7333 Barlite #120 | City: SA | State: TX | Zip: 78224 |
|---|---|---|---|

| Contact: Luz | Phone: 210-921-0050 | Fax: 210-921-0056 |
|---|---|---|

### SHIPPING AND REPORTING INFORMAITON

| Shipping pickup days and time: | M: ON-call | T: | W: | Th: | F: |
|---|---|---|---|---|---|

| Report Delivery Options: | Online Portal: X | Fax: X | Both: X | EMR Interface: Y | Secured Email: ___ |
|---|---|---|---|---|---|

Additional Instructions: Will call courier when needed.

Federal Lab: Please send to (PHDX) (All federal)

### SALES INFORMATION

| Sales Representative: | Sales Manager: Milo Caskey / NuMedica |
|---|---|
| Sales Rep Phone: | Sales Manager Phone: 210-241-5692 |
| Sales Rep Email: | Sales Manager Email: milocaskey @ yahoo.com |

### PROVIDER INFORMATION

| Provider Name: Alex Roka MD | NPI #: 1982602264 |
|---|---|
| Provider Name: Matt Jones PA-c | NPI #: 1962802975 |
| Provider Name: Terri Finiki, NP | NPI #: 1376974899 |
| Provider Name: | NPI #: |
| Provider Name: | NPI #: |

### PROVIDER SIGNATURE RECORD

This form gives Mission Toxicology permission to test each specimen according to the selection made on the individual forms received in the laboratory. Please have each provider ordering tests sign and date.

I, the below signed, authorize tests ordered and sent for analysis at Mission Toxicology.

| Provider Signature: [signature] | Date: 12-14-16 |
|---|---|
| Provider Signature: [signature] | Date: 12-14-16 |
| Provider Signature: [signature] | Date: 12-14-16 |
| Provider Signature: | Date: |
| Provider Signature: | Date: |

Email completed forms to afeyrer@missiontoxicology.com

2145 NW Military HWY., Ste. 102          San Antonio, Texas 78213          Phone: 210 314-8607 Fax: 210 314-8666

NM_0002563

# Exhibit 16

**From:** Mike Murphy <mlmurphy25@gmail.com>
**Sent:** 12/25/2016 11:13:08 PM -0600
**To:** Thomas Palmer <tpalmer@fortisdiagnostics.com>
**Subject:** Re: Sun / Fortis Conference Call - Tomorrow 9am

Thomas, what amount do you think I could distribute next week to keep your docs and you happy?

On Sun, Dec 25, 2016 at 10:29 PM, Thomas Palmer <tpalmer@fortisdiagnostics.com> wrote:

Hi Dr Murphy,

See you on the call tomorrow am. Dial instructions below.

## Fortis / Sun Conference Call

Mon, Dec 26, 2016 9:00 AM - 11:00 AM CST

**Please join my meeting from your computer, tablet or smartphone.**
https://global.gotomeeting.com/join/495332365

**You can also dial in using your phone.**
United States: +1 (669) 224-3412

**Access Code: 495-332-365**

--
Michael L. Murphy M.D.
7373 Broadway Suite 507
San Antonio, Texas 78209
c-210 845 3138

EXHIBIT
59

# Exhibit 17

From:    Julie Pricer
Sent:    Fri 1/27/2017 4:22 PM (GMT-00:00)
To:      "Christian Calhoun" <ccalhoun@paradigmhealthsolutions.com>,
         "cbrackett@paradigmhealthsolutions.com" <"cbrackett@paradigmhealthsolutions.com>,
         "pstewart@sdrconsult.com" <"pstewart@sdrconsult.com">
Cc:
Bcc:
Subject: RE: SDR AllergyPro Distribution for SAA

Good Morning,
Yes I just received a text from Dr. Murphy about this. I will get the wire submitted today. If you
wouldn't mind sending me your report and I can verify that is what I have as well and make sure
we are all on the same page.
Thanks guys!

Kind Regards,

Julie Pricer
Integrity Ancillary Management, LLC
Office: 210-503-4221
Fax: 210-503-4242

-----Original Message-----
From: Christian Calhoun [mailto:ccalhoun@paradigmhealthsolutions.com]
Sent: Friday, January 27, 2017 9:46 AM
To: Julie Pricer <jpricer@iamgmt.com>; cbrackett@paradigmhealthsolutions.com;
pstewart@sdrconsult.com
Subject: SDR AllergyPro Distribution for SAA

Julie,

Per Dr Murphy's blessing. Please release the funds to SDR for SAA AllergyPro claims
referenced on the spreadsheet provided last week. As stated, Paradigm already received its
distribution which is half of what Sun collects after paying out the distributors. If you have any
questions please let us know as I've copied both Paul and Carl on this email who can provide the
reports as well.

Thank you,

Christian

Sent from my iPhone



SDR 005927

# Exhibit 18

**From:**                Michael L Murphy <mlmurphy25@gmail.com>
**Sent:**              3/6/2017 3:17:05 PM -0600
**To:**                 Thomas Palmer <tpalmer@fortisdiagnostics.com>
**Subject:**
Time to get out of the physician ownership models.

https://www.bna.com/aetna-wins-41m-n73014449292/

Sent from my iPhone



FORT_003016

# Exhibit 19

| | |
|---|---|
| **From:** | Jesse Saucedo <jsj_tmmc@sbcglobal.net> |
| **Sent:** | 8/17/2016 3:30:08 PM -0500 |
| **To:** | Bill Flowers <billflowersmed@gmail.com>; jesse@txmmc.com; Thomas Palmer <tpalmer@fortisdiagnostics.com> |
| **Subject:** | Re: Sun Labs |

I will be traveling to Houston tomorrow but I am available today.

Jesse Saucedo Jr.
Mission Toxicology, LLC
2145 NW Military Hwy, Ste. 102
San Antonio, TX. 78213

On Wednesday, August 17, 2016 3:25 PM, Bill Flowers <billflowersmed@gmail.com> wrote:

Hi Jesse,

Tommy is on a much needed vacation this week and asked me to reach out to you regarding starting with Sun Labs. We have several physician groups we would like to start, but I wanted to meet or speak with you first. We have had issues with two of the hospital deals we have been using for blood, and I would like discuss in further detail how it is going at Sun and hopefully see some recent collection reports. We just want to make sure that if we move our doctors that we are moving them to a lab that has had success with in-network billing. I also want to make sure Fortis is clear on how to bring on new accounts and to take a look at the portal.

Would you have time to meet some time tomorrow (Thursday)? Please let me know and I will be there.

Thank you Jesse.

Bill Flowers
Managing Partner,
AdvancedLife Sciences™
www.advlifesciences.com
bflowers@advlifesciences.com
713.906.3580



EXHIBIT
107

FORT_002434

# Exhibit 20

## DECLARATION OF DR. CHRISTINE CONTRERAS

I, Dr. Christine Contreras, hereby declare as follows:

1. I am over the age of 21 years, am under no legal disability, and am otherwise fit and competent to make this Declaration, which is based on my personal knowledge.

2. I am a physician at St. Lazarus Family Practice located at 4143 Gardendale St., San Antonio, TX 78229.

3. Previously, St. Lazarus Family Practice was located at 7333 Barlite Blvd., San Antonio, TX 78224.

4. In 2016, an individual named Milo Caskey marketed the services of NuMedica Innovations, LLC to me.

5. Mr. Caskey agreed to pay for a phlebotomist that would come to my practice to draw blood and collect urine specimens. The phlebotomist would then send the specimens to laboratories, including Mission Toxicology and Sun Clinical Laboratories, for testing.

6. Mr. Caskey represented to me that he would only send patient specimens to in-network laboratories. He assured me that if a patient received a bill for the testing performed by these laboratories, the patient could discard the bill because the laboratories did not have bill collection services.

7. In 2016 and 2017, I ordered urine and blood toxicology testing from both Mission Toxicology and Sun Clinical Laboratories, which I understood to be laboratories located in San Antonio, Texas.

8. At the time I ordered these tests, I had never heard of Newman Memorial Hospital

1

UHS_Mission00038922

("NMH") or Community Memorial Hospital ("CMH").

9. I have never:

    a. ordered any test to be performed by either NMH or CMH; or

    b. sent, authorized, or instructed anyone to send urine or blood specimen to NMH or CMH.

10. When I ordered testing from Mission Toxicology and Sun Clinical Laboratories, I did not give my permission for either lab to send tests to any other laboratory or hospital.

11. When I ordered testing from Mission Toxicology and Sun Clinical Laboratories, I was not informed that NMH or CMH would be involved in the testing in any way.

12. For each test that I ordered to be performed by Mission Toxicology and Sun Clinical Laboratories, it was my expectation that Mission Toxicology and Sun Clinical Laboratories would perform that test.

13. If I had known that NMH and CMH would bill insurers for testing that I ordered from Mission Toxicology and Sun Clinical Laboratories, I would not have ordered those tests.

14. I recall receiving and reviewing laboratory test results for specimens I sent to Mission Toxicology and Sun Clinical Laboratories.

15. I am sensitive to the cost-sharing obligations that my patients will incur when receiving medical services I ordered, and I make an effort to inform my patients of the cost-sharing obligations associated with the medical services I order for them.

16. I received numerous complaints of high laboratory bills from patients whose

2

UHS_Mission00038923

specimen I sent to be tested at Mission Toxicology Sun Clinical Laboratories. I was concerned of the significant financial impact these higher out-of-pocket costs would have on my patients.

17. I have no idea why or how my name or NPI was listed on these claims and test results, or why or how these tests ended up being billed through NMH or CMH. I never authorized anyone to utilize my name, NPI, or other credentials to order or bill for tests run by or billed through either NMH or CMH. This testing and billing occurred without my knowledge or authorization. Moreover, nobody at any treatment facility ever: (i) received my permission to use my signature to order any testing through NMH or CMH, (ii) asked what protocol I would want to use to order any testing through NMH or CMH, or (iii) asked how I would want results handled or delivered — all of which would have been required prerequisites to me ordering and approving any such testing.

18. I am very concerned about the apparent misuse of my name, NPI, and credentials to order and bill for unauthorized urine and blood testing through NMH and CMH.

19. I stopped sending samples to Mission Toxicology and Sun Clinical Laboratories in 2017 in large part because of patient complaints over high bills and delays in receiving patient test results from the laboratory.

Executed in San Antonio, Texas this _ 19th_ _ _ day of November 2019.

3

UHS_Mission00038924



Dr. Christine Contreras, M.D.

4

UHS_Mission00038925

# Exhibit 21

# Physician, Health Care Professional, Facility and Ancillary Provider 2016 Administrative Guide

## For Commercial and Medicare Advantage Products



UHS_Mission00040512

improvement activities. It is important to note that in many benefit plans, Customers receiving services in out-of-network laboratories may incur increased financial liability and therefore higher out-of-pocket expenses.

You are required to refer laboratory services to a participating laboratory provider in our network, except as otherwise authorized by us or a Payer. Participating laboratory providers can be found in the UnitedHealthcare Physician Directory online at UnitedHealthcareOnline.com. If you need assistance in locating or using a participating laboratory Provider, or you believe no participating laboratory is available, please contact UnitedHealthcare in advance to confirm that the specific laboratory test is covered. We will work with you to assure that those covered tests are performed, even if that means the use of a non-participating laboratory. Some plans are capitated for Laboratory services and only the capitated laboratory Provider can be utilized for services.

### Administrative actions for out-of-network laboratory services referrals

UnitedHealthcare network physicians have long demonstrated their commitment to affordable health care by making extensive use of participating laboratories. We anticipate that physicians will be able to easily find a participating laboratory that will meet their needs.

If we identify a material practice of referrals to out-of-network laboratory service providers, we will inform the responsible participating physicians of the issue and remind them of the general requirements to refer their patients to other network providers. While it is our expectation that these actions will rarely be necessary, please note that continued referrals to non-participating laboratories may, after appropriate notice, subject the referring physician to one or more of the following administrative actions for failure to comply with this protocol:

- Loss of eligibility for the Practice Rewards programs;
- A decreased fee schedule; or
- Termination of network participation, as provided in your agreement with us.

### Self-Referral and Anti-Kickback

This protocol applies to all participating physicians and health care professionals, and it applies to all laboratory services, clinical and anatomic, ordered by physicians and health care professionals. Referrals for laboratory services that results in the physician earning a profit, including, but not limited to the following, are not allowed:

- Profits resulting from an investment in an entity for which the referring physician or health care professional generates business; or
- Profits resulting from collection, processing and/or transport of specimens,

Failure to comply with this protocol may result in:

- A decreased fee schedule; or
- Termination of network participation, as provided in your agreement with us.

### UnitedHealthcare Laboratory Benefit Management Program Administered by BeaconLBS™

The UnitedHealthcare Laboratory Benefit Management Program applies to fully insured Customers who live in Florida. If you order laboratory services and your practice is located outside of Florida, this program does not apply to you. This Program will provide physicians and laboratories with point of order support for test selection and laboratory selection. Certain Laboratory Services are subject to additional protocols, including but not limited to, Advance Notification and Laboratory Point of Performance Requirements. Claims for Laboratory Services are subject to additional complete claim requirements.

For more information on requirements and implementation, please visit UnitedHealthcareOnline.com → Tools & Resources → Policies, Protocols and Guides → Protocols → UnitedHealthcare Laboratory Benefit Management Program.

### Protocols for UnitedHealthcare Nursing Home Plans

Applicability – This protocol is only applicable to primary care physicians, nurse practitioners, and physician assistants who participate in the network for the UnitedHealthcare Nursing Home Plan (i.e., Medicare Advantage Institutional Special Needs Plans).

UHS_Mission00040577

Most UnitedHealthcare HRA and HSA plans do not require copayments; therefore, please do not ask your UnitedHealthcare Customers to make a copayment at the time of service unless it is expressly indicated on their health care ID card.

Submit claims electronically through your clearinghouse or UnitedHealthcareOnline.com. Alternatively, you may submit claims to the address on the back of the Customer's health care ID card.

Please wait until after a claim is processed and you receive your EOB/remittance advice before collecting funds from your Customers with HRA/HSA plans because the Customer responsibility may be reimbursable through their HRA account and paid directly to you. The EOB will indicate any remaining Customer balance. UnitedHealthcare will not automatically transfer the HSA balance for payment; however, the Customer can pay with their HSA debit card or convenience checks linked directly to their account balance.

### Consumer account cards and qualified medical expenses

Providers may charge UnitedHealthcare HRA or FSA consumer account cards only for expenses that are "qualified medical expenses" (as defined in Section 213(d) of the Internal Revenue Code) incurred by the cardholder or the cardholder's spouse or dependent. "Qualified medical expenses" are expenses for medical care which provide diagnosis, cure, mitigation, treatment or prevention of any disease, or for the purpose of affecting any structure or function of the body.

Providers may not process charges on the consumer account cards for any expenses that do not qualify as qualified medical expenses; such non-qualifying expenses include, but are not limited to:

**Cosmetic surgery/procedures** (i.e., procedures directed at improving a person's appearance that do not meaningfully promote the proper function of the body or prevent or treat illness or disease), including the following:

- Face lifts
- Liposuction
- Hair transplants
- Hair removal (electrolysis)
- Breast augmentation or reduction.
  **Note:** Surgery or procedures that are necessary to ameliorate a deformity arising from a congenital abnormality, and reconstructive surgery following a mastectomy for cancer, may be qualified medical expenses.
- Teeth whitening and similar cosmetic dental procedures
- Advance expenses for future medical care
- Weight loss programs (note, however, that disease-specific nutritional counseling may be covered)
- Illegal operations or procedures

An expense can be defined as a "qualified medical expense", but might not be covered under a Customer's benefit plan. For updated information regarding qualified medical expenses, please consult the Internal Revenue Service (IRS) website at: irs.gov or call the IRS toll-free phone number at (800) TAX-FORM; (800) 829-3676.

### Pass-through billing/CLIA requirements/reimbursement policy

If you are a physician, practitioner or medical group, you must only bill for services that you or your staff perform. Pass-through billing is not permitted and may not be billed to our Customers.

For laboratory services, you will only be reimbursed for the services for which you are certified to perform through the Federal Clinical Laboratory Improvement Amendments (CLIA) and you must not bill our Customers for any laboratory services for which you lack the applicable CLIA certification. However, this requirement does not apply to laboratory services rendered by physicians, practitioners or medical groups in office settings that have been granted "waived" status under CLIA.

Payment of a claim is subject to our payment policies (reimbursement policies) and medical policies, which are available to you online or upon request to your Network Management contact.

UHS_Mission00040589

# Exhibit 22

**2017**
**UnitedHealthcare Care Provider**
Administrative Guide



UHS_Mission00104899

EDI Education for Electronic Transactions > General EDI Info > Companion Guide Documents; numbers 11 and 12.

**Requirement to Use Participating Laboratories**

This protocol applies to all participating physicians and health care professionals, and it applies to all laboratory services, clinical and anatomic, ordered by physicians and health care professionals, except this protocol does not apply:

- When the physician bears financial risk of laboratory services.
- When the physician provides laboratory services in their offices.

We maintain a robust network of regional and local providers of laboratory services. These participating laboratories provide a comprehensive range of laboratory services on a timely basis to meet the needs of the physicians participating in the UnitedHealthcare network. Participating laboratories also provide clinical data and related information to support HEDIS® reporting, care management, the UnitedHealth Premium Designation program, and other clinical quality improvement activities. Members receiving services in out-of-network laboratories may incur increased financial liability and therefore higher out-of-pocket expenses.

You are required to refer laboratory services to a participating laboratory provider in our network, except as otherwise authorized by us. Participating laboratory providers can be found in our Physician Directory on UnitedHealthcareOnline.com. If you need assistance in locating or using a participating laboratory provider, or you believe no participating laboratory is available, please contact UnitedHealthcare in advance to confirm that the specific laboratory test is covered. We will work with you to assure that those covered tests are performed, even if that means the use of a non-participating laboratory. Some benefit plans are capitated for Laboratory services and only the capitated laboratory provider can be utilized for services.

**Administrative Actions for Out-of-Network Laboratory Services Referrals**

UnitedHealthcare network physicians have long demonstrated their commitment to affordable health care by making extensive use of participating laboratories. We anticipate that physicians will be able to easily find a participating laboratory that will meet their needs.

If we identify a material practice of referrals to out-of-network laboratory service providers, we will inform the responsible participating physicians of the issue and remind them of the general requirements to refer their patients to other network providers. While it is our expectation that these actions will rarely be necessary, continued referrals to non-participating laboratories may, after appropriate notice, subject the referring physician

to one or more of the following administrative actions for failure to comply with this protocol:

- Loss of eligibility for the Practice Rewards programs;
- A decreased fee schedule; or
- Termination of network participation, as provided in your agreement with us.

**Self-Referral and Anti-Kickback**

This protocol applies to all participating physicians and health care professionals, and it applies to all laboratory services, clinical and anatomic, ordered by physicians and health care professionals. Referrals for laboratory services that results in the physician earning a profit, including, but not limited to the following, are not allowed:

- Profits resulting from an investment in an entity for which the referring physician or health care professional generates business; or
- Profits resulting from collection, processing and/or transport of specimens.

Failure to comply with this protocol may result in:

- A decreased fee schedule; or
- Termination of network participation, as provided in your agreement with us.

# Non-Participating Providers Consent Form

**Excluded Plans (benefit plans not subject to the following requirements)**

- Neighborhood Health Partnership
- M.D.IPA, Optimum Choice, or OneNet
- Benefit plans subject to the *River Valley Entities Supplement*
- UnitedHealthcare West

Except in emergent situations, when a participating care provider is recommending, referring, including or utilizing one of the following types of non-participating care providers/services, the requirements within this protocol apply so that our members may make informed choices regarding their health care providers.

**Impacted Care Provider/Service Types:**

- Ambulatory Surgical Centers – free-standing and hospital outpatient non-emergent
- Assistant Surgeon - a physician or other health care professional who is assisting the physician performing a surgical procedure, where the participating surgeon selects the assistant surgeon
- Home Health
- Air Ambulance, fixed-wing non-emergency transport

UHS_Mission00104944

Case 5:17-cv-01016-JKP    Document 174-2    Filed 01/31/20    Page 287 of 456

## Pass-through Billing/CLIA Requirements/Reimbursement Policy

If you are a healthcare care provider, you must only bill for services that you or your staff perform. Pass-through billing is not permitted and may not be billed to our members.

For laboratory services, you will only be reimbursed for the services you are certified to perform through the Federal Clinical Laboratory Improvement Amendments (CLIA). You must not bill our members for any laboratory services for which you lack the applicable CLIA certification.

Claim payment is subject to our payment policies (reimbursement policies) and medical policies, which are available to you online or upon request to your Network Management contact.

## Special Reporting Requirements for Certain Claim Types

### Anesthesia Services
- Use one of the CMS-required modifiers (AA, AD, QK, QX, QY, QZ, G8, G9 or QS) for anesthesia services reporting.

- For electronic claims and/or encounters, report the actual number of anesthesia minutes in loop 2400 SV104 with an "MJ" qualifier in loop 2400 SV103. For Form 1500 paper claims, report the actual number of minutes in Box 24G with qualifier MJ in Box 24H.

- When using qualifying circumstance codes 99100, 99116, 99135 and/or 99140, report the qualifier on the same claim with the anesthesia service.

### Laboratory Claims
Many UnitedHealthcare benefit plan designs exclude outpatient laboratory services from coverage if they were not ordered by a participating care provider. Our benefit plans may also cover such services differently when a portion of the service (e.g., the draw) occurs in the care provider's office, but the analysis is performed by a laboratory care provider. In addition, many state laws require that most, if not all, laboratory services are ordered by a licensed care provider.

Therefore, all laboratory claims and/or encounters must include the name of the referring care provider and NPI number of the referring care provider, in addition to the other elements of a complete claim and/or encounter described in this guide. Laboratory claims that do not include the identity of the referring care provider will be rejected or denied.

This requirement applies to claims and/or encounters for both anatomic and clinical laboratory services. This requirement also applies to claims and/or encounters received from both participating and non-participating laboratories, unless otherwise provided under applicable law. This requirement does not apply to claims for laboratory services provided by care providers in their offices. Please also refer to the *Laboratory Services Protocol*, in Chapter 7: Specific Protocols.

### Physical Medicine and Rehabilitation Services
Physical Medicine and Rehabilitation (PM&R) services are eligible for reimbursement only if provided by a physician or therapy care provider duly licensed to perform those services as described in the applicable benefit plan. PM&R services rendered by individuals who are not duly licensed to perform those services are not eligible for reimbursement, regardless of whether they are supervised by, or billed by, a physician or licensed therapy care provider.

### Assistant Surgeons or Surgical Assistants Claim Submission Requirements
The practice of directing or using non-participating care providers significantly increases the costs of services for our members, we require our participating care providers to use reasonable commercial efforts to use the services of network care providers, including network surgical assistants or assistant surgeons to render services to our members. Payment is subject to our payment policies (reimbursement policies).

### Submission of Claims for Services Subject to Medical Claim Review
We may pend or deny a claim and request medical records to determine whether the service rendered is a covered service and eligible for payment.

In these cases, a letter will be sent explaining additional information is needed.

To facilitate claim processing and avoid delays due to pended claims, please resubmit only what is requested in our letter. The claim letter will state specific instructions of any required information to resubmit, which may vary for each claim. You must also return a copy of our letter with your additional documents.

For more information about our Medical and Drug Policies, please see UnitedHealthcareOnline.com > Tools & Resources > Policies, Protocols and Guides > Medical & Drug Policies and Coverage Determination Guidelines - Commercial.

For Medicare Advantage benefit plans, if you are ineligible for payment even though the service is covered, you will be denied reimbursement for these claims and will be liable for the cost of care. You may not bill the member for the amount denied.

### Erythropoietin (For Commercial Members)
For Erythropoietin (EPO) claims, we require yo to submit the Hematocrit (Hct) level in order for us to determine coverage under the member's benefit plan. For claims submitted by paper to UnitedHealthcare on a Form 1500,

UHS_Mission00104954

# Exhibit 23

APP 266

# EXHIBIT C

## AMERICAN ARBITRATION ASSOCIATION

## COMMERCIAL TRIBUNAL

| | | |
|---|---|---|
| **JACK COUNTY HOSPITAL DISTRICT, d/b/a Faith COMMUNITY HOSPITAL,**<br><br>  *Claimant and Counter-Respondent*,<br><br>  **vs.**<br><br>**BLUE CROSS BLUE SHIELD OF TEXAS, A DIVISION OF HEALTH CARE SERVICES CORP.,**<br><br>  *Respondent and Counterclaimant*. | § § § § § § § § § § § § | **Case Number: 01-17-0006-8253** |

## <u>FINAL AWARD</u>

4816-2351-0942.9

App 009

TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................................... 5

    A.    The Parties and the Relevant Agreements ............................................... 5

II.   FACTUAL BACKGROUND .................................................................................. 6

    A.    The Parties ............................................................................................... 6

        1.    Faith .................................................................................................. 6

        2.    BCBSTX ........................................................................................... 7

    B.    Facts Regarding the Parties' Contracts ................................................... 8

        1.    The Contracts Require Faith to Notify BCBSTX About Changes in Its Operations. ................................................................................. 12

        2.    The Contracts Prohibit Faith From Assigning Its Rights, Duties, and Obligations Under the Contracts to a Third Party Without BCBSTX's Prior Written Consent. ..................................................... 13

        3.    The BCBSTX Provider Manuals Are Part of the Contracts and Prohibit Faith From Billing for Services Performed by Third Parties. ....................................... 14

        4.    Faith is Contractually Bound by the BCBSTX Provider Manuals and Blue Review Policy Newsletters. ................................................. 16

        5.    The Contracts Allow Termination Without Cause and the HMO and BAV Contracts Prohibit BCBSTX From Retaliating Against Faith. ............................. 18

    C.    Billing of and Payment for Medical Services ....................................... 18

    D.    Faith Fundamentally Changed Its Business Relationship With BCBSTX by Setting Up Its Outreach Laboratory Program Without Giving Notice to BCBSTX or Getting Its Consent. ....................................................... 21

    E.    BCBSTX's Investigation of Faith's Billing Schemes ......................... 25

    F.    Faith Is Not Entitled to Payments for Claims Where It Did Not Perform the Laboratory Services. ........................................................................ 34

    G.    The Blue Cross Blue Shield Members for Whom Faith Billed Reference Laboratory Claims Were Non-Patients. ................................................. 38

    H.    Faith's Claims Also Were Not Payable Because They Were Not Complete and Accurate. ......................................................................... 40

        1.    Claims Performed by Other Parties, Even if Not Expressly Prohibited Under the Contracts, Still Were Not Payable Due to Faith's Improper Coding and Claims Submission. ............................................. 40

        2.    The 500 Claim Sample Analysis Establishes That Faith's Claims Were Not Payable Due to Inadequate Documentation and Improper Coding. ..................... 43

    I.    Faith's Claims Were Unpayable for Additional Reasons, Which Were Communicated to Faith in Three Different Ways. ................................. 45

        1.    Many of Faith's Claims Were Denied Because the Members Did Not Have Benefits for the Services. ................................................................ 49

Award of Arbitrators AAA Faith v BCBSTX

App 010

    2.   Faith Submitted Claims for Services That Did Not Meet Medical Necessity, Coding, or Documentation Requirements; Such Claims Are Not Payable. ......... 50

J.    BCBSTX Terminated the Contracts Because Faith Did Not Change Its Billing Practices. ............................................................................................................ 51

K.    There Is No Evidence That Faith Filed a Complaint or an Appeal on Behalf of a Member Against BCBSTX Pursuant to the Dispute Procedures Outlined in the Contracts And Provider Manuals. ............................................................................ 54

III.    ARBITRATORS' RULING ............................................................................. 54

Breach of Contract (Counterclaim Count I)..................................................... 54

    Fraud (Counterclaim Count II) ............................................................ 58

    Fraudulent Inducement (Counterclaim Count III) ............................... 60

    Money Had and Received (Counterclaim IV) ...................................... 61

    Breach of Contract for Unpaid Claims (Faith Count B) ...................... 61

    Breach of Contract for Retaliation (Faith Count C).............................. 62

    Tortious Interference With Prospective Business Relations (Faith Count E)....... 62

    Claim for Permanent Injunctive Relief (Count F) ................................ 64

    Claim for Declaratory Judgment (Faith Count A) ................................ 65

IV.    DAMAGES.................................................................................................. 65

BCBSTX's Counterclaim Damages ................................................................. 65

Faith's Damage Claims.................................................................................... 66

Faith Is Not Entitled to Recover Any Damages Resulting From BCBSTX's Denials of Faith's Claims. ................................................................................ 67

    Faith Is Not Entitled To Recover Any Lost Profit Damages. .............................. 70

    Faith Is Barred From Recovery Because It Failed To Mitigate Its Damages. ....... 72

Award of Arbitrators AAA Faith v BCBSTX

App 011

## TABLE OF DEFINED TERMS

AAA ......................................................................................................................... 5

BAV Contract .......................................................................................................... 9

BCBSTX .................................................................................................................. 5

Benchmark ............................................................................................................. 22

clear and complete ............................................................................................... 19

Contracts ................................................................................................................. 9

Covered Services ................................................................................................... 11

Current Procedural Terminology ......................................................................... 19

Faith ........................................................................................................................ 5

Global Molecular .................................................................................................. 21

HIPAA ................................................................................................................... 46

HMO Contract ........................................................................................................ 9

Members .................................................................................................................. 8

Panel ........................................................................................................................ 5

Rules ........................................................................................................................ 5

Subscriber .............................................................................................................. 11

True Health ............................................................................................................ 21

Award of Arbitrators AAA Faith v BCBSTX

WE, THE UNDERSIGNED ARBITRATORS (the "**Panel**"), having been appointed by the American Arbitration Association (the "**AAA**") in accordance with the Commercial Arbitration Rules of the AAA (the "**Rules**") and having been designated in accordance with the arbitration agreements entered into between the above-named Parties, having been duly sworn, having presided over numerous preliminary hearings and duly heard the proofs and allegations of the parties and upon due deliberation, hereby issue this FINAL AWARD in full settlement of the merits of all claims submitted in this Arbitration, as follows:

The Panel, as its duty, has heard and evaluated the testimony of the numerous witnesses presented by both Parties at the Final Hearing. The determination in this Final Award take into account the credibility and the relevance of the testimony of each of those witnesses and the exhibits admitted into evidence.

## I.   INTRODUCTION

### A.   The Parties and the Relevant Agreements

This matter came before the Panel for a Final Hearing on the merits on July 15, 2019, through July 26, 2019, between Claimant and Counter-Respondent Jack County Hospital District d/b/a Faith Community Hospital ("**Faith**") and Respondent and Counterclaimant Blue Cross and Blue Shield of Texas ("**BCBSTX**").  Appearing for Faith were counsel Michael Alfred, David Spiller and Mason Spiller and company representative Frank Beaman.  Appearing for BCBSTX were counsel Martin Bishop, Bryan Webster, Peter Chassman and Courtney Averbach and company representatives Ray Walker and Matt Barnes.

The essential question in this case is whether Faith was entitled to reimbursement under its contracts with BCBSTX for healthcare claims for laboratory services performed by third-party reference laboratories in locations other than at the hospital.

**5 | P a g e**

Award of Arbitrators AAA Faith v BCBSTX

The following are the legal theories of each of the parties that remain in the case as of the final hearing (At the June 22, 2018 telephonic hearing, the Panel dismissed Faith's Count D for Violation of the Texas Insurance Code in their First Amended Statement of Claim. *See* Arbitration Order No. 2 signed and entered on June 25, 2018.):

| Faith's Claims: | BCBSTX's Counterclaims: |
| --- | --- |
| A. Declaratory Judgment (Various) | I. Breach of Contract on Multiple Grounds |
| B. Breach Of Contract For Unpaid Claims | II. Fraud |
| C. Breach Of Contract For Alleged Retaliation | III. Fraudulent Inducement |
| E. Tortious Interference | IV. Money Had and Received |
| F. Application for Permanent Injunctive Relief | |

## II.    FACTUAL BACKGROUND

### A.  The Parties

#### 1.  Faith

1.      Faith is the hospital of the Jack County Hospital District (the "District.")  It is located in Jacksboro, Texas, and is the sole community hospital in the area.

2.      In 2009, Faith sought to have Jack County voters approve a $17 million bond to build a new hospital.  The voters rejected the bond proposal by a 3-1 margin.

3.      In 2010, Faith hired a new Chief Executive Officer, Frank Beaman.  Mr. Beaman was hired to turn around the hospital.  Faith was in need of money and new revenue sources in order to stay open.

4.      In February 2012, Medicare conducted an audit of the hospital and found deficiencies that required significant repairs or renovations.  If Faith did not either repair the existing hospital facility or build a new hospital by the time the next Medicare audit occurred a

Award of Arbitrators AAA Faith v BCBSTX

few years later, Medicare was going to pull its accreditation.  That would have forced Faith to close.

5.      In 2013, Faith issued revenue debt to build a new hospital  (s*ee* Beaman Testimony 162:16-25).

6.      Faith moved into its new facility in September 2015.  The new hospital facility has 17 patient beds.

7.      From 2002 through 2013, Faith performed and billed for typical hospital services. Faith also performed a limited number of laboratory services at the hospital for local nursing homes and home health agencies for members of the Jack County community.

8.      In 2010, Faith had one full-time and one part-time doctor.  That increased to six full time doctors in 2016.

### 2.      BCBSTX

9.      BCBSTX is an unincorporated division of Health Care Service Corporation, a Mutual Legal Reserve Company.  BCBSTX provides a number of types of health insurance policies, and it provides health benefit administration services for group customers, including employers and governmental entities.  Its main office is located in Richardson, Texas.

10.      As a health insurer and plan administrator, BCBSTX is hired to help control health care costs for its customers and members, improve member health outcomes, and prevent fraudulent, wasteful, and abusive billing.

11.      BCBSTX develops provider networks to ensure that providers meet certain quality standards, and to ensure that there is the right mix of healthcare providers available to provide services to BCBSTX's members at reasonable prices within a particular geographic area.  For a healthcare provider to be allowed to participate in BCBSTX's provider network, the provider—including Faith—has to be vetted through BCBSTX's credentialing process under which the

**7** | P a g e

Award of Arbitrators AAA Faith v BCBSTX

provider makes disclosures as to the types of services it will be providing to Blue Cross Blue Shield members.

12.    BCBSTX will offer a different type of contract to a hospital than what BCBSTX will offer to an independent reference laboratory.[1]  There are differences between the facility contracts involving a hospital versus an independent reference laboratory.  For example, the contractual reimbursement and payment rates are developed depending upon the volume and mix of services the facility will be providing (s*ee, e.g*., Carr Testimony 1306:14, 1307:4-1309:11, 1313:10-25).  As such, BCBSTX reimburses a reference laboratory at much lower rates than those available to a hospital facility.

### B.    Facts Regarding the Parties' Contracts

13.    BCBSTX and Faith entered into a contractual relationship beginning in 2002 under which Faith agreed to provide inpatient and outpatient hospital services for Blue Cross Blue Shield members at its Jacksboro hospital.[2]  In return, BCBSTX agreed to pay Faith at contracted rates for providing such services to Blue Cross Blue Shield members.  The hospital contracts provided that BCBSTX would pay Faith favorable rates, set as a percentage of Faith's billed charges for services performed.  This favorable rate structure was not available to all providers, including other hospitals and independent reference laboratories.

14.    BCBSTX and Faith ultimately entered into the following four contracts:

---

[1] The Panel notes that an independent reference laboratory is a standalone laboratory whose sole purpose is to provide laboratory services.  These facilities do not provide any medical treatment and have no relationship with the patient other than running a laboratory test that was ordered by another provider.

[2] "**Members**" are individuals who are covered by health insurance policies insured or administered by a BCBS plan.

**8** | P a g e

Award of Arbitrators AAA Faith v BCBSTX

App 016

15. On September 10, 2002, BCBSTX and Faith entered into the PPO Contract and the Traditional Contract, both of which became effective on November 1, 2002. The PPO Contract establishes Faith as an "in-network" provider for BCBSTX's members with preferred-provider or point-of-service plans. (*See* Joint Ex. 1, PPO Contract, BCBSTX_FAITH_0000087.) The Traditional Contract established Faith as an "in-network" provider for BCBSTX's members with traditional indemnity healthcare plans (s*ee* Joint Ex. 2, Traditional Contract, BCBSTX_FAITH_0000078).

16. On October 11, 2012, the parties executed the Agreement for HMO Network Participation ("**HMO Contract**"), which became effective on January 1, 2013. The HMO Contract established Faith as an "in-network" provider for BCBSTX's members with health maintenance organization plans (s*ee* Joint Ex. 3, HMO Contract, BCBSTX_FAITH_0000054).

17. On June 19, 2013, the parties executed the Agreement for BlueAdvantage HMO Network Participation ("**BAV Contract**") (collectively with the PPO Contract, the Traditional Contract, and the HMO Contract, "**the Contracts**"), which became effective on August 15, 2013. The BAV Contract established Faith as an "in-network" provider for BCBSTX's members who were part of a health maintenance organization plan (s*ee* Joint Ex. 4, BAV Contract, BCBSTX_FAITH_0000029).

18. The PPO, HMO, and BAV Contracts established reimbursement rates of 70% of billed charges (s*ee* Joint Ex. 1, PPO Contract, BCBSTX_FAITH_0000096; Joint Ex. 3, HMO Contract, BCBSTX_FAITH_0000076; Joint Ex. 4, BAV Contract, BCBSTX_FAITH_0000051). The Traditional Contract established a reimbursement rate of 80% of billed charges (s*ee* Joint Ex. 2, Traditional Contract, BCBSTX_FAITH_0000086). These rates were not generally available to hospitals in urban or suburban areas or to independent reference laboratories.

Award of Arbitrators AAA Faith v BCBSTX

19.     BCBSTX agreed to pay Faith a percentage of its charges for services it performed based on the understanding that Faith was a rural community hospital that provided a small volume of inpatient and outpatient services to members of the Jack County community.  In contrast to its contracts with rural hospitals such as Faith, BCBSTX's contracts with other types of providers provide for much lower rates.  For example, BCBSTX's contracts with independent reference laboratories, whose business is to provide high volumes of laboratory services for Blue Cross Blue Shield members, contain a fee schedule setting forth a specific fee for each service that is not contingent upon how much is billed for the service.  In those contracts, BCBSTX pays significantly lower fees for laboratory services than it would pay Faith under the parties' rural hospital contracts.

20.     The Contracts set forth a number of requirements regarding billing and payment for health care services that define what services BCBSTX would pay and under what conditions.

21.     The Contracts define Faith as the "hospital located at Jacksboro, Jack County, Texas"  (see Joint Ex. 1, PPO Contract, BCBSTX_FAITH_0000087; Joint Ex. 2, Traditional Contract, BCBSTX_FAITH_0000086).  The only entity identified in the Contracts as being responsible for providing services to Blue Cross Blue Shield members is Faith (see Joint Ex. 3, HMO Contract at Ex. C, BCBSTX_FAITH_0000077; Joint Ex. 4, BAV Contract at Ex. C, BCBSTX_FAITH_0000052).  Faith "agree[d] to provide Covered Services" for Blue Cross Blue Shield Members (see Joint Ex. 1, PPO Contract at Art. 16(B), BCBSTX_FAITH_0000092; Joint Ex. 2, Traditional Contract at Art. 16(B), BCBSTX_FAITH_0000083.  See also Joint Ex. 3, HMO Contract at Part II(A), BCBSTX_FAITH_0000056; Joint Ex. 4, BAV Contract at Part II(A), BCBSTX_FAITH_0000031 (same).  The Contracts do not identify any other entity responsible for providing services or identify the provision of services at any location other than the Jacksboro

hospital (*see* Beaman Testimony 435:20-22("Q. There's only one location here listed for Faith Community Hospital, right? A. That's correct."))

22.    "**Covered Services**" are defined as "acute-care inpatient and outpatient hospital services for which benefits are available under a Subscriber's health care benefit plan" (*see* Joint Ex. 1, PPO Contract, BCBSTX_FAITH_0000087; Joint Ex. 2, Traditional Contract, BCBSTX_FAITH_0000079; *see also* Joint Ex. 3, HMO Contract, BCBSTX_FAITH_0000054 (defining "Covered Services" as **"**those health services specified and defined as Covered Services under the terms of a Member's Health Plan"); Joint Ex. 4, BAV Contract, BCBSTX_FAITH_0000029 (same); Beaman Testimony 435:9-15).

23.    A "**Subscriber**" is "any person entitled to receive Covered Services under a healthcare benefit plan provided or administered by (1) BCBSTX; (2) a Blue Cross Blue Shield plan of another state, territory or country other than the United States, (3) an affiliate of HCSC, or (4) a subsidiary of a Blue Cross Blue Shield Plan of another state, territory or country other than the United States" (*see* Joint Ex. 1, PPO Contract, BCBSTX_FAITH_0000087; Joint Ex. 2, Traditional Contract, BCBSTX_FAITH_0000078[3]).

24.    Faith similarly agreed that "[a]s soon as possible after providing Covered Services to a Subscriber having coverage under a health care benefit plan, the HOSPITAL shall furnish to BCBSTX a claim for services furnished by such Subscriber" (*see* Joint Ex. 1, PPO Contract at Art. 5(A), BCBSTX_FAITH_0000088; Joint Ex. 2, Traditional Contract at Art.5(A), BCBSTX_FAITH_0000079.   *See also* Joint Ex. 3, HMO Contract at Part IV(D), BCBSTX_FAITH_0000060 (agreeing to "submit complete and properly executed claims to

---

[3] The terms Member and Subscriber are used interchangeably in the health care industry.

**11 |** P a g e

Award of Arbitrators AAA Faith v BCBSTX

[BCBSTX] within the required filing period"); Joint Ex. 4, BAV Contract at Part IV(D), BCBSTX_FAITH_0000036 (same).

25.     Pursuant to the PPO and Traditional Contracts, "[u]pon completion by [Faith] of the billing requirements of this Contract, BCBSTX will pay to [Faith] the amount of its obligation" (s*ee* Joint Ex. 1, PPO Contract at Art. 6(A), BCBSTX_FAITH_0000089; Joint Ex. 2, Traditional Contract at Art. 6(A), BCBSTX_FAITH_0000080).

26.     Pursuant to the HMO and BAV Contracts, BCBSTX agreed to "pay [Faith] for Covered Services. . . ." (s*ee* Joint Ex. 3, HMO Contract at Part IV(A)(1), BCBSTX_FAITH_0000059; Joint Ex. 4, BAV Contract at Part IV(A)(1), BCBSTX_FAITH_0000035.)

### 1.     The Contracts Require Faith to Notify BCBSTX About Changes in Its Operations.

27.     Pursuant to the Contracts, Faith also agreed to notify BCBSTX about any changes to its operations.  Specifically, the PPO and Traditional Contracts state:

> [Faith] or BCBSTX shall notify the other in writing of any actions, policies, determinations, or internal or external developments which may have a direct impact on [Faith's] or BCBSTX's ability to discharge its obligations under this Contract as soon as [Faith] or BCBSTX is aware of them.

( see Joint Ex. 1, PPO Contract at Art. 10, BCBSTX_FAITH_0000090-91; Joint Ex. 2, Traditional Contract at Art. 10, BCBSTX_FAITH_0000081. *See also* Carr Testimony 1377:25-1378:14).

28.     Similarly, the HMO and BAV Contracts require Faith to notify BCBSTX "at least sixty (60) days in advance if there is a change in the business address, telephone numbers, tax identification number, billing information, or services provided by [Faith]" (see Joint Ex. 3, HMO Contract at Part II(J), BCBSTX_FAITH_0000057; Joint Ex. 4, BAV Contract at Part II(J), BCBSTX_FAITH_0000033).

---

12 | P a g e

Award of Arbitrators AAA Faith v BCBSTX

29.     Faith did not notify BCBSTX that Faith would be instituting an outreach laboratory program (s*ee* Carr Testimony 1376:22-1377:4).  Faith's development of its outreach laboratory program had a direct impact on BCBSTX's ability to discharge its obligations under the Contracts. This impact includes BCBSTX's ability to investigate, make determinations of, or pay for services that were performed by other providers or that were services for Blue Cross Blue Shield members who were not patients at Faith's Jacksboro hospital.

> **2.      The Contracts Prohibit Faith From Assigning Its Rights, Duties, and Obligations Under the Contracts to a Third Party Without BCBSTX's Prior Written Consent.**

30.     The PPO and Traditional Contracts state:  "Neither [Faith] nor BCBSTX shall assign, subcontract . . . any right, financial obligation, benefit or duty created by this Contract without the prior written consent of the other party" (s*ee* Joint Ex. 1, PPO Contract at Art. 13, BCBSTX_FAITH_0000092;   Joint   Ex.   2,   Traditional   Contract   at   Art.   13, BCBSTX_FAITH_0000082-83).

31.     The HMO and BAV Contracts state:  "No part of this Agreement, or any rights, duties or obligations described herein, shall be assigned . . . without the prior express written consent of both parties" (s*ee* Joint Ex. 3, HMO Contract at Part X(C), BCBSTX_FAITH_0000065; Joint Ex. 4, BAV Contract at Part X(C), BCBSTX_FAITH_0000041).

32.     BCBSTX did not give Faith written consent to assign or subcontract its duties under the Contracts, including performance of laboratory services, to other providers (s*ee* Beaman Testimony 442:9-12 ("Q. … Faith never got BlueCross's consent for any assignment, did it? A. We never asked. That's a correct statement."); *see also id.* at 462:14-16; 465:15-19; 468:10-15).

**13 |** P a g e

Award of Arbitrators AAA Faith v BCBSTX

**3.    The BCBSTX Provider Manuals Are Part of the Contracts and Prohibit Faith From Billing for Services Performed by Third Parties.**

33.    BCBSTX maintains provider manuals that are available to BCBSTX's contracted providers on BCBSTX's website (s*ee, e.g.*, Joint Ex. 5, PPO Provider Manual at Cover Page (Jan. 2016), BCBSTX_FAITH_0001363, at Table of Contents (Apr. 14, 2016), BCBSTX_FAITH_0001678-1691, and at Section F – Filing Claims (June 21, 2016), BCBSTX_FAITH_0009967-0010103; Respondent Ex. 11, HMO Provider Manual at Table of Contents (May 2, 2016), BCBSTX_FAITH_0012786-90, and at Section F – Filing Claims (May 2, 2016), BCBSTX_FAITH_0012791-12927. *See* also Carr testimony, 1436:22-25).

34.    The provider manuals are incorporated into each of the Contracts.  For instance, the PPO and Traditional Contracts incorporate the provider manuals by stating that Faith "agrees to abide by rules, regulations, and procedures pertaining to functions encompassed in this Contract that BCBSTX may from time to time adopt in policy statements, newsletters, or other communications to [Faith]" (s*ee* Joint Ex. 1, PPO Contract at Art. 5(C), BCBSTX_FAITH_0000089; Joint Ex. 2, Traditional Contract at Art. 5(C), BCBSTX_FAITH_0000080).  The HMO and BAV Contracts incorporate the provider manuals as a part of the contract by stating that Faith "shall comply with . . . applicable provisions of the Provider Manual" (see Joint Ex. 3, HMO Contract at Part X(F), BCBSTX_FAITH_0000065; Joint Ex. 4, BAV Contract at Part X(E), BCBSTX_FAITH_0000041).

35.    BCBSTX's provider manuals prohibit providers from engaging in pass-through billing:

> Pass-through billing is not permitted by BCBSTX.  Pass-through billing occurs when the ordering provider requests and bills for a service, but the service is not performed by the ordering provider.  The performing provider should bill for these services unless otherwise approved by BCBSTX.  BCBSTX does not consider the following scenarios to be pass-through billing:  (1) The service of the performing provider is performed at the place of service of the ordering provider and is billed

**14 | P a g e**

Award of Arbitrators AAA Faith v BCBSTX

by the ordering provider, or (2) The service is provided by an employee of a physician or professional provider, e.g., Physician Assistant, Surgical Assistant, Advanced Practice Nurse, Clinical Nurse Specialist, Certified Nurse Midwife and Registered First Assistant, who is under the direct supervision of the ordering provider and the service is billed by the ordering provider.

*(see* Joint Ex. 5, PPO Provider Manual, BCBSTX_FAITH_0009990 (Section F – Filing Claims, updated June 21, 2016) (excerpted pages); Respondent Ex. 11, HMO Provider Manual, BCBSTX_FAITH_0012803 (Section F – Filing Claims, updated May 2, 2016); *see also* Monroe Testimony 1338:4-16 (testifying that Faith was the ordering provider when it ordered the services); McVey Testimony 2049:22-2051:6).

36.    The BCBSTX provider manuals allow only the provider who performed a service to bill for the service:

> If services are rendered directly by the **Blue Choice PPO** physician, professional provider, facility or ancillary provider, the services must be billed by the **Blue Choice PPO** physician, professional provider, facility or ancillary provider. However, if the **Blue Choice PPO** physician, professional provider, facility or ancillary provider does not directly perform the service and the service is rendered by another provider, only the rendering provider can bill for those services.

*(see* Joint Ex. 5, PPO Provider Manual, BCBSTX_FAITH_0009983 (bold in original, underlining added) (excerpted pages); *see also* Respondent Ex. 11, HMO Provider Manual, BCBSTX_FAITH_0012797 (containing similar language)).

37.    The HMO Provider Manual also states, "Quest Diagnostics, Inc. is the exclusive statewide outpatient clinical reference laboratory provider for HMO members.  This arrangement excludes lab services provided during emergency room visits, inpatient admissions and outpatient day surgeries (hospital and free standing ambulatory surgery centers." (s*ee* Respondent Ex. 11, May 2016 HMO Provider Manual, BCBSTX_FAITH_0012845).  The HMO Provider Manual applies to both the HMO Contract and the BAV Contract, as both are HMO network contracts.

**15 |** P a g e

Award of Arbitrators AAA Faith v BCBSTX

**4.    Faith is Contractually Bound by the BCBSTX Provider Manuals and Blue Review Policy Newsletters.**

38.    Although Faith denied that it received the BCBSTX policy manuals and Blue Review newsletters, Faith acknowledged these documents by, among other things, requiring its third-party contracting partners to follow BCBSTX's provider manuals (s*ee, e.g.*, Joint Ex. 36, True Health Diagnostics Laboratory Management Agreement, THD_0000063-0000124 (stating that Faith "shall perform all obligations hereunder in accordance with:  . . . all applicable written policies, provider manuals, and other requirements of any public or private payors to which [Faith] submits claims for laboratory services"); *see also* Beaman Testimony 207:24 – 208:5 ("A. Correct. I do understand it's on their website."); 208:25 – 209:3 ("A. That's right. Sure. It would be great to look at the manuals, and there are people in place that would probably need to do that. I just couldn't tell you how often it would be appropriate.")

39.    When BCBSTX adopts a rule, regulation, or procedure – including in the provider manual – it posts documentation of such rule, regulation, or procedure on its website, to which providers such as Faith have access.

40.    Dawn Jones testified at the hearing that she never reviewed the provider manuals (s*ee* Jones Testimony 662:3-8; 664:22-24; 665:25-666:5 *see also id.* at 671:22-672:7 (indicating Faith's policies and procedures required them to stay up to date on BCBSTX billing requirements), 671:22 – 672:12).

41.    Diane Carr testified that a provider would not be able to do business with BCBSTX without reviewing the provider manual, and that in her twenty years of hospital contracting experience, providers know that they are supposed to look at payers' provider manuals.  Carr Testimony 1400:1-16 ("[Y]ou wouldn't be able to do business with us if you weren't reviewing our provider manual or our tools.")

**16 |** P a g e

42. Providers who are contracted with BCBSTX are also sent monthly BCBSTX policy newsletters, called Blue Reviews, notifying them about key policies in BCBSTX's provider manuals or any updates to BCBSTX's policies in its provider manuals. In 2016, and 2017, BCBSTX sent Blue Review newsletters to providers to remind them about BCBSTX's policies prohibiting providers from billing for services performed by other providers (s*ee* Respondent Ex. 16, March 2016 Blue Review, BCBSTX_FAITH_0003637-3656; Respondent Ex. 17, March 2017, Blue Review, BCBSTX_FAITH_0003657-3682).

43. The Blue Review newsletters explained the same prohibition on pass-through billing as the BCBSTX provider manuals (s*ee* Respondent Ex. 16, March 2016, Blue Review, BCBSTX_FAITH_0003651-3652; Respondent Ex. 17, March 2017, Blue Review, BCBSTX_FAITH_0003670; Carr Testimony 1389:14-23).

44. The Blue Reviews also referred Faith to BCBSTX's provider manual and website (s*ee generally* Respondent Ex. 16, March 2016 Blue Review, BCBSTX_FAITH_0003637-3656; Respondent Ex. 17, March 2017 Blue Review, BCBSTX_FAITH_0003657-3682).

45. Faith, as a contracted provider in BCBSTX's network, received copies of these Blue Reviews. Dawn Jones, Faith's Fiscal Services Director, opted in to receive Blue Review newsletters via email as of April 1, 2014. The general email address "info@fchtexas.com" was used by Faith to opt in to receive Blue Review newsletters via email as of March 31, 2015, (s*ee* Respondent Ex. 20, List of Faith Blue Review Recipients, BCBSTX_FAITH_0017211; Carr Testimony 1403:7-16). Diane Carr testified that these are valid email addresses because the communications were never returned or "bounced back" to BCBSTX (s*ee* Carr Testimony 1403:17-22).

**17 |** P a g e

Award of Arbitrators AAA Faith v BCBSTX

**5.      The Contracts Allow Termination Without Cause and the HMO and BAV Contracts Prohibit BCBSTX From Retaliating Against Faith.**

1.Each of the Contracts permits either party to terminate the contract without cause upon timely written notice to the other party (see Joint Ex. 1, PPO Contract at Art. 18, BCBSTX_FAITH_0000093; Joint Ex. 2, Traditional Contract at Art. 18, BCBSTX_FAITH_0000083-84; Joint Ex. 3, HMO Contract at Part VIII, BCBSTX_FAITH_0000063; Joint Ex. 4, BAV Contract at Part VIII, BCBSTX_FAITH_0000039-40).

2.Two of the contracts, the HMO Contract and BAV Contract, also prohibit BCBSTX from terminating the contracts because Faith has filed a complaint or an appeal on behalf of a member. In particular, the two contracts state:

> Retaliation.  BCBSTX acknowledges and agrees that it will not engage in any retaliatory action against Hospital, including termination of this Agreement, because Hospital has, on behalf of a Member, reasonably filed a complaint against BCBSTX or has appealed a decision of BCBSTX.

( see Joint Ex. 3, HMO Contract, BCBSTX_FAITH_0000068; Joint Ex. 4, BAV Contract, BCBSTX_FAITH_0000044).  The PPO and Traditional Contracts do not have the retaliation prohibition.

**C.      Billing of and Payment for Medical Services**

3.Faith receives payment for services that it provides through the submission of a claim to a payer.  The standardized billing form for institutional services, such as those provided by Faith, is the UB-04 claim form.  Providers can submit this form in either electronic or paper format (see Mitchell Testimony 1699:19-1700:3).

4.Faith, when filing a claim, communicates information about the claim to BCBSTX on the UB-04 form, including, but not limited to, the type of bill (which indicates the type of patient

**18 | P a g e**

Award of Arbitrators AAA Faith v BCBSTX

App 026

and the setting in which the service was rendered), an ICD[4] code (which identifies the medical diagnosis), the applicable CPT[5]/HCPCS code (which identifies the service that was provided), any applicable modifier(s) (which report that a service or procedure that was performed was altered by some specific circumstance, but not changed in its definition or code), and remarks (which are any information that the provider deems appropriate to share that is not supported elsewhere).[6]

5. BCBSTX's provider manuals and provider billing guidelines included detailed instructions regarding the requirements for billing on the UB-04 form (s*ee, e.g.*, Joint Ex. 5, PPO Provider Manual, BCBSTX_FAITH_00010039-10045 ; Respondent Ex. 11, HMO Provider Manual, BCBSTX_FAITH_0012855-12861; *see also generally* Joint Ex. 95, BCBSTX Guide for Completing the UB-04 Form; Respondent Ex. 73, Health Care Service Corporation (HCSC) 837 Companion Document, BCBSTX_FAITH_0017234-17301).

6. The BCBSTX provider manuals also instruct a provider to "[u]se the appropriate CPT and ICD codes on all claims" and that they should include the codes that "best represent the services furnished" (s*ee* Joint Ex. 5, PPO Provider Manual, BCBSTX_FAITH_0009982-9983; Respondent Ex. 11, HMO Provider Manual, BCBSTX_FAITH_0012796).

---

[4] ICD codes are alphanumeric codes used by providers and health insurance companies, among others, to represent diagnosis.

[5] CPT, or "**Current Procedural Terminology**," codes are codes set specific to procedures that are administered by the American Medical Association. The code set includes codes that are specific to a particular procedure, modifiers, and places of service. The CPT Manual also provides guidelines that are specific to the codes contained in each chapter.

[6] *See* Mitchell Testimony 1703:7-25 (testifying about BCBSTX guidance requiring providers to report applicable CPT code on the claim form); *id.* at 1704:2-1705:12 (testifying about BCBSTX guidance requiring providers to report applicable modifiers, including the 90 modifier, on the claim form where it makes the claim "**clear and complete**").

**19 |** P a g e

Award of Arbitrators AAA Faith v BCBSTX

7.BCBSTX has thousands of providers in its networks and millions of members. Monroe Testimony 1295:19-24. BCBSTX processes over 375,000 claims each day (s*ee* Monroe Testimony 1147:23-1148:1; *see also id.* at 1203:20-24 (HCSC overall processing 800,000 claims per day)). Because of the volume of claims it handles and the number of providers in its network, BCBSTX relies on providers, including Faith, to, in good faith, submit claims that are billed accurately, correctly and completely to reflect the services that are being rendered to the Blue Cross Blue Shield member and the provider who is rendering the service. (Monroe Testimony 1205:16-21.)

8.Laboratory services are one type of medical service that can be provided to Blue Cross Blue Shield members. Laboratory services can be performed by independent reference laboratories or hospital laboratories. Independent reference laboratories perform the same laboratory services and use the same CPT/HCPCS codes as hospital laboratories to signify the services they perform. Hospital laboratories perform tests on hospital patients; whereas, independent reference laboratories perform tests on non-patients (s*ee* Miller Testimony 731:21-732:8; *see also* McVey Testimony 2013:25).

9.Hospital providers and independent laboratories are also required to include on their billing form a bill type code to indicate the type of patient that is being seen. There are separate bill type codes to indicate whether a patient is an inpatient (signified, for example, through a 121 bill type code), an outpatient (signified, for example, by a 131 bill type code), or a non-patient (signified, for example, through a 141 bill type code) (s*ee* Mitchell Testimony 1693:1-11; Jones Testimony 625:3-8; McVey Testimony 2058:19-2060:11; *see also id.* at 2063:5-17 (indicating a non-patient is never a form of outpatient)).

---

**20 |** P a g e

Award of Arbitrators AAA Faith v BCBSTX

10.     No payments are owed under the Contracts where a service is inaccurately coded.[7] That is consistent with Medicare requirements and industry standards of other commercial health insurance payers.

> **D.     Faith Fundamentally Changed Its Business Relationship With BCBSTX by Setting Up Its Outreach Laboratory Program Without Giving Notice to BCBSTX or Getting Its Consent.**

11.     For over 13 years, until 2016, the parties operated under the Contracts without much controversy or dispute.  During that period, Faith provided rural hospital services at the Jacksboro hospital campus to a small volume of Blue Cross Blue Shield members and BCBSTX paid the claims submitted by Faith at the percent of charge billing rates under the Contracts (s*ee* Beaman Testimony 419:1-9 ("Q. And between 2002 and 2013, Faith served as a rural hospital, right? A. Yes. Q. It had an average of between two and six outpatients. Does that sound about right? A. Yes. Q. And up to eight additional outpatients each day? A. Potential -- yes."))

12.     Beginning in 2016, Faith implemented an outreach reference laboratory program. It began by first developing a "transitional-reference arrangement" in an effort to find new revenue streams because it was struggling financially.  In the transitional-reference arrangement Faith referred specimens to independent third-party laboratories True Health Diagnostics ("**True Health**") and Global Molecular Laboratories, LLC ("**Global Molecular**") with which Faith had entered into contracts.[8]  Faith also entered into management service agreements with Benchmark

---

[7] As Faith's expert testified, "[I]t's Faith's burden to submit a claim that is supportable and meets the requirements for submission of a claim." Kohler Testimony 881:12-14.

[8] Faith's contracts with third-party laboratories included:  a December 24, 2015 Outreach Administrative Services Agreement with Benchmark Health Network, LLC ("Benchmark Health Network Agreement"), Joint Ex. 31, FCH_010702-10723; a Master Agreement for Reference Laboratory Services with Global Molecular Laboratories LLC ("Global Molecular Labs Agreement"), Joint Ex. 33, FCH_010571-10585; an August 18, 2016 Laboratory Management Agreement with Outreach Management Solutions, LLC d/b/a True Health Outreach ("True Health Lab Agreement"), Joint Ex. 36, THD_0000063-0000124 .

**21 |** P a g e

Award of Arbitrators AAA Faith v BCBSTX

Health Network, LLC ("**Benchmark**") under which Benchmark would solicit physician groups to send laboratory samples to Faith (s*ee* Beaman Testimony 458:10-14 ("Q. So in this contract, outpatient -- outreach patients are defined as patients who are not registered with the hospital as inpatients or outpatients, right? A. That's Correct.")).  Benchmark in turn contracted with other marketing companies to solicit additional physician groups across Texas.  Benchmark and the other marketing companies were paid a percentage of collections obtained for laboratory services billed by Faith, except that they explicitly excluded any payments regarding government programs such as Medicare (s*ee* Joint Ex. 31, 12/24/2015 Benchmark Outreach Independent Administrative Services Agreement at Exs. A-B, FCH_1148048-1148051.)

13.     The samples obtained from these provider offices were for Blue Cross Blue Shield members who were often hundreds of miles from the Jacksboro hospital and who did not visit the hospital or obtain medical treatment at the hospital (s*ee* Miller Testimony 732:4-8).

14.     Pursuant to the laboratory contracts between True Health, Global Molecular, and Faith, True Health and Global Molecular performed laboratory testing services on samples obtained from Blue Cross Blue Shield members who never visited Faith's Jacksboro hospital and who had no connection to the Jack County community or Faith.  Faith then ran billings for such services through its BCBSTX hospital Contracts without disclosing to BCBSTX that Faith itself was not performing the laboratory services and that the services were instead performed by unaffiliated third-party laboratories with which Faith had separate contracts (s*ee* Beaman Testimony 422:19-423:8).

15.     Moreover, Faith exercised little to no oversight or training of the outreach program. (s*ee* Miller Testimony 727:2-25; *see also* Strate Testimony 696:1-14).  Faith's laboratory director

---

**22** | P a g e

did not know the types of tests Faith was including in its laboratory panels or provide guidance to physicians concerning those panels (s*ee* Miller Testimony 719:17-721:6).

16.     Once the third parties performed the services, Faith billed BCBSTX for the services.  Faith would then pay those third parties a nominal amount of what Faith would bill to BCBSTX for the service and of what BCBSTX would ultimately pay Faith for the services based on its lucrative percentage of charge contract rates.  BCBSTX would pay Faith for the services based on Faith's representations on its claims that Faith was the one that provided the services.  In other words, under this scheme, Faith would retain for itself a significant portion of the fees BCBSTX paid Faith for services that were performed by third-party laboratories.

17.     For example, the True Health fee schedule provides that Faith would pay True Health $3.14 for the 1,5-AG Assay test associated with CPT code 84378 (s*ee* Joint Ex. 34, True Health Fee Schedule, THD_0000142).  In comparison, the total service charge that Faith billed BCBSTX for the test associated with CPT code 84378 in 2017 was $146.40, and BCBSTX paid $102.48 (s*ee* Claimant Ex. 18, Faith 2017 Claims Data at, for example, columns Z-AA, lines 1226, 6854, 7522, BCBSTX_FAITH_00009671).  Those claims payment differentials would then further compound when factoring in that most of Faith's claims would have multiple claim lines, with some claims listing over 35 to 40 lab services on different claim lines on a single given claim.

Similar examples were presented at the hearing (s*ee* Claimant Ex. 18, Faith 2017 Claims Data at, for example, columns Z-AA, lines 48726, 53610, 109221, BCBSTX_FAITH_00009671.[9]); (Jones Testimony 649:21-651:2; *see also id*. at 651:7-652:7

---

[9] True Health has an ancillary laboratory contract with BCBSTX that has a set rate for each laboratory testing code. Typically, the rates that BCBSTX would pay to Faith at 70 percent of billed charges under the PPO Contract are about 800 or more percent higher than the rates that BCBSTX would pay to True Health pursuant to the ancillary laboratory contract.  *See* Carr Testimony 1393:2-23, 1397:5-1400:6; *see also* Respondent's Demonstrative 3.

**23 |** P a g e

Award of Arbitrators AAA Faith v BCBSTX

(discussing markups for CPT codes 81227 and 81001 charging anywhere from 14 to over 40 times fair market value to BlueCross for those tests)).

18.    Despite Faith's own policy requiring that the laboratory director monitor for compliance to policies and procedures (*see* Joint Ex. 82, FCH Patient Accessioning Procedure Outreach Program), Faith's laboratory director testified that she did not monitor any of the contractors involved in the outreach program (s*ee* Miller Testimony 724:2-12).  There was no evidence that Faith exercised oversight in the running of any test performed by a third party. Similarly, Faith did not oversee any of the phlebotomists operating outside the hospital (*Id.* at 696:6-14; 702:1-12).  Faith also did not train the phlebotomists (*Id.* at 719:14-24). Until 2018, Ms. Miller had never even visited a doctor's office where a phlebotomist was placed (*Id.* at 725:20-25).

19.    The second part of Faith's outreach laboratory program was to perform laboratory testing of remotely collected specimens for Blue Cross Blue Shield members at the Jacksboro hospital, even though the members—who were located across Texas—did not obtain medical treatment at the hospital (s*ee* Beaman Testimony 420:21-421:21). The second phase of Faith's outreach laboratory program became operational in January 2017.

20.    Under the second phase of its outreach program, Faith entered into a second set of contracts with True Health in which it leased laboratory equipment (s*ee* Beaman Testimony 482:23-483:1). Prior to leasing this equipment, Faith did not have the capability to perform many of the laboratory services for which it billed BCBSTX in 2016 *(see* Miller Testimony 702:23-703:1; 703:8–704:5; 704:10-705:4).  Faith did not disclose to BCBSTX that it was developing this outreach laboratory program where it would solicit laboratory samples from physicians treating

**24 |** P a g e

Award of Arbitrators AAA Faith v BCBSTX

Blue Cross Blue Shield members across Texas to then perform the labs at the hospital (s*ee* Beaman Testimony 422:4-9).

21.    Although Faith leased the laboratory equipment from True Health, a review of the claims data submitted by the parties along with lab test result reports regarding the claims billed by Faith shows that Faith still was not performing many of the services it was billing to BCBSTX in 2017, and that the services were still being performed by True Health.

### E.    BCBSTX's Investigation of Faith's Billing Schemes

22.    In 2016, BCBSTX started receiving complaints from its members and employer group customers regarding Faith. Some Blue Cross Blue Shield members were confused why they were receiving explanations of benefits from Faith when they had no affiliation with Faith and had never received any laboratory services through Faith.   Some members and employer group customers also were concerned about the high cost of the services, particularly where the service could have been performed by reference laboratories at a fraction of the price being charged by Faith (s*ee* Beaman Testimony 479:4-7 (Q. Now, the charges that Faith charged BlueCross for the same -- for testing all those blood and urine samples was a lot more, right? A. For sure."); Carr Testimony 1360:11-1363:1;  Mothershed Testimony 1553:1-1554:11; 1559:23-1560:8; *see also* Joint Ex. 16, 6/16/2017 Email String:  Carr, Suter Hill, Willis, others, BCBSTX_FAITH_0000106-108).

23.    As an example, in May 2016, one Blue Cross Blue Shield member complained that she "received a bill about a drug test from [Faith] that she didn't partake in"  (see Respondent Ex. 51(a), Hot Line Complaint Incident Report (5-20-16), BCBSTX_FAITH_0000771-772).

**25 |** P a g e

Award of Arbitrators AAA Faith v BCBSTX

24.      Other examples of member complaints were presented (s*ee* Respondent Ex. 51(c), Hot Line Complaint Incident Report (6-6-16), BCBSTX_FAITH_0000775-776.    BCBSTX received dozens of such complaints throughout 2016 and 2017).[10]

25.      BCBSTX, through its Special Investigations Department ("SID"), launched a formal investigation on October 5, 2016, (s*ee* Mothershed Testimony 1570:10-1571:3).

26.      On October 13, 2016, BCBSTX issued a Pre-Payment Review Notice to Faith, indicating that "certain claims submitted by [Faith] will be subject to medical review prior to a final determination or payment" effective October 19, 2016, (s*ee* Mothershed Testimony 1571:10-1573:14; *see also* Joint Ex. 9, Pre-Payment Review Notice, BCBSTX_FAITH_0000619).

27.      Under prepayment review, BCBSTX required Faith to submit medical records substantiating the services it was billing (s*ee* Joint Ex. 9, Pre-Payment Review Notice, BCBSTX_FAITH_0000619).   This included a requirement that Faith provide copies of any requisition forms and test result reports identifying what laboratory services were requested and performed (s*ee* Beaman Testimony 522:13-16).   Similarly, Faith agreed under the PPO and Traditional Contracts to "provide, on a timely basis at no charge, access to, information about and copies of a Subscriber's medical and business records to BCBSTX . . . for the purpose of ascertaining, auditing and/or verifying any information reflected in such records which is pertinent to a Subscriber or the appropriateness of payment in relation to this Contract" (s*ee* Joint Ex. 1, PPO Contract at Art. 8, BCBSTX_FAITH_0000090; Joint Ex. 2, Traditional Contract at Art. 8, BCBSTX_FAITH_00000 81).   The HMO and BAV Contracts required Faith to "[p]rovide

---

[10] *See also, e.g.*, Respondent Ex. 51(n), Hot Line Complaint Incident Report (1-11-17), BCBSTX_FAITH_0000541-542; Respondent Ex. 51(s), Hot Line Complaint Incident Report (4-1-17), BCBSTX_FAITH_0000551-552; Respondent Ex. 49, Hot Line Complaint Incident Report (7-19-17), BCBSTX_FAITH_0000372-373.

Award of Arbitrators AAA Faith v BCBSTX

[BCBSTX], upon request and at no charge, copies of specified sections of Member medical records that are in the custody of Hospital . . . ." (s*ee* Joint Ex. 3, HMO Contract at Part VI(B), BCBSTX_FAITH_0000062; Joint Ex. 4, BAV Contract at Part VI(B), BCBSTX_FAITH_0000039).

28.     Prior to initiating the prepayment review, BCBSTX did not have access to underlying records supporting Faith's claims, including laboratory requisition forms, doctor's progress notes or patient histories, or laboratory test result forms to verify what services were being ordered, why they were being ordered, or who was performing the laboratory services (s*ee* Mothershed Testimony 1584:8-19). Thus, BCBSTX was relying on representations by Faith in its claims submissions that it was the one providing the laboratory services it was billing, that Faith was correctly coding and billing for the services under BCBSTX guidelines and industry standards, and that the services were medically necessary as established under BCBSTX's medical policies (s*ee* Jones Testimony 691:21-692:18).

29.     Based upon BCBSTX's review of documentation supporting Faith's laboratory claims, BCBSTX identified a number of what BCBSTX considered to be irregularities with Faith's claims (s*ee* Monroe Testimony 1169:14-1171:5 (he believed Faith's actions were fraudulent); *see also id*. at 1183:13-1186:14).

30.     The claims that Faith submitted on the UB-04 forms or their electronic equivalent indicated that Faith performed the services.  The claims had no information identifying that an outside laboratory performed the services.  Such information would be indicated on a claim form by including a 90-modifier with the CPT codes, including information in the remarks section of the claim form, or including other provider information in the other provider section of the claim form (s*ee* Mitchell Testimony 1695:18-1696:25; 1699:14-16; 1701:15-1703:12).  BCBSTX

**27** | P a g e

Award of Arbitrators AAA Faith v BCBSTX

provided guidance to providers to include this information on its UB-04 claims.  The claims that Faith submitted in 2016, and 2017, failed to include any of this information, despite that other providers such as Global Molecular and True Health performed the lab tests for which Faith billed BCBSTX (s*ee* McVey Testimony 2082:22-2083:4).

31.     Many of the underlying laboratory test result records demonstrated that Global Molecular or True Health performed the lab tests (s*ee* Mothershed Testimony 1595:4-14). The claims that Faith submitted to BCBSTX, however, did not indicate that either of these entities performed the tests.

32.     In other instances, the laboratory test result records indicated that Faith performed the laboratory services.  However, Faith could not have performed many of those services because Faith did not have the laboratory equipment or appropriate industry certifications to perform the services (s*ee, e.g*., McVey Testimony 2029:4-2027:3; *see also* Respondent Ex. 98, Rebuttal Report of Kara McVey, at p. 9).  Thus, even though other records indicated that Faith performed the lab tests, the evidence demonstrates that Faith did not do so because it did not have the equipment or capability to run those tests (s*ee, e.g.,* Miller Testimony 729:5-24).

33.     During its prepayment review investigation of Faith's claims, BCBSTX also uncovered instances in which Faith removed or blacked out the headers and footers in the lab test result reports that identified third-party providers as the entities that performed the laboratory services and replaced them with Faith's logo (s*ee* Mothershed Testimony 1585:23-1586:25; *see also* Respondent Ex. 48, February 11, 2017, Laboratory Results for Claim #7061505V9820X, BCBSTX_FAITH_0000256; Respondent Ex. 48, April 18, 2017, Laboratory Results for Claim #71728102905, BCBSTX_FAITH_0000235; Respondent Ex. 48, Email re: SUSPICIOUS LAB PAPERWORK, BCBSTX_FAITH_0000234 ("I have attached redacted test results from True

Award of Arbitrators AAA Faith v BCBSTX

Health Diagnostics . . . and Faith Community Hospital.  It appears the hospitals are simply stripping the report headers and footers and replacing them with their information to make it appear as though they are doing the tests."); Joint Ex. 58, 5/3/2017 Email A. Willis to C. Tierney re: FCH blacking out True Health on forms, BCBSTX_FAITH_0009512-9514).

34.     In another example, the requisition form for claim number 63135097E380X identifies Faith as the provider.  But the CLIA identification numbers at the bottom left hand corner of the form, which are unique laboratory certification numbers issued to a particular laboratory were the numbers associated with True Health.  This indicated that True Health actually performed the laboratory tests (s*ee* Respondent Ex. 54(x), Requisition Form for Claim #63135097E380X, FCH_00893271, 00893280).  The results pages for the same claim are branded with True Health headers and footers, and do not reference Faith (s*ee* Respondent Ex. 54(x), Requisition Form for Claim #63135097E380X, FCH_00893282-893299).

35.     BCBSTX's investigation also revealed that Faith's billing increased by more than $20 million in a single year, which is more than 2,700% increase when compared to previous years (s*ee* Respondent Ex. 33, Email re: Claims Spike, BCBSTX_FAITH_0000021-22; *see also* Respondent Ex. 34, Email re: FCH Billing Amounts, BCBSTX_FAITH_0000097-99).

36.     Within several months in 2016, Faith went from billing laboratory services at a historical average of $30,000-$40,000 per month to over $16 million per month.  This unprecedented mix of services was not contemplated by BCBSTX when entering into the Contracts.

37.     From March 2016 through May 2017, Faith billed BCBSTX $143,451,241, of which $141,360,589 (or 98.5%) was for laboratory services  (s*ee* Respondent Ex. 34, July 10, 2017 Email from J. Guy to D. Carr re: FCH Billing Amounts, BCBSTX_FAITH_0000098; Joint Ex.

**29** | P a g e

Award of Arbitrators AAA Faith v BCBSTX

63, Email re: Faith Procedures Billed, BCBSTX_FAITH_0000190; *see also* Beaman Testimony 357:1-23; Monroe Testimony 1188:2-24).[11]

38.     The prices that Faith was charging BCBSTX for these laboratory services were substantially larger than the amounts that Faith was paying third-party reference laboratory True Health (*compare* Claimant Ex. 101, Charge Master 2017 Excel Spreadsheet, *with* Joint Ex. 34, 5/9/2016 THD Lab Processing Agreement, THD_0000128-178, at 141-145 (fee schedule); *see also* Respondent's Demonstratives 2-3; Jones Testimony 646:9-655:16; Needham Testimony 1099:15-1101:21).   Mr. Beaman testified that the prices listed in the fee schedule in Faith's contract with True Health were the fair market value for laboratory services (s*ee* Beaman Testimony 483.23484:3).

39.     Typically, Faith's billings to BCBSTX for laboratory services were about 800 percent (or more) higher than if True Health had directly billed BCBSTX for the services (s*ee* Carr Testimony 1363:20-1364:3 ("[T]ypically . . . it's about 800 or more percent higher money not billing through Faith versus if True Health had billed for it[.]").   The rates that BCBSTX pays directly to True Health pursuant to BCBSTX and True Health's ancillary laboratory contract are comparable to the rates that BCBSTX pays to its other contracted laboratories, such as Quest and LabCorp (s*ee* Carr Testimony 1364:10-18).

40.     For example, for the CPT code 83789, Faith billed BCBSTX $240.45.   If Faith billed BCBSTX for that service, and BCBSTX paid 70 percent of the contractual allowed amount on that claim under the PPO Contract, the paid amount would be about $165.   In comparison, if True Health billed BCBSTX directly for that same service, BCBSTX would have paid True Health

---

[11] As noted by the testimony of BCBSTX's damages expert Jeffrey Benton, those numbers continued to grow to over $200 million when aggregating all claims from 2016 to 2018.

**30 |** P a g e

Award of Arbitrators AAA Faith v BCBSTX

approximately $13.50. Faith's charge is a markup of over 120 percent (s*ee* Carr Testimony 1364:12-1368:15).

41.     Similar examples exist for the CPT codes 82542 and 8434 (s*ee* Carr Testimony 1308:16-1369:6) (s*ee* Carr Testimony 1369:26-1370:3 ("Q.  That seems like a pretty big price difference between what Faith had billed and what Blue Cross would have – or what Faith was allowed under its contract versus what True Health would have been paid had True Health billed directly?  A.  It's huge."))

42.     The impact of Faith's markup was largely borne by BCBSTX's self-funded employer groups and members.  Two-thirds of BCBSTX's claims are for administrative services only – *i.e.*, the employer groups with which BCBSTX is contracted bear the risk for the claims (s*ee* Monroe Testimony 1135:18-1135:4).  BCBSTX's group customers in Texas include H-E-B Grocery, American Airlines, Halliburton, Southern Methodist University, Texas A&M University, and the Texas Employee Retirement System, (s*ee also* Monroe Testimony 1141:25-1142:5. ("Q. And when you say "taking on the risk," so if a member submits a claim and HEB is the employer group, who pays that claim?  A.  HEB pays that claim.  We process the claim, but the actual funding, the dollars and cents, would come from HEB."); *see also* Monroe Testimony 1199:16-21 ("If BlueCross and BlueShield of Texas recovers money in this matter that belongs to those employer groups, where is that money going?  A.  It goes right back to the employer groups."); Carr Testimony 1366:10-13 ("Q.  So when it shows here it says Blue Cross of Texas paid $3,809.97 what does that mean in the context of a self-funded account like H-E-B?  A.  That's the amount that employer group pays for . . . those services.") *see also* Carr Testimony 1408:15-20 ("Q. What was the impact on Blue Cross' employer group customers?  A.  The employer groups were upset

**31** | P a g e

they were perhaps not trusting us because they have a trust relationship with us to purchase healthcare coverage for their employees. Also that increases their cost.")

43.      Employee groups H-E-B and Zachary complained to BCBSTX about members with large out-of-pocket costs related to laboratory claims billed by Faith that were confusing their members (see Carr Testimony 1361:1-11; see also Mothershed Testimony 1362:11-1363:1; ; Joint Ex. 66, 7/24/2017 Case Opening Memorandum L. Mothershed to R. Ruminski re: request to open an investigation, BCBSTX_FAITH_0000175 (identifying groups that were impacted by Faith's laboratory claims in terms of billed and paid amounts)).

44.      Mr. Beaman agreed that when a self-funded employer group submits a claim, the money to pay that claim comes from the employer group (see Beaman Testimony 398:2-13 ("Q. But you will agree with me that for the most part, when . . . you submit a claim for a self-funded insured claim, that money comes out of the employer group, right? A. It does. Q. And BlueCross isn't paying that, right? That's not BlueCross's money; that's the employer group's money? A. In an employer group plan, the employer is paying the cost for the plan.")).

45.      Faith's markup had a negative effect on BCBSTX's members (see Respondent's Exhibits 50-51(ll)). For example, one member complained on May 20, 2016, that she received a bill for 29 drug and screening tests from Faith, which she did not partake in, requesting that she pay $1,400.00 (see Respondent Ex. 51(a), May 20, 2016 BCBSTX Fraud/Incident Report No. BCT-16-05-0145, BCBSTX_FAITH_0000771-772, Mothershed Testimony 1558:16-1559:17).

46.      The claims data also reflects the portions of the claims for which BCBSTX's members were responsible. Kimberly Mitchell testified that BCBSTX's 2016, counterclaim spreadsheet shows that members were responsible for $1,176,781.64 in deductibles and $1,173,393.94 in coinsurance. Ms. Mitchell further testified that BCBSTX's 2017, counterclaim

Award of Arbitrators AAA Faith v BCBSTX

spreadsheet likewise shows that members were responsible for $2,803,213.65 in deductibles and $1,000,778.05 in coinsurance (*ee* Mitchell Testimony 1748:3-6 ("Q.  These numbers represent the impact on BlueCross's members?  A.  Correct.  In addition to the copay amount too.""))

47.    Faith was contracted to perform hospital services at its Jacksboro hospital for members of the surrounding Jacksboro community.  A core part of that process is BCBSTX's credentialing process, which FCH agreed to follow.  FCH's failure to disclose its laboratory outreach program eliminated BCBSTX's ability to conduct that due diligence and unilaterally changed the Contracts without BCBSTX's consent (s*ee* Respondent's Ex.  47, Credentialing Application BCBSTX_FAITH_0001318).

48.    The Contracts required Faith to notify BCBSTX of its intention to develop an outreach reference laboratory program (*see* Joint Ex. 1, PPO Contract, at Art. 10(B), BCBSTX_FAITH_0000090, (requiring FCH notify BCBSTX of "any change… specialty provided, or location.")  The scope and types of services had a significant impact on BCBSTX's obligations under the Contracts, including by causing BSBCTX to pay significantly higher rates for the laboratory services than it would have paid had the claims been submitted directly by the third parties that performed the services.

49.    Based on the information collected in its investigation, BCBSTX's SID team concluded that Faith was "involved in pass through billing" because "[a]ll labs billed by Faith were actually rendered by non-contracting lab[s]" such as Global Molecular and True Health (s*ee* Joint Ex. 61, January 10, 2017 Report of Investigation, BCBSTX_FAITH_0000949; *see also* Monroe Testimony 1210:24-1213:25).

Award of Arbitrators AAA Faith v BCBSTX

### F.    Faith Is Not Entitled to Payments for Claims Where It Did Not Perform the Laboratory Services.

50.    Many of the claims at issue are for services that were performed by third-party laboratories.  Specifically, of the 21,946 claim identification numbers relating to claims that Faith has asserted against BCBSTX, Faith admits True Health was the location of services for 12,733 (s*ee* Respondent Ex. 10, Faith Claims Excel Chart, FCH_01148305; *see also* Kohler Testimony 872:24-873:5).  The total disputed amount of those 12,733 claims, as measured by the damages Faith asserts for those claims, is \$62,373.420.67[12]  (s*ee* Kohler Testimony 874:14-17).

51.    BCBSTX's laboratory expert Kara McVey and damages expert Jeffrey Benton testified, however, that this amount underrepresents the total number of disputed claims for which Faith did not perform the laboratory services.

52.    Based upon her review of Faith's billing and laboratory records, Ms. McVey concluded that Faith did not have the capability to perform dozens of laboratory testing services related to molecular pathology/genetic testing, quantitative/definitive toxicology testing, or advance lipid testing because it did not have the equipment to perform those services. *See also* Miller Testimony 746:19-747:3. Those laboratory tests were performed by Global Molecular and True Health (s*ee, e.g*., Joint Ex. 73 (result report for testing performed by Global Molecular)). Accordingly, because Faith did not have the capability to perform these tests, any CPT codes that Faith billed for these services had to have been performed by Global Molecular or True Health (s*ee* Respondent Ex. 98, Kara M. McVey Expert Rebuttal Report (May 10, 2019), at p. 9).

---

[12] That amount factors in corresponding allowed amounts that would be owed under the respective contracts (*i.e.*, 70% of billed charges for claims under the PPO/POS claims) while subtracting any patient cost-shares of co-pays, coinsurance, or deductibles.

**34 |** P a g e

Award of Arbitrators AAA Faith v BCBSTX

53.      Mr. Benton then analyzed Faith's claims data and determined, based upon a specific set of rules for determining pass-through billing based upon electronic claims file data alone, that 20,625 of the claims Faith submitted to BCBSTX included genetic testing or advanced lipid testing (s*ee* Benton Testimony 1863:5-1864:1).  Those claims totaled $157,320,045 in charges for services performed by these third parties.  Factoring in that Faith would be paid 70% of its charges for almost all claims at issue, that equates to approximately $110,124,032.00 in disputed payments for claims asserted by Faith—a figure that exceeds the damages Faith's own expert Ms. Charlotte Kohler contends Faith would be owed based on an extrapolation of her damage calculations from her review of 500 sample claims that were selected by Faith's statistics expert Dr. Dana Keller.

54.      Similarly, of the 11,655 unique claim identification numbers relating to counterclaims that BCBSTX has asserted against Faith in this action, Faith has admitted that True Health was the location of services for 5,001 of the claims, meaning True Health performed the services (s*ee* Respondent Ex. 6, BCBSTX Counterclaims Excel Chart, FCH_01148269).  Faith also admits that it received from BCBSTX $19.2 million in payments for these 5,001 claims (s*ee* Kohler Testimony 878:4-21).

55.      Faith's admission underrepresents the total number of claims and payments at issue. The evidence similarly establishes that BCBSTX made additional payments to Faith for services that were performed by Global Molecular and True Health because Faith did not have the capability to perform molecular pathology/genetic testing, quantitative/definitive toxicology testing, or advance lipid testing.  Taking into account these additional claims, Mr. Benton identified that BCBSTX paid $23,300,000 to Faith based upon misrepresentations that Faith performed services when it could not and did not (s*ee* Benton Testimony 1954:13-21).

**35 | P a g e**

Award of Arbitrators AAA Faith v BCBSTX

56.    This figure is bolstered by Ms. Kohler's admission that Respondent's Exhibit 8 identified True Health as the site of service for 5,002 claims and that the amount was $19.2 million (see Kohler Testimony 878:11-18).  Ms. Kohler's analysis, however, was incomplete because she did not include Global Molecular claims and she over-credited Faith as the site of service.

57.    Faith's billing of claims for services that True Health and Global Molecular provided was prohibited because the Contracts contemplated the provision of hospital services by Faith to its "Jacksboro, Jack County, Texas" hospital address. By engaging True Health and Global Molecular to perform the testing for BCBS Members not at the Jacksboro hospital, Faith was billing for non-patient services at undisclosed and unapproved locations under the Contracts (see Beaman Testimony 387:8-388:4, 417:10-418:11; see also Monroe Testimony 1185:4-8). Faith argues that there was no limitation in the Contracts only to bill for services performed at the Jacksboro hospital because BCBSTX paid for, among other things, ambulance services and home health services.  However, BCBSTX previously consented to Faith's practice of billing for these non-laboratory services at other locations because the services were for members located in the Jacksboro community.  Unlike in those instances, Faith made no disclosures to BCBSTX regarding its outreach laboratory program and billing of non-patient laboratory services rendered by True Health and Global Molecular.

58.    Effectively, Faith improperly assigned and subcontracted to True Health or Global Molecular Faith's duty to "provide all Covered Services" to BCBS Members and to submit a bill to BCBSTX "after providing Covered Services to a Subscriber" This violated the Contracts' prohibition on assigning and/or subcontracting contractual duties to third parties without BCBSTX's consent. BCBSTX did not consent.  Faith contends that it maintained responsibility for the patient and the third-party contracts Faith entered into with Global Molecular and True

**36 | P a g e**

Health to perform the laboratory services did not constitute assignments or subcontracts.  However, Faith's contracts had third parties step into Faith's shoes and perform services constituting obligations arising out of the Contracts with BCBSTX (s*ee, e.g.*, Joint Ex. 31, Benchmark Health Network Agreement, FCH_010702-10723; FCH_010571-10585; Joint Ex. 36, True Health Diagnostics Laboratory Management Agreement, THD_0000063-0000124, s*ee also* Beaman Testimony 493:24-495:12). In fact, as of June 2016, Faith's laboratory director testified that she had never even seen the result reports from the performing laboratories (s*ee* Miller Testimony 717:14-718:8; Joint Ex. 78).  Until January 2017, Faith was not even able to track a specimen tested by a third party reference laboratory (s*ee* Miller Testimony 721:25-723:14).

59.    Faith also violated the BCBSTX provider manual provisions that prohibited Faith from billing for these services.  Faith did not "perform," the services that True Health and Global Molecular provided (s*ee* Miller Testimony 702:17-20 ("Q. And to perform a laboratory test means to run a test, right?  A. To perform the test, yes, means to run the test."))  The BCBSTX provider manuals state "if [Faith] does not directly perform the service and the service is rendered by another provider, only the rendering provider can bill for those services".  Faith contends that the terms "provide," "render," and "perform" support its argument that the third-party billing arrangements were permissible on the grounds that Faith could "provide" or "render" the laboratory tests without "performing" them because Faith drew the samples, registered the members as patients, and otherwise coordinated services.  This reading is inconsistent with the Contracts and is contrary to industry standards on what it means to "provide," "render," or "perform" a laboratory service.  The Panel concludes that the terms are used interchangeably within the industry and by the parties, such that Faith cannot be said to "provide," "render," or "perform" the laboratory services it billed to BCBSTX (s*ee*, *e.g.*, Mothershed Testimony 1610:15-

**37** | P a g e

Award of Arbitrators AAA Faith v BCBSTX

19; 1611:20-22; *see also* Monroe Testimony 1218:16-24; McVey Testimony 2056:17-2057:1; Carr Testimony 1345:10-1346:25).

60.     Faith was also barred by the Contracts and the provider manuals from pass-through billing claims for laboratory services provided by Global Molecular and True Health. Faith contends that the prohibition does not apply because a hospital cannot be an ordering provider; however, the evidence has shown that Faith acted as an ordering provider when it submitted requests to third parties to perform testing. The pass-through billing policy does not apply to only the physician who initially submitted the requisition form; it also applied to Faith because Faith placed an order, and thus acted as an ordering provider, with these third-party reference laboratories (s*ee* Carr Testimony 1394:2-25;; *see also* Mothershed Testimony 1549:23-1552:11; McVey Testimony 2049:22-2050:21, 2131:23-2132:18).

### G.     The Blue Cross Blue Shield Members for Whom Faith Billed Reference Laboratory Claims Were Non-Patients.

61.     The Contracts provide that only inpatient and outpatient hospital services are covered services (s*ee* Beaman Testimony 199:23-200:5). The Contracts do not provide reimbursement for non-patient services.

62.     In the hospital context, inpatients and outpatients are distinct and separate categories that necessarily refer to a patient who is present at the hospital to receive hospital services. A non-patient, in contrast, is someone who is not a patient of the hospital because he or she is not present at the hospital and is not treated by the hospital (s*ee  Kohler Testimony 912:6-913:11; see also* Respondent Ex. 55, Pub. 100-04 Medicare Claims Processing Manual, Chapter 16, at § 30.3, BCBSTX_FAITH_0003354-3355; *see also* Joint Ex. 36, True Health Diagnostics Laboratory Management Agreement, THD_0000063-0000124 (distinguishing between inpatients, outpatients, and non-patients)).

**38 |** P a g e

Award of Arbitrators AAA Faith v BCBSTX

63.    Non-patient laboratory services are performed on individuals who are not receiving inpatient or outpatient services from the hospital.

64.    Individuals whose specimens were not collected for testing at the Jacksboro hospital (or at a credentialed off-campus facility of the Jacksboro hospital), who were not otherwise receiving services from Faith, and whose specimens were referred to one of Faith's reference laboratory partners for testing are non-patients of Faith (s*ee* Miller Testimony 702:13-16 ("Q. For a person to be a hospital patient that means a patient that gets lab work done at the hospital, doesn't it? A. Yes.")).  Because these were non-patient services, they were not covered services under the Contracts and BCBSTX was not obligated to pay for them (s*ee* Beaman Testimony 409:6-16).

65.    Faith has argued that BCBSTX was obligated to pay for treatment of non-patients under the Contracts for two reasons. First, Faith contends that the HMO and BAV Contracts, which define outpatient as anyone who is not an inpatient, include non-patients by default.  Although the PPO and Traditional Contracts do not define outpatient, inpatient, or non-patient, Faith also contends that the definitions of outpatient and inpatient from the HMO and BAV contracts should be imputed to those earlier Contracts, thereby permitting coverage for non-patient services.  But defining an outpatient as not being an inpatient does not foreclose the existence of a third category, *i.e.*, a non-patient.  Nor does that definition of outpatient require that people who are not patients at all are properly considered outpatients.   Thus, that the panel does not accept Faith's interpretation of the term outpatient.

66.    Second, Faith contends that non-patient services are just a form of outpatient services such that the distinction has no impact on this dispute because all outpatient services are covered under the Contracts. The Panel declines to adopt this interpretation.  Medicare, and health

**39 |** P a g e

care industry standards define "outpatient" as someone who receives treatment at a hospital but does not spend the night there (s*ee* Lisa Mothershed Testimony 1548:3-14 (being an outpatient requires going to the facility); *see* also Respondent Ex. 55 ("Nonpatient (Referred) Laboratory Specimen - A nonpatient is defined as beneficiary that is neither an inpatient nor an outpatient of a hospital, but that has a specimen that is submitted for an analysis to a hospital and the beneficiary is not physically present at the hospital.").

67.     The term non-patient is similarly understood to encompass a separate category of individuals.   Providers are instructed to use a separate bill type code to signify that a patient is a non-patient as opposed to an inpatient or outpatient.   Adoption of Faith's position would render this separate industry-recognized category as meaningless.

68.     The evidence shows that the disputed services at issue here were non-patient services under the commonly accepted definition, that non-patient services are not outpatient services, and that the services were not covered under the Contracts.

69.     Where BCBSTX did not consent to pay for service to non-patient services, BCBSTX had no obligation to pay for them, and Faith is not entitled to payments for those claims.

> **H.     Faith's Claims Also Were Not Payable Because They Were Not Complete and Accurate.**
>
> **1.     Claims Performed by Other Parties, Even if Not Expressly Prohibited Under the Contracts, Still Were Not Payable Due to Faith's Improper Coding and Claims Submission.**

70.     As noted for a claim to be payable under the Contracts, the claim must be correctly coded, and it must include complete and accurate information as to the services performed and who performed the services.   BCBSTX issued payment policies that Faith agreed to follow reaffirming that BCBSTX required claims to be correctly coded, complete, and accurate.   Further, industry standards support that a claim must be correctly coded, accurate, and complete, including

**40 |** P a g e

that the claim identify the services performed and who performed the services, in order to be payable.[13]

71.     Faith's own policy also required bills submitted to payors like BCBSTX to be complete and accurate (*see* Joint Ex. 25 (Billing Policy No. 1 and No. 2); *see also* Jones Testimony 670:21-671:2).  Further, Faith failed to abide by its own policies because it did not stay up to date in its review and implementation of BCBSTX billing requirements (*see* Joint Ex. 25 ( Billing Policy No. 9); Jones Testimony 672:8-673:11). None of the new staff hired to implement the outreach program were even provided with a copy of BCBSTX policy manual (*see* Jones Testimony 671:22-673:11).

72.     Faith's laboratory director testified that as of June 2016, the Faith test result reports were improperly failing to indicate where the laboratory tests were performed (*see* Miller Testimony 718:14-18 ("Q. And you say, 'The contact information for the lab that is performing the test needs to be on the report as well as their CLIA ID.'  Right?  A. Yes, sir.")); *id.* at 715:18-716:5; *see also* Joint Ex. 78)  Ms. Miller went on to say that failing to include this information could be a misrepresentation (*see* Miller Testimony 718:22-25 ("Q. If you didn't have accurate information on the test result report, that would be a misrepresentation, wouldn't it?  A. It could be, yes."))

73.     While the Panel notes that the parties dispute what information must be included on a claim to make it correctly coded, complete, and accurate, the Panel finds that in the context

---

[13] *See* Beaman Testimony 458:11-16 ("Q.  And you would agree that BlueCross would not have a duty to pay a claim if the services provided are determined not to be covered services under a patient's benefit plan, right?  A.  If that's the determination going through the process, then certainly it would not be payable."); *id.* at 458:17-21 ("Q. You would agree BlueCross would not have a duty to pay a second claim, if duplicate claims were made for the same service for the same member?  A.  I don't believe duplicate claims should ever be paid."); *see also id.* at 457:16-458:10, 458:22-459:2, 459:15-20.

**41** | P a g e

Award of Arbitrators AAA Faith v BCBSTX

of billing for laboratory services, Faith was required to include certain information indicating that the service was  by conducted another provider or at a different location.  Such information was necessary to give BCBSTX sufficient notice regarding the circumstances regarding the performance of the service.

74.    One such piece of information is appending the 90-modifier to the relevant CPT/HCPCS service code.  The 90-modifier is used by providers to signify to a payer that the test performed was performed by a third-party reference laboratory.  In other words, it should be appended to CPT/HCPCS codes where the hospital itself did not perform the laboratory testing, but used an affiliate or reference laboratory partner to perform those services (*see* Mitchell Testimony 1837:15-1838:6).

75.    None of the 21,946 claims that Faith asserts or the 11,655 claims that BCBSTX asserts contained the 90-modifier (s*ee* Claimant Ex. 18 and Respondent Exs. 2-4, Claims and Counterclaims Data, BCBSTX_FAITH_0009670-9674; *see also* Respondent Exs.  6 and 10, Faith Claims and Counterclaims Excel Charts, FCH_01148269 and FCH_01148305; *see also* McVey Testimony 2082:22-2083:6).

76.    In 2014, before Faith began its outreach laboratory program, Faith submitted claims to BCBSTX that appended the 90-modifier to CPT codes for services that had been performed by third-party laboratories.[14]  This evidence suggests that Faith knew how to correctly use the 90-modifier, but chose not to utilize the modifier after starting its outreach laboratory program (s*ee* Respondent Ex.  1, 2014 Facility Claims Data, BCBSTX_FAITH_0017209; *see also* Mitchell Testimony 1697:1-1699:16).

---

[14] In fact, Faith's expert Ms. Kohler does not dispute.  *See* Kohler Testimony 842:21-23 ("Q. And you don't dispute that Faith was using modifier 90 in 2014, correct? A. That's correct.").

**42** | P a g e

Award of Arbitrators AAA Faith v BCBSTX

77.     There was evidence that BCBSTX provided specific guidance to hospital providers such as Faith that they should use modifiers, including the 90-modifier, whenever it would clarify or improve the reporting accuracy of a claim (s*ee* Mitchell Testimony 1694:25-1696:2 (testifying about BCBSTX guidance requiring providers to report applicable modifiers, including the 90 modifier, on the claim form where it makes the claim "clear and complete")).

78.     BCBSTX also provided specific guidance to hospital providers that they should include information on their claims that indicated that a service was performed at a location that is different from the billing provider's location (s*ee* Joint Ex. 95, BCBSTX Guide for Completing the UB-04 Form, at 3-4 (identifying UB-04 claim form fields including 44 (HCPCS (CPT) code and modifiers), 78-79 (other provider name and identifiers), and 80 (remarks)); *see also* Respondent Ex. Health Care Service Corporation (HCSC) 837 Companion Document, BCBSTX_FAITH_0017281, identifying "Laboratory or Facility Name" as a required field for the 837 claim form (electronic equivalent of the UB-04 claim form); *see also* Mitchell Testimony 1690:2, 1691:2-20, 1694:5-1695:9, 1700:7-18).

79.     Where Faith itself did not perform the laboratory testing services for a claim, but failed to append the 90-modifier or identify the location of where a service was performed where the location was separate from the billing provider's location, such claims were not payable under the parties' contracts.

### 2.      The 500 Claim Sample Analysis Establishes That Faith's Claims Were Not Payable Due to Inadequate Documentation and Improper Coding.

80.     As a part of the litigation process, the parties agreed to review a sample set of 500 claims that were selected by Faith's statistical expert, Dr. Dana Keller, to determine whether Faith's claims were payable.   The parties agree that the 500 claim sample is a statistically significant sample and that it is representative of the disputed claims.   Faith's healthcare expert,

Award of Arbitrators AAA Faith v BCBSTX

Ms. Charlotte Kohler, and BCBSTX's hospital and independent laboratory expert, Ms. Kara McVey, however, disagree as to the underlying conclusions regarding the 500 sample claims and whether they were payable, and if so, as to how much was payable.

81.     Ms. Kohler testified that she assumed all of Faith's claims were for covered services *see* Kohler Testimony 875:16-20 ("Q.  Let's talk about some of the assumptions that your opinions were based upon in your expert reports.  You assumed that Faith's claims were for covered services?  A. Yes, I do.")

82.     Ms. McVey testified that none of the 500 sample claims were payable because they contained multiple documentation and coding errors[15] (s*ee e.g.*, McVey Testimony 2010:25-2011:11).  In particular, Ms. McVey determined that none of the claims were payable for the following, but not exhaustive list, of errors:

- Faith failed to provide the accurate provider name on submitted claim forms.

- Faith failed to provide correct bill type codes on submitted claims forms.

- Faith failed to provide accurate CPT and HCPCS codes on submitted claim forms.

- Faith failed to provide accurate units of service on submitted claim forms.

- Faith failed to provide accurate verification numbers on submitted claim forms.

- Claims submitted by Faith were missing valid requisition forms and/or result reports.

- Claims submitted by Faith did not meet provider and/or patient signature requirements establishing that the services were authorized.

---

[15] *See* Appendix 1 to Supplemental Report of Kara M. McVey, CPC, CPMA, CPCO, 500-Patient Sample Summary of Findings.

Award of Arbitrators AAA Faith v BCBSTX

App 052

83.     100 percent of the claims in the 500-patient sample were non-payable due to coding or insufficient documentation errors for the dates of service on the claims.  In all instances, there were multiple issues per claim (s*ee* McVey Testimony 2086:16-2089:6, 2005:2-9, 2000:16-23).  When Ms. McVey's results are extrapolated to the entire set of 21,946 claims that Faith asserts against BCBSTX, Faith is not entitled to damages for any of its claims.

### I.     Faith's Claims Were Unpayable for Additional Reasons, Which Were Communicated to Faith in Three Different Ways.

84.     Faith asserts that after January 17, 2017, it performed the laboratory services, so it was entitled to payment for those services.  However, the evidence has shown that Faith did not perform many of the services after that date because it still had its contracted reference laboratory partner, True Health, perform the services.[16]

85.     In addition, even in those instances where Faith did perform the laboratory services, Faith's claims were unpayable for a number of reasons.[17]  Notably, the services were not properly billed, the Blue Cross Blue Shield member receiving the services was not an inpatient or outpatient at the Jacksboro hospital, the Blue Cross Blue Shield member receiving the services did not have benefits available for the services, or there was not sufficient documentation establishing that the

---

[16] *See, e.g.*, Respondent Ex.  6, BCBSTX Counterclaims Excel Chart, FCH_01148269 at "universe" tab, column E ("Date of Service"), column G ("Specimen Location"), rows 6942-6950, 6971-9677, 7002-7013, 7029-7035, 7061-7064, 7097-7099, 7124-7125, 7142, 7174-7177, 7205-7208, 7213, 7241-7242, 7269-7271, 7301-7302, 7335-7338, 7358, 7390-7391, 7425-7426, 7440-7448, 7483-7485, 7509-7512, 7574-7576, 7605-7607, 7665-7666, 7693, 7725-7727, 7753, 7829, 7885-7886, 8075, 8164, 9916, 9996-9997 (admitting that THD rendered laboratory services for claims billed to BCBSTX for dates of service in May, June, July, August, and September of 2017).

[17] *See* Mitchell Testimony 1721:1-8 (noting that BCBSTX's prepayment review of Faith's claims was  not limited to the specific reasons that Faith was placed on prepayment review); *id.* at 1749:1-5 ("Q.  . . . with the ineligible reason codes we were talking about[,] there were a variety of reasons why Faith's claims were denied, is that right?  A.  Exactly.").

**45** | P a g e

Award of Arbitrators AAA Faith v BCBSTX

services were medically necessary. Thus, even as to those claims where Faith did not contract with another lab to perform the services, Faith's claims were still not payable for other reasons.[18]

86.      BCBSTX has a few methods by which it communicated to Faith that its claims were not payable. First, BCBSTX provided provider remittance advice statements to Faith (s*ee generally, e.g.*, Claimant Ex. 29, Sample Provider Remittance Advice Statements). These statements have different codes that a payer will communicate to a provider that supplies information as to why a claim was paid or denied. These are called Claim Adjustment Reason Codes ("CARCs") and Remittance Advice Reason Codes ("RARCs") (s*ee* Mitchell Testimony 1754:9-14). Payers are required to use the codes pursuant to the Health Insurance Portability and Accountability Act ("**HIPAA**") of 1996. The various codes and code combinations are intended to help a provider understand how a claim was adjudicated. To the extent the remittance advice statements are unclear as to how a claim was adjudicated or Faith needed additional information, BCBSTX provided additional options for Faith to obtain clarification.

87.      Second, Faith could call its BCBSTX provider network and claims representatives to obtain additional information as to how a claim or set of claims were adjudicated. Thus, to the extent Faith was unclear as to why certain claims were adjudicated or why certain RARC or CARC codes or code combinations were included on a provider remittance advice statements, Faith could contact BCBSTX representatives to have its questions answered (s*ee* Mitchell Testimony 1740:22-1742:7, 1782:11-21 ("It's more than one resource to give to the provider to find out why we're

---

[18] *See* Beaman Testimony 448:1-5 ("Q.  And you would agree that BlueCross would not have a duty to pay a claim for services that are determined according to the appropriate policy, not to be medically necessary? A.  That's correct.  That's correct."); *see also supra* note 15.

**46** | P a g e

denying a claim.  And if they're still in question, they can call in or they can reach out to their provider rep."))

88.   Third, BCBSTX provided Faith with provider claim summaries.  Provider claim summaries are available to providers on BCBSTX's claim research tool, Availity.  Faith was registered with Availity in 2016, and 2017, (s*ee* Mitchell Testimony 1732:21-1733:9, 1737:2-9).  These provider claim summaries are separate from the provider remittance advice statements that BCBSTX made available to Faith.  The provider claim summaries have different reason codes than what are on provider remittance advice statements, which can provide additional information as to why a claim was paid or denied (s*ee id.* at 1739:7-1740:4).

89.   The codes included on provider claim summaries are called ineligible reason codes ("IRCs"), which are proprietary codes developed by BCBSTX that communicate to a provider additional information as to why a claim was paid or denied (s*ee* Mitchell Testimony 1722:11-14, 1724:28-1725:6). They are intended to supplement the information that is included in the RARCs or CARCs on the provider remittance statements.  IRCs include denial reasons such as membership issues, coverage issues, duplicate claims, failure to provide medical records, or lack of medical necessity for the billed services (s*ee id.* at 1745:9-1748:14).

90.   BCBSTX identified a number of reasons why Faith's claims were denied that were unrelated to question of whether it was appropriate for Faith to bill for services performed by another provider.  Some examples of the other reasons why Faith's claims were denied, as indicated by IRCs communicated by BCBSTX on provider claim summaries that were made available to Faith, include the following code numbers and explanations:

- 6:  No record of membership.
- 11:  On or after termination date.

**47 |** P a g e

Award of Arbitrators AAA Faith v BCBSTX

- 12: Our records indicate that this dependent is not an eligible dependent as defined.

- 38D: This claim/service is a duplicate to a claim that processed and paid to the member directly.

- 39D: This claim/service is a duplicate to a claim that has been processed and paid to the provider directly.

- 91H: Claim denied based on information provided. Medical records that were previously requested on a related claim are required for appeal/reconsideration of this claim. No additional information is needed from you at this time.

- 129: Service/charge is a duplicate of a previously processed claim.

- 137: Member not covered for these dates of service due to lapse in coverage.

- 150: Contract does not cover this type of outpatient hospital service.

- 324: Type of procedure done is not covered by this contract.

- 334: Experimental procedure not covered.

- 360: Medical records required. Claim denied based on information provided. Complete medical record should be provided for appeal/reconsideration of this claim.

- 920: Services have been reviewed and medical necessity has not been established, therefore this service is not covered under your medical plan.

- H49: Services not documented in patients' medical records.

(*See, e.g.*, Respondent Ex. 2, 2016 Faith Claims Data at INEL RSNS Codes tab, BCBSTX_FAITH_0009670).

91.    Faith's claims in this action generally fell into seven different categories based on why BCBSTX denied the claims:

- (1) Denial based on suspect/flagged issue: This category includes claims denied for pass-through billing and reference laboratory issues alleged in the parties' pleadings;

- (2) Medical necessity: This category includes claims denied on the basis of medical necessity review;

- (3) Insufficient documentation: This category includes claims denied for insufficient document, which includes where additional information was requested, where services were not documented in the patient's

**48 |** P a g e

Award of Arbitrators AAA Faith v BCBSTX

medical records, where a diagnosis or treatment is inconsistent with the patient's information or other documentation;

- (4) Improper documentation:  This category includes claims denied for being submitted on the wrong form or with incorrect coding;

- (5) Ineligible for coverage:  This category includes claims denied for ineligibility reasons outside of the issues specific to this litigation, including non-members, outside specific member plan coverage, failure to pay premiums, denials for experimental treatment/procedures, denials for failure to preauthorize, and denials because treatment was provided by out of network provider;

- (6) Maximum benefit paid/voided claims:  This category includes claims denied because the member reached maximum benefit for coverage, as well as voided claims; and

- (7) Other insurers/Medicare:  This category includes claims denied because the treatment should be covered by another insurer and/or Medicare coverage, or involve other coverage determinations by another insurer.

*(See* Claimant Ex. 18-2, Respondent Exs. 2-3, 2016-2018 Faith Claims Data at "Category Key"

tab, BCBSTX_FAITH_0009670-9672; *see also* Mitchell Testimony 1727:2-1732:20).

### 1. Many of Faith's Claims Were Denied Because the Members Did Not Have Benefits for the Services.

92.    The Ineligible Reason Codes in categories 5, 6, and 7 relate to denial reasons regarding membership, eligibility issues, and other insurance coverage determinations.  For example, Faith does not dispute that BCBSTX is not required to pay for claims for services provided to individuals who were not presently Blue Cross Blue Shield members, or where the individual's employer group plan is no longer insured by BCBSTX or administered by BCBSTX. BCBSTX denied these claims in the ordinary course of business for different reasons than those Faith has complained of in this action, and there is no evidence that such denials were improper.[19]

---

[19] *See* Mitchell Testimony 1731:6-12 ("12 Q. Do you know why the categories 5 through 7 were grouped together? A. Based on these there's no membership. The claim wouldn't be paid. We would -- it's just something that's going to happen regardless we oh we do review we don't do review those are going to happen."); *see also* Beaman Testimony

**49 |** P a g e

93.     Faith's claims from 2016-2018 with IRCs that fall into categories 5-7, on a line-by-line basis using the "total service charge" amount, equal $16,888,005.19 (s*ee* Mitchell Testimony 1740:4-10).  Reducing that to account for 70% of a billed charge amount, these claims would account for approximately $11,821,603.63 of Faith's alleged damages.  Faith is not entitled to damages for these claims.

> **2.      Faith Submitted Claims for Services That Did Not Meet Medical Necessity, Coding, or Documentation Requirements; Such Claims Are Not Payable.**

94.      BCBSTX has medical policies in place that apply to the laboratory testing services at issue in this matter, including urine drug testing, genetic testing, molecular pathology, and advanced cardiovascular testing.[20]

95.      Laboratory services that Faith billed to BCBSTX – regardless of whether Faith performed them –  that were not medically necessary, were improperly coded, or lacked proper documentation, those claims are not payable.  Ineligible Reason Codes in categories 2, 3 and 4 relate to denial reasons regarding those issues (s*ee* Mitchell Testimony 1731:13-19).

96.     Faith's claims from 2016-2018 with IRCs that fall into categories 2-4, on a line-by-line basis using the "total service charge" amount, equal $30,324,760.12.  *See* Mitchell Testimony 1732:3-8. Reducing that to account for 70% of a billed charge amount, these claims would account

---

447:7-14 ("Q.  So let's, I guess while we're on the topic, talk about some situations where claims might not be payable.  And you would agree with BlueCross's position that it would only have to pay a claim if a patient is not -- would not have to pay a claim if a patient wasn't a BlueCross member, right?  A.  Certainly not."); Kohler Testimony 860:2-5 ("Q.  Isn't it true that BlueCross denied some of Faith's claims because the services were not covered services?  A.  That is true."); *see also supra* note 15.

[20] *See* Respondent Group Ex. 52 (identifying example medical policies applicable to Faith's disputed laboratory claims); *see also* Mitchell Testimony 1715:11-1119:8.

Award of Arbitrators AAA Faith v BCBSTX

for approximately $21,227,332.08 of Faith's alleged damages. Faith is not entitled to damages for these claims.

### J.    BCBSTX Terminated the Contracts Because Faith Did Not Change Its Billing Practices.

97.    Whether to terminate a BCBSTX provider contract is decided by BCBSTX's provider network department.    The BCBSTX person who made the decision to terminate the Contracts with Faith was BCBSTX's Network Vice President Adele Paulett.

98.    On February 27, 2017, it was brought to Ms. Paulett's attention that there was a massive spike in Faith's laboratory billing suggesting that it was engaging in improper billing practices.  Ms. Paulett immediately commented that BCBSTX should terminate Faith's Contracts. There is no evidence that she was aware of any complaint or appeal that was filed by Faith either on its own behalf or on behalf of any member. The termination of the Contracts had nothing to do with Faith filing a complaint (s*ee* Carr Testimony 1392:5-12).

99.    In February 2017, BCBSTX's SID team also recommended terminating Faith from BCBSTX's provider networks after a "[r]eview of the sample revealed that [t]he facility is billing for labs rendered by Global Molecular Medicine . . . and True Health Diagnostics[.]" (s*ee* Claimant Ex. 13, February 28, 2017 Case Notification Update at BCBSTX_FAITH_0001014-1020, at 1016, 1020; *see also* Joint Ex. 13, 2/7/2017 SID Report Requesting Immediate Termination, BCBSTX_FAITH_0000989; *see also* Mothershed Testimony 1594:21-1595:3).

100.    BCBSTX did not immediately terminate the Contracts (s*ee* Mothershed Testimony 1612:25-1613:17). Instead, it reached out to Faith to educate Faith to stop pass-through billing/billing for services performed by other providers (*see* Carr Testimony 1379:13-17 ("In February of 2017, the conversation was around turning to a negotiation."). BCBSTX's network representatives had a call with Faith's representatives on March 20, 2017, in which the third party

**51 | P a g e**

Award of Arbitrators AAA Faith v BCBSTX

laboratory billing issue was discussed. Faith's representatives acknowledged that they were billing for services performed by third-party laboratories. BCBSTX informed Faith that it should stop billing for the services. Faith, did not agree (s*ee* Carr Testimony 1385:25-1387:1; *see also* Joint Ex. 21, Email re: Faith Community Hospital, BCBSTX_FAITH_0000165 ("We've been communicating with [Faith] and they've [sic] haven't been willing to work with us. . . ."); *see also* Joint Ex. 20, Email re: Faith Community Hospital, BCBSTX_FAITH_0000156(indicating that Faith believed its billing practices were "legal" and that they were going to continue to bill for the labs); *see also* Joint Ex. 16, 6/16/2017 Email String: *see also* Carr, Suter Hill, Willis, others, BCBSTX_FAITH_0000102-104).

101.    BCBSTX continued to get complaints from customers and members for Faith's billing practices regarding laboratory services, including complaints that the members did not receive any services from Faith and that the costs of the services were exorbitant compared to charges from independent reference laboratories.

102.    In July and August of 2016, the parties engaged in additional discussions and meetings through Faith's outside counsel Mary Emma Karam and BCBSTX's in-house counsel Bonnie Reinke, and BCBSTX indicated that it was "willing to discuss a new contract with [Faith] at our standard lab rates." (*see* Ex. 20, Email re: Faith Community Hospital, BCBSTX_FAITH_0000157; *see also* Carr Testimony 1387:14-1388:3).

103.    BCBSTX continued to monitor Faith's billing through its prepayment review of Faith's claims. Faith, however, did not change its billing practices (s*ee, e.g.*, Ex. 20, Email re: Faith Community Hospital, BCBSTX_FAITH_0000157 ("So far we don't see any change to their billing. . . .  The billing looks the same and appears to be True Health's forms with the Faith name placed over it."); *see also id.* at 156 ("I also want to let you know we continue . . . to get complaints

**52 |** P a g e

about Faith on our fraud hotline from members.  They complain they did not go to Faith and did not have labs done."); *see also* Respondent Ex. 44, Email re:  PHI Faith lab letter, BCBSTX_FAITH_0008031 ("I don't see this as changing anything, simply trying to amend records to look like the service was done at Faith.")

104.    Ms. Paulett thus made the decision to terminate the Contracts.  No evidence was presented that she was aware of any complaint or appeal that Faith filed on its behalf or on behalf of a member.  There similarly is no evidence that BCBSTX terminated the Contracts for these reasons.  Instead, the Panel finds that evidence establishes that BCBSTX terminated the Contracts as a result of Faith's actions in not notifying BCBSTX about development of its outreach reference laboratory program, the unprecedented spike in billing for laboratory claims, Faith's effective transformation from a rural hospital into a reference laboratory, Faith's unwillingness to change its billing practices and the numerous member and customer fraud hotline complaints BCBSTX received regarding Faith's billing practices.[21]

105.    On August 28, 2017, BCBSTX sent Faith notice of its intent to terminate the Contracts (s*ee* Joint Ex. 12, Termination Letters, BCBSTX_FAITH_008053-8056.  The notices stated that the terminations were pursuant to the without cause provisions in the Contracts.  *Id.*; *see also* Carr Testimony 1391:17-21).

---

[21] *See* Joint Ex. 20, Email re:  Faith Community Hospital, BCBSTX_FAITH_0000157 ("Faith ha[d] for the most part become a lab" and BCBSTX did not "need any more labs in the area especially at a percent of charge rate."); *see also* Carr Testimony 1391:22-1392:16 ("Q.  . . . Why did Blue Cross actually terminate the four hospital contracts?  A.  Why did we terminate it?  First was the billing for services they weren't providing.  Their lack of communication in regard to the changes they made.  Their unwillingness to change that behavior and the member complaints.  Q.  Did the termination of the four hospital contracts have anything to do with Faith filing a complaint or appeal on behalf of itself?  A.  No.  Q.  Did the termination have anything to do with Faith filing a complaint or appeal on behalf of a member?  A. No.").

**53** | P a g e

106.    Faith has produced no evidence that BCBSTX's termination was improper or that BCBSTX engaged in retaliatory conduct in violation of any of the Contracts.

**K.    There Is No Evidence That Faith Filed a Complaint or an Appeal on Behalf of a Member Against BCBSTX Pursuant to the Dispute Procedures Outlined in the Contracts And Provider Manuals.**

107.    The vast majority of the claims in this case related to the PPO Contract (s*ee* Beaman Testimony 192:3-7 ("Q.  Okay.  And what percentage of the claims at issue in this case do you understand are involving maybe one contract more than the others?  A.  97 to 98 percent of the claims at issue here are under the PPO contract.").  The PPO Contract, however, along with the Traditional Contract, has no retaliation provision concerning termination of the Contract.  *See* Joint Exs. 1-2, PPO and Traditional Contracts.

108.    The panel finds that BCBSTX's decision to terminate Faith's contracts was not caused by, or in retaliation against, Faith's filing of any complaint or appeal on behalf of a Blue Cross Blue Shield member.

109.    Rather, the evidence showed that BCBSTX terminated the Contracts due to Faith's billing for services performed by third parties, its drastically changed business model, and the numerous complaints BCBSTX received regarding Faith's practices.  The termination was further prompted because BCBSTX did not need Faith as an additional reference laboratory, and Faith's billing schemes caused BCBSTX and its members to pay significantly more for the laboratory services.

## III.    ARBITRATORS' RULING

### Breach of Contract (Counterclaim Count I)

110.    Faith entered into the "Hospital Contracts For PPO Business" as a hospital (*see* Joint Exhibit 1, PPO  Contract). Because Faith acted as an outreach or reference laboratory, and not as a hospital located in Jacksboro, Texas, Faith breached the Contracts.

**54 | P a g e**

Award of Arbitrators AAA Faith v BCBSTX

111.    The Contracts are valid and enforceable contracts that governed the parties' relationship.

112.    Under Texas law, BCBXTX must prove four elements to sustain its breach of contract claim:  (1) the existence of a valid contract; (2) performance or tendered performance by BCBSTX, (3) breach of the contract by Faith, and (4) damages sustained by BCBSTX as a result of the breach.  *Residential Dynamics, LLC v. Loveless*, 186 S.W.3d 192, 198 (Tex. App. 2006).

113.    BCBSTX performed all of the duties, conditions, and obligations at the time and in the manner specified per the terms of the Contracts, in particular by processing payment of claims properly submitted by Faith for Covered Services. Prior to Faith implementing its outreach laboratory program  98.5 percent of Faith's billed charges were for laboratory services and 97.7 percent of claims BCBSTX paid to Faith were for laboratory services (s*ee* Respondent Ex. 34, July 10, 2017 Email from J. Guy to D. Carr re: FCH Billing Amounts, BCBSTX_FAITH_0000098). Mr. Beaman testified that Faith held itself out to BCBSTX and the world before and after the implementation of the laboratory program as only providing clinical laboratory testing for the hospital (*see* Beaman Testimony 416:4-417:23).

114.    Implementing its outreach laboratory program, Faith was not providing Covered Services to inpatients or outpatients, and was not providing hospital services.  Rather, True Health and/or Global Molecular were providing laboratory services to non-patients.  Faith's argument that a non-patient is a type of outpatient is contrary to the Contracts, contrary to Faith's contract with True Health, and contrary to industry standards (s*ee* Joint Ex. 36, True Health Diagnostics Laboratory Management Agreement, THD_0000063-124, at 63 (distinguishing between "inpatients, outpatients, and non-patients"); Jones Testimony 625:20-24 ("There are different [bill type] codes for an outpatient versus a nonpatient."), 630:19-21 ("Q.  In the ordinary English usage,

**55 |** P a g e

Award of Arbitrators AAA Faith v BCBSTX

what does 'non' mean as a prefix in a word? A. Means it's not."); Monroe Testimony 1355:7-1356:9; Mitchell Testimony 1703:4-6; McVey Testimony 2015:24-2056:20).

115.    Effectively, by contracting with third-party laboratories Faith improperly assigned or subcontracted its duty to provide Covered Services under Article 13 of the PPO Contract. Faith effectively assigned or subcontracted first with Global Molecular, and second with True Health, for each of those laboratories to process patient samples taken from BCBSTX members in locations in the state of Texas outside of Jack County. Faith then billed BCBSTX for those services (s*ee* Joint Ex. 33, Global Molecular Master Agreement for Reference Laboratory Services, FCH_010571-10585; Joint Ex. 34, 5/13/2016 THD Lab Processing Agreement, THD_0000128-178). The evidence shows that the site of service for the majority of these claims was True Health. (s*ee* Respondent Ex. 8, BCBS Universe of Counterclaims (identifying the testing location for BCBSTX's counterclaims as True Health), FCH_01148301; Respondent Ex. 10, Faith Asserted Universe of Claims, FCH_01148304).

116.    The evidence shows that BCBSTX did not provide written consent for Faith to contract with Global Molecular or True Health to provide Covered Services (s*ee* Beaman Testimony 441:9-12 ("Q. Faith never got Blue Cross's consent for any assignment, did it? A. We never asked. That's a correct statement.")). Regardless of Faith's strained definition of assignment and subcontracting that is effectively what Faith was doing with Global Molecular and True Health. Contractual prohibitions of assignment or subcontracting have been "consistently enforced by Texas courts." *Tex. Farmers Ins. Co. v. Gerdes By & Through Griffin Chiropractic Clinic*, 880 S.W.2d 215, 218 (Tex. App. 1994), *writ denied* (Dec. 1, 1994); *see also 54 Broad., Inc. v. Lin Television of Tex., L.P.*, No. A-08-CA-030-SS, 2008 WL 7836291, at *6 (W.D. Tex.

**56 |** P a g e

Dec. 2, 2008) (citing *Cloughly v. NBC Bank–Seguin, N.A.*, 773 S.W.2d 652, 655 (Tex. App. 1989)).

117.    Faith engaged in pass-through billing in violation of the provider manuals prohibiting pass-through billing. The provider manuals state that "pass-through billing is not permitted by BCBSTX" and "[t]he performing provider should not bill for these services unless otherwise approved by BCBSTX.".   The evidence established that True Health and Global Molecular were the third-party providers that actually performed the laboratory services and that Faith merely acted as an ordering provider when it submitted requests ordering these third parties to perform the testing.   Therefore the pass-through billing policy applied to Faith  *(see supra* § I.D-F; *see also* Beaman Testimony 225:21-226:4; Monroe Testimony 1232:9-17, Carr Testimony 1394:2-10; Mothershed Testimony 1549:6-8; McVey Testimony 2053:6-23).

118.    Faith billed BCBSTX for services Faith did not actually perform in violation of the policy set forth in the provider manuals. The provider manuals provide,

> "[i]f services are rendered directly by the Blue Choice PPO physician, professional provider, facility or ancillary provider, the services must be billed by the Blue Choice PPO physician, professional provider, facility or ancillary provider.  However, if the Blue Choice PPO physician, professional provider, facility or ancillary provider does not directly perform the service and the service is rendered by another provider, only the rendering provider can bill for those services."]

(s*ee* Joint Ex. 5, PPO Provider Manual, BCBSTX_FAITH_0009983 (excerpted pages); *see also* Respondent Ex. 11, HMO Provider Manual, BCBSTX_FAITH_0012797 (containing similar language)).   In the context of BCBSTX's policies and industry usage, "render", "provide", and "perform" all mean the same thing – to do the service  (s*ee* Carr Testimony 1332:7-16; Mothershed Testimony 1610:15-19; Joint Ex. 13; Joint Ex. 16; Joint Ex. 66)

**57 |** P a g e

Award of Arbitrators AAA Faith v BCBSTX

119.     Faith failed to notify BCBSTX in writing that it was transforming into a reference or outreach laboratory in violation of the Contracts' requirement to provide notice of any change impacting BCBSTX's ability to discharge its obligations. Because of Faith's transformation into a reference laboratory, BCBSTX unknowingly paid in excess of fair market value for reference laboratory services (s*ee* Beaman Testimony 470:4-19).

### Fraud (Counterclaim Count II)

120.     Faith made specific misrepresentations and omissions in connection with its claim submissions that were   fraudulent. These   misrepresntations   include:   (1)   material misrepresentations within the claims' coding to hide that the laboratory testing was not performed, or even exclusively ordered, by Faith; and (2) misrepresentations in the underlying medical records submitted for prepayment review to obscure who was actually performing the services (s*ee supra* § I.D-F).

121.     Under Texas law, BCBSTX must prove five elements to sustain its fraud claim:  (1) Faith made a material representation that was false; (2) Faith knew the representation was false or the representation was recklessly made; (3) Faith made false material representations with the intention that BCBSTX acted on it; (4) BCBSTX relied on the false material representation; and (5) injury resulted to BCBSTX.  *Ernst & Young v. Pac. Mut. Life Ins. Co.*, 51 S.W.3d 573, 577 (Tex. 2001).

122.     Non-disclosure of material facts is equivalent to a false representation when a party had a duty to disclose but remained silent.  *See SmithKline Beecham Corp. v. Doe*, 903 S.W.2d 347, 353 (Tex. 1995).  A duty to disclose arises "when one party makes a representation, which gives rise to the duty to disclose new information that the party is aware makes the earlier representation misleading or untrue."  *White v. Zhou Pei*, 452 S.W.3d 527, 537-538 (Tex. App. 2014).

**58 |** P a g e

123.    Moreover, "[s]light circumstantial evidence of fraud, when considered with the breach of a promise to perform, is sufficient to support a finding of fraudulent intent." *Spoljaric v. Percival Tours, Inc.*, 708 S.W.2d 432, 435 (Tex. 1986) (internal quotations omitted); *Maulding v. Niemeyer*, 241 S.W.2d 733, 737-38 (Tex. Civ. App.–El Paso 1951) ("The gist of the fraud is deception as to an existing fact, namely, the state of the promisor's mind.  That fact may be established by circumstantial evidence taken in connection with the breach . . . .  [V]ery slight circumstantial evidence of fraud, when considered with the breach of promise to perform some act in the future, is sufficient to support a finding of fraudulent intent.")

124.    Faith's longstanding relationship with BCBSTX and its obligations under the Contracts required Faith to inform BCBSTX of the fundamental changes Faith made to its billing practices and Faith's entire business model.  Despite this, Faith did not contact BCBSTX before implementing its outreach program or disclose that it did not perform the laboratory services for thousands of claims it billed to BCBSTX (s*ee* Beaman Testimony 417:21-418:1 ("Q. Well, did you tell your community you were doing that? A.  No.  Q.  Did you tell BlueCross you were doing that? A.  No.") This non-disclosure of material facts by Faith is equivalent to a false representation.

125.    Faith knew that these representations were false and made them with the intention that BCBSTX act upon them by paying Faith's claims for laboratory services at elevated rural hospital rates.

126.    BCBSTX relied upon the false material representations and omissions contained in Faith's claims submissions when BCBSTX paid Faith millions of dollars for claims for laboratory services at rural hospital rates where BCBSTX would not have done so in the absence of the misrepresentations.

**59 |** P a g e

Award of Arbitrators AAA Faith v BCBSTX

127.    BCBSTX was injured because BCBSTX paid Faith for the laboratory services based on Faith's material misrepresentations.

### Fraudulent Inducement (Counterclaim Count III)

128.    Faith made specific material misrepresentations and omissions to BCBSTX with the intention of inducing BCBSTX to continue paying Faith on claims for laboratory services at the rural hospital rates set forth in the Contracts and to continue the parties' contractual relationship.

129.    A fraudulent inducement cause of action has the same elements as a fraud cause of action, plus the added element that the fraud relates to an agreement between the parties.  (s*ee Haase v. Glazner*, 62 S.W.3d 795, 798-99 (Tex. 2001).

130.    BCBSTX has established each of the elements of fraud against Faith.

131.    Faith's material misrepresentations and omissions include:   (1) material misrepresentations within the claims' coding to hide that the laboratory testing was not performed by Faith; (2) material alterations of the underlying medical records submitted for prepayment review to obscure who was actually performing the services; and (3) non-disclosure of the fundamental changes Faith made to its billing practices and its business model.

132.    BCBSTX was injured by payments it made to Faith because BCBSTX paid Faith for the laboratory service claims based on Faith's material misrepresentations.

133.    BCBSTX relied upon Faith's material misrepresentations and omissions when BCBSTX paid Faith's claims for laboratory services at rural hospital rates.  BCBSTX relied upon Faith's material misrepresentations and omissions when BCBSTX continued the parties' contractual relationship, which BCBSTX would not have done without Faith's misrepresentations.

134.    BCBSTX was injured by continuing a contractual relation with Faith based on Faith's misrepresentations.

**60 |** P a g e

Award of Arbitrators AAA Faith v BCBSTX

**Money Had and Received (Counterclaim IV)**

135.    Because BCBSTX prevailed on its counterclaim for Breach of Contract it cannot prevail on its counterclaim for money had and received.

136.    Money had and received is an equitable doctrine applied to prevent unjust enrichment by Faith resulting from Faith being paid for services it did not perform.  *See Acoustical Screens in Color, Inc. v. T. C. Lordon Co.*, 524 S.W.2d 346, 350 (Tex. Civ. App.–Dallas 1975).  However, a claim for money had and received "is unavailable when a valid, express contract governing the subject matter of the dispute exists." *Burlington Northern R.R. Co. v. Southwestern Elec. Power Co.*, 925 S.W.2d 92, 97 (Tex. App.—Texarkana 1996), *aff'd* 966 S.W.2d 467 (Tex. 1998); *Southwestern Elec. Power Co. v. Burlington Northern R.R. Co.*, 966 S.W.2d 467, 471 (Tex. 1998).

**Breach of Contract for Unpaid Claims (Faith Count B)**

137.    BCBSTX did not breach the Contracts because Faith was not entitled to payment for its asserted claims.  For the same reasons that BCBSTX prevails on its claim for breach of contract (Counterclaim Count I), Faith cannot prevail on its claim for breach of contract for unpaid claims (Faith Count B).

138.    Faith's claim for breach of contract for unpaid claims is based on its allegations that BCBSTX "breached the Contracts by failing to pay for medically necessary and covered-laboratory services provided by Faith to Blue Cross' Subscribers" (s*ee* Faith's First Amended Statement of Claim and Demand for Arbitration ¶ 30).

139.    Faith has not established that BCBSTX breached the Contracts by failing to pay claims for laboratory services submitted by Faith because the claims that Faith asserts against BCBSTX were not Covered Services and were not payable for the reasons previously discussed. Faith did not perform the laboratory services for many of the claims; the claims were for non-

**61 |** P a g e

patient services, which are not Covered Services under the Contracts, BCBSTX properly denied many of the claims in the ordinary course of business for reasons unrelated to the issues in this action, Faith submitted claims for services that were not medically necessary, Faith failed to append the 90-modifier to identify claims that were rendered by third-party laboratories, and Faith's claims were not complete and accurate.

### Breach of Contract for Retaliation (Faith Count C)

140.    BCBSTX did not breach the Contracts by retaliating against Faith. Further, only the HMO and BAV Contracts contain an anti-retaliation provision stating that BCBSTX will not engage in any retaliatory action where "[Faith] has, on behalf of a Member, reasonably filed a complaint against BCBSTX or has appealed a decision of BCBSTX."

141.    The PPO and Traditional Contracts have no such provision.   Therefore, Faith cannot prevail on its claim for breach of contract for retaliation under either the PPO or Traditional Contract.  Faith relies solely on the BAV and HMO Contracts in its claim for breach of contract for retaliation (see Faith's First Amended Statement of Claim and Demand for Arbitration ¶ 31).

142.    BCBSTX, however, properly terminated all the HMO and BAV Contracts pursuant to the without cause termination provisions and the termination was not related to a complaint or appeal filed on behalf of a member or on behalf of Faith.

143.    BCBSTX terminated the HMO and BAV Contracts due to Faith's billing for services performed by third parties, Faith's changed business model, and the numerous complaints BCBSTX received from its members regarding Faith's practices.

### Tortious Interference With Prospective Business Relations (Faith Count E)

144.    BCBSTX did not tortiuously interfere with any prospective business relations of Faith.

**62 |** P a g e

Award of Arbitrators AAA Faith v BCBSTX

145.     "To prove a cause of action for tortious interference with prospective contractual relations, Faith must establish the following elements:  (1) a reasonable probability that the parties would have entered into a business relationship; (2) an intentional, malicious intervention or an independently tortious or unlawful act performed by BCBSTX with a conscious desire to prevent the relationship from occurring or with knowledge that the interference was certain or substantially likely to occur as a result of its conduct; (3) a lack of privilege or justification for BCBSTX's actions; and (4) actual harm or damages suffered by Faith as a result of BCBSTX's interference, *i.e.*, that BCBSTX's actions prevented the relationship from occurring."  *Tex. Disposal Sys. Landfill, Inc. v. Waste Mgmt. Holdings, Inc.*, 219 S.W.3d 563, 590 (Tex. App. 2007).

146.     Faith alleges that BCBSTX's only interference with Faith prospective business relationships with Faith's patients was through BCBSTX terminating the contracts in retaliation for the billing dispute (s*ee* Faith's First Amended Statement of Claim and Demand for Arbitration ¶ 36).

147.     As discussed above, BCBSTX did not retaliate against Faith when BCBSTX lawfully terminated the Contracts.  Therefore, Faith has not established the second element of its tortious interference claim – *i.e.*, an intentional, malicious intervention or an independently tortious or unlawful act designed to interfere with Faith's prospective business relations.

148.     Further, Faith has not established the third element of its tortious interference claim – *i.e.*, a lack of justification.  BCBSTX was justified in terminating the Contracts pursuant to the Contracts' "without cause" termination provisions. Faith cannot maintain its cause of action for tortious interference because the termination was "merely [BCBSTX's] exercise of its own contractual rights." *Prudential Ins. Co. of Am.*, 29 S.W.3d at 81.

Award of Arbitrators AAA Faith v BCBSTX

149. Finally, Faith has not proven that BCBSTX owed Faith any duty that could form the basis of recovery for a tortious interference claim where BCBSTX was not required to contract with Faith for participation in BCBSTX's network. *Graff v. Beard*, 858 S.W.2d 918, 919 (Tex. 1993).

### Claim for Permanent Injunctive Relief (Count F)

150. Faith is not entitled to permanent injunctive relief.

151. To sustain a claim for injunctive relief, a plaintiff must first plead a viable underlying cause of action. *McLaughlin v. Wells Fargo Bank, N.A.*, 2013 WL 5231486, at *6 (S.D. Tex. Sept. 13, 2013) (citing *Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 204 (Tex. 2002)); *see also Bejjani v. Wilmington Trust Co.*, 2011 WL 3667569, at *6 (S.D. Tex. Aug. 22, 2011) ("A request for injunctive relief, absent another successful legal cause of action, is fatally defective and does not state a claim.")

152. Faith's claim for permanent injunctive relief rests on its theory that BCBSTX unlawfully terminated the Contracts in retaliation against Faith for filing a complaint or an appeal on behalf of a Blue Cross Blue Shield member.

153. Because all of Faith's claims based on BCBSTX's alleged unlawful termination fail, Faith's claim for permanent injunctive relief also fails.

154. Further, Faith's claimed injury of lost revenue and profits that it would otherwise receive if it remained in BCBSTX's network under the Contracts is monetary in nature. Thus, injunctive relief is not an appropriate remedy for the nature of the injury alleged by Faith, and Faith's claim fails for this reason as well. *Watchguard Techs., Inc. v. Valentine*, 433 F. Supp. 2d 792, 794-95 (N.D. Tex. 2006).

Award of Arbitrators AAA Faith v BCBSTX

App 072

### Claim for Declaratory Judgment (Faith Count A)

155.    Faith is not entitled to a finding in its favor on any of its claims in this case. Therefore, Faith's associated claim for declaratory judgment also fails.

156.    The Texas Declaratory Judgments Act "is merely a procedural device; it does not create any substantive rights or causes of action."   *Sid Richardson Carbon & Gasoline Co. v. Interenergy Res., Ltd.*, 99 F.3d 746, 752 n.3 (5th Cir. 1996).

157.    Where a plaintiff's underlying substantive claims fail, an associated claim for declaratory judgment also must fail.   *Davis v. Silver State Fin. Servs.*, No. H-13-1432, 2014 WL 713235, at *4 (S.D. Tex. Feb. 20, 2014).

## IV.    DAMAGES

### BCBSTX's Counterclaim Damages

158.    BCBSTX overpaid Faith by $23,300,000 as a result of improperly submitted claims for services performed by third parties.

159.    Faith billed BCBSTX for claims associated with a number of specialized genetic testing and advanced lipid testing CPT codes for services that Faith did not have the capability to perform at its Jacksboro hospital laboratory.  Because Faith was not capable of performing these services on-site, the services were performed by independent third-party laboratory facilities Global Molecular and True Health, and Faith was not entitled to payment for such third-party services.

160.    BCBSTX's expert Jeffrey Benton testified on the associated payments BCBSTX made to Faith regarding these claims. Mr. Benton concluded through his analysis (which included a waterfall analysis to remove duplicate counting of claims) that as a result of Faith's improper billing of claims performed by Global Molecular and True Health for services that Faith did not

**65 |** P a g e

Award of Arbitrators AAA Faith v BCBSTX

have the capability to perform, BCBSTX overpaid Faith by $23,300,000.[22]  BCBSTX is entitled to recover that amount in damages on its counterclaims.

161.    Faith, through its expert Ms. Charlotte Kohler, did not dispute that True Health was the location of services for 5,001 of the 11,655 unique claim identification numbers relating to counterclaims BCBSTX has asserted against Faith in the amount of $19.2 million (see Respondent Ex. 6, BCBSTX Counterclaims Excel Chart (Prepared by Ms. Charlotte Kohler), FCH_01148269). This $19.2 million in damages where Faith admits that True Health performed the laboratory services is already incorporated into the damage calculations of Mr. Benton.[23]

### Faith's Damage Claims

162.    Faith is not entitled to recover any damages on any of its causes of action.

163.    Faith has asserted that out of a data set of approximately $168,000,000 in claims submitted by Faith that are either unpaid or partially paid, it is entitled to recover $78,869,301.21 in damages for unpaid claims and $158,217,202 million in lost profits damages for the period 2018 through 2022.  The Panel addresses the various reasons why Faith is not entitled to recover these asserted damages.

---

[22] See Benton Testimony 1868:9-1877:17. Mr. Benton did not rely on any sampling or extrapolation of the claims data set to conclude that BCBSTX overpaid Faith by $23,300,000 as a result of improperly submitted claims performed by third parties.  Rather, Mr. Benton inspected every single claim using a computer query.  While Mr. Benton's initial expert report concluded that BCBSTX overpaid Faith by $23,713,007, he reduced that number to $23,300,000 based upon testimony that he heard at trial regarding the timing of Faith's advanced lipid testing capabilities.  Id. at 1863:9-1864:4.

[23]  Ms. Kohler's location of services analysis was incomplete because she identified Faith as the location where testing of at least one procedure code was conducted at Faith's on-site laboratory, even if testing of other procedural codes in the claim was conducted at True Health.  See Claimant Ex. 24, Charlotte Kohler Expert Report (April 17, 2019), at 21; see also McVey Testimony 2042:3-9 ("[T]hey're basically giving Faith more credit than they deserve, right?  . . . [T]hey're overrepresenting Faith's involvement and underrepresenting the dependence upon the reference laboratory.").

**66 |** P a g e

Award of Arbitrators AAA Faith v BCBSTX

**Faith Is Not Entitled to Recover Any Damages Resulting From BCBSTX's Denials of Faith's Claims.**

164.    Faith failed to establish essential elements of all of its claims and therefore Faith is not entitled to any damages.

165.    As previously noted Faith was not entitled to any damages involving claims in which Faith did not perform the services. The analysis that BCBSTX's damages expert Jeffrey Benton performed indicates that the claims in which Faith had third parties perform the services eclipse all damages sought by Faith such that Faith is not entitled to recover any amount.

166.    In response to Faith's direct damages claim, Mr. Benton created an electronic database file that contained a claims data set of $157,320,045 in unpaid claims submitted by Faith, which he considered reasonably reconciled with the universe of claims that Ms. Kohler used (s*ee* Respondent Ex. 101, Jeffrey D. Benton Rebuttal Report (May 10, 2019), at Table 1).  Mr. Benton inspected the entire claims data set for four specific billing issues using database queries.  His four queries were for:  (1) pass-through billing for genetic tests; (2) pass-through billing for advanced lipid tests; (3) violations of per unit billing maximums (multi-unit); and (4) billing for non-patients of Faith (s*ee* Benton Testimony 1873:20-1874:6).

167.    Mr. Benton was able to inspect every single unpaid claim using computer queries. Accordingly, Mr. Benton's analysis did not require any extrapolation (s*ee* Benton Testimony 1877:12-17).

168.    Mr. Benton's findings, were that almost every dollar of the unpaid or partially paid claims was unpayable for at least one of the four reasons:

    a.    $81,462,475, or 52 percent, of the claims dollars were unpayable due to genetics pass-through billing issues (*see* Respondent Ex. 101, Jeffrey D. Benton Rebuttal Report (May 10, 2019), at Table 2; Benton Testimony 1870:2-25);

**67** | P a g e

Award of Arbitrators AAA Faith v BCBSTX

    b.   $155,810,885, or 99 percent, of the claims were unpayable due to advanced lipids pass-through billing issues (*see* Respondent Ex. 101, Jeffrey D. Benton Rebuttal Report (May 10, 2019), at Table 3; Benton Testimony 1871:2-10));

    c.   $77,045,578, or 49 percent, were unpayable due to multi-unit billing issues (*see* Respondent Ex. 101, Jeffrey D. Benton Rebuttal Report (May 10, 2019), at Table 7; Benton Testimony 1872:10-19); and

    d.   $106,146,326, or 67 percent, were unpayable due to improper billing for non-patients (*see* Respondent Ex. 101, Jeffrey D. Benton Rebuttal Report (May 10, 2019), at Table 10; Benton Testimony 1873:16-1874:6).

169.    Mr. Benton found substantial overlap among the claims selected by his queries because the claims often suffered from more than one of the four billing issues for which he was searching.  As summarized in his Rebuttal Report, (Respondent's Exhibit 101), Mr. Benton therefore ran a waterfall analysis to remove duplication, which showed that a combined $156,331,672, or 99.4 percent, of the entire claims data set of $157,320,045 were unpayable based upon at least one of the four billing violations for which he queried (*see* Respondent Ex. 101, Jeffrey D. Benton Rebuttal Report (May 10, 2019), at Table 11; *see also* Benton Testimony: 1875:20-22 ("And the total was 156.3 million deemed by me to be nonpayable and that's 99.4 percent of the total charges in my data set.").

170.    Faith is further not  entitled to any damages based upon the testimony and analysis provided by BCBSTX's laboratory expert Ms. McVey.  Ms. McVey opined that none of the 500 sample claims from the sample selected by Faith's statistics expert Dr. Dana Keller were payable for many reasons.  Dr. Keller admits that results from that claim sample can be appropriately extrapolated to all of Faith's disputed claims (*see* Keller Testimony 1035:7-1036:23). Given Ms.

McVey's conclusion that none of the 500 sample claims was payable, the Panel concludes that none of Faith's 21,946 claims are payable such that Faith is not entitled to any damages on those claims. This conclusion is further supported by BCBSTX's statistics expert Dr. Arnold Barnett, who testified that it is reasonable to conclude that Faith would not be entitled to recovery of any damages based on an extrapolation of Ms. McVey's findings to all Faith claims (see Respondent Ex. 103, Arnold I. Barnett Statistical Supplemental Report (June 24, 2019), at 1).

171.    Faith is further not entitled to $62,373,420.67 of its damages claim because that amount represents claims for which True Health performed the services (see Respondent Ex. 10, Faith Claims Excel Chart, FCH_01148305). For the reasons noted previously, these claims are not payable because Faith breached the various contractual and provider manual provisions regarding third party services and the claims were not correctly and accurately billed in a way that would have given BCBSTX notice about who performed the services.

172.    BCBSTX denied $33,048,935.71 in Faith's claims for reasons unrelated to who performed the service (see Mitchell Testimony 1732:13-17 ("Q. Does that mean that any claim that was denied on the basis of an ineligible reason code in these categories 2 through 7 was denied for a reason besides or in addition to pass-through billing? A. Yes.") In particular, BCBSTX denied $ 11,821,603.63 of Faith's claims because there were various member eligibility issues and other insurer coverage issues. BCBSTX also denied $21,227,332.08 in Faith's claims due to medical necessity, coding and documentation issues. Faith's asserted damages for claims for which it alleged BCBSTX inappropriately withheld payment or underpaid, rely on a finding that BCBSTX breached the Contracts by not paying or by underpaying the laboratory service claims that Faith billed. For the reasons discussed above, BCBSTX appropriately denied these claims such that Faith is not entitled to any damages regarding the alleged underpaid claims.

**69 |** P a g e

Award of Arbitrators AAA Faith v BCBSTX

**Faith Is Not Entitled To Recover Any Lost Profit Damages.**

173. Faith's claim for lost profit damages is predicated by BCBSTX improperly terminating the parties' Contracts or tortiuously interfering with Faith's prospective business relations regarding its laboratory (s*ee* Needham Testimony 1063:24-1064:11 (indicating that if the Contracts were properly terminated "Blue Cross Blue Shield would not be responsible" for lost profits).[24] The evidence established that BCBSTX did not improperly terminate the parties' Contracts. The evidence further established that BCBSTX's termination of the Contracts was not due to any complaint or appeal Faith filed either on behalf of itself or a member. All four Contracts were validly terminated pursuant to the without cause termination provisions in each Contract.

174. Only the HMO and BAV Contracts had provisions prohibiting BCBSTX from retaliating by terminating the Contracts due to Faith filing an appeal or complaint. Therefore any damages Faith would be entitled to receive would be nominal. Most of the claims Faith filed involved members insured under PPO or POS plans. These are benefit plans that would apply to the PPO Contract between BCBSTX and Faith, which had no retaliation provision.

175. Further, there is insufficient evidence to show that BCBSTX tortiously interfered with any prospective business relationship. Therefore, Faith has not proven lost profit damages predicated upon either a wrongful termination of the Contracts or some sort of tortious interference. Moreover, as also noted previously, the evidence established that BCBSTX's termination of the Contracts was permissible, such that the evidence affirmatively established that there was no wrongful termination or tortious interference.

---

[24] Also, Faith's expert admitted that most all of the revenue at issue was through the PPO contract, so in order for BCBSTX to be responsible for Faith's lost profits, BCBSTX would have had to improperly terminate the PPO agreement, which did not have an anti-retaliation provision. (*See* Needham Testimony 1081:14-20, 1086:10-22.)

**70 |** P a g e

Award of Arbitrators AAA Faith v BCBSTX

176.    The evidence further established that Faith's calculation of lost profits is not well founded with either the expected revenue projections or the expenses upon which it is based (s*ee* Needham Testimony 1124:21-16, 1138:12-1139:3).  Faith's revenue projections are based upon an expectation that BCBSTX would never terminate the Contracts, which was not foreseeable based upon the plain language of the Contracts because each Contract could be and was terminated without cause (s*ee* Needham Testimony 1086:23-1087:8; *see also* Benton Testimony 1881:7-14).  In its closing, Faith agreed that any reinstated contracts could be terminated within 90 days, further suggesting that this case is not suitable for lost profits (at least not more than 90 days' worth, even if the contract is reinstated)  (s*ee* Faith's Closing Argument 2268:10-16).  In addition, Faith's revenue projections are speculative because of the limited time period of past revenues upon which they are based and market condition uncertainties (s*ee, generally* Benton Testimony 1887:11-1895:7; Needham Testimony 1100:2-1102:8.)

177.    As shown, BCBSTX's damages expert Mr. Benton, Mr. Needham did not take the necessary steps to be certain that the forecast upon which he relied to project lost profits was an accurate representation of Faith's laboratory department (see Benton Testimony 1880:17-19 ("In this case I don't think he took the necessary steps to be certain or reasonable [*sic*] certain that was a good extract of Faith's lab department.")

178.    Faith's revenue projections also would require that Faith  correct its following billing practices:  (a) improper third-party billing for advanced lipid testing; (b) improper third-party billing for genetic testing; (c) billing for non-patients; and (d) violations of specimen unit maximums.  Faith has not shown that a single one of these four practices was permissible under the Contracts.

179.   In addition, generally BCBSTX expert Benton concluded that the expenses that Faith claims underlie its lost profits claims were not supported by the evidence. For these additional reasons concerning projected revenues and expenses, Faith's lost profits claims are not traceable to BCBSTX's alleged breach of the Contracts.  As such, Faith is not entitled to recover its lost profit damages.

### Faith Is Barred From Recovery Because It Failed To Mitigate Its Damages.

180.   Faith is also barred from recovering any damages because Faith failed to take "reasonable efforts" to avoid incurring damages. *Great Am. Ins. Co. v. N. Austin Mun. Util. Dist. No. 1*, 908 S.W.2d 415, 426 (Tex. 1995) ("Where a party is entitled to the benefits of a contract and can save himself from the damages resulting from its breach at a trifling expense or with reasonable exertions, it is his duty to incur such expense and make such exertions.")  As Faith prepared to change its billing practices, start an outreach laboratory program, and open a new laboratory facility, Faith could have discussed the change in its business relationship with BCBSTX prior to incurring its alleged damages.   Had Faith done so, this dispute could have been avoided in its entirety.  *Wyde v. Francesconi*, 566 S.W.3d 890, 895 (Tex. App. 2018) ("Thus, the doctrine of mitigation of damages prevents a party from recovering for damages resulting from a breach of contract that could be avoided by reasonable efforts on the part of the plaintiff.") (*see also* Beaman Testimony 421:6-21, ("Q.  You didn't tell BlueCross about Faith's outreach program, did you? A.  No.  Q.  You didn't talk to BlueCross about it when Faith first conceived of the idea? A.  That's correct. . . .  Q.  And you went through a development phase, I presume, right?  A. Correct.  Q.  And you didn't tell BlueCross about it then, right?  A.  Correct. . . .  Q.  And you never told BlueCross about it?  A.  Correct.")  Instead, Faith proceeded to invest millions of dollars to launch an outreach laboratory program that it knew or should have known violated the terms of its Contracts with BCBSTX.

**72** | P a g e

181.    Faith's duty to mitigate its damages arose before any damages occurred (s*ee E.L. & Assocs., Inc. v. Pabon*, 525 S.W.3d 764, 771 (Tex. App. 2017) (affirming jury award of no damages after holding that duty to mitigate arose prior to damages).  At the very least, Faith was obligated to take "reasonable efforts" to prevent additional damages after it was placed on pre-payment review in October 2016.  However, Faith failed to even discuss its conduct with BCBSTX and indicated that it did not plan to change its billing practices.  Accordingly, Faith is barred from recovery because it failed to mitigate its damages.

Award of Arbitrators AAA Faith v BCBSTX

## AWARD IN FAVOR OF RESPONDENT AND COUNTERCLAIMANT

For the reasons stated in this Award, the Panel finds in favor of Respondent and Counterclaimant BCBSTX and against Claimant and Counter-Respondent Faith.

In this Final Award it is **Ordered, Adjudged** and **Decreed** as Follows:

a.) Faith is directed to pay BCBSTX as damages on its counterclaims the sum of **$23,300,000.**

b.) The Panel hereby denies any and all relief sought by Faith on its claims.

c.) Faith shall pay to BCBSTX accrued, pre-award interest at the rate of 5.5% per annum on the award from the date of  February 8, 2018, through August 19, 2019, the date of the Interim Award in the amount of $1,866,713.01.  Faith shall pay to BCBSTX the sum of $184,613.37 for additional accrued, pre-award interest calculated at the rate of $3,619.87 per day from August 20, 2019, to the date of this Award.

d.) Faith shall pay to BCBSTX the sum of $2,637,699.00 for BCBSTX's reasonable and necessary attorneys' fees and $1,125,878.22 for litigation costs determined by the Panel to have been incurred by BCBSTX in connection with this arbitration.

e.) The administrative fees and expenses of the AAA totaling $69,229.59 and the compensation and expenses of the Panel totaling $381,031.34 are to be borne by Faith. Therefore, Faith shall reimburse BCBSTX the additional sum of $214,536.60 representing the amount of such fees and expenses previously paid by BCBSTX to the AAA.

f.) If the total amount of $29,329,440.20 as set out in this Award is not paid in full, post-Award interest at the rate of 5.5% per annum shall accrue and be payable by Faith to

**74** | P a g e

Award of Arbitrators AAA Faith v BCBSTX

BCBSTX on any such unpaid amounts beginning on the date of this Final Award and such interest shall continue to accrue on any such unpaid amount until paid in full.

The above sums shall be paid on or before 30 days from the date of this Award.

This Award is in full settlement of all claims and counterclaims submitted to the Panel in this arbitration. All claims, counterclaims, and any other relief requested by any party to this arbitration not expressly granted by the Panel are hereby DENIED.

So **Ordered** this 9th day of October, 2019.

Hon. Anne Ashby (Ret.)
Chair Arbitrator

Charles Sartain, Esq.
Arbitrator

Edward "Trey" Bergman, Esq.
Arbitrator

75 | P a g e

Award of Arbitrators AAA Faith v BCBSTX

App 083

# Exhibit 24

to Declaration of
Jeffrey S. Gleason

[FILED UNDER SEAL]

# Exhibit 25

to Declaration of
Jeffrey S. Gleason

[FILED UNDER SEAL]

# Exhibit 26

to Declaration of
Jeffrey S. Gleason

[FILED UNDER SEAL]

# Exhibit 27

to Declaration of
Jeffrey S. Gleason

# [FILED UNDER SEAL]

# Exhibit 28

## MASTER BILLING SERVICES AGREEMENT

THIS MASTER BILLING SERVICES AGREEMENT (the "Agreement"), is made effective as of the 23 day of Sept, 2016 (the "Effective Date"), by and between Integrity Ancillary Management, LLC, (the "Company") and Mark Milford Hicksville Joint Township Hospital District d/b/a/ Community Memorial Hospital, an Ohio Joint Township District Hospital located at 208 North Columbus Street, Hicksville, OH, 43526 on behalf of itself and its subsidiaries listed on Schedule 1, attached hereto and incorporated herein (the "Laboratory"). The entities named above may also be referred to herein individually as a "Party" or collectively as the "Parties."

### RECITALS

A.    Laboratory is engaged in the business of providing clinical laboratory services ("Lab Services");

B.    Company provides revenue cycle management services to clinical laboratories and other healthcare providers in the United States; and

C.    Laboratory desires to retain Company to provide such revenue cycle management services, and Company desires to provide such services on the terms and conditions set forth in this agreement.

NOW THEREFORE, in consideration of the mutual covenants and promises contained herein, the parties hereto agree as follows:

1.    Appointment and Authority.

1.1    Appointment; Exclusivity. Laboratory hereby appoints Company as its sole and exclusive agent for the billing and collection of clinical laboratory fees generated from Laboratory's provision of Lab Services ("Lab Fees"), and Company hereby accepts such appointment, subject at all times to the provisions of this Agreement. During the Term, Laboratory shall not use any other outside agent or in-house billing service, in whole or in part, for the provision of billing and/or collection services for Lab Fees.

1.2    Authority of Company. Consistent with the provisions of this Agreement, Company shall have the responsibility and authority to provide billing and collection services for Lab Fees of Laboratory as further described in Section 2.3 hereof (the "Billing Services").

1.3    Authority of Laboratory. Laboratory shall be solely responsible for and have sole and complete authority, supervision and control over the provision of Lab Services and other related services performed in connection with the Lab Services, as Laboratory deems appropriate and in accordance with all applicable state and federal laws.

1

BN 20884631v1

Company Initial Here DS
Laboratory Initial Here MLM
0650892v1

EXHIBIT
162
10-30-19 CM

2.    Covenants of Company.

2.1    Organization/Operation. Company is a limited liability company created under Delaware law and shall at all times during the Term be and remain legally organized so as to be capable of providing Billing Services in a manner consistent with all state and federal laws, and Company shall provide Billing Services in compliance with all state and federal laws. Company represents and warrants that it is not excluded, suspended, or otherwise ineligible to participate in, or provide goods and services to others that participate in federal health care programs, as defined in 42 USC 1320a-7b(f). Company shall check its employees against the HHS/OIG List of Excluded Individuals/Entities and the General Services Administration System of Award Management ("SAM") prior to the execution of this Agreement and at least annually thereafter. Company will notify Laboratory in the event that it becomes so excluded, suspended or otherwise ineligible to participate in or provide goods and services to others that participate in such federal health care programs. Company acknowledges that Laboratory has made available to Company information about the federal false claims act and federal administrative remedies law for false claims and statements, and any related civil or criminal Ohio laws and Laboratory's policies and procedures for detecting and preventing fraud. Company agrees to abide by such policies and procedures as to the Services provided pursuant to this Agreement and to make such policies and procedures available to its personnel involved in performing such services.

2.2    Provision of Company Personnel. Company shall employ or otherwise retain, at Company's expense, and shall be responsible for selecting, training, supervising, and terminating all management, administrative, clerical, secretarial, bookkeeping, accounting, payroll, billing and collection, and other non-professional personnel as Company deems reasonably necessary and appropriate for Company's performance of its duties and obligations under this Agreement.

2.3    Billing and Collection Services.

2.3.1    Company's Billing and Collection Obligations. Subject to Laboratory's compliance with the terms of this Agreement, Company shall, on behalf of Laboratory, perform the Billing Services in a competent and professional manner using qualified personnel. Company shall establish and maintain billing and collection policies and procedures and shall use Company's best efforts to timely bill and collect all Lab Fees, it being understood, however, that Laboratory, in its sole discretion, shall establish and provide Company with a current listing of the Lab Fees. Laboratory shall timely advise Company of any changes in Laboratory's fee schedule to permit Company to implement such changes. In Company's discretion, Company may utilize qualified outside resources in the performance of its duties and responsibilities to provide the Billing Services. Company shall remain responsible for the performance of such outside resources. In connection with this Section 2.3 and throughout the Term, Laboratory hereby engages Company as Laboratory's true and lawful agent, and Company hereby accepts such engagement, for the following purposes only:

(a)    To bill, in Laboratory's name and on Laboratory's behalf, all claims for reimbursement or indemnification from patients, third party payors, excluding

2

Company Initial Here _DS_

Laboratory Initial Here _MLM_

10850892v1

UHS_Mission00004012

Medicare, Medicaid, TRICARE, and any other governmental payors, whether as the primary or secondary payor, or beneficiaries of such governmental programs, for covered Lab Fees. Company shall never bill, in Laboratory's name and/or on Laboratory's behalf or otherwise, any claims for reimbursement or indemnification from Medicare, Medicaid, TRICARE, and/or any other governmental payors, or any beneficiaries of governmental programs.

(b)    To collect and receive, in Laboratory's name and on Laboratory's behalf, all accounts receivable generated by such non-governmental billings and claims for reimbursement or indemnification, and to deposit all amounts collected in the Laboratory's Account (as defined in Section 2.3.4(a) below), which account shall be and remain in Laboratory's name. In connection herewith, Laboratory covenants to deposit in the Laboratory's Account any funds received directly by Laboratory from patients or third party payors for Lab Fees. In connection herewith, Company covenants to endorse in the name of Laboratory, and deposit into Laboratory's Account any notes, checks, money orders, insurance payments, and any other instruments directly received in payment of the accounts receivable for Lab Fees, pursuant to the limited power of authority granted hereunder.

2.3.2    Company's Further Obligations.    Company will further provide services related to the implementation of the systems and processes necessary to commence the Billing Services, described in Exhibit A.

2.3.3    Laboratory's Obligations.    In order for Company to provide the Billing Services, Laboratory shall perform all of the duties and responsibilities set forth in Exhibit B, attached hereto and incorporated herein.

2.3.4    Accounts.

(a)    Laboratory's Account.    For the purposes stated herein only, Laboratory shall grant Company access to the bank or other depository account in the name of Laboratory specified in Exhibit C attached hereto ("Laboratory's Account"). Laboratory shall bear all costs in relation to the establishment and maintenance of Laboratory's Account. In connection herewith and throughout the Term, Laboratory hereby engages Company as Laboratory's true and lawful agent to deposit in the Laboratory's Account all Lab Fees collected by Company.

(b)    Lock Box Arrangement.    Accounts receivable from non-governmental agencies shall be deposited directly into the Laboratory's Account. Laboratory further agrees, at the request by Company, to deliver instructions, letters, or other necessary documents, forms, or instructions, all of which shall be in such form reasonably acceptable to Company, to any or all payors, instructing such payors as to where to direct payments for such accounts receivable.

2.4    Access.    Laboratory shall have the right upon reasonable request to audit, examine, and make copies of entries in books of account maintained by Company pursuant to this Agreement, provided that such entries relate solely to Laboratory's provision of Lab Services or any funds or payments Company receives or claims it is entitled to under this

3

BN 30884631v1

Company Initial Here ___
Laboratory Initial Here __MLM__
10650892v1

UHS_Mission00004013

APP 386

Agreement. Company shall maintain such records for Laboratory's access upon request for a period of four (4) years following the Term hereof. If applicable, until the expiration of four (4) years after the furnishing of any service pursuant to this Agreement, Company shall maintain and make available upon the written request of the Secretary of Health and Human Services, or the Comptroller General of the United States, or any of their duly authorized representatives, or other governmental payers, intermediaries and carriers, copies of this Agreement and any books, documents, records, and other data that are necessary to certify the nature and extent of costs incurred hereunder.  If Company carries out any of its duties under this Agreement through a subcontract with a related organization involving a value or cost of Ten Thousand Dollars ($10,000.00) or more over a twelve (12) month period, it will cause such subcontract to contain a clause to the effect of the preceding sentence.

 2.5  Reports and Records.

 2.5.1  Records. It is understood by the parties that, in performing Billing Services for Laboratory, it shall be necessary that the Company access certain records generated by Laboratory in connection with Laboratory's provision of Lab Services. All records shall be treated in accordance with all applicable state and federal laws relating to the confidentiality of health records. All records shall be the property of and remain in the custody of Laboratory, but Laboratory expressly agrees that Company shall have access to such records to the extent necessary for Company to fulfill its obligations under this Agreement. Company shall maintain the confidentiality of all health records in accordance with all applicable laws and shall establish written policies and procedures for the protection of confidential information.

 2.5.2  HIPAA Compliance. Company agrees not to use or further disclose any protected health information, as defined in 45 CFR Part 160 and 164 (the "Protected Health Information"), other than as permitted by this Agreement and the requirements of the federal privacy regulations as contained in 45 CFR Part 160 and 164, Subpart E (the "Federal Privacy Regulations") and the federal security standards as contained in 45 CFR Part 160 and 164, Subpart C (the "Federal Security Regulations"). Company will implement appropriate administrative, physical and technical safeguards to protect the confidentiality, integrity and availability of and prevent the use or disclosure of Protected Health Information other than as provided for by this Agreement. Company will promptly report to Laboratory any security incident, data breach, or use or disclosure of Protected Health Information not provided for by this Agreement of which Company becomes aware. In the event Company contracts with any subcontractor or agents to whom Company provides Protected Health Information received from Laboratory, Company shall include provisions in such agreements whereby the subcontractor and agent agree to the same restrictions and conditions that apply to Company with respect to such patient's Protected Health Information. Company will make its internal practices, books, and records relating to the use and disclosure of a patient's Protected Health Information available to the Secretary of Health and Human Services to the extent required for determining compliance with the Federal Privacy Regulations and the Federal Security Regulations. Notwithstanding the foregoing, no attorney-client, or other legal privilege shall be deemed waived by Company or Laboratory by virtue of this

4

BN 30884631v1

Company Initial Here ___ DS

Laboratory Initial Here  MLM

10030892v1

UHS_Mission00004014

APP 387

Section 2.5.2. Company and Laboratory shall enter into a Business Associate Agreement in the form attached hereto as Exhibit D.

2.5.3    Other Reports and Records. Company shall timely create, prepare, and file such additional reports and records as are determined by Company in its sole discretion to be reasonably necessary and appropriate for the purposes hereunder.

2.5.4    Return of Laboratory Information. Within thirty (30) days of the effective date of termination or the expiration of this Agreement for any reason (the "Post-Termination Period"), Company shall return, or, at the request of Laboratory, destroy all content, data, hardware, software, or other materials provided by or on behalf of Laboratory or any of its users, or derived from these materials required to support the Billing Services for the Laboratory (the "Laboratory Specific Materials") received from Laboratory or created or received by Company on behalf of Laboratory and which Company still maintains in any form. If expressly requested by Laboratory, within five (5) business days of the termination of this Agreement, Company shall, at no charge provide such data files and records in Company's standard data extract format. Laboratory shall have the option within five (5) business days of the start of the Post-Termination Period, to specify an alternate data extract format of these data files and records. Company shall have ten (10) business days therefrom to evaluate the alternate data format and respond to Laboratory with a cost and delivery date estimate at the rate specified in Exhibit F for the technical services required to perform the requested data conversions. If Company determines the alternate data format is not technically feasible, Company and Laboratory will use commercially reasonable efforts to mutually agree on an alternate data extract format. Unless required by law, Company shall neither retain nor bear responsibility or obligations for Laboratory Specific Materials after return of such materials to Laboratory. Notwithstanding the foregoing, the obligations of Company under the Business Associate Agreement attached hereto as Exhibit D shall govern the return or destruction of Protected Health Information.

3.    Indemnification; Limitation of Liability.

3.1    Intentionally Left Blank.

3.2    Indemnification by Company. Company shall indemnify, defend, and hold harmless Laboratory, its managers, members, officers, directors, employees, and agents from and against any and all claims, settlements, demands, losses, costs, expenses, obligations, liabilities, damages, recoveries, and deficiencies, including, interest, penalties and reasonable attorneys' fees and costs, that Laboratory may incur or suffer which arise, result from, or relate to any breach of or failure by Company to perform any of its duties and/or responsibilities described in this Agreement, any infringement of the intellectual property rights of a third party, any act or omission of Company, including, without limitation, noncompliance with any local, state, or federal statutes, rules, or regulations, and all third-party payor rules and regulations governing health insurance payments. If Laboratory shall receive notice of any claim arising hereunder, Laboratory shall give prompt written notice of such claim to Company; except that

5

BN 20584631v1

Company Initial Here ___DS

Laboratory Initial Here MLM

10 60592v1

UHS_Mission00004015

APP 388

any delay or failure of notice shall not relieve Company of the obligations hereunder except to the extent such delay has materially prejudiced Company.

   3.3 Limitation of Liability. Notwithstanding anything to the contrary contained in this Agreement or otherwise, except for liability for indemnity and breach of confidentiality or the Parties' HIPAA Business Associate Agreement, the liability of each Party (and of any successor to each Party) to the other Party (or any person or entity claiming by, through, or under such Party) shall be limited to an amount equal to the twenty-four (24) month's average Fees under this Agreement, calculated based on the Fees charged during the three (3) months immediately preceding receipt by a Party of notice of any such claim of liability from the other Party.

  4. Covenants of Laboratory.

   4.1 Organization/Operation. Laboratory shall at all times during the Term be and remain legally organized to provide Lab Services in a manner consistent with all state and federal laws.

   4.2 Professional Personnel of Laboratory. Laboratory shall employ or otherwise engage the services of, at Laboratory's expense, all personnel, including a qualified laboratory director and laboratory technicians, as Laboratory deems reasonably necessary and appropriate for Laboratory's operation and provision of Lab Services, each of whom shall be subject to the applicable provisions of this Agreement (collectively, "Professional Personnel").

   4.3 Compliance Program. Company is committed to complying with federal and state law and preventing fraud and abuse. Laboratory will at all times maintain and enforce a compliance program, including applicable standards of conduct which prevent fraud and abuse. Company does not code any procedures or diagnoses, and it is the sole responsibility of Laboratory to ensure that billing is accurate and based on the actual Lab Services provided.

   4.4 Submission of Claims Information. Laboratory shall submit claim information in a timely manner to Company for processing and provision of the Billing Services. Company will not be liable for processing any incorrect, incomplete, or duplicate information received from Laboratory, nor will Company be liable for any loss of revenue resulting from any delay in the processing of accounts due to untimely delivery to Company or accurate and complete claims information by Laboratory. Company will not be liable for unpaid claims resulting from Laboratory's failure to provide Company with accurate and complete demographic information, insurance information, diagnosis codes, referral or authorization numbers, and necessary supporting documentations. Any charge submitted to Company by Laboratory that is missing any of the necessary information, or that is not provided to Company in the required format, will be returned by Company to Laboratory.

   4.5 End User Terms. Laboratory shall sign and at all times comply with the End User Terms, attached hereto as Exhibit E and incorporated herein.

6

BN 20884631v1

Company Initial Here ____ DS
Laboratory Initial Here MLM
16650892v1

UHS_Mission00004016

5.    Fees.

5.1    Billing Fee; Web Services Fee; Ancillary Services Fees. In consideration of the Billing Services to be provided by Company hereunder, Company shall be entitled to receive and Laboratory shall pay to Company a monthly fee (the "Billing Fee") described in Exhibit F. Company shall also be entitled to receive and Laboratory shall pay to Company fees in connection with implementation, web services and ancillary services, if requested by Laboratory, as described and in the amounts set forth in Exhibit F (together with the Billing Fee, the "Fees").

5.2    Payment of Fees. Payment of the Fees is acknowledged as the parties' negotiated agreement as to the reasonable, fair market value of the expenses of providing the Billing Services furnished by Company pursuant to this Agreement, considering the nature and volume of the services required and the risks assumed by Company.

5.3    Adjustment of Billing Fee. Company or Laboratory ("Requesting Party") may propose an adjustment to the Billing Fee in the event that collections vary significantly for any of the following reasons: Laboratory fails to disclose to Company information relating to Laboratory's business which information, if disclosed, would have materially increased the costs of billing and collection efforts incurred by Company; a material adverse change in reimbursement rates; or Laboratory materially changes fundamental aspects of its operations (such as its locations, the type of Lab Services provided, its payor mix, quality or type of demographic information available or method of documenting Lab Services). For the thirty (30) day period after receipt of the Requesting Party's written adjustment proposal, the Requesting Party shall be available to discuss the basis for the amount of the proposed adjustment with the other Party. If the other Party agrees to the proposed adjustment, this Agreement will be amended in writing to reflect the adjustment proposal. If at the end of the thirty (30) day discussion period, other Party has not agreed to an adjustment, the Requesting Party may terminate this Agreement upon ninety (90) days prior written notice to the other Party.

5.4    Technical Consulting Work. Technical consulting work requested by Laboratory not directly supporting the Billing Services, delivery or maintenance of Billing Services or otherwise included in this Agreement shall be on a consulting fee for service basis as set forth in Exhibit F.

5.5    External Vendor Fees. Unless specifically stated in this Agreement, each Party shall be responsible for fees for services from external vendors contracting directly with such Party, such as, but not limited to, collection agencies, internet service providers, statement mailing services, skip tracing services, credit card service providers, and clearinghouses.

6.    Term and Termination.

6.1    Initial and Renewal Terms. The initial term of this Agreement shall commence upon the Effective Date and continue for a period of three (3) years from the commencement of Phase 2 of the Billing Services as provided in Exhibit A (the "Initial Term"), unless sooner terminated in accordance with the terms and conditions hereof. At the end of the

7

BN 20884631v1

Company Initial Here _____ DS
Laboratory Initial Here MM
10650892v1

UHS_Mission00004017

Initial Term and each Renewal Term, this Agreement shall be automatically renewed for an additional one (1) year period (each a "Renewal Term"), unless either party provides notice to the other at least ninety (90) days prior to the end of the then-current Term that such party desired to terminate the Agreement at the end of the current Term. For purposes of this agreement, the Initial Term and any Renewal Terms may be referred to herein collectively as the "Term."

6.2     Termination. In addition to each party's rights specified in Section 6.1 above, this Agreement may be terminated in accordance with the following:

6.2.1     Termination by Agreement. In the event Laboratory and Company shall mutually agree in writing, this Agreement may be terminated on the date specified in such written agreement.

6.2.2     Termination Without Cause.  Either party may terminate this Agreement at any time after the expiration of the first year of the Initial Term (also known as the "Minimum Term"), for any reason or no reason, upon providing the other party at least sixty (60) calendar days' prior written notice ("Notice of Termination"). The sixty (60) calendar day period after the delivery of such Notice of Termination will hereafter be referred to as the "Transition Phase."  Upon the effective date of termination, each of the parties' obligations hereunder shall cease (except those obligations that explicitly survive termination, as provided herein).  Notwithstanding the foregoing, during and after the Transition Phase, Company shall continue to bill for all Lab Services with dates of service up to and including the effective date of termination, and Laboratory shall pay all Fees owed for the Billing Services of Company during and after the Transition Phase.  Company shall not provide Billing Services for any Lab Services with dates of service after the effective date of termination.  The Fees shall be owed for Billing Services during the Transition Phase, payable according to the terms of this Agreement.

6.2.3     Bankruptcy. In the event that either party becomes insolvent, or if any petition under federal or state law pertaining to bankruptcy or insolvency or for a reorganization or arrangement or other relief from creditors shall be filed by or against either party, or if any assignment, trust, mortgage, or other transfer shall be made of all or a substantial part of the property of either party, or if either party shall make or offer a composition in its debts with its creditors, or if a receiver, trustee, or similar officer or creditor's committee shall be appointed to take charge of any property of or to operate or wind up the affairs of either party, then the other party may by written notice immediately terminate this Agreement.

6.2.4     Default. In the event either party shall give written notice to the other that such other party has defaulted in the performance of any duty or obligation imposed upon it by this Agreement, and such default shall not have been cured within thirty (30) days following the giving of such written notice, the party giving such written notice shall have the right to immediately terminate this Agreement unless the defaulting party shall, within said thirty (30) day period, have cured the default.

6.2.5     Exclusion. This Agreement shall terminate immediately upon the exclusion, suspension, debarment or other ineligibility of Company or any of its personnel

8

BN 20854631v1

Company Initial Here ___DS

Laboratory Initial Here  MLM
19450892v1

UHS_Mission00004018

APP 391

providing services to Laboratory to participate in federal health care programs, as defined in 42 USC 1320a-7b(f).

6.3    Suspension of Services for Laboratory's Breach.    Notwithstanding the foregoing, Company shall have the right to suspend all Billing Services upon Laboratory's failure to pay any invoice within ten (10) days of the date upon which payment is due, provided that Company shall immediately recommence all Billing Services upon receiving payment of such invoice.

6.4    Effects of Termination.    Upon termination of this Agreement, as hereinabove provided, neither party shall have any further obligations hereunder except for (a) obligations accruing prior to the date of termination, and (b) the obligations, promises, or covenants set forth herein in Sections 2.4, 2.5, 3, 6.2.2, 7, and Exhibit F as to fees for services performed prior to the effective date of termination.

7.    Miscellaneous.

7.1    Independent Relationship.    It is mutually understood and agreed that Laboratory and Company, in performing their respective duties and obligations under this Agreement, are at all times acting and performing as independent contractors with respect to each other, and nothing in this Agreement is intended nor shall be construed to create an employer/employee relationship or a joint venture relationship, or to allow Company to exercise control or direction of any nature, kind, or description over the manner or method by which Laboratory performs Lab Services.

7.2    Non-Solicitation of Employees.    During the Term, and for a one (1) year period thereafter, neither party will, directly or indirectly, employ, or solicit or seek to employ, any person who is an employee of the other party or any subsidiary or other affiliate of the other party as of the Effective Date, or who becomes an employee of the other party or any subsidiary or other affiliate of the other party, during the Term. The parties acknowledge that monetary remedies for any breach of this Section 7.2 will be inadequate to protect the aggrieved party and that injunctive relief will be appropriate to protect such rights, along with any other legal or equitable remedies, which shall be cumulative and not exclusive of any other remedy or remedies.

7.3    Notice.    All notices, demands and other communications to be given or delivered under or by reason of the provisions of this Agreement will be in writing and will be deemed to have been given (a) when personally delivered, (b) upon receipt when sent by email, facsimile, telecopy or other electronic transmission device (with transmission confirmed) and a confirmation copy is sent by certified mail, postage prepaid, return receipt requested; provided, however, that if transmission is confirmed after normal business hours of the recipient, notice shall be deemed to have been given on the next business day, (c) one day after deposit with a nationally recognized overnight courier, specifying next day delivery or (d) upon receipt after being sent by registered or certified mail, postage prepaid, return receipt requested. Notices, demands and communications to parties will, unless another address is specified in writing, be sent to the addresses set forth in the caption of this Agreement, or to such other address, and to

9

BN 2085463 v1

Company Initial Here DS

Laboratory Initial Here MLM

10630892v1

the attention of such other person or officer as any party may designate, with copies thereof to the respective counsel thereof as notified by such party. Rejection or other refusal to accept or the inability to deliver because of a changed address of which no notice was given in accordance with the provisions hereof, shall be deemed to be receipt of the notice sent.

7.4     Legal Fees and Costs. In the event either party brings any action for relief against the other, declaratory or otherwise, arising out of this Agreement (including actions to enforce and interpret this Agreement), the losing party shall pay to the prevailing party, in addition to any other relief to which such party shall be entitled, a reasonable sum for attorneys' fees incurred in bringing such suit and/or enforcing any judgment granted therein, all of which shall be deemed to have accrued upon the commencement of such action and shall be paid whether or not such action is prosecuted to judgment. Any judgment or order entered in such action shall contain a specific provision providing for the recovery of attorney fees and costs incurred in enforcing such judgment, in addition to any other relief to which such party shall be entitled.

7.5     Choice of Law. This Agreement shall be governed by and construed in accordance with the laws of the state of Ohio, without regard to any conflicts of laws principles. Exclusive venue for any legal proceeding shall be in the state and federal courts of Defiance County, Ohio.

7.6     Confidentiality.

7.6.1    "Confidential Information" means, with respect to a party hereto, any non-public, confidential, and/or proprietary information disclosed by a party to the other party, whether before the Effective Date or during the Term, including, but not limited to, the pricing, fees, and terms and conditions of the Agreement; business, marketing and technical plans; strategies and information; financial information; patient information; forecasts; intellectual property (including, without limitation, business models, ideas, inventions, methods, designs, formulas, systems, improvements and know-how); trade secrets; organizational charts and/or structure; past, current, and prospective director, manager, officer, employee, and independent contractor information such as identity, credentials, skill sets and background information; past, current and prospective customer/client information (including customer/client lists); information regarding referral sources (including lists of referral sources); business leads; the subject matter of any of the foregoing; and information concerning a party's existing and future products and services. Confidential Information shall not include information which (i) is or becomes a part of the public domain through no fault of the receiving party; (ii) was in the receiving party's lawful possession prior to the disclosure; (iii) is lawfully disclosed to the receiving party by a third party without restriction on disclosure or any breach of confidence; (iv) is independently developed by the receiving party without any assistance from the other party's information; or (v) is required to be disclosed by law, but only to the limited extent of such required disclosure.

7.6.2    The parties agree that during the term of this Agreement and thereafter, each party shall hold the other party's Confidential Information in strict confidence.

10

BN 29884631v1

Company Initial Here ___DS

Laboratory Initial Here MLM

The parties agree not to make each other's Confidential Information available in any form to any third party or to use each other's Confidential Information for any purpose other than the implementation of or as specified in this Agreement. Without limiting Section 7.6.3, each party agrees to take all reasonable steps to ensure that Confidential Information of the other party is not disclosed or distributed by its employees, agents, or consultants in violation of the provisions of this Agreement. Under no circumstance shall either party transmit or store the Confidential Information of the other party outside of the United States.

7.6.3    Each party shall ensure that its employees, agents, and consultants (a) shall be permitted access to the other party's Confidential Information only on a need-to-know basis, and (b) are instructed regarding and agree in writing to act in accordance with the obligation of nondisclosure and non-use imposed by this Agreement.

7.6.4    The receiving party shall not put to commercial use or use in any way except for the sole benefit of the disclosing party any Confidential Information disclosed to the receiving party by the disclosing party. For the avoidance of doubt, Company shall not put to commercial use or use in any way except for the sole benefit of Laboratory any Confidential Information disclosed or otherwise exposed to Company in connection with its duties under this Agreement.

7.6.5    Each party acknowledges that any use or disclosure of the other party's Confidential Information other than as specifically provided for in this Agreement may result in irreparable injury and damage to the party. Accordingly, each party hereby agrees that, in the event of use or disclosure by the other party other than as specifically provided for in this Agreement, the non-using or non-disclosing party may be entitled to immediate injunctive and/or other equitable relief as granted by any appropriate judicial body.

7.6.6    The receiving party shall be responsible for any noncompliance by its receiving party's employees, agents, and consultants. In addition, the receiving party shall promptly notify the disclosing party in writing of any unauthorized use or disclosure of any Confidential Information.

7.6.7    Notwithstanding the foregoing, either party can disclose the existence and terms of this Agreement as may be necessary in connection with disclosures made to, or due diligence performed by, any investors, potential investors, or acquirers of such party.

7.6.8    The obligations of nonuse and nondisclosure in this Agreement shall not be breached by disclosure required in a judicial proceeding or governmental investigation, provided that the receiving party (a) promptly, upon learning of such requirement to disclose Confidential Information, giving the disclosing party notice of such requirement, (b) affords the disclosing party an opportunity to oppose such disclosure or seek a protective order, and (c) cooperates with the disclosing party and provides the disclosing party all assistance that it reasonably requests in opposing such disclosure or in seeking a protective order.

11

Company Initial Here ___DS

Laboratory Initial Here MM



7.6.9    All Confidential Information of the disclosing party and any modifications, enhancements, or improvements thereto shall remain the property of the disclosing party and, except as expressly provided herein, no license or other rights to such Confidential Information or any such modifications, enhancements, or improvements is granted or implied hereby. The receiving party shall, upon termination of this Agreement (or earlier request), as instructed by the disclosing party, either (i) return to the disclosing party, or (ii) destroy and upon request certify in writing such destruction, of all Confidential Information and all models, prototypes, writings, photographs, drawings, and other materials which disclose and/or contain Confidential Information of the disclosing party as well as all excerpts, summaries, and copies thereof and worksheets and the like pertaining thereto.

7.7    Assignment. Except as may be herein specifically provided to the contrary, this Agreement shall inure to the benefit of and be binding upon the parties hereto and their respective legal representatives, successors, and assigns; provided, however, that Laboratory and Company shall not assign, transfer or pledge their respective rights and obligations under this Agreement or collaterally assign or hypothecate this Agreement without the prior written consent of the other party, which consent shall not be unreasonably withheld. Notwithstanding the foregoing, Laboratory shall be permitted without Company's consent to assign, transfer, or pledge its respective rights or obligations under this Agreement to a successor in interest to substantially all of its assets.

7.8    Waiver of Breach. The waiver by either party of a breach or violation of any provision of this Agreement shall not operate as, or be construed to constitute, a waiver of any subsequent breach of the same or another provision hereof.

7.9    Gender and Number. Whenever the context of this Agreement requires, the gender of all words herein shall include the masculine, feminine, and neuter, and the number of all words herein shall include the singular and plural. The term "person" when used herein shall mean an individual, partnership, joint venture, corporation, trust, government entity, and association.

7.10    Additional Assurances. Except as may be herein specifically provided to the contrary, the provisions of this Agreement shall be self-operative and shall not require further agreement by the parties; provided, however, at the request of either party, the other party shall execute such additional instruments and take such additional acts as are reasonable and as the requesting party may deem necessary to effectuate this Agreement.

7.11    Consents, Approvals, and Exercise of Discretion. Except as may be herein specifically provided to the contrary, whenever this Agreement requires any consent or approval to be given by either party, or either party must or may exercise discretion, the parties agree that such consent or approval shall not be unreasonably withheld or delayed, and such discretion shall be reasonably exercised in good faith.

7.12    Force Majeure. Neither party shall be liable or deemed to be in default for any delay or failure in performance under this Agreement or other interruption of service deemed to result, directly or indirectly, from acts of God, civil or military authority, acts of public enemy,

12

BN 20884631v1

Company Initial Here ___DS___

Laboratory Initial Here MM

166508921

UHS_Mission00004022

war, accidents, fires, explosions, earthquakes, floods, failure of transportation, strikes or other work interruptions by either party's employees, or any other similar cause beyond the reasonable control of either party, provided that the other party may terminate this Agreement in the event that the delay or failure exceeds sixty (60) days.

7.13    Severability. In the event any provision(s) of this Agreement is held to be invalid, illegal, or unenforceable for any reason and in any respect, if the extent of such invalidity, illegality or unenforceability does not destroy the basis of the bargain herein, such invalidity, illegality, or unenforceability shall in no event affect, prejudice, or disturb the validity of the remainder of this Agreement, which shall be in full force and effect, enforceable in accordance with its terms as if such provisions had not been included, or had been modified as provided below, as the case may be. To carry out the intent of the parties hereto as fully as possible, the invalid, illegal or unenforceable provision(s), if possible, shall be deemed modified to the extent necessary and possible to render such provision(s) valid and enforceable. In the event this Agreement cannot be modified to the satisfaction of the parties hereto, then either party may terminate this Agreement upon ten (10) days written notice.

7.14    Divisions and Headings. The division of this Agreement into articles, sections, and subsections and the use of captions and headings in connection therewith are solely for convenience and shall not affect in any way the meaning or interpretation of this Agreement.

7.15    Time of Essence. Time shall be of the essence with respect to this Agreement.

7.16    Entire Agreement/Amendment. This Agreement supersedes all previous agreements (written or oral), and constitutes the entire agreement of whatsoever kind or nature existing between or among the parties respecting the within subject matter and no party shall be entitled to benefits other than those specified herein. As between or among the parties, no oral statements or prior written material not specifically incorporated herein shall be of any force and effect; the parties specifically acknowledge that in entering into and executing this Agreement, the parties rely solely upon the representations and agreements contained in this Agreement and no others. All prior representations or agreements, whether written or verbal, not expressly incorporated herein are superseded. This Agreement may not be amended, supplemented, canceled or discharged except by written instrument executed by all parties hereto or as otherwise provided in this Agreement. This Agreement may be executed in two or more counterparts, each and all of which shall be deemed an original and all of which together shall constitute one instrument. It shall not be necessary that the signatures of all of the parties appear on each counterpart; it shall be sufficient that the signature of each party appear on one or more counterparts.

7.17    Rules of Construction. The parties acknowledge that each party and its counsel have reviewed and revised this Agreement, and the parties hereby agree that the normal rule of construction to the effect that any ambiguities are to be resolved against the drafting party shall not be employed in the interpretation of this Agreement or any amendments or exhibits, certificates and schedules hereto. The terms "include" and "including" shall mean without

13

BN 20884631v1

Company Initial Here DS
Laboratory Initial Here MLM
10650692v1

UHS_Mission00004023

limitation by reason of enumeration. The terms "herein," "hereof," and "hereunder" and other words of similar import refer to this Agreement as a whole and not to a particular part or subdivision thereof unless otherwise clearly indicated. All references in this Agreement to Dollars or monetary payment shall be deemed to refer to U.S. Dollars.

7.18   Reproduction. This Agreement may be reproduced by any means or process including electronic or mechanical means. Any reproduction shall be admissible into evidence as the original itself in any litigation without regard to whether the original is in existence. If a party signs this Agreement and then transmits an electronic facsimile of the signature page the recipient may rely upon the electronic facsimile as a signed original of this Agreement without modification or change unless same is noted thereon.

7.19   Compliance with Laws. The parties enter into this Agreement with the intent of conducting their relationship in full compliance with applicable federal, state and local laws. Notwithstanding any unanticipated effect of any of the provisions herein, neither party will intentionally conduct itself under the terms of this Agreement in a manner to constitute a violation of any applicable federal, state or local law. If at any time legal counsel for either party determines that this Agreement violates any federal, state or local law, or places at risk the federal health care program provider status of Laboratory, the parties agree to amend this Agreement to eliminate the non-compliance, and in lieu of such amendment within thirty (30) days of notice of such determination, either party may terminate this Agreement.

7.20   Data Security.

7.20.1 Security Controls. Company or its applicable contractors shall implement effective controls that provide reasonable protection of, and restricted access to, the data wherever it is stored, processed, or transferred within Company's or its applicable contractors' span of control.

7.20.2 Audits and Assessments. If an SSAE-16 (Statement on Standards for Attestation Engagements No. 16) SOC 1 Type 2 SOC 2 Type 2 or SOC 3 audit has been conducted with respect to Company and/or, as applicable, any contractor, by a qualified third party within the twelve (12) month period immediately preceding the Effective Date to formally evaluate the effectiveness of Company's or the contractor's data security controls, Company will provide a copy of the audit report or reports to Laboratory for review. If Company or the contractor has arranged for some other type of third party assessment of the effectiveness of security controls, Company will provide the details of such assessment and will include a detailed definition of the scope of the audit as well as its independent conclusions regarding effectiveness.

7.20.3 Disaster Recovery and Business Continuity. Company will have a process in place to escalate, communicate and notify Laboratory in the event of a disruption at facilities or operations. Company's disaster recovery plans must be tested at least annually, and evidence of tests provided to Laboratory. If Company or its applicable contractors fail to implement effective controls or disaster recovery plans within the established timeframe,

14

UHS_Mission00004024

Laboratory reserves the right to immediately terminate this Agreement without further financial obligation.

7.20.4 Access to Laboratory IT Systems. If Company requires access to Laboratory IT systems, Company shall provide Laboratory with a list of Company employees, agents, or contractors ("Users") who will need access to Laboratory IT systems, as well as the role/category that each User will occupy. Company shall notify Laboratory of any change in a User's role/category within one (1) business day of such change. Company shall provide Laboratory with a current list of Users and their roles/category on the tenth (10th) day of every month.

7.20.5 Cloud Services. If proposed services are considered a Cloud Service, or Cloud Services are included in delivery of the services, Laboratory owns and reserves all right, title and interest in and to all Laboratory data and content during the life of this Agreement, and after expiry or upon termination. Laboratory may download a copy of all Laboratory data at any time and for any reason. Company will not manipulate the data stored to create new data sets, generate its own metadata, or use such data for its own benefit without prior written authorization from Laboratory. Company shall ensure that the Cloud Service Provider will return to Laboratory all data and content, upon contract termination, and utilize approved data and hardware disposal techniques to ensure all Laboratory data and content have been removed from Cloud Service Provider environment. Cloud Service Provider will not geographically locate or transmit Laboratory data outside of the United States. Laboratory shall be provided with the exact physical location of data at all times, and shall have the ability to specify geographic location.

(a)     Incidents. Company will immediately disclose potential or true instances of data breach incidents to Laboratory. This includes potential instances of incidents involving data that was encrypted.

(b)     Legal or Governmental Requests. Company will immediately notify Laboratory in the event legal or governmental requests are made to obtain Laboratory data.

7.21    Insurance. Company shall maintain the following during the term of this Agreement:

7.21.1 Comprehensive general liability insurance, including product liability, in the minimum amount of $1,000,000 per occurrence and $3,000,000 in the aggregate.

7.21.2 Workers' compensation coverage for all of its employees as required by law.

7.21.3 Employer's liability insurance in the minimum amount of $1,000,000 per incident.

15

BN 28884631v1

Company Initial Here ___DS
Laboratory Initial Here MLM
10658892v1

UHS_Mission00004025

7.21.4 Errors and omissions insurance for the service provided under this Agreement with limits of $1,000,000 per occurrence and $3,000,000 in the aggregate.

7.21.5 Technology errors and omissions insurance, which shall include but not be limited to coverage for failure to prevent unauthorized access to or unauthorized use of electronic data containing private or confidential information of others, media and content rights infringement and liability, network security failure and software copyright infringement liability, injury to body or person, and property damage with limits of $1,000,000 per occurrence and $3,000,000 in the aggregate.

[The remainder of this page is intentionally left blank.]

16

BN 20884631v1

Company Initial Here ___DS___
Laboratory Initial Here ___MM___
10660892v1

UHS_Mission00004026

IN WITNESS WHEREOF, Laboratory and Company have executed this Agreement as of the first date written above.

LABORATORY:

COMMUNITY MEMORIAL HOSPITAL

By: _____

Name: _____

Title: _____

COMPANY:

Integrity Ancillary Management, LLC

DocuSigned by:

*Michael L. Murphy*

By: ____DE2C9FA9C12D455..._____

Name:  Michael L. Murphy

Title:  Manager

17

BN 20884631v1
10650892v1

UHS_Mission00004027

## EXHIBIT A

## BILLING SERVICES AND IMPLEMENTATION

In addition to the services described in the Agreement, Company shall provide the following, divided into two (2) phases, in connection with and as part of the Billing Services:

Phase 1

- Provide billing services using industry-standard semi-automated procedures;

- Implementation of AllScripts platform for Phase 1.

Phase 2

- Provide billing services using the Xifin RCM system, which includes:

    A. Web-based information management systems to optimize the billing process complemented by infrastructure management and maintenance services.

    B. Summary of key application functionality:

    1. Comprehensive Order Entry
    2. ABN (Advance Beneficiary Notice) workflow management
    3. Patient demographic files management
    4. Interactive front-end claims editing
    5. Primary and multiple secondary payor capabilities
    6. Error Processing: Resources and automated functionality to identify, route, correct and manage errors, front-end rejections/denials and backend denials
    7. 3rd Party Fee Schedule management
    8. Retail Price List Management:
       (A) Multiple Discounts Schedules
       (B) Special Pricing
    9. Test level pricing
    10. Comprehensive, standard and analytical reports
    11. End of month accounts receivable reconciliation and closing package
    12. Promissory Payment/Contact manager
    13. Electronic 3rd party payment posting and reconciliation (as available from payors)
    14. Automatic transaction detail tracking/audit trail
    15. Compliance requirements management: includes compliance rules/logic to identify and report potentially non-compliant actions, and generation of compliance audit logs

BN 29884631v1

Company Initial Here ___DS

Laboratory Initial Here MLM

IG 30892v1

UHS_Mission00004028

16. Physician exclusions from government programs
17. Correct Coding
18. OCE
19. Customized Panel Acknowledgement Letters

C.  Ongoing Service & Support:

1.  Management and maintenance of essential business process infrastructure including: hardware, software, database technology, storage, security, and interfaces necessary to deliver Billing Services described herein

2.  Provide, maintain and manage data resources and logic:

(A)  ICD-10 Codes (International Classification of Diseases, Tenth Revision, Clinical Modification)
(B)  CPT Codes (Current Procedural Terminology)
(C)  LCDs (Local Coverage Determinations)
(D)  ABN (Advance Beneficiary Notice) formats
(E)  CCI (Correct Code Initiative) edits
(F)  OCE (Out-Patient Code Editor) edits
(G)  NCD (National Coverage Determinations)
(H)  NPIs
(I)  NPI exclusions from Federal and state programs
(J)  State level no-mark-up or disclosure
(K)  Compliance guidelines and standards
(L)  Zip Codes
(M)  Medicare and Medicaid Fee Schedules
(N)  Eligibility Services
(O)  Remittance Advice and Adjustment Codes
(P)  Payor/Clearinghouse Edits
(Q)  Payor Submission Requirements
(R)  Modifier data logic
(S)  Payor Setup and maintenance

3.  Daily processing and management of all on-line submissions, including processing, correcting and resubmission of front-end rejections and processing of denials

4.  Technical Support for client portal

5.  User/Training Support
(A)  On-Line
(B)  Phone/Interactive On-line

BN 20884631v1

Company Initial Here DS
Laboratory Initial Here MLM
IC630892v1

UHS_Mission00004029

6. Data Backup And Disaster Avoidance and Recovery:

    (A) Maintain daily backup of incremental data changes, weekly full system backup, monthly archived copy of system data.

    (B) Maintain disaster avoidance procedures in accordance with industry standards that are designed to safeguard the data and the data processing capability throughout the term of this Agreement.

7. Web Services (Optional: any third party costs associated with providing the optional web services upon the written request of Laboratory shall be billed to Laboratory at cost)

    (A) Real Time Eligibility – Direct

    (B) Lab Portal

    (C) Patient Portal

D. Implementation: Prepare and configure Billing Services for use by Laboratory:

1. Accurate Client Customer data files conversion (the parties will mutually agree on files to be converted):

    (A) Laboratory configuration per Company's specifications

    (B) Test codes

    (C) Pricing

Note: Company shall provide to Laboratory the configuration specifications, and it shall be the responsibility of Laboratory to provide the data to Company.

2. Company-defined HL7/Web Services Interface between Billing Services and Laboratory's HL7 Web Services Interface

3. Initial setup to produce statements:

    (A) Laboratory's clients

    (B) Patient (Matrix Services will be used to print and mail)

4. Connectivity between Billing Services and HL7 Web Services Interface for all 3rd party payors

5. Claims submissions, remittance and eligibility transactions

6. Mutually agreed upon project plan

7. User training and education

BN 20884631v1

Company Initial Here ___DS___
Laboratory Initial Here MLM
11659892v1

UHS_Mission00004030

8. Customer data collections and setup

9. New payor remittance setup and testing

BN 20884631v1

Company Initial Here

Laboratory Initial Here  MLM

UHS_Mission00004031

## EXHIBIT B

## LABORATORY'S DUTIES AND OBLIGATIONS

Laboratory acknowledges that: (i) certain services or obligations of Company hereunder are dependent on the Laboratory's timely provision, facilitation of or assistance with access to Laboratory controlled assets, information, and resources reasonably requested by Company (collectively, "Cooperation"); and (ii) such Cooperation may be essential to the performance of Billing Services by Company. The parties agree that any delay or failure by Company to provide Services hereunder, resulting from Laboratory's failure to provide Cooperation shall not be deemed to be a breach of Company's performance obligations under this Agreement.

Laboratory agrees to perform the following duties and obligations:

1. Laboratory shall provide the source data and access to system files and databases necessary for implementation and provision of Billing Services.

2. Laboratory shall accomplish all tasks and provide all required materials that are specified in the mutually agreed project plan that are necessary for Company to perform its obligations.

3. Laboratory's IT staff shall provide timely support for HL7/Web Service Interface.

4. Laboratory's Information System vendor or developer shall be requested to provide timely support, as required.

5. Laboratory shall use commercially reasonable efforts to ensure that its HL7/Web Service Interface is in proper working order and does not transmit invalid or incorrect information. If the HL7/Web Service Interface is not in proper working order or transmits invalid or incorrect information, Laboratory shall use its best efforts to resolve such issues with the HL7/Web Service Interface in a timely manner.

6. Laboratory shall provide and maintain during the Term the minimum hardware, software and connectivity as reasonably determined necessary by the agreement of Laboratory and Company for provision of the Billing Services.

7. Laboratory shall provide Company with descriptions and diagrams of the network topology supporting billing and accounts receivable operations, as requested by Company.

8. Laboratory shall coordinate with Company any changes to Laboratory's network that may impact the use of Billing Services, as may be agreed upon by the parties.

9. Laboratory shall use commercially reasonable efforts to establish and maintain connectivity between Company and Laboratory to support Billing Services.

10. Laboratory shall verify and approve all Laboratory specific system pricing files, set-up, updates and configurations.

BN 26884631v1

Company Initial Here

Laboratory Initial Here

106 59892v1

11.     Laboratory shall have sole discretion to set the prices and fees it charges for Lab Services. Nothing herein shall be construed as imposing a restriction upon Laboratory in determining the amount of the fees charged by Laboratory, Laboratory being free to make such determination independently.

12.     Laboratory shall not rent, lease, sublicense, distribute, transfer, lend, copy or modify any part of the Billing Services. Laboratory shall not translate, decompile, or create or attempt to create, by reverse engineering or otherwise, the source code from the object code made available through the Billing Services. Laboratory shall not use the Billing Services in any manner that (i) infringes upon or violates any intellectual property right of any third party, (ii) constitutes a defamation, libel, invasion of privacy, or violation of any right of publicity or other third-party right or is threatening, harassing or malicious, or (iii) violates any applicable international, federal, state or local law, rule, legislation, regulation or ordinance, including without limitation, the Communications Decency Act of 1996, as amended.

13.     Laboratory shall employ reasonable security procedures to ensure that transactions, notices and other information specified in this Agreement that are electronically created, communicated, processed, stored, retained or retrieved are authentic, accurate, reliable, complete and confidential.

14.     During the Term and thereafter for any period during which Laboratory receives access to the Billing Services, Laboratory agrees that it will not initiate or otherwise pursue development efforts that attempt to duplicate or re-create any functionality, processes or business model concepts included in the Xifin System and Services.

BN 20884631v1

Company Initial Here DS
Laboratory Initial Here MLM
1658089v1

UHS_Mission00004033

APP 406

## EXHIBIT C

## LABORATORY'S ACCOUNT

Bank or Other Financial Institution _____

Address _____

Telephone _____    Fax _____

Account Number _____

BN 20884631v1

Company Initial Here _____ DS

Laboratory Initial Here *MLM*

16s80892v1

UHS_Mission00004034

## EXHIBIT D

## BUSINESS ASSOCIATE AGREEMENT

This Business Associate Agreement ("**Agreement**") supplements and is made a part of the Billing Services Agreement ("Underlying **Agreement**") by and between Fortus Laboratory Billing, LLC, a Delaware limited liability company ("**Business Associate**") and Mark Milford Hicksville Joint Township Hospital District d/b/a/ Community Memorial Hospital ("**Covered Entity**").

## RECITALS

A.    Covered Entity wishes to disclose certain information to Business Associate pursuant to the terms of the Underlying Agreement, some of which may constitute Protected Health Information ("**PHI**").

B.    Covered Entity and Business Associate intend to protect the privacy and provide for the security of PHI disclosed to Business Associate pursuant to the Underlying Agreement in compliance with the Health Insurance Portability and Accountability Act of 1996, Public Law 104-191 ("**HIPAA**"), the Health Information Technology for Economic and Clinical Health Act, Public Law 111-005 (the "**HITECH Act**"), and regulations promulgated thereunder by the U.S. Department of Health and Human Services (the "**HIPAA Regulations**") and other applicable laws, as such laws may be amended from time to time.

C.    As part of the HIPAA Regulations, the Privacy Rule and the Security Rule require Covered Entity to enter into a contract containing specific requirements with Business Associate prior to the disclosure of PHI, as set forth in, but not limited to, Title 45, Sections 164.314(a), 164.502(e) and 164.504(e) of the Code of Federal Regulations ("**CFR**") and contained in this Addendum.

In consideration of the mutual promises below and the exchange of information pursuant to this Addendum, the Parties agree as follows:

## I.    Definitions

A.    **Catch-all definition:** The following terms used in this Agreement shall have the same meaning as those terms in the HIPAA Rules: Breach, Data Aggregation, Designated Record Set, Disclosure, Health Care Operations, Individual, Minimum Necessary, Notice of Privacy Practices, Protected Health Information, Required By Law, Secretary, Security Incident, Business Associate, Unsecured Protected Health Information, and Use.

B.    **Specific definitions:**

1.    Business Associate. "Business Associate" shall generally have the same meaning as the term "covered entity" at 45 CFR 160.103.

BN 30884631v1

Company Initial Here ___DS___
Laboratory Initial Here  MLM
10460892v1

UHS_Mission00004035

2.    HIPAA Rules. "HIPAA Rules" shall mean the Privacy, Security, Breach Notification, and Enforcement Rules at 45 CFR Part 160 and Part 164.

## II.    Obligations and Activities of Business Associate

Business Associate agrees to:

A.    **Use or Disclosure**. Not use or disclose protected health information other than as permitted or required by the Underlying Agreement or as required by law;

B.    **Appropriate Safeguards**. Use appropriate safeguards, and comply with Subpart C of 45 CFR Part 164 with respect to electronic protected health information, to prevent use or disclosure of protected health information other than as provided for by the Agreement;

C.    **Reporting of Improper Access, Use or Disclosure**. Report to Covered Entity any use or disclosure of protected health information not provided for by the Underlying Agreement of which it becomes aware, including breaches of unsecured protected health information as required at 45 CFR 164.410, and any security incident of which it becomes aware. Business Associate shall notify Covered Entity in writing within three (3) business days of any security incident, as defined in the Security Rule, suspected or actual breach of security, intrusion or unauthorized access, use, or disclosure of PHI of which Business Associate becomes aware and/or any actual or suspected access, use, or disclosure of data in violation of the Underlying Agreement, this Addendum, or any applicable federal or state laws or regulations. Business Associate shall take (i) prompt corrective action to cure any such deficiencies and (ii) any action pertaining to such security incident, unauthorized access, use, or disclosure required by applicable federal and state laws and regulations. Business Associate also shall, following the discovery of any Breach of Unsecured PHI, notify Covered Entity in writing of such Breach without unreasonable delay and in no case later than three (3) business days after discovery. The notice shall include the following information if known (or can be reasonably obtained) by Covered Entity: (i) contact information for the individuals who were or who may have been impacted by the Breach (e.g., first and last name, mailing address, street address, phone number, email address); (ii) a brief description of the circumstances of the Breach, including the date of the Breach and date of discovery (as defined in 42 U.S.C. § 17932(c)); (iii) a description of the types of Unsecured PHI involved in the Breach (e.g., names, social security numbers, date of birth, addresses, account numbers of any type, disability codes, diagnostic and/or billing codes and similar information); (iv) a brief description of what the Business Associate has done or is doing to investigate the Breach, mitigate harm to the individuals impacted by the Breach;

D.    **Mitigation**. Business Associate agrees to mitigate, to the extent practicable, any harmful effect that is known to Business Associate of a use or disclosure of PHI in violation of this Addendum.

E.    **Business Associate's Subcontractors and Agents**. In accordance with 45 CFR 164.502(e)(1)(ii) and 164.308(b)(2), if applicable, ensure that any subcontractors that create, receive, maintain, or transmit protected health information on behalf of the business associate agree in writing to the same restrictions, conditions, and requirements that apply to the business associate with respect to such information;

BN 20584631v1

Company Initial Here ___DS

Laboratory Initial Here  MLM

1056892v1

UHS_Mission00004036

F.     **Access to PHI**. To the extent Business Associate maintains a Designated Record Set on behalf of the Covered Entity, Business Associate shall make PHI maintained by Business Associate or its agents or subcontractors in Designated Record Sets available to Covered Entity for inspection and copying within fifteen (15) days of a request by Covered Entity to enable Covered Entity to fulfill its obligations under the Privacy Rule, including, but not limited to, 45 C.F.R. § 164.524. If Business Associate maintains PHI in an electronic format, Business Associate shall provide such information in electronic format to enable Covered Entity to fulfill its obligations under the HITECH Act, including, but not limited to, 42 U.S.C. § 17935(e).

G.     **Amendment of PHI**. To the extent Business Associate maintains a Designated Record Set on behalf of Covered Entity, within fifteen (15) days of receipt of a request from the Covered Entity or an individual for an amendment of PHI or a record about an individual contained in a Designated Record Set, Business Associate or its agents or subcontractors shall make any amendments that Covered Entity directs or agrees to in accordance with the Privacy Rule.

H.     **Accounting Rights**. Within fifteen (15) days of notice by Covered Entity of a request for an accounting of disclosures of PHI, Business Associate and its agents or subcontractors shall make available to Covered Entity the information required to provide an accounting of disclosures to enable Covered Entity to fulfill its obligations under the Privacy Rule, including, but not limited to, 45 C.F.R. § 164.528, and its obligations under the HITECH Act, including but not limited to 42 U.S.C. § 17935(c), as determined by Covered Entity. The provisions of this subparagraph II.H shall survive the termination of this Addendum.

I.     **Obligations**. To the extent the Business Associate is to carry out one or more of Covered Entity's obligation(s) under Subpart E of 45 CFR Part 164, comply with the requirements of Subpart E that apply to the Covered Entity in the performance of such obligation(s); and

J.     **Governmental Access to Records**. Make its internal practices, books, and records available to the Secretary, as well as to Covered Entity, for purposes of determining compliance with the HIPAA Rules.

K.     **Minimum Necessary**. Business Associate (and its agents or subcontractors) shall request, use and disclose only the minimum amount of Protected Information necessary to accomplish the purpose of the request, use or disclosure. Business Associate understands and agrees that the definition of "minimum necessary" is in flux and shall keep itself informed of guidance issued by the Secretary with respect to what constitutes "minimum necessary."

## III.     Permitted Uses and Disclosures by Business Associate

A.     **Permitted Uses**. Business Associate shall not use PHI except for the purpose of performing Covered Entity's obligations under the Underlying Agreement and as permitted under the Underlying Agreement and this Addendum. Further, Business Associate shall not use PHI in any manner that would constitute a violation of the Privacy Rule or the HITECH Act if so used by Covered Entity. However, Business Associate may use PHI (i) for the proper management

BN 20884631v1

Company Initial Here ___DS
Laboratory Initial Here MLM


UHS_Mission00004037

and administration of Covered Entity, (ii) to carry out the legal responsibilities of Covered Entity, or (iii) for Data Aggregation purposes for the Health Care Operations of Covered Entity.

B.    **Permitted Disclosures**. Business Associate shall not disclose PHI except for the purpose of performing Covered Entity's obligations under the Underlying Agreement and as permitted under the Underlying Agreement and this Addendum. Business Associate shall not disclose PHI in any manner that would constitute a violation of the Privacy Rule or the HITECH Act if so disclosed by Covered Entity. However, Business Associate may disclose PHI (i) for the proper management and administration of Covered Entity; (ii) to carry out the legal responsibilities of Covered Entity; (iii) as required by law; or (iv) for Data Aggregation purposes for the Health Care Operations of Covered Entity. If Business Associate discloses PHI to a third party, Business Associate must obtain, prior to making any such disclosure, (i) reasonable written assurances from such third party that such PHI will be held confidential as provided pursuant to this Addendum and only disclosed as required by law or for the purposes for which it was disclosed to such third party, and (ii) a written agreement from such third party to immediately notify Business Associate of any breaches of confidentiality of the PHI, to the extent it has obtained knowledge of such breach.

C.    **Prohibited Uses and Disclosures under HITECH**. Notwithstanding any other provision in this Addendum, Business Associate shall comply with the following requirements: (i) Business Associate shall not use or disclose PHI for fundraising or marketing purposes, except as provided under the Underlying Agreement and consistent with the requirements of 42 U.S.C. § 17936; (ii) Business Associate shall not disclose PHI to a health plan for payment or health care operations purposes if the patient has requested this special restriction, and has paid out of pocket in full for the health care item or service to which the PHI solely relates, 42 U.S.C. § 17935(a), 45 C.F.R. § 164.22(a); (iii) Business Associate shall not directly or indirectly receive remuneration in exchange for PHI, except with the prior written consent of Covered Entity and as permitted by the HITECH Act, 42 U.S.C. § 17935(d)(2), 45 C.F.R. § 164.502(a); however, this prohibition shall not affect payment by Covered Entity to Business Associate for services provided pursuant to the Underlying Agreement.

IV.    **Term and Termination**

A.    **Material Breach by Business Associate**. A breach by Business Associate of any provision of this Addendum, as determined by Covered Entity, shall constitute a material breach of the Agreement and shall provide grounds for termination of the Underlying Agreement, any provision in the Underlying Agreement to the contrary notwithstanding, with or without an opportunity to cure the breach.

B.    **Effect of Termination**. Upon termination of this Agreement for any reason, Business Associate, with respect to protected health information received from Covered Entity, or created, maintained, or received by Business Associate on behalf of Covered Entity, shall:

1.    Return to Covered Entity or, if agreed to by Covered Entity, destroy the remaining protected health information that the Business Associate still maintains in any form;

BN 29884631v1

Company Initial Here _DS_

Laboratory Initial Here _MM_

10550892v1

UHS_Mission00004038

2.    If return or destruction is not feasible, as determined by Covered Entity, Business Associate shall continue to use appropriate safeguards as specified in this Agreement to prevent use or disclosure of the PHI, and limit further use of such PHI to those purposes that make the return or destruction of such PHI infeasible, for as long as Business Associate retains the PHI, 45 C.F.R. § 164.504(e);

3.    Retain only that protected health information which is necessary for Business Associate to continue its proper management and administration or to carry out its legal responsibilities, only to the effect that such retention is otherwise permissible under HIPAA or the HITECH Act, and return to Covered Entity, or if agreed by Covered Entity, destroy the PHI retained by Business Associate when it is no longer needed by the Business Associate for its proper management and administration or to carry out its legal responsibilities;

4.    Return to Covered Entity or, if agreed to by Covered Entity, ensure the destruction of the protected health information created, received or maintained by subcontractor(s) under the same terms as described in IV(B)(1)-(4).

C.    **Survival**. The obligations of Business Associate under this Section shall survive the termination of this Agreement.

V.    **Miscellaneous**

A.    **Indemnification; Limitation of Liability**. To the extent permitted by law, Business Associate shall indemnify, defend and hold harmless Covered Entity from any and all liability, claim, lawsuit, injury, loss, expense or damage resulting from or relating to the acts or omissions of Business Associate in connection with the representations, duties and obligations of Business Associate under this Addendum. Any limitation of liability contained in the Underlying Agreement shall not apply to the indemnification requirement of this provision. This provision shall survive the termination of the Addendum.

B.    **Assistance in Litigation**. Business Associate shall make itself and any subcontractors, consultants or agents assisting Business Associate in the performance of its obligations under the Underlying Agreement or Addendum available to Covered Entity, at no cost to Covered Entity, to testify as witnesses, or otherwise, in the event of litigation or administrative proceedings being commenced against Covered Entity, its directors, officers or consultants based upon a claim of violation of HIPAA, the HITECH Act, or other laws related to security and privacy, except where Business Associate or its subcontractor, consultant or agent is named as an adverse party.

C.    **Regulatory References**. A reference in this Agreement to a section in the HIPAA Rules means the section as in effect or as amended.

D.    **Amendment**. The Parties agree to take such action as is necessary to amend this Agreement from time to time as is necessary for compliance with the requirements of the HIPAA Rules and any other applicable law.

BN 29884631v1

Company Initial Here ___DS

Laboratory Initial Here ___MLM

UHS_Mission00004039

E.    **Interpretation**. Any ambiguity in this Agreement shall be interpreted to permit compliance with the HIPAA Rules.

F.    **No Third-Party Beneficiaries**. Nothing express or implied in the Agreement or Addendum is intended to confer, nor shall anything herein confer upon any person other than Covered Entity, Business Associate and their respective successors or assigns, any rights, remedies, obligations or liabilities whatsoever.

IN WITNESS WHEREOF, the Parties hereto have duly executed this Addendum as of the Effective Date.


**BUSINESS ASSOCIATE**                    **COVERED ENTITY**

By: _____            DocuSigned by:
                                         By: Michael L. Murphy
Name: _____                DE2C9FA9C12D455
        Michelle Waggoner
                                         Name:    Michael L. Murphy
Its: _____
        CEO                              Its:    Manager

Date: _____           Date:    11/16/2016
        9-23-16


BN 29884631v1

Company Initial Here ___DS___
Laboratory Initial Here MLM
16650892v1

UHS_Mission00004040

## EXHIBIT E

## XIFIN END USER TERMS

**RIDER TO BILLING SERVICES AGREEMENT BETWEEN FORTUS LABORATORY BILLING, LLC ("Fortus") AND** MARK MILFORD HICKSVILLE JOINT TOWNSHIP HOSPITAL DISTRICT D/B/A/ **COMMUNITY MEMORIAL HOSPITAL. ("End User")**

**IMPORTANT NOTICE: THESE END USER TERMS ARE ACCEPTED BY END USER UPON THE OCCURRENCE OF EITHER OF THE FOLLOWING: EXECUTION OF THIS AGREEMENT OR THE ACCESS OR USE OF XIFIN'S PROPRIETARY INTERNET-BASED ACCOUNTS RECEIVABLE SYSTEM (THE "XIFIN SYSTEM AND SERVICES"), IN WHOLE OR IN PART, WITH NO FURTHER ACTS OF ASSENT REQUIRED. SHOULD ANY OF THESE END USER TERMS BE UNACCEPTABLE TO YOU, PLEASE DO NOT EXECUTE, NOR ACCESS OR USE THE XIFIN SYSTEM AND SERVICES.**

1.  **Acknowledgement.** END USER HEREBY ACKNOWLEDGES AND AGREES TO BE LEGALLY BOUND BY THE FOLLOWING PROVISIONS:

    a.  End User acknowledges that XIFIN, Inc. ("XIFIN"), a third party, provides the XIFIN System and Services, which consists of services of processing of financial transactions and connectivity to commercial payors as well as other healthcare business partners (the "Third Party Services") and sublicenses certain proprietary software and documentation to facilitate the use of the Third Party Services.

    b.  End User further acknowledges that Fortus has entered into a services agreement (the "Master Services Agreement") with XIFIN to permit Fortus to use the XIFIN System and Services in connection with its provision of services to the End User.

    c.  End User further acknowledges that End User has no privity of contract with XIFIN and that End User is neither a named nor an intended third party beneficiary of the Master Services Agreement.

    d.  End User further acknowledges that without End User's acceptance of this Rider and agreement to be legally bound by the provisions contained herein, Fortus will not be able to provide to End User, and End User would not be able to use, the XIFIN System and Services pursuant to the Master Services Agreement.

    e.  END USER ACKNOWLEDGES AND AGREES THAT (1) XIFIN WILL NOT BE ORIGINATING ANY THIRD PARTY CONTENT UNDER THIS RIDER AND (2) WITH RESPECT TO ANY SUCH THIRD PARTY CONTENT, THE XIFIN SYSTEM AND SERVICES ARE SOLELY A SWITCH/CLEARINGHOUSE DESIGNED TO ALLOW FOR COMMUNICATION BETWEEN END USER, XIFIN, AND PAYOR; AND (3) XIFIN SHALL HAVE NO LIABILITY TO END USER OR TO ANY THIRD PARTY, BASED ON ANY END USER OR THIRD PARTY CONTENT

BN 20884631v1

Company Initial Here _DS_

Laboratory Initial Here _MM_

10650892v1

UHS_Mission00004041

TRANSMITTED BY OR THROUGH XIFIN, OR THE XIFIN SYSTEM AND SERVICES UNDER THIS RIDER. XIFIN SHALL HAVE NO LIABILITY FOR ACTUAL PAYMENT OF CLAIMS; FOR THE ELIGIBILITY STATUS OF A PATIENT; OR THAT ANY PAYOR RESPONSE INDICATING ELIGIBILITY DOES NOT ENSURE PAYMENT BY THE PAYOR OR FOR ANY OTHER INFORMATION TRANSMITTED THROUGH THE XIFIN SYSTEM AND SERVICES.    FURTHER, INFORMATION ACCEPTED BY THE XIFIN SYSTEM IN NO WAY GUARANTEES THE PAYMENT BY PAYOR AND DOES NOT CONSTITUTE A PROMISE TO PAY; ELIGIBILITY INFORMATION IS SUBJECT TO CHANGE; AND WAITING PERIODS MAY APPLY.

2. **Transaction Services; Licenses.** XIFIN grants to the End User a non-exclusive, non-transferable and limited license to use the XIFIN System in accordance with this Rider. The XIFIN System may be used solely in connection with the services provided to End User by Fortus. The XIFIN System is and shall remain the sole property of XIFIN. End User shall not transfer, assign, translate, reverse engineer, decompile, disassemble, modify or duplicate the XIFIN System, or any portion thereof, or allow any third party to do any of the foregoing. Upon any termination of expiration of the Client Agreement for any reason, End User will cease all use of the XIFIN System. Subject to the terms and conditions of this Rider, End User grants to XIFIN a non-exclusive, nontransferable, limited license for the term of the Client Agreement to access and use the End User's system as necessary in connection with End User's access to and use of the XIFIN System and Services for End User.

3. End User shall comply with XIFIN's procedures to secure any authorizations then required by XIFIN, applicable law, or industry practice in connection with End User's use of the XIFIN System and Services. **END USER HEREBY APPOINTS XIFIN AS ITS AGENT FOR THE LIMITED PURPOSE OF ENROLLING OR REGISTERING END USER INTO A PAYOR'S TRANSACTION PROCESSING SYSTEM AND OF SUBMITTING END USER'S TRANSACTIONS AND/OR SIGNING PAPER TRANSACTIONS ON END USER'S BEHALF TO THIRD PARTY PAYORS OR PROCESSORS, COVERING WORK-RELATED ACCIDENT OR ILLNESS BENEFITS, WHERE END USER'S SIGNATURE IS REQUIRED FOR ENROLLMENT, PROCESSING OR ADJUDICATION.**

4. Notwithstanding the foregoing, in addition to any other rights and remedies available to it, XIFIN may immediately terminate End User's access and use of the XIFIN System and Services if: (i)(a) the End User commits a material breach of Section 2 of these End User Terms which cannot be cured; (b) ceases to conduct its business in the ordinary course; (c) becomes legally insolvent; (d) makes a general assignment for the benefit of creditors; (e) suffers or permits the appointment of a receiver for its business or assets; or (f) avails itself of or becomes subject to any proceeding under the bankruptcy laws of any applicable jurisdiction; or (ii) if the End User commits a material breach of any of its other obligations under this Rider to Client Agreement and such breach is not cured within 30 days after receiving written notice thereof from XIFIN; except for a breach of a

BN 20884631v1

Company Initial Here  DS
Laboratory Initial Here  MM
10630892v1

UHS_Mission00004042

party's payment obligations, which shall have a cure period of ten days after receiving written notice thereof from XIFIN.

5. **Security Procedures.** Each party shall employ reasonable security procedures to ensure that transactions, notices and other information specified in this Rider that are electronically created, communicated, processed, stored, retained or retrieved are authentic, accurate, reliable, complete and confidential. Moreover, inasmuch as XIFIN and End User exchange data electronically, each party shall and will require any subcontractor or agent involved in the electronic exchange of data to comply with the following: (i) require its agents and subcontractors to provide security for all data that is electronically exchanged between End User and XIFIN and (ii) implement and maintain, and shall require its agents and subcontractors to implement and maintain, appropriate and effective administrative, technical and physical safeguards to protect the security, integrity and confidentiality of data electronically exchanged between End User and XIFIN, including access to data as provided herein. Each party and its agents and subcontractors shall keep all security measures current and shall document its security measures implemented in written policies, procedures, or guidelines, which such will provide to the other party upon the other party's request.

6. **Disclaimer of Warranties.** XIFIN PROVIDES THE XIFIN SYSTEM AND SERVICES "AS IS", AND EXPLICITLY DISCLAIMS ALL OTHER WARRANTIES, EXPRESSED, IMPLIED, OR STATUTORY, INCLUDING, ANY WARRANTY OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR USE, WITH RESPECT TO ANY OF THE FOREGOING. NEITHER PARTY SHALL BE LIABLE FOR ANY INDIRECT OR CONSEQUENTIAL DAMAGES, OR FOR ANY OTHER SPECIAL DAMAGES SUCH AS BUT NOT LIMITED TO, EXEMPLARY OR PUNITIVE DAMAGES, EVEN IF IT HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES OCCURRING.

7. **Limitation of Liability.** IN ANY EVENT XIFIN'S CUMULATIVE LIABILITY FOR ANY AND ALL LOSSES ARISING HEREUNDER OR AS A RESULT HEREOF SHALL NOT EXCEED $10,000. THE FOREGOING LIMITATION OF LIABILITY REPRESENTS THE ALLOCATION OR RISK OF FAILURE BETWEEN THE PARTIES AS REFLECTED IN THE PRICING HEREUNDER AND IS AN ESSENTIAL ELEMENT OF THE BASIS OF THE BARGAIN BETWEEN THE PARTIES.

BN 20884631v1



Company Initial Here ___DS

Laboratory Initial Here MLM

(0x50892v1

UHS_Mission00004043

# EXHIBIT F

## FEES

### A. Billing Fee

In consideration of the Billing Services to be provided by Company, Company shall be entitled to receive and Laboratory shall pay to Company a Billing Fee equal to five percent (5%) of all monthly gross collections for each sample reimbursed as the result of the Billing Services, payable every two weeks for the revenues collected in the preceding two weeks. "Monthly gross collections" shall be defined as all funds collected by Company or Laboratory as payment for Lab Services excluding Lab Services paid by Medicare, Medicaid, TRICARE, and any other governmental payors, whether as the primary or secondary payor, or by beneficiaries of such governmental programs.

### F. Invoices

Invoices for all fees described in this Exhibit F shall be due and payable in full within thirty (30) days of the date of Laboratory's receipt of invoice.

BN 20884631v1

Company Initial Here ___DS
Laboratory Initial Here MLM
1650892v1

UHS_Mission00004044

## SCHEDULE 1

### SUBSIDIARIES

Company shall provide Billing Services under this Agreement to Community Memorial Hospital and each of the following subsidiaries:

1.    [Lab 1]

2.    [Lab 2]

3.    [Lab 3]

4.    [Lab 4]

BN 20884631v1

Company Initial Here _DS_

Laboratory Initial Here _MLM_

UHS_Mission00004045

# Exhibit 29

to Declaration of
Jeffrey S. Gleason

[FILED UNDER SEAL]

# Exhibit 30

to Declaration of
Jeffrey S. Gleason

[FILED UNDER SEAL]

# Exhibit 31

to Declaration of
Jeffrey S. Gleason

[FILED UNDER SEAL]

# Exhibit 32

to Declaration of
Jeffrey S. Gleason

[FILED UNDER SEAL]

# Exhibit 33

to Declaration of
Jeffrey S. Gleason

[FILED UNDER SEAL]

# Exhibit 34

to Declaration of
Jeffrey S. Gleason

[FILED UNDER SEAL]

# Exhibit 35

to Declaration of
Jeffrey S. Gleason

[FILED UNDER SEAL]

# Exhibit 36

to Declaration of
Jeffrey S. Gleason

[FILED UNDER SEAL]

# Exhibit 37

to Declaration of
Jeffrey S. Gleason

[FILED UNDER SEAL]

# Exhibit 38

to Declaration of
Jeffrey S. Gleason

[FILED UNDER SEAL]

# Exhibit 39

to Declaration of
Jeffrey S. Gleason

[FILED UNDER SEAL]

# Exhibit 40

to Declaration of
Jeffrey S. Gleason

[FILED UNDER SEAL]

# Exhibit 41

to Declaration of
Jeffrey S. Gleason

[FILED UNDER SEAL]

# Exhibit 42

to Declaration of
Jeffrey S. Gleason

[FILED UNDER SEAL]

# Exhibit 43

to Declaration of
Jeffrey S. Gleason

[FILED UNDER SEAL]

# Exhibit 44

to Declaration of
Jeffrey S. Gleason

[FILED UNDER SEAL]

# Exhibit 45

to Declaration of
Jeffrey S. Gleason

[FILED UNDER SEAL]

# Exhibit 46

to Declaration of
Jeffrey S. Gleason

[FILED UNDER SEAL]

# Exhibit 47

to Declaration of
Jeffrey S. Gleason

[FILED UNDER SEAL]

# Exhibit 48

to Declaration of
Jeffrey S. Gleason

[FILED UNDER SEAL]

# Exhibit 49

to Declaration of
Jeffrey S. Gleason

[FILED UNDER SEAL]

# Exhibit 50

to Declaration of
Jeffrey S. Gleason

[FILED UNDER SEAL]

# Exhibit 51

## to Declaration of
## Jeffrey S. Gleason

## [FILED UNDER SEAL]

# Exhibit 52

to Declaration of
Jeffrey S. Gleason

[FILED UNDER SEAL]

# Exhibit 53

to Declaration of
Jeffrey S. Gleason

[FILED UNDER SEAL]

# Exhibit 54

## to Declaration of
## Jeffrey S. Gleason

# [FILED UNDER SEAL]

# Exhibit 55

to Declaration of
Jeffrey S. Gleason

[FILED UNDER SEAL]

# Exhibit 56

to Declaration of
Jeffrey S. Gleason

[FILED UNDER SEAL]

# Exhibit 57

to Declaration of
Jeffrey S. Gleason

[FILED UNDER SEAL]

# Exhibit 58

to Declaration of
Jeffrey S. Gleason

[FILED UNDER SEAL]

# Exhibit 59

to Declaration of
Jeffrey S. Gleason

[FILED UNDER SEAL]

# Exhibit 60

to Declaration of
Jeffrey S. Gleason

[FILED UNDER SEAL]

# Exhibit 61

to Declaration of
Jeffrey S. Gleason

[FILED UNDER SEAL]

# Exhibit 62

to Declaration of
Jeffrey S. Gleason

[FILED UNDER SEAL]

# Exhibit 63

to Declaration of
Jeffrey S. Gleason

[FILED UNDER SEAL]

# Exhibit 64

to Declaration of
Jeffrey S. Gleason

[FILED UNDER SEAL]

# Exhibit 65

to Declaration of
Jeffrey S. Gleason

[FILED UNDER SEAL]

# Exhibit 66

## to Declaration of Jeffrey S. Gleason

[FILED UNDER SEAL]

# Exhibit 67

to Declaration of
Jeffrey S. Gleason

[FILED UNDER SEAL]

# Exhibit 68

to Declaration of
Jeffrey S. Gleason

[FILED UNDER SEAL]

# Exhibit 69

to Declaration of
Jeffrey S. Gleason

[FILED UNDER SEAL]

# Exhibit 70

to Declaration of
Jeffrey S. Gleason

[FILED UNDER SEAL]

# Exhibit 71

to Declaration of
Jeffrey S. Gleason

[FILED UNDER SEAL]

# Exhibit 72

to Declaration of
Jeffrey S. Gleason

[FILED UNDER SEAL]

# Exhibit 73

to Declaration of
Jeffrey S. Gleason

[FILED UNDER SEAL]

# Exhibit 74

to Declaration of
Jeffrey S. Gleason

[FILED UNDER SEAL]

# Exhibit 75

to Declaration of
Jeffrey S. Gleason

[FILED UNDER SEAL]

# Exhibit 76

to Declaration of
Jeffrey S. Gleason

[FILED UNDER SEAL]

# Exhibit 77

## to Declaration of
## Jeffrey S. Gleason

[FILED UNDER SEAL]

# Exhibit 78

to Declaration of
Jeffrey S. Gleason

[FILED UNDER SEAL]

# Exhibit 79

## to Declaration of
## Jeffrey S. Gleason

# [FILED UNDER SEAL]

# Exhibit 80

## to Declaration of
## Jeffrey S. Gleason

# [FILED UNDER SEAL]