EXHIBIT KK - 001



IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

MISSION TOXICOLOGY, L.L.C., et al., CONFIDENTIAL

Plaintiffs,

Case No. 5:17-CV-01016 (lead case)

vs.

UNITEDHEALTHCARE INSURANCE COMPANY, INC., et al.,

Defendants.

UNITEDHEALTHCARE INSURANCE COMPANY, INC., et al.,

Plaintiffs,

Case No. 5:18-CV-00347 (consolidated case)

vs.

MICHAEL MURPHY, M.D., et al.,

Defendants.

VIDEOTAPED DEPOSITION OF DANIEL BOONE

August 28, 2019

TAKEN ON BEHALF OF UNITEDHEALTHCARE INSURANCE COMPANY

REPORTED BY: VESTA L. YORK

JOB NO: 165877

**EXHIBIT KK - 002**



APPEARANCES

For Mission Toxicology, L.L.C.; Sun Clinical Laboratory, L.L.C.; Michael Murphy, M.D.; Jesse Saucedo, Jr.; Samantha Murphy; Lynn Murphy; Julie Pricer; Sun Ancillary Management LLC; Integrity Ancillary Management LLC; Alternate Health Lab, Inc.; and LMK Management LLC:
Mr. John Markham, Esq.
Markham & Read
One Commercial Wharf West
Boston, MA 02110

For UnitedHealthcare Insurance Company; UnitedHealthcare of Texas, Inc.; UnitedHealthcare of Florida, Inc.; and UnitedHealthcare Services, Inc.:
Ms. Jamie Kurtz, Esq.
Robins Kaplan
800 Lasalle Avenue
Minneapolis, MN 55502

-and-

Mr. Grant Miller, Esq.
Associate General Counsel
UnitedHealthcare Group
Chicago, IL

Videographer: Mike Zarich
Court Reporter: Vesta L. York, CSR, RMR, CRR



(Deposition commenced at 9:04 a.m.)
THE VIDEOGRAPHER: Okay. Good morning. This is the start of DVD number 1 in the videotape deposition of Dan Boone in the matter of Mission Technology, L.L.C., et al., Plaintiffs, versus UnitedHealthcare Insurance Company, Inc., et al., defendants. Case Number 5:17-CV-01016, lead case; and UnitedHealthcare Insurance Company, Inc., et al., plaintiffs, versus Michael Murphy, M.D., et al., defendants. Case Number 5:18-CV-00347, consolidated case. This is in the United States District Court, Western District of Texas, San Antonio Division.
The deposition is being held at the Regus offices at 801 East Douglas, Wichita, Kansas. Today is August 28, 2019, and the time is approximately 9:05 a.m.
My name is Mike Zarich. I'm the legal video specialist representing TSG Reporting, Inc., headquartered at 747 Third Avenue, New York, New York. The court reporter is Vesta York in association with TSG Reporting.
Counsel can now identify themselves for the record and the court reporter can swear in the witness.



MS. KURTZ: Jamie Kurtz of the Robins Kaplan Law Firm on behalf of UnitedHealthcare. With me is Grant Miller who is in-house counsel at UnitedHealthcare.
MR. MARKHAM: John Markham on behalf of all of the plaintiffs in the first of the two consolidated cases and the counterclaim defendants in the second of the two consolidated cases.
DANIEL BOONE,
having been first duly sworn on his oath to state the truth, the whole truth, and nothing but the truth, testifies as follows:
DIRECT EXAMINATION
BY MS. KURTZ:
Q. Good morning, Mr. Boone.
A. Good morning.
Q. We met just briefly before. My name is Jamie Kurtz and I represent UnitedHealthcare. With me is Grant Miller who also represents UnitedHealthcare as in-house counsel. Good morning. Thank you for being here?
A. My pleasure.
Q. Before we get started in talking about the substance, I want to go through a few ground --
A. Sure.



Q. -- rules about depositions.
First of all, have you been deposed before?
A. No.
Q. Okay. So a deposition is a little bit of a unique human interaction in that it feels like a conversation, but it's really not that, and what I mean by that is, as you know, there's a court reporter sitting here --
A. Uh-huh.
Q. -- and she's transcribing our entire conversation. Her transcription is the official record of the conversation, so what that means is it's really important that we don't talk over each other.
A. Okay.
Q. So I would ask you to let me finish asking my question before you start answering and I will endeavor to do the same. I'll let you finish answering before I ask --
A. Sure.
Q. -- the next question.
Is there any reason why you're unable to testify truthfully and accurately today?
A. No.

EXHIBIT KK - 003

Page 194

who were doing business with Dr. Murphy?
A. They had or they may have heard about him.
Q. Okay. And did you ever discuss his lab, Mission -- Sun with other people?
A. Yes. Mission -- Sun.
Q. Sun and Mission?
A. Dr. Murphy was probably the initial quote-quote person out in the lab outreach program.
Q. Okay.
A. And I think it was, off the top of my head, maybe with Integrity, okay, that it started off and went south. And then he had -- then he had the other outreach program that he had.
Q. And in your discussions with other people about Sun Lab, did you ever discuss Sun Lab's quality as a lab or its competence as a lab?
A. The -- yes, with a lot of people. But as -- as I was stating earlier, that there are people here that -- there are people here that would be bagging on Dr. Murphy just by hearsay. And do you mind if I give an example?
Q. I really didn't ask you about that.
A. Okay.
Q. I asked whether you heard discussions

Page 195

about the lab.
A. Yes, but it was running more on -- the Mission part of it was running top notch. People liked to deal more with Mission than they did with Sun. But Dr. Murphy was probably about 50/50 of what -- not so much on the lab part of it but on him.
Q. Do you know why so many people preferred to work with Sun and Mission over some of the other labs that were out there?
A. They thought that Jesse had a better reputation and Jesse was as honest as the day is long and -- and they preferred to deal with Jesse instead of Dr. Murphy.
Q. Okay. In terms of the quality of the labs, did you ever hear anybody talk --
A. No.
(Reporter clarification.)
Q. Did you ever hear anybody talk about the quality of Sun Labs?
A. No. The business they did was good because there was people who were making money with him.
Q. Okay. How about the lab tests, ever hear any complaints about that?

Page 196

A. No.
Q. Okay. Either Sun or Mission?
A. No.
Q. Do you think that's part of the reason why so many people went to those two labs as opposed to other labs?
MS. KURTZ: Objection. Misstates the testimony. You may answer.
A. Can you rephrase that to me?
Q. Well, you called them the 800-pound gorillas?
A. Yes.
Q. Is that because they were large?
A. They were probably -- they were probably the premier outreach program in the country.
Q. Okay. And do you know why they were?
A. Because they did a lot of business, I think, in the neighborhood of their prime. They were probably doing maybe 30, 40,000.
Q. I didn't ask you how much business they were doing. Why so many people went to them as opposed to --
A. Well, because they were doing it right.
Q. Okay. What do you mean by "right"?

Page 197

A. They were running the samples in correctly and people were getting paid.
Q. And did you ever hear of any doctors complaining about them?
A. I don't work with doctors so I don't -- can't answer that question.
Q. Okay. Did you ever hear about anybody complaining about the lab results, the accuracy of the lab results?
A. No, not -- no, not of that.
Q. Okay. Now, did you ever have any discussions with Jesse Saucedo about the paying of doctors for referring lab samples to a particular lab for testing?
A. It's a no-no.
Q. I asked you whether you had discussions with him.
A. I can tell you the answer is yes and the answer is no.
Q. Okay. Did you have the discussions with him; yes or no?
A. Yes.
Q. And what did he say in that regard?
A. That's -- if we -- if I ever knew of anybody that did that, you know, then -- to let him

know because he would -- he would cancel the contract immediately.
Q. Did you ever have any discussions with Dr. Murphy on that subject?
A. Yes.
Q. And what did Dr. Murphy say to you on the subject of the payment of doctors for lab referrals?
A. Same thing. The answer is yes, I did. And also that if he like heard of anybody did it, to let him know and he would take it from there and he'd cancel their contract.
Q. Okay. And did you have that discussion with him more than once?
A. I didn't need to. No, I didn't.
Q. All right. Did you -- you -- during your testimony in answer to questions to Ms. Kurtz you used the term "referral" many, many times --
A. Uh-huh.
Q. -- fair enough?
A. Yes.
Q. And you used -- you talked about payment for referrals, correct?
A. Yes.
Q. Were you at any time talking about



payment to doctors for referrals?
A. No.
Q. You were talking payment -- you were talking about payment to brokers who were bringing doctors' business to a lab, correct?
A. That's -- yes.
Q. And what is your understanding about whether or not that is covered by the anti-kickback statute?
MS. KURTZ: Objection. Calls for a legal conclusion.
Q. You can answer.
A. Run this by me again because I lost my train of thought.
Q. You know what, Ms. Kurtz is right. It is a legal conclusion.
A. Okay.
Q. But you were not ever talking about paying doctors, were you?
A. No.
Q. Ever paid a doctor?
A. No.
Q. Ever known Jesse or -- Jesse Saucedo or Mike Murphy to pay a doctor?
A. Two words. Absolutely not.



Q. Okay. Does that go for their companies as well?
A. That's correct.
Q. Does that go for the people working for them?
A. That's correct.
Q. Who is Chris Parris?
A. Chris, he's a senior vice president of -- of -- of -- let me think. Nexus Laboratory Systems.
Q. Do you happen to know how he gained access to any of United's contracts?
A. Oh, no. No, I do not. Well, the only thing I could guess would be that they had a lab called Foremost up in Michigan, and maybe that came from there. I don't know that answer. That's speculative.
MR. MARKHAM: Okay. I have nothing further.
MS. KURTZ: I don't have anything further either. I would like to mark the -- designate the transcript as confidential, attorney's eyes only just because for now there's going to be some PHI in the exhibits. I believe under the protective order we have time to designate portions



of it, but it --
MR. MARKHAM: Well, I mean these all came through my clients. They've all seen this information.
MS. KURTZ: Okay. Fine. Good point. Let's mark it as confidential and then as containing PHI, just to make sure it doesn't get distributed anywhere else.
MR. MARKHAM: Anywhere else. Agreed.
MS. KURTZ: And You have an opportunity to review the transcript and to sign it and identify whether there are any errors in the transcript. The court reporter will send you the transcript directly if that's something you wish to do.
THE WITNESS: By mail or how would they send it?
MS. KURTZ: By mail.
THE WITNESS: By mail? And what do I need to do with it? Just review it.
MS. KURTZ: And sign it.
THE WITNESS: Yes, be glad to. Now --
MR. MARKHAM: Since we're on the record, if you see an answer that there's something that does not look like what you said --
THE WITNESS: Uh-huh.