**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

| | |
|---|---|
| MISSION TOXICOLOGY, L.L.C., et al.,<br><br>Plaintiffs,<br><br>v.<br><br>UNITEDHEALTHCARE INSURANCE COMPANY, INC., et al.,<br><br>Defendants. | Case No. 5:17-cv-01016<br>(lead case) |
| UNITEDHEALTHCARE INSURANCE COMPANY, INC., et al.,<br><br>Plaintiffs,<br><br>v.<br><br>MICHAEL MURPHY, M.D., et al.,<br><br>Defendants. | Case No. 5:18-cv-00347<br>(consolidated case) |

**UNITED'S MOTION TO STRIKE DEFENDANTS' "DECLARATIONS OF MARKETERS INVOLVED IN LAB OUTREACH PROGRAM"**

Plaintiffs UnitedHealthcare Insurance Company, Inc. and UnitedHealthcare Services, Inc. (collectively, "United"), hereby move the Court to strike Exhibit MM to the Declaration of Bridget Zerner [ECF 186-35] (the "Marketer Declarations") in its entirety.

## INTRODUCTION

Having failed to obtain any testimony or produce any evidence supporting their version of events, Defendants now attempt to muddy a clear record with a series of five "Declarations of Marketers Involved in Lab Outreach Program." Zerner Decl. [ECF 186-5] ¶ 15. Each declaration includes three or four conclusory paragraphs and provides no foundation for the declarant's testimony whatsoever. What little content the declarations include is rife with hearsay and frequently strays beyond the declarant's personal knowledge. If that were not enough, one of the declarations flatly contradicts the declarant's prior deposition testimony. And in any event, Defendants failed to disclose *any* of these marketers as potential witnesses. The Marketer Declarations are inadmissible as summary judgment evidence, and the Court should strike them.

## BACKGROUND

As explained in United's Motion for Partial Summary Judgment [ECF 173], Defendants generated most of the referrals that fueled their scheme through payments to "marketers." Each marketer maintained a stable of physicians comprising their "book[ ] of business." Dkt. 174-2 at 14. The marketers would "solicit" the "referral of specimen" from their physicians to Defendants, APP 4, and Defendants would "split the fees that they received for . . . performing the test[s]" with the responsible marketers. Dkt. 174-2 at 4; *see also* APP 19. Typically, marketers kicked back some of the proceeds to the ordering physicians. For example, marketer Charles Beauford testified that he paid doctors a "consulting fee" every time they ordered a test, and then a larger "consulting fee" after the test was resulted. APP 9-10. Marketer Milo Caskey

similarly testified he would "split th[e] payments" he received from Defendants with ordering physicians, paying them 40% through "management services organizations." APP 19.[1]

Marketers also served as Defendants' points of contact with physicians, who thus received their information concerning Defendants' program from marketers. APP 7; APP 16; APP 29; 30; APP 27. The marketers United deposed testified, repeatedly and unequivocally, that they told physicians that tests would be ordered from, and performed by, Sun and Mission—*not* the rural hospitals at issue in this case.

For example, Beauford testified he "faithfully convey[ed]" to physicians that "a clinical lab owned and operated by Mission" would perform the tests, and that "Mission was in-network with all five major payors," as that was the information he received from Defendant Jesse Saucedo. APP 7-8; APP 39-58. Beauford thus *only* marketed "a laboratory owned and operated by Mission" to his physicians. Dkt. 174-2 at 3. Beauford testified that he knew Defendants had "hospital partnerships," but "wasn't privy" to "what the hospitals did as part of those partnerships." APP 11. Caskey similarly testified that he *only* marketed "a lab owned and operated by Mission Toxicology and not another lab" to his physicians. APP 13, 14. It was Caskey's understanding that physicians would "order tests [from] Mission," that "Mission would perform those tests," and that Mission was "in network" with insurers like United. APP 15, 17. Like Beauford, Caskey testified that he was aware that Defendants had hospital "partners," but didn't "have a clear understanding" of the hospitals' "role . . . in the partnership." APP 18. One of Caskey's physicians confirmed his account with a sworn declaration, stating that she "was not informed that [Newman] or CMH would be involved in the testing in any way." APP 256-57.

---

[1] Notably, Caskey and Beauford [redacted] from Defendants respectively in the course of about a year. APP 31-38; APP 59-83.

Daniel Boone—who recruited marketers to Defendants' scheme in exchange for a share of their commissions—also confirmed the foregoing, testifying that tests "weren't being ordered from the hospital[s]" by physicians, but from Sun and Mission. Dkt. 174-2 at 16-17. He further testified "there might have been . . . one or [two]" hospitals that ran tests themselves, but that it was his "understanding" that "Alternate Health . . . [was] running the samples." Dkt. 174-2 at 17.

Against this backdrop, on March 9, 2020, Defendants submitted the Marketer Declarations as Exhibit MM to the Declaration of Bridget Zerner. The declarations are from five "Marketers Involved in Lab Outreach Program." Zerner Decl. [ECF 186-5] ¶ 15. Defendants failed to identify any of these individuals as potential witnesses pursuant to Rule 26(a).

Each declaration sets forth three or four short paragraphs. In the first, the declarant states that they have the legal capacity to lodge the declaration. LDAPP 709, 712, 714, 716, 718. The declarations generally provide no further detail regarding the declarant—who they are, their relationship to this case, or any other facts to lay a foundation for their testimony. *See id.* The most information any provides on that score is one declaration that states simply: "As a 1099 contractor, I marketed lab services through and provided by Mission Toxicology." LDAPP 714.

The next paragraph of each declaration asserts the declarant's "awareness" that Newman and CMH played a role in Defendants' scheme. LDAPP 709, 712, 714, 716, 718. Most of the declarants further assert that the hospitals referenced tests to Sun and Mission, thus implying that physicians ordered the tests from the hospitals rather than Sun and Mission. LDAPP 709, 712, 716, 718. In the final paragraph, the declarants assert that ordering physicians knew that the hospitals were somehow involved in Defendants' scheme. LDAPP 709, 712, 714, 716, 718. A few of the declarants offer a sentence or two speculating as to *why* doctors ordered tests from Sun and Mission. *See* LDAPP 712, 716. One (Boone) appears to concede he has no direct

knowledge regarding what marketers told physicians. LDAPP 709. Another declarant briefly asserts what he believes *Defendants* told physicians outside of his presence. LDAPP 714.

None of the Marketer Declarations stretch more than a page, or reference other materials outside of the declaration. Rather, each declaration perfunctorily asserts two facts in opposition to the clear and consistent evidence in the record, with no explanation or elaboration.

## LEGAL STANDARD

"Under Rule 56(e), affidavits offered to support a summary judgment motion must meet three requirements. The affidavit must be made on personal knowledge, must set forth facts that would be admissible in evidence, and affirmatively show that the affiant is competent to testify to the matters stated in the affidavit." *Lorenz v. Wal-Mart Stores, Inc.*, No. SA-05-CA-0319 OG (NN), 2006 U.S. Dist. LEXIS 36145, at *17-18 (W.D. Tex. May 24, 2006). Where an affidavit fails to meet one or more of these requirements, "[t]he proper method of attacking the evidence is by a motion to strike that contains specific objections." *Rushing v. Kan. City S. Ry.*, 185 F.3d 496, 506 (5th Cir. 1999). A party may "move to strike an affidavit supporting a motion for summary judgment that contains conclusory statements or statements that constitute hearsay." *Hardtke v. The Hartford*, No. SA-04-CA-1006 NN, 2006 U.S. Dist. LEXIS 73830, at *19 (W.D. Tex. Oct. 10, 2006). "A court has broad discretion to grant or deny a motion to strike." *Id.*

## ARGUMENT

### I. The Marketer Declarations are impermissibly conclusory, stray beyond the declarant's personal knowledge, and rest on hearsay.

Try as they might, Defendants cannot create a factual dispute with "unsupported . . . affidavits setting forth 'ultimate or conclusory facts.'" *Galindo v. Precision Am. Corp.*, 754 F.2d 1212, 1216 (5th Cir. 1985) (quoting C. Wright, A. Miller & M. Kane, *Federal Practice and Procedure: Civil* 2d § 2738 (1983)); *see also Reyes v. Greater Tex. Finishing Corp.*, 19 F. Supp.

2d 709, 712 (W.D. Tex. 1998) ("The contents of summary judgment affidavits cannot be conclusory[,] . . . the facts must be specific and otherwise admissible as evidence."). An affidavit submitted in connection with a summary judgment motion must "show that the affiant or declarant is competent to testify on the matters stated," Fed. R. Civ. P. 56(b)(4), and "must include enough factual support to show that the affiant possesses that knowledge." *Amie v. El Paso Indep. Sch. Dist.*, 253 F. App'x 447, 451 (5th Cir. 2007). Similarly, statements in affidavits constituting "hearsay . . . cannot be considered by a court at summary judgment." *Hurlston v. City of Princeton*, No. 4:13-CV-757, 2016 U.S. Dist. LEXIS 25421, at *13 (E.D. Tex. Mar. 1, 2016); *see also Goodwin v. Johnson*, 132 F.3d 162, 186 (5th Cir. 1997) (holding affidavit constituting hearsay to be "incompetent summary judgment evidence"). These basic principles dictate that the Marketer Declarations are inadmissible as summary judgment evidence.

As an initial matter, the Marketer Declarations fail to lay any foundation for the declarant's testimony. The Declaration of Bridget Zerner identifies the declarants only as "Marketers Involved in [the] Lab Outreach Program" Zerner Decl. [ECF 186-5] ¶ 15. The declarations themselves omit any further details regarding who the declarants are, what they did, when they did it, or any other facts that would "show that the affiant possesses . . . [the] knowledge" they profess to have regarding Defendants' scheme. *Amie*, 253 F. App'x at 451. This alone is sufficient to warrant striking the Market Declarations in full. Regardless, each individual assertion in the Marketer Declarations fails to present competent summary judgment evidence.

*Assertions regarding "awareness" of Newman and CMH's role in the scheme.* The Marketer Declarations each begin by asserting the declarant's "awareness" that Newman and

CMH played a specific role in Defendants' scheme.[2] The declarations fail to explain the basis for that "awareness," such as what the declarant learned, from what source, or when. Indeed, the Marketer Declarations employ the passive voice in a manner that seems calculated to *obscure* the basis for, and origin of, the declarant's "awareness." These conclusory assertions are not competent summary judgment evidence. *See, e.g.*, *Galindo*, 754 F.2d at 1216.

Moreover, the declarations include no suggestion that the declarant had *personal knowledge* of the hospitals' role in Defendants' scheme. Indeed, it is difficult to see how the declarants could have observed firsthand that Newman and CMH referenced the tests at issue to Defendants, or that the hospitals did so because they lacked the "capacity" or "capability" to perform the testing themselves. Witnesses who indisputably *did* have firsthand knowledge uniformly testified that the hospitals "never referenced any testing services to Sun or Mission." APP 21; APP 25. The fact that the Marketer Declarations fail to establish that the declarants are

[2] *See* LDAPP 709 ("I am totally aware that Newman Hospital and Community Memorial Hospital or (CMH) that [sic] through their Laboratory Out Reach Program [sic] was billing [sic] the Lab tests and in certain on occasions [sic] they would work with a another vendor or lab to Sub Contract [sic] it out because they have [sic] exceeded their capacity . . ."); LDAPP 712 ("I was aware that both Newman Hospital and Community Memorial Hospital were performing laboratory testing services through their own Laboratory Outreach Programs. I was made aware and fully informed that not all testing was performed in the actual hospital laboratories as they may have lacked the specific analytical equipment and/or laboratory efficiency / capability to perform all of the testing in-house. As is common practice with hospitals, these two organizations contracted with outside reference laboratories to best accommodate the requested testing. It was my understanding that the contracted lab tests were being referenced to Alternate Health Lab which was managed by Mission Toxicology and Sun Clinical Laboratory."); LDAPP 714 ("I marketed in-network blood and urine testing to local area physicians through critical access rural hospitals seeking to grow their laboratory outreach programs."); LDAPP 716 ("I was aware that Newman Hospital and Community Memorial Hospital through their Laboratory Outreach Program were billing for lab tests that in some cases that they subcontracted out because they didn't have the ability to run them either because of capacity or analytical capability. These subcontracted lab tests were run by Alternate Health Lab which was managed by Mission Toxicology and Sun Clinical Laboratory."); LDAPP 718 ("I was informed that Mission Toxicology and Sun Clinical Laboratory manged [sic] Alternate Health Lab which was subcontracted with Community Memorial Hospital and Newman Hospital to help them in running a Hospital Outreach Program.").

competent to offer testimony on this topic presents yet another reason why these assertions fail to meet Rule 56's standards. *Amie*, 253 F. App'x at 451; *see also Ripple v. Marble Falls Indep. Sch. Dist.*, 99 F. Supp. 3d 662, 674 (W.D. Tex. 2015) (striking portions of an affidavit where the declarant failed to "indicate that he would have had the opportunity to observe" the facts to which he testified). And to the extent these assertions merely parrot what Defendants told the declarants, they constitute inadmissible hearsay. *Goodwin*, 132 F.3d at 186.

*Assertions regarding physicians' knowledge of the hospitals.* The Marketer Declarations next assert that physicians "were aware" of the hospitals' purported roles in Defendants' scheme.[3] The declarations again assert this perfunctorily, without any factual grounding. None of the Marketer Affidavits explain *how* the physicians at issue "were aware" that Newman and CMH were involved in Defendants' scheme—for example, who told who what, when, or through what means. Indeed, none of the declarations so much as *mention* a specific physician. Again using the passive voice to muddy their testimony, the Marketer Affidavits offer the assertion that physicians "were aware" of certain facts in too conclusory a manner to constitute competent summary judgment evidence. *See Galindo*, 754 F.2d at 1216. Similarly, the declarations fail to

---

[3] *See* LDAPP 709 ("I would additionally want to say to the best of my knowledge that Providers that were engaged in the Laboratory Outreach Program had been briefed that the hospitals listed above on line 2, that the that the [sic] billing for the tests were [sic] under their contracts. In which the Providers [sic] that were engaging in the Hospital Outreach Program through Mission Toxicology and Sun Clinical Laboratory's [sic] was always [sic] briefed of [sic] the processes and that Mission Toxicology as well of [sic] Sun Clinical Laboratory managed their testing needs."); LDAPP 712 ("Any and all providers for whom I facilitated coordination and set up of laboratory services tlu-ough the Laboratory Outreach Programs of Newman Hospital and Community Memorial Hospital were made aware that any and all billing was through the payer contracts of that specific hospital."); LDAPP 714 ("It was explained to these physicians that their lab reports would show the participating hospitals (Newman Memorial and CMH)."); LDAPP 716 ("Additionally, those Providers' [sic] utilizing the Laboratory Outreach Program were aware that the aforementioned Hospitals were the billing for the tests under their contracts."); LDAPP 718 ("My accounts were fully informed of the participation in a Hospital Outreach program [sic] providing in-network solution [sic] and providing excellent quantitative and qualitative results and customer service.").

explain how the declarants knew that physicians "were aware" of these facts. *Amie*, 253 F. App'x at 451. To the extent that the declarants assert that physicians "were aware" of the hospitals' involvement because Defendants told them so, this testimony again constitutes hearsay that the Court cannot consider on a motion for summary judgment. *Goodwin*, 132 F.3d at 186.

*Extraneous statements regarding third parties*. Two of the Marketer declarations speculate as to *why* physicians ordered tests from Defendants.[4] These statements concerning the motivations of third parties are self-evidently impermissible hearsay. *See id.* Similarly, one of the declarations offers speculation regarding *Mission*'s activities.[5] The declarant fails to show how he possessed knowledge of Mission's "day-to-day business," and so is not qualified to offer testimony on that topic. *Amie*, 253 F. App'x at 451. The Court should thus strike the foregoing portions of the Marketer Declarations.

**II. The Court should strike the Declaration of Dan Boone because it contradicts Boone's deposition testimony.**

A "district court may appropriately reject affidavits that contradict prior accounts—especially when no explanation for the conflict is offered." *Hackett v. UPS*, 736 F. App'x 444, 449 (5th Cir. 2018); *see also Doe ex rel. Doe v. Dall. Indep. Sch. Dist.*, 220 F.3d 380, 386 (5th Cir.2000) ("If a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact.").

---

[4] LDAPP 712 ("All providers chose to utilize the specific hospital as their reference laboratory based on their dissatisfaction with their previous laboratory relationship and experience of better accuracy, efficiency, and customer service through the Laboratory Outreach Program relationship."); LDAPP 716 ("The Providers' [sic] chose to use the Outreach Program because of their dissatisfaction with their previous lab relationships and because of the quality client service provided Mission Toxicology and Sun Clinical Laboratory's management of their testing needs.").

[5] LDAPP 714 ("To the best of my recollection, this is how Mission Toxicology was represented [sic] and conducted their day to day [sic] business.")

The Declaration of Daniel Boone flatly contradicts Boone's prior sworn deposition testimony, and fails to explain the contradiction. Accordingly, the Court should strike it.

First, Boone asserts in his declaration that Newman and CMH "Sub Contract[ed] [sic]" with Defendants to run tests that physicians ordered from those hospitals because the hospitals had "exceeded their capacity." LDAPP 709. At his deposition, however, Boone testified that the tests "weren't being ordered from the hospital[s]," but from *Sun and Mission*. Dkt. 174-2 at 16-17. He further testified that it was his understanding that "there might have been . . . one or [two]" hospitals that played some role in the testing, but Boone's "understanding" was that "Alternate Health . . . [was] running the samples." Dkt. 174-2 at 17. When asked "why certain specimens were billed through one hospital versus another," Boone stated that the answer was "above [his] pay code [sic]." Dkt. 174-2 at 29. Boone's assertions regarding the hospitals' roles in Defendants' scheme cannot be squared with this testimony he offered at his deposition.

Boone further asserts in his declaration that, "to the best of [his] knowledge," physicians knew that the hospitals played a role in Defendants' scheme. LDAPP 709. But in his deposition, Boone stated that he "d[id]n't work with doctors." APP 23. He further disclaimed knowledge of the relationships between marketers and doctors. Dkt. 174-2 at 19. Boone cannot now claim to have known all along what these physicians understood regarding Defendants' scheme.

## III. The Court should strike the Declarations of Mendler, Delgado, Dood, and Coleman because Defendants failed to disclose them as witnesses.

In response to United's discovery requests, Defendants identified *many dozens* of marketers, and produced nearly *two hundred* contracts that appear to be agreements with marketers. Defendants, however, did not identify any marketers as potential witnesses to support their claims or defenses pursuant to Rule 26(a) when they served their initial disclosures well over a year ago. Accordingly, United chose a few of Defendants' highest-volume marketers to

focus on during discovery and to depose. Now, more than a month after the close of a lengthy fact discovery period, Defendants attempt to sandbag United by submitting affidavits from several *other* of these many marketers without having disclosed them as potential witnesses.

"If a party fails to . . . identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that . . . witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). "In evaluating whether a violation of Rule 26 is harmless, the court examines four factors: (1) the importance of the evidence; (2) the prejudice to the opposing party of including the evidence; (3) the possibility of curing such prejudice by granting a continuance; and (4) the explanation for the party's failure to disclose." *Klein v. Fed. Ins. Co.*, Civil Action No. 7:03-CV-102-D, 2015 U.S. Dist. LEXIS 44516, at *12-13 (N.D. Tex. Apr. 6, 2015) (citation omitted). Here, the Marketer Declarations all touch on a centrally important factual question: was the testing at issue actually ordered from rural hospitals? United is prejudiced because it chose to focus on several of the many potential witnesses on that topic, only for Defendants to belatedly assert *after the close of discovery* that they will rely upon the testimony of *other* such individuals. The prejudice to United cannot be cured by an extension, as the discovery deadline in this case has been extended repeatedly, and further extensions will only unduly prolong this litigation. Defendants fail to offer any excuse for failing to disclose the individuals in question. Accordingly, the Court should strike the declarations offered by Mendler, Delgado, Dood, and Coleman.[6]

## CONCLUSION

For the foregoing reasons, the Court should grant United's Motion and strike the Marketer Declarations in their entirety.

---

[6] United does not move to exclude Boone's declaration on these grounds because, as discussed above, United deposed him on the pertinent issues.

Dated: March 30, 2020

Respectfully submitted,

By: */s/ William Bornstein*
Jeffrey S. Gleason
*Admitted Pro Hac Vice*
jgleason@robinskaplan.com
Jamie R. Kurtz
*Admitted Pro Hac Vice*
jkurtz@robinskaplan.com
Nathaniel J. Moore
*Admitted Pro Hac Vice*
nmoore@robinskaplan.com
William Bornstein
*Admitted Pro Hac Vice*
wbornstein@robinskaplan.com
Charles C. Gokey
*Admitted Pro Hac Vice*
cgokey@robinskaplan.com
Ena M. Kovacevic
*Admitted Pro Hac Vice*
ekovacevic@robinskaplan.com

**ROBINS KAPLAN LLP**
800 LaSalle Avenue, Suite 2800
Minneapolis, MN 55402-2015
Telephone: (612) 349-8500
Facsimile: (612) 339-4181

Andrew G. Jubinsky
Texas Bar No. 11043000
andy.jubinsky@figdav.com
Timothy A. Daniels
Texas Bar No. 24037663
tim.daniels@figdav.com

**FIGARI + DAVENPORT LLP**
901 Main Street, Suite 3400
Dallas, TX 75202
Telephone: (214) 939-2000
Facsimile: (214) 939-2090

*Counsel for UnitedHealthcare Insurance Company, United Healthcare of Texas, Inc., UnitedHealthcare of Florida, Inc., and UnitedHealthcare Services, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on the 30th day of March, 2020, I caused the foregoing to be electronically filed with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following:

John J.E. Markham, Esq.
jmarkham@markhamread.com
Bridget A. Zerner, Esq.
bzerner@markhamread.com
**MARKHAM & READ**
One Commercial Wharf West
Boston, MA 02110

## LOCAL RULE 7(i) CERTIFICATION

The undersigned certifies that he communicated with counsel for Defendants and counsel was unable to resolve the issues raised in United's Motion to Strike "Declarations of Marketers Involved in Lab Outreach Program."

Dated: March 30, 2020

*/s/ William Bornstein*
William Bornstein