# Exhibit 1

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | |
|---|---|
| MISSION TOXICOLOGY, LLC, and SUN CLINICAL LABORATORIES, LLC,<br><br>Plaintiffs,<br><br>v.<br><br>UNITEDHEALTHCARE INSURANCE COMPANY; UNITEDHEALTHCARE OF TEXAS, INC.; and UNITEDHEALTHCARE SERVICES, INC.,<br><br>Defendants. | No. 5:17-CV-01016 (lead case) |
| UNITEDHEALTHCARE INSURANCE COMPANY, INC., and UNITEDHEALTHCARE SERVICES, INC.,<br><br>Plaintiffs,<br><br>v.<br><br>MICHAEL MURPHY, MD; JESSE SAUCEDO, JR.; SAMANTHA MURPHY; LYNN MURPHY; JULIE PRICER; MISSION TOXICOLOGY, LLC; SUN CLINICAL LABORATORY, LLC; SUN ANCILLARY MANAGEMENT, LLC; INTEGRITY ANCILLARY MANAGEMENT, LLC; ALTERNATE HEALTH LAB, INC.; and LMK MANAGEMENT, LLC,<br><br>Defendants. | C.A. No. 5:18-cv-00347 (consolidated case) |

DEPOSITION OF CHARLES BEAUFORD
Dallas, Texas
Tuesday, November 26, 2019

Reported by:
REBECCA A. GRAZIANO, CSR, RPR, CRR
JOB NO. 171987

only to a lab owned and operated by Mission?
A. To my understanding.
Q. All right. So if you look at the next paragraph, am I correct that this states: "Manager is in the business of, among other businesses, managing and arranging for the availability of ancillary health care services for and on behalf of networks of physicians and physician group practices, defined as the 'Network Physicians'"?
A. Yes.
Q. All right. So were these the same physicians that we were talking about a moment ago?
A. Can you clarify?
Q. So BeauMed has relationships with some physicians; is that correct?
A. Correct.
Q. And were those the same physicians with whom BeauMed was connecting Mission in this contract?
A. One of the laboratories I connect them with, yes.
Q. So if you look at the next paragraph, am I correct that this says:



"Manager desires to arrange for the lab to be available for use by the network physicians for the provision of medically necessary toxicology testing services"?
A. Yes.
Q. So then did you understand that this would be a contract under which BeauMed's physicians would order testing from a lab owned and operated by Mission?
MR. CARR: Objection; form; vague; assumes facts not in evidence.
MS. ZERNER: Same objection.
THE WITNESS: I understood the physicians, based upon their desire to test their patients and based upon what Mission offered, to elect to send patient submission. That's what I understand.
BY MR. GOKEY:
Q. So do you mean by that that they would order tests from Mission?
A. Yes.
Q. And order those tests to be performed at a lab owned and operated by Mission?
A. To my understanding, yes.



Q. So if you'll just take a second to quickly review Paragraph 2 here under "Recitals," it lists a series of services BeauMed contracted to perform.
All right. So is it fair to say that one duty BeauMed assumed under this contract was to market the services of Mission's laboratory to physicians?
A. Yes.
Q. And is it fair to say that another duty that BeauMed assumed under this contract was to facilitate the orders of toxicology testing from Mission?
A. Yes.
Q. And, again, these were -- strike that.
So BeauMed didn't assume any duty with respect to marketing other labs other than the laboratory owned and operated by Mission; is that correct?
A. That's incorrect.
Q. "That's incorrect," did you say?
A. Because Mission was one of the laboratories that I offered to physicians that I knew based upon their desires for testing and



what they asked for.
Q. I see. So under this contract, though, under this contract, BeauMed only assumed duties related to marketing services from Mission; correct?
A. Yeah, that's correct.
Q. And those were the services of a clinical laboratory owned and operated by Mission?
A. Yes, sir.
Q. Did you perform any services for Mission that weren't governed by this contract?
A. Not to my understanding, sir.
Q. Okay. So if you turn the page here to Page 2, and if you look at Paragraph 4, "Management Fee," am I correct that this states that "throughout the term of this agreement, Mission agrees to pay manager a monthly fee, defined as the 'Management Fee,' with regard to the services provided to each network physician in an amount equal to 60 percent of the net collections"?
A. Yes.
Q. All right. And am I correct that if you look at the following sentence, it

Page 42

specifies these are net collections that were received by Mission?
A. Yes.
Q. So did that mean that you would receive 60 percent of the net collections on tests ordered from BeauMed physicians?
A. Yes.
Q. And so the more tests those physicians referred, the more BeauMed would get paid?
A. Would you clarify that?
Q. So if a physician orders one test, that means that BeauMed gets paid 60 percent of what Mission gets for that one test; correct?
A. Correct.
Q. And if that same physician that orders ten tests, that means BeauMed gets 60 percent of what Mission receives for those ten tests; right?
A. Yes.
Q. So then the more tests a physician orders, the more BeauMed is paid under this agreement; is that correct?
A. In theory, yes.
Q. Why only in theory?

Page 43

A. Because I really don't know exactly how and when they got paid, and I just know the reports they gave me.
Q. But assuming that they got paid for every test, is that how it would work?
A. Yes.
Q. All right. And so earlier you said that you did little work for Sun; is that correct?
A. I referred one physician there that ordered some testing.
Q. And was that on similar terms that we were just discussing here under this contract?
A. It was presumed. I never had a contract with Sun.
Q. When you say "presumed," was there any discussion about the terms on which you would be sending this physician to Sun?
A. Yes.
Q. And do you recall those terms?
A. It would be similar to -- to the 60 percent agreement represented here.
Q. I see.
So you would get 60 percent of what

Page 44

Sun received from tests ordered by that physician?
A. Yes.
Q. And how did you decide whether to market Sun or Mission to a particular physician?
A. It was all based upon what the physician wanted in terms of service, what they wanted as it relates to testing, if they had satisfaction with a current vendor or if they were seeking something else.
My job was to make sure that the laboratory was credible, that they offered the testing the physicians wanted, and then to connect them and let the doctor make the decision at that point.
Q. So then did you connect physicians with both Sun and Mission and then they would make the decision?
A. There was only one instance where a physician opted to send some tests to Sun.
Q. But did you market Sun's clinical lab to others?
A. No, I didn't.
Q. Um-hum.

Page 45

A. It was only one physician I spoke to about it.
Q. So for both Sun and Mission, though, your work was essentially marketing the services of their clinical labs?
A. Yes, sir.
Q. To solicit business from physicians?
A. On an as-needed basis.
Q. And that business was the referral of specimen?
A. Yes, sir.
Q. Okay. And as compensation, Sun and Mission would pay you commissions equal to about 60 percent of what it received?
A. On Mission. I never received any payment from Sun.
Q. And do you know why that was?
A. I have no idea, besides the fact I heard it was -- it was some internal issues. I have no details of it. I never really got a good answer about that.
Q. But at least with Mission, it was your understanding that they would essentially split the fees that they received for receiving -- performing the test with you?

Page 50

capabilities would have come from Mission itself?
A. Yes, sir.
Q. So looking at this email, am I correct that this email that starts here about halfway down the page is you asking Jesse Saucedo: "Could you send me some marketing PDFs for all services and account setup paperwork?"
A. Um-hum.
Q. All right. And am I correct that Jesse Saucedo responds: "Attached is a presentation we use for physicians and reps. I also included our account registration form to set up"?
A. Yes, sir.
Q. All right. So having taken a look at this marketing material, to your knowledge, is this material 100 percent accurate?
A. To my knowledge, it is accurate.
Q. And so when you marketed Mission's services to doctors, would they rely on you for accurate information about Mission?
A. Yes, they would.
Q. And so then did you faithfully

Page 51

convey the information set out in this marketing material to doctors when marketing to them?
A. Yes, I did.
Q. And do you understand that that was what Jesse intended when he said that this was "a presentation that we use for physicians and reps"?
MS. ZERNER: Objection to the extent it calls for speculation.
BY MR. GOKEY:
Q. I'm asking for your understanding, though.
A. Could you rephrase the question?
Q. Yeah.
So -- you know what? Withdrawn.
So let's take a look at this first attachment.
A. Okay.
Q. So is this the presentation to which Jesse Saucedo was referring in the email?
A. Yes, sir.
Q. So this was the presentation for physicians and reps?
A. Yes, sir, to my understanding.

Page 52

Q. And were those reps the contractors we discussed earlier who were marketing to other physicians under you?
A. The contractors I referred to, yes.
Q. So taking a look at the first page here, there is a page that's captioned at the bottom: "About Mission & our commitment to you."
A. Um-hum.
Q. All right. If you look in the lower left-hand corner of this top box, there are a series of lab services listed: "Toxicology, OB/GYN blood profile, allergy, and blood wellness"?
A. Um-hum.
Q. All right. Did you understand that those were lab services offered by Mission?
A. Yes.
Q. And they were offered at a clinical lab owned and operated by Mission?
A. To my knowledge.
Q. All right. And if you look at the next page here, am I correct that this is a list of benefits of ordering testing from Mission?

Page 53

A. It seems so, yes, sir.
Q. And the caption here says: "High Complexity reference lab;" correct?
A. It does.
Q. So did you understand that Mission Toxicology was a high complexity reference lab?
A. To my understanding.
Q. All right. So if you flip, I guess -- this is, what, one, two -- three pages forward, there is a page with the caption "Benefits, Advantages & Tools" at the bottom.
A. Okay.
MR. CARR: Would you repeat that? I'm sorry. I did not -- I just didn't hear what you say.
MR. GOKEY: Yeah. Sorry. It's about three pages beyond the page we were just looking at, and it's captioned: "Benefits, Advantages & Tools."
MR. CARR: Got it. Thank you.
MR. GOKEY: Yes. Thank you.
BY MR. GOKEY:
Q. So if you look in the upper left-hand corner, this says that Mission is "in-network with all major five payors;" is

Page 54

that correct?
A. Yes.
Q. So did you understand that Mission was in-network with all five major payors?
A. To my knowledge.
Q. All right. And this one is going to be a little bit challenging to find because you're going to have to flip through a bunch of pages here.
A. Yes, sir.
Q. But if you flip through these various charts, you will eventually reach the first page after the charts, which says "Tips & Tools" at the bottom.
A. Got it.
Q. All right. So in the upper right-hand corner, am I correct that this says: "Mission Toxicology works hard to keep our testing cost-efficient by negotiating in-network status with most major insurance companies"?
A. Yes, sir.
Q. And so you understood, then, that Mission Toxicology had negotiated in-network status with most major insurance companies?

Page 55

A. To my knowledge, yes, sir.
Q. And that was information you would have conveyed to the doctors you marketed to?
A. To my knowledge, yes, sir.
Q. And so if you look below that, it says: "Mission will perform and bill the patients insurance for the testing services that have been ordered by the physician;" is that correct?
A. Yes, sir. That's what it reads.
Q. So did you understand that Mission Toxicology would, itself, perform the testing ordered from it?
A. I understood them to manage all the testing. You know, I can't say exactly who billed or who didn't bill.
Q. But in terms of the tests that were ordered, they were ordered from Mission Toxicology; correct?
A. Yes, sir.
Q. And you understood Mission Toxicology to be a high complexity reference lab?
A. To my knowledge, yes, sir.
Q. And that would perform the tests

Page 56

that were ordered from Mission?
A. To my knowledge, I understood them to manage all the testing.
Q. Is that different from performing the testing?
A. Performing the testing and managing the testing would be similar.
Q. And how are they different?
A. Because I understood them to have some agreements with people that, at times, you know, they would utilize to help them with tests they couldn't manage.
Q. So a physician would order a test from Mission; is that right?
A. Yes.
Q. And then Mission would reference that sample out to another lab?
A. It was based on the need, and I trusted them to manage that. I really didn't know exactly the process of that. I can just speak to what I know. I trusted them to manage those samples and do what they felt best.
Q. But those were tests that were ordered from Mission; correct?
A. Correct.

Page 57

Q. And am I correct that the information set out in this pertains to a clinical lab owned and operated by Mission?
A. Yes, sir.
Q. So the management services that aren't encompassed in actually testing the samples are not discussed in this?
A. To my knowledge, no, I don't -- I don't think it is.
Q. All right. And if you would turn to the second attachment here, it is a form that says "New Client Registration" at the top; am I correct?
A. Yes, sir.
Q. All right. So was this a registration form you used to onboard physicians for Mission Toxicology?
A. Yes.
Q. And did you ever fill out any of these forms?
A. Yes.
Q. Do you recall if Mission requested any other information to onboard physicians?
A. If this was incomplete, to my knowledge, they would follow up and ask more

Page 114

email from Ms. Graham, she referred to 15 minutes of consulting when ordering a test; is that correct?
A. Based on -- yes, she did.
Q. And so then is it your understanding that these entries here where there are 15 minutes recorded for "spoke to regarding need for testing" pertain to ordering Mission tests?
A. I understood it to -- to be related to it of some degree.
Q. And then the entry under that, "consult & recommendations" for 60 minutes, is that the consultation that would then follow the results of the test being released?
A. I'm not 100 percent sure. I know that normally when I met with Dr. Steiner, I spoke with him at length about his recommendations. So I'm not sure if he's referring to us talking about a specific patient type versus -- versus what you just said.
Q. Yeah. But based on the email that you received earlier from Ms. Graham, am I correct that she referred to 60 minutes of

Page 115

consultation after receiving results for tests?
A. You are correct in that, yes, sir.
Q. So then is that what you understand these entries to mean, based on that email?
A. Based on the email. But based on actually what happened, I'm -- I'm not 100 percent sure.
Q. So you think, then, that this wasn't accurate?
A. I think that it was a mix of what he did in terms of speaking to patients versus when me and him met. You know, what I understood him to be doing would be gathering information about different prototypes and why he tested and protocols and sharing those and educating me just so I would be better in terms of marketing my services to chiropractors, and so that's what I understood him to be doing.
So it seems that it could possibly be a mix. But based on the email, what you said is correct.
Q. All right. So then was it every time that Dr. Steiner ordered a test from Mission, he would consult for 15 minutes with the patient regarding the need for testing?

Page 116

A. Based on the email, if that's what he's saying, I presume. I'm not 100 percent sure that's exactly what he did every time. But based on the email, yes.
Q. And then after receiving the results of the testing, he would consult for 60 minutes regarding the results?
A. Based on the email, it seems to be so.
Q. Yes. And then he would bill you for this time under the consulting agreement?
A. He billed me for the time that me and him spoke as it relates to the patient types and protocols, which is why I said it may be a little bit of not as -- consistency in terms of this document.
But I remember speaking to him many times and, you know, about different patient types and why he tested. So this is what he billed me for.
Q. I see.
So just to be clear, he billed you for the time recorded in this document?
A. He billed me for the time recorded.
Q. But in this document?

Page 117

A. In this document.
Q. And did you pay Dr. Steiner for his time referred that document?
A. I did pay Dr. Steiner for his time.
Q. Did you have similar arrangements with other physicians?
A. "Similar arrangements"?
Q. Similar consultation agreements, I should say.
A. Yes, our -- and our medical advisory boards.
Q. And did those physicians consult regarding Mission testing, sort of like Dr. Steiner?
A. Dr. Steiner, how this is written is a little bit different than what would typically happen. So to some degree, yes, and other degrees no.
Q. But would they typically consult with patients when ordering Mission tests, like Dr. Steiner?
A. To my understanding, they were gathering information about prototypes and patients. So to a degree, I'm sure they asked patients questions so they could refer back to

Page 118

me.
Q. But would they have billed you for services similar to what Dr. Steiner billed you for in that last document?
A. They would have billed me to some degree for that. Not exclusively.
Q. But at least to some degree?
A. More than likely, yes.
Q. Mr. Beauford, were BeauMed's arrangements with physicians, like, a secret?
A. A secret?
Q. Yeah. Did you try to, like, you know, conceal your relationships with physicians?
A. I can't say that I did.
Q. So you were open about those relationships with your business partners?
A. To the degree that it was necessary, yes.
Q. And do you understand arrangements like this to be somewhat of an industry standard, like common to others?
A. Based on the feedback I got from my attorney in terms of what would be compliant, I understood it to be compliant. I understood it

Page 119

to be aboveboard. I understood it to be in accordance with Mission's compliance document as well. You know, as long as it's not excessive and it follows certain parameters for it to be okay.
Q. But just in terms of the way the agreement is structured, did you understand that other people in the industry had similar agreements with physicians?
A. I never spoke to other people about their agreements with physicians, so I can't speak to that.
Q. Okay.
MS. ZERNER: Charles, we've been going a little over an hour.
MR. GOKEY: Oh, yeah. I was wondering if I was keeping track of time wrong. I'm happy to go off, yeah.
MS. ZERNER: Yeah, let's go off for five minutes or so.
THE VIDEOGRAPHER: Off the record at 11:34 a.m.
(Recess from 11:34 a.m. to 11:50 a.m.)
THE VIDEOGRAPHER: Back on the record at 11:50 a.m.

Page 120

BY MR. GOKEY:
Q. So with respect to the physician relationships we were just talking about, am I correct that that's not something that you shared with insurers, health insurance companies?
A. That would be correct.
Q. Okay. And so you never told anybody at, you know, UnitedHealthcare about any of that?
A. No.
Q. Okay. Did you tell anybody at UnitedHealthcare about any of what we were just talking about?
A. No.
Q. Okay. Mr. Beauford, do the doctors that you work with still order tests from Mission?
A. No, not to my knowledge.
Q. And do you know approximately when those doctors stopped ordering tests from Mission?
A. Who would you be referring to?
Q. The various doctors that we saw listed in that chart earlier.

Page 121

A. I don't remember exactly the dates they stopped.
Q. Would it have been around the same time?
A. No.
Q. No?
So one doctor would stop referring, then another one would --
A. Based on a guess, yes. But I don't remember exactly.
Q. Mr. Beauford, I'm going to hand you another document. We're getting towards the end of the pile of stuff I'm going to dump on you, so...
This is going to be marked as Exhibit 243.
(Exhibit 243, Email Chain with Attachment; Bates BeauMed 000639 through 000641, marked for identification.)
BY MR. GOKEY:
Q. Take a moment to familiarize yourself with that.
So, Mr. Beauford, am I correct that this is an email to you from Amanda Feyrer?
A. Yes.

Page 138

A. I wasn't privy to those conversations. I was just a person to introduce Marc to Jesse through a third party.
Q. Do you know if Mission had other hospital partnerships?
A. I knew they had a few.
Q. Did you know what the hospitals did as part of those partnerships?
A. I wasn't privy to that. That was between them. Yeah, I wasn't privy to everything he did.
Q. Yeah. So you didn't know if the hospital did really anything in connection with that partnership?
A. I wouldn't be sure. I wouldn't know.
Q. Because, to your knowledge, the doctors were ordering tests from Mission; correct?
A. To my understanding, Mission was the expert.
Q. Yeah.
A. And they made the decisions about the testing and how it would be handled.
Q. All right. I'm going to hand you

Page 139

another document. And this one is going to be marked as Exhibit 246.
(Exhibit 246, Email with Attachment; Bates BeauMed 000430 through 000434, marked for identification.)
BY MR. GOKEY:
Q. Have you had a chance to look at it?
A. (Moving head up and down.) Um-hum. I'm ready.
Q. All right. So, Mr. Beauford, am I correct that this is an email to you from Jesse Saucedo?
A. Correct.
Q. And if you look at the file name of the attachment here, am I correct that it states "BeauMed Consultants Override Agreement (Hospital Broker)"?
A. Correct.
Q. And so is this the Valor hospital deal that was discussed in that previous email?
A. It is.
Q. All right. So taking a look at this, if you look at the second page, the signature block, am I correct, says that it's being signed for Mission by Ancillary

Page 140

Healthcare Management, LLC?
A. Yes.
Q. So, then, did you understand Ancillary Healthcare Management, LLC, to be some sort of agent of Mission?
A. I understood them to be their entity. I'm not sure if they were agent of Mission or not. I just knew they were a spin-off company. So I don't -- I don't have all the details of that.
Q. I see.
And Jesse Saucedo, Jr., though was going to be the signatory for Ancillary Healthcare Management?
A. Yes, sir.
Q. Was it your understanding that Jesse Saucedo is in charge of Ancillary Healthcare Management?
A. He was.
Q. All right. And am I correct that under that, there's a space for you to sign?
A. Yes, correct.
Q. All right. So looking at the first paragraph, am I correct that Ancillary Healthcare Management, LLC, is defined as

Page 141

"AHM"?
A. Yes.
Q. And BeauMed Consultants is defined as the representative?
A. Yes.
Q. All right. So if you look three -- four paragraphs down -- actually, wait. Three paragraphs down, am I correct that this states: "Representative desires to introduce AHM, or has otherwise introduced AHM to, the hospital or hospitals listed in Exhibit A" --
A. Yeah.
Q. -- "attached hereto (collectively, the 'Representative Hospitals') for purposes of enabling AHM to promote and offer its services to such representative hospitals"?
A. Yes.
Q. All right. So if you look at Exhibit A, which is I think the last page of the document, am I correct that that is blank?
A. It is.
Q. Do you know why this is blank?
A. I have no idea.
Q. But were there actually representative hospitals to which you