# Exhibit 2

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| MISSION TOXICOLOGY, L.L.C., ET AL., Plaintiffs | * | |
| V. | * | Case No. 5:17-cv-01016 (lead case) |
| UNITEDHEALTHCARE INSURANCE COMPANY, INC., ET AL., Defendants | * | |
| -------------------------- | * | |
| UNITEDHEALTHCARE INSURANCE COMPANY, INC., ET AL., Plaintiffs | * | |
| V. | * | Case No. 5:18-cv-00347 (consolidated case) |
| MICHAEL MURPHY, M.D., ET AL., Defendants | * | |

***************************************
ORAL AND VIDEOTAPED DEPOSITION OF GREGORY MILO CASKEY
NOVEMBER 19, 2019
***************************************

Job No. 172099

Page 34

MR. MERRILL: Thank you.
(Exhibit Number 180 marked.)
Q. Again, take a moment to look over it.
A. Okay.
Q. All right. Mr. Caskey, am I correct that this is a contract between NuMedica and Mission Toxicology, LLC?
A. Yes.
Q. And just, again, for the sake of convenience, can we agree that when I say "Mission," I'm referring to Mission Toxicology, LLC?
A. Yes.
Q. All right.
So if you will turn to page 8 of this document, which you can see very tiny, little numbers at the very bottom.
Am I correct that that's your signature for NuMedica Innovations?
A. It is.
Q. And am I correct that Jesse Saucedo, Jr. is listed as the signatory for Mission Toxicology?
A. Yes.
Q. All right.
So look back to the first page of this document, which is not the page with the control number

Page 35

on it.
A. Yes.
Q. Looking at the very first paragraph under Management Services Agreement, am I correct that NuMedica Innovations, LLC is called the manager in this contract?
A. Yes.
Q. And Mission Toxicology, LLC is referred to as Mission?
A. Yes.
Q. All right. So just taking a quick look at the first couple of paragraphs under Recitals here.
The first paragraph says, Mission is engaged in the business of owning, operating a clinical laboratory, the lab; is that correct?
A. Yes.
Q. So "the lab" is defined here as a clinical lab, a laboratory owned and operated by Mission?
A. Yes.
Q. Having reviewed this document a second ago, did you see any other labs referred to?
A. No.
Q. So this is a contract that pertains to a lab owned and operated by Mission Toxicology and not another lab?

Page 36

A. Yes.
Q. All right. Actually, before we go any further, did you have any other contracts with Mission?
A. No.
Q. All right. And did you perform any other services for Mission that were not governed by this contract?
A. No.
Q. Okay.
So if you look in the second paragraph, am I correct that this says, Manager, or I guess NuMedica, is in the business of, among other businesses, managing and arranging for the availability of ancillary healthcare services for and on behalf of networks and physicians and physician group practices defined as the network physicians.
A. Yes.
Q. And are these network physicians the same physicians that we were discussing earlier with whom NuMedica had relationships?
A. Yes.
Q. And these were the physicians with whom NuMedica had MSOs?
A. Mostly. I mean, there could be physicians I worked with that didn't go into an MSO, just wanted a --

Page 37

a good lab to use.
Q. Uh-huh. Approximately how many physicians do you work with who didn't want an MSO?
A. I mean, I -- I don't recall. It was -- it was a handful, not a lot.
Q. But most wanted an MSO?
A. Yes, most were in -- in an MSO.
Q. So it was the exception, then, I guess, that they didn't want an MSO?
A. Yes.
Q. All right.
So looking at the third paragraph here under Recitals, am I correct that this says, Manager desires to arrange for the lab to be available for use by the network physicians for the provision of medically necessary toxicology testing services?
A. It does say that, yes.
Q. All right. And so did you understand that this contract was governing the terms under which the physicians NuMedica had relationships with would order tests from Mission?
A. Yes. Well, it says toxicology. You know, I basically use them more for blood, wellness. And, you know, we had passive investors as well as active investors, so there was no -- you know, the hope would

Page 38

be that they would use services that, you know, we installed.
Q. But just to be clear, does this contract contemplate NuMedica physicians ordering tests from Mission?
A. Yes, they had the option of doing that.
Q. Uh-huh. All right.
And so if you look in the next paragraph here, it says, In connection with the use of the lab by the network physicians, Mission desires to engage manager to provide certain management training and other services to the network physicians to facilitate the efficient and appropriate utilization of the lab by the network physicians.
Is that correct?
A. Yes.
Q. All right. So if you look at paragraph 2 here, which starts about two-thirds of the way down the page, am I correct that that defines the services that NuMedica will perform under this contract?
A. Yes.
Q. All right. You can take a moment to just look those over.
A. Yeah. (Witness complies.)
Okay. Yep, looks like it was.

Page 39

Q. So is it fair to say that one of the duties that NuMedica assumed under this contract was marketing Mission's lab to NuMedica's physicians?
A. Yes.
Q. And it didn't assume any duties related to marketing other labs?
A. No.
Q. Just the lab owned and operated by Mission?
A. Yes.
Q. All right. And is it fair to say that another duty that NuMedica assumed under this contract was to facilitate the order of testing from Mission?
A. Yes.
Q. Is there any other service that you performed for Mission that you don't think is fairly encompassed in those two categories?
MR. MERRITT: Objection, best evidence.
THE WITNESS: Sorry? I didn't hear what he said.
MR. MERRITT: You can answer the question, but listen carefully what he asked you.
A. Oh. Can you repeat the question?
Q. Sure.
Did you perform any other services for Mission under this contract that were not marketing

Page 40

Mission's lab to NuMedica physicians or facilitating the order of lab testing by NuMedica physicians from Mission?
MS. ZERNER: The same objection.
A. That was -- that was part of it. But, you know, there's a lot that goes into, you know, running specimens, resulting them, and handling all the day-to-day operations with that.
Q. All right. And so what other services did you provide?
A. Like three pages of management services that, you know, we can go through if you would like. But there is a lot of stuff on there. Just day to day, making sure the courier picked them up, making they're resulted, make sure they were processed correctly, make sure the results go into portals correctly, making sure if any patients had questions, we would facilitate that; if physicians had questions, we would facilitate that, you know, setting up the lab, all the equipment, making sure the equipment ran correctly --
Q. Uh-huh.
A. -- you know, works with the staff, the collectors.
Q. So just to back up, what equipment exactly are you talking about?

Page 41

A. Just like a centrifuge, a draw chair. Not a lot of equipment, just, you know...
Q. So this is equipment that NuMedica would provide to physicians' offices?
A. Normally. Normally we would do that, yeah. A lot of times the clinic already had it. But if they didn't, you know, we would find it for them.
Q. And NuMedica would bear the cost of that?
A. Usually.
Q. Did Mission ever reimburse NuMedica for any of those sorts of expenses?
A. Not that I'm aware of. Not that I'm aware of.
Q. All right. Is it fair to say that primarily the services you performed were first -- well, strike that.
So under this contract, you marketed Mission's laboratory to NuMedica's physicians; is that fair to say?
A. Yes.
Q. And under those contracts, you facilitated their orders of testing from the lab owned and operated by Mission; is that correct?
A. Yes.
Q. All right. And if you would turn to the next page, please.

Page 42

A. (Witness complies.)
Q. Look at paragraph 4. Am I correct that this says throughout --
A. Paragraph 4?
Q. Oh, I'm sorry.
A. Okay. Here (indicating).
Q. There (indicating).
Am I correct that this says that,
Throughout the term of this agreement, Mission agrees to pay manager a monthly fee, defined as the management fee, with regard to the services provided to each network physician in an amount equal to percent (55 percent) of the net collections?
A. Yes.
Q. And if you look at the last sentence of that paragraph, am I correct that it specifies these are net collections received by Mission?
A. Correct.
Q. All right. So Mission would pay NuMedica 55 percent of what it received in net collections?
A. Yes.
Q. And were these net collections for tests performed for NuMedica's physicians?
A. Yes.
Q. All right. So those physicians would refer

Page 43

tests to Mission, or I should say order tests for Mission.
A. Yes.
Q. Is that correct?
A. Uh-huh.
Q. And then Mission would perform those tests; is that correct?
A. Yes.
Q. And then Mission would bill somebody for those tests; is that correct?
A. I'm not sure what the relationship was on billing.
Q. Uh-huh.
But somebody would bill somebody for the services that Mission provided, correct?
A. Yes.
Q. And then Mission would get paid for performing the tests; is that right?
A. Yes.
Q. And then Mission would pay NuMedica 55 percent of what it received for performing the tests; is that correct?
A. Well, they pay us for the management, yes.
Q. But the fee was calculated by taking the net collections for performing the tests and dividing it

Page 44

between you and Mission; is that correct?
A. That's correct.
Q. Okay. So under this agreement, the more tests that Mission performed, the more NuMedica would receive. Is that fair to say?
A. Theoretically.
Q. Why only theoretically?
A. Because you're assuming that the test was going to get covered and paid. I mean, some -- some patients don't even have lab benefits, you know, so you don't even know if it's going to be covered or not. But, yes, that's correct.
Q. All right. And is that how this arrangement worked at operation?
A. Can you clarify that?
Q. So that's what the contract says, but is that what actually happened in your relationship with Mission?
A. For the most part, I mean, yeah. I mean, it was full-time management of these accounts and, you know, we had revenue.
Q. So that's a "yes"?
A. Yes.
Q. Okay.
So does this help jog your memory at all in

Page 45

terms of the services that you performed for Sun?
MR. MERRITT: Sun?
MR. GOKEY: Sorry. Sun Labs.
MR. MERRITT: Oh, I'm sorry. I was making sure you were changing the subject.
MR. GOKEY: Yeah, yeah.
A. They would be similar kind of activities, I'm sure, yeah.
Q. Uh-huh. So the work that you did for Sun was like the work that you did for Mission?
A. Yeah, I suppose so. But, like I said, Sun was such a short amount of time. It was only a month or two, yeah.
Q. Uh-huh. So for both Sun and Mission, is it fair to say that you sort of solicited business from physicians for their labs?
A. Yeah, I -- yeah, I mean, I like -- I like to term it as -- as, you know, we were a management company trying to manage labs and other things. So for sure, uh-huh.
Q. But you were marketing essentially --
A. Yes.
Q. -- those labs to your physicians?
A. Yes, for marketing, uh-huh.
Q. And the business you were trying to solicit

e-mail, do I understand your statement that there are significant dollars for us when we get these into Mission to mean that these individuals were also paid commissions for the tests ordered by NuMedica physicians?
A. They were K-1. At this particular time, they were K-1 shareholders in the MSOs. So they would get a distribution based on their shares.
Q. Uh-huh. Sort of like the doctors?
A. Right, any shareholder.
Q. Okay.
MR. GOKEY: May I have Tab 28, please? Thank you.
Q. All right. Mr. Caskey, I'm going to hand you another document. This will be marked Exhibit 182.
(Exhibit Number 182 marked.)
A. Okay.
Q. Take a moment to familiarize yourself with that.
A. (Witness complies.)
Okay. I took a look at it.
Q. All right.
So, Mr. Caskey, looking at the first e-mail in the chain, am I correct that this is an e-mail from an A. Feyrer at Mission Toxicology?



A. Yes.
Q. And was this individual an employee of Mission?
A. Yes.
Q. All right. And you are forwarding this e-mail from Ms. Favor to Scott Norman, Robert Castaneda, and Alex Epstein, correct?
A. Yes.
Q. And those are the same individuals that we discussed a moment ago who would help you market Mission's services; is that correct?
A. Yes.
Q. All right. And having reviewed the attachments, am I correct that these are materials that those individuals were to use in marketing Mission's services?
A. They're the req forms, yes.
Q. So, for example, is this first attachment instructions for filling out the req form for ordering tests for Mission Toxicology?
A. Yeah. It appears that way, yes, uh-huh.
Q. All right. And for the second attachment, the same sort of instructions for filling out tox forms; is that correct?
A. Yes.
Q. All right.



Now, if you look to the -- the last page of this attachment -- or, sorry, last attachment, I should say.
A. The tox one?
Q. No, it's this one that's right --
A. Oh, yeah. Uh-huh.
Q. So am I correct that this is a form that was used to register physicians for receiving services from Mission?
A. Yes. It's a registration form.
Q. And did you ever fill out one of these forms for a physician?
A. Yeah, either myself or one of my colleagues.
Q. Uh-huh. And do you recall, was this all of the information that Mission required to onboard a physician?
A. I don't recall. I think this was it, but...
Q. But you think this was it?
A. I think so.
Q. You don't recall submitting other information for a physician to register --
A. Not that I recall.
Q. And you don't recall hearing that Mission had reached out to one of NuMedica's physicians for other information?



A. No.
Q. Would you have expected Mission to communicate directly with your physicians?
A. No.
Q. So communications generally would have gone through you?
A. Yes, yes, through the management company. So they were our accounts to manage.
Q. Uh-huh.
All right. I would like to walk through this briefly if that's all right.
A. Sure.
Q. So looking at the first box, that kind of information, can you tell me the general sort of information that's being requested here?
A. Yeah, it's just registering the facility and the -- the pertinent information, address, fax, phone, e-mail contacts, criticals, things like that.
Q. All right. And so all of these relate to the contact information for the physician's office; is that correct?
A. Yes.
Q. All right. So -- and the shipping and report delivery information box that's below that, was that for scheduling the pickup of a specimen from the physician's

Page 74

tests were sent for analysis to Mission Toxicology, yeah.
Q. Uh-huh.
So where would the physicians that ordered tests for Mission send the specimen?
A. They get picked up by courier.
Q. And do you know if those would be taken to Mission's facilities?
A. They were taken someplace, a sorting station, something like that. I'm not sure where it was.
Q. And how would physicians typically receive results for those tests?
A. Usually a portal. They have a user name and ID, and they were able to get them dropped down into the portal, and could print them or put them into the HR.
Q. And Mission would provide that portal?
A. Yes.
Q. And do you recall if it worked roughly the same way when you were working for six months with Dr. Roka under Sun?
A. I'm sure it was similar. I don't recall what their reporting was. It was pretty standard to have a portal. Pretty much every laboratory has a portal.
Q. But Dr. Roka would order a test from Sun on a Sun requisition?

Page 75

A. Yes.
Q. And then send that sample out, presumably, to whoever would test it?
A. Yes.
Q. And would Mission then provide the courier that would take the sample to its destination?
A. Yes. Part of our management was managing the courier's schedule, the pickup, delivery, any problems, traffic, accident, whatever it was. We were always dealing with couriers making sure they picked up on time.
Q. But Mission would pay for the courier?
A. Yes, it was a Mission expense, uh-huh.
Q. So from our conversation, I take it you did not consider working with Sun again after forming NuMedica?
A. No.
Q. And was there any particular reason for that?
A. No. There wasn't any reason at all. I mean, Nick and I had a falling out, so I probably just avoided him and working with Mission -- or Sun.
Q. Uh-huh. So when you marketed Mission's services to physicians, what did you tell them were some of the benefits of Mission?
A. Well, Mission is a known lab in San Antonio. They've been in town for a long time, so physicians know

Page 76

Mission already. Probably just, you know, a quality lab, quick turnaround time, probably something about being in network. I'm not positive. But those kind of things that doctors would ask about.
Q. Uh-huh. So was it your understanding that Mission was in network with insurers?
A. Yes.
Q. And that was something that you would communicate to physicians in the course of marketing Mission?
A. I don't know if we communicated -- I can't recall if we would communicate it all the time. But, I mean, that was something that was asked of us, you know.
Q. Uh-huh. And who told you that Mission was in network?
A. I don't recall.
Q. So who was your primary point of contact at Mission?
A. Mostly Amanda. I talked to Amanda quite a bit. Rarely talked to Jesse. And then everyone else was just through e-mails and stuff. But Amanda and I would chat about, you know, the management and operations.
Q. Uh-huh.
So is she the person who would have provided you with information about Mission typically?

Page 77

A. Yes.
Q. Uh-huh.
Mr. Caskey, I recall earlier you mentioned phlebotomy. Could you tell me what a phlebotomist is?
A. They're, you know, typically MAs with a degree in phlebotomy. It's a -- I don't know what the course is to get certified as a phlebotomist, eight weeks or a six-week course or something like that, to draw blood, or just any kind of laboratory services. But phlebotomy is, you know, about blood.
Q. All right. I'm going to hand you another document, which is --
MR. GOKEY: Could I have 39, please?
Q. And I'm going to mark this as Exhibit 186.
(Exhibit Number 186 marked.)
Q. This is an e-mail with attachments. Beginning Bates number of NM_0008138.
A. Okay.
Q. All right. Mr. Caskey, am I correct that this is an e-mail from Valeria Norris of Mission Toxicology?
A. Yes.
Q. And you received this e-mail notwithstanding the fact that it was sent to missionservices@missiontoxicology.com?
A. Yes.

Ms. Hernandez's office?
A. No, I don't. I couldn't give a specific. Obviously, Chris was unhappy about something, obviously. Maybe --
Q. All right.
A. -- I wanted her out of it.
Q. So looking at the attachment to this e-mail --
A. Yes.
Q. -- you will see in the left-hand column there's another column that says the session; is that right?
A. Yes.
Q. And did we earlier discuss that being the number of assigned tests; is that right?
A. I believe so.
Q. All right. So looking at all these test numbers, do you know if these were tests ordered from Mission?
A. It looks to be Mission.
Q. And if you look a few columns over, there's a physician name column, am I correct?
A. Yes.
Q. And all throughout this document, the physician name is listed as Melissa Hernandez; is that correct?
A. Yes.
Q. So did you understand these were tests ordered



by Ms. Hernandez -- or Dr. Hernandez, I should say?
A. Yes.
Q. All right. And do you understand these were tests performed by Mission?
A. I'm sorry?
Q. Did you understand that these were tests performed by Mission?
A. Oh. Yes.
Q. And they were ordered from Mission by Dr. Hernandez?
A. Yes.
Q. All right. If you look at the furthest right column here with distribution number, there are a number of numbers listed under that, am I right?
A. Yes.
Q. And do you know what those numbers denoted?
A. I think that was an internal Mission system which, when they paid the management fees out, which month or week it was under. I'm not exactly clear what it correlated to.
Q. Uh-huh. And so if you look two columns to the left here, they're -- the furthest right column, there's a column that says, Current bill type, am I right?
A. Yes.
Q. Do you know what the items under that mean?



A. I think they're the various entities that Mission partnered with, I'm assuming.
Q. Uh-huh. But you don't necessarily recognize those entities?
A. Not really. SEK, I don't know what that is. Yeah. It looks like abbreviations for the hospitals.
Q. And what hospitals were those?
A. I don't know the names of them. I just know CMH was a hospital; NM was a hospital. I can't recall SEK. I think they were just partners of Mission.
Q. Do you know what their role was in the partnership?
A. I don't have a clear understanding of it.
Q. Uh-huh. So as we established earlier, the tests were ordered from Mission by Dr. Hernandez, right?
A. Yes.
Q. And they were, to your knowledge, performed by Mission?
A. Right.
Q. And having discussed these tests, if we go back to that cover e-mail.
A. Yes.
Q. You recall having just reviewed that document to tell me whether the MSO dividend discussed here stems from payments for those tests?



A. Well, they were payments to the MSO for management. I don't know if that -- an MSO with total amount or whether that was Ms. Hernandez's amount. I don't -- I don't know. I'm not clear.
Q. Uh-huh.
A. But it falls in line with the agreement we have with Mission.
Q. Uh-huh. Which contemplated that NuMedica would be paid 55 percent for each of the tests listed in that spreadsheet, right?
A. Right, for management.
Q. But the management fee would be calculated by taking 55 percent of what Mission received for the tests --
A. Yes.
Q. -- in that structure?
All right. All right.
MR. GOKEY: May I please have tab 46?
Q. I'll be marking this as Exhibit 190.
(Exhibit Number 190 marked.)
Q. Take a moment to review that.
A. (Witness complies.)
Okay.
Q. And this is an exhibit with the Bates number NM_0004134.

Page 106

of Lab?
A. Yes.
Q. All right. So beneath that, there are two cells, one of which says Mission 28/29, and another one that says 2/15/17 Sun, am I right?
A. Yes.
Q. Do you understand those to be payments from Sun and Mission?
A. Yes.
Q. Uh-huh.
And so in the column immediately to the right of that, there is a column titled Number of Labs, am I right?
A. Right.
Q. All right. And do you understand those to be the number of tests that were ordered from Dr. Roka from Mission and Sun?
A. I'm not positive what that number refers to.
Q. Uh-huh.
A. You know, I'm not sure what that pertains to.
Q. Okay. And so one column to the right of that, am I right that there is a column titled Total Distribution?
A. Yes.
Q. And are those amounts that were distributed

Page 107

through the MSO?
A. Yeah. I'm not sure total distribution. That was probably the total management fee we received, and then it's broken up by the shareholders.
Q. Okay. So if you then go a few columns to the right, there is a column titled Dividend Amount?
A. Right.
Q. And is that the amount that would have been paid to Dr. Roka?
A. I'm not sure. I don't know. Yeah, I'm not -- I'm not positive about that. It -- it would make sense that it probably would be if he was the only shareholder on the B side.
Q. Okay.
So, for example, if you go then to the furthest right-hand column, where it says Check Number --
A. Yes.
Q. -- if you look down this spreadsheet, eventually you will get to a couple of cells that say, Paid 6/22, Dr. Roka; is that correct?
A. 6/22, yes, uh-huh.
Q. All right. And does that refresh your recollection as to whether these amounts were paid to Dr. Roka?

Page 108

A. Right, yes.
Q. Okay. And so these were amounts taken from what NuMedica was paid by Sun and Mission, correct?
A. Yes.
Q. And those were amounts generated by tests ordered by Dr. Roka?
A. Well, once again, you know the amounts were generated by management fees and what we did.
Q. But they were calculated by what Mission received and was not received for performing tests ordered by Dr. Roka?
A. Right, per the agreement.
Q. Uh-huh.
So Sun and Mission received payments. Do you know who those payments were from?
A. I do not.
Q. All right. But then they would split those payments with NuMedica, basically?
A. Yes, per the contract.
Q. And then NuMedica would then split those payments with Dr. Roka?
A. Yeah, any shareholder on record.
Q. Uh-huh.
So then is it fair to say that physicians shared a substantial amount of NuMedica's income from

Page 109

Sun and Mission?
A. It's fair to say that they have a 40 percent ownership in the management agreement.
Q. Uh-huh.
A. Yes.
Q. All right. So earlier we were talking about your MSOs. Did I understand that you were saying that these arrangements were, you believe, industry standard?
A. Yes. I mean, when I -- when I got into the business, you know, that's the way I was told they ran; got the legal opinions and structures; thought we were doing things the right way.
Q. Yeah, and they weren't a secret, right?
A. Right.
Q. Yeah.
A. Far from it. Almost every doctor I know was in some kind of management agreement.
Q. Yeah, and you were open with the MSOs with your business partners?
A. Of course.
Q. Yeah. And so were you open about the MSOs with Sun and Mission?
A. Well, Sun, I didn't really have contact with at all. Mission, like I said, I talked to Amanda most of the time. Rarely did I talk to Jesse.