**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

**MISSION TOXICOLOGY, LLC, et al.,**

       **Plaintiffs,**

**v.**                                                    **Case No. 5:17-CV-1016-JKP**

**UNITEDHEALTHCARE INSURANCE**                 **(Consolidated with**
**COMPANY, et al.,**                                **Case No. 5:18-CV-0347-JKP)**

       **Defendants.**

**<u>MEMORANDUM OPINION AND ORDER</u>**

     This consolidated action involving millions of dollars in alleged damages by both sides pits a group of related insurance entities against various lab-service providers and other involved entities and individuals. The lead case arises under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1001 et seq. Plaintiffs, Mission Toxicology, L.L.C. ("Mission") and Sun Clinical Laboratory, L.L.C. ("Sun Clinical") (collectively "Plaintiffs" or "the Labs"), therein seek to recover unpaid claims from Defendants (four affiliates of United Healthcare) on behalf of Defendants' insureds. In the member case, the consolidated plaintiffs, Unitedhealthcare Insurance Company, Inc. and Unitedhealthcare Services, Inc. (collectively "United"),[1] sue the Labs, several individuals, and other entities (collectively "the Lab Defendants")[2] for various claims under state law, including (1) tortious interference with contract against all Lab Defendants except the last two listed in footnote 1 and (2) money had and received against all Lab De-

---

[1] Although "United" refers collectively to multiple affiliates, the Court will generally refer to United in a singular sense as United does in its briefing.

[2] The Lab Defendants are Mission; Sun Clinical; Michael L. Murphy, MD ("Dr. Murphy" or "MM"); Jesse Saucedo ("Saucedo" or "JS"); Samantha Murphy ("SM"); Lynn Murphy "LM"; Julie Pricer; Sun Ancillary Management, LLC ("SAM"); Integrity Ancillary Management, LLC ("Integrity" or "IAM"); Alternate Health Labs, Inc.; and LMK Management, LLC.

fendants.

The consolidated action has spawned several pending motions, four of which the Court addresses in this Memorandum Opinion and Order: (1) *United's Motion for Partial Summary Judgment* (ECF Nos. 173 (redacted) and 179 (unredacted and sealed)),[3] (2) *United's Motion to Strike Defendants' "Declarations of Marketers Involved in Lab Outreach Program"* (ECF Nos. 201 (redacted) and 212 (unredacted and sealed)), (3) *United's Motion to Strike Defendants' Evidence of "Audit Responses"* (ECF No. 204), and (4) *Lab Defendants' Opposed Motion for Leave to File Sur-Reply* (ECF No. 220). To avoid potential confusion, the Court may cite these filings by their docket number (redacted version if more than one filing), but a generic citation to "Mot.," "Resp.," or "Reply" will refer to briefing related to the motion for summary judgment.

The motions are fully briefed, including evidence submitted by both sides.[4] The Lab Defendants have responded to the summary judgment motion, *see* ECF Nos. 184 (redacted), 193 (unredacted and sealed) and both motions to strike, *see* ECF Nos. 215 (redacted response to ECF

---

[3] The filing is actually titled as a "Memorandum in Support" of the motion, but there is no separate motion as suggested by the title.

[4] United has filed an Appendix (ECF No. 174, 179-1 (sealed exhibits to Decl. Jeffrey S. Gleason, 411 pages), 179-2 (sealed Decl. R. Dean Graves), 179-3 (sealed Decl. Jennifer A. Shimek) with its motion for partial summary judgment. It has also filed appendices with its motions to strike. *See* ECF Nos 202 (redacted), 205 (redacted), 206 (sealed portions of ECF No. 205 permitted by Text Order), 212-1 to -3 (sealed portions of ECF No. 202). The parties cite to United's appendix as "APP" and the Court will at times include that in its citations.

The Lab Defendants have likewise supported their response with an Appendix (ECF Nos. 186 (redacted as to Exs. D through H; N through S; V; and NN through ZZ) and 193-2 (unredacted and sealed as to exhibits redacted in ECF No. 186)), which resulted in United's motions to strike the declarations of marketers (Ex. MM to Decl. of Bridget Zerner (ECF Nos. 186-35, 193-2) and evidence of audit responses (Exs. N through S of Decl. Lynn Murphy and related paragraphs of that declaration; ¶ 15 of Decl. of Michael Murphy; and ¶ 11 of Decl. of Saucedo) within the appendix. The Lab Defendants have also supported their responses to the motions to strike with an appendix. *See* ECF Nos. 218 (redacted Ex. N2); 221-2 (sealed as to Ex. N2 of ECF No. 218).

United has also filed a Supplemental Appendix (ECF Nos. 210 (redacted), 214-1 (sealed Exs. 6-7, 9-15 to Second Decl. Jeffrey S. Gleason); 214-2 (sealed email identified as LD0195810); 214-3 (sealed email identified as LD0104263); 214-4 (sealed provider agreement between Aetna and Newman identified as LD0104297); 214-5 (sealed email identified as LD0104323); 214-6 (sealed email identified as LD0104372); 214-7 (sealed email identified as LD0106993); 214-8 (various sealed documents) with its reply brief.

No. 204), 217 (response to ECF No. 201), 221 (unredacted and sealed response to ECF No. 204). United has filed reply briefs (ECF Nos. 208 (redacted version of reply to motion), 214 (unredacted and sealed version of reply), 222 (reply to ECF No. 201), and 223 (reply to ECF No. 204) to support each of their motions and a response to the Lab Defendants' motion for leave, *see* ECF No. 225. The Lab Defendants have filed a reply brief (ECF No. 228) to the response to their motion for leave to file a surreply.

## I. BACKGROUND

The current motions concern the member case brought by United after the Labs brought the lead action. In an order denying a motion to dismiss, the Court previously set out a thorough background based upon the allegations of the Second Amended Complaint filed by the Labs. *See* Order Denying Defs.' Mot. Dismiss (Dkt. # 47) (ECF No. 115). There is no reason to reiterate that background here. Nor is there reason to delve deeply into the various allegations asserted by United against the Lab Defendants. The Court will provide necessary background information as needed to resolve the pending motions. At his point, suffice to say that this case involves a complex billing arrangement involving two non-party, rural hospitals (Newman Memorial Hospital ("Newman") and Community Memorial Hospital ("Community" or "CMH") (collectively "the Hospitals"), the Lab Defendants, and United.

Like most cases, this one has both disputed and undisputed facts. One disputed aspect is the nature and existence of a "Lab Outreach Program" in which the Labs claim to have endeavored to assist vulnerable rural hospitals at the request of the Hospitals and their management company, People's Choice Hospital, LLC ("PCH"). United describes this program as made-up and fraudulent, which is consistent with its numerous allegations and claims asserted against the Lab Defendants.

Of course, the summary judgment context requires the Court to view the facts in the light most favorable to the non-movant. Regardless of the existence or nature of such a program, the parties do not dispute that the Labs are non-contracted (also known as out-of-network) providers that entered into arrangements with the Hospitals, which had in-network contracts with United. Further, the parties agree that, the Labs (or referred third-party laboratories) performed most laboratory testing, not the Hospitals. And they agree that, after such testing, Integrity, an entity formed by the owners of Sun Clinical (Dr. Michael Murphy) and of Mission (Jesse Saucedo), would submit claims for services allegedly provided by the Labs to beneficiaries of ERISA plans administered or insured by United on behalf of, and using the names and billing credentials, of the Hospitals. Although the submitted claim forms list the names and credentials of the Hospital providers rather than the Labs' names and credentials, there is evidence that Integrity also submitted the claims on behalf of the Mission and Sun Clinical, although United vigorously disputes that fact in its briefing on its other pending motion for summary judgment.

Through the motion for partial summary judgment addressed herein, United argues that (1) it is entitled to summary judgment on its claims of tortious interference and money had and received and (2) Dr. Murphy and Saucedo are personally and jointly liable as co-conspirators with Sun Clinical, Mission, and Integrity.

## II. APPLICABLE LAW

"Under the *Erie* doctrine, federal courts sitting in diversity apply state substantive law and federal procedural law." *Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415, 427 (1996); *accord Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938). Although the lead case of this consolidated action arises under federal law, the issues presented in the motions addressed in this Memorandum Opinion and Order arise solely out of the member case which the Court consolidated for all pretrial purposes, including discovery. *See* Order Adopting Mag. Judge's Report &

4

Recommendation (ECF No. 25 in member case). Jurisdiction in the member case is predicated on diversity of citizenship. *See* Orig. Compl. (ECF No. 1 in Cause No. 5:18-CV-0347-JKP) ¶ 24.

When jurisdiction is based on diversity of citizenship, the Court "must apply state substantive law," which is Texas law in this case. *Balfour Beatty Constr., L.L.C. v. Liberty Mut. Fire Ins. Co.*, 968 F.3d 504, 509 (5th Cir. 2020). Although "federal law, rather than state law, invariably governs procedural matters in federal courts," *Camacho v. Tex, Workforce Comm'n*, 445 F.3d 407, 409 (5th Cir. 2006), classifying "law as 'substantive' or 'procedural' for *Erie* purposes is sometimes a challenging endeavor," *Gasperini*, 518 U.S. at 427. But when a matter is "covered by the Federal Rules of Civil Procedure, the characterization question is usually unproblematic," because "if the Rule in point is consonant with the Rules Enabling Act, 28 U.S.C. § 2072, and the Constitution, the Federal Rule applies regardless of contrary state law." *Id.* at 427 n.7 (citing *Hanna v. Plumer*, 380 U.S. 460, 469-74 (1965); *Burlington N. R. Co. v. Woods*, 480 U.S. 1, 4-5 (1987)).

"When reviewing issues of state law, federal courts look to the law of that state's highest court." *City of Alexandria v. Brown*, 740 F.3d 339, 351 (5th Cir. 2014); *accord Price v. City of San Antonio, Tex.*, 431 F.3d 890, 892 (5th Cir. 2005). Absent a final decision by the Texas Supreme Court that "'precisely' resolves the legal issue, federal courts "must make an *Erie* guess and determine as best [they] can what the Supreme Court of Texas would decide." *Martinez v. Walgreen Co.*, 935 F.3d 396, 398 (5th Cir. 2019) (citation omitted). When compelled to make an *Erie* guess, federal courts "defer to intermediate state appellate court decisions, unless convinced by other persuasive data that the highest court of the state would decide otherwise." *Mem'l Hermann Healthcare Sys. Inc. v. Eurocopter Deutschland, GMBH*, 524 F.3d 676, 678 (5th Cir. 2008) (citations and internal quotation marks omitted); *accord Price*, 431 F.3d at 893 n.5. The

5

federal courts not only look to the intermediate state appellate decisions, but also to "the general rule on the issue, decisions from other jurisdictions, and general policy concerns." *Martinez*, 935 F.3d at 398 (citation omitted).

The Court will first address the procedural motions before considering the summary judgment motion.

### III. MOTIONS TO STRIKE

United has filed two motions to strike. In the first, it seeks to strike "Declarations of Marketers Involved in Lab Outreach Program." *See* ECF No. 201. These declarations are referenced in the Declaration of Bridget Zerner (ECF No. 186-5, ¶ 15) and found as Exhibit MM (ECF No. 186-35). United wants to strike Exhibit MM because the Lab Defendants failed to disclose any of the marketers as potential witnesses and because the declarations are inadmissible summary judgment evidence. ECF No. 201 at 1. In the second motion, United seeks to strike evidence of audit responses – Exhibits N through S (ECF No. 193-2 at 69-100) of the Declaration of Lynn Murphy and related paragraphs of that declaration (ECF No. 186-2, ¶¶ 17, 21-33, 35(ii)-(v), and 36); paragraph 15 of the Declaration of Michael Murphy (ECF No. 186-1); and paragraph 11 of the Declaration of Jesse Saucedo (ECF No. 186-3) – due to the Lab Defendants failure to produce the audit responses during discovery. *See* ECF No. 204 at 2.

"Prior to December 1, 2010, the proper method by which to attack an affidavit was by filing a motion to strike," but amendments to the Federal Rules of Civil Procedure changed that practice. *Cutting Underwater Techs. USA, Inc. v. Eni U.S. Operating Co.*, 671 F.3d 512, 515 (5th Cir. 2012) (per curiam). "As amended in December 2010, Fed. R. Civ. P. 56(c)(2) makes motions to strike unnecessary to challenge evidence presented in the summary judgment context." *Silo Rest. Inc. v. Allied Prop. & Cas. Ins. Co.*, 420 F. Supp. 3d 562, 569 (W.D. Tex. 2019) (quoting *Reitz v. City of Abilene*, No. 1:16-CV-0181-BL, 2018 WL 6181493, at *8 n.8 (N.D. Tex.

Nov. 27, 2018)). Nevertheless, courts may strike presented evidence as a sanction under Fed. R.

Civ. P. 37(c)(1) when circumstances warrant such a sanction. *Davidson v. AT&T Mobility, LLC*,

No. 3:17-CV-0006-D, 2018 WL 1609756, at \*1 (N.D. Tex. Apr. 3, 2018); *Campbell v. McMillin*,

83 F. Supp. 2d 761, 765 (S.D. Miss. 2000).

     In this instance, the Court finds no need to strike the submitted summary judgment evidence. It has considered the motion for summary judgment without considering the evidence sought to be struck. Accordingly, it denies the motions to strike as unnecessary at this juncture.

## IV. MOTION FOR LEAVE TO FILE SURREPLY

     The Lab Defendants move for leave to file a surreply to respond to new arguments and evidence presented for the first time by United in its reply and accompanying affidavit in support of its motion for partial summary judgment. They identify new arguments presented in that reply in addition to new exhibits submitted in a supplemental appendix.

     As a general practice, neither the Federal Rules of Civil Procedure nor the local rules of this Court permit the filing of a surreply. But the local rules do contemplate a party seeking leave to file a post-reply submission. *See* W.D. Tex. Civ. R. 7(f)(1).

     Although surreplies "are heavily disfavored," it is within the sound discretion of the courts to grant or deny leave to file such additional briefing. *Warrior Energy Servs. Corp. v. ATP Titan M/V*, 551 F. App'x 749, 751 n.2 (5th Cir. 2014) (per curiam) (quoting *Weems v. Hodnett*, No. 10-CV-1452, 2011 WL 2731263, at \*1 (W.D. La. July 13, 2011)). Because "the scope of the reply brief must be limited to addressing the arguments raised" in the response or memorandum in opposition, *Petty v. Portofino Council of Coowners, Inc.*, 702 F. Supp. 2d 721, 729 n.3 (S.D. Tex. 2010) (citation omitted), and "it is improper for the movant to sandbag and raise wholly new issues in a reply memorandum," *Weems*, 2011 WL 2731263, at \*1, the need for post-reply briefing should be rare. As aptly explained in *Weems*,

This court's experience, shared by others in reported decisions, is that surreplies often amount to little more than a strategic effort by the nonmovant to have the last word on a matter. The fourth brief usually just repeats arguments from the memorandum in opposition and serves only to delay resolution of the underlying motion. Accordingly, it is proper to deny a motion for leave to file a surreply where the party fails to demonstrate exceptional or extraordinary circumstances warranting the relief sought. In other words, in seeking leave to file a surreply brief, a party must identify the new issues, theories, or arguments which the movant raised for the first time in its reply brief.

*Id.* (citations omitted).

Of course, as recognized by the Fifth Circuit, "[a]rguments raised for the first time in a reply brief are generally waived." *Jones v. Cain*, 600 F.3d 527, 541 (5th Cir. 2010). Such waiver often reduces a need for a surreply. Nevertheless, granting leave to file a surreply in extraordinary circumstances "on a showing of good cause" is a viable alternative to the general practice to summarily deny or exclude "all arguments and issues first raised in reply briefs." *Layne Christensen Co. v. Bro-Tech Corp.*, No. CIV.A. 09-2381-JWL, 2011 WL 3880830, at *1 n.1 (D. Kan. Aug. 31, 2011) (citation omitted).

In this case, the Lab Defendants clearly and specifically identify the new arguments presented in the reply and addressed in the proposed surreply. When they conferred with United about filing a surreply, they offered United an opportunity to respond to the proposed surreply. *See* ECF No. 220 (email attachment). Such offer shows that the Lab Defendants do not seek leave to file their surreply so as to have the last word on any issue. On the other hand, it does not appear that United was sandbagging or raising wholly new issues in its reply brief. It instead replies to arguments made by the Lab Defendants in their response to the motion for summary judgment. But United has submitted a supplemental appendix with its reply. In addition to the matters already discussed, such submission provides good cause and extraordinary circumstances that warrant granting the Lab Defendants leave to file their surreply. The surreply does not rehash arguments already presented in the response. Nor is it an attempt to have the last word on

8

any matter as shown by their proposal to permit United an opportunity to respond to the surreply. Accordingly, the Lab Defendants may file their proposed surreply (ECF No. 220-1) and the Court will consider that attachment as filed.

## V. MOTION FOR SUMMARY JUDGMENT

United moves for summary judgment on two of its asserted claims (tortious interference and money had and received) and argues that two individuals are personally and jointly liable as conspirators with Mission, Sun Clinical, and Integrity.

### A. Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[5] Fed. R. Civ. P. 56(a). "As to materiality, the substantive law will identify which facts are material" and facts are "material" only if they "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Disputes over material facts qualify as "genuine" within the meaning of Rule 56 when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* Given the required existence of a genuine dispute of material fact, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Id.* at 247-48. A claim lacks a genuine dispute for trial when "the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party." *Scott v. Harris*, 550 U.S. 372, 380 (2007) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)).

The "party seeking summary judgment always bears the initial responsibility of inform-

---

[5] The summary judgment standard "remains unchanged" despite 2010 amendments to Fed. R. Civ. P. 56 that replaced "issue" with "dispute." Fed. R. Civ. P. 56 advisory committee notes (2010 amend.). Although the standard remains the same, the Court utilizes the amended terminology even when relying on caselaw that predates the amendments.

ing the district court of the basis for its motion." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). When considering a motion for summary judgment, courts view all facts and reasonable inferences drawn from the record "in the light most favorable to the party opposing the motion." *Heinsohn v. Carabin & Shaw, P.C.*, 832 F.3d 224, 234 (5th Cir. 2016) (citation omitted). Once the movant has carried its summary judgment burden, the burden shifts to the non-movant to establish a genuine dispute of material fact. With this shifting burden, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586. "Unsubstantiated assertions, improbable inferences, and unsupported speculation are not sufficient to defeat a motion for summary judgment." *Heinsohn*, 832 F.3d at 234 (citation omitted). Additionally, the courts have "no duty to search the record for material fact issues." *RSR Corp. v. Int'l Ins. Co.*, 612 F.3d 851, 857 (5th Cir. 2010); *accord Hernandez v. Yellow Transp., Inc.*, 670 F.3d 644, 651 (5th Cir. 2012).

**B. Summary Judgment Analysis**

United argues that it is entitled to summary judgment on two claims and that two individuals are personally and jointly liable as co-conspirators.

### 1. <u>Tortious Interference</u>

United asserts a claim for tortious interference with contract under Texas law. *See* Orig. Compl. ¶¶ 147-53. It brings the claim only against Mission, Sun Clinical, Integrity, SAM, and the individual defendants. *See id.* at 46. For each of the four entities, United claims that the entity "is a stranger to the contracts between United" and the Hospitals. *Id.* ¶¶ 149-52. United further alleges that to the extent these entities were "acting as the corporate agent of these facilities when [they] willfully and intentionally interfered with United's contracts, the interference was motivated by the [entities'] interests and was contrary to the facilities' interests." *Id.* United also al-

leges that the individual defendants are liable for the entities' tortious interference through "theories of attribution of liability." *Id.* ¶ 153.

In their Answer filed after consolidation, the Lab Defendants deny each of those paragraphs while noting "See answer to the allegations incorporated herein," as to Paragraph 47. *See* Defs.' Answer to Pls.' Compl. (ECF No. 125) at 8-9. They also asserted various affirmative defenses but did not identify agency as such a defense. *See id.* at 10-12.

To succeed on its tortious interference claim, United must establish four elements: "(1) the existence of a contract subject to interference, (2) a willful and intentional act of interference, (3) such act was a proximate cause of damage, and (4) actual damage or loss occurred." *Flourine on Call, Ltd. v. Flourogas Ltd.*, 380 F.3d 849, 864 (5th Cir. 2004) (applying Texas law); *accord McGehee v. Hagan*, 367 S.W.3d 848, 854 (Tex. App. – Houston [14th Dist.] 2012, pet. denied) (citing *Prudential Ins. Co. of Am. v. Fin. Review Servs., Inc.*, 29 S.W.3d 74, 77 (Tex. 2000)). There is no need "to prove that [anyone] acted with intent to injure," but the party moving for summary judgment must establish that the "interference with the contract was intentional." *Flourine on Call*, 380 F.3d at 864. This means that United has to prove that the Lab Defendants intended to interfere with its contracts with the Hospitals "or was substantially certain that such interference would result from" their actions with the Hospitals. *See Wardlaw v. Inland Container Corp.*, 76 F.3d 1372, 1376 (5th Cir. 1996).

The Lab Defendants first argue that United's theory is legally flawed because they were acting as agents on behalf of the Hospitals and thus, could not tortiously interfere with the Hospitals' contracts with United. Resp. at 23. They further argue that United has failed to show any intentional interference because United has not shown that they knew the terms of the relevant contracts. *Id.* at 23-25. United contests agency status on multiple grounds, including waiver,

11

while also arguing that the Lab Defendants have failed to dispute its uncontested facts. *See*, *generally*, Reply.

Based on the briefing, the only element at issue is whether the Lab Defendants willfully and intentionally acted to interfere with the contracts between United and the Hospitals. United submits that the Lab Defendants took actions to interfere with contractual provisions obligating it to pay only for services rendered at the Hospitals' physical locations and prohibiting network providers for billing for lab services they did not perform or were not certified to perform under Clinical Laboratory Improvement Amendments ("CLIA"). Mot. at 18-19. United also asserts that the Lab Defendants took actions that frustrated and breached protocols incorporated into its contracts with the Hospitals that expressly forbid referrals for lab services that result in physicians earning profits.[6] *Id.* at 20.

United submits that it may make the requisite showing of intent by presenting "evidence that a defendant knew, or had knowledge that would lead a reasonable person to believe, that the contracts at issue existed." *Id.* at 18 (citing *Exxon Corp. v. Allsup*, 808 S.W.2d 648, 656 (Tex. App. – Corpus Christi 1991, writ denied)). In reply, United notes that "[i]t is not necessary that a defendant in a case of interference with contract rights have actual knowledge of the contract and *its terms*." Reply at 5 (adding emphasis and quoting *Kelly v. Galveston Cty.*, 520 S.W.2d 507, 513 (Tex. Civ. App. – Houston [14th Dist.] 1975, no writ)).

No one disputes the existence of contracts between United and the Hospitals that were subject to interference. *See* Mot. at 14; Resp. at 7. But United misconstrues *Exxon Corp.* as only requiring knowledge of the existence of their contracts. *Exxon Corp.* requires more knowledge than that. It requires a party asserting tortious interference with contract to show either "actual

---

[6] According to the contracts, protocols are programs and administrative procedures adopted by United or payers to be followed by the facilities. ECF No. 179-1 at 193, ¶ 1.7; 219, ¶ 1.7.

knowledge of the existence of the contract and of the plaintiff's interest in it" or "knowledge of such facts and circumstances that would lead a reasonable person to believe in the existence of the contract and the plaintiff's interest in it." 808 S.W.2d at 656. United simply ignores the need for knowledge of its interest in the contracts.

Arguably, knowledge of the contracts between United and the Hospitals confers some knowledge of United's interest in a basic sense. But tortious interference requires a willful or intentional act of interference. In a case relied upon by *Exxon Corp.*, it was noted that "if intentional interference is to be required, it presupposes knowledge of the plaintiff's interests or, at least, of facts that would lead a reasonable man to believe in their existence." *See Tippett v. Hart*, 497 S.W.2d 606, 611 (Tex. Civ. App. – Amarillo), *writ ref'd n.r.e.*, 501 S.W.2d 874 (Tex. 1973). In affirming the judgment against the tortfeasor-appellant, the appellate court recognized that "[t]he appellant admitted that he knew of the existence of the contract and that he knew that the land was not to be grazed," i.e., the interests of the plaintiff. *Id*. It later noted that the evidence also showed "that the appellant had knowledge of the existence of the contract and its provisions." *Id*. at 612. It thus found the evidence "sufficient to support the trial court's finding that the appellant had actual knowledge that appellee's contract prohibited grazing of the land and of the special damages if such breach occurred." *Id*. at 612-13.

Guided by *Tippett*, neither *Exxon Corp*. nor *Kelly* stand for the proposition presented by United that mere knowledge of a contract's existence is sufficient. While *Kelly* does specifically state that it is unnecessary for tortious interference that the interferer have "actual knowledge of the contract and its terms," the focus of that statement is on "actual knowledge" not eliminating the knowledge requirement of the relevant terms, .i.e., the plaintiff's interests. And that focus is supported by *Kelly*'s citation to *Tippett* following its next sentence that "[i]t is enough that the

defendant had facts from which a reasonable person would conclude the existence of a contract." 520 S.W.2d at 513. In *Kelly*, furthermore, it could "be reasonably inferred from the undisputed fact that Kelly was administrator of the Galveston County Coordinated Community Clinics that he had some form of contractual arrangement." *Id*.

Knowledge of the existence of the contracts or facts or circumstances that would lead a reasonable person to believe in the existence of the contracts is only a part of the knowledge requirement. The alleged interferer must also have similar knowledge as to the plaintiff's (here United's) interest in the contracts. To intentionally interfere with a contract between others requires knowledge of the parties' interests in the contracts. Not only is this analysis supported by *Exxon Corp.* and *Tippett*, but it is consistent with precedent of both the Supreme Court of Texas and the Fifth Circuit. *See Amigo Broad., LP v. Spanish Broad. Sys., Inc.*, 521 F.3d 472, 490-91 (5th Cir. 2008) (applying Texas law that the interfering party must "desire[] to cause the consequences of his act, or that he believes that the consequences are substantially certain to result from it" and "must have 'actual knowledge of the contract or business relation in question, or knowledge of facts and circumstances that would lead a reasonable person to believe in the existence of the contract or business relationship"); *Sw. Bell Tel. Co. v. John Carlo Tex., Inc.*, 843 S.W.2d 470, 472 (Tex. 1992) (recognizing that there must be an intent to interfere or a belief "that interference was substantially certain to result from its actions"). United argues that the Lab Defendants mischaracterize these latter two cases. Reply at 6. But the Court interprets them as consistent with the above analysis of *Exxon Corp.* and *Tippett*. In short, standing alone, knowledge of the mere existence of the contracts is not sufficient to satisfy the intent element.

In *Exxon Corp.*, the relevant contract was for lifetime employment of a particular individual. *See* 808 S.W.2d at 656. Knowledge of such a contract along with the parties to the con-

14

tract provides ample proof that the alleged interferer knew Allsup's interest in the contract. This differs significantly from knowledge that an insurer such as United has contracts with the Hospitals. Unlike an employment contract with readily apparent interests of the parties, contracts between insurance companies and hospitals may include a variety of terms that could reflect the parties' interests. And according to Newman's CEO, David Wanger, it was not uncommon for a hospital to use an outside reference lab. *See* Wanger Dep. 190:3-19 (ECF No. 193-2 (Ex. NN) at 223). Gary Ayres of PCH also testified that referrals were not uncommon. *See* Ayres Dep. 86:14-22 (ECF No. 186-31 (Ex. II) at 15).

In this case, mere knowledge of the existence of the contracts provides no reasonable basis to infer that any Lab Defendant knew United's interests in the contract or that any Lab Defendant intended to interfere with United's interest in the contracts. And, while actual knowledge of the terms is not required, the alleged interferer must at least have knowledge that would lead a reasonable person to believe in both the existence of the contract and the relevant terms, i.e., plaintiff's interest in the contract. Knowledge that an existing contract might have certain terms is not enough to satisfy the intent component of tortious interference unless the Lab Defendants were substantially certain that interference would result from their actions with the Hospitals. The nature of the contracts at issue do not make interference substantially certain. Unless the Lab Defendants possessed knowledge of the terms of such contracts, there is a genuine dispute of material fact as to the intent element for United's tortious-interference-with-contract claim.

United presents evidence and argues that the Lab Defendants had access to at least one of the contracts between United and the Hospitals. Dr. Murphy, however, testified: "We never saw [the Newman] contracts." MM Dep. 365:19-20 (ECF No. 186-26 (Ex. DD)). While he did concede that he did receive contracts from CMH, "they were old contracts and many, many, many

years ago" and he did not recall them having any "payment schedule." *Id*. at 366:3-9. An email attachment shows that he received a 2004 contract between United and CMH, which did not include a payment schedule. *See* ECF No. 179-1 at 243-57 (APP 594-607). Saucedo, Lynn Murphy, and Samantha Murphy all similarly testified that they had not seen the contracts or the terms of the contracts. *See* LM Dep. 75:2-6 (ECF No. 174 at 53); SM Dep. 206:19-20 (ECF No. 174 at 100); JS Dep. 134:24-135:2 (ECF No. 174 at 171); JS Dep. 265:8-17 (ECF No. 174 at 188).

Other evidence also addresses what knowledge the Lab Defendants possessed regarding the contracts between United and the Hospitals. First, confidentiality provisions in paragraph 9.9 of each contract provide some explanation regarding the lack of access to the contracts. *See* ECF No. 179-1 at 205 (APP 560) and 229 (APP 581). Furthermore, Saucedo testified that he had no concern that the contracts between the Hospitals and United might prohibit certain conduct "[b]ecause, obviously the – the hospital executed the contract. So if they had any provisions, I would assume that their attorneys would have advised them not to." JS Dep. 142:1-8 (ECF No. 174-2 at 181). Saucedo inferred a lack of concern on the Hospitals' part about the arrangement violating any contractual interest of United. And there is evidence that the Hospitals through PCH approached the Lab Defendants regarding entering into the arrangements to assist the rural hospitals. Decl. MM ¶ 6 (ECF No. 186-1); MM Dep. 72:20-75:3 (ECF No. 186-26, Ex. DD); Ayres Dep. 20:12-16 (ECF No. 186-31 (Ex. II) at 4) (showing that PCH was "running a reference laboratory to – to help the hospital revenue"). The Hospitals' apparent lack of concern regarding their contracts with United coupled with their approaching the Lab Defendants with the Lab Outreach Program supports the Lab Defendants' position that they did not intentionally interfere with the Hospitals' contracts with United.

Viewing the evidence in a light most favorable to the Lab Defendants, the Court finds a

genuine dispute of material fact regarding the existence of a willful and intentional act of inter-

ference with the contracts between United and the Hospitals. The Lab Defendants provide sworn

assertions that they had not seen and did not know the terms of the contracts. Other evidence

supports such assertions. Additionally, some pertinent protocols are found in the form of provid-

er guidance rather than within the contracts themselves and the Lab Defendants also lacked

knowledge of the contents of the administrative guidance. Decl. LM ¶ 7 (ECF No. 186-2) (aver-

ring that declarant was unable to access online version of the guidance when attempted in 2016).

The 2016 guide, furthermore, merely prohibited any "physician, practitioner or medical group"

from billing for services they did not provide; it did not include hospitals. ECF No. 174 at 283

(APP 262). It was changed in April 2017 to expand the prohibition to any "health care provider."

*Id.* at 287 (APP 265). Given the reliance on administrative guidance found outside the relevant

contracts, knowledge of the contracts and their terms alone may not provide a full picture of

United's interests.

Furthermore, the contracts themselves are not as clear as United would have the Court

view them with respect to using outside lab services. Even if the Lab Defendants knew of Unit-

ed's interests in their contracts with the Hospitals, each contract permits use of subcontracted

individuals and entities to "render services" in connection with the contracts. *See* ECF No. 179-1

at 197 ¶¶ 4-5; 222, ¶¶ 4-5. These provisions do not expressly restrict where services may be ren-

dered, yet United could have drafted them like it did with the contractual definition of "Observa-

tion" services, which specifically requires such services to be "furnished by a Facility on the Fa-

cility's premises." *See* ECF No. 179-1 at 209 ("All Payer Appendix" for CMH 2014 contract);

235 (same appendix for Newman). While United views section 3.1 of its contracts as only cover-

ing service locations and types set for in Appendix 1, the subcontractor provisions mentioned above appear to create some ambiguity.

And, although United points to deposition testimony from an attorney for the Lab Defendants that paragraph 3.1 limits the locations allowed to bill under the contracts with United, *see* Reply at 8, the attorney's testimony is not as certain as United portrays. The attorney conditioned his answers several times during the brief exchange at his deposition: (1) "I read this one sentence of paragraph 3.1 to read that they've identified the service locations and service types in the Appendix 1. To the extent that there is no other carve-out or exception or any other language of the contract that would further define or explain that sentence."; (2) characterizing his answer as "hypothetically"; (3) conceding that "That's what the first sentence of that paragraph says, yes."; (4) stating that "I do not see any other language regarding other locations in paragraph 3.1"; and (5) concluding with "Just by looking at 3.1 in a vacuum, yes." *See* Mora Dep. 156:3-8; 156:16; 156:20-21; 157:12-13; 157:20 (ECF No. 210-3 at 3 (Supp. App. 10)). The testifying attorney understood that one does not interpret a contract by looking at one provision.

United quarrels with the Lab Defendants not focusing on provisions that are consistent with paragraph 3.1. Reply at 8. But the issue is whether the Lab Defendants' intentionally interfered and from their perspective the proper focus should include the contractual ambiguity in their effort to show a genuine dispute of material fact as to that element, even if they knew of the terms, which they have denied. In addition, due to concerns regarding the Lab Outreach Program, United required the Hospitals to enter into new contracts to clarify their obligations. *See* ECF No. 193-2 at 250-51 (Ex. OO as to Newman), 445 (Ex. VV as to CMH). United naturally argues that such modification does not alter what the contracts had already prohibited. Reply at 8. Considering all of these matters, the Court finds that the contractual provisions themselves add

18

to the genuine dispute of material fact as to whether the Lab Defendants intentionally interfered with United's contracts.

When looking at the evidence through the lens of summary judgment, the Court simply cannot find that United is entitled to judgment as a matter of law on its tortious interference claim. At the summary judgment stage, courts determine whether "the record, taken as a whole, could . . . lead a rational trier-of-fact to find for the non-moving party." *Koerner v. CMR Constr. & Roofing, L.L.C.*, 910 F.3d 221, 227 (5th Cir. 2018) (quoting *Kariuki v. Tarango*, 709 F.3d 495, 501 (5th Cir. 2013)). Because the courts view the summary judgment evidence from the party opposing summary judgment as true, there is "no place in summary judgment proceedings" for determinations of credibility. *Id.* (quoting *Richardson v. Oldham*, 12 F.3d 1373, 1379 (5th Cir. 1994)). "Moreover, '[w]hen state of mind is an essential element of [a] party's claim, it is less fashionable to grant summary judgment because a party's state of mind is inherently a question of fact which turns on credibility.'" *Waste Mgmt. of La., L.L.C. v. River Birch, Inc.*, 920 F.3d 958, 964 (5th Cir.) (quoting *Int'l Shortstop, Inc. v. Rallys, Inc.*, 939 F.2d 1257, 1265 (5th Cir. 1991)), *cert. denied*, 140 S. Ct. 628 (2019).

Not only have the Lab Defendants shown a genuine dispute of material fact regarding their state of mind, but they have also shown a genuine dispute as to whether they were acting as agents for the Hospitals. "[T]he second element is particularly important," when the defendant is both an agent and an alleged interfering tortfeasor. *Powell Indus., Inc. v. Allen*, 985 S.W.2d 455, 456 (Tex. 1998) (per curiam) (citing *Holloway v. Skinner*, 898 S.W.2d 793, 796 (Tex. 1995)). This is so because "a third party generally has no cause of action against an agent for inducing the principal to breach a contract with a third party." *Prudential Ins. Co. of Am.*, 29 S.W.3d at 79. "To prove the willful and intentional interference element of a tortious interference claim, the

plaintiff must show that the defendant was legally capable of tortious interference." *Cmty. Health Sys. Prof'l Servs. Corp. v. Hansen*, 525 S.W.3d 671, 690 (Tex. 2017) (relying on *Holloway*). And, "[t]o be legally capable of tortious interference, the defendant must be a stranger to the contract with which he allegedly interfered." *Id*. As noted by the Texas Supreme Court in *Hansen*, it "extended this rule to corporate agents," in *Holloway* "because corporations can act only through agents." *Id*.

This stranger-to-the-contract requirement means that "a contracting party's agent or employee acting in the party's interests cannot interfere with the party's contract." *Morgan Stanley & Co. v. Tex. Oil Co.*, 958 S.W.2d 178, 179 (Tex. 1997). Thus, to recover for tortious interference against an agent of a contracting party, "a plaintiff must prove that the agent willfully or intentionally acted to advance the agent's own interests at the principal's expense." *Prudential Ins. Co. of Am.*, 29 S.W.3d at 79. This is necessary "to preserve the logical rule that a party cannot tortiously interfere with its own contract." *Holloway*, 898 S.W.2d at 796. And for the plaintiff "to meet this burden in a case of this nature, the plaintiff must show that the agent acted in a fashion so contrary to the corporation's best interests that his actions could only have been motivated by personal interests." *Id*.; *accord Hansen*, 525 S.W.3d at 691.

United argues that, as support for their assertion of agency, the Lab Defendants merely cite contracts with the Hospitals that flatly contradict an agency relationship because they identify the Lab Defendants as independent contractors. But first, the "contract is not conclusive." *Robles v. Consol. Graphics, Inc.*, 965 S.W.2d 552, 558 (Tex. App. – Houston [14th Dist.] 1997, no pet.) (citing *Exxon Corp. v. Tidwell*, 867 S.W.2d 19, 21 n.3 (Tex. 1993)). Second, status as an independent contractor is not mutually exclusive to being an agent under Texas law. *See id.*; *accord Gaalla v. Citizens Med. Ctr.*, No. CIV.A. V-10-14, 2010 WL 5395772, at *11 (S.D. Tex.

Dec. 22, 2010), *aff'd in part, vacated in part, rev'd in part sub nom. Gaalla v. Brown*, 460 F.

App'x 469 (5th Cir. 2012); *Nocando Mem. Holdings, Ltd. v. Credit Commercial De France,*

*S.A.*, No. CIV.A. SA-01-1194-XR, 2004 WL 2603739, at *13 n.7 (W.D. Tex. Oct. 6, 2004) (not-

ing "an independent contractor may or may not be an agent"). And most importantly, the Lab

Defendants provide enough evidence to create a genuine dispute of material fact regarding their

agency status. *See* ECF No. 179-1 at 4 (Newman lab service agreement (APP 343));10 (Service

and Compensation (APP 349)); 23 (Newman contract instructing Integrity to bill claims (APP

360)); 29 (Laboratory Services Agreement between CMH and Mission (APP 365)); 37 ("Exhibit

A Services and Compensation (APP 373); ECF No. 174-2 (CMH contract referring to Integrity

as agent (APP 384-86); Ayres Dep. 88:3-17 (ECF No. 186-31 (Ex. II) at 15).

Because United argues that the Lab Defendants have waived their ability to raise agency

as an affirmative defense in this action by failing to plead it, Reply at 9, the Court cannot limit its

consideration of the agency issue to whether the Lab Defendants have shown a genuine dispute

of material fact. In a diversity case, such as this one, the Federal Rules of Civil Procedure govern

procedural rules such as "the requirement to plead an affirmative defense." *Glass Containers*

*Corp. v. Miller Brewing Co.*, 643 F.2d 308, 313 (5th Cir. Unit A Apr. 1981). Rule 8(c)(1) of the

Federal Rules of Civil Procedure requires parties "responding to a pleading" to "affirmatively

state any avoidance or affirmative defense," including the ones listed in the rule. Neither the

Texas nor federal rules list "agency" as an affirmative defense. *See* Tex. R. Civ. P. 94; Fed. R.

Civ. P. 8(c). But those non-exhaustive lists do not end the inquiry. Whether Texas has created

"an affirmative defense within the meaning of Rule 8(c) is determined by looking to the substan-

tive law of Texas." *Lucas v. United States*, 807 F.2d 414, 417 (5th Cir. 1986); *accord LSREF2*

*Baron, L.L.C. v. Tauch*, 751 F.3d 394, 398 (5th Cir. 2014).

The parties disagree as to whether "agency" is an affirmative defense. United provides an unpublished opinion from a Texas court of appeals as support that it is. *See Fed. Servs. Corp. v. Harlan & Boettger, L.L.P.*, No. 04-00-00462-CV, 2001 WL 997382 (Tex. App. – San Antonio Aug. 31, 2001, no pet. h.) (not designated for publication). However, in *Holloway*, the Texas Supreme Court clearly differentiates between an affirmative defense, such as "legal justification," and the issue of agency in the context of tortious interference with contract. *See* 898 S.W.2d at 796. By doing so, it placed a burden on the plaintiff rather than the agent defendant. *See id.*

Concededly, *Holloway* presented no dispute as to the agency status of the alleged tortfeasor. *See Hansen*, 525 S.W.3d at 691. And United focuses on this undisputed agency status in its arguments. *See* Reply at 9 & n.5. While the position that the party claiming an agency-relationship bears the burden of proof is well-taken, that burden allocation does not make it an affirmative defense. S*ee IRA Res., Inc. v. Griego*, 221 S.W.3d 592, 597 (Tex. 2007) (holding that "Texas law does not presume agency, and the party who alleges it has the burden of proving it," while also placing the burden on the plaintiff to show agency as the party asserting it to show minimum contacts); *Fifth Third Bank v. Ericsson Inc.*, No. 05-19-00759-CV, 2020 WL 4344918, at *3 (Tex. App. – Dallas July 29, 2020, pet. filed) (same). Further nothing in *Holloway* or its progeny indicates that a dispute as to the agency status would make it an affirmative defense.

As *Hansen* appears to have recognized in the tortious interference context, the agency status is part of the defendant's legal capability to tortiously interfere with the contract and the plaintiff must show that capability to satisfy the second element of the tortious interference claim. *See* 525 S.W.3d at 690. Without the requisite legal capability, an agent defendant simply cannot interfere with a contract of the agent's principal absent proof of personal interests that motivated the agent.

However, *Hansen* does characterize the *Holloway* rule as "narrow" and arising "[w]hen the defendant is both a corporate agent and the third party who allegedly induces the corporation's breach." *Id*. at 691. Furthermore, *Hansen* specifically limited its holding to "the circumstances of this case, in which the summary-judgment record reveals no factual dispute as to the defendant's status as an agent of one party to the underlying contract." *Id*. But still, it did not similarly limit its earlier pronouncement regarding the plaintiff's burden to show the defendant's legal capability to tortiously interfere in the contract.

Nevertheless, it may be reasonable to also limit *Hansen*'s earlier discussion about legal capability based on the specific limitations of its holding. If the case is not so limited, United has the burden to show agency in the current context. But if *Hansen* is limited to established agency statuses, then the Lab Defendants would need to first establish their agency status before the burden would shift to United to show the personal interest motivation. In the summary judgment context, the Lab Defendants can carry such a burden by showing a genuine dispute of material fact as to their agency status. And in this instance, even if the Court were to place the initial burden on the Lab Defendants to show agency, they have carried that burden at this stage by showing such a genuine dispute. The burden thus shifts to United to satisfy the burden set out in *Holloway/Hansen* and United has not made the requisite showing, especially in light of the genuine dispute of material fact with respect to the intent of the Lab Defendants.

This case presents no reason to definitively determine whether agency is an affirmative defense under Texas law in the circumstances here. Although a party may waive an affirmative defense by failing to plead it, *Woodfield v. Bowman*, 193 F.3d 354, 362 (5th Cir. 1999), a "defendant does not waive a defense if it was raised at a 'pragmatically sufficient time' and did not prejudice the plaintiff in its ability to respond," *LSREF2 Baron, L.L.C.*, 751 F.3d at 398 (quoting

*Rogers v. McDorman*, 521 F.3d 381, 386 (5th Cir. 2008)). The requirement to timely plead affirmative defenses arises out of "central concerns" to avoid unfair surprise and prejudice and determining their presence "is a fact-specific inquiry based on the circumstances of the case." *Id*. at 402. Raising a defense even at summary judgment may not result in waiver depending on the circumstances. *See Pasco ex. rel. Pasco v. Knoblauch*, 566 F.3d 572, 577-78 (5th Cir. 2009). It lies within the Court's "discretion to determine whether the party against whom the defense was raised suffered prejudice or unfair surprise as a result of the delay." *LSREF2 Baron, L.L.C.*, 751 F.3d at 398.

Here, United itself pleaded that Integrity acted as a billing agent for the Hospitals. *See* Orig. Compl. ¶¶ 62, 136, 137. And within its specific allegations asserting tortious interference, it addressed the agency status of the Lab Defendants. *See id.* ¶¶ 149-52. To the extent agency is an affirmative defense in the current context, the Court finds no unfair surprise even if the Lab Defendants did not assert it until their response to the summary judgment motion.

Viewing the evidence in a light most favorable to the Lab Defendants, United is not entitled to summary judgment on this claim because there remains a genuine dispute of material fact as to whether (1) any Lab Defendant willfully and intentionally interfered with the contracts between United and the Hospitals and (2) the Lab Defendants were agents for the Hospitals. Even though the existence of those contracts is not in dispute, the noted genuine disputes preclude summary judgment.

### 2. <u>Money Had and Received</u>

United asserts a claim for "Money had and Received" against all Lab Defendants. *See* Orig. Compl. ¶¶ 175-81. It alleges that the Lab Defendants "are in possession of funds that belong in good conscious to United." *Id*. ¶ 176. It bases this claim on funds paid to the Hospitals

that were then paid to the Lab Defendants. *Id.* ¶¶ 177-78.

"A case for money had and received looks solely to whether the defendant holds money that belongs to the plaintiff." *Aetna Life Ins. Co. v. Humble Surgical Hosp., LLC*, No. CV H-12-1206, 2016 WL 7496743, at *2 (S.D. Tex. Dec. 31, 2016). Texas courts apply the ordinary principles of common law:

> The question, in an action for money had and received, is to which party does the money, in equity, justice, and law, belong. All plaintiff need show is that defendant holds money which in equity and good conscience belongs to him. Again, it has been declared that a cause of action for money had and received is less restricted and fettered by technical rules and formalities than any other form of action. It aims at the abstract justice of the case, and looks solely at the inquiry, whether the defendant holds money, which belongs to the plaintiff.

*Bank of Saipan v. CNG Fin. Corp.*, 380 F.3d 836, 840 (5th Cir. 2004) (quoting *Staats v. Miller*, 150 Tex. 581, 243 S.W.2d 686, 687-88 (1951)). Such a claim "is equitable in nature" and "is not premised on wrongdoing, but looks only to the justice of the case and inquires whether the defendant has received money which rightfully belongs to another." *Plains Exploration & Prod. Co. v. Torch Energy Advisors Inc.*, 473 S.W.3d 296, 302 n.4 (Tex. 2015) (internal quotation marks and citations omitted).

United contends that the Lab Defendants' "illegal offering, payment, and receipt of remuneration for referrals entitles [it] to recover the amounts of its money . . . received and paid out in violation of Texas's Patient Solicitation Act—Texas Occupations Code § 102.001." Mot. at 21. But, as the Lab Defendants point out, the state courts of Texas have not found that § 102.001 or any provision of the referenced Act confers a private right of action. Resp. at 26. Section 102.001 makes certain acts of soliciting patients a criminal offense. Although the Southern District of Texas cites to the statute when imposing liability in an "Opinion on Debt and Truculence," *see Humble Surgical Hosp., LLC*, 2016 WL 7496743, at *2 n.9, the case likewise provides no basis for finding that Texas would recognize a private cause of action under the Act.

But whether Texas would recognize a private cause of action under § 102.001 is not truly the correct inquiry. Texas recognizes a cause of action for money had and received. The pertinent question thus seems to be whether *Humble* or § 102.001 dictate entry of summary judgment on the facts of this case. And, as a criminal statute, § 102.001 certainly does not dictate that result standing alone.

Nor does *Humble* in combination with § 102.001. First, *Humble* merely cites to the statute without discussing its criminal nature. The case, moreover, is readily distinguishable on several fronts from the case now before the Court. Unlike the shell entities at issue in *Humble*, 2016 WL 7496743, at *2, the Lab Defendants have existing assignments from the patients that may entitle them to benefits. The *Humble* entities did "nothing except cash checks," *id*., whereas the Lab Defendants provided lab services to patients. The defendant in *Humble* was the hospital who "kicked back to the doctors thirty percent of its collections" and the damages were imposed against the hospital. *Id*. The insurance company in *Humble* sought "to recoup money that it improperly paid because of Humble's fraud," *id*., but United has not sought summary judgment on its fraud claims at this point. The defendant in *Humble* had no defense because the court had struck its "answer and counterclaims" as a sanction for "its malfeasance." *Id*. This case presents no such sanction to prohibit the Lab Defendants from defending the claim.

United's premise for its money-had-and-received claim stands entirely on § 102.001 and *Humble*'s citation to that provision. But United has not shown that *Humble*, § 102.001, or any other basis entitles it to judgment as a matter of law on the facts and circumstances of this case. To the contrary, viewing the evidence in the light most favorable to the Lab Defendants, the Court finds that United has not shown that it is entitled to judgment as a matter of law on its money-had-and-received claim. At the very least, a genuine dispute of material fact exists as to

whether the Lab Defendants hold money which belongs to United as a matter of equity and good conscience. Consequently, granting summary judgment on United's equity claim is improper. *See Midwestern Cattle Mktg., L.L.C. v. Legend Bank, N. A.*, 800 F. App'x 239, 246-47 (5th Cir. 2020) (per curiam).

### 3. <u>Personal Liability</u>

United asserts that Saucedo and Dr. Murphy are personally liable to the wrongful conduct alleged in the motion for summary judgment and that they are jointly liable as co-conspirators with Mission, Sun Clinical, and Integrity. Mot. at 25. "It is well settled law that when corporate officers directly participate in or authorize the commission of a wrongful act, even if the act is done on behalf of the corporation, they may be personally liable." *Moss v. Ole S. Real Estate, Inc.*, 933 F.2d 1300, 1312 (5th Cir. 1991) (citing *Mozingo v. Correct Mfg. Corp.*, 752 F.2d 168, 173 (5th Cir. 1985)). As discussed herein, United has not shown any wrongful act that entitles it to summary judgment. Accordingly, it is premature to determine whether an individual defendant is personally liable for wrongful conduct of any entity defendant. Under Fed. R. Civ. P. 56(a), the courts grant summary judgment only when the movant has shown entitlement to judgment as a matter of law. On the motion now before the Court, United is not entitled to judgment as a matter of law on its assertion of personal liability against the two individual defendants.

### VI. CONCLUSION

For the foregoing reasons, the Court **DENIES** *United's Motion for Partial Summary Judgment* (ECF Nos. 173 (redacted) and 179 (unredacted and sealed)), **DENIES** *United's Motion to Strike Defendants' "Declarations of Marketers Involved in Lab Outreach Program"* (ECF Nos. 201 (redacted) and 212 (unredacted and sealed)), **DENIES** *United's Motion to Strike Defendants' Evidence of "Audit Responses"* (ECF No. 204), and **GRANTS** *Lab Defendants' Opposed Motion for Leave to File Sur-Reply* (ECF No. 220). The Court has considered the sur-

reply (ECF No. 220-1) attached to the motion for leave and there is nothing more the Clerk of

Court needs to do regarding that filing.

      **SIGNED this 4th day of November 2020.**

**JASON PULLIAM**
**UNITED STATES DISTRICT JUDGE**